MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
DAVID E. AZAR
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com
*Plaintiffs' Attorney*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DAWN DANGAARD, a/k/a ALANA
EVANS; KELLY GILBERT, a/k/a KELLY
PIERCE; JENNIFER ALLBAUGH, a/k/a
RUBY; and      on behalf of themselves
              and all others similarly situated,

　　　*Plaintiffs,*

v.

INSTAGRAM, LLC;
FACEBOOK OPERATIONS, LLC;
FENIX INTERNET LLC;
FENIX INTERNATIONAL INC.;
META PLATFORMS, INC.;
LEONID RADVINSKY;
and JOHN DOES 1-10,
　　　*Defendants.*

CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED

_____

Plaintiffs allege as follows upon personal knowledge and upon information and belief
based upon the investigation of counsel:

## I.　INTRODUCTION

1.　　This case is about a corrupt business gaining an enormous advantage over its
competitors by wrongfully manipulating behind-the-scenes databases, and in the process, harming
thousands of small entrepreneurs who rely on social media to promote sales of their product and
earn a living.

**1**

2.      Plaintiffs and Class Members are performers in the online adult entertainment business and anyone else (regardless of the description they use for themselves, such as influencer or artist) who provided content to a competitor of OnlyFans and was harmed by the alleged scheme ("AE Providers" or "AE Performers").  They make their performances available to consumers through online adult entertainment businesses that provide websites and serve as platforms ("AE Platforms").  Consumers are charged to access the content, with the revenue split between the AE Platform and the AE Provider. AE Providers rely on interactions on social media platforms such as Instagram and Twitter to guide customers to their pages on AE Platforms. Without the social media sites, the business model for the industry is dead.

3.      Collusion between certain employees or agents of Meta Platforms, Inc. and its subsidiaries (such as Facebook and Instagram), and the OnlyFans adult entertainment business and those affiliated with it, has had severe repercussions. The collusion systematically and methodically damaged or destroyed the businesses of many competing AE Platforms and with that unfairly harmed the livelihoods of Plaintiffs and Class Members featured on those platforms by eliminating or reducing their visibility on social media. Some of those performers and businesses were destroyed.

4.      Up until late 2018 or early 2019, the online adult entertainment industry was a vibrant, competitive market. That is when AE Providers that had promoted competitors of OnlyFans suddenly began to experience a drop-off in traffic and user engagement on social media platforms. The deletion and hiding of posts, and reduction in social media traffic for certain providers, started to occur suddenly and was so substantial and so dramatic that it could not have been the result of filtering by human reviewers of social media content. The business lifeblood of certain AE Providers and AE Platforms appeared to be blocked so consistently that only automated

processes could be responsible. But performers associated exclusively with OnlyFans were not affected in the same way. As a result, OnlyFans began to grow incrementally, and then exponentially -- rocketing up the internet traffic rankings -- and quickly became one of the most dominant players in the adult industry, while most of OnlyFans' competitors stagnated or saw dramatically reduced traffic and revenue.

5.     The Complaint alleges that the Defendants in this action orchestrated a scheme through which they caused AE Performers associated with OnlyFans' competitors to be "blacklisted" by certain social media platforms for the purpose of reducing competition with OnlyFans. "Blacklisting" is a process whereby social media accounts are identified to certain social media platforms in a way to prompt those platforms to suspend or delete those accounts or otherwise reduce their visibility. The blacklisting process was accomplished first internally at Instagram/Facebook by automated classifiers or filters, which were then submitted to a shared industry database of "hashes," or unique digital fingerprints. This database was and is intended to flag and remove content produced by terrorists and related "Dangerous Individuals and Organizations" to curtail the spread of terrorism and violent extremism online.  However, the AE Performers blacklisted, and the AE Platforms injured by the blacklisting, were not terrorists and had nothing to do with terrorism of any kind.  The scheme was intended to destroy the AE Platforms' businesses, and either destroy the AE Providers or force them to work exclusively through OnlyFans.

6.     According to a recent BBC article, Meta claims it investigated but found no evidence the shared hash database had been abused.  Meta did not say the scheme did not happen, just that it found no evidence of it and therefore the claim had no merit.  Meta did not explain what triggered its investigation or how it conducted the investigation. Plaintiffs believe Meta did not

investigate thoroughly enough and encourage it to make this information available for independent review.

## II.    PARTIES

7.    Plaintiff Dawn Dangaard is a professional adult entertainment performer.  Her stage name is Alana Evans.  In this Complaint, "Alana Evans" refers to Plaintiff Dangaard. She is also the president of the Adult Performance Artists Guild ("APAG"), a federally recognized labor union whose goals are "to earn employee rights, set performer responsibilities, negotiate fair practices, and help performers provide themselves with a better future." She is a citizen of California.

8.    Plaintiff Kelly Gilbert is a professional adult entertainment performer. Her stage name is Kelly Pierce. In this Complaint, "Kelly Pierce" refers to Plaintiff Kelly Gilbert.  She is Secretary of the APAG.  She is a citizen of Illinois.

9.     Plaintiff Jennifer Allbaugh is a professional adult entertainment performer. Her stage name is Ruby. In this Complaint, "Ruby" refers to Plaintiff Allbaugh. She is Vice President of the APAG.  She is a citizen of Ohio.

10.    Defendant Fenix International Limited ("Fenix") is a private, limited company registered under the laws of the United Kingdom and Hong Kong, with its principal place of business at 4th Floor Imperial House, 8 Kean Street, London, WC2B 4AS United Kingdom. Based on public information, Fenix also conducts business or has operations (directly or through subsidiaries or affiliates) in the United States, Manila, Singapore, Tokyo, New Delhi, and Bangkok.  Fenix operates the OnlyFans AE Platform.

11.    Defendant Fenix Internet, LLC ("Fenix Internet") is a Delaware limited liability company that is headquartered in Florida. On information and belief, Fenix Internet, LLC is a

wholly owned subsidiary of Fenix. Accordingly, for purposes of diversity jurisdiction, its citizenship is the same as Fenix.  On information and belief, customer charges for the OnlyFans website have appeared as "Fenix Internet LLC" on customer bank statements; accordingly, on information and belief, Fenix Internet LLC receives, and is a conduit for, funds wrongfully obtained and/or proximately connected to the tortious conduct alleged herein.

12.    Leonid Radvinsky ("Radvinsky") is an individual who resides in Palm Beach County, Florida.  He is the owner of the OnlyFans AE Platform, https://onlyfans.com/, through his ownership of Fenix, and he controls Fenix Internet. Radvinsky is also the founder and owner (through a holding company) of the cam site "myfreecams"; on information and belief, Radvinsky also owns or controls "stars.avn.com." Those sites are referred to herein as the Radvinsky-affiliated sites.  He is a citizen of Florida.

13.    Defendants Fenix, Fenix Internet, and Radvinsky are collectively referred to as the "Radvinsky Defendants."

14.    The Radvinsky Defendants are subject to the personal jurisdiction of this Court because (i) they operate, conduct, engage in, and carry on business in California and (ii) they caused injury to Plaintiffs and to Class Members in California arising out of activities in California. The Radvinsky Defendants are subject to the personal jurisdiction of this Court because they engaged in substantial and not isolated activity within this district.

15.    Defendant. Meta Platforms, Inc. ("Meta") is a Delaware corporation with its headquarters and principal executive offices in this district at 1601 Willow Road, Menlo Park, California 94025. It is a citizen of Delaware and California.  Prior to December 1, 2021, Meta was known as Facebook Inc. It is the owner and operator of, among other things, two large social media platforms, Facebook and Instagram.

16.     Defendant Instagram, LLC is a wholly owned subsidiary of Defendant Meta.  It is the operator of the Instagram social media platform. It is organized under the laws of Delaware. On information and belief, its sole Member is Meta so its citizenship is the same as that of Meta.

17.     Defendant Facebook Operations, LLC is a wholly owned subsidiary of Defendant Meta. It is organized under the laws of Delaware. It is the operator of the Facebook social media platform. On information and belief, its sole member is Meta so its citizenship is the same as that of Meta.

18.     Meta and its subsidiaries are vicariously liable for the acts of their agents and employees enumerated in this Complaint on the basis of respondeat superior, as the tortious acts of its employees arose out of and are engendered by their employment, along with other principles of vicarious liability, along with liability for its own conduct, including lack of internal controls.

19.     John Does 1-10 are employees and/or agents of Meta and its subsidiaries who participated in the scheme detailed below. Because the identities individuals are not currently known to Plaintiff, they are collectively named as John Does.

20.     Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned herein, each Defendant acted as the actual or ostensible agent, employee, and/or co-conspirator of each other Defendant and, in performing the actions alleged herein, acted within the course and scope of such agency, employment, and/or conspiracy.

21.     Plaintiffs and Class Members were harmed by each Defendant, or each Defendants' employees, tortious conduct as alleged herein, and each Defendant, is responsible for the harm because, and to the extent, each was part of a conspiracy to commit the torts alleged herein by (1) being aware that one or more of the other Defendants planned to do one or more of the wrongful acts alleged herein, and (2) agreed with one or more of the other Defendants and intended that the

1   wrongful act be committed, or (3) was responsible in its capacity as employer of conspirators for

2   the acts in furtherance of the conspiracy taken by such employees in the course of their

3   employment. Plaintiffs allege that each Defendant, or their agents and employees, cooperated, or

4   agreed to cooperate, for one or more of the harms alleged that was committed by one or more of

5   the other Defendants as co-conspirators.

6       22.    At all times mentioned herein, a unity of interest and ownership existed, and still

7   exists, among the Radvinsky Defendants, such that the separate personalities of the companies and

8   the individuals did not, and do not, exist, and adherence to the fiction of a separate legal existence

9   would promote injustice.

10              **III.    JURISDICTION AND VENUE**

11      23.    This Court has jurisdiction over this action under the Class Action Fairness Act

12  ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the

13  aggregated claims of the individual class members exceed the sum or value of $5,000,000.00

14  exclusive of interest and costs, and some of the members of the proposed class are citizens of states

15  different from each of the Defendants.

16      24.    All Defendants have sufficient minimum contacts with California to be subject to

17  this Court's personal jurisdiction. Defendant Meta and its subsidiaries have their principal place

18  of business in this District. Defendants Fenix, Fenix Internet, and Radvinsky intentionally avail

19  themselves of the markets within California through the promotion, sale, marketing, and

20  distribution of their adult entertainment platforms in this district, which renders this Court's

21  exercise of jurisdiction necessary and proper. In addition, on information and belief, acts in

22  furtherance of the conspiracy occurred in this district at or through (e.g., via technology or systems)

23  the offices of defendant Meta and its subsidiaries.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants Meta, Instagram, LLC, and Facebook, LLC are based in this District, and a substantial part of the events giving rise to the claims occurred in this district (e.g., via technology or systems). Alternatively, Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Defendant Meta is subject to this court's personal jurisdiction, and there is no other district where this action could be brought.

## IV.     FACTS

### A.     The Scheme

26.     Plaintiffs allege that Defendants engaged in a scheme to cause performers who worked with competitors of OnlyFans – including Plaintiffs – to be "blacklisted" by social media platforms, including social media platforms owned and operated by entities other than Meta or its subsidiaries, for the purpose of interfering with those AE Platforms' business and reducing competition with OnlyFans. "Blacklisting" is a process whereby social media platforms suspend or delete particular accounts or otherwise reduce their visibility. Blacklisting is typically accomplished by automated classifiers or filters that keep particular websites or pages from appearing on social media platforms or appearing in the results shown by search engines pursuant to user queries. Plaintiffs are not making a claim against anyone for the act(s) of classification/filtering themselves in the normal course by the social media platforms.  They are suing Defendants for wrongfully causing their social media content, and that of fellow Class Members, to be identified for blacklisting at multiple social media platforms and included in training data for a "classifier" (a technical term referring to a learning algorithm  that learns a model from training data) or filtering list used by multiple social media platforms and other

technology companies. The identification for blacklisting is evidence of the scheme and has caused Plaintiffs' and Class Members' to be damaged.

27.     This complaint uses the words "classifier" or "classification" in the technical sense as they relate to machine learning. Specifically, as explained in one article: "Classification is the process of predicting the class of given data points. Classes are sometimes called targets/ labels or categories. Classification predictive modeling is the task of approximating a mapping function (f) from input variables (X) to discrete output variables (y). *For example, spam detection in email service providers can be identified as a classification problem*. This is a binary classification since there are only 2 classes as spam and not spam. A classifier utilizes some *training data* to understand how given input variables relate to the class. In this case, known spam and non-spam emails have to be used as the training data. When the classifier is trained accurately, it can be used to detect an unknown email. Classification belongs to the category of supervised learning where the targets also provided with the input data."[1] (Emphasis added.)

28.      For ease of reference, throughout this complaint the word "database" is used generically to refer to a collection of data and information and includes the training data used for a classifier; when the context requires, the word database also refers to the database management system and applications associated with them so that the term refers to both the data and the program/application that uses it.

29.     The AE Providers relevant to this lawsuit are adult performers who create content posted on their accounts on AE Platforms. Customers are charged to access the content, with the revenue split between the AE Platform and the AE Provider. The AE Providers attempt to drive

---

[1] Machine Learning Classifiers, https://towardsdatascience.com/machine-learning-classifiers-a5cc4e1b0623.

traffic to their accounts on the AE Platforms by posting on social media services, such as using their personal Instagram accounts.

30.     AE Providers drive traffic to their accounts on the AE Platforms by posting on their personal social media accounts, such as their Instagram accounts.  One important mechanism for service providers to establish and maintain connections with potential customers over social media is by attracting "followers."  Social media users may choose to "follow" any other account (whether or not that followed is promoting commercial services) by pressing the "Follow" button, thus affirmatively requesting that they be notified when the followed individual has posted new content. "Followers" may ultimately become paying customers on AE Platforms.

31.     Up until the fourth quarter of 2018, the online adult entertainment industry was a vibrant, competitive market with AE Platforms, large and small.

32.     In October 2018, the controlling interest in Fenix changed ownership, with Radvinsky acquiring 100 percent of the company.

33.     Soon after Radvinsky's acquisition of OnlyFans through his purchase of Fenix, AE Providers that had ever worked with competitors of OnlyFans suddenly began to experience a drop-off in traffic and user engagement on social media platforms (with the effects first appearing for some AE Providers, and then seeming to expand to others over several months, consistent with more AE Providers being targeted).  AE Providers that used OnlyFans' competitors as platforms for their content experienced having many posts deleted by the social media services, other posts being "hidden" from users searching for the sites and from users who had chosen to "follow" the site, and the number of click-throughs from those posts that did appear on social media services dropped drastically. This deletion of posts and reduction in traffic was most noticeable on Instagram but on information and belief also occurred on Twitter, Facebook, Snap, and other

platforms. The combination of deleted and hidden posts led to reduced click-throughs and substantially reduced visibility for the AE Providers on social media. On information and belief, the effect on AE Providers appeared to extend as far as reduced visibility on Google's search engine.

34.     The deletion and hiding of posts, and reduction in social media traffic for certain AE Providers started to occur suddenly and was so substantial and dramatic that, on information and belief, it could not have been the result of filtering by human reviewers of social media content. Rather, the takedowns and other adverse actions and reduced traffic suggested that the social media services were using computer algorithms that automatically classify/filter content without human intervention. Put another way, the postings and traffic that were the business lifeblood of certain AE Providers appeared to be blocked so methodically, systematically, and consistently that only automated processes could be responsible.

35.     On information and belief, AE Providers who had *only* promoted OnlyFans online or the Radvinsky-affiliated sites, and had never promoted or affiliated online with any of OnlyFans' competitors, appeared to be unaffected by these automated takedowns and reduced traffic. They did not experience the dramatically reduced visibility on social media that was experienced by AE Providers who worked with OnlyFans' competitors.

**B.      The Success of the Scheme**

36.     Many of these AE Providers had little to no previous experience being subjected to such classifications/filtering. Effectively overnight, their traffic dropped without any apparent reason. But OnlyFans' traffic did not drop, even though OnlyFans was providing the same type of content as its competitor AE Platforms.

37.     As a result, external links to OnlyFans pages became ubiquitous on Instagram.  AE Providers were allowed to freely promote their OnlyFans pages on Instagram, and as long as the AE Providers had only ever promoted OnlyFans on Instagram (or one of Radvinsky's two other affiliated sites), they were significantly less likely to be impacted by classifiers/filtering.

38.     As a result, OnlyFans began to grow incrementally, and then exponentially -- rocketing up the internet traffic rankings -- and quickly became one of the most dominant players in the adult industry, while most of OnlyFans' competitors stagnated or saw dramatically reduced traffic and revenue. Within a few years, OnlyFans became the 129th largest website in the world, the 86th largest website in the United States, the 8th largest adult website in the world (including all free sites), and the 4th largest adult pay website in the world. The chart below shows the growth of Only fans, measured by total web traffic as determined by Similarweb, from June 2019 through June 2021.



39.     On information and belief, through online postings and anecdotal observation of Instagram, it appears that many of the AE Providers that were promoting themselves in 2018 and

2019 on social media have been deleted or had their visibility dramatically reduced on social media services, particularly on Instagram.

40.     Third-party traffic data shows that, over a two-year period of 2019-2020, AE Platforms that compete against OnlyFans were losing traffic sourced from social media while only OnlyFans increased traffic sourced from social media. Examples of traffic losses experienced by competitors of OnlyFans in the June 2019-June 2021 period appear below:







41.     The use of a classifier to blacklist AE Providers who had promoted, or affiliated online with, any of OnlyFans' competitors, and thus to suppress traffic to OnlyFans' competitors, was experienced on multiple social media services, indicating that the social media companies were sharing information about OnlyFans' competitors and AE Providers who promoted or affiliated with them.  Social media companies are allowed, under their terms of service, to control

content on their services, and they are protected in some circumstances from liability for removing content in good faith. However, the classification/filtering effects experienced by OnlyFans' competitors can be explained only by the social media services' reliance on one or more databases – individual (to that service), and shared (among the services) – that blacklisted AE Providers that had used OnlyFans' competitors, and blacklisted certain AE Platforms that competed with OnlyFans but did not blacklist OnlyFans or the Radvinsky-affiliated sites.

### C.   Individual Plaintiffs' Injuries

42.   Plaintiff Alana Evans has been a prominent AE Provider long before the events described in this Complaint. She had used Instagram to promote her Adult Entertainment content on several different AE Platforms, none of which were associated with the Radvinsky Defendants. By 2019, Evans had over 100,000 followers on Instagram.

43.   Beginning in March 2019, Evans noticed that her followers were receiving many fewer of her posts than they had previously received.  She made inquiries on behalf of herself, as well as on behalf of other member of the APAG, but did not receive any clear explanation of why this was happening.

44.   On January 24, 2020, Instagram deleted Evans' account, so that none of the content in her account could be seen, and she could not log in to make new posts.  She had received no explanation for why this occurred.  Following complaints to Instagram from Evans and from followers, as well as coverage in the adult entertainment trade press, the account was reinstated, but the reach of her post was vastly reduced. For example, the publicity from the unexplained deletion of her account resulted in an immediate increase of about 30,000 followers, but those followers disappeared almost immediately afterwards.

45.     While Evans remained a popular performer, so that increasing numbers of potential customers followed her on Instagram, the content that she produced was not served to most of her followers. Evans now has almost 300,000 followers, but many of her posts are viewed by less than 2,000 users, indicating that the content is not reaching the vast majority of her followers. The loss of social media reach has adversely affected Evans' revenue, which remains lower than it had been in previous years.

46.     The scheme also affected Evans by causing competitors of OnlyFans, with whom she had contractual dealings, to go out of business, thus forcing her to the OnlyFans platform. For example, in February 2020, Evans' AE Platform Provider, https://cams.com, was driven out of business, and to remain in business she had no choice but to move some of her content to OnlyFans.

47.     Representative Plaintiff Kelly Pierce is an active AE Provider. She has worked with several different platforms over the past decade, including Chaturbate and Streamate, and has also posted content to OnlyFans. She began promotion on Instagram before that platform was acquired by Facebook, Inc. (now Meta) in 2012. She had about 75,000 followers in 2021.

48.     In about 2019, Pierce began to notice that her posts were reaching fewer followers, leading to fewer click-throughs to her AE Platforms. She received regular complaints from long-time fans that they were unable to find her posts on Instagram and Snap. In March 2021, her Instagram site was deleted in its entirely. Instagram refused to reinstate the existing site, but it permitted her to open a new promotional account after a few months. However, complaints have persisted that the new account is often not visible to her fans, and she has only 6,000 followers at her new account. In November 2021, her Snap account was deleted in its entirety.

49.   In addition to the account deletion, Pierce has also had numerous individual posts deleted on both Instagram and Snap.  She believes that posts promoting content at sites other than OnlyFans are especially likely to be deleted.  As a consequence of reduced visibility on social media, Pierce has experience decreasing revenue since 2019.

50.   Representative Plaintiff Ruby has been an AE Provider for over 30 years. In recent years, her principal platform has been sexpanther.com, and she also uses AE Platforms unfiltered.com and loyalfans.com, as well as OnlyFans and the Radvinsky-affiliated site avnstars.com.  She was never exclusively associated with OnlyFans or the Radvinsky-affiliated sites.

51.   Ruby has used social media to promote her own content, including Facebook and Instagram, which she joined in 2014. She now has about 2,000 followers on Instagram.  However, beginning in 2018, she has experienced unexplained deletions of posts on Instagram, and unexplained loss of distribution of her posts to followers, as well as reduced search engine traffic. She has experienced a loss of revenue due to the loss of social media visibility.

### D.   How the Scheme Worked

52.   On information and belief, individual and shared classification/filtering databases include, but are not limited to, those which identify and block fake accounts, spam accounts, and terrorist content, such as the Global Internet Forum to Counter Terrorism ("GIFCT") Shared Hash Database and URL sharing.

53.   The GIFCT was created in 2016 by Meta (then known as Facebook, Inc.), Microsoft, Twitter, and YouTube (a subsidiary of Google). The GIFCT has a shared industry database of "hashes," or unique digital fingerprints, of violent terrorist content that had been

1  flagged and removed from their services to curtail the spread of terrorism and violent extremism

2  online.  GIFCT also has a program to share URLs, coordinated with an outside vendor.

3      54.  In addition to the founding member companies, the GIFCT lists thirteen general

4  members: Tumblr, WordPress, Justpaste.it, Airbnb, Mailchimp, Discord, Instagram, WhatsApp,

5  Pinterest, Amazon, Dropbox, Mega, and LinkedIn.  In addition to these companies, on information

6  and belief, the GIFCT engages with more than 120 tech companies, including smaller platforms

7  that lack the resources to develop their own classifier/filtering systems.

8      55.  One purpose of the GIFCT is to allow members to share hashes (and also URLs) in

9  order to identify and quickly remove potential terrorist content on their respective platforms,

10  sometimes referred to as content originating from "dangerous individuals or organizations," or

11  DIO.  On information and belief, each of the GIFCT members uses the shared hash tags (and

12  URLs) in their own way, based on their classification/filtering/machine learning/artificial

13  intelligence system(s).

14      56.  In order to generate the hashes (and URLs to share), each GIFCT member has its

15  own list (or structured data), sometimes referred to as its dangerous individuals and organizations

16  list, comprised of individuals and organizations (and their associated URLs and other electronic

17  identifying data) that are designated as terrorists, terrorist sympathizers, or otherwise a dangerous

18  organization or individual.  Computer algorithms use that data to generate unique hashes of content

19  from organizations and individuals to be classified/filtered due to their supposed connection with

20  or promotion of (including by linking to, liking, or tagging) those terrorist/dangerous organizations

21  or individuals.  On information and belief, the GIFCT members share their dangerous

22  organizations lists (particularly through sharing URLs), and also the shared hash database (of

23  content).

57.     In a recent transparency report, the GIFCT reported over 300,000 unique hashes in its database, consisting of approximately 250,000 distinct images and approximately 50,000 distinct videos.

58.     None of the associated content in the GIFCT shared hash database is presently available for independent review or audit.

59.     During the time relevant to the allegations in this Complaint, Instagram, a social media platform owned and operated by Meta through its Instagram subsidiary, drove significant traffic to external adult websites (i.e., the AE Platforms).  Instagram has been one of the primary platforms used by content AE Providers to drive traffic to OnlyFans and competitors of OnlyFans.

60.     Just months before Radvinsky acquired OnlyFans, when the OnlyFans website was still owned by the Stokely family, Facebook's own transparency report shows a sudden 500% increase in content removed for terrorist propaganda and a 66% increase in content removals for Adult Nudity and Sexual Activity in Q2 2018, occurring in unison. On information and belief, one or more of the as-yet unidentified participants in the scheme to wrongfully include AE Providers in the shared filtering database tested the scheme and prepared to implement the scheme in advance of an acquisition.   On information and belief, the scheme started going into effect soon after Radvinsky acquired OnlyFans in October 2018. On information and belief, it was the Stokely family that provided the link between Radvinsky and at least some of his as-yet unidentified co-conspirators and/or aiders and abettors at a major social media service.

61.     On information and belief, due to the misuse of one or more individual and shared databases, social media services removed accounts and hid posts of AE Providers who used AE Platforms competing with OnlyFans and the identifying URLs and other information for those competing AE Platforms. This affected (i) AE Providers who at any point promoted a competitor

of OnlyFans and (ii) AE Platforms that compete against OnlyFans. But the removals had a much smaller effect on OnlyFans and the Radvinsky-affiliated sites. While some AE Providers who worked with both OnlyFans and other AE Platforms were deleted or hidden, those who *always* linked their postings on social media services *only* to OnlyFans, or the Radvinsky-affiliated sites, were allowed to remain.

62.     On occasion, takedowns were reversed when AE Providers complained to social media services, and postings and accounts that had been removed were restored. On information and belief, these reversals did not change any training data for a "classifier" or any individual or shared database that identified those AE Providers or their content as  terrorists, terrorist sympathizers, or otherwise a dangerous organization or individual. In other words, a takedown might be reversed because a social media service decided that particular content was not, for example, adult content, but it would not change the separate classification of the person, organization or their associated content as (or related to) terrorists, terrorist sympathizers, or otherwise a dangerous organization or individual in the separate lists, training data, and databases for that purpose.  Thus, on information and belief, because the reversals happened only at the individual social media company level – e.g., by Instagram and Facebook -- it did not change the fact that the training data and individual or shared databases of terrorist or dangerous individuals, organizations, and/or associated content still had the names, IP addresses and URLs of those AE Providers and AE Platforms in those training data or databases (along with their hashed content), and thus those AE Providers and AE Platforms continued to suffer wrongful filtering. This had the effect of further concealing the scheme to AE Providers while also ensuring that the targeted AE Provider would continue to have their content removed or hidden in the future.

63.     On information and belief, there is no statistical or other benign explanation (such as better marketing) for the disproportionate classification/filtering treatment of and effects on both (i) OnlyFans' competitors on social media platforms and (ii) AE Providers who had ever promoted or affiliated with OnlyFans' competitors, leaving the conclusion that it was caused by a manipulation of one or more of the individual databases (or sets of training data) that was then shared in part or in full among multiple companies for the purpose of harming the competitors of OnlyFans and their AE Providers, and to cause a net benefit to OnlyFans and its AE Providers who never promoted any OnlyFans competitor.

64.     The combination of the following six facts -- (i) sudden volume of increased content classification/filtering starting soon after October 2018 across multiple online platforms, (ii) massive spike in content classification/filtering activity specifically targeting AE Providers in the adult industry that is inconsistent with human filtering, (iii) disproportionate impact of classification/filtering on AE Platform competitors of OnlyFans, (iv) mysterious immunity of OnlyFans and the Radvinsky-affiliated sites to a similar level of impact from this new heightened classification/filtering activity, (v) subsequent mass migration of AE Providers from competitors of OnlyFans to OnlyFans, to the point that external links to OnlyFans virtually took over the Instagram platform, while AE Providers who promoted competitors to OnlyFans continued to have their posts removed, visibility reduced (as shown by reduced click-throughs from social media postings), user engagement reduced, and pages deleted, and (vi) such a dramatic shift in OnlyFans' market position as to adult content providers at the detriment of other competitors -- can only be explained by the manipulation  of one or more persons of information in one or more of the individual databases that was later shared in part or in full with other social media companies, including but not limited to manipulation of training data for a "classifier."

65.    One or more DIO lists, combined with the GIFCT Shared Hash Database and URL sharing program, would have served as the ideal training data for a classifier/filtering tool to create this blacklisting effect, particularly in 2018 and 2019.

66.    On information and belief, the anti-terrorism and anti-DIO tools at individual social media services,  which were shared at least in part with other social media services (including but not limited through the GIFCT), were the only ones capable of the broad blacklisting competitors of OnlyFans, and the AE Providers who had ever promoted them, experienced in 2018 and 2019.

67.    Plaintiffs have nothing to do with terrorism, are not terrorist sympathizers, or DIOs. And on information and belief, the same is true for the other AE Providers and AE Platforms targeted by Defendants and the presently unknown participants.   On information and belief, Plaintiffs and other AE Providers were blacklisted as terrorist organizations or individuals, sympathizers, or otherwise as dangerous organization or individuals, and content associated with them was hashed and shared with the GIFCT, along with certain URL data, with the goal of harming the businesses of AE Platforms that competed with OnlyFans, in order to improve the market position, revenue, power, and otherwise benefit OnlyFans and its owner, Radvinsky.

68.    On information and belief, after the Defendants originally executed the scheme by using individual social media companies' anti-terrorism tools (such as their lists of dangerous individuals and organization, combined with wrongly populating training data and databases, and then sharing hashed content and URLs through the GIFCT programs), new shared databases or systems beyond the individual anti-terrorism tools and GIFCT may have also been utilized to negatively impact both (i) AE Providers that promoted any competitor websites to OnlyFans and (ii) the competitor AE Platforms.

69.     On information and belief, the scheme required and involved (i) officers, directors, or managing agents of Meta and its subsidiaries with the ability to add and/or manipulate content on one or more individual lists of dangerous organizations and individuals and/or databases (including training data) which were then shared in part or in whole with multiple online service providers, to (ii) direct the company's employees or agents to manipulate the content and/or the use of that/those list(s) of dangerous organizations/individuals or database(s)/training data for the purpose of wrongfully suppressing content posted by users of AE Platforms that compete with OnlyFans, and protect OnlyFans and Radvinsky-affiliated sites  from similar content suppression.

70.     Further, on information and belief, Radvinsky and one or more other owners, officers, directors, or managing agents of Fenix and/or Fenix Internet provided the information used by agents of Meta and its subsidiaries to add false classifier/filtering information to the individual databases/training data and/or lists of dangerous organizations and individuals (i.e., falsely identifying an AE Provider or AE Platform, or their associated content, as terrorist related or as a dangerous individual or organization), some or all of which were then included in one or more shared databases or lists, in order to effectuate the scheme, and otherwise provided direction to it, and aided and abetted and/or conspired to pursue the scheme.

71.     Plaintiffs intend to amend this complaint as the identity of the Does are identified.

72.     On information and belief, there must be an economic incentive for the parties engaging in the scheme.

73.     The Radvinsky Defendants' economic incentive to engage in this scheme is obvious: it dramatically increased the market share and revenue of OnlyFans, which provided more money to, and increased valuation of, Fenix and Fenix Internet. Radvinsky created a no-lose situation in which he purchases OnlyFans and essentially guarantees that its business will improve.

74.     The agents and employees of Meta and its subsidiaries benefited economically in return for their participation in manipulating one or more individual databases and/or lists of dangerous organizations and individuals and for classification/filtering that was later shared in part of in whole with other companies to benefit OnlyFans, and thus Fenix, Fenix Internet, and Radvinsky.

75.     On information and belief, the economic benefits included payments to one or more of the agents of Meta and its subsidiaries, which were accomplished in a way to minimize the chance of discovery.

76.     On information and belief, such payments occurred in a jurisdiction where discovery of it would be more difficult and receipt easier to hide.

77.      Fenix (which directly operates OnlyFans) also maintains a secret entity – non-party Fenix International Limited Hong Kong – that is not advertised or disclosed anywhere on the OnlyFans.com website.

78.     However, OnlyFans did advertise its Hong Kong office through online job postings and listed an individual by the name of RJ Phillips as a member of their Hong Kong-based team.

79.     The law of Hong Kong makes it very difficult to obtain discovery for a proceeding in a foreign court.

80.     Fenix International Hong Kong, and a different entity that was listed as its Secretary during the key period that the scheme was implemented, Smart Team International Business Limited Hong Kong, share the same physical address in Hong Kong.

81.     Therefore, on information and belief, Radvinsky could have used either Smart Team International Business Limited Hong Kong or Fenix International Hong Kong to make the scheme-facilitating payments.

82.     Additionally, according to online job posting, OnlyFans also does business in Singapore, Japan, India, the Philippines, and Thailand.

83.     The law in some of those countries makes it very difficult to obtain discovery for a proceeding in a foreign court, and some are not parties to the Hague Evidence Convention.

84.     On information and belief, some or all payments to Does 1-10, that were made or directed to be made by Radvinsky on behalf of or through an entity he controls, were routed through entities in Hong Kong, including but not limited to one of the Fenix entities' affiliates or Secretaries, to obfuscate the source of funds. As such, on information and belief, payments to Does 1-10 moved through banks located in Hong Kong to accounts by third parties affiliated or otherwise assisting Defendants.

85.     On information and belief, as of today's date, the anti-terrorism tools and GIFCT may or may not continue to be utilized to perpetuate the scheme. Discovery may reveal that Radvinsky and his co-conspirators have moved on to utilize newer databases or systems to further OnlyFans' unfair competitive position relative to its competitors in the online market for adult entertainment content.

86.     On information and belief, after the scheme was implemented, Defendants and other participants in the scheme over time *attempted to cover their tracks by various means*, including but not limited to (i) changing the identifying names on the social media companies' lists of dangerous individuals and organizations and other shared databases or services while leaving intact the URL, IP addresses, and other technical information for the automated computer filtering system to use, and/or (ii) shifting the scheme to a different classifier or content filtering system, and/or (iii) determining that the behind the scenes hashed tag database and effect of the URL sharing contain enough linkage to competitors of OnlyFans (and the AE Providers who

*Dangaard v. Instagram, LLC et al.*  Class Action Complaint

promote them) that they no longer need to be listed explicitly on the manually curated list(s) or databases/training data of terrorists and other dangerous organizations and individuals made available to human reviewers.

87.   As a result of Defendants' conduct, Plaintiffs and other Class Members were damaged, experiencing stagnating or decreasing social media interactions and declining revenue.

88.   In contrast, as indicated in Similarweb data, OnlyFans started to take off towards the end of 2018 – around the same time that Class members began losing social network referrals – and OnlyFans then continued to build momentum and snowballed into exponential growth. On information and belief, this growth occurred because (i) content providers who exclusively promoted OnlyFans or the Radvinsky-affiliated sites were not targeted by the individual social media services' classification/filtering systems, or added to a shared database or system used by multiple social media services for classification/filtering, and thus were less likely to be adversely classified/filtered with deletion of posts and reduction in traffic, while (ii) other AE Providers who suffered from deletion of posts and reduction in traffic, switched to OnlyFans.

## V.   THIS DISPUTE IS NOT SUBJECT TO ARBITRATION

89.   Plaintiffs, and Class members who have or had accounts at Facebook or Instagram, may arguably be subject to The Terms of Service of Meta and its subsidiaries, which contain a limited arbitration agreement and class action waiver.  These terms make clear that the dispute described in this Complaint is not subject to arbitration. The relevant Term of Service is as follows:

> Except as provided below, you and we agree that **any cause of action, legal claim or dispute between you and us arising out of or related to these Terms or Instagram ("claim(s)") must be resolved by arbitration on an individual basis.** Class actions and class arbitrations are not permitted; you and we may bring a claim only on your own behalf and cannot seek relief that would affect other Instagram users. If there is a final judicial determination that any particular claim (or a request for particular relief) cannot be arbitrated in accordance with this provision's limitations, then only that claim (or only that request for relief) may be brought in court. All other

claims (or requests for relief) remain subject to this provision.

. . .

**The following claims don't have to be arbitrated and may be brought in court: disputes related to . . . efforts to interfere with the** Service or engage with the Service in unauthorized ways (for example, automated ways). In addition, issues relating to the scope and enforceability of the arbitration provision are for a court to decide. This arbitration provision is governed by the Federal Arbitration Act.

The claims pleaded in this complaint do not arise out of, and are not related to, the Terms of Service; rather, they are premised on violations of generally applicable law for which Meta may and its subsidiaries be held responsible for their own conduct, and under *respondeat superior* and other principles of vicarious liability, and as alleged above (e.g., regarding aiding and abetting, conspiracy, agency, alter ego).

90.     In addition, the claims in this case are explicitly excluded from arbitration because they are "related to . . . efforts to interfere with the Service or engage with the service in unauthorized ways." The manipulations of classifier data were intended to, and did, interfere with Plaintiffs' Instagram service.

91.     Plaintiff, and many class members, have also entered into business relationships with OnlyFans at one time or another. The forum selection clause in the OnlyFans Terms of Service also clearly does not affect this dispute, as it states only:

If you are a business User, you and we agree that the courts of England and Wales shall have exclusive jurisdiction to resolve **any dispute or claim (including non-contractual disputes or claims) which you have or which we have arising out of or in connection with your agreement with us (including its subject matter or formation) or your use of OnlyFans.**[2]

---

[2] OnlyFans Terms of Service, https://onlyfans.com/terms.html

Unquestionably, this dispute does not arise in connection with any agreements between Class members and OnlyFans, or in connection with Class Members' use of OnlyFans.

## CLASS ACTION ALLEGATIONS

92.     The Class Plaintiffs bring this action on behalf of themselves and the members of the following class (the "Class"):

> All Adult Entertainment Providers, regardless of the label they use, such as performer, influencer or artist, who suffered economic injury because they either (i) used their Instagram or Facebook account to link to, promote, or demonstrate praise, substantive support, or representation of any competitor of OnlyFans at a time when those businesses were falsely designated as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies, or (ii) were themselves falsely designated as a DIO; the class includes anyone who suffered damages from any shift in the scheme beyond the initial DIO tactic, such  as suffering continuing effects through other computerized systems.  .

Specifically excluded from this definition are Defendants, any entity in which any Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors.

93.     Plaintiffs reserve the right to amend the Class definition as necessary.

94.     As used herein, "Class Members" shall mean and refer to the members of the Class, including Plaintiffs.

95.     <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is believed to be greater than 100 and is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

96.   <u>Typicality</u>: The claims of the representative plaintiffs are typical in that they, like all Class Members, have been damaged by Defendants' misconduct in that, *inter alia*, they experienced loss of business and revenue as a consequence of being blacklisted from social media promotion opportunities by Defendants. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and negligent misconduct resulting in injury to all Class Members.

97.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any individual questions.  These common legal and factual issues include the following:

a)   Whether Defendants engaged in any scheme, plan, or contrivance to designate any competitor of OnlyFans as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or of their predecessor or subsidiary entities or technologies; or

b)   Whether Defendants engaged in any scheme, plan, or contrivance to exclude OnlyFans and/or myfreecams from being designated as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies; or

c)   Whether Defendants engaged in any scheme, plan, or contrivance to designate anyone (such as an adult entertainment performer) who used their Instagram or Facebook account to link to, promote (including via advertisements), engage with, share, or demonstrate praise, substantive support, or representation of any competitor of OnlyFans as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or

that of Facebook or Instagram or any of your or their predecessor or subsidiary entities or technologies; or

d)      Whether Defendants engaged in any scheme, plan, or contrivance to remove, filter, moderate, or perform other content actioning on anyone (such as an adult entertainment performer) who used their Instagram or Facebook account to link to, promote (including via advertisements), engage with, share, or demonstrate praise, substantive support, or representation of any competitor of OnlyFans because they were designated as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies; or

e)      Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to remove, filter, moderate, or perform other content actioning on anyone (such as an adult entertainment performer) who was not designated as a Dangerous Individual or Organization and did not violate terms of service but was deemed to be providing Praise, Substantive Support, or Representation (as defined by Meta's current DIO policy, or alternative concepts in any prior version of said policy) of any competitors of OnlyFans.

f)      Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to hash the content that was removed, filtered, moderated, or actioned as described in subparagraph (d) and/or (e) above and then share that hash data, and/or any associated labels, classifications, and taxonomies, with the Global Internet Forum to Counter Terrorism ("GIFCT") Shared Hash Database(s), with companies within the Hash Sharing Consortium, or with any other internal or external database(s), or collections of information, including those owned, operated, and maintained by non-Meta owned entities.

g)      Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to give preferential treatment or otherwise benefit OnlyFans over competitors of OnlyFans.  "Preferential treatment" includes but is not limited to causing individuals (including adult entertainment performers) who only ever linked to, promoted (including via advertisements), engaged with, shared, or provided praise, substantive support, or representation of OnlyFans on Instagram and/or Facebook, and never linked to, promoted (including via advertisements), or provided praise, substantive support, or representation of any other competitor of OnlyFans on Instagram and/or Facebook, to:

      a.  Be able to generate a higher level of traffic from Instagram or Facebook to OnlyFans

      b.  Be able to generate a higher level of engagement on Instagram or Facebook with OnlyFans accounts and content, including followers, likes, shares, comments and other forms of user engagement.

      c.  Experience a lower degree of page deletions, content removals, and other forms of content actioning

      d.  Have higher visibility and discoverability on Instagram and Facebook

      e.  Experience less "shadow banning," less suppression of content in user feeds, and less filtering or other content actioning

h)      Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to cause any competitor of OnlyFans, or content providers to OnlyFans' competitors, to experience negative treatment, including but not limited to any of the following:

    a.  Heightened scrutiny by artificial intelligence (including machine learning scoring and algorithmic content actioning) and human content actioning systems on Instagram or Facebook, including but not limited to a higher degree of page deletions and other forms of content actioning.

    b.  Less ability to generate engagement within, and traffic from Instagram or Facebook to FanCentro or other competitors of OnlyFans.

    c.  Lower visibility and discoverability on Instagram and Facebook.

    d.  Fewer followers and less engagement on accounts and content, including followers, likes, shares, comments and other forms of user engagement.

    e.  More "shadow banning," more suppression of content in user and/or Subscriber feeds, more filtering and other content actioning

    i)     Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to give preferential treatment or otherwise benefit businesses owned by, connected to, or affiliated with Leonid Radvinsky (including but limited to OnlyFans) over competitors of OnlyFans.

    j)     Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to give preferential treatment or otherwise benefit users and/or subscribers that generate and/or contribute content to the businesses described in subparagraph (i) above over competitors of OnlyFans.

    k)     Whether there was any direct or indirect payment of money or other consideration to any Facebook, Instagram, or Meta employee by the parent company of OnlyFans (Fenix International Ltd.) or any of its affiliates (including Smart Team International Business Ltd), or by any of their executives or owners (including Leonid Radvinsky and anyone with the last name

of Stokely), or by any other companies owned by or affiliated with Radvinsky or any member of the Stokely family.  An "indirect" payment to an employee is when a payment is made to their family member or any trust in the name of an employee or family members, or to a trust in which any of them are a trustee or beneficiary, or to any other entity controlled by the employee.

l)      Whether Defendants Meta, Instagram, and Facebook are legally responsible for the acts of their agents and employees in furtherance of the alleged scheme/conspiracy; and

m)      Whether Plaintiffs and other Class Members were injured by these actions;

n)      Whether the Radvinsky Defendants were unjustly enriched by the acts described above; and

o)      Whether Class Members are entitled to damages and/or injunctive relief as a consequence of the Defendants' action.

98.     Pursuant to Fed. R. Civ. Proc. 23(e)(4), Plaintiff seeks certification of a class for purposes of proving liability only.

99.     <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including class actions and other mass actions, and Plaintiffs intend to prosecute this action vigorously.

100.     <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will

continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

101.    Further, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(AGAINST ALL DEFENDANTS)**

102.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

103.    The Radvinsky Defendants and John Does 1-10 knew that Class Members had (and have) contracts with AE Platforms, in which Class Members and the AE Platforms split revenue from customers who paid to view the Class Members' content posted on the AE Platforms.  The Class Members that worked with competitors to OnlyFans, or referred traffic to them from social media services, were known to OnlyFans, and the Does who carried out the scheme, including but not limited to the fact that such data was available in 2018 and 2019 through one or more third party services.

104.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts of tortious interference undertaken by their agents and employees John Does 1-10 because their participation in the scheme arose from and was engendered by their employment and /or association with these Defendants.

105.    The Radvinsky Defendants and John Does 1-10 intentionally took actions to

interfere with those contracts as alleged herein by, among other acts, causing AE Platforms and the Class Members that promoted them to be blacklisted on individual lists of dangerous organizations and individuals and/or databases of social media services that were also shared in part or in whole with other social media services, including Instagram, among other sites.

106.    There was no legal justification for these Defendants' actions.

107.    The Radvinsky Defendants have profited from their tortious interference with Class Members' contracts with AE Platforms.

108.    As a proximate result of Defendants' tortious interference, Plaintiffs and Class Members have been damaged including lost income.

## COUNT II
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (AGAINST ALL DEFENDANTS)

109.    Plaintiffs incorporate by reference and realleges the preceding allegations as though fully set forth herein.

110.    The Radvinsky Defendants and John Does 1-10 intentionally and knowingly interfered with business relationships between Class members and AE Platforms, and their customers (i.e., people who paid to view the Union Members' content posted on AE Platforms). Additionally, it became known in the industry that the only viable platform for Class Members was OnlyFans and the two other affiliates of Radvinsky (myfreecams and stars.avn.com), and this caused Class Members to avoid entering into business relationships with the AE Platform(s) of their choice; it also caused customers to avoid entering into business relationships with certain AE Platforms and/or to reduce the amount of Class Members' content they paid to view.

111.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts of tortious interference undertaken by their agents and employees John Does 1-10

because their participation in the scheme arose from and was engendered by their employment and/or association with these defendants.

112.    The interference was unjustified and not privileged, and done through improper means.

113.    As a proximate result of Defendants' intentional interference, Plaintiffs and Class Members have been damaged including lost income.

**COUNT III**
**VIOLATION OF THE UNFAIR COMPETITION LAW**
**(California Business and Professions Code § 17200, et seq.)**

114.    Plaintiffs incorporate by reference and realleges the preceding allegations as though fully set forth herein.

115.    The Radvinsky Defendants and John Does 1-10 have engaged and continue to engage in unfair and/or unlawful business practices in California in violation of California's Unfair Competition Law ("UCL"), Business and Professions code, § 17200 et seq., by: (a) causing the classifying of AE Provider content as originating from terrorists, terrorist sympathizers, or a DIO; and (b) falsely representing AE Provider content as originating from terrorists, terrorist sympathizers, or otherwise a DIO to other social media platforms, including but not limited to GIFCT members.

116.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts, including communications, undertaken by their agents and employees John Does 1-10 because their participation in the scheme arose from and was engendered by their employment and/or association with these Defendants.

117.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts, including communications, undertaken by their agents and employees John Does

36

1-10 because their participation in the scheme arose from and was engendered by their employment and/or association with these Defendants.

118.    Defendants' utilization of these unfair practices also injured Plaintiffs and Class Members because in the absence of the scheme they would have been free to continue to promote their content across social media as they had done so in the past.

119.    Because Plaintiffs and Class Members are victims of Defendants' unfair and/or unlawful conduct alleged herein, Plaintiffs seek full restitution of monies, as necessary and according to proof, and restoration of any and all monies withheld, acquired, and/or converted by the Defendants pursuant to Business and Professions Code §§ 17203 and 17208.

120.    The acts complained of herein occurred within the last four years immediately preceding the filing of the Complaint in this action.

121.    Plaintiffs have suffered injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.

122.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business in the state of California.

123.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful and/or deceptive practices, and to restore to Plaintiffs the monies the Defendants owe Plaintiff, including restitution and/or restitutionary disgorgement, unjust enrichment and for such other relief as may be appropriate.

124.    Plaintiffs were compelled to retain the services of counsel to file this action to protect their interests, to obtain restitution, to secure injunctive relief on behalf of OnlyFans Competitors, and to enforce important rights affecting the public interest. Plaintiffs thereby

1  incurred the financial burden of attorneys' fees and costs, which they are entitled to recover under

2  Code of Civil Procedure § 1021.5.

### RELIEF DEMANDED

4      WHEREFORE, Plaintiffs, individually and on behalf of the Class of all others similarly

5  situated, seek a judgment against Defendants, as follows:

6      a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil

7          Procedure and naming Plaintiffs as Class representatives and Plaintiffs' attorneys

8          as Class Counsel;

9      b.  For an order declaring that Defendants' conduct violates the statutes referenced

10         herein;

11     c.  For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

12     d.  For compensatory, statutory, and punitive damages, as applicable, in amounts to be

13         determined by the Court and/or jury;

14     e.  For prejudgment interest on all amounts awarded;

15     f.  For an order of restitution and all other forms of equitable monetary relief;

16     g.  For an order requiring defendants Meta and its subsidiaries to remove all AE

17         Providers from being designated as a DIO, or a supporter of one, unless there is

18         evidence that such individuals are DIO's independently of their involvement in the

19         Adult Entertainment industry;

20     h.  For an Order requiring defendant Meta and its subsidiaries to cause the removal

21         from the GIFCT shared hash tag database any content it contributed concerning AE

22         Performers who do not meet the requirements for inclusion on such a list;

23     i.  For an Order requiring Meta and its subsidiaries to create a system to prevent abuses

*Dangaard v. Instagram, LLC et al.*  Class Action Complaint

of shared hashtag databases by including non-qualifying hashtags in the future;

j. For an injunction against all defendants to refrain from abuses of shared hashtag databases for anti-competitive purposes in the future;

k. For such other injunctive relief as pleaded or as the Court may deem proper; and

l. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, expenses and costs incurred in bringing and prosecuting this lawsuit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 22, 2022

Respectfully submitted,

By: */s/* David Azar

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
DAVID E. AZAR
280 S. Beverly Drive, Suite PH
Beverly Hills, California  90212
Telephone: 1-866-252-0878
dazar@milberg.com
*Counsel for Plaintiff*