Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
United States
Telephone: +1 415 439 1400
Facsimile: +1 415 439 1500
michael.esser@kirkland.com

K. Winn Allen, P.C. (*admitted pro hac vice*)
Devin S. Anderson (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
winn.allen@kirkland.com
devin.anderson@kirkland.com

*Attorneys for Defendants Instagram, LLC,*
*Facebook Operations, LLC, and Meta*
*Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DAWN DANGAARD, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>INSTAGRAM, LLC, et al.,<br><br>Defendants. | CASE NO. 3:22-CV-01101-WHA<br><br>**DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AND STRIKE THE FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Complaint Filed Date: February 22, 2022<br>Judge: William Alsup<br>Hearing Date: September 8, 2022<br>Time: 11:00 am<br>Courtroom: 12, 19th Floor |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on September 8, 2022 at 11:00am, pursuant to this Court's April 9, 2022 order, the undersigned will appear before the Honorable William Alsup of the United States District Court for the Northern District of California in Courtroom 12, 19th Floor, at the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, and shall then and there present defendants Instagram, LLC; Facebook Operations, LLC; and Meta Platforms, Inc.'s Motion to Dismiss and Strike the First Amended Class Action Complaint (the "Motion").

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the attached exhibits and Supporting Declaration of Devin S. Anderson (the "Anderson Decl."), the pleadings and other papers on file in this action, any oral argument, and any other evidence the Court may consider in hearing this Motion.

## RELIEF REQUESTED

Instagram, LLC; Facebook Operations, LLC; and Meta Platforms, Inc. (collectively, "Meta") request that the Court strike or dismiss the amended complaint with prejudice.

## STATEMENT OF THE ISSUES TO BE DECIDED

On February 22, 2022, plaintiffs, who seek to represent a class of adult-entertainment performers, filed this lawsuit alleging that Meta employees have engaged in a multi-layered scheme to "blacklist" or remove, block, and otherwise reduce the visibility of plaintiffs' posts and accounts on social media. Plaintiffs bring claims for tortious interference with contract, tortious interference with business relationships, and a violation of California's Unfair Competition Law, Business and Professions code, § 17200 et seq.  Meta moves to strike the amended complaint under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, or alternatively, to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6).  This Motion raises the following issues:

1.   Whether plaintiffs' claims should be stricken under California's anti-SLAPP statute, Section 425.16, because:

    a.   Plaintiffs' claims arise from allegations about conduct that is protected under the First Amendment of the U.S. Constitution and is in connection with an issue of public interest, and therefore falls within the scope of Section 425.16.

    b.   Plaintiffs have not shown a reasonable probability of prevailing on their claims.

2.      Whether plaintiffs' claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6), because:

a.      Plaintiffs' claims are barred by the First Amendment of the U.S. Constitution.

b.      Plaintiffs' claims are barred by Section 230 of the Communications Decency Act.

c.      Plaintiffs have not plausibly alleged facts showing entitlement to relief.

d.      Meta is not vicariously liable for the alleged conduct of John Doe defendants.

e.      Plaintiffs have not alleged any interference with contracts or prospective economic advantage.

f.      Plaintiffs have not shown they lack adequate remedies at law.

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

LEGAL STANDARDS .......................................................................................................... 5

ARGUMENT ......................................................................................................................... 6

I.    The Anti-SLAPP Statute Applies to Plaintiffs' Claims ........................................ 7

       A.    The Complaint Targets Meta's Protected Conduct ................................... 7

       B.    Plaintiffs' Suit Targets Conduct in Connection with an Issue of Public
           Interest ...................................................................................................... 11

II.    Plaintiffs' Claims Fail as a Matter of Law ......................................................... 12

       A.    Plaintiffs' Claims Are Barred by the First Amendment......................... 12

       B.    Plaintiffs' Claims are Barred by Section 230 of the Communications
           Decency Act ............................................................................................ 14

       C.    Plaintiffs' Allegations Are Not Plausible............................................... 18

       D.    Meta Is Not Vicariously Liable for the Alleged Conduct of John Doe
           Defendants............................................................................................... 21

       E.    Plaintiffs Have Not Alleged Any Interference With Contracts Or
           Prospective Economic Advantage............................................................ 23

       F.    Plaintiffs' UCL Claim Must Be Dismissed Under *Sonner* ................... 24

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
   727 F.3d 502 (6th Cir. 2013) ........................................................................20

*AlterG, Inc. v. Boost Treadmills LLC*,
   388 F. Supp. 3d 1133 (N.D. Cal. 2019) ......................................................24

*Aschroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................19, 21

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ................................................................15, 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................19, 20

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ........................................................................................7

*Caraccioli v. Facebook, Inc.*,
   167 F. Supp. 3d 1056 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017) .................15

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ................................................................15, 18

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ......................................................................20

*Cross v. Facebook, Inc.*,
   14 Cal. App. 5th 190 (2017) ...........................................................................8

*Davison v. Facebook, Inc.*,
   370 F. Supp. 3d 621 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162 (4th Cir. 2019)......................8

*Donald J. Trump for President, Inc. v. Sec'y of Pa.*,
   830 F. App'x 377 (3d Cir. 2020) ..................................................................20

*Ebeid v. Facebook, Inc.*,
   2019 WL 2059662 (N.D. Cal. May 9, 2019) ...........................................15, 16

*Emery v. Visa Int'l Serv. Ass'n*,
   95 Cal. App. 4th 952 (2002) ....................................................................21, 22

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ......................................................................16

*FilmOn.com Inc. v. DoubleVerify Inc.*,
   7 Cal. 5th 133 (2019) ...............................................................................12, 13

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Firearm Cases,*
   126 Cal. App. 4th 959 (2005) ...........................................................................22

*Force v. Facebook, Inc.,*
   934 F.3d 53 (2d Cir. 2019)...............................................................17, 18, 19

*In re Ford Tailgate Litig.,*
   2014 WL 1007066 (N.D. Cal. Mar. 12, 2014)...............................................25

*Fraley v. Facebook, Inc.,*
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ..........................................................15

*Fyk v. Facebook, Inc.,*
   808 F. App'x 597 (9th Cir. 2020), *cert. denied,* 141 S. Ct. 1067 (2021)..................15, 16, 18

*Gonzalez v. Google LLC,*
   2 F.4th 871 (9th Cir. 2021) .............................................................2, 15, 16, 18

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.,*
   742 F.3d 414 (9th Cir. 2014) ............................................................................9

*Herring Networks, Inc. v. Maddow,*
   8 F.4th 1148 (9th Cir. 2021) ............................................................................6

*Hinman v. Westinghouse Elec. Co.,*
   2 Cal. 3d 956 (1970) ......................................................................................23

*JFF Publ'ns LLC, d/b/a JustFor.Fans v. Facebook Operations, LLC,*
   Case No. 22-CIV-00782 ...................................................................................3

*Kelsey K. v. NFL Enterprises, LLC,*
   254 F. Supp. 3d 1140 (N.D. Cal. 2017), *aff'd,* 757 F. App'x 524 (9th Cir. 2018) .................20

*Kimzey v. Yelp! Inc.,*
   836 F.3d 1263 (9th Cir. 2016) .......................................................................17

*Klayman v. Zuckerberg,*
   753 F.3d 1354 (D.C. Cir. 2014) .....................................................................15

*La'Tiejira v. Facebook, Inc.,*
   272 F. Supp. 3d 981 (S.D. Tex. 2017) .............................................................8

*Lancaster v. Alphabet Inc.,*
   2016 WL 3648608 (N.D. Cal. July 8, 2016)...................................................16

*Levitt v. Yelp!, Inc.,*
   2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd,* 765 F.3d 1123 (9th Cir. 2014).............16

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.,*
   12 Cal. 4th 291 (1995) .............................................................................22, 23

*Lusk v. Kellogg,*
   2011 WL 13225140 (C.D. Cal. Aug. 10, 2011)...............................................23

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Maloney v. T3Media, Inc.*,
   853 F.3d 1004 (9th Cir. 2017) ...................................................................6, 12

*Manhattan Cmty. Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) ..................................................................................7

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974).........................................................................7, 10, 13

*Munning v. Gap, Inc.*,
   238 F. Supp. 3d 1195 (N.D. Cal. 2017) ...........................................................25

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021) .........................................................................16

*Nationwide Biweekly Admin., Inc. v. Super. Ct. of Alameda Cnty.*,
   9 Cal. 5th 279 (2020) ................................................................................24

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022) ........................................................... *passim*

*NetChoice, LLC v. Paxton*,
   2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) ...................................................10

*Nguyen v. Nissan N. Am., Inc.*,
   2017 WL 1330602 (N.D. Cal. Apr. 11, 2017) ...................................................25

*O'Handley v. Padilla*,
   2022 WL 93625 (N.D. Cal. Jan. 10, 2022) ...............................................8, 10, 14

*People v. Toomey*,
   157 Cal. App. 3d 1 (1984) ..........................................................................22

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
   494 F.3d 788 (9th Cir. 2007) .......................................................................22

*Philips v. Ford Motor Co.*,
   726 F. App'x. 608 (9th Cir. 2018) .............................................................24, 25

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018)...........................6

*Publius v. Boyer-Vine*,
   237 F. Supp. 3d 997 (E.D. Cal. 2017).............................................................8

*Reno v. ACLU*,
   521 U.S. 844 (1997) ...................................................................................8

*Rhynes v. Stryker Corp.*,
   2011 WL 2149095 (N.D. Cal. May 31, 2011) ...................................................25

*Riggs v. MySpace, Inc.*,
   444 F. App'x 986 (9th Cir. 2011) ..................................................................16

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ............................................................................................... 7

*Rodgers v. Kemper Constr. Co.*,
50 Cal. App. 3d 608 (1975) ................................................................................... 23

*San Miguel v. HP Inc.*,
317 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................................................... 24

*Search King, Inc. v. Google Tech., Inc.*,
2003 WL 21464568 (W.D. Okla. May 27, 2003) ................................................. 10

*Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*,
144 F. Supp. 3d 1088 (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Just., Inc. v.
Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) ............................... 15, 16, 17, 18

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........................................................................... 24, 25

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ................................................................................................ 7

*Stackla, Inc. v. Facebook, Inc.*,
2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ..................................................... 12

*Tietsworth v. Sears, Roebuck & Co.*,
720 F. Supp. 2d 1123 (N.D. Cal. 2010) ................................................................. 6

*U.S. Telecom Ass'n v. FCC*,
855 F.3d 381 (D.C. Cir. 2017) .............................................................................. 14

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ................................................................................. 19

*Williams v. Apple, Inc.*,
2020 WL 6743911 (N.D. Cal. Nov. 17, 2020) ................................................. 24, 25

*Wong v. Jing*,
189 Cal. App. 4th 1354 (2010) ............................................................................. 12

*Worldwide, LLC v. Google, Inc.*,
2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ....................................................... 10

*Zapata Fonseca v. Goya Foods Inc.*,
2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) ....................................................... 25

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ................................................................................ 15

*Zhang v. Baidu.com Inc.*,
10 F. Supp. 3d 433 (S.D.N.Y. 2014) .................................................................... 10

**Statutes**

47 U.S.C. § 230 .............................................................................................. *passim*

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

47 U.S.C. § 230(f)(2) .................................................................................................15

47 U.S.C. § 230(f)(3) .................................................................................................15

Cal. Bus. & Prof. Code § 17200 .................................................................................6

Cal. Civ. Proc. Code § 425.16(b)(1) .........................................................................13

Cal. Civ. Proc. Code § 425.16(e)(4) .........................................................................11

**Court Rules**

Rule 12(b)(6).................................................................................................................6

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Plaintiffs are three adult entertainers who use social-media services like Meta's Facebook and Instagram to direct users to certain adult-entertainment platforms where users can subscribe and see the entertainers' performances.  Plaintiffs post their content on sites that compete with OnlyFans, which is a well-known adult-entertainment platform that saw recent explosive growth through extensive media coverage during the COVID-19 pandemic and as pop megastars joined or referenced the platform.  Plaintiffs claim that engagement with their social-media accounts and corresponding traffic to their sites diminished as OnlyFans increased in popularity.  Instead of chalking this up to OnlyFans' ascendancy in the cultural spotlight, plaintiffs filed a putative class action that alleges—on "information and belief"— that their social-media posts and accounts were systematically removed and suppressed from Facebook and Instagram as part of a vast and sophisticated scheme involving manipulation of automated filtering and blocking systems by "John Doe" Meta employees.  Plaintiffs contend that these unnamed employees received payments from OnlyFans through a web of complex offshore transactions in exchange for promoting OnlyFans creators' content at the expense of adult entertainers who used competing platforms.

Plaintiffs' highly implausible allegations fall within the scope of California's anti-SLAPP statute.  On its own terms, plaintiffs' lawsuit rests on claims about Meta's exercise of its First Amendment-protected editorial decision to block, filter, or de-prioritize certain content created by adult-entertainment performers.  Such editorial choices—whether plaintiffs think those decisions are fair or unfair—are fully protected by California law and the First Amendment of the United States Constitution.  As the Eleventh Circuit recently held, when social-media apps "choose to remove users or posts, deprioritize content in viewers' feeds or search results, or sanction breaches of their community standards, they engage in First-Amendment-protected activity."  *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1213 (11th Cir. 2022).[1]  And there can be no dispute that the speech here constitutes conduct "in connection" with an issue of public interest under the anti-SLAPP statute.

Plaintiffs fail to state a claim as a matter of law for multiple reasons.  For starters, even if plaintiffs'

---

[1] All case citations are cleaned up, unless otherwise noted.

improbable allegations were true, they would run headfirst into the protections of the First Amendment. In particular, plaintiffs' claims violate the bedrock principle that, "whatever the reasons" a speaker may have for choosing to display (or not to display) particular speech, that decision "is presumed to lie beyond the government's power to control." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575 (1995). Plaintiffs' claims are also barred by Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230, because this lawsuit seeks to hold Meta liable for the alleged removed content posted by plaintiffs. "Congress affirmatively immunized interactive computer service providers" like Meta "that publish the speech or content of others" from lawsuits like this one. *Gonzalez v. Google LLC*, 2 F.4th 871, 892, 897 (9th Cir. 2021).

Plaintiffs' claims also fail Rule 8's plausibility standard. The only well-pleaded allegations in the complaint are (1) that adult-entertainer content is sometimes removed from Facebook and Instagram (both of which prohibit posting or linking off-site to sexually explicit material); and (2) that web traffic on OnlyFans increased, while web traffic on other adult-entertainment platforms decreased. Those allegations do not show an entitlement to relief because they are just as (if not more) consistent with plausible alternative explanations—most obviously, Meta's own content-moderation policies and the widespread popularity of OnlyFans during the relevant time period. Nor are there allegations of fact that Meta under-enforced its policies as to OnlyFans. Rule 8 requires more than simply positing "on information and belief" an alternative story of offshore bribery and manipulation of algorithms. Plaintiffs' claims fail for a variety of state-law reasons, because they fail to allege any facts that would support vicarious liability for the alleged actions of the "John Doe" Meta employees. This is especially true when the bizarre implication of plaintiffs' claims is that these John Doe Meta employees were working to drive traffic *off* of Facebook and Instagram and onto OnlyFans. For these reasons and those that follow, this Court should strike or dismiss the amended complaint with prejudice.

## BACKGROUND

Facebook and Instagram are online services that enable millions of users worldwide to connect and share information, including photographs and videos with family, coworkers, friends, and the broader public (if they so choose). Plaintiffs Dawn Dangaard (stage name: Alana Evans), Kelly Gilbert (stage

name: Kelly Pierce), and Jennifer Allbaugh (stage name: Ruby) are adult entertainers.  Feb. 23, 2022 First Am. Class Action Compl., ECF No. 4 ("Am. Compl.") ¶¶ 8–10.  Plaintiffs claim they used Facebook or Instagram (or both) to "promote" their "Adult Entertainment content," usually by posting links or directions to third-party adult-entertainment platforms where plaintiffs display pornographic content.  *Id.* ¶¶ 43, 51–52. [2]  "Consumers are charged to access the content on" the adult-entertainment platforms, "with the revenue split between" the platform and the adult entertainer.  *Id.* ¶ 2.  Posting or linking to sexually explicit content has at all relevant times violated Facebook and Instagram's Community Standards, which prohibit offers of "pornographic material, including, but not limited to, sharing of links to external pornographic websites," Ex. 1,[3] and which "restrict the display of nudity or sexual activity," Ex. 2.[4]

Plaintiffs complain about the removal of some of their (unidentified) posts or that their accounts were suspended altogether.  Am. Compl. ¶¶ 43–52.  For example, Evans claims that "her followers were receiving many fewer of her posts than they had previously received," and that her Instagram account was deleted in January 2020.  *Id.* ¶¶ 44–45.  The account was restored, but she had fewer followers.  *Id.* ¶ 45.  Pierce and Ruby allege similar experiences, although Ruby's Instagram account was never removed.  *Id.* ¶¶ 48–52.  Plaintiffs claim that their reduced presence on Instagram and Facebook has prevented them from directing more users off of Facebook and Instagram to their adult-entertainment websites, resulting in fewer visitors and subscribers.  *Id.* ¶¶ 44–46, 49, 52.  There are many adult-entertainment platforms: plaintiffs themselves reference cams.com, unfiltered.com, loyalfans.com, Chaturbate, and Streamate.  *Id.* ¶¶ 47–48.  But the focus of plaintiffs' complaint is OnlyFans.com, which is allegedly owned by defendants Fenix International Inc., Fenix Internet LLC, and Leonid Radvinsky.  According to the complaint, OnlyFans began substantially increasing in popularity in 2019–21.  *Id.* ¶ 39.  While OnlyFans' web traffic increased moderately in late-2019, traffic on the site skyrocketed beginning in March of 2020, which was the onset of the global COVID-19 pandemic.  *Id.*  In a 30-day period between March and April of 2020,

---

[2] There is a parallel putative class action pending in the Superior Court for the State of California, County of San Mateo, which is asserted on behalf of adult-entertainment platforms that compete with OnlyFans.  *See JFF Publ'ns LLC, d/b/a JustFor.Fans v. Facebook Operations, LLC*, Case No. 22-CIV-00782.  This case is brought only on behalf of adult entertainers.

[3] Anderson Decl. Ex. 1, Meta Community Standards – Sexual Solicitation.

[4] Anderson Decl. Ex. 2, Meta Community Standards – Adult Nudity and Sexual Activity.

60,000 content creators flocked to OnlyFans, and by December of 2020, more than one million content creators had joined the platform, a nearly ten-fold increase from the 120,000 content creators on OnlyFans in 2019.[5]  Supporting this influx of new adult entertainers were hundreds of millions of people confined to their homes with few sources of entertainment—in the first 12 months of the pandemic, OnlyFans' user base grew from 20 million to 120 million.[6]

High-profile celebrities also endorsed OnlyFans, generating substantial popular cultural cachet and elevating "OnlyFans" into the country's pandemic lexicon.  In April of 2020, popular recording artists Beyoncé and Megan Thee Stallion released the song "Savage Remix," in which Beyoncé referenced OnlyFans.  "Savage Remix" quickly shot to number one on Billboard's Hot 100,[7] and the song's music video has been viewed nearly 80 million times.  In the 24-hour period following the song's release, OnlyFans experienced a 15% spike in internet traffic,[8] and observed daily sign-ups of 200,000 users and 7,000–8,000 creators.[9]  OnlyFans' visibility was further amplified when, four months later, in August of 2020, popular rapper Cardi B joined OnlyFans as a creator, promising to share previously unreleased footage related to the music video for her pandemic-era blockbuster song.[10]

Plaintiffs nevertheless claim that OnlyFans' increase in popularity and the decrease in popularity of some of its competitors was in fact the product of an elaborate scheme.  As plaintiffs tell it, John Doe

---

[5] Anderson Decl. Ex. 3, Gabrielle Drolet, *The Year Sex Work Came Home*, N.Y. TIMES, (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/style/camsoda-onlyfans-streaming-sex-coronavirus.html.)

[6] Anderson Decl. Ex. 4, Anna Cooban, *OnlyFans has boomed during lockdown. Users spent $2.4 billion on the adult-entertainment site in 2020, and 120 million people now use it*, BUSINESS INSIDER (Apr. 27, 2021), https://www.businessinsider.com/onlyfans-lockdown-boom-transactions-hit-24b-revenue-up-553-2021-4.

[7] Anderson Decl. Ex. 5, Gary Trust, *Megan Thee Stallion & Beyoncé's 'Savage' Surges to No. 1 on Billboard Hot 100*, BILLBOARD, (May 26, 2020), https://www.billboard.com/pro/megan-thee-stallion-beyonce-savage-number-one-hot-100/.

[8] Anderson Decl. Ex. 6, Marlow Stern, *Beyoncé Gives Adult Site OnlyFans Big Bump With 'Savage' Remix Shout-Out*, THE DAILY BEAST, (Apr. 30, 2020), https://www.thedailybeast.com/adult-site-onlyfans-experiences-big-beyonce-bump-following-savage-remix.

[9] Anderson Decl. Ex. 7, Otillia Steadman, *Everyone is Making Porn at Home Now. Will the Porn Industry Survive?*, BUZZFEED NEWS, (5/6/2020), https://www.buzzfeednews.com/article/otilliasteadman/coronavirus-amateur-porn-onlyfans.

[10] Anderson Decl. Ex. 8, Christi Carras, *Cardi B made an OnlyFans account to promote 'WAP' video—because of course she did*, L.A. TIMES, (Aug. 12, 2020), https://www.latimes.com/entertainment-arts/music/story/2020-08-12/wap-cardi-b-only-fans-account-instagram-video.

defendants (allegedly employees of Meta) accepted bribes from individuals and/or entities affiliated with OnlyFans in exchange for manipulating various content-moderation tools to harm adult entertainers who host content on competing adult-entertainment platforms.  Am. Compl. ¶¶ 68, 77, 85.

In exchange, plaintiffs allege, John Doe defendants engaged in "blacklisting" of adult entertainers, which plaintiffs define as "a process whereby social media platforms suspend or delete particular accounts or otherwise reduce their visibility."  *Id.* ¶ 27.  Plaintiffs allege that such "blacklisting" was accomplished by adding "false classifier/filtering information to . . . individual databases/training data and/or lists of dangerous individuals . . . some or all of which were then included in one or more shared databases or lists," thereby "falsely identifying" adult entertainers or the adult-entertainment platforms they use as related to terrorism.  *Id.* ¶ 71.  Plaintiffs allege that only adult entertainers and adult-entertainment platforms that compete with OnlyFans were affected by the alleged blacklisting.  *Id.* ¶ 70.  Plaintiffs further claim that as a result of the alleged "blacklisting," OnlyFans and the adult entertainers who host content on OnlyFans enjoyed a competitive advantage in their respective markets, and that platforms and entertainers that compete with OnlyFans and its entertainers experienced "substantially reduced visibility . . . on social media."  *Id.* ¶¶ 1, 34, 39, 41.  Plaintiffs allege that the purported deletion and decrease in visibility of their content on Instagram caused plaintiffs to "experience decreas[ed] revenue" from the sale of their adult content.  *Id.* ¶¶ 46, 50, 52.

Plaintiffs filed a putative class action on behalf of all adult entertainers who, among other things, "used their Instagram or Facebook account to link to, promote, or demonstrate praise, substantive support, or representation of any competitor of OnlyFans."  *Id.* ¶ 92.  Plaintiffs assert claims for tortious interference with contract, intentional interference with business relationships, and violations of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, et seq.

### LEGAL STANDARDS

The anti-SLAPP statute was designed "to allow for early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."  *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021).  To achieve this goal, the statute "permits defendants to file a 'special motion to strike' any 'cause of action against a person arising from any act of that person in

furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.'" *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 (9th Cir. 2017) (quoting Cal. Civ. Proc. Code § 425.16(b)(1)). The statute instructs courts to "construe[ ]" its provisions "broadly." *Herring*, 8 F.4th at 1155 (quoting Cal. Civ. Proc. Code § 425.16(a)). The Section 425.16 inquiry involves a two-part test. *Id.* at 1155. First, the moving defendant must show that "the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech" in connection with a public issue. *Id.* The burden then shifts to the plaintiff "to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Id.* "The district court must grant the defendant's motion and dismiss the complaint if the plaintiff presents an insufficient legal basis for the claims." *Id.*

"[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim," the analysis of plaintiff's likelihood of success merges with the Rule 12(b)(6) analysis. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018). In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts "need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences." *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123, 1132 (N.D. Cal. 2010).

## ARGUMENT

Plaintiffs' lawsuit arises from Meta's exercise of its First Amendment-protected editorial decision to block, filter, or de-prioritize content created by adult-entertainment performers, which brings this case within the scope of California's anti-SLAPP statute. Moreover, plaintiffs' highly implausible allegations fail to state a claim as a matter of law for multiple, independent reasons. First, even if all of plaintiffs' wild allegations were true, the dispositive fact is that each of their claims seeks to interfere with Meta's editorial choices in "disclos[ing]," "publish[ing]," and "disseminat[ing]" content. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). Such editorial choices—regardless whether plaintiffs think those decisions are unfair or discriminatory—are fully protected by the First Amendment. Plaintiffs' claims are also barred by Section 230 of the CDA, 47 U.S.C. § 230, because they seek to hold Meta liable for its alleged publication decisions to remove, block, or filter third-party content posted by plaintiffs. Plaintiffs' claims

separately fail Rule 8's plausibility standard.  Plaintiffs' complaint does no more than allege facts that are merely consistent with potential liability, and so does not cross the line between conceivable and plausible. Finally, there are state-law specific problems with plaintiffs' theories of liability.  For these reasons and those that follow, this Court should strike or dismiss the amended complaint with prejudice.

## I.   The Anti-SLAPP Statute Applies to Plaintiffs' Claims

### A.   The Complaint Targets Meta's Protected Conduct

All of plaintiffs' claims arise from Meta's exercise of its First Amendment-protected editorial decision to block, filter, or de-prioritize certain content created and posted by adult-entertainment performers.  When "a private entity provides a forum for speech," it may "exercise editorial discretion over the speech and speakers in the forum."  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).  Editorial decisions to remove content are afforded the exact same constitutional protection as the decision to display it in the first place, as the Supreme Court has reaffirmed over and over again. *E.g., Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *Hurley*, 515 U.S. at 573; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988).  Such publication choices by private entities—"whether fair or unfair—constitute the exercise of editorial control and judgment" protected by the First Amendment.  *Tornillo*, 418 U.S. at 258.  This protection extends to all forms of dissemination and "presentation of an edited compilation of speech generated by other persons."  *Hurley*, 515 U.S. at 570; *see also Sorrell*, 564 U.S. at 570; *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011); *NetChoice*, 34 F.4th at 1210–13.

These basic First Amendment principles apply with equal force to social-media apps, because displaying (or not displaying) the speech of others through websites is inherently "expressive," and there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno v. ACLU*, 521 U.S. 844, 853, 870 (1997).  Courts in this District and State have thus consistently found that social-media apps' editorial decisions—including the decision not to display posts or to remove accounts or content—are plainly an exercise of the apps' First Amendment rights.  *See, e.g.*, *O'Handley v. Padilla*, 2022 WL 93625, at *14 (N.D. Cal. Jan. 10, 2022) ("Like a newspaper or a news network, Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or

promote, and those decisions are protected by the First Amendment."); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 202 (2017) ("[S]ource of ... alleged injuries ... is the content of the pages and Facebook's decision not to remove them, an act 'in furtherance of the ... right of petition or free speech.'"); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017) (similar).  Likewise, courts have recognized that Facebook's acts of displaying, distributing, removing, and organizing content are protected by the First Amendment.  *See Cross*, 14 Cal. App. 5th at 202; *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (acknowledging "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit."), *aff'd*, 774 F. App'x 162 (4th Cir. 2019).

The Eleventh Circuit's recent opinion in *NetChoice, LLC v. Attorney General* enjoining aspects of Florida's new social-media law is instructive.  That case involved a Florida "first-of-its-kind law," which would, among other things, prohibit social-media companies from "deplatforming" political candidates, as well as prioritizing, deprioritizing, or removing certain types of content.  34 F.4th at 1203.  The law was a response to an alleged bias against conservative users and their content.  *Id.*  The question "at the core" of the case was "whether the Facebooks and Twitters of the world—indisputably 'private actors' with First Amendment rights—are engaged in constitutionally protected expressive activity when they moderate and curate the content that they disseminate on their platforms."  *Id.*  The Eleventh's Circuit's unanimous answer was an emphatic "yes."  When "a platform removes or deprioritizes a user or post, it makes a judgment about whether and to what extent it will publish information to its users," and such "judgment" is "rooted in the platform's own views about the sorts of content and viewpoints that are valuable and appropriate for dissemination on its site."  *Id.* at 1210.  Thus, when a social media app "removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in 'speech' within the meaning of the First Amendment."  *Id.*  These "content-moderation decisions" are "closely analogous to the editorial judgments that the Supreme Court recognized" as protected by the First Amendment.  *Id.* at 1213.  "Just as the parade organizer exercises editorial judgment when it refuses to include in its lineup groups with

whose messages it disagrees, and just as a cable operator might refuse to carry a channel that produces content it prefers not to disseminate, social-media platforms regularly make choices 'not to propound a particular point of view.'" *Id.* at 1213 (quoting *Hurley*, 515 U.S. at 575). The court held that the relevant statutory provisions triggered First Amendment scrutiny and enjoined enforcement of those provisions. *Id.* at 1231.

There can be no doubt that plaintiffs' claims target Facebook's exercise of its constitutionally protected editorial discretion and are therefore "based on conduct in furtherance of free speech rights." *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 424–25 (9th Cir. 2014). Here, plaintiffs allege Meta "blacklisted" competitors of OnlyFans and adult entertainers using those competitor platforms, by altering its algorithms to remove or suppress such content. Am. Compl. ¶¶ 5, 7, 27. Plaintiffs claim Meta accomplished this scheme by identifying their content for inclusion in shared databases for dangerous or terrorism-related content. *Id.* ¶¶ 5, 70–71. While the alleged technical mechanics of the purported "blacklisting" are convoluted, the bottom line is not. The identification, flagging, removal, and classification of content or user accounts is the heartland of Meta's editorial decision-making. While none of plaintiffs' allegations has any actual factual support, what matters here is that even if they did, the speech social-media companies choose to disseminate or not to disseminate necessarily reflects a "message" about the communities. *Hurley*, 515 U.S. at 575; *see also NetChoice*, 34 F.4th at 1214 ("[U]nless posts and users are removed *randomly*, those sorts of actions necessarily convey *some* sort of message—most obviously, the platforms' disagreement with or disapproval of certain content, viewpoints, or users."). These decisions—"whether fair or unfair—constitute the exercise of editorial control and judgment" and are subject to protection under the First Amendment and therefore the anti-SLAPP statute. *Tornillo*, 418 U.S. at 258; *see also NetChoice*, 34 F.4th at 1211–12; *Padilla*, 2022 WL 93625, at *14.

Plaintiffs try to plead around this issue by claiming that their lawsuit does not arise from Meta's editorial decisions at all, but from their misuse of automated systems. Am. Compl. ¶ 27 ("Plaintiffs are not making a claim against anyone for the act(s) of classification/filtering themselves in the normal course by the social media platforms."); *see also id.* ¶¶ 35, 42 (similar). But whether an editorial process allegedly

involves automation makes no difference from the perspective of the First Amendment.  Even when they are the product of "automated processes," *id.* ¶ 35, "decisions about what speech to permit, disseminate, prohibit, and deprioritize—decisions based on platforms' own particular values and views—fit comfortably within the Supreme Court's editorial-judgment precedents," *NetChoice*, 34 F.4th at 1214; *see also Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437–43 (S.D.N.Y. 2014) ("to hold [website] liable for ... a conscious decision to design its search-engine algorithms to favor certain expression on core political subjects over other expression on those same political subjects" would "violate[ ] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message"); *NetChoice, LLC v. Paxton*, 2021 WL 5755120, at *8 (W.D. Tex. Dec. 1, 2021) ("It is indeed new and exciting—or frightening, depending on who you ask—that algorithms do some of the work that a newspaper publisher previously did, but the core question is still whether a private company exercises editorial discretion over the dissemination of content, not the exact process used."); *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("Google's actions in formulating rankings for its search engine and in determining whether certain websites are contrary to Google's guidelines and thereby subject to removal are the same as decisions by a newspaper editor regarding which content to publish, which article belongs on the front page, and which article is unworthy of publication."); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003) (Google's PageRank system expressed "opinions of the significance of particular websites as they correspond to a search query" and was "entitled to full constitutional protection").

After all, plaintiffs allege that the algorithms and classifiers were manipulated by unidentified Meta employees to make specific editorial choices about what content to remove or limit.  Indeed, plaintiffs' whole lawsuit is premised on the theory that Meta employees manipulated algorithms and other automated tools—normally used to filter or block terrorist content—to systematically discriminate against them and their content in order to promote the content of OnlyFans creators.  Putting aside the sheer implausibility of such claims and whether those employees' actions could even be imputed to Meta, what matters here is that such alleged conduct would boil down to a choice to exclude certain content from

Facebook and Instagram.  That plaintiffs might "perceive bias in [Meta's] content-moderation decisions is compelling evidence that those decisions are indeed expressive." *NetChoice*, 34 F.4th at 1214.

Plaintiffs' alleged injuries and the relief they seek also confirm that the conduct at issue is the removal or limited dissemination of content on Facebook and Instagram, which is precisely the editorial decision-making the First Amendment protects.  Evans, for example, alleges that Instagram "deleted" her account, and that "the reach of her postings was vastly reduced."  Am. Compl. ¶¶ 44–46.  Pierce alleges that her posts "were reaching fewer followers," and that her Instagram account, as well as "numerous individual posts … on … Instagram" were deleted.  *Id.* ¶¶ 49–50.  Ruby also alleges that she has experienced unexplained deletions of posts on Instagram, and an unexplained loss of distribution of her posts to followers, as well as reduced search engine traffic.  *Id.* ¶ 52.  And plaintiffs seek an order requiring Meta "to remove all AE Providers from being designated" as a dangerous individual or organization, an order requiring Meta to "create a system to prevent abuses of shared hashtag databases by including non-qualifying hashtags in the future," and an order forcing "all defendants to refrain from abuses of shared hashtag databases for anti-competitive purposes in the future."  Am. Compl. at 38–39.  Plaintiffs' claims put the First Amendment squarely at issue.

**B.    Plaintiffs' Suit Targets Conduct in Connection with an Issue of Public Interest**

Meta's editorial decisions about disseminating and presenting adult-entertainment content to millions of users on its apps constitutes conduct "in connection" with an issue of public interest under the anti-SLAPP statute.  Cal. Civ. Proc. Code § 425.16(e)(4).  Although the statute does not define an "issue of public interest[,]' courts have defined such phrase "broadly" and sensibly as "'any' issue in which the public is interested."  *Maloney*, 853 F.3d at 1009 n.3 (citing *Nygard, Inc. v. Uusi–Kerttula*, 159 Cal. App. 4th 1027, 1042–44 (2008)).  Indeed, matters that "can affect many people [are] generally deemed to involve an issue of public interest for purposes of the anti-SLAPP statute." *Wong v. Jing*, 189 Cal. App. 4th 1354, 1366 (2010).

This lawsuit involves an alleged exercise of editorial discretion that plaintiffs seek to attribute to Meta.  Given the wide reach of online platforms, courts have found that Facebook's ability to "decisively police the integrity of its platforms is without question a pressing public interest."  *Stackla, Inc. v.*

*Facebook, Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019).  Plaintiffs here readily acknowledge this—the entire premise of their lawsuit is that Meta's editorial decisions have had a lasting impact on the visibility of the online adult entertainment industry.  *See, .e.g.,* Am. Compl. ¶ 4; *see also id.*  ¶ 45 (alleging that the deletion of Evans' account led to press coverage and publicity, which resulted "in an immediate increase of" followers).  And there can be no dispute that the millions who use Facebook and Instagram have significant interest in editorial policies and actions aimed at filtering and removing adult-entertainment content from widely available social-media apps.

Moreover, there is a strong "functional relationship" between these issues of public interest and Meta's alleged conduct of moderating and filtering adult-entertainment content.  *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 150–51 (2019).  Meta's decisions about displaying and disseminating content created by adult entertainers clearly "contribute[] to" the public discourse and broader debate about the online adult-entertainment industry and directly affect the visibility and dissemination of adult entertainment content.  *See id.* at 154.  An action that "directly targets the way a content provider chooses to deliver, present, or publish" content is an issue of public interest, and such "action is based on conduct in furtherance of free speech rights and must withstand scrutiny under California's anti-SLAPP statute."  *Greater L.A. Agency on Deafness*, 742 F.3d at 424–25.

## II.     Plaintiffs' Claims Fail as a Matter of Law

Because this case involves claims arising from alleged acts in furtherance of First Amendment speech rights in connection with a public issue, Cal. Civ. Proc. Code § 425.16(b)(1), the protections of the anti-SLAPP statute apply, and plaintiffs' claims must be stricken unless they can show a likelihood of success.  They cannot.  All of plaintiffs' claims fail as a matter of law for multiple, independent reasons.

### A.     Plaintiffs' Claims Are Barred by the First Amendment

On their own terms and setting aside their implausibility, plaintiffs' claims are barred by the First Amendment for the same reasons that they implicate it.  Plaintiffs are plainly seeking to override an exercise of editorial discretion by Meta's employees to remove their content.  That plaintiffs allege their content was removed out of avarice does not strip that decision of First Amendment protection.  As the Eleventh Circuit recognized, "preventing 'unfair[ness]' to certain users or points of view isn't a substantial

governmental interest; rather, private actors have a First Amendment right to be 'unfair'—which is to say, a right to have and express their own points of view." *NetChoice*, 34 F.4th at 1228; *see also Tornillo*, 418 U.S. at 258 ("The choice of material to go into a newspaper []—*whether fair or unfair*—constitute[s] the exercise of editorial control and judgment," and is subject to First Amendment protection.) (emphasis added).

The Supreme Court's unanimous decision in *Hurley* establishes the governing principle here. There, an LGBTQ group claimed that the defendant's refusal to allow the group to participate in a parade violated a Massachusetts anti-discrimination law. 515 U.S. at 561. The Supreme Court emphasized that, even if the parade organizers excluded the group on grounds that would otherwise violate the law, an anti-discrimination statute of general applicability could not be used to punish their selection of speech and thus "requir[e] petitioners to alter the expressive content of their parade." *Id.* at 572–73. The "general rule of speaker's autonomy," *id.* at 578, means that "[w]hatever the reason[s]" a speaker may have for choosing *not* to repeat speech, that decision is "presumed to lie beyond the government's power to control"—whether the reasons for the choice are good or bad, *id*. at 575.

Under decisions like *Hurley*, plaintiffs cannot wield laws of general applicability—including California common law or the UCL—to force social-media companies to accept content that they do not wish to carry, to punish them for declining to display certain posts, or to dictate the criteria that may or may not be used in selecting posts to display and the extent to which they can be disseminated. This is precisely what plaintiffs seek to do here through judicial force. They seek to impose liability under state law to Meta for alleged conduct by its employees in blocking, removing, or otherwise decreasing visibility of their adult content on social media. *See* Am. Compl. at 39 (seeking "an order declaring that Defendants' conduct violates the statutes referenced" as well as "compensatory, statutory, and punitive damages"). They seek a judicial order requiring Meta to remove plaintiffs and competitors of OnlyFans from its supposed classification and filtering lists and databases. *Id.* And they seek a judicial order "requiring Meta and its subsidiaries to create a system to prevent abuses of shared hashtag databases by including non-qualifying hashtags in the future," and "an injunction against all defendants to refrain from abuses of shared hashtag databases for anti-competitive purposes in the future." *Id.* Plaintiffs thus not only seek to

punish Meta for its past editorial choices, but they also ask for judicial assistance in continuing to interfere with Meta's editorial discretion by regulating their editorial decisions in the future. The First Amendment does not permit a court to issue an order "telling" a social media platform "what content-moderation policies to adopt and how to enforce those policies." *Padilla*, 2022 WL 93625, at *15; *see also U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 435 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc) (the government "may not . . . tell Twitter or YouTube what videos to post; or tell Facebook or Google what content to favor"). Because plaintiffs seek to hold Meta liable for protected First Amendment activity, they fail as a matter of law.

### B. Plaintiffs' Claims Are Barred by Section 230 of the Communications Decency Act

Section 230 of the CDA also bars plaintiffs' claims, even assuming they were plausible and that they had alleged facts establishing that Meta can be liable for the alleged acts of the John Doe employees. Congress enacted the law "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). Section 230(c)(1) protects from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

Meta easily satisfies the first and third prongs. An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Meta plainly meets that description, and numerous courts in this District and elsewhere have reached that conclusion.[11] Meta also satisfies the third prong because the "information" at issue is indisputably plaintiffs' own content that they created, posted, and now claim was improperly removed. *E.g.*, Am. Compl. ¶¶ 4–5; *see* 47 U.S.C. § 230(f)(3)

---

[11] *See, e.g., Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Just., Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801–02 (N.D. Cal. 2011); *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 597, n.2 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1067 (2021); *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *3 (N.D. Cal. May 9, 2019); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017).

(defining an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

That leaves the second prong, which asks whether plaintiffs' lawsuit seeks to treat Meta as the publisher of the information at issue.  It does.  The act of "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content."  *Gonzalez*, 2 F.4th at 892; *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) ("[T]he very essence of publishing is making the decision whether to print or retract a given piece of content ...."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (Section 230 protects the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content").  Section 230 thus protects "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online ...."  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008).

The Ninth Circuit has explained that "there can be no meaningful difference between an editor starting with a default rule of publishing all submissions and then manually selecting material to be removed from publication, and a default rule of publishing no submissions and manually selecting material to be published—they are flip sides of precisely the same coin."  *Id.* at 1170–71 n.29; *see also*; *Fyk*, 808 F. App'x at 597 n. 2.  Employing this logic, "[c]ourts have routinely rejected a wide variety of civil claims . . . that seek to hold interactive computer services liable for removing or blocking content or suspending or deleting accounts (or failing to do so) on the grounds they are barred by the CDA."  *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 27 (2021); *see, e.g.*, *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011); *Levitt v. Yelp!, Inc.*, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *Lancaster v. Alphabet Inc.*, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016).  Courts have also routinely rejected efforts to hold Meta in particular liable for removing or blocking content as barred under Section 230.  *See, e.g., Ebeid v. Facebook, Inc.*, 2019 WL 2059662 at *3–5 (N.D. Cal. May 9, 2019); *Sikhs for Just.*, 144 F. Supp. 3d at 1092–93.

Plaintiffs seek to hold Meta liable for its decision "whether to publish" third-party content. *Barnes*, 570 F.3d at 1102. The crux of plaintiffs' claims is that Meta "blacklisted" their accounts and removed or reduced the visibility of their content. Am. Compl. ¶¶ 5, 27. Plaintiffs define "blacklisting" as "a process whereby social media platforms suspend or delete particular accounts or otherwise reduce their visibility." *Id.* ¶ 27. In other words, plaintiffs are seeking to hold Meta liable for its decision not to publish (or to de-publish) content from third parties (namely, plaintiffs themselves). Because "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," *Gonzalez*, 2 F.4th at 892, such conduct by Meta is protected under Section 230(c)(1).

This conclusion finds firm support in other cases involving Meta's services. For example, in *Sikhs for Justice*, the plaintiff was a non-profit organization concerned with religious minorities in India and alleged that Facebook blocked access to the organization's Facebook page in India at the request of the Indian government because of discrimination against the plaintiff on the grounds of race, religion, ancestry, and national origin. 144 F. Supp. 3d at 1090. The district court held that the plaintiff's claims were clearly barred by Section 230. *Id.* at 1095. The court explained that the act that Facebook "allegedly conducted in a discriminatory manner is the removal of the [Sikhs for Justice] Page in India," and because "removing content is something publishers do," imposing "liability on the basis of such conduct necessarily involves treating the liable party as a publisher." *Id.* The Ninth Circuit affirmed the district court's decision and found that the plaintiff's claims "seek[] to hold Facebook liable as a publisher for hosting, and later blocking, [Sikhs For Justice]'s online content" and so were barred under Section 230. *Sikhs for Just.*, 697 F. App'x at 526–27.

Likewise, in *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), the Second Circuit applied Section 230 to affirm a dismissal of claims against Facebook. In that case, plaintiffs sought to hold Facebook liable under federal anti-terrorism laws for allegedly failing to delete terrorist content and for "disseminating" such content "to interested parties" by using algorithms to suggest content to users. *Id.* at 65. The Second Circuit rejected the plaintiffs' contention that "Facebook's use of algorithms renders it a non-publisher," instead concluding that such "alleged conduct by Facebook falls within the heartland of what it means to be the 'publisher' of information under Section 230(c)(1)." *Id.* at 65–66.

Plaintiffs try to avoid Section 230 by declaring that "[t]his lawsuit does not allege wrongdoing by Meta or its subsidiaries as 'publishers'"; instead, "this lawsuit alleges that Defendants 'blacklisted,' without justification and in violation of law, Plaintiffs and other Class Members as part of a scheme to reduce and eliminate competition for OnlyFans." Am. Compl. ¶ 7; *see also id.* ¶ 27. But that is simply a legal conclusion that need not be credited at this stage, as plaintiffs cannot "circumvent the CDA's protections through 'creative' pleading." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016). Plaintiffs' claims are that Meta employees de-published or limited publication of content that plaintiffs posted, while publishing content posted by OnlyFans creators, which checks all the Section 230 boxes.

It does not matter that the alleged removal of plaintiffs' content was purportedly the product of a far-fetched conspiracy between Meta employees and OnlyFans. As with the First Amendment, courts have repeatedly held that it is immaterial for Section 230(c)(1) purposes whether the plaintiff claims that the removal of content was made for allegedly illegitimate reasons. For example, in *Sikhs for Justice*, the plaintiffs alleged that Facebook had violated federal and state law by blocking access to their Facebook page in India, and that such conduct "was motivated solely by unlawful discrimination against the national identity of India and the minority religion of Sikhs in India." 144 F. Supp. 3d. at 1095. In dismissing the complaint, the court focused not on the alleged *motive*, but on the alleged *act* that Facebook performed: "the removal of [the Facebook] Page in India." *Id*. Because "removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher," the court concluded that the act of removing the page—even if performed for allegedly discriminatory purposes—was protected by Section 230(c)(1). *Id.*

Similarly, in *Fyk v. Facebook* the Ninth Circuit rejected the plaintiff's argument that Section 230(c)(1) immunity did not apply, because "Facebook allegedly 'discriminated' against him by singling out his pages.'" 808 F. App'x at 598. The court explained that the plaintiff's allegation that "Facebook . . . took its actions for monetary purposes" was immaterial, because "nothing in § 230(c)(1) turns on the alleged motives underlying the editorial decisions of the provider of an interactive computer service." *Id.* The same principle applies here: that Meta allegedly removed or filtered content for reasons plaintiffs deem illegitimate or unfair is wholly immaterial for purposes of Section 230.

Plaintiffs' allegations that the removal of their content was done pursuant to automated processes and database classification does not eliminate Section 230 protection, either.  The Ninth Circuit has time and again explained that "a website's use of content-neutral algorithms, without more, does not expose it to liability for content posted by a third-party."  *Gonzalez*, 2 F.4th at 896; *see also Carafano*, 339 F.3d at 1124–25).  The Second Circuit likewise found "no basis in the ordinary meaning of 'publisher,' the other text of Section 230, or decisions interpreting Section 230," to conclude that the use of algorithms renders Facebook a non-publisher.  *Force*, 934 F.3d at 66.  Any ruling to the contrary would "deny immunity for the editorial decisions regarding third-party content that interactive computer services have made since the early days of the Internet."  *Id.*  It would also "turn Section 230(c)(1) upside down to hold that Congress intended that when publishers of third-party content become especially adept at performing the functions of publishers, they are no longer immunized from civil liability."  *Id.* at 66–67.  "[S]o long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific edit[orial] or selection process."  *Id.* at 67 (citing *Carafano*, 339 F.3d at 1124).

## C.     Plaintiffs' Allegations Are Not Plausible

Plaintiffs' amended complaint also fails because it does not make it past the threshold plausibility requirement.  "Under Rule 12(b)(6), a complaint should be dismissed if it fails to include 'enough facts to state a claim to relief that is plausible on its face.'"  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 617 (9th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Claims are plausible only when the well-pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) [liability] reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief.'"  *Twombly*, 550 U.S. at 557.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678.  "[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant

1    evidence." *Twombly*, 550 U.S. at 559.  And claims are not plausible when based on "naked assertion[s]

2    devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678.

3        Plaintiffs allege a sensational, multi-faceted conspiracy between unnamed John Doe Meta

4    employees and individuals and/or entities affiliated with OnlyFans involving covert payments and

5    manipulation of both shared terrorism-related databases and Meta's own internal algorithms.  But each of

6    the critical links in this alleged scheme is supported only by allegations "on information and belief"—a

7    pleading crutch employed 39 times in the amended complaint.  Am. Compl. ¶¶ 35, 53, 61, 64, 67, 69–70,

8    71, 76–77, 82, 85, 86, 89.  Indeed, plaintiffs even allege the impact on adult entertainers from the supposed

9    scheme upon information and belief.  *See id.* ¶¶ 34, 36, 40, 62, 63, 68, 89.  And the nonsensical result of

10   this alleged scheme is ultimately diverting more users away from Meta's apps and onto OnlyFans.  "For

11   a conspiracy of the scale alleged by this complaint, one would expect at least some evidentiary facts to

12   have been located and pled." *Kelsey K. v. NFL Enterprises, LLC*, 254 F. Supp. 3d 1140, 1144 (N.D. Cal.

13   2017), *aff'd,* 757 F. App'x 524 (9th Cir. 2018).  Instead, plaintiffs' highly speculative allegations come

14   nowhere close to plausibly stating a claim against *Meta*.

15       *Twombly* is especially instructive here.  In that case, the plaintiffs alleged facts that were merely

16   "consistent with [a] conspiracy" to engage in anticompetitive conduct, but were "just as much in line with

17   a wide swath of rational and competitive business strategy."  550 U.S. at 554.  And plaintiffs' "ultimate

18   allegations" that defendants had in fact entered into an anticompetitive contract or combination was

19   alleged exclusively "upon information and belief." *Id.* at 551.  The Supreme Court held that "a bare

20   assertion of conspiracy" did not "nudge[ the plaintiffs'] claims across the line from conceivable to

21   plausible." *Id.* at 556, 570.  As in *Twombly*, plaintiffs' only well-pleaded allegations set forth a narrative

22   that is merely consistent with unlawful conduct: (1) that from 2018 to present, OnlyFans became ascendant

23   in the market for subscription-based, adult entertainment while its competitors' market share diminished,

24   and (2) that the visibility of the named plaintiffs' content or accounts was diminished.  As in *Twombly*,

25   plaintiffs' "ultimate allegations" regarding the underlying cause driving these claims are made exclusively

26   upon "information and belief," which "are precisely the kinds of conclusory allegations that *Iqbal* and

27   *Twombly* condemned and thus told [courts] to ignore when evaluating a complaint's sufficiency." *16630*

28

*Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (dismissing complaint where allegations of racially disparate treatment were made exclusively on information and belief). "'Upon information and belief' is a lawyerly way of saying that [plaintiff] does not know that something is a fact but just suspects it or has heard it." *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 387 (3d Cir. 2020).

"When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). Rather, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* Plaintiffs have not cleared this hurdle. The allegedly uneven outcomes between OnlyFans and its competitors are equally consistent with more straightforward, plausible explanations. Plaintiffs' allegations that their content was suppressed are similarly insufficient to cross the line between conceivable and plausible. Indeed, plaintiffs concede that the content they posted to Facebook and Instagram contained links to "their accounts on the [adult entertainment] Platforms." Am. Compl. ¶ 30. While the removal or suppression of content is theoretically consistent with plaintiffs' alleged scheme, such facts are equally, if not more, suggestive of Meta's enforcement of its Sexual Solicitation Community Standard, which flatly prohibits content that links to pornographic material. Ex. 1. There are no factual allegations showing that OnlyFans was somehow exempt from enforcement of these policies. Instead, the fact that OnlyFans grew in popularity is most obviously explained by the fact that prominent celebrities became early adopters or endorsers of OnlyFans, catapulting the platform into the pandemic-era zeitgeist. It also makes zero sense that Meta would be involved in a scheme whose purpose is directing users away from Meta's platforms and onto the platforms of third parties.

Because plaintiffs have pleaded facts that are merely consistent with Meta's liability alongside a bare assertion of conspiracy, and further because they have not alleged facts tending to exclude more

1    plausible explanations, the complaint "stops short of the line between possibility and plausibility of

2    'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

3        **D.      Meta Is Not Vicariously Liable for the Alleged Conduct of John Doe Defendants**

4            Plaintiffs' claims should also be dismissed because they have not pleaded the necessary facts to

5    establish vicarious liability.  The complaint seeks to hold Meta vicariously liable for the conduct of the

6    unnamed John Doe defendants, who are allegedly employees of Meta and who plaintiffs claim ("on

7    information and belief") accepted bribes in exchange for manipulating algorithms to target adult

8    entertainers who exclusively use OnlyFans competitors.  *See* Am. Compl., ¶¶ 104, 111, 116–17.  But

9    California courts have repeatedly held that vicarious liability is unavailable under the UCL, and the

10   complaint has no allegations showing that Meta is vicariously liable for the economic torts allegedly

11   committed by their employees.

12           ***UCL.***  Under the UCL, a "defendant's liability must be based on his *personal participation* in the

13   unlawful practices and unbridled control over the practices that are found to violate section 17200."  *Emery*

14   *v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002) (emphasis added).  Because of the "personal

15   participation" requirement, the "concept of vicarious liability has no application to actions brought under

16   the unfair business practices act."  *Id.*; *see also People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984).  "[A]n

17   unfair practices claim cannot be based on vicarious liability, but must contain an element of the

18   defendant's 'personal participation in the unlawful practices and unbridled control over the practices that

19   are found to violate section 17200 or 17500.'"  *In re Firearm Cases*, 126 Cal. App. 4th 959, 983 (2005).

20   Relying on these state-law authorities, the Ninth Circuit has similarly held that "an unfair practices claim

21   under section 17200 cannot be predicated on vicarious liability."  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,

22   494 F.3d 788, 808 (9th Cir. 2007).

23           Plaintiffs do not have a single allegation establishing Meta's "personal participation" or "unbridled

24   control" over the alleged conduct of the John Does.  To the contrary: plaintiffs' fanciful theory appears to

25   be that individual rogue employees abused Meta's systems and processes at the behest of OnlyFans.  These

26   extraordinary allegations are utterly implausible, but the point for present purposes is that plaintiffs have

27   not put forward any allegation showing Meta's involvement in or control over the John Does.  That the

28

John Doe defendants are alleged to be Meta employees is insufficient to establish vicarious liability: "[a] principal cannot ratify the act of the alleged agent, unless the 'agent' purported to act on behalf of the principal." *Emery*, 95 Cal. App. 4th at 961–62 (rejecting UCL claim based on agency theory where the alleged "agent" did not "purport to act for" the principal). Plaintiffs do not allege that the John Doe defendants purported to act on behalf of Meta when they allegedly accepted bribes in exchange for manipulating content-moderation tools to benefit OnlyFans.

*Economic Torts.* Plaintiffs must plead facts sufficient to establish that the John Does' alleged economic torts were "engendered by" their employment with Meta. They have not done so. Plaintiffs seeking to impute liability to an employer for the tortious conduct of its employee and so must establish that the conduct was "engendered by or ar[ose] from the work." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 298 (1995). "That the employment brought tortfeasor and victim together in time and place is not enough." *Id.* Rather, "the risk of tortious injury must be 'inherent in the working environment,' . . . or 'typical of or broadly incidental to the enterprise [the employer] has undertaken.'" *Id.* In determining whether an employee's conduct was "engendered by" his work, the core inquiry is foreseeability. "Respondeat superior liability should apply only to the types of injuries that . . . as a practical matter are sure to occur in the conduct of the employer's enterprise." *Id.*; *see also Hinman v. Westinghouse Elec. Co.*, 2 Cal. 3d 956, 959–60 (1970). "The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." *Lisa M.*, 12 Cal. 4th at 299. Conduct is foreseeable, and therefore is "engendered by" the employment, only when "an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.*; *see also Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 618 (1975). "An act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way." *Lisa M.*, 12 Cal. 4th at 292. Whether an employee has acted within the scope of employment is a question of law that can be resolved on a motion to dismiss if the necessary facts are absent from the face of the complaint. *See, e.g.*, *Lusk v. Kellogg*, 2011 WL 13225140, at *3 (C.D. Cal. Aug. 10, 2011) (granting motion to dismiss).

Plaintiffs allege that the John Doe employees of Meta accepted payments via offshore accounts to manipulate a variety of tools for purposes of harming competitors of a subscription-based, adult-entertainment platform.   It is eminently unforeseeable that employees tasked with identifying and eradicating harmful content on social-media apps would accept foreign bribes to manipulate content-moderation tools for purposes of benefiting one adult-entertainment platform over its competitors.   Neither is this conduct the type that "as a practical matter [is] sure to occur in the conduct of" Meta's "enterprise[s]."   *Lisa M.*, 12 Cal. 4th at 299.   Rather, the alleged conduct of the John Doe defendants is so "unusual [and] startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business."   *Id.*   In fact, plaintiffs allege that the John Doe defendants engaged in this conduct for their *own* economic benefit, *see* Am. Compl., ¶ 75, and do not (and cannot) allege that the conduct was intended to benefit *Meta*.   *See Lisa M.*, 12 Cal. 4th at 298 ("An act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way.").   Because the alleged conduct of the John Does was not foreseeable, and further because plaintiffs allege that the John Does acted in their own pecuniary interest rather than that of their employer, the complaint does not allege facts sufficient to establish Meta's vicarious liability for the alleged economic torts.

### E.   Plaintiffs Have Not Alleged Any Interference With Contracts Or Prospective Economic Advantage

Plaintiffs' economic-tort claims also fail because they have not pleaded facts showing actual interference with any contracts or business opportunities.   As a matter of law and logic, plaintiffs asserting tortious interference with contract or prospective economic advantage must allege, respectively, that a contract was actually breached or disrupted, or that there was an actual disruption of an economic relationship.   *See San Miguel v. HP Inc.*, 317 F. Supp. 3d 1075, 1094 (N.D. Cal. 2018); *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1151 (N.D. Cal. 2019).   Plaintiffs have not identified any actual contract that was breached (or disrupted), or any economic relationship that was disrupted.   At a minimum, then, the absence of these most-basic allegations precludes the economic-tort claims.

1

F.    **Plaintiffs' UCL Claim Must Be Dismissed Under *Sonner***

2

Plaintiffs' UCL claim should be dismissed for the independent reason that they have not pleaded

3

that they lack an adequate remedy at law.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th

4

Cir. 2020).  As the Ninth Circuit recently explained, it "is a basic doctrine of equity jurisprudence that

5

courts of equity should not act . . . when the moving party has an adequate remedy at law."  *Id.*  This

6

doctrine precludes plaintiffs' equitable UCL claim as a matter of law.  Recent cases have confirmed that

7

"civil causes of action authorized by the UCL … must properly be considered equitable, rather than legal,

8

in nature." *Williams v. Apple, Inc.*, 2020 WL 6743911, at *9 (N.D. Cal. Nov. 17, 2020); *see also*

9

*Nationwide Biweekly Admin., Inc. v. Super. Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 299 (2020) ("[T]he

10

legislature, in enacting the UCL, intended to create an equitable, rather than a legal, cause of action.").

11

Plaintiffs' UCL claims are therefore governed by the traditional constraints on equitable claims, including

12

the rule that federal jurisdiction extends to equitable claims only when the plaintiff can establish that it

13

"lacks an adequate remedy at law."  *Sonner*, 971 F.3d at 844; *see also Philips v. Ford Motor Co.*, 726 F.

14

App'x. 608, 609 (9th Cir. 2018) (similar).

15

Plaintiffs make no such showing here—"the operative complaint does not allege that [plaintiffs]

16

lack[] an adequate legal remedy."  *Sonner*, 971 F.3d at 844.  The Ninth Circuit has now twice held that

17

plaintiffs must allege the inadequacy of their legal remedies in order to allege a right to the UCL's

18

equitable remedies.  *Id.*; *see also Philips*, 726 F. App'x at 609 ("the district court correctly determined

19

that Appellants were required to plead the inadequacy of their legal remedies" to state claims for equitable

20

relief under the UCL).  Courts in this District have (both before and after *Sonner* and *Philips*) repeatedly

21

granted motions to dismiss UCL claims where plaintiffs "d[o] not plead … the inadequacy of remedies at

22

law." *Williams*, 2020 WL 6743911, at *10 (quoting *Sonner*, 971 F.3d at 844); *see also Nguyen v. Nissan*

23

*N. Am., Inc.*, 2017 WL 1330602, at *4 (N.D. Cal. Apr. 11, 2017) (collecting cases).  Plaintiffs do not plead

24

that they are without adequate remedies at law, requiring dismissal of their UCL claim.

25

The complaint also makes plain that plaintiffs have adequate remedies at law.  Plaintiffs seek

26

money damages under tort claims for exactly the same conduct for which they seek restitution under the

27

UCL.  When an equitable claim "relies upon the same factual predicates as a plaintiff's legal causes of

28

action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action." *In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5 (N.D. Cal. Mar. 12, 2014).  As such, federal courts routinely dismiss UCL or other equitable claims at the motion to dismiss stage when "plaintiffs . . . allege[] other claims presenting an adequate remedy at law." *Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1203 (N.D. Cal. 2017); *see Zapata Fonseca v. Goya Foods Inc.*, 2016 WL 4698942, at *7 (N.D. Cal. Sept. 8, 2016) (dismissing UCL and other equitable claims where plaintiff pleaded five legal claims for the same conduct).  That plaintiffs' non-equitable claims are otherwise subject to dismissal (for the reasons described above) is of no moment—"[i]t matters not that a plaintiff may have no remedy if her other [legal] claims fail." *Munning*, 238 F. Supp. 3d at 1203.  "Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable." *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) (emphasis in original) ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing.").  The UCL claim fails.

## CONCLUSION

This Court should strike or dismiss the amended complaint in its entirety.

DATED:  June 30, 2022

KIRKLAND & ELLIS LLP

Respectfully submitted,

/s/ *K. Winn Allen*

K. Winn Allen, P.C. (*admitted pro hac vice*)
Devin S. Anderson (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
winn.allen@kirkland.com
devin.anderson@kirkland.com

Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
United States
Telephone: +1 415 439 1400
Facsimile: +1 415 439 1500
michael.esser@kirkland.com

*Attorneys for Defendants Instagram, LLC,
Facebook Operations, LLC, and Meta
Platforms, Inc.*

**CERTIFICATE OF SERVICE**

On June 30, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

/s/ *K. Winn Allen*
K. Winn Allen, P.C.