**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
David E. Azar, Esq. (SBN 218319)
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAWN DANGAARD, a/k/a ALANA EVANS, ASHLEY NICOLE MILLER, a/k/a NICOLE ANISTON, KELLY GILBERT, a/k/a KELLY PIERCE, JENNIFER ALLBAUGH, a/k/a RUBY, and LAURA ALLEN, a/k/a AMBER LYNN on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>FENIX INTERNET LLC, FENIX INTERNATIONAL INC., META PLATFORMS, INC., INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, LEONID RADVINSKY, and JOHN DOES 1-10,<br><br>                              Defendants. | Case No. 3:22-cv-01101-WHA<br><br>**PLAINTIFFS' OPPOSITION TO META DEFENDANTS' MOTION TO DISMISS AND STRIKE THE FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**[Declarations of expert Jonathan Hochman, Jack Aaronson, David E. Azar, Dawn Dangaard, Jennifer Allbaugh, Kelly Gilbert, and Dawn Holt filed concurrently.]**<br><br>Complaint File: February 22, 2022<br><br>Judge: William Alsup<br>Hearing Date: September 8, 2022<br>Time: 11:00am<br>Courtroom: 12, 19th Floor |

1

## <u>TABLE OF CONTENTS</u>

2

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

I.       STATEMENT OF ISSUES TO BE DECIDED ....................................................1

II.      INTRODUCTION AND BACKGROUND ...........................................................1

III.     LEGAL STANDARDS FOR ANTI-SLAPP IN FEDERAL COURT ...................4

IV.      ARGUMENT.......................................................................................................6

         A.       THE ANTI-SLAPP STATUTE DOES NOT APPLY TO PLAINTIFFS'
                  CLAIMS. .......................................................................................................6

                  1.       Plaintiffs' claims do not arise from protected conduct. .......... 6

                  2.       The conduct at issue was not undertaken in connection with a
                           public issue or an issue of public interest. .............................. 8

                  3.       Plaintiffs satisfy their step two burden.................................... 9

                  4.       Plaintiffs should be awarded their fees. ................................ 10

         B.       PLAINTIFFS HAVE PROPERLY PLEADED EACH CAUSE OF
                  ACTION. .....................................................................................................10

                  1.       Plaintiffs' claims are not barred by the First Amendment. ... 10

                  2.       Plaintiffs' Claims are not barred by the Communications
                           Decency Act. ......................................................................... 13

                  3.       Plaintiffs' claims are plausible. ............................................. 17

                  4.       Meta is vicariously liable for the alleged conduct of the John
                           Doe defendants....................................................................... 20

                  5.       Plaintiffs have alleged interference with contract and
                           prospective economic advantage. .......................................... 23

                  6.       The Complaint Properly Pleads Claims for Equitable Relief.
                           ................................................................................................ 24

V.       CONCLUSION..................................................................................................26

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Again, in Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969) ...................................... 11

*American Humane Assn. v. Los Angeles Times Communications*, 92 Cal.App.4th 1095 (2001)  10

*Associated Press v. Labor Board*, 301 U.S. 103 (1937) ............................................................... 12

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ................................................................ 14

*Bernstein v. Health Net Life Ins. Co.*, 2013 WL 12095240 (S.D. Cal. Apr. 4, 2013) ................. 17

*Catlin Ins. Co. v. Meredith*, 2021 WL 764042 (N.D. Cal. 2021) ..................................................... 7

*Cisco Systems, Inc. v. STMicroelectronics, Inc.*, 2015 WL 3488923 (N.D. Cal. June 2, 2015)... 17

*City of Cotati v. Cashman*, 29 Cal.4th 69 (2002) ........................................................................... 6

*Dekker v. Vivint Solar, Inc.*, 2022 WL 827246 (N.D. Cal. Mar. 18, 2022) ................................. 25

*Delfino v. Agilent Technologies*, 145 Cal App. 4th 790 (2006) ................................................... 21

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Marketing, LLC*, 541 F.Supp.3d 1020
(C.D. Cal 2021) ......................................................................................................................... 5, 6

*Eco Electrical Contract LLC v. Reliaguard*, 2022 WL 1157481 (N.D. Cal. Apr. 22, 2022)  23, 24

*Emery v. VISA International Service Ass'n*, 95 Cal. App. 4th 952 (2002) ................................... 22

*Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (2019) .................... 16

*Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal.4th 53 (2002) ................................................... 5

*Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ....................... 14

*FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133 (2019) ................................................... 5, 6

*First Amendment. Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................... 11

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) ............................................................ 14

*FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ...................................................... 14

*FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990) ................................... 12

*Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal.App.4th 1388 (2002) ..................... 7

*Gamble v. Kaiser Foundation Health Plan, Inc.*, 348 F.Supp.3d 1003 (N.D. Cal. 2018) ............. 7

*Gevarter v. Maple Ridge Mobile Homes*, 2002 WL 31058040 (Cal. App. Sept. 17, 2002) ........ 22

*Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021) ........................................................... 14-15

*Heineke v. Santa Clara University*, 2017 WL 6026248 (N.D. Cal. 2017) ..................................... 5

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) .............................................................. 5

*Holomaxx Techs. v. Microsoft Corp.*, 783 F.Supp.2d 1097 (N.D. Cal. 2011) ............................ 16

*Homeaway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) ..................... 12, 15

*Iglesia Ni Cristo v. Cayabyab*, 2019 WL 3997474 (N.D. Cal. 2019) ........................................... 6

*Associated Press v. United States*, 326 U.S. 1 (1945) ................................................................. 11

*Song fi, Inc. v. Google, Inc.*, 108 F.Supp.3d 876 (N.D. Cal. 2015) ............................................ 16

*Inter Mountain Mortgage, Inc. v. Sulimen*, 78 Cal. App. 4th 1434 (2000) ................................ 20

*Jane Doe No. 14 v. Internet Brands, Inc.*, 824 F.3d. 846 (9th Cir. 2016) .............................. 14, 15

*JTH Tax, Inc.*, 212 Cal. App. 4th 1219 (2013) ................................................................. 22

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ........................................ 19

*Khraibut v. Chahal*, 2021 WL 1164940 at *13 (N.D. Cal. March 21, 2021) ............................... 20

*Lee v. Amazon.com, Inc.*, 76 Cal.App.5th 200 (2022) ....................................................... 15

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) ...................................................... 15

*Lisa M v. May Newhall Memorial Hospital*, 12 Cal.4th 291 (1995) ......................................... 20

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) .................................................. 11

*Mary M., v. City of Los Angeles*, 54 Cal.3d 202 (1991) ..................................................... 21

*Meta, In re Firearm Cases*, 126 Cal. App. 4th 959 (2005) .................................................. 22

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ............................................. 12

*Mindys Cosmetics v. Dakar*, 611 F.3d 590 (9th Cir. 2010) .................................................. 9

*Moore v. Shaw*, 116 Cal.App.4th 182 (2004) ................................................................. 10

*National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978) ............ 11, 12

*Navellier v. Sletten*, 29 Cal.4th 82 (2002) ................................................................. 5, 6

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268 (9th Cir 2013) ... 5

*NetChoice, LLC v. Attorney General*, 34 F.4th 1196 (11th Cir. 2022) ...................................... 12

*Nocarino v. Chobani LLC*, 3033 WL 34966 (N.D. Cal. Feb. 4, 2022) ........................................ 25

*of the Federal Rules of Civil Procedure. Metabolife Int'l., Inc. v. Wornick*Federal Rules of Civil
Procedure. Metabolife Int'l., Inc. v. Wornick, 264 F.3d 832 (9th Cir. 2001) ............................... 4

*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688 .............................. 9

*Park*, 2 Cal.5th ............................................................................................ 6

*Penrose Hill, Ltd. v. Mabry*, 479 F.Supp.3d 840 (N.D. Cal. 2020) .......................................... 6

*People v. Toomey*, 157 Cal. App. 3d 1 (1984) ................................................................ 22

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.App.4th 658
(2005) ...................................................................................................... 7

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828 (9th Cir. 2018)
............................................................................................................. 4

*Rose v. Seamless Financial Corp.*, 916 F.Supp.2d 1160 (S.D. Cal. 2013) ................................... 22

*Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016) ........................................................... 5

*Sherman v. Yahoo! Inc.*, 997 F.Supp.2d 1129 (S.D. Cal. 2014) .............................................. 16

*Soka University of America v. Shogakukuan*, 2007 WL 9770694 (C.D. Cal. 2007) ..................... 10

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834. (9th Cir. 2020) ......................................... 24

*Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) ....................................................... 17

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) .............................................................. 19

*TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676 (9th Cir. 1990) ................. 23

*United Nat. Maint., Inc. V. San Diego Convention Ctr., Inc.*, 766 F.3d 1002 (9th Cir. 2014) .... 23

iii

*v. Facebook, Inc.*, 2020 WL 4260733 (N.D. Cal. July 24, 2020) ................................. 18

*ValueRock TN Properties, LLC v. PK II Larwin Square SC LP,* 36 Cal.App.5th 1037 (2019) ..... 7

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) .................................. 10

*Wilson v. Cable News Network, Inc.*, 7 Cal.5th 871 (2019) ...................................... 5, 8

*Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029 (M.D. Fla. 2017) ....................... 16

*Zango Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) ........................... 16

*Zeiger v. WellPet, LLC*, 526 F.Supp.3d 652 (N.D. Cal. 2021) ................................. 25

*In re Zoom Video Communications, Inc. Privacy Litigation*, 525 F.Supp.3d 1017 (N.D. Cal. 2021) ................................................................................................................... 15

## Statutes

47 U.S.C. § 230 .......................................................................................................... 13

Business & Professions Code § 17200 ................................................................... 7, 22

Business & Professions Code § 17500 .........................................................................22

Cal. Code Civ. Proc. § 425.16 ................................................................3, 4, 5, 6, 9

Section 230 of the Communications Decency Act ........................................... *passim*

## Rules

Fed. R. Civ. P. 8 ........................................................................................................ 25

Fed. R. Civ. P. 12 ...................................................................................................... 19

Fed. R. Civ. P. 56 ........................................................................................................ 4

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     STATEMENT OF ISSUES TO BE DECIDED

Plaintiffs do not have a materially different statement of the issues than Meta.

## II.    INTRODUCTION AND BACKGROUND

Meta Defendants argue that Plaintiffs and the public are out of luck because they have a First Amendment right to report whoever they want as terrorists and have absolute immunity under Section 230 of the Communications Decency Act because they are an interactive service provider – even if someone bribed their staff to do so. Meta Defendants further claim this allows them total freedom to include content posted on Instagram by everyday Americans in a secret terror database that is used by more than 120 social media platforms. That cannot be what Congress intended. The Meta Defendants are legally wrong – and it is troubling that they read the Communications Decency Act in such a way, making this another example (in a growing list of them) of why Congress and the Courts should clarify or re-examine of the appropriate scope of safe harbors under Section 230 to prevent abuse. This situation calls for immediate investigation and quick resolution to determine if class members (and innocent, everyday Americans) have indeed been wrongly designated as terrorists or terrorist sympathizers by an artificial intelligence system run amok at any point during the class period. For anyone wrongfully designated, Meta Defendants should correct the designation, remove any hashed content from the terror database, provide relief, identify how this happened, and make sure it does not happen again. It cannot be said enough: terror lists should only be for terrorists, period.

Through this lawsuit, Plaintiffs seek to hold accountable entities and individuals that own or control Facebook, Instagram, and the OnlyFans adult-content internet platform, alleging that the Defendants engaged in a scheme to misuse a terrorist blacklist to obtain a competitive advantage and thereby harm Plaintiffs, those who use Plaintiffs' online platform, and other OnlyFans competitors. The blacklisting of Plaintiffs and others has caused OnlyFans to achieve a drastically enlarged market share starting in late 2018 while its competitors stagnated or declined.

This is *not* a lawsuit seeking to control the editorial choices of Facebook and Instagram, as Meta[1] contends. *Rather, Meta and its codefendants are accused of engaging in unfair business practices by conspiring to advance the interests of OnlyFans and harm OnlyFans' competitors and their users.* Meta's attempt to wrap itself in the First Amendment and the Communications Decency Act ("CDA") ignores the central focus of this action: the alleged collusion between employees of Meta and the OnlyFans adult entertainment business to damage the businesses of Plaintiffs and others associated with OnlyFans' competitors.

The scheme started with alleged payoffs to add certain adult content platforms that were competitors of OnlyFans to the Facebook Dangerous Individual and Organization List ("DIO"), even though they were not "dangerous." After that designation, that information appears to have been integrated into the Facebook Threat Exchange, causing the blacklisting, and blocking by the AI system. These secondary effects happened either at Facebook/Instagram directly, and/or at/through the Global Internet Forum to Counter Terrorist ("GIFCT") shared hash database, which is hosted by Facebook through its Threat Exchange Platform. (*See, e.g.*, Hochman Declaration at ¶ 10). This scheme alleged by Plaintiffs is more than just plausible on its face; in fact, Plaintiffs have already retained an expert who has backed that up with data. (*Id.*, *e.g.*, at ¶¶7-14, 18-23).

Meta's actions do not merely affect the Facebook and Instagram social media services; inclusion in the terrorist list of those who do not belong there has negatively affected OnlyFans' competitors and their users on *other* internet platforms. Plaintiffs allege that Meta, in collaboration with the other defendants, has engaged in unfair business conduct by misusing the GIFCT database for the purpose of suppressing traffic to OnlyFans' competitors' sites.

As a result of the public attention to this and related lawsuits, whistleblowers came forward and provided tips to Plaintiffs' counsel about the alleged scheme. Tips included details about some of the alleged payoffs and a list of 21,874 names of Instagram users who were allegedly affected (the "21K list"), some of whom had content hashed and added to GIFCT's database that is used on dozens of social media platforms to identify and block postings by terrorist and other dangerous organizations. The list of flagged content obtained by counsel includes content from businesses

---

[1] "Meta" refers to Meta Platforms, Inc., Facebook Operations, LLC, and Instagram, LLC.

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

1   big and small, as well as from individuals who include actors, singers, and influencers, as well as

2   highly regarded companies. Many of the names on the leaked list of people are in the adult

3   entertainment industry and have nothing to do with terrorism. It is likely a partial list – a snapshot

4   – at a particular moment in time, and so the full scope of the problem may be much greater.

5        Meta's Special Motion to Strike Pursuant to Section 425.16 of the California Code of Civil

6   Procedure ("Anti-SLAPP Motion") should be denied because Plaintiffs' claims do not fall within

7   the scope of the statute for several reasons. Plaintiffs' claims do not "arise from" protected activity

8   or speech. Additionally, based on Meta Defendants' alleged role in the scheme, they were not using

9   neutral search tools for content posted by *third* parties, since this does not involve content "posted"

10  by third parties but it is Meta's own content, and thus (c)(1) is inapplicable to Meta in this case.

11  Meta also fails to meet the requirement that the conduct it is being sued over contributed to an

12  existing public issue. Meta therefore cannot meet its first step 1 burden in the anti-SLAPP analysis.

13       Further, *even if* Section 425.16 is available to Meta, its contention that Plaintiffs cannot

14  prevail are simply incorrect. Plaintiffs' claims of unfair business conduct and suppression of

15  competition do not implicate and are not barred by the First Amendment, and the CDA does not

16  immunize Meta for its own actions and speech.

17       If the Court does not deny Meta's motion a matter of law, and finds Plaintiff's evidentiary

18  showing on Step 2 insufficient, discovery is necessary for Plaintiffs to respond and meet its burden

19  in the second step under Section 425.16. The limited discovery sought by Plaintiffs will depend

20  on what the Court finds insufficient, but potentially relates to: (a) Meta's contention that this

21  lawsuit arises from the speech of its users, (b) whether Meta included Plaintiffs and others who

22  are not terrorists on an anti-terrorism database in good faith, (c) whether Meta's conduct falls

23  within or outside the protection of the First Amendment and the CDA, and (d) any merits issues

24  identified by the Court for Step 2. Only with discovery can Plaintiffs establish with admissible

25  evidence (most of which is in the possession of defendants or certain third parties) proof of the

26  blacklisting, the *cause* of the blacklisting (*i.e.*, is inclusion of certain individuals and businesses in

27  a blacklist constitutes the speech of users that might fall within Section 230), the *purpose* of the

28

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

1  blacklisting (*i.e.*, was it a practice unprotected by the First Amendment and Section 230), and other

2  issues that Defendant appear to challenge on the merits.

3  Finally, aside from Section 425.16, the First Amendment, and the CDA, Meta briefly

4  attacks Plaintiffs' claims on the merits. Each of those attacks fail because the facts alleged in the

5  Amended Complaint clearly support several causes of action. Alternatively, Plaintiffs request

6  leave to amend to address any deficiencies.

7  **III.    <u>LEGAL STANDARDS FOR ANTI-SLAPP IN FEDERAL COURT</u>**

8  When an anti-SLAPP motion to strike only challenges the legal sufficiency of a claim, the

9  court should apply the standard under Fed. R. Civ. Pro. 12(b)(6). *Planned Parenthood Fed'n of*

10  *Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018), *amended*, 897 F.3d

11  1224 (9th Cir. 2018). However, if the anti-SLAPP motion challenges the factual sufficiency of the

12  claim, the standard under Rule 56 shall apply and discovery must be allowed. *Id*. An anti-SLAPP

13  motion brought in federal court does not stay discovery because such a stay would conflict with

14  Rule 56 of the Federal Rules of Civil Procedure. *Metabolife Int'l., Inc. v. Wornick*, 264 F.3d 832,

15  846 (9th Cir. 2001) (reversing trial court's denial of discovery and remanding to allow plaintiff to

16  obtain information that was in the defendants' exclusive control). Accordingly, if the Court reaches

17  a point where it needs to conduct an evidentiary analysis in Step 2 of the anti-SLAPP analysis, and

18  finds Plaintiffs' submission of evidence insufficient, it should hold the anti-SLAPP in abeyance

19  until Plaintiff has the opportunity to obtain discovery of evidence in the exclusive control of

20  Defendants and certain third parties.

21  Section 425.16 provides, "A cause of action against a person arising from any act of that

22  person in furtherance of the person's right of petition or free speech under the United States

23  Constitution or the California Constitution in connection with a public issue shall be subject to a

24  special motion to strike, unless the court determines that the plaintiff has established that there is a

25  probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1).

26  "California's anti-SLAPP statute is designed to discourage suits that 'masquerade as ordinary

27  lawsuits but are brought to deter common citizens from exercising their political or legal rights or

28

1  to punish them for doing so.'" *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724

2  F.3d 1268, 1272 (9th Cir 2013) (quoting *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003)).

3      Courts employ a two-step process to evaluate anti-SLAPP motions. *Sarver v. Chartier*, 813

4  F.3d 891, 901 (9th Cir. 2016); *Equilon Enters. v. Consumer Cause, Inc.,* 29 Cal.4th 53, 61 (2002).

5  The defendant must first show that the lawsuit arises from protected activity, which includes

6  "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection

7  with a public issue or an issue of public interest." Code Civ. Proc. § 425.16(e)(4); *Sarver*, 813 F.3d

8  at 901. Second, if the defendant has made such showing, the court evaluates whether the plaintiff

9  has "establish[ed] a reasonable probability that the plaintiff will prevail on his or her ... claim."

10 *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 139 (2019); *Sarver*, 813 F.3d at 901; *Hilton*

11 *v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010). Plaintiffs responding to anti-SLAPP

12 motions need only show that its claims have "***minimal merit***," and a defendant can defeat the

13 claims with an affirmative defense in the second step only if it establishes it can prevail on its

14 defense as a matter of law. *Hilton*, 599 F.3d at 908, 910 (emphasis added).

15     The phrase "arising from" in subsection (b)(1) restricts the statute to situations where "'the

16 speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability

17 or a step leading to some different act for which liability is asserted.'" *Wilson v. Cable News*

18 *Network, Inc.*, 7 Cal.5th 871, 884 (2019) (quoting *Park v. Bd. of Trustees of Cal. St. Univ.*, 2

19 Cal.5th 1057, 1060 (2017)) (original emphasis); *accord Diamond Resorts U.S. Collection Dev.,*

20 *LLC v. Pandora Marketing, LLC,* 541 F.Supp.3d 1020, 1030 (C.D. Cal 2021); *OneLegacy v. City*

21 *of Monterey Park*, 2019 WL6729723, *3 (C.D. Cal. 2019); *Heineke v. Santa Clara University*,

22 2017 WL 6026248, *5-6 (N.D. Cal. 2017). "[T]he mere fact that an action was filed after protected

23 activity took place does not mean the action arose from that activity for the purposes of the anti-

24 SLAPP statute . . . [T]hat a cause of action arguably may have been 'triggered' by protected activity

25 does not [mean] that it is one arising from such." *Navellier v. Sletten*, 29 Cal.4th 82, 89 (2002).

26     The phrase "in connection with" in subsection (e)(4) has been interpreted by the California

27 Supreme Court as restricting the SLAPP statute's "catchall provision" to situations where "a

28 defendant – through public or private speech or conduct – participated in, or furthered, the

discourse that makes an issue one of public interest." *FilmOn*, 7 Cal.5th at 151. "'[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.'" *Id*. (quoting *Wilbanks v. Wolk*, 121 Cal.App.4th 883, 898 (2004)); *accord Penrose Hill, Ltd. v. Mabry*, 479 F.Supp.3d 840, 855 (N.D. Cal. 2020); *Iglesia Ni Cristo v. Cayabyab*, 2019 WL 3997474 (N.D. Cal. 2019); *Diamond Resorts*, 541 F. Supp.3d at 1030.

## IV.   ARGUMENT

### A.   THE ANTI-SLAPP STATUTE DOES NOT APPLY TO PLAINTIFFS' CLAIMS.

#### 1.   Plaintiffs' claims do not arise from protected conduct.

Meta's motion must be denied at the outset because Plaintiffs' claims do not "arise from" protected activity and therefore do not fall within the scope of Section 425.16. Although Meta operates social networks used by millions of people, its blacklisting of Plaintiffs and others in order to advance the interests of OnlyFans is not an act that "itself . . . was in furtherance of Meta's right of petition or free speech." *City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002). "[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." *Park,* 2 Cal.5th at 1060 (original emphasis).

While Meta might have a First Amendment right to publish (or not publish) postings of particular users of Facebook and Instagram, Plaintiffs are alleging that Meta's wrongdoing was the act of causing OnlyFans' competitors and their content providers "to be falsely designated as a Dangerous Individual or Organization." This was part of a scheme to give preferential treatment to, and benefit, OnlyFans in order to advance OnlyFans' commercial interests and crush its competitors. That Plaintiffs' *evidence of this scheme* and Plaintiffs' *damages* involve social media postings does not mean the wrongful conduct (the blacklisting through false designation) arises from protected conduct and triggers the anti-SLAPP statute. *E.g.*, Hochman Decl. ¶ 62.

The statute's "definitional focus is not the form of the plaintiffs' cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability – and whether that activity constitutes protected speech or petitioning." *Navellier*, 29 Cal.4th at 92. "[T]he fact a cause of

1   action 'may have been triggered by protected activity' or the 'fact that protected activity may lurk

2   in the background – and may explain why the rift between the parties arose in the first place' does

3   not mean the alleged SLAPP *arises from* protected activity." *ValueRock TN Properties, LLC v. PK*

4   *II Larwin Square SC LP,* 36 Cal.App.5th 1037, 1047 (2019) (citations omitted) (original

5   emphasis); *accord Gamble v. Kaiser Foundation Health Plan, Inc*., 348 F.Supp.3d 1003, 1024-25

6   (N.D. Cal. 2018); *Catlin Ins. Co. v. Meredith*, 2021 WL 764042, *3 (N.D. Cal. 2021).

7          In *Gallimore v. State Farm Fire & Casualty Ins. Co*., 102 Cal.App.4th 1388 (2002), the

8   plaintiff sued State Farm for claims handling misconduct in violation of Business & Professions

9   Code section 17200. The complaint included references to an investigation conducted by the

10  California Department of Insurance. The trial court granted an anti-SLAPP motion, but it was

11  reversed because the complaint alleged "State Farm engaged in certain claims handling

12  misconduct and violated a number of statutory and regulatory rules. [Plaintiff] seeks ... to call State

13  Farm to task for *that conduct. . . .*" *Id.* at 1399. The Court of Appeal rejected "out of hand" State

14  Farm's argument that its communications with a regulatory agency were protected. "This

15  contention confuses State Farm's allegedly *wrongful acts* with the *evidence* that plaintiff will need

16  to prove such misconduct. Plaintiff seeks no relief from State Farm for its communicative acts, but

17  rather *for its alleged mistreatment of policyholders and its related violations and evasions of*

18  *statutory and regulatory mandates*." *Id.* (emphasis added)*; see also Peregrine Funding, Inc. v.*

19  *Sheppard Mullin Richter & Hampton LLP,* 133 Cal.App.4th 658, 673 (2005) (distinguishing cases

20  where defendants' communications were evidence of liability, not the basis of liability).

21         Plaintiffs' allegations do not arise from "editorial decisions to remove, block, filter, or

22  otherwise reduce the visibility of content," as Meta contends. Rather, Plaintiffs allege that it and

23  others were *falsely designated as terrorists*; these were private actions that had an *impact* on

24  speech, and thereby damaged Plaintiffs, but the speech is merely collateral to the claimed

25  wrongdoing. As discussed further below, there is no First Amendment protection for publishers

26  that engage in anti-competitive conduct, and *that* is the thrust of the Complaint. Meta cannot meet

27  the first step in the anti-SLAPP analysis, and its motion should be denied on that basis alone.

28

### 2. The conduct at issue was not undertaken in connection with a public issue or an issue of public interest.

Meta also fails to meet the requirement that the speech or conduct it is being sued over contributed to a public issue. "[A] defendant who claims its speech was protected as 'conduct in furtherance of the exercise of [free speech rights] in connection with a public issue or an issue of public interest' . . . must show not only that its speech referred to an issue of public interest, but also that *its speech contributed to public discussion or resolution of the issue*.'" *Wilson*, 7 Cal.5th at 900 (emphasis added). "'What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern.'" *Id.* (citation omitted).

It is noteworthy that Meta, in its motion, fails to mention the California Supreme Court's decision in *Wilson*, which controls here and explicitly rejects the "synecdoche theory of public issue in the anti-SLAPP statute." 7 Cal.5th at 902. In *Wilson*, CNN contended that its firing of a writer for plagiarism was a public issue because it implicated "ethical lapses of all journalists everywhere." The Supreme Court held that the existence of a larger public issue does not mean the conduct or speech in dispute is "in connection" with that issue. Rather, the targeted conduct or speech must *contribute to* the public discussion. The fact that a defendant is a publisher does not change the analysis. "We . . . do not read the anti-SLAPP statute to call for preliminary screening of every claim that might be brought against a news organization, merely because the claim might have incidental effects on the organization's operation." *Id.* at 894. "CNN's alleged statements about an isolated plagiarism incident did not contribute to public debate about when authors may or may not borrow without attribution." *Id.* at 903.

Meta is making the exact same argument here, and the Court should reject it. Meta contends that the public has "a significant interest in editorial policies and actions aimed at filtering and removing adult-entertainment content from widely available social-media apps." (Mot. at 16.) Of course, this lawsuit is *not* about the removal of "adult entertainment content" from Facebook and Instagram; it's about the false designation of particular people and companies as being dangerous, such that their postings are suppressed for anti-competitive reasons on Meta's platforms *and* the platforms of some other companies that use GIFCT. Meta's blacklisting of Plaintiffs and others

does not contribute to public discourse about a pressing issue. Plaintiffs are suing Meta over specific actions against specific companies and people. In fact, Meta used the GIFCT to blacklist Plaintiffs' "publishers" in secret – by bringing its motion, Meta actually wants to *stop* any public debate.

Accordingly, Meta fails to establish that the conduct complained of by Plaintiffs arises from protected speech or is in connection with a public issue. Meta's inability to meet its burden in the first step of the anti-SLAPP analysis requires the Court to deny Meta's motion.

### 3.      Plaintiffs satisfy their step two burden.

Should the Court reach the second step of the Section 425.16 analysis, Plaintiffs discuss n the next sections why Defendants purely legal arguments fail (First Amendment and CDA).  As to Plaintiffs' evidentiary showing on the rest, Plaintiffs submit expert and fact declarations that satisfy the limited standard of proof required to meet their burden on Step 2 of an anti-SLAPP motion "to demonstrate a probability of prevailing on its challenged causes." *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699 ("plaintiff's burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence.") "The statute requires only a 'minimum level of legal sufficiency and triability.'" *Mindys Cosmetics v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) (citation omitted). "'The statute poses no obstacle to suits that possess "minimal merit," which requires the plaintiff to only "state and substantiate a legally sufficient claim."'" *Id*. at 599 (quoting *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal.4th 728 (2003)).

Here, the concurrently submitted expert Declaration of Jonathan Hochman concludes that the alleged scheme is "technologically plausible and consistent with the data."  Hochman Decl. ¶7; *see also* id. at 3 (summary of conclusions), ¶¶ 62, 75-82, 85, 91, 96, 101. Further, the concurrently submitted declarations of Dangaard, Gilbert, Allbaugh and Aaronson (*passim*) provide admissible facts on various issues, including rejecting alternative causes, and providing information about contracts interfered with. The Forensic News article states that a source

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

provided information that largely comports with the allegations in the complaint.[2] The Azar Declaration and Hold declarations also provides circumstantial evidence in support of the complaint. *E.g.*, *see* Azar Declaration section "Additional Circumstantial Evidence Supporting The Complaint." Defendants submitted no factual evidence; thus, Plaintiffs' evidence is legally sufficient to establish even just one cause of action to satisfy Step 2.

### 4.       Plaintiffs should be awarded their fees.

Plaintiff believes it meets the standard to obtain their attorney fees and costs as provided in the anti-SLAPP statute and will make a separate motion with that request after this motion is decided. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1111 (9th Cir. 2003) (approving award of fees); *Moore v. Shaw*, 116 Cal.App.4th 182, 200 (2004) (awarding mandatory fees to defendant filed meritless anti-SLAPP motion); *Soka University of America v. Shogakukuan*, 2007 WL 9770694, *3 (C.D. Cal. 2007) (awarding fees on separate motion filed after defendant prevailed on anti-SLAPP motion); *American Humane Assn. v. Los Angeles Times Communications*, 92 Cal.App.4th 1095, 1103 (2001) (separate motion permitted).

### B.       PLAINTIFFS HAVE PROPERLY PLEADED EACH CAUSE OF ACTION.

### 1.       Plaintiffs' claims are not barred by the First Amendment.

The United States Supreme Court has held, repeatedly, that the First Amendment does not protect unlawful restraint of trade. Meta's citation to inapposite cases rejecting government regulation of speech – including government-imposed requirements that private companies publish certain material – does not help its case. "Although the First Amendment protects 'the freedom of speech,' its protections are not limitless. The United States Supreme Court has distinguished between "restrictions on protected expression," which are subject to First Amendment scrutiny, and "restrictions on economic activity or, more generally, on nonexpressive conduct," which do

---

[2] "The allegations largely comport with information that was shared with Forensic News in early 2022 by a source familiar with the situation. The source, who asked for anonymity to protect their safety, told Forensic News that they have seen bank wires from Fenix International Limited to Smart Team International which then paid offshore trust accounts set up in the Philippines by "senior Facebook executives." Forensic News could not independently confirm the allegations, and Meta and OnlyFans have denied any wrongdoing." https://forensicnews.net/adminleo-onlyfans-owners-dubious-financial-history/

1  not ordinarily implicate the First Amendment. *Sorrell v. IMS Health Inc*., 564 U.S. 552, 567

2  (2011).

3      The First Amendment *does not* protect anti-competitive conduct such as that alleged in this

4  lawsuit. This is bedrock law, expressed first by the Supreme Court in *Associated Press v. United*

5  *States*, 326 U.S. 1 (1945), and reaffirmed repeatedly over the past 75 years. "The fact that [a]

6  publisher handles news while others handle food does not . . . afford the publisher a peculiar

7  constitutional sanctuary in which he can with impunity violate laws regulating his business

8  practices." *Id.* at 7. Associated Press's ban on members selling news to non-members was found

9  to be an unlawful restraint on trade. "Freedom of the press from governmental interference under

10  the First Amendment does not sanction repression of that freedom by private interests." *Id.* at 20.

11      In *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), the Supreme Court upheld an

12  injunction against a newspaper publisher that refused to publish ads by businesses who also

13  advertised on a local radio station. The district court "found expressly that the purpose and intent

14  of this procedure was to destroy the broadcasting company. The court characterized all this as

15  'bold, relentless and predatory commercial behavior.'" *Id.* at 148-49. Like Meta, the "publisher

16  claim[ed] a right as a private business concern to select its customers and to refuse to accept

17  advertisement from whomever it pleases." *Id.* at 155. The Supreme Court flat-out rejected this

18  defense: "The right claimed by the publisher is neither absolute nor exempt from [antitrust]

19  regulation." *Id.*

20      Again, in *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969), the Supreme Court

21  held that a joint operating agreement between two newspapers was unlawful, even though the

22  publishers contended the agreement would save one of the newspapers from failure. The Court

23  quoted *Associated Press*: "'The First Amendment affords not the slightest support for the

24  contention that a combination to restrain trade in news and views has any constitutional

25  immunity.'" *Id.* at 140.

26      In *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), the

27  Supreme Court rejected the contention that an injunction against the Society's prohibition on

28  members bidding against each other impinged on First Amendment rights. "The First Amendment

---

11

does not 'make it . . . impossible ever to enforce laws against agreements in restraint of trade.'" *Id.* at 697 (*quoting Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). The Supreme Court also found in *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990), that a boycott by court-appointed lawyers to force an increase in pay was an unlawful restraint of trade and not protected by the First Amendment because it was driven by the attorneys' economic interests. *Id.* at 424-27 (distinguishing politically motivated boycott protected by the First Amendment in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)).

*NetChoice, LLC v. Attorney General*, 34 F.4th 1196 (11th Cir. 2022), *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), and the other cases cited by Meta are completely inapposite. The ridiculous statute in *NetChoice*, compelling internet platforms to publish materials favorable to conservatives, did not even come close to passing muster under the First Amendment. Similarly, the watershed *Tornillo* decision rejected a law stripping newspaper of the right to decide what they want to publish in their news pages about political races. This lawsuit does not involve an unconstitutional statute or ordinance imposing government control over privately owned media, triggering strict scrutiny under the First Amendment. Rather, this lawsuit alleges that Meta has abused a blacklist used by numerous online providers to advance the economic interests of its co-defendants, and to crush its codefendants' competitors. ***This lawsuit is all about "nonspeech, nonexpressive conduct" that does not implicate the First Amendment***. That Meta is in the online media business, and compliance with generally applicable laws (such as those prohibiting unfair business practices) might have an incidental effect on speech, does not require First Amendment scrutiny. *Homeaway*, 918 F.3d at 685-86; see also *Associated Press v. Labor Board*, 301 U.S. 103, 130-33 (1937) (rejecting argument that news organization was protected by the First Amendment for discharging an employee for union activity; "[t]he publisher of a newspaper [has] no special immunity from the application of general laws").

If the Court believes that Meta's First Amendment argument might have legs, discovery is necessary. Even where it applies, a First Amendment defense is not absolute and it would only conceivably come into play if Meta can show that, in blacklisting Plaintiffs and others, it did not intend to engage in unlawful anti-competitive activity, and its purpose in filtering (suppressing)

the postings of disfavored speakers was not economic and not motivated by a desire to advance the interests of OnlyFans.  Plaintiffs are entitled to test with evidence Meta's assertion that by misusing the GIFCT database it was engaging in its "exercise of its First Amendment-protected editorial decision to block, filter, or de-prioritize certain content created by adult entertainment performers," rather than engaging in unfair business conduct aimed at Plaintiffs. (Mot. at 1.)

### 2. Plaintiffs' Claims are not barred by the Communications Decency Act.

Meta asserts that it is immune from liability as an intermediary for user postings. Section 230 of the Communications Decency Act does not apply in this case, however, because Meta cannot meet two requirements: (1) Plaintiffs are not seeking relief from Meta for speech by any of Meta's users, and (2) Meta has not established that its conduct toward Plaintiffs was done in "good faith."

Section 230 of the Communications Decency Act has two independent but related immunities. Section 230(c)(1) provides an absolute immunity for "publisher" claims against providers of "interactive computer services" for the *dissemination of content posted on their platforms by users*. Section 230(c)(2) provides immunity from claims based on a provider's *"good faith" removal of offensive content* posted by users.

### a. The claims do not implicate "publisher" immunity.

Section 230(c)(1) states: "No provider or user of interactive computer service shall be treated as the *publisher or speaker* of any information *provided by another information content provider*." 47 U.S.C. § 230(c)(1) (emphasis added). An interactive computer service is defined as "any information service . . . that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2).

An information content provider is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Thus, an online service is unprotected by Section 230(c)(1) if, as here, *it* is itself the "information content provider" of the statements that are the basis for a claim – *i.e.,* if it bears responsibility for developing the material being sued over.

13

1   *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1164 n.15 (9th Cir. 2008) (*en*

2   *banc*).

3          *Roommates* established that a website operator is immune only with respect to content

4   created **entirely by third parties**. *Id.* at 1162. A court must look at whether the defendant online

5   service "materially contributes" to what makes the particular statement unlawful. The Ninth

6   Circuit distinguished "material contribution" to "the alleged unlawfulness" from an online

7   service's protected behavior as a mere conduit or in providing "neutral tools," such as a search

8   engine. *Id.*

9          Thus, an online service is unprotected by Section 230(c)(1) when a plaintiff sues the service

10  *for its own conduct and breaches of duty*. The leading case here is *Barnes v. Yahoo!, Inc.,* 570 F.3d

11  1096 (9th Cir. 2009), where the Ninth Circuit found that the plaintiff had pleaded a promissory

12  estoppel claim based on the assertion that Yahoo! promised but failed to remove from online chat

13  rooms certain sexually explicit postings. The court reasoned that the promise created a duty

14  independent of the tort rules controlling publishers. In *Jane Doe No. 14 v. Internet Brands, Inc.,*

15  824 F.3d. 846 (9th Cir. 2016), the Ninth Circuit reversed the grant of a motion to dismiss a

16  negligence claim resting on the contention that a website failed to warn plaintiff that two men were

17  using the site to lure women to photo shoots, during which they committed rape. The court pointed

18  out that the plaintiff alleged that the website had knowledge of the rape scheme that was

19  independent of any user posting, and this gave rise to a duty to warn. *Id.* at 853.

20         Pointing to the Ninth Circuit's discussion of "neutral tools," the Tenth Circuit held in *FTC*

21  *v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009), that "specific encouragement" of illegality

22  was not "neutral," and this made an online service that solicited and sold confidential telephone

23  records was not immune under Section 230(c)(1). Similarly, in *FTC v. LeadClick Media, LLC*, 838

24  F.3d 158, 176-77 (2d Cir. 2016), the Second Circuit held that the defendant was not entitled to

25  immunity under Section 230 because it participated in creation and dissemination of deceptive

26  advertisements.

27         Here, Plaintiffs' claims rest on the conduct and speech of Meta and its co-defendants, not

28  on Meta's publication of content created by third parties. *See, e.g.*, *Gonzalez v. Google LLC*, 2

F.4th 871, 898 (9th Cir. 2021) (CDA did not apply to claims that Google provided terrorists with material support); *Lemmon v. Snap, Inc*., 995 F.3d 1085, 1092-93 (9th Cir. 2021) (CDA did not apply to Snapchat's "speed filter," which allegedly incentivized teenagers to drive 123 miles per hour, resulting in a fatal wreck); *Homeaway.com*, 918 F.3d at 682-83 (CDA did not relieve rental website from complying with generally applicable laws, even if the website's activities involved user-provided data); *In re Zoom Video Communications, Inc. Privacy Litigation*, 525 F.Supp.3d 1017, 1033-34 (N.D. Cal. 2021) (distinguishing immunity provided for harmful third-party content from liability based on provider's actions).

That a defendant operates a social media platform (such as Facebook and Instagram) and the allegations touch on publication does not trigger immunity under Section 230(c)(1). In *Lemmon*, the Ninth Circuit pointed out that because "publishing content is a 'but-for-cause of just about everything' Snap is involved in, that does not mean that the [plaintiffs'] claim [of negligent design] seeks to hold Snap responsible in its capacity as a 'publisher or speaker.'" *Lemmon*, 995 F.3d at 1093. "After all, CDA immunity is available only to the extent a plaintiff's claim implicates third-party content." *Id.* at 1094; accord *Internet Brands*, 824 F.3d at 851 (rejecting a CDA "but-for" test). "As our Supreme Court has observed, 'not all legal duties owed by Internet intermediaries necessarily treat them as the publishers of third-party content, even when these obligations are in some way associated with their publication of this material." *Lee v. Amazon.com, Inc*., 76 Cal.App.5th 200, 256 (2022) (citing *Hassell v. Bird*, 5 Cal.5th 522, 542-43 (2018)).

Plaintiffs' claims challenge Meta's conduct in blacklisting Plaintiffs and others as terrorists, not the publication of third-party content. Plaintiffs' claims do not seek to impose liability on Meta for publishing or refusing to remove third party content.

### b. The claims do not implicate "good samaritan" immunity.

Although Meta asserts in its anti-SLAPP motion that it is protected by Section 230(c)(1), the provision in the CDA that may actually be relevant to the allegations here – if any – is Section 230(c)(2). Meta does not attempt to justify it conduct under (c)(2), and thus waives the argument, but we briefly explain why it is inapplicable for avoidance of doubt.  That section provides protection for online providers that take actions to remove certain content from their services under

1  "Good Samaritan" immunity for *"good faith" restriction and removal* of objectionable content.

2  Courts have found that Section 230(c)(2) provides the test for immunity where content is blocked

3  or filtered, rather than Section 230(c)(1), which immunizes publisher-type decisions regarding the

4  removal of user-created content. *See, e.g., e-Ventures Worldwide, LLC v. Google, Inc.*, 2017 WL

5  2210029 (M.D. Fla. 2017).

6        Although there has been debate in the courts as to what type of content is "objectionable"

7  and its removal thereby falls within the scope of Section 230(c)(2),[3] the Ninth Circuit has made

8  crystal-clear that removal of content to obtain competitive advantage is not "good faith." In

9  *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (2019), the plaintiff

10  alleged that the defendant had configured its software to block users from accessing the plaintiff's

11  software in order to divert customers. The defendant contended that it had legitimate reasons for

12  its filtering decisions, but the Ninth Circuit found that "Enigma's allegations of anticompetitive

13  animus are sufficient to withstand dismissal." *Id*. at 1045. The court emphasized Congress' stated

14  policy in the statute "to preserve the vibrant and competitive free market that presently exists for

15  the Internet and other interactive computer services." *Id.* at 1050-51. Congress wanted to

16  encourage development of filtration technologies "in large part to protect competition, not suppress

17  it." *Id.* at 1051.  Even though providers might have discretion in deciding what content was

18  "objectionable," the court found that "blocking and filtering decisions that are driven by

19  anticompetitive animus are not entitled to immunity under section 230(c)(2)." *Id.* at 1047. The

20  court refused to enter into the debate over whether Enigma's software in particular was

21  "objectionable;" rather, it concluded "that if a provider's basis for objecting to and seeking to block

22  materials is because those materials benefit a competitor, the objection would not fall within any

23  category listed in the statute and the immunity would not apply." *Id*. at 1052.

24        Plaintiffs allege that the content of its users is being filtered (suppressed) in bad faith;

25  evidence that Meta has placed on the GIFCT hash database individuals and entities who are not

26

27  [3] See, e.g., *Zango Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 (9th Cir. 2009); *Song fi, Inc. v. Google, Inc.*, 108 F.Supp.3d 876, 884 (N.D. Cal. 2015); *Sherman v. Yahoo! Inc.*, 997 F.Supp.2d

28  1129, 1138 (S.D. Cal. 2014); *Holomaxx Techs. v. Microsoft Corp.,* 783 F.Supp.2d 1097, 1104 (N.D. Cal. 2011).

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

1    terrorists, and evidence showing why Meta did this, goes directly to Plaintiffs' claims and is

2    indispensable in deciding Meta's CDA defense. At minimum, discovery is necessary before the

3    Court can decide whether Meta and its services are immune under Section 230(c).

4               3.         **Plaintiffs' claims are plausible.**

5    Plaintiffs have stated plausible claims against the Meta Defendants under the

6    *Twombly/Iqbal* standards. Allegations based on information and belief "are not automatically

7    insufficient and are advantageous when the factual issues are ambiguous or unclear between the

8    parties." *Bernstein v. Health Net Life Ins. Co*., 2013 WL 12095240, at *5 (S.D. Cal. Apr. 4, 2013)

9    (citation omitted). According to the Ninth Circuit, "[t]he *Twombly* plausibility standard ... does not

10   prevent a plaintiff from pleading facts alleged upon information and belief where the facts are

11   peculiarly within the possession and control of the defendant or where the belief is based on factual

12   information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d

13   910, 928 (9th Cir. 2017) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)

14   (citations and quotation marks omitted); *see also Concha v. London*, 62 F.3d 1493, 1503 (9th Cir.

15   1995) ("[W]e relax pleading requirements where the relevant facts are known only to the

16   defendant."). In other words, allegations made "upon information and belief" are appropriate

17   where (1) the support for the claims turns on the content of records held by the defendants, or (2)

18   where there is other factual information elsewhere in the complaint upon which the allegations are

19   based. *Cisco Systems, Inc. v. STMicroelectronics, Inc*., 2015 WL 3488923, at *4 (N.D. Cal. June

20   2, 2015) (citing *Arista*, 604 F.3d at 120).

21   In support of its allegations, Plaintiffs have provided specific information about

22   Defendants' alleged scheme. As discussed above, Plaintiffs allege that Defendants unlawfully

23   gained an unfair advantage over competitors of OnlyFans by manipulating hash databases resulting

24   in significant injury to Plaintiffs. See ¶ 1. Plaintiffs allege, in part, that owners, officers, directors,

25   or managing agents of both sets of Defendants provided the information used by its co-conspirators

26   to add false classifier/filtering information to the hash databases at issue resulting in false

27   identification of AE Providers or AE Platforms as either terrorist or as a dangerous individual or

28   organization. *E.g.*, ¶ 70-75.

1    The Complaint further specifies the time period in which this specifically alleged scheme

2  manifested in the damages alleged. For example, the Complaint details that the drop-off in traffic

3  and user engagement on social media platforms for OnlyFans's competitors mirrors the timing of

4  Fenix's co-conspirator's acquisition of OnlyFans. ¶¶ 33-34. As alleged, virtually overnight,

5  OnlyFans's competitors' traffic dramatically fell while OnlyFans's traffic exploded—even though

6  OnlyFans provided the same type of content. ¶¶ 37-41. According to the Complaint, this coincided

7  with OnlyFans' competitors losing traffic sourced from social media platforms that were deleting

8  or reducing the visibility of AE performers using OnlyFans' competitors' platforms while, at the

9  same time, OnlyFans's traffic from social media was increasing, again, notwithstanding the fact

10  that OnlyFans was providing the same content. ¶¶ 37-38; 40-41. Plaintiffs further detail the fact

11  that Facebook showed a sudden 500% increase in content removed for terrorist propaganda and a

12  66% increase in content removals for Adult Nudity and Sexual Activity over the identical time

13  period. ¶ 61. Despite Defendants' contentions to the contrary, Plaintiffs specifically allege that

14  these undisputable facts are the result of conduct by Defendants which intentionally manipulated

15  information in the databases at issue that was later shared in part or in full with other social media

16  companies." ¶ 43. Finally, Plaintiffs allege that Meta conducted an investigation into whether the

17  shared has database had been abused, in a manner consistent with the allegations here, and that

18  Meta has refused to share the findings or any other information about the investigation. ¶ 6.

19  Therefore, based on the allegation in the Complaint and the analysis herein, Plaintiffs have more

20  than met their burden at the pleading stage of this litigation and rightfully seeks additional

21  information in the sole possession of Defendants in order to prove its well-pled allegations. Courts

22  have found similar allegations plausible. *See Cisco Systems, Inc*., 2015 WL 3488923, at *4; *UAB*

23  *"Planner5D" v. Facebook, Inc*., 2020 WL 4260733, at *8 (N.D. Cal. July 24, 2020) (permitting

24  allegations based on information and belief where alleged a "multi-step plan" that defendant used

25  to improperly acquire data files.).

26    Plaintiffs have thus advanced plausible allegations that satisfy the standard under

27  *Twombly/Iqbal*. Meta's alternative and competing explanation—that OnlyFans captured "the

28  pandemic-era zeitgeist," Defs.' Br. at 20—fails because ***the pandemic happened about 18 months***

1    ***after the alleged scheme and bulk of the harm***.  Thus, OnlyFans would already have been in an

2    advantaged, dominant position to capitalize on the pandemic due to the effects of the scheme.  *See*

3    Aaronson Decl. at ¶12.  So Meta does not offer an alternative explanation for the actual time period

4    alleged.  .  As stated by the Ninth Circuit: "[i]f there are two alternative explanations, one advanced

5    by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint

6    survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only

7    when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is

8    implausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis added). Meta has not

9    met this high bar.

10      First, Meta's citation to its Sexual Solicitation Community Standard does not explain the

11    disproportionate effect on adult content platform that competed against OnlyFans, even though

12    they all would have been impacted by the same standards. Meta's alternative theory actually

13    bolsters the allegations in the Complaint: if Meta was truly only enforcing its own Standard, how

14    was it that OnlyFans' social media traffic flourished compared to that of its competitors when they

15    provided the same adult content? ¶ 37. If anything, the allegations in the Complaint show that

16    Meta's Standard was not applied uniformly, by exempting OnlyFans and, not by coincidence,

17    Radvinsky's two other websites. ¶ 38.

18      Meta's evidence is also inappropriate to consider on the present motion to dismiss.

19    "Generally, district courts may not consider material outside the pleadings when assessing the

20    sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d

21    988, 998 (9th Cir. 2018). Additionally, the Ninth Circuit has cautioned that the "use of extrinsic

22    documents to resolve competing theories against the complaint risks premature dismissals of

23    plausible claims that may turn out to be valid after discovery." *Id*.

24      Meta's final argument, that Meta would not be involved in a scheme to "direct [] users

25    away from Meta's platforms, Def Mot. at 20, misconstrues the allegations regarding Meta's role

26    in the de-platforming scheme because Plaintiffs allege that Meta's employees and/or agents are

27    responsible for the deplatforming scheme with Fenix rather than Meta itself. ¶¶ 19-20. Also, the

28    complaint alleges that performers essentially were forced to shift to OnlyFans over competitors,

so it is not clear (and not alleged) that Meta lost a material number of users.  While Plaintiffs are not required to rebut Meta's alternative theories, Meta has not shown that their proffered theories render Plaintiffs' allegations implausible.

### 4. Meta is vicariously liable for the alleged conduct of the John Doe defendants.

Meta's attempt to evade responsibility for the acts of its employees and agents must fail. It is liable for its agents and employees' actions both vicariously and directly. "Vicarious liability based on the tort doctrine of respondeat superior and direct liability based on the theory of actual or ostensible agency are different liability theories which cases do not always distinguish between them." *Inter Mountain Mortgage, Inc. v. Sulimen*, 78 Cal. App. 4th 1434, 1440 n.4 (2000). Both theories are pleaded in the Complaint, ¶ 19 (alleging Meta to be liable on the basis of "vicarious liability. along with liability for its own conduct"), and both are applicable.

### a. Vicarious Liability: Respondeat Superior

"[A]n employer is vicariously liable for the torts of its employees committed within the scope of the employment." *Lisa M v. May Newhall Memorial Hospital*, 12 Cal.4th 291, 296 (1995). Employee conduct is within the scope of employment if the conduct either "(1) is required by or incidental to the employee's duties, or (2) it is reasonably foreseeable in light of the employer's business." *Khraibut v. Chahal*, 2021 WL 1164940 at *13 (N.D. Cal. March 21, 2021) *quoting Montague v. AMN Healthcare, Inc.,* 223 Cal. App. 4th 1515, 1521 (2014). In *Khraibut*, the Court found that an executive employee whose responsibilities included monitoring computer usage of other employees, and who used his position to maliciously install spyware on another employee's computer, was acting within the scope of employment even though he may have had personal motivations for his actions. *Id.* The court also found that both the employer and the executive employee were liable under the UCL. *Id.* at *11.

Here, the Complaint pleads Meta's liability for the acts of its "officers, directors, or managing agents," "employees and agent." ¶ 70. Specifically, Plaintiffs allege that the GIFCT database was created by Meta, working with a few other social media businesses. ¶ 54. The officers, managing agents, and employees' acts was part of and arose from their employment; fell

within their professional responsibilities, and they were able to accomplish this only because their Meta authorized them to do so. *Compare Delfino v. Agilent Technologies*, 145 Cal App. 4th 790, 813 (2006) (no employer liability for act of sending tortious email from a private account, even during working hours, because the acts were not caused by the employment). Accordingly, the tortious acts alleged were "required by or incidental to the employee's duties."

Whether or not Meta explicitly authorized its personnel and agents to destroy the livelihoods of Plaintiffs and class members, and whether or not Meta itself profited from these acts, is not dispositive. "The fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer . . . . The proper inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." *Mary M., v. City of Los Angeles*, 54 Cal.3d 202 (1991) (internal citations omitted.) "Tortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment. So may acts that do not benefit the employer or are willful or malicious in nature." *Id.* at 209, (internal citations omitted).

Even if the act of entering data were found to be outside of the employees' scope of employment, Meta remains liable for the employees' acts because their tortious actions were reasonably foreseeable in light of Meta's business. As the operator of the world's largest social media networks, Meta was fully aware that many people and businesses depend for their livelihoods on social media visibility on their platforms. It was aware that the precise purpose of the GIFCT database was to reduce or eliminate the visibility of listed individuals and businesses on their platforms, and on other platforms as well. ¶ 54. Thus, it was easily foreseeable that employees entrusted to list individuals as "Dangerous Individuals or Organizations" ("DIO") had the ability not only to disempower actual terrorists, but also to destroy legitimate businesses that depended on social media visibility. That such power would create a temptation by the holders to attempt to personally profit is unfortunate but foreseeable. The crime that occurred here was foreseeable to Meta. At the very least, discovery is required.

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

### b.     Direct Liability: Agency Theory.

Some courts have rejected vicarious liability for UCL violations, although none of these cases were considering the lability of an employer for acts on an employee, and it's not clear that the precedent should be applicable.[4] In any event, there is no doubt that a corporation may be directly liable under the UCL for the acts of its employees **on the basis of agency theory, rather than vicarious liability**.

"A principal is liable to third parties for an agent's acts within the scope of the agent's actual or ostensible authority, . . . Further, a principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." *Gevarter v. Maple Ridge Mobile Homes*, 2002 WL 31058040 at *2 (Cal. App. Sept. 17, 2002) (nonprecedential) (sustaining UCL Complaint against employer for employee's acts based on agency theory), *quoting Rutherford v. Rideout Bank,* 11 Cal.2d 479, 484 (1938); *Rose v. Seamless Financial Corp*., 916 F.Supp.2d 1160, 1168 (S.D. Cal. 2013) (UCL case: "Under traditional agency principles, a principal may be liable for the acts of his agent if the principle consents to the "agent acting on his behalf and subject to his control, and the agent consents to act for the principal".); *see also Rutherford*, at 483 (bank liable where a bank manager "made a fraudulent use for the authority conferred upon him by the bank" after accepting a bribe; no indication that the bank profited from the fraud in any way);. *JTH Tax, Inc.,* 212 Cal. App. 4th 1219, 1242-43 (2013) (holding corporation liable for UCL violations of its franchisees applying "normal agency theory").

By this approach, Meta is liable for injury caused by its employees' and agents' if the alleged conduct was within the scope of their actual, apparent, or ostensible authority. The Complaint pleads that the scheme depended on actions taken by agents and employees of META who had this authority—if they had not had credentials from Meta, they would not have been able

---

[4] The principal case Meta relies on, *People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984), actually holds: "Holiday [the corporate entity] can, of course, be held liable for violations of sections 17200 and 17500 by its employees." The other cases cited by Meta, *In re Firearm Cases*, 126 Cal. App. 4th 959 (2005), and *Emery v. VISA International Service Ass'n*, 95 Cal. App. 4th 952 (2002), involve attempts to hold corporations liable for acts of their *customers*, not their employees, and so they are inapt.

1    to provide misinformation for false designations.  Meta may be liable for their acts and the claims

2    should not be dismissed out of the gate.

3           5.           **Plaintiffs have alleged interference with contract and
                         prospective economic advantage.**

4           Plaintiffs have properly alleged all elements of intentional interference with

5    contract:

6           Under California law, the elements for the tort of intentional interference with
7           contractual relations are "(1) a valid contract between plaintiff and a third party;
            (2) defendant's knowledge of this contract; (3) defendant's intentional acts
8           designed to induce a breach or disruption of the contractual relationship; (4)
9           actual breach or disruption of the contractual relationship; and (5) resulting
            damage."

10   *United Nat. Maint., Inc. V. San Diego Convention Ctr., Inc*., 766 F.3d 1002, 1006 (9th Cir. 2014)

11   (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co*., 791 P.2d 587, 589–90 (1990). Plaintiffs

12   properly plead each of these elements: Plaintiffs had contractual relationships with Adult

13   Entertainment Platforms, this was known to Defendants, Defendants acted to wrongfully interfere

14   with these contracts, including driving some platforms out of business, the contracts were

15   disrupted, and Plaintiffs were damaged. ¶¶ 103-4, 110-11; *see also* Dangaard, Pierce, Allbaugh

16   and Aaronson Declarations. No more is required.

17          Plaintiffs have also alleged all elements of intentional interference with prospective

18   business relationships: (1) an economic relationship between the plaintiff and some third party,

19   with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of

20   the relationship; (3) intentional acts on the part of the defendant designed to disrupt the

21   relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

22   proximately caused by the acts of the defendant. *TransWorld Airlines, Inc. v. Am. Coupon Exch.,*

23   *Inc.*, 913 F.2d 676, 689 (9th Cir. 1990) (quoting Y*oust v. Longo*, (1987) 43 Cal.3d 64, 71 n. 6). An

24   "economic relationship" need not necessarily arise to the level of a contract. *Eco Electrical*

25   *Contract LLC v. Reliaguard*, 2022 WL 1157481 at *9-10 (N.D. Cal. Apr. 22, 2022) (sustaining

26   claim for interference with prospective business relationships where plaintiff alleged interference

27   with a continuing, but non-contractual, connection between a buyer and a seller).

28

1   Here, the ongoing relationships between Plaintiffs and the AE Platforms with whom they

2   contracted were "economic relationships," providing both past and prospective economic benefits,

3   which were created and/or fostered through social media. These facts were known to Defendants.

4   ¶¶ 110-111. The designation of entertainers as terrorists interfered with these relationships and

5   drove many of the platforms out of business. Id. ¶ 105. These allegations are subject to proof or

6   disproof through financial records and testimony. Defendants' suggestion that Plaintiffs should

7   have listed in the Complaint the names of individual customers it had lost due to Defendants' acts,

8   while perhaps appropriate in cases where alleged interference involves a single business

9   relationship, makes no sense here, and would be inconsistent with California's pleading rules.

10          **6.          The Complaint Properly Pleads Claims for Equitable Relief.**

11   Meta's claim that *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834. 844 (9th Cir. 2020),

12   requires dismissal of all equitable claims, is misplaced. Plaintiffs have properly pleaded that legal

13   remedies are inadequate to redress all of the injuries that they have suffered and continue to suffer.

14   Plaintiffs allege that Defendants' acts have prevented them from promoting their businesses

15   through social media, which has hurt their careers in the past, continue to hurt them today, and will

16   continue to hurt their careers in the future unless the acts can be undone. Dkt. 4 ¶¶ 46, 50, 52.

17   Therefore, the Complaint seeks several forms of equitable relief for which a money judgment

18   would be an inadequate substitute:

19          g. For an order requiring defendants Meta and its subsidiaries to remove all AE
            Providers from being designated as a DIO, or a supporter of one, unless there is
20          evidence that such individuals are DIO's independently of their involvement in
            the adult entertainment industry;

21
            h. For an Order requiring defendant Meta and its subsidiaries to cause the
22          removal from the GIFCT shared hash tag database any content it contributed
            concerning AE Performers who do not meet the requirements for inclusion on
23          such a list;

24          i. For an Order requiring Meta and its subsidiaries to create a system to prevent
            abuses of shared hashtag databases by including non-qualifying hashtags in the
25          future;

26          j. For an injunction against all defendants to refrain from abuses of shared
            hashtag databases for anti-competitive purposes in the future.
27

28   First Amended Class Action Complaint, Demand for Relief, at 38-40; *see also Id.* at ¶ 123.

1    An award of money damages will compensate only for past losses, and it would be

2 inadequate to compensate for the ongoing damage Plaintiffs continue to suffer. As this Court has

3 previously ruled, *Sonner* has no application where a plaintiff seeks relief other than money

4 damages, which is the case here. *Dekker v. Vivint Solar, Inc.*, 2022 WL 827246 at * 3-4 (N.D. Cal.

5 Mar. 18, 2022) (Alsup, J.) ("A remedy at law may provide adequate relief for certain harms but

6 fail to remedy others, necessitating equitable relief."); *see also Zeiger v. WellPet, LLC*, 526

7 F.Supp.3d 652, 687 (N.D. Cal. 2021) (Orrick, J.) ("California's consumer protection laws permit

8 courts to issue injunctions that serve different purposes and remedy different harms than

9 retrospective monetary damages.").

10    In addition, Defendant' proposed extension of *Sonner* is clearly inconsistent with Fed. R.

11 Civ. P. 8(d)(3), which states, "A party may state as many separate claims or defenses as it has,

12 regardless of consistency," and Rule (a)(3), which states that complaints may include a "demand

13 for the relief sought, which may include relief in the alternative or different types of relief."

14 Plaintiffs have, and have pleaded, both legal and equitable claims, and any inconsistency between

15 the two forms of relief does not justify the dismissal of either at this stage. *Nocarino v. Chobani*

16 *LLC*, 3033 WL 34966, at *10 (N.D. Cal. Feb. 4, 2022) (Chen, J.) (sustaining complaint against

17 *Sonner* challenge, and noting that Rule 8(a)(3) permits alternative relief). Plaintiffs may have to

18 choose a specific claim or type of relief later, but that is not a basis to dismiss any claims or types

19 of reliefs right out of the gate.[5]

20    In  *Sonner,* the Ninth Circuit affirmed a district court's dismissal of claims for equitable

21 relief due to the adequacy of legal remedies. In that case, the plaintiff had voluntarily dismissed

22 all legal claims on the eve of trial, apparently to deprive the defendant of trial by jury. *Id.* at 838.

23 Since the dismissed legal claims would have provided precisely the same relief as the plaintiff

24 sought through equity, he was not entitled to equitable relief. Meta seeks to extend that ruling to

25 require dismissal of all equitable claims at the pleading stage where both legal and equitable claims

26 are pleaded.

27
28
---
[5] If the Court determines that any aspect of the pleadings is inadequate, Plaintiffs respectfully request that dismissal be without prejudice, and Plaintiffs be permitted leave to amend the Complaint to correct any deficiencies.

## V.      CONCLUSION

For the foregoing reasons, the Court should deny Meta's motion to dismiss and anti-SLAPP motion.

DATED:  August 11, 2022            **MILBERG COLEMAN BRYSON**
                                                      **PHILLIPS GROSSMAN, PLLC**


___/s/ David E. Azar_____
DAVID E. AZAR, ESQ. (SBN 218319)
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
Email: dazar@milberg.com

*Attorney for Plaintiffs and*
*Proposed Class Counsel*

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA

**CERTIFICATE OF SERVICE**

1

2          I hereby certify that on August 11, 2022, the foregoing was electronically filed with the

3   Clerk of the U.S. District Court, Northern District of California, using the CM/ECF system,

4   which will send notification of such filing to all parties.

5

6                                          By: /s/ David Azar
                                           David Azar
7                                          dazar@milberg.com
                                           MILBERG COLEMAN BRYSON
8                                          PHILLIPS GROSSMAN, PLLC
                                           280 South Beverly Dr., Suite PH
9                                          Beverly Hills, CA 90212
                                           Phone: (866) 252-0878
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Meta Motion to Dismiss and To Strike the First Amended Class Action Complaint
Case No. 3:22-cv-01101-WHA