**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
David E. Azar, Esq. (SBN 218319)
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DAWN DANGAARD, a/k/a ALANA
EVANS, ASHLEY NICOLE MILLER,
a/k/a NICOLE ANISTON, KELLY
GILBERT, a/k/a KELLY PIERCE,
JENNIFER ALLBAUGH, a/k/a RUBY,
and LAURA ALLEN, a/k/a AMBER
LYNN on behalf of themselves and all
others similarly situated,

                    Plaintiffs,

v.

FENIX INTERNET LLC, FENIX
INTERNATIONAL INC., META
PLATFORMS, INC., INSTAGRAM,
LLC, FACEBOOK OPERATIONS, LLC,
LEONID RADVINSKY, and JOHN
DOES 1-10,

                    Defendants.

Case No. 3:22-cv-01101-WHA

**NOTICE OF ERRATA IN DOC 43
SUBMITTING INADVERTENTLY
OMITTED DECLARATION OF
JONATHAN HOCHMAN FILED IN
SUPPORT OF PLAINTIFFS'
OPPOSITION TO META
DEFENDANTS' MOTION TO
DISMISS AND STRIKE THE FIRST
AMENDED CLASS ACTION
COMPLAINT**

Complaint File: February 22, 2022

Judge: William Alsup
Hearing Date: September 8, 2022
Time: 11:00am
Courtroom: 12, 19th Floor

**TO THE HONORABLE WILLIAM ALSUP, UNITED STATES DISTRICT COURT
JUDGE, AND OTHER PARTIES IN INTEREST**:

        While preparing the hyperlinked versions of Plaintiffs' August 11 opposition filings,

Plaintiffs discovered that the expert declaration of Jonathan Hochman was not attached to one of

the three documents in which it was cited.  Specifically, the Hochman Declaration was filed as

Doc. 44-5 and Doc. 45-5, but not with Doc. 43, "Meta Defendants' Motion to Dismiss and Strike

the First Amended Class Action Complaint."

Plaintiffs therefore submit this Notice of Errata to add to Doc. 43 the Declaration of Jonathan Hochman Filed in Support of Plaintiffs' Opposition to Meta Defendants' Motion to Dismiss and Strike the First Amended Class Action Complaint (the "Hochman Declaration").

Attached as Exhibit 1 hereto is a copy of the Hochman declaration which was executed by Mr. Hochman on August 11, 2022 and attached to Plaintiffs' other two oppositions as Docs. 44-5 and 45-5.

DATED:  August 16, 2022

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

/s/ David E. Azar
DAVID E. AZAR, ESQ. (SBN 218319)
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
Email: dazar@milberg.com

*Attorney for Plaintiffs and*
*Proposed Class Counsel*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2022, the foregoing was electronically filed with the Clerk of the U.S. District Court, Northern District of California, using the CM/ECF system, which will send notification of such filing to all parties.

/s/ David E. Azar
David E. Azar

1

# EXHIBIT 1

DECLARATION OF JONATHAN HOCHMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANSISCO DIVISION

| | | |
|---|---|---|
| DAWN DANGAARD, a/k/a ALANA EVANS; KELLY GILBERT, a/k/a KELLY PIERCE; JENNIFER ALLBAUGH, a/k/a RUBY, and on behalf of themselves and all others similarly situated, | § § § § § § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | **CASE NO. 3:22-cv-01101-WHA** |
| | § | |
| INSTAGRAM, LLC; FACEBOOK OPERATIONS, LLC; META PLATFORMS, INC.; FENIX INTERNATIONAL INC.; FENIX INTERNET LLC; LEONID RADVINSKY, and JOHN DOES 1-10, | § § § § § § § | **DECLARATION OF JONATHAN E. HOCHMAN** |
| | § | |
| Defendants. | § § § § § | **Judge: Hon. William Alsup** **Location: Courtroom 12, 9th Floor** **Date: September 8, 2022** **Time: 11:00 a.m.** |

I, JONATHAN E. HOCHMAN, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I make this Declaration based upon my personal knowledge, as well as my investigations and analytical work based on data sources, facts, and other information of a kind that I and people in my field would regularly and reasonably rely on in forming an opinion on the subjects discussed in this Declaration.

2.     I have a Bachelor of Science (BS) degree awarded *summa cum laude* and Master of Science (MS) degree in computer science, both from Yale University. I am founder of Hochman Consultants, an internet marketing agency, established in 2004. Hochman Consultants provides clients with marketing strategy, website development, ecommerce, digital advertising, and internet

1

security services, along with advice on search engine optimization and pay-per-click advertising, making websites more user friendly, increasing traffic, and increasing the value of each visitor. My clients have included major corporations and organizations, such as Apple (on two occasions), Delta Air Lines, U-Haul, the FDIC, and the US Treasury. My involvement has been disclosed in significant class action litigations, including one that resulted in a $22.25 proposed settlement by Yelp, one that resulted in a $187.5 million settlement by Snap Inc., and another against Google where $5 billion in damages are claimed.

3.      A copy of my *curriculum vitae* is attached as Exhibit A.

4.      I have been retained by Milberg Coleman Bryson Phillips Grossman PLLC, attorneys for plaintiffs and proposed class counsel, in connection with the above-captioned litigation.

5.      I understand that Plaintiffs have alleged that, as the pleadings describe, the OnlyFans Defendants and Meta Defendants (owner of Facebook and Instagram) participated in a "scheme" in which OnlyFans (directly or indirectly through control persons, agents, or affiliates) bribed actors within the Meta Defendants to harm OnlyFans's competitors and those who promoted, or were affiliated with, OnlyFans's competitors, by the mechanism described in the First Amended Complaint  ("Complaint") and discussed below.

6.      As a result of the public attention from this and related lawsuits, I understand that Plaintiffs' counsel has received tips about the alleged scheme, including details about the alleged payoffs and an alleged list of 21,874 names of Instagram users who either had content that was designated as terrorist or harmful (the "21K list"), or associated with such individuals or content, but may not necessarily have had their content removed and hashed (but still under heightened scrutiny as a dangerous individual or organization), which I analyzed as part of this Declaration.

**Summary of Conclusions**

7.     Based on my research and analysis described herein, the alleged scheme involving employees with data access rights at the Meta Defendants, and benefiting OnlyFans, is technologically plausible and consistent with the data, based on my analysis thus far.

8.     For a more definitive analysis, I would need access to data and documents from Defendants, and certain third parties, that are not available publicly.  I identify some of those data sources, types of data and documents in this Declaration, and believe that a technical special master would be an efficient option to assist with the further analysis I preliminarily describe.

9.      My best present understanding from analyzing documents, and my experience and industry knowledge, is that it appears that the scheme alleged in the Complaint would have started with the designation of various data associated with adult entertainment platforms as "dangerous" (or similar designation) to the Facebook Dangerous Individuals and Organizations ("DIO") List, or similar list, despite these platforms and data *not* being dangerous.  Making those designations would have required actions by one or more employees or the equivalent at (what was then) Facebook or Instagram.  I understand that this inclusion of false information in the designation list is the primary wrongdoing that is alleged to have occurred by humans, with the balance being what I will call secondary effects caused by the computer systems that use this input.  This inclusion of false information, whether submitted manually, by automated feed, or other process, would not be technologically difficult to accomplish for one or more persons with the relevant access. It would also not be technologically difficult or implausible for one or more persons with the relevant access to then take efforts to cover up the scheme by removing a false designation from the DIO list and using an alternative process within Facebook/Instagram, as is alleged in the Complaint.

Additionally, as explained later in this Declaration, the designation of an account or website does not by itself involve content actioning.

10.     After these allegedly false designations occurred as to certain platforms competing with OnlyFans, the information associated with them would have been integrated into the Facebook Threat Exchange (or similar system utilized by Facebook).  That integration would have been automated.[1]

11.     The integration of the designations of those OnlyFans competitor platforms into the Facebook Threat Exchange (or similar system utilized by Facebook) would then cause negative impacts to people with Instagram accounts who linked to those platforms (e.g., adult performers), including suppression, and blocking by the AI systems.

12.     These secondary effects (suppression and blocking) happened at one or both of Facebook/Instagram directly, or within platforms owned and maintained by any GIFCT or Threat Exchange partner or member organizations which relied, and continue to rely, upon the information submitted to the GIFCT Hash Sharing Database or Threat Exchange. This description of the secondary effects is plausible, and consistent with the data, based on my analysis thus far.

13.     These secondary effects are further plausible because Tech Against Terrorism represents to GIFCT members that having access to the GIFCT database "allows companies to consult ***verified*** terrorist content" (emphasis added). This bold representation ostensibly gives

---

[1] For clarification, my understanding is that there are various kinds of designations.  One kind of designation is when a person or organization is designated on the DIO list as a dangerous organization, which is a manual process.  Another kind is when a person or organization is designated by the AI systems for association, etc. with dangerous individuals or organizations. In any event, designations, whether manual or automated, do not necessarily generate a hash at the same time, or even ever; this data and its associated attributions can be relied upon by a system for heightened scrutiny and content actioning without hashing (as discussed later in this Declaration).

other online platforms confidence to act on that content, but Plaintiffs in this matter allege that all the content is not really verified since it includes them, and thus some online platforms mistakenly rely on it. See Exhibit C-1, the JustPaste.it Case Study (under "Benefits of using the Hash Sharing DB").

14.     Further supporting plausibility, and the fact that errors exist in the data despite any verification efforts, it is an undisputable fact that data submitted to the Threat Exchange (and by extension, the GIFCT Hash Sharing Database) includes both objective and subjective information[2]. As a result, it is also undisputable that users of this data face the issue of determining the data's accuracy and validity, and therefore its reliability. In fact, in 2015 Facebook announced that the most requested feature "by far" from users of the Threat Exchange was "to include attribution information." Jesse Kornblum, Software Engineer for the Threat Infrastructure team at Facebook, announced via Facebook post[3]:

> The most requested feature, by far, has been to include attribution information. People have asked us to help them not only get threat information, but to tell them who provided that information. Knowing the source of data can be instrumental for determining how to act on it.

15.     Mr. Kornblum continues to explain that with the new functionality, "Each person can form their own subjective point of view about these kinds of data," illustrating how a single threat indicator has two very different subjective opinions which, in this example, were assigned by two different entities within Facebook itself:

> We can quickly see a major difference in these subjective opinions. The Facebook CERT declared that this domain was MALICIOUS and "Evil Malware!," while the Facebook SI team called it NON_MALICIOUS and "Harmless parody site."

---

[2] https://web.archive.org/web/20150801135024/https://www.facebook.com/notes/threatexchange/improving-threat-analysis-with-descriptor-details/1628794534000539
[3] *Id.*

16.     Mr. Kornblum acknowledges that users might want to rely on some sources of data over others due to this subjectivity, suggesting that users can highlight data from "trusted sources," and conversely, ignore data from "people who have not been helpful in the past." This subjective data is still a core component of Threat Exchange and GIFCT data, as Facebook's current Developer documentation references[4] how Threat Exchange users can search for "subjective opinions" on indicators stored in the Threat Exchange.

17.     Accordingly, even though Tech Against Terrorist represents the GIFCT data as verified, causing some people to rely on it, others acknowledge that it is not really "verified" and are requesting better means of evaluating the data.  The inference is that users discovered non-terrorists' content had been hashed and acted upon, which is why they were calling for better processes.

18.     I analyzed data from or related to the union of adult performers (APAG) along with two adult content platforms that I understand are or were competitors of OnlyFans for Instagram referral traffic when the alleged scheme was being implemented – FanCentro ("FC") and JustFor.Fans ("JFF").  I analyzed this data to assess the allegations of the competitive impact on platforms competing with OnlyFans and performers who promoted them.

19.     I performed an analysis of publicly available traffic estimates to the websites of OnlyFans and its competitors during the relevant period. That analysis shows an abnormally steep drop in traffic to the competitors' websites continuing to occur in 2019, coinciding with an abnormally steep increase in traffic to OnlyFans's website during that same period.  This data is consistent with what I understand from media articles, FanCentro, JFF, and APAG that referral

---

[4] https://developers.facebook.com/docs/threat-exchange/reference/apis/threat-descriptors/ and https://web.archive.org/web/20220000000000*/https://developers.facebook.com/docs/threat-exchange/reference/apis/threat-descriptors/

traffic from Instagram to competitors of OnlyFans started to drop earlier, starting in fall 2018. These changes in traffic are consistent with, and explained by, what Plaintiffs allege in the complaint: that the competitors' websites (and, associated, identifying information) were wrongly designated as dangerous, and subsequently added to one or more database(s) containing these designations (e.g., the Threat Exchange, the GIFCT Hash Sharing Database, or similar database). The publicly available data of traffic estimates starts in 2019, several months after the scheme is alleged to have begun in October 2018 but while its effects continue to grow. I need data from the Meta Defendants and potentially third parties for the earlier periods and for additional data for the entire class period that is in their possession and not otherwise available to me.

20.     I also analyzed the above-described data to evaluate the integrity of the leaked list of 21k Instagram user names described in paragraph 6 above, who either had content that was designated as terrorist or harmful, or associated with such individuals or content, but may not necessarily have had their content removed and hashed (but still under heightened scrutiny as a dangerous individual or organization).   In analyzing the integrity of the 21k list, I sought to determine whether I could make any conclusions or inferences based on presently available data that would justify requesting discovery from Defendants and third parties about matters related to this case and those Instagram accounts.  I used a direct matching and also a fuzzy matching process to compare the Instagram names on the 21k list with information on the lists of adult performers I was given from the union, FC and JFF.

21.     There are so many performer accounts on the list of 21k that are on a list of Instagram accounts provided by the adult performers' union, most of whom on the list complained of unjustified content actioning starting in late 2018 and 2019, that there is no way this happened randomly.  Adult performers on the list provided by the union were targeted.

22.     There are so many FanCentro adult performers on the 21K list that there is no way this happened randomly. FanCentro performers were targeted.

23.     There are so many JustForFans ("JFF") performers on the 21K list that there is no way this happened randomly. JFF performers were targeted.

24.     I was conservative with the fuzzy matching. The number of matches is likely to double when I have sufficient time to investigate every potential match.

25.     I have investigated the 21K list looking for any indication that it might be fake or forged. I have found no indication that the list is not authentic. The nature of the accounts on the list is consistent with my conclusions. I have found no significant discrepancies.[5]

26.     Turning to a summary of my conclusions regarding the technical systems, Facebook's developer documentation for its Threat Exchange platform describes individual submissions of data as "Threat Indicators" (e.g., "indicators of compromise"), and lists various "types" of these indicators that can be submitted to the database. Examples of Threat Indicator types include video files, image files, text strings, web domains, complete web URLs, email addresses, IP addresses, longitudinal location data, and location names, and hashes thereof. The submission of these Threat Indicators and the various designations applied to a social media platform's content in the database (including threat levels, privacy levels, tags, and other descriptors) enables various organizations to rely on these designations in performing content

---

[5]   As one would expect, the 21k list includes the Instagram accounts of both Instagram (@instagram) and OnlyFans (@onlyfans) because they are associated with adult performers who promoted OnlyFans competitors and thus would have been impacted by the scheme.  It is quite clear that these designations have not harmed either company. The list also includes famous Instagram personalities and other major brands, and they have not been harmed either. Being on the 21k list does not seem to have harmed major brands because if content is benign according to AI's criteria, there will not be content actioning, and major brands are quite careful.  But this can be devastating for "the little people" (as Leona Helmsley coined the phrase).  Discovery is needed to understand the specific parameters.

actioning on their platforms. Content actioning can result in removal of content from platforms relying on the Threat Exchange submissions, and it can also result in the removal or shadow banning of a performer's account and content, as well as content associated with the performer, but uploaded by other users, based solely on the performer's name, social media handle, or website they choose to link to in their account.

27.     If a performer uploads content about another performer containing words, content, or other pieces of information which has been designated as harmful and subsequently submitted to the Threat Exchange (as a Threat Indicator), this can result in the uploading performer being shadow banned on platforms relying on the Threat Exchange submissions -- even if the posting performer's content (e.g., an image file) was a picture of another performer, not of themselves.

28.     Content actioning can be taken against various digital content including images, videos, and entities, as well as against organizations and individuals.

29.     When Threat Indicators are uploaded to the exchange, various associated information, including attributions and metadata, is added so that users of the platform can determine who (e.g., what social media company, GIFCT, or Threat Exchange Member) uploaded it, and more importantly why they have designated it as dangerous.

30.     The Threat Exchange contains a database or databases which list, among 80+ additional types of Threat Indicators, including specific websites or domain names which allegedly contain terrorism-related (i.e., dangerous, or otherwise inappropriate) content.

31.     Various social media platforms, such as Facebook and Instagram, access contents within this database and rely on the information it contains to make decisions pertaining to reducing and often eliminating visibility of the content that sends traffic to those websites that might otherwise come from their own platforms.

32.     Websites, such as those for OnlyFans and its competitors, rely heavily on links from social media companies like Facebook and Instagram. If Facebook and Instagram were to stop linking to those websites, those websites would suffer a severe drop in traffic. Additionally, if Threat Indicator Types other than a specific website address but which are associated with that website (for example, an individual performer's name) are submitted to these databases, the same effect can occur due to the associated designations.

33.     Public documents show that the database used by the Defendants allegedly to wrongly designate the plaintiffs' and referenced OnlyFans competitor platforms' content as dangerous or related to terrorism is controlled by the Meta Defendants. Consequently, the Meta Defendants possess documents that would substantiate or refute the Plaintiffs' claims.

34.     My analysis is still in progress.

35.     In conducting the data analysis for this investigation, I used data provided by counsel. I am not attaching the source documents I used because I understand that counsel will be offering to provide my source data to Defendants directly, subject to the parties discussing the parameters of a protective order. Exhibit B is a placeholder where I may attach the source data in a future version of this report when a protective order is issued. Select documents cited in this declaration are attached in Exhibit C.

36.     Attached as Exhibit D are true and correct copies of data obtained from the standard Microsoft Sysinternals Whois64.exe tool[6] pertaining to three domain names (suicidegirls.com, suicideboys.com, and suicidegirls.us) for which Mr. Radvinsky is listed as an Administrative Contact with a Los Angeles address.  The Whois64.exe tool uses the Internet standard WHOIS

---

[6] https://docs.microsoft.com/en-us/sysinternals/downloads/whois

service[7] to look up domain registration information.  I have used WHOIS since the 1980s and am familiar with how it works and how to analyze WHOIS data.

**Facebook's Threat Exchange and the GIFCT**

37.     I have reviewed technical information published by GIFCT, Facebook, and various other affiliated entities as cited. Based on my review of these document and my analysis, it appears that the alleged scheme was perpetuated through a system owned, operated, and maintained by Facebook – which may exist (1) separate from, in combination with, or fully analogous to what has been referred to as the Facebook Threat Exchange Platform – a system which Facebook/Meta still appears to own and manage; or (2) separate from, in combination with, or fully analogous to the GIFCT and its related databases, including its Hash Sharing Database, which appears to be hosted on the Threat Exchange Platform.

38.     Therefore, relevant data sought by Plaintiffs are within the Meta Defendants' possession, custody, or control. To the extent that the Meta Defendants maintain any system, data, or processes which provide information responsive to Plaintiffs' discovery requests, but which Facebook/Meta contends *are not* contained within, or are not accessible by, or are not labeled as a part of the GIFCT Hash Sharing Database or the Facebook Threat Exchange, I am nonetheless seeking the same information about those platforms, processes, or systems pertaining to these requests as well.

39.     All statements in this section come from my review of various publicly available documents and statements by Facebook/Meta, as well as other publicly available documents which I cite below. My analysis of these documents and the resulting inferences made therefrom are

---

[7] See https://en.wikipedia.org/wiki/WHOIS

based on my experience and are all subject to refinement and adjustment once I obtain additional information through discovery. When I refer to Facebook, it includes the other Meta Defendants as well, because during the period at issue, Facebook was both the parent entity and an operating entity, and it is unclear whether any of the publicly described "Facebook" systems may now be split among the Meta Defendants.

40.     In 2014 Facebook announced it had built a framework for internet threat identification and data organization which it referred to as ThreatData[8], describing it as *"a framework for importing information about badness on the Internet in arbitrary formats, storing it efficiently, and making it accessible for both real-time defensive systems and long-term analysis."*

41.     The ThreatData framework included data feeds, data storage, and real-time response, and it would incorporate internet threat information from various sources (i.e., feeds), including data imported from open-source blogs and malware tracking sites (in the form of URL lists), malware file hashes from VirusTotal[9], and Facebook security team member web browsers as they read articles, blogs, or other content.

42.     On February 11, 2015[10], Facebook launched Threat Exchange, utilizing Facebook's ThreatData framework and internal infrastructure, as "a community and mechanism for sharing

---

[8] https://web.archive.org/web/20141111132659/https://www.facebook.com/notes/protect-the-graph/understanding-online-threats-with-threatdata/1438165199756960 (a Facebook post authored by Mark Hammel, then-manager of the Threat Infrastructure team at Facebook)
[9] https://web.archive.org/web/20141111005416/https://www.virustotal.com/
[10] https://web.archive.org/web/20190831215254/https://www.facebook.com/notes/threatexchange/graph-based-sharing-of-threat-intelligence/1591912327688760

threat intelligence among organizations[11]." When the Threat Exchange was launched, Facebook worked informally with various companies using the Threat Exchange to collaborate on threat identification on the internet, until ultimately sponsoring the Global Internet Forum to Counter Terrorism ("GIFCT"), which appears to be a collaboration of entities (who refer to themselves as a "consortium") who created a non-profit, public-facing entity to coordinate the fight against harmful content on the Internet, while utilizing Facebook's Threat Exchange platform.

43.     Publicly available documents (including a recent case study discussed below), show that the GIFCT still uses the Facebook Threat Exchange platform, which is still owned, operated, and maintained by Facebook, and for which there are at least 57 pages of developer documentation describing how to use and access it.[12]

44.     The basis for my belief that the GIFCT Hash Sharing Database exists on Facebook's Threat Exchange (a platform which Facebook owns, maintains, and administers), includes a publicly available letter from the GIFCT's Executive Director Nick Rasmussen posted to the GIFCT.org website, where he references recommendations made by their partner organization BSR (Business for Social Responsibility) based on their assessment of the "actual and potential human rights impacts of GIFCT's work."[13] In his letter, Rasmussen references BSR's *recommendations* regarding content removal and preservation, with specific reference to the Hash Sharing Database being hosted by Facebook's Threat Exchange[14]:

---

[11] https://web.archive.org/web/20150822133417/https://www.facebook.com/notes/threatexchange/threatexchange-the-first-180-days/1643701642509828

[12] For example, https://developers.facebook.com/docs/threat-exchange/getting-started/, last accessed Aug 3, 2022.

[13] https://gifct.org/2021/07/20/hria-response-letter-by-nick-rasmussen/; see also: https://web.archive.org/web/20210726150454/https://gifct.org/2021/07/20/hria-response-letter-by-nick-rasmussen/

[14] *Id.*

## Content removal and preservation:

- Require contributing companies to conduct human review and approval prior to adding hashes to the database
- Investigate how to enable third-party reviews of the hash-sharing database to assess whether hashes are consistent with the GIFCT taxonomy
- Develop a process for enabling researcher access to the hash-sharing database and associated content
- Require companies that contribute to and utilize the hash-sharing database to commit to specific disclosure
- Enable multi-stakeholder governance of the hash-sharing database to the extent possible under the current management model (i.e., hosted by Facebook Threat Exchange) and develop a plan for long-term governance and oversight

45.     I also rely on a Case Study performed by TechAgainstTerrorism.org, a GIFCT partner, as noted in the footer section of the GIFCT.org website and attached as one of the documents in Exhibit C.[15] This Case Study, performed by Tech Against Terrorism and published by CounterExtremism.com[16], describes that the GIFCT Hash Sharing Database as hosted on Facebook's Threat Exchange:

---

[15] https://gifct.org
[16] https://www.counterextremism.com/sites/default/files/TAT%20--%20JustPaste.it%20GIFCT%20hash-sharing%20Case%20study.pdf; see also: https://web.archive.org/web/20200204221057/https://www.counterextremism.com/sites/default/files/TAT%20--%20JustPaste.it%20GIFCT%20hash-sharing%20Case%20study.pdf



The database itself is hosted on Facebook's ThreatExchange platform which was originally developed to allow companies to share hashes of malware with one another. ThreatExchange is secure, flexible, and robust; data shared via the hash-sharing consortium is available only to other members of the consortium, not all users of ThreatExchange. ThreatExchange also has a mature API, and many consortium members choose to integrate with that platform in that way. Others use a graphical interface. The consortium uses multiple hashing techniques to facilitate easy engagement by companies that may have familiarity with one technique over another.

The consortium has developed guidelines for the type of content to be uploaded into the database. When a hash is uploaded it includes metadata that corresponds to the company that uploaded it and a code that corresponds roughly to the type of content reflected in the hash. The hash-sharing consortium does not share personally identifiable information.

**How Do Small Companies Get Involved?**

The first step to joining the hash-sharing consortium is signing an NDA, which facilitates more detailed discussion about ThreatExchange, the coding scheme, and the hashing techniques we use. This also gives existing members of the consortium an opportunity to vet interested companies. Companies then sign an MOU, register for ThreatExchange, and get set up with one or more of the supported hashing techniques. The Facebook team provides support and guidance for all of those technical aspects, and the hash-sharing companies more broadly sometimes collaborate to write and share useful scripts and tools. After that, implementation is a matter of engaging the ThreatExchange API and developing tools and processes for managing matches to hashes that are found on the platform. Many of the GIFCT member companies are happy to provide support and guidance for developing those protocols, but they are ultimately the purview of each platform.

46.     The GIFCT is the public facing organization that provides a framework for social media platforms and other organizations, including Amazon, Microsoft, YouTube, Twitter, Zoom, Airbnb, LinkedIn, Pinterest, Tumblr, WhatsApp, Discord, and Dropbox[17] to collaborate on the Threat Exchange platform owned and maintained by Facebook to submit and exchange various

---

[17] GIFCT reference guide, source: https://gifct.org/resource-guide/

designations, descriptions, or other information pertaining to various digital content types through its Application Programming Interface ("API"), which has parameters for access, tracking of who submits what, privacy levels for data, etc.  It contains information that pertains to how submitted Threat Indicators are designated in various manners, including by categorizing, tagging, and setting privacy levels which determine what other users or members can view the data and information pertaining to it.

47.    In addition to the GIFCT, the Threat Exchange itself allows organizations, including small businesses, to apply for membership (via Facebook) to license use of the Threat Exchange and participate in the contribution of designated content to the Threat Exchange, as well as rely on the designations submitted by other members in their policing of their own platforms, as in the JustPaste.it example above.

48.    Below is a screenshot from Facebook's publicly available developer documentation[18] for the Threat Exchange, which illustrates a basic overview of how approved Threat Exchange members interact with the Threat Exchange user interface (UI):

---

[18] https://developers.facebook.com/docs/threat-exchange/ui/

## Vocabulary

What do people do with ThreatExchange? Lots of things. Here we focus on the most basic subset:



49.     The above page further describes how organizations "share information about threats" (referred to as "Threat Indicators," also referred to as signals):

- People at various organizations want to share information about **threats** -- malware signatures, malicious URLs, and so on.
- A **threat indicator** is the **objective part** -- a file hash, a URL, and so on -- along with a type (MD5, SHA1, URL, etc.).
- A **threat descriptor** contains an indicator as well as the **subjective parts** -- how malicious a team thinks it is; when they first saw it; and so on.
- Whereas Facebook privacy revolves around **user IDs**, ThreatExchange revolves around **app IDs**. For example, app ID 1064060413755420 is Media Hash Sharing Test. These are generally of the form *Team T at company C*.
- When people share threat data, they can specify who they want to see each datum -- this is **visibility** or **privacy type**.
  - Visible/public means all ThreatExchange members can see it
  - Or for each datum they can make an app-whitelist of specific teams at specific companies.
  - Or for each datum they can specify a privacy-group which is simply a predefined list of app IDs.
- People can **tag** their descriptors. These are tags in any other tool -- except that ThreatExchange tags have their own metadata including the subjective parts that descriptors have, and they also have their own visiblity (public/app-whitelist/privacy-group).
- There's more about threat descriptors (review status and others), and other types of data shareable on ThreatExchange (malware analyses, malware families, and others) -- but for this little walkthrough we've just stuck to indicators, descriptors, visibility, and tags.

Please continue on to the UI Reference to learn more.

50.     Any company can apply to become a member of both the GIFCT and the Threat Exchange, and thus can be granted certain rights on the Threat Exchange platform. Anyone who becomes a member is provided with an application identification number ("App ID") that is associated with all submissions of designated content made by that member to the database, as well as all modifications to submissions already made.

51.     Every Threat Indicator submission a GIFCT or Threat Exchange member makes is associated with this App ID, and each such submission has its own "indicator ID" that cannot be edited or changed. Thus, an indicator ID is like a tracking or audit number for a piece of designated content, so that there is an ID for the entity that submitted a report, and an ID assigned to each report, creating part of an audit trail which should include additional information for which I would require discovery.

52.     Therefore, *the Meta Defendants, the GIFCT, and all members can track which member or user submitted designations pertaining to hashed content, and other Threat Indicators*.

53.     The fact that Facebook owns and manages the GIFCT Hash Sharing Database and the entire platform on which it is accessed, maintained, and utilized (the Threat Exchange) reasonably implies that it has full access and administrative rights to the entire system, as well as unfettered access to its stored data – while other companies' access rights may depend on their designated security level (e.g., low, medium, or high).

54.     For reference, "Hashing" of digital content, refers to the process whereby a computer application creates a digital fingerprint of digital content, converting it into a series of numbers and letters. When content that is designated as dangerous or harmful is hashed in this manner, uploaded to one of these databases, and then relied upon by a social media (or other) platform's systems, these systems to compare new postings of pictures, videos, and any other content to their platforms to the submitted hashes within the database to see if there is enough of a similarity for their platform to decide to subject the person or account uploading the content to heightened scrutiny or content actioning, such as reduced visibility on the platform, shadow banning, or other content actions.

55.     Thus, if the digital content, or other identifiers (see Threat Indicator "Types" above) associated with an innocent person or organization are designated in a manner which causes its inclusion within a database that is designed to be a repository for harmful or dangerous content, then these people and organizations can be subject to secret, unregulated scrutiny and content actioning, including suppression (e.g., reduced exposure, removal, lower user engagement) and banning of content, accounts, and users.   Such databases include the GIFCT Hash Sharing

Database or the Facebook Threat Exchange Platform. Secret actions may be taken even if the innocent person or organization is posting a picture or video of themselves celebrating a graduation, on vacation, accepting an award, at a business event, or any of the safe, legitimate, and inherent reasons people post content about themselves and their lives on social media.

56.     Importantly, there are distinct steps involved in content actioning associated with content designations. While there may be additional steps, the following events are typically required for content actioning. Additionally, a user's association with an entity designated by Facebook as a dangerous organization, as alleged in the Complaint, can also result in their name, account, and content being designated as dangerous or harmful.[19]

57.     First, the decision is made by a person or by an automated system without human involvement, to designate a piece of content or information (see Threat Indicator "Types" above) as dangerous or problematic, and that designation is recorded and stored.

58.     Second, the decision is made by a person or a system to add this designation and any additional information to at least one system (either owned or external), including a database, which stores designated content.

59.     Third, the decision is made by a person or a system to create an associated hash value for this designated content and submit this designated content and its hash value to a system

---

[19] *See also* Meta Dangerous Individuals and Organizations Policy Details ("We remove Praise, Substantive Support, and  Representation of various Dangerous Organizations," and proceeding to define each of those  terms and provide example, including speaking positively about a Dangerous Organization (e.g., calling them "really brave") or "aligning oneself ("I stand with Brenton Tarrant")), https://transparency.fb.com/policies/community-standards/dangerous-individuals-organizations/ accessed Jan. 1, 2022); see also "Revealed: Facebook's Secret Blacklist Of "Dangerous Individuals And Organizations", Sam Biddle, The Intercept Oct. 12, 2021, https://theintercept.com/2021/10/12/facebook-secret-blacklist-dangerous/.

or systems (either owned or external) which store that designated content. Conversely, the system itself may create the hash value for the designated content after being uploaded, as in Step 2 above.

60.    Fourth, the decision is made by a person or system, in administering a particular platform (for example, Instagram), to access the various content designations, file hashes, and associated information stored and described in these system(s), for the purpose of informing the process by which that platform identifies harmful content on that platform.

61.    Fifth, the decision is made by a person or system, in administering a particular platform (for example, Instagram), having accessed the various content designations, file hashes, and associated information stored and described in these system(s), to take an action towards specific content, users, user accounts, on that platform (i.e., content actioning). While the actioning itself does not necessarily involve human interaction with the system or direct human input, there is human decision making in designing, testing, adopting, implementing, and maintaining a filtering system, and in designing the rules by which any given system designates content as harmful or dangerous, adds content to a designation list, and submits that content to a database such as the GIFCT Hash Sharing Database or the Threat Exchange Platform. I understand that Plaintiffs allege that Meta or a person connected with Meta consciously caused Meta to designate the competitor platforms websites, accounts, or performers as dangerous or harmful (e.g., "DIO"), and to submit these designations to the Facebook Threat Exchange or other system utilized by Facebook and Instagram as part of their content actioning system.

62.    The steps outlined above are important to understand in the context of Defendants' anti-SLAPP argument. The preceding steps show that the dataset at issue is a "designation" list because it assigns a characterization to certain pieces of information, including users, accounts, and websites. As outlined above, ***the designation of an account or website does not by itself***

*involve content actioning*. The designation must be submitted to one of these databases, and subsequently, a system performing content actioning (e.g., Instagram, Facebook, or other platforms relying on the submissions of designations) apply their own platform's criteria in relying upon the submissions to determine how and to what extent to action content associated with the submissions. Accordingly, ***from a technical perspective, the alleged wrongdoing in this case was the designation and submission of the designation to a database – with content actioning based on these submissions being a separate, secondary action***.

63.     As referenced above, the JustPaste.it Case Study[20] (performed by the GIFCT's partner organization, Tech Against Terrorism) (Exhibit C) illustrates how one company used the GIFCT Hash Sharing Database before becoming a GIFCT member. The company accessed this database via the Facebook Threat Exchange, with the assistance of Facebook/Meta personnel.

64.     One main project for JustPaste.it was to hash its existing content to compare it to the Hash Sharing Database of dangerous content. The Case Study states that Facebook owns and hosts the platform used by the GIFCT, and it shows the clear technical feasibility of one of Plaintiffs' proposals for injunctive relief, and for determining who was damaged.

65.     Specifically, the Case Study shows that Plaintiffs can create their own repository with images and videos of class members,  generate hashes for all of these content files, and then perform the same type of comparison (e.g. "consult") against the GIFCT Hash Sharing Database, the Facebook Threat Exchange database, or any internal database utilized by Defendants, to determine whether and to what extent any of Plaintiffs' content "matches" or, according to the

---

[20] https://www.counterextremism.com/sites/default/files/TAT%20--%20JustPaste.it%20GIFCT%20hash-sharing%20Case%20study.pdf ; see also:
https://web.archive.org/web/20200204221057/https://www.counterextremism.com/sites/default/files/TAT%20--%20JustPaste.it%20GIFCT%20hash-sharing%20Case%20study.pdf

Defendants' database in question, identifies "terrorist" or other harmful content based on the submitted designations). The result of that analysis would aid in determining whether class members were impacted at the designation level (which would then demand further investigation into the actual platform actions taken based on these designations), or if a coverup was attempted (e.g., via deleting hashes, or changing indicator data). My analysis would use the same relational hash comparison algorithms as was done by the company in the Case Study, or the most appropriate relational comparison algorithms based on the content types being hashed and examined. This is one area I identify for limited discovery, the feasibility of which is demonstrated by the case study.

66.     Therefore, it does not matter whether the hash values can be reversed engineered to identify the original image, video, or other piece of content or information, because I can still obtain content or other signals or Threat Indicators and hash them with the same algorithm (or similar) used by the Facebook Defendants or the GIFCT. By doing this type of "forward" analysis I can compare content of interest to present and historical records of the system(s) utilized by Facebook, as well as to the Hash Sharing Database. Such an analysis would aid in determining whether non-terrorist, non-harmful content providers, websites, organizations, and other entities had Threat Indicators associated with their accounts, content, or identities, added to these databases.

**The Hot Tip**

67.     When a digital platform's content actioning systems and processes trigger a reduction to or elimination of content visibility, user engagement, or traffic to a particular user's account or content (or to another user's content deemed to be "associated" with that user, their account, or their content), the common parlance in social media marketing is to say that the user

account has been **shadow banned** (if the action is not transparently disclosed to the user) or **banned** (if the action is disclosed).

68.     Actioning is often the natural result of incorporating information from either internal lists, databases, or sources such as the GIFCT Hash Sharing Database or related data sources that provide Threat Indicators. When a digital artifact (such as content) is designated as a threat, actioning against related entities (such as users) is an obvious outcome that may occur often, but not always.

69.     As a result of the public attention from these lawsuits, I understand that Plaintiffs' counsel received tips about the alleged scheme, including details about some of the alleged payoffs and a list of 21,874 names of Instagram users whose content was allegedly designated as terrorist or harmful, hashed, and subsequently added to GIFCT's Hash Sharing Database that is used on numerous internet platforms to identify terrorist and other dangerous organizations.  Based on the list of designated content sent by a whistleblower, my understanding is that content being designated is allegedly from businesses big and small, as well as from individuals who include actors, singers, influencers as well as highly regarded company Instagram account names (handles). Plaintiffs are not naming the source of this list publicly at present, and so I do not identify them here.

70.     The fact that such individuals and common and popular brands could end up on the list suggests that the larger dataset from which this list was obtained, whether from the GIFCT Hash Sharing Database, the Threat Exchange, or other database,  does in fact contain designations which appear to be incorrect or problematic – suggesting that it lacks sufficient quality control, at best, or that there are other actors contributing to this database to cause non-harmful content to be actioned. Lack of quality control is a natural consequence of operating a non-transparent

designation list, which does not provide disclosure to those listed, denies them any opportunity to review or appeal, and which exists without any independent oversight, regulation, or input.

71.     In the field of Internet security, the practice of keeping the design of security machinery (such as GIFCT) secret has long been discredited. According to the widely accepted Kerckhoff's Principle in cryptography, "The enemy knows the system." An alternative formulation, "One ought to design systems under the assumption that the enemy will immediately gain full familiarity with them," is known as Shannon's Maxim. Keeping the workings of the GIFCT system secret does not stop the enemy from discovering its mechanisms. An enemy can even abuse the system for his own gain, such as by falsely designating competitors. Secrecy just hinders good faith actors from improving the system and ensuring that it works as it should.

72.     As mentioned above, I understand that Plaintiffs' counsel received, from an anonymous leaker, a list of 21,874 Instagram handles who either had content that was designated as terrorist or harmful, or associated with such individuals or content, but may not necessarily have had their content removed and hashed (but still under heightened scrutiny as a dangerous individual or organization) (e.g., users that were designated as "Dangerous Individuals and Organizations" ("DIO") or connected to threat indicators submitted to the Facebook Threat Exchange, or the portion of it connected to the GIFCT). I refer to this list as the "21K List."  My working assumption is that the 21K is a fragment of a larger origin list, and obviously a snapshot from one moment in time. I expect that the origin list has continued to evolve since the 21K list was sent to Plaintiffs' counsel.

73.     As I will explain below, empirical information shows that Plaintiffs have suffered a loss of traffic and business, consistent with the alleged Scheme by Defendants. I will also show that this loss is not correlated with any reduction of content being posted on Plaintiffs' user

accounts at FanCentro.com, eliminating such reduction as a potential cause for these reductions. I mention FanCentro because we had the most robust set of data for them to start and able to analyze in this compressed briefing period. In addition, further discovery will allow me to analyze actual losses of content visibility and user engagement.

74.    The chart below shows the average monthly posts by each open account at FanCentro.com. Old, inactive accounts might be suppressing the post average due to them being kept in the data. Outliers may be caused by large uploads which occur when a performer with a large body of content joins the service for the first time. The general trend of postings is positive until mid-2021 with a slight drop off after. There is no significant drop off in posting at any point. The last point (July of 2022), which looks like a drop off, is due to incomplete data collection for that month. ***This information allows me to conclude that changes to performers' sales or traffic on FanCentro are related to extrinsic factors, not due to a decrease in marketing efforts by the performers***.



*Figure 1: x-axis: month, y-axis: average number of posts by FanCentro performers*

26

75.     The chart below shows the average number of transactions for each FanCentro.com performer generated by Instagram traffic. There is a sharply positive trend into mid-2018 with a **sharp drop following October 2018, when the Scheme is alleged to have begun**.

76.     Contrary to my expectations, this chart is inversely proportional to the social media transactions referred from Instagram to FanCentro, which I document below in the next chart. Normally when social media marketers post more content, they get more referrals, not fewer.



*Figure 2: x-axis: month, y-axis: average number of referral transactions by FanCentro performers*

77.     The chart below shows the number of FanCentro performer accounts which lost over 95% of their Instagram referral transactions from one month to the following month. There is a sharp peak that lasts a year following the Scheme. Small accounts gaining and losing one or two subscription that might equal more than 95% of their subscriptions were overrepresented in this graphic. The following graphic rectifies that issue.



*Figure 3: x-axis: change between months, y-axis: number of FanCentro accounts that lost over 95% of referral transactions*

78.     The chart below shows the number of accounts that lost between 90% and 100% of their Instagram referral transactions from one month to the following month. 100% transaction loss was excluded to remove the static from accounts going inactive and the typical sways of smaller accounts. ***There is a clear uptick in accounts losing substantial amounts of transactions during October- November 2018 after the Scheme was implemented, with a massive spike in November 2018*** (circled in red).



*Figure 4: x-axis: change between months, y-axis: number of FanCentro accounts that lost 90% to 100% (exclusive) of referral transactions*

79.    The chart below shows the average number of Instagram referral transactions among the 174 exact matches found between the FanCentro transaction data and on the 21k list. The ***number of transactions trend upwards until October 2018 and then plummets significantly***. This chart warrants repeating with fuzzy match (explained below), and further analysis when I have more time.



*Figure 5: x-axis: months, y-axis: average number of referral transactions among the 174 exact matches.*

**Similarweb Data Analysis**

80.    Available data from Similarweb, a publicly available tool that estimates traffic to websites from social media platforms, shows that between mid-2019 and mid-2021, estimated social media traffic to OnlyFans has increased, while at the same time social media traffic to sites competing with OnlyFans has gone down or stagnated.

81.    Similarweb traffic data is approximate, though it is a source commonly used by people in my industry when we lack the actual data. I would prefer to obtain the actual traffic statistics that are in Instagram's possession, which would be another discovery request.

82.    I am using Similarweb data supplied to me by counsel because it would be prohibitively expensive (tens of thousands of dollars) and take too much time for me to acquire the data myself directly from Similarweb. If I produce an expert report in this matter, I expect to

replace the approximate data supplied by Similarweb with precise data that Instagram has in its possession that I hope to obtain through Plaintiffs' proposed discovery requests.





## Evaluating the Integrity of the 21K List

83.     The nature of the data contained in the 21K list indicates that it would be extremely

difficult to create this list retrospectively. I analyzed a random sample of Instagram accounts from

the list, which contains 21,874 Instagram account handles. My sample included 99 random

accounts. My staff manually checked whether those 99 accounts were active. I found that 56% +/- 10% (confidence 95%) were active, and 44% +/-10% (confidence 95%) were inactive or deleted.[21]

84.    It would be extremely difficult to construct a list of 10,000 Instagram accounts that are no longer publicly visible or active. I am not aware of any practical way to compile a list of such accounts from public data sources. The 21K list contains a high proportion of inactive, private, or deleted accounts because when an account has been shadow banned, the owner will normally abandon the ineffective account and start a new account. There is no point for a social media marketer to continue using an account that has been hobbled.

85.    Therefore, *I infer that the 21K list is unlikely to be a recent creation, but more likely an authentic list of accounts that was created after the alleged scheme was implemented. At the time the accounts were designated as or connected to threat indicators, they were likely to have been active and readily discoverable*.

86.    When I have more time, I intend to analyze a larger sample from the 21K list and provide a tighter estimate on the number of active and inactive accounts, as well as other characteristics of the accounts, such as whether they are adult oriented.

**Identifying Accounts in Common Between the 21K List and the Union Complaint List**

87.    I understand that the Adult Performance Artists Guild (APAG) supplied Plaintiffs' counsel with data submitted by performers who were complaining about improper shadow bans and bans on social media, starting in 2018 and 2019. I will call this data compilation the "Union Complaint List." It contains 3,234 Instagram handles used by performers.

88.    My analysis shows that at least 392 handles from the Union Complaint List overlap the 21K list. Of these 392, there are 234 exact matches and 158 probable matches (or "fuzzy

---

[21] 21K List Sample.xlsx

matches." A fuzzy match means that two account names may not be identical but are close enough that I can infer the same user controls them. When a user's account is shadow banned, the user may create a new account with only a slight change in the name, such as adding an underscore or a number. This helps the user to remain identifiable to their audience but can give them a "clean start" with the social media platform.

89.     The fuzzy match results are contained in a filed titled "Union Complaints Fuzzy Matches.xlsx" (Available from counsel, as part of Appendix B).

90.     To do the fuzzy matching my assistant used the Python library called FuzzyWuzzy. He worked under my direction and followed my instructions for how to process the data. He then conducted a manual review of the 1,133 potential matches listed in "Union Complaints Fuzzy Matches.xlsx," and I then checked his work. *I am only reporting as matches those accounts I am confident are controlled by the same user. Given more time to investigate, I believe I might find twice as many matches*.  Further, given more time, I would ask the union to review the list themselves with their industry knowledge.

91.     Considering that Instagram reported 1 billion active accounts in June 2018, and 2 billion active accounts in December 2021, *the probability of an accounts ending up on the 21K list by random chance is less than 0.002%*. The Union Complaint List has 3,234 accounts. If the 21K list were evenly selected from all Instagram accounts, I would expect a 93% chance of finding no accounts on both lists, and just a 7% chance of finding one account from the Union Complaint List on the 21K list. Because there are at least 392 accounts in common on both lists, *the obvious inference is that these adult performers were specifically targeted for placement on the 21K list. These 392 accounts did not get allegedly designated as connected to terrorism by chance, "never in a million years."*

34

**Identifying Accounts in Common Between the 21K List and the FanCentro Performer List**

92.     I understand that FanCentro provided Plaintiffs' counsel with tables of FanCentro posting and transaction data. From these tables my assistant created a list of 6,491 Instagram handles of FanCentro performers (the "FC list").

93.     I followed a similar procedure for fuzzy matching as described above to compare the FC list to the 21K list. Because this was the second search run, I improved the parameter configuration to reduce the number of false positives.

94.     My analysis shows that at least 538 Instagram handles from the FC list overlap the 21K list. Of these 538, there are 260 exact matches and 278 probable matches (fuzzy matches). Given more time to investigate, I believe I might find twice as many matches.

95.     The fuzzy match results are contained in the file "21K-FanCentro fuzzy matches.xlsx" (Available from counsel as part of Appendix B).

96.     As discussed above, due to Instagram having 1-2 billion active users in the era 2018-2021, the ***existence of such a significant overlap strongly suggests that FanCentro accounts were specifically targeted*** for designation on the 21K list. In terms of probabilities, if the 21K list were not targeting FC, there would be an 86% chance of no FC handles being listed, and a 14% chance of one or two handles being listed. Yet there were 538 FC performer handles on the 21K list.

**Identifying Accounts in Common Between the 21K List and the JustForFans Performer List**

97.     I understand that JustFor.Fans provided Plaintiffs' counsel with tables of JustFor.Fans posting and transaction data. From these tables my assistant created a list of 18,573 Instagram handles of JustFor.Fans performers.

98.     I followed a similar procedure for fuzzy matching as described above. Because this was the third search run, I had already improved the parameter configuration to reduce the number of false positives.

99.     My analysis shows that at least 274 Instagram handles from the JustFor.Fans performer list overlap the 21K list. Of these 274, there are 168 exact matches and 106 probable matches (fuzzy matches). Given more time to investigate, I believe I might find twice as many matches.

100.    The fuzzy match results are contained in the file "21K-JFF fuzzy matches.xlsx" (Available from counsel as part of Appendix B).

101.    As discussed above, due to Instagram having 1-2 billion active users in the era 2018-2021, the *existence of such a significant overlap strongly suggests that JustFor.Fans accounts were specifically targeted* for designation on the 21K list. In terms of probabilities, if the 21K list were not targeting JFF, there would be a 60% chance of no JFF handles being listed, and a 40% chance of one to five handles being listed. Yet there were 274 JFF performer handles on the 21K list.

**Further Work**

102.    The most important data that I have not yet seen, and would like to see, are the designations applied, including but not limited to the threat indicators submitted to the systems, applications, and processes utilized by Facebook and by Meta staff when actioning content on the Instagram platform associated with JustFor.Fans, FanCentro, and several other platforms used by putative class members to post content, including LiveJasmin, Chaturbate, Bongacams, Clip4sale, Manyvids, Modelcentro, Celebtv, Camversity, Camster, Camdolls, and all Mindgeek variants, including but not limited to its own internal systems, the Threat Exchange or GIFCT Hash Sharing

Database, during the time period October 1, 2017 to the present, as outlined at points in this Declaration and will be further described after what I understand will be efforts to meet and confer with Defendants. I start at October 1, 2017, instead of the October 2018 date in the complaint as to when Radvinsky purchased OnlyFans, in order to obtain approximately 1 year of data for the pre-conspiracy period (and because it is possible the scheme was tested or started earlier than the closing of the purchase, based on the inference that negotiations started well before then).

**Limited Discovery and Suggestion of Special Master**

103.    In my discussion above, and in this section, I identify some of the discovery we require for a further analysis of the issues I identify above to the extent the Court determines that the conclusions in my declaration, based on available data, are not sufficient for Plaintiffs' burden of proof on the anti-SLAPP motion. I also explain why, based on my experience, appointing a technical special master for the data production and analysis is the most efficient way to manage the specifics to accommodate everyone's concerns.

104.    In preparing this request for discovery, I understand that there is limited standard of proof required for a plaintiff to meet their burden on Step 2 of an anti-SLAPP motion, which I understand is "to demonstrate a probability of prevailing on its challenged causes," which is less than proving the merits in a civil case with a "preponderance" of evidence. Therefore, if the Court concludes that the conclusions in my declaration, based on available data, are not sufficient to show that Plaintiffs have "a probability of prevailing," I have identified the additional data and discovery for a further analysis in this Declaration and in a detailed set of technical requests, as we would express these requests in a subpoena or meet and confer to the engineers, computer scientist, and other technical people at Defendants and any third parties.  I understand those will be used by Plaintiffs' counsel to meet and confer with Defendants before presenting a proposal to the Court.

I can prioritize the requests depending on the level of analysis the Court requires, and the quality and scope of the data provided by Defendants and third parties (i.e., I may ask for a certain kind of data as an easy solution, but if it is not available, or there are issues with the data, I may need a different set of information).

105.    The Court could order compliance with our technical versions of the discovery requests. Alternatively, from my experience, ***delegating the implementation to a technical special master is an efficient method of proceeding, since this kind of data production and analysis is most efficiently accomplished when technical people work together under guidance by a special master to obtain sample data, engage in iterations and testing, and other protocols and procedures***.

106.    I understand Plaintiffs' counsel has contacted Meta to meet and confer about the limited anti-SLAPP discovery and will provide a supplemental list after the parties' complete efforts to meet and confer. But as a partial initial list, I have reviewed the partial list of requested discovery included in the opposition papers concerning Step 2 of the anti-SLAPP argument (subject to modification based on the meet and confer with Meta), and the listed discovery would be relevant to my analysis of the issues so identified, which I list below.

107.    To implement my inquiry into this subject from a data perspective, the most efficient and practical approach would start with a discussion with technical personnel at Meta, facilitated if needed by the Court or a special master, after the Court orders the general topics and scope for discovery. I reviewed the anti-SLAPP discovery motion and I have requested the following:

a.  Data about whether Meta and its employees and agents designated Plaintiff and others as harmful despite not being harmful or involved in terrorism or other dangerous activities, rather than third parties.

b.  Data about whether parties other than Meta were responsible for the designation of data associated with Plaintiffs and others not involved in terrorism or other dangerous activities, and the subsequent inclusion of these designations in, and or submitting them to, the GIFCT, Threat Exchange, or other database for the purposes identifying terrorist or harmful content. Plaintiffs have alleged that Meta and its employees and agents included Plaintiffs and others in the database, which was then relied upon by Meta and other online providers to block content - with such confidence that Tech Against Terrorism describes that having access to the GIFCT database "*allows companies to consult **verified terrorist content**"* (emphasis added).

c.  Data about whether Meta designated, and later submitted, data associated with non-terrorist individuals and entities to the GIFCT, Threat Exchange, or other database for the purpose of causing other online providers to suppress postings. I understand that Plaintiffs have alleged that Meta and its co-defendants wanted to (and did) negatively affect Plaintiffs and its users, to advance the economic interests of OnlyFans and its owners across the largest platforms on the internet.

    d.   Member-level access to the Threat Exchange and all data it contains through a Special Master, to perform a comparison of adult performer data in 2019; this can be supervised by a neutral party.

I certify (or declare) under penalty of perjury under the laws of the United States of American and the State of California that the foregoing is true and correct.

Executed this 11th day of August 2022.

_____
JONATHAN E. HOCHMAN

EXHIBIT A

## JONATHAN E. HOCHMAN
jonathan@hochmanconsultants.com
Tel +1-203-699-2628

CURRENT POSITIONS

| | |
|---|---|
| 2004 – Present | **HOCHMAN CONSULTANTS – Partner** <br> Founded Internet and search marketing agency as outgrowth of prior position. Provides consulting and software development services to clients, including technology companies, publishers, ecommerce providers and web development firms. |
| 2018 – Present | **UNS PROJECT – Co-Founder** <br> Invented and developed Internet infrastructure service for user authentication, linking of de-identified records, and detection of fake accounts. |

PAST POSITIONS

| | |
|---|---|
| 2010 – 2018 | **CODEGUARD, INC. – Co-Founder – Acquired by Comodo CA** <br> Invented web site security service, built working prototype, and raised initial capital. |
| 2008 – 2019 | **SEMNE (SEARCH ENGINE MARKETING NEW ENGLAND) – Chair and** <br> Founding member of search marketing association in New England. |
| 1999 – 2004 | **BARCODING INC. – Director** <br> Systems integrator provides software, bar code technology, RFID technology, and wireless networks to commercial, manufacturing, and government sectors. Named to the Inc. 500 (Nov 2004). Recognized by Forbes Magazine as one of ten privately held companies to watch (Feb 2004). Ranked third on the Maryland Fast 50. Raised 50% of initial funding to grow the business from two to sixty employees. |
| 1999 – 2003 | **UNITED ALLOYS CORPORATION – General Manager** <br> Imported specialty metals and chemicals for sale in North America on behalf of Russian producers. |
| 1996 – 1999 | **INDUSTRIAL METALS & CHEMICALS CORPORATION – General Manager** <br> Sales and marketing of specialty metals and chemicals representing Russian producer worldwide. |
| 1990 – 1996 | **NORTH ATLANTIC RESOURCES, INC. – President** <br> Consulting firm assisted Russian companies with foreign trade in Europe, North America, Middle East, and Asia. Products sold included mainframe computers, software, office equipment, consumer electronics, consumer packaged goods, and construction materials. |

EDUCATION

| | |
|---|---|
| 2022 – Present | **YALE UNIVERSITY** <br> PhD student in the Yale Applied Cryptography Laboratory (starting August 22, 2022). Work funded by Yale University. |
| 1990 – 1991 | **COLUMBIA LAW SCHOOL** <br> Completed first year of law school, then departed to spend time managing own venture. |
| 1986 – 1990 | **YALE UNIVERSITY** <br> Simultaneous BSc. and MSc. degrees in Computer Science awarded *summa cum laude*, distinction in the major, Tau Beta Pi (The Engineering Honor Society), Barge Mathematics Prize, Henry Edwards Ellsworth Memorial prize for significant research. |

ACADEMIC PAPERS

1. Fischer M.J., Hochman J.E., Boffa D. (2021) Privacy-Preserving Data Sharing for Medical Research. In: Johnen C., Schiller E.M., Schmid S. (eds) Stabilization, Safety, and Security of Distributed Systems. SSS 2021. Lecture Notes in Computer Science, vol 13046. Springer, Cham. https://doi.org/10.1007/978-3-030-91081-5
2. How to Create a Failure Tolerant Distributed System, Jonathan E. Hochman, Yale University Department of Computer Science Tech Report 799, April 1990

PUBLISHED ARTICLES

1. New Wave of Referrer Spam Wrecking Google Analytics Data, Marketing Land, December 8, 2016
2. What is Search Engine Optimization Manipulation, National Law Review, May 18, 2016
3. A Proposal for Ethical Ad Blocking, Marketing Land, October 5, 2015
4. Web Overload: Why Digital Advertising Needs to Hit the Reset Button, Marketing Land, September 25, 2015
5. Pay-to-Unpublish Sites Practice 'Digital Blackmail', Internet Evolution, November 6, 2013
6. Why Google Should Crack Down Harder On The Mugshot Extortion Racket, Search Engine Land, Feb. 6, 2013
7. How to Avoid Enterprise Password Danger, Internet Evolution, June 27, 2012
8. Tech Group's Open Letter to Its Congressman, Internet Evolution, January 19, 2012
9. SEO Service Spammers: Combating Disinformation, Search Marketing Standard, Winter 2011/2012
10. Deconstructing Microsoft AdCenter's Missed Opportunities, Search Engine Land, February 17, 2011
11. What Every Search Marketer Needs to Know About Web Security, Search Engine Land, December 30, 2010
12. 5 SEO Tips You Can Usually Ignore, Search Marketing Standard, Summer 2010
13. How To Avoid Getting Your Search Rankings Trashed by Malware, Search Engine Land, Sept. 4, 2009
14. Google Turns Blind Eye to Scam Ads, Internet Evolution, Aug. 21, 2009
15. Nasty Malware Attack Targets Web Developers, Internet Evolution, Aug. 19, 2009
16. An Open Letter to Online Ad Networks, SEOBOOK, July 28, 2009
17. Simple Security Steps to Stop Server Spam, Internet Evolution, July 23, 2009
18. How to Protect Your Web Marketing Assets, Internet Evolution, March 4, 2009
19. An Update on JavaScript Menus And SEO, Search Engine Land, January 9, 2009
20. Is Wikipedia Transparent Enough?, Search Marketing Standard, Winter 2008/2009
21. Google SearchWiki - Opportunity or Headache, Search Marketing Standard, Spring 2009
22. Microsoft Announces adCenter Desktop Beta during SMX Advanced Keynote, Search Engine Land, June 2, 2008
23. Twelve Simple Ways to Write Search-Friendly HTML Code, Search Engine Land, May 30, 2008
24. Legitimate, Useful Subversion for Search Engine Marketers, Search Engine Land, April 8, 2008
25. Using Wikipedia to Reveal Web Traffic Data, Search Engine Land, March 12, 2008
26. Virtual Blight & The Ten Commandments for Online Marketers, Search Engine Land, February 18, 2008
27. URL Rewriting & Custom Error Pages in ASP.NET 2.0, Search Engine Land, September 21, 2007
28. Microsoft adCenter Offers Appealing Upgrade, Search Engine Land, September 10, 2007
29. Tracking Hot Topics on Wikipedia, Search Engine Land, September 10, 2007
30. Search Marketing & Web Page Download Speed, Search Engine Land, September 5, 2007
31. How to Get More Pages into Google's Index, Search Engine Watch, August 1, 2007

SELF-PUBLISHED ARTICLES

1. The Cost of Pay Per Click Advertising— PPC Trends and Analysis
2. 302 Redirect vs. 301 Redirect: Which is Better?
3. How to Get Google Sitelinks
4. How to Standardize Multiple Domains for SEO Using 301 Redirects
5. How to Write Meta Descriptions (Code Sample Included)
6. The Cost of Banner Advertising – Trends and Analysis
7. Basic SEO Tips
8. The Benefits of Clean URLs
9. Best Content Management Systems and SEO
10. Best Practices for Managing Online Reviews
11. The Cost of SEO Services
12. External Links & SEO

13. Adobe Flash and SEO
14. The Google Sandbox Effect
15. How to Block Part of a Page from Being Indexed by Google or Other Search Engines
16. The Internet Marketing Process
17. The Danger of Deadlines in Web Development
18. Spam Prevention Techniques


SPEAKING

1. Yale Innovation Summit, New Haven, May 2022
2. 23rd International Symposium on Stabilization, Safety, and Security of Distributed Systems, November 2021
3. Yale Innovation Summit, New Haven, May 2019
4. VT Web Marketing Summit, Burlington, VT, November 2017
5. National Expert Witness Conference, Clearwater Beach, FL, May 2017
6. International Printing & Imaging Conference, Henderson, NV, July 2016
7. VT Web Marketing Summit, Burlington, VT, November 2015
8. VT/NH Marketing Group, Woodstock, VT, May 2015
9. VT Web Marketing Summit, Burlington, VT, November 2014
10. VT Web Marketing Summit, Burlington, VT, November 2013
11. VT/NH Marketing Group, Whitefield, NH, June 2013
12. VT Web Marketing Summit, Burlington, VT, November 2012
13. SMX East, New York, October 2012
14. SMX Advanced, Seattle, June 2012
15. SMX West, San Jose, Feb 2012
16. SMX Advanced, London, May 2011
17. SMX Toronto, April 2011
18. SMX West, San Jose, March 2011
19. SMX West, Santa Clara, March 2010
20. IWLA Marketing and Sales Conference, Chicago, July 2009
21. SMX Advanced, Seattle, June 2009
22. Web 2.0 Expo, San Francisco April 2009
23. Web 2.0 Summit, November 2008
24. SMX East, New York, October 2008
25. SMX Advanced, Seattle, June 2008
26. SMX Social Media, Long Beach, April 2008
27. Search Engine Strategies, San Jose, August 2007
28. Search Engine Strategies, New York, April 2007
29. Search Engine Strategies, Chicago 2006
30. IWLA Marketing and Sales Conference, Chicago, July 2006


PATENTS AND PATENT APPLICATIONS

1. Systems and Methods for Secure Data Sharing, Provisional US Patent Application 63280955
2. User Authentication System, U.S. Patent Application No. 16856213
3. Systems and methods for automated retrieval, monitoring, and storage of online content
   Patent number: 9069885
4. Wireless collection of battery performance metrics system, method, and computer program product
   Publication number: 20050027466

TRIAL TESTIMONY

1. **Take 5 Media, et al.** v. Advantage Sales & Marketing, et al., AAA No. 01-19-0002-7532.
2. **Client 5** v Party 5, American Arbitration Association, Case 01-20-15-5410.
3. Social Tokens v. **VDOPIA**, Tel Aviv-Jaffa Magistrate's Court (2021).
4. Boppers v. **Rosenay**, HHD-CV19-60104115-S, Connecticut Superior Court, Judicial District of Hartford.
5. **Loytr** v. TinyCo, CGC-16-551519, Superior Court of California, County of San Francisco.
6. **Borg** v. Cloutier, FST-CV-16-6028856-S, Connecticut Superior Court, Judicial District of Stamford.
7. **Client 2** v Party 2, binding private arbitration, Glendale, CA.
8. Party 3 v **Client 3**, binding private arbitration, Austin, TX.
9. The H&M Law Firm v. **Venning**, BC577241, Superior Court of California, County of Los Angeles.
10. General Steel v. **Chumley**, 13-00769, US District Court for the District of Colorado.
11. PODS v. **U-Haul**, 8:12-01479, US District Court for the Middle District of Florida.
12. **Client 1** v Party 1, binding private arbitration, Miami, FL.

DEPOSITION TESTIMONY

1. **Brown** v Google, 20-cv-03664, US District Court for the Northern District of California.
2. **Black** v CNN, 5016CA001517, Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida.
3. Legno Bastone v **Provenza Floors**, 20-CA01486, Circuit Court, 20th Judicial Circuit, Collier County, Florida.
4. **Drips** v Teledrip, 5:19-CV-02789, US District Court for the Northern District of Ohio, Eastern Division.
5. **Lane** v Elyassnia, et al., CGC-20-586918, Superior Court of California, County of San Francisco.
6. **Take 5 Media** v. Advantage Sales & Marketing, et al., AAA No. 01-19-0002-7532.
7. Honey Baked Ham Inc. v. **Honey Baked Ham Company LLC**, 8:19-cv-01538, US District Court, Central District of California, Southern Division.
8. **National Rifle Association of America** v. Ackerman McQueen Inc et al, 3:19-cv-02074, US District Court, Northern District of Texas, Dallas Division.
9. **Evox** v AOL, 20-cv-02907, US District Court for the Central District of California.
10. Party 4 v **Client 4**, binding private arbitration.
11. **Zillow** v IBM, IPR2020-01656, USPTO, Patent Trial and Appeal Board.
12. **Zillow** v IBM, IPR2020-01655, USPTO, Patent Trial and Appeal Board.
13. **FurnitureDealer.Net** v Amazon.com and COA Inc, 18-cv-00232, US District Court, Minnesota.
14. **H. Roske** v Christian Burghart, 657328/2017, Supreme Court of New York, New York County.
15. RingCentral v **Nextiva**, 19-cv-02626, US District Court for the Northern District of California.
16. **Davis and Azar** v Yelp, 18-cv-00400, US District Court for the Northern District of California.
17. **Jayda Cheaves** v Walgreens, 19-cv-02970, US District Court for the Northern District of Georgia.
18. Penn Engineering v **Peninsula Components**, 19-cv-00513, US District Court, Eastern District of Pennsylvania.
19. American Airlines v **Delta Air Lines**, 19-cv-01053, US District Court for the Northern District of Texas.
20. Troubleshooter Network v **HomeAdvisor**, 18-cv-02362, US District Court for the District of Colorado.
21. Hotel Airport v **Best Western International**, 2:19-cv-01393, US District Court for the District of Arizona.
22. **Dreamstime** v Google, 3:18-cv-01910, US District Court for the Northern District of California.
23. In re Snap Securities Litigation (for **lead plaintiffs and the class**), 2:17-cv-03679, US District Court, Central District of California.
24. Gree v **Supercell**, IPR2019-00086, USPTO, Patent Trial and Appeal Board.
25. Gree v **Supercell**, IPR2019-00083, USPTO, Patent Trial and Appeal Board.
26. **Ascente** v Digital River, 18-cv-00138, US District Court for the District of Minnesota.
27. **Williamson** v Google, 3:15-cv-00966, US District Court for the Northern District of California.
28. Tempur-Pedic v **Mattress Firm**, 4:17-cv-1068, US District Court for the Southern District of Texas.
29. **Leadership Studies** v. Blanchard, 15-cv-1831, US District Court for the Southern District of California.
30. **Loytr** v TinyCo, CGC-16-551519, Superior Court of California, County of San Francisco.
31. **Borg** v Cloutier, FST-CV-16-6028856-S, Connecticut Superior Court, Judicial District of Stamford.
32. Linkepic v **Wittstrom and Tannehill**, 12-cv-9058, US District Court for the Northern District of Illinois.
33. Hooked Media Group v **Apple**, 114CV265819, Superior Court of California, County of Santa Clara.
34. Pensler v **Fox Television**, 11 L 009425, Circuit Court of Cook County, IL.
35. **Client 2** v Party 2, binding private arbitration.

36. Telebrands v **Tinnus Enterprises**, PGR2015-00016, USPTO, Patent Trial and Appeal Board.

37. Edible Arrangements v **1-800-Flowers.Com,** 3:14-01744, US District Court for the District of Connecticut.

38. **Concordia Partners** v Marcelle Pick, 2:14-00009, US District Court for the District of Maine.

39. General Steel v **Ethan Daniel Chumley**, 14-01932, US District Court for the District of Colorado.

40. **Client 1** v Party 1, binding private arbitration.

41. Kelly-Brown v **Oprah Winfrey**, 1:11-07875, US District Court for the Southern District of New York.

42. PODS v **U-Haul**, 8:12-01479, US District Court for the Middle District of Florida.


Retaining parties shown in bold.

Exhibit B [intentionally not attached, pending confidentiality discussion with Defendants]

# EXHIBIT C

**tech**
**against**
**terrorism**

# Case study: Using the GIFCT hash-sharing database on small tech platforms

This case study is intended to provide insight into how a Public-Private Partnership has contributed to the fight against terrorist use of the internet by using the Global Internet Forum to Counter Terrorism's (GIFCT) hash-sharing database to support small platforms. The study was completed with the assistance of JustPaste.it, one of the leading small platforms that has joined the hash-sharing consortium established by the GIFCT to identify terrorist imagery. This guide provides insight into the benefits and challenges of deploying this technology.

**What is the Global Internet Forum to Counter Terrorism (GIFCT)?**

The GIFCT is an industry-led coalition formed by Facebook, Twitter, Google, and Microsoft which collaborates with a wide range of NGOs, academic experts, and governments. The objective of the initiative is to substantially disrupt terrorists' ability to promote terrorism, disseminate violent extremist propaganda, and exploit or glorify real-world acts of violence on the internet. The GIFCT focusses on: conducting and funding research; sharing knowledge, information and best practices; and employing and leveraging technology. The GIFCT is working in close partnership with Tech Against Terrorism initiative to share knowledge and expertise with smaller tech platforms.

**What is JustPaste.it?**

JustPaste.it is a "pasting" site that allows users to share content anonymously. The site is run by one person, who works on the site in his spare-time. Unfortunately, groups like ISIS have exploited the site to re-share propaganda material. Despite these challenges, JustPaste.it has made significant strides in removing terrorist content shortly after it is posted.

**The GIFCT's hash-sharing consortium**

Terrorist organisations use the internet to recruit, propagandise, and connect. Technology companies, both independently and collectively, are pushing back. This is not easy: smaller platforms in particular often do not have the resources to build large operations teams or develop sophisticated algorithmic policy enforcement tools. That is why the GIFCT has developed a shared database of hashes of known terrorist content. Updated continuously by participating companies, the hash-sharing consortium empowers smaller platforms to find and act on terrorist content on their platforms. Currently, there are more than 80,000 visually distinct images hashed in the database and more than 8,000 visually distinct videos in the database.

**How does it work?**

The hash-sharing consortium is designed to be flexible for participating companies. They sign an NDA, MOU, and, if necessary, no-cost licenses to use specific content-hashing techniques. Companies are NOT required to agree on shared content policies in order to participate, which means that if a company finds a match to content in the database they are not obligated to report on that match to the consortium or anyone else. They are not even required to take action. The purpose is simply to empower companies to enforce their own standards more effectively by enabling companies to tip one another off to potentially dangerous material at scale.

**tech**
**against**
**terrorism**

The database itself is hosted on Facebook's ThreatExchange platform which was originally developed to allow companies to share hashes of malware with one another. ThreatExchange is secure, flexible, and robust; data shared via the hash-sharing consortium is available only to other members of the consortium, not all users of ThreatExchange. ThreatExchange also has a mature API, and many consortium members choose to integrate with that platform in that way. Others use a graphical interface. The consortium uses multiple hashing techniques to facilitate easy engagement by companies that may have familiarity with one technique over another.

The consortium has developed guidelines for the type of content to be uploaded into the database. When a hash is uploaded it includes metadata that corresponds to the company that uploaded it and a code that corresponds roughly to the type of content reflected in the hash. The hash-sharing consortium does not share personally identifiable information.

**How Do Small Companies Get Involved?**

The first step to joining the hash-sharing consortium is signing an NDA, which facilitates more detailed discussion about ThreatExchange, the coding scheme, and the hashing techniques we use. This also gives existing members of the consortium an opportunity to vet interested companies. Companies then sign an MOU, register for ThreatExchange, and get set up with one or more of the supported hashing techniques. The Facebook team provides support and guidance for all of those technical aspects, and the hash-sharing companies more broadly sometimes collaborate to write and share useful scripts and tools. After that, implementation is a matter of engaging the ThreatExchange API and developing tools and processes for managing matches to hashes that are found on the platform. Many of the GIFCT member companies are happy to provide support and guidance for developing those protocols, but they are ultimately the purview of each platform.

---

**TECH AGAINST TERRORISM**

Tech Against Terrorism is an initiative launched and supported by the United Nations Counter Terrorism Executive Directorate (UN CTED) that supports the tech sector in tackling terrorist exploitation of the internet whilst respecting human rights.

Our work consists of three pillars:

1. **Outreach:** Convening tech companies of all sizes, counter-terrorism experts, government officials, and civil society at in-person workshops and seminars, as well as video conferences, to learn more about the nature of the threat and how smaller companies can play their part to help address terrorist exploitation

2. **Emerging Best Practice and Knowledge-Sharing:** Facilitating knowledge-sharing amongst tech companies through in-person workshops and our online Knowledge Sharing Platform.[1] We work with companies to improve their Terms of Service / Community Guidelines, develop balanced approaches to content moderation, and produce transparency reports to increase accountability. We also collaborate with the GIFCT to facilitate knowledge-sharing with smaller tech companies

3. **Capacity Building:** Working with companies to provide individual training workshops on Terms of Service, Content Moderation and Transparency Reporting. Building online tools to help small tech companies tackle terrorist exploitation of their platforms

**USING THE HASH-SHARING DATABASE**

**Getting access to the hash-sharing database**

JustPaste.it was given access to the GIFCT's hash-sharing database by Facebook. JustPaste.it saw this as a means of getting "the biggest impact possible" in terms of tackling exploitation of the platform and explained that they wanted to examine "all images hosted on the site". Before granting access, JustPaste.it signed a non-disclosure agreement and an agreement "licensing" JustPaste.it to use the GIFCT hash-sharing database.

**The hash-sharing database in practice**

Initially JustPaste.it deployed the hash-sharing database as a one-off procedure but then implemented an almost real-time version of the platform that enables continuous and automated consultation of the database. Given that JustPaste.it does not host video, only photos are matched. In total, this process took around a month.

JustPaste.it received support from Facebook at all stages of the technical integration. For example, Facebook provided JustPaste.it with a handbook containing a detailed description of the technology and on-boarding procedure. Furthermore, a Facebook developer assisted JustPaste.it with building a plug-in for the programming language used by JustPaste.it that was used to generate PDQ hashes[1] from the images on JustPaste.it. Once these hashes were generated, JustPaste.it was able to compare them with the hashes in the GIFCT's hash-sharing database. In order to compare the hashes, Facebook supported JustPaste.it with Hamming distance[2] measuring, a procedure that measures the proximity between hashes and can therefore determine whether two hashes are similar enough to constitute a "match".

JustPaste.it then ran the hashes comparisons between its database and GIFCT's hash-sharing database. As an additional measure, JustPaste.it verified the matches to determine that they had correctly matched identified terrorist content. JustPaste.it told Tech Against Terrorism that all matches were accurately identifying terrorist content, and this allowed for JustPaste.it to remove 10-12,000 entries containing terrorist imagery.

---

[1] PDQ hashes are hashes developed by Facebook

[2] Oxford Math Center, "Hamming Distance and Error Correcting Codes": http://www.oxfordmathcenter.com/drupal7/node/525 (accessed on 14 May 2018).

## CONCLUSIONS

**1.  Benefits of using the hash-sharing database according to JustPaste.it**

- According to JustPaste.it, all image matches made through the database identified terrorist content with "almost 100% accuracy". As a result, JustPaste.it were able to remove 10-12,000 entries containing terrorist imagery.

- Human verification is still possible. Companies can verify that matches made from the database are correct, thereby ensuring that there is a "human in the loop".

- The database gives platforms more independence in their moderation efforts - having access to the database allows companies to consult verified terrorist content and decreases dependence on user content reporting and government takedown requests.

- Companies do not have to implement the database by themselves and have access to GIFCT support. JustPaste.it received assistance from Facebook in both hash generation and matching.

**2.  Challenges in using the hash-sharing database**

- The process requires some time commitment. JustPaste.it estimates that it took a month from initiated to content removal.

- Using the database once might not be enough. JustPaste.it initially consulted the hash-sharing database as a one-off procedure however then made some changes to its platform allowing the company to examine uploaded imagery against the database in "almost real time".

- Since the process can be time-consuming for a small company with limited time and resources, JustPaste.it suggests starting small and implementing as a one-off procedure rather than trying to immediately implement a "perfect" solution.

**3.  Key learnings**

- The procedure is repeatable, and more small tech companies could use the GIFCT hash-sharing database. Given the assistance supplied by Facebook in hash generation and matching, other companies could replicate JustPaste.it's procedure. Since JustPaste.it does not host video they only used matching for image content, although the database does hold hashes from videos. Platforms hosting video can therefore deploy the database for both types of imagery.

- Examining a platform's entire repository of imagery over all history is time-consuming given that it entails generating hashes and matching them against all content uploaded on the platform. JustPaste.it therefore recommends initially matching content from a more limited time period, for example one month prior, to more easily get a grasp of how the hash-sharing database works.

- Companies should strive towards deploying the database in tandem with Tech Against Terrorism's Knowledge Sharing Platform, which provides companies with operational support on how to moderate content once detected by the hash-sharing database.

# EXHIBIT C-1

On This Page

# Welcome to ThreatExchange!

ThreatExchange is a simple-to-use platform that supports signal sharing among predefined groups of members in a secure, privacy-compliant, and automated way. Today, ThreatExchange (aka TX or TE) is used by multiple companies to share signals on a variety of topics intended to prevent real world harm. Some examples of how TX is currently used include sharing malware, phishing scams, and terrorism signals with the goal of helping all participating organizations these tackle problems based on their terms of service.

ThreatExchange supports three core concepts: **signals (aka ThreatIndicators)**, **descriptions of signals (aka ThreatDescriptors)**, and **visibility of signals**. These three concepts allow a group of members to share signals, react to and describe signals other members upload, and decide individually on how a signal aligns with their policies.

## What is Signal Sharing?

Signal sharing is a tactic to prevent harm on the internet where platforms work together to combat global threats like malware, terrorism, and other harmful content. Platforms help each other by sharing signals from content that they found and labeled on their platform. For example, Platform A might find a video of terrorism on their platform. By sharing the hash of that video (a type of signal) with Platform B, Platform B can find and review that video, which they might have otherwise missed. By sharing signals, the platforms can compound their individual trust & safety efforts and prevent more harm faster.

Signal Sharing is NOT a way for platforms to align on content policies or to coordinate on what content they remove. Each platform reviews content independently according to its own community standards policies and takes actions according to those standards.

## Why Would I Contribute?

There are many problems in the Trust & Safety space that affect all platforms jointly, and lead to real world harm. Signal sharing on ThreatExchange tries to reduce this harm by helping platforms find and remove more harmful content. Platforms come in all shapes and sizes, and not all can afford to hire a myriad of reviewers or invest millions in specialized machine learning models. For these platforms, investing in ThreatExchange can be an effective way to use their trust and safety resources.

Even for platform's which already have robust trust and safety programs, there are still tangible benefits to joining and contributing to ThreatExchange. Namely, the harmful content found on those platform often doesn't go away, it just goes somewhere else. A rising tide lifts all boats, and by all pitching in, we can improve the baseline safety level for the entire internet. Even if you aren't uploading new signals to ThreatExchange simply confirming (or disputing!) labels will improve that baseline, build trust in our platforms, and help make the internet safer.

## What Signals are Commonly Shared?

In ThreatExchange we refer to the signals being shared as Indicators. Over 80 types of Indicators can be shared on ThreatExchange and the full list can be found here. There are, however, a few data types that are particularly common.

Indicator Types to Match Text:

- **Raw Text** — Indicator Type: `TEXT_STRING`
- **Trend Queries (keywords + regex)** — Indicator Type: `TREND_QUERY`

Indicator Types to Match URLs:

- **URLs** — Indicator Type: `URI`
- **Domains** — Indicator Type: `DOMAIN`

Indicator Types to Match Photos:

- **PDQ Hashes (details)** — Indicator Type: `HASH_PDQ`
- **PDQ Hashes + OCR Text** — Indicator Type: `HASH_PDQ_OCR`

Indicator Types to Match Videos:

- MD5 Hash (details) — Indicator Type: `HASH_MD5`
- TMK+PDQF Hash (details) — Indicator Type: `HASH_TMK`

## What is the Cost of Integration?

Partners who have onboarded have reported the process takes take 1-2 weeks of engineering time to get a basic integration plus another 1-2 weeks for fully automated ingestion and contribution. The cost will vary by company and will depend on a number of factors including the maturity of internal systems and the number of signal types you are attempting to use.

Some questions that might be useful in determining how long it will take your company to integrate are:

- Which of the above signal types are you planning to integrate with? (Text tends to be quick, photos moderate)
- Can you currently search your platform for matches of those signal types? (You can likely piggyback on existing infrastructure, saving time)

# How do I Start Reading and Sharing Signals?

Threre are three ways to share signals on ThreatExchange:

- **UI**: ThreatExchange has a graphical user interface you can use to quickly and interactively do things like read and share signals and run queries. This is the best place to quickly explore the data in ThreatExchange You can learn more here: https://developers.facebook.com/docs/threat-exchange/ui
- **Python Package**: To build an inital integration and to preform validation we recommend using the python open source library we've developed. This will let you fetch a copy of shared signals in a simple format.
- **API**: Lastly, there is also a powerful HTTP API which has greater functionality than the python wrapper for an advanced integration. You can learn more here: https://developers.facebook.com/docs/threat-exchange/reference/apis

To use any of these methods you will first need to get access to ThreatExchange. ThreatExchange requires you (or someone on your team) to have a Facebook account, or to create one, and then will require creating a new application. Afterwards, you can apply for access to ThreatExchange, which will require that you confirm that your application belongs to your business. After that, you can add more accounts to the application, or store a token to gain access to the API.

You can follow the steps here to create an App and get access to ThreatExchange.

  Like 112        Share

**ThreatExchange**

**Getting Started**

Best Practices

UI Overview

UI Reference:

API Overview

API Examples

API Structure

API Reference:

Privacy Controls

Submitting Data

Editing Existing Data

Deleting Data

Re-sharing

Reacting

Submitting Connections

Integrations

Webhooks

FAQ

Webinar

Changelog

# EXHIBIT C-2

tech
against
terrorism

# Case study: Using the GIFCT hash-sharing database on small tech platforms

This case study is intended to provide insight into how a Public-Private Partnership has contributed to the fight against terrorist use of the internet by using the Global Internet Forum to Counter Terrorism's (GIFCT) hash-sharing database to support small platforms. The study was completed with the assistance of JustPaste.it, one of the leading small platforms that has joined the hash-sharing consortium established by the GIFCT to identify terrorist imagery. This guide provides insight into the benefits and challenges of deploying this technology.

**What is the Global Internet Forum to Counter Terrorism (GIFCT)?**

The GIFCT is an industry-led coalition formed by Facebook, Twitter, Google, and Microsoft which collaborates with a wide range of NGOs, academic experts, and governments. The objective of the initiative is to substantially disrupt terrorists' ability to promote terrorism, disseminate violent extremist propaganda, and exploit or glorify real-world acts of violence on the internet. The GIFCT focusses on: conducting and funding research; sharing knowledge, information and best practices; and employing and leveraging technology. The GIFCT is working in close partnership with Tech Against Terrorism initiative to share knowledge and expertise with smaller tech platforms.

**What is JustPaste.it?**

JustPaste.it is a "pasting" site that allows users to share content anonymously. The site is run by one person, who works on the site in his spare-time. Unfortunately, groups like ISIS have exploited the site to re-share propaganda material. Despite these challenges, JustPaste.it has made significant strides in removing terrorist content shortly after it is posted.

**The GIFCT's hash-sharing consortium**

Terrorist organisations use the internet to recruit, propagandise, and connect. Technology companies, both independently and collectively, are pushing back. This is not easy: smaller platforms in particular often do not have the resources to build large operations teams or develop sophisticated algorithmic policy enforcement tools. That is why the GIFCT has developed a shared database of hashes of known terrorist content. Updated continuously by participating companies, the hash-sharing consortium empowers smaller platforms to find and act on terrorist content on their platforms. Currently, there are more than 80,000 visually distinct images hashed in the database and more than 8,000 visually distinct videos in the database.

**How does it work?**

The hash-sharing consortium is designed to be flexible for participating companies. They sign an NDA, MOU, and, if necessary, no-cost licenses to use specific content-hashing techniques. Companies are NOT required to agree on shared content policies in order to participate, which means that if a company finds a match to content in the database they are not obligated to report on that match to the consortium or anyone else. They are not even required to take action. The purpose is simply to empower companies to enforce their own standards more effectively by enabling companies to tip one another off to potentially dangerous material at scale.

tech
against
terrorism

The database itself is hosted on Facebook's ThreatExchange platform which was originally developed to allow companies to share hashes of malware with one another. ThreatExchange is secure, flexible, and robust; data shared via the hash-sharing consortium is available only to other members of the consortium, not all users of ThreatExchange. ThreatExchange also has a mature API, and many consortium members choose to integrate with that platform in that way. Others use a graphical interface. The consortium uses multiple hashing techniques to facilitate easy engagement by companies that may have familiarity with one technique over another.

The consortium has developed guidelines for the type of content to be uploaded into the database. When a hash is uploaded it includes metadata that corresponds to the company that uploaded it and a code that corresponds roughly to the type of content reflected in the hash. The hash-sharing consortium does not share personally identifiable information.

**How Do Small Companies Get Involved?**

The first step to joining the hash-sharing consortium is signing an NDA, which facilitates more detailed discussion about ThreatExchange, the coding scheme, and the hashing techniques we use. This also gives existing members of the consortium an opportunity to vet interested companies. Companies then sign an MOU, register for ThreatExchange, and get set up with one or more of the supported hashing techniques. The Facebook team provides support and guidance for all of those technical aspects, and the hash-sharing companies more broadly sometimes collaborate to write and share useful scripts and tools. After that, implementation is a matter of engaging the ThreatExchange API and developing tools and processes for managing matches to hashes that are found on the platform. Many of the GIFCT member companies are happy to provide support and guidance for developing those protocols, but they are ultimately the purview of each platform.

---

**TECH AGAINST TERRORISM**

Tech Against Terrorism is an initiative launched and supported by the United Nations Counter Terrorism Executive Directorate (UN CTED) that supports the tech sector in tackling terrorist exploitation of the internet whilst respecting human rights.

Our work consists of three pillars:

1. **Outreach:** Convening tech companies of all sizes, counter-terrorism experts, government officials, and civil society at in-person workshops and seminars, as well as video conferences, to learn more about the nature of the threat and how smaller companies can play their part to help address terrorist exploitation

2. **Emerging Best Practice and Knowledge-Sharing:** Facilitating knowledge-sharing amongst tech companies through in-person workshops and our online Knowledge Sharing Platform.[1] We work with companies to improve their Terms of Service / Community Guidelines, develop balanced approaches to content moderation, and produce transparency reports to increase accountability. We also collaborate with the GIFCT to facilitate knowledge-sharing with smaller tech companies

3. **Capacity Building:** Working with companies to provide individual training workshops on Terms of Service, Content Moderation and Transparency Reporting. Building online tools to help small tech companies tackle terrorist exploitation of their platforms

**USING THE HASH-SHARING DATABASE**

**Getting access to the hash-sharing database**

JustPaste.it was given access to the GIFCT's hash-sharing database by Facebook. JustPaste.it saw this as a means of getting "the biggest impact possible" in terms of tackling exploitation of the platform and explained that they wanted to examine "all images hosted on the site". Before granting access, JustPaste.it signed a non-disclosure agreement and an agreement "licensing" JustPaste.it to use the GIFCT hash-sharing database.

**The hash-sharing database in practice**

Initially JustPaste.it deployed the hash-sharing database as a one-off procedure but then implemented an almost real-time version of the platform that enables continuous and automated consultation of the database. Given that JustPaste.it does not host video, only photos are matched. In total, this process took around a month.

JustPaste.it received support from Facebook at all stages of the technical integration. For example, Facebook provided JustPaste.it with a handbook containing a detailed description of the technology and on-boarding procedure. Furthermore, a Facebook developer assisted JustPaste.it with building a plug-in for the programming language used by JustPaste.it that was used to generate PDQ hashes[1] from the images on JustPaste.it. Once these hashes were generated, JustPaste.it was able to compare them with the hashes in the GIFCT's hash-sharing database. In order to compare the hashes, Facebook supported JustPaste.it with Hamming distance[2] measuring, a procedure that measures the proximity between hashes and can therefore determine whether two hashes are similar enough to constitute a "match".

JustPaste.it then ran the hashes comparisons between its database and GIFCT's hash-sharing database. As an additional measure, JustPaste.it verified the matches to determine that they had correctly matched identified terrorist content. JustPaste.it told Tech Against Terrorism that all matches were accurately identifying terrorist content, and this allowed for JustPaste.it to remove 10-12,000 entries containing terrorist imagery.

---

[1] PDQ hashes are hashes developed by Facebook

[2] Oxford Math Center, "Hamming Distance and Error Correcting Codes": http://www.oxfordmathcenter.com/drupal7/node/525 (accessed on 14 May 2018).

**CONCLUSIONS**

**1. Benefits of using the hash-sharing database according to JustPaste.it**

- According to JustPaste.it, all image matches made through the database identified terrorist content with "almost 100% accuracy". As a result, JustPaste.it were able to remove 10-12,000 entries containing terrorist imagery.

- Human verification is still possible. Companies can verify that matches made from the database are correct, thereby ensuring that there is a "human in the loop".

- The database gives platforms more independence in their moderation efforts - having access to the database allows companies to consult verified terrorist content and decreases dependence on user content reporting and government takedown requests.

- Companies do not have to implement the database by themselves and have access to GIFCT support. JustPaste.it received assistance from Facebook in both hash generation and matching.

**2. Challenges in using the hash-sharing database**

- The process requires some time commitment. JustPaste.it estimates that it took a month from initiated to content removal.

- Using the database once might not be enough. JustPaste.it initially consulted the hash-sharing database as a one-off procedure however then made some changes to its platform allowing the company to examine uploaded imagery against the database in "almost real time".

- Since the process can be time-consuming for a small company with limited time and resources, JustPaste.it suggests starting small and implementing as a one-off procedure rather than trying to immediately implement a "perfect" solution.

**3. Key learnings**

- The procedure is repeatable, and more small tech companies could use the GIFCT hash-sharing database. Given the assistance supplied by Facebook in hash generation and matching, other companies could replicate JustPaste.it's procedure. Since JustPaste.it does not host video they only used matching for image content, although the database does hold hashes from videos. Platforms hosting video can therefore deploy the database for both types of imagery.

- Examining a platform's entire repository of imagery over all history is time-consuming given that it entails generating hashes and matching them against all content uploaded on the platform. JustPaste.it therefore recommends initially matching content from a more limited time period, for example one month prior, to more easily get a grasp of how the hash-sharing database works.

- Companies should strive towards deploying the database in tandem with Tech Against Terrorism's Knowledge Sharing Platform, which provides companies with operational support on how to moderate content once detected by the hash-sharing database.

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=a1hCI2o3HPM)

      Who We Are ⌄    What We Do ⌄    Join Us ⌄    News & Events ⌄     



### By GIFCT (https://gifct.org/author/gifct/)
20 July 2021
In Letter (https://gifct.org/category/letter/)

Dear GIFCT Stakeholders,

One year ago, when I assumed the role of inaugural Executive Director of the Global Internet Forum to Counter Terrorism (GIFCT), I embarked upon a six-month virtual listening tour with members of our global stakeholder community. As part of that process, I met with colleagues from industry, government, academia, and civil society about both the challenges and opportunities for GIFCT as a newly independent organization.

In my conversations with a range of civil society stakeholders — members of our Independent Advisory Committee, participants in our working groups, and other individuals following and invested in GIFCT — understanding and addressing the human dimension of the impacts of our work emerged as a key theme. In particular, I received advice to focus on those most vulnerable in this context: both the victims of terrorism and violent extremism and the victims of efforts to address terrorism and violent extremism.

Drawing on recommendations from multiple quarters, I committed last fall to commissioning an assessment to identify in detail the actual and potential human rights impacts of GIFCT's work. My hope was that this report would serve as a catalyst for GIFCT's organizational development as a newly independent entity, helping us at this foundational moment to chart a clear path forward for the coming years. The Operating Board also reaffirmed its commitment to conducting this assessment and ensuring that the protection of human rights and free expression remain a cornerstone of GIFCT's work.

In December, GIFCT partnered with a non-profit organization called BSR (Business for Social Responsibility) to conduct the assessment. Over the past six months, this effort has informed our work in real-time, allowing us to take early and decisive action to position universal and fundamental human rights at the center of our strategic planning and programmatic activities. Today, I am pleased to share that we have published BSR's full report on our website here (https://gifct.org/wp-content/uploads/2021/07/BSR_GIFCT_HRIA.pdf). We plan to hold open office hours (https://docs.google.com/forms/d/e/1FAIpQLSeu-UZo3zEUavQ6rB0-WtLEFIsQLrAcO5hoWB5Zn99rjPI2Aw/viewform)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    **Read More (https://gifct.org/privacy-policy/)**    ACCEPT


Privacy - Terms

Case 3:22-cv-01101-WHA  Document 46  Filed 08/16/22  Page 68 of 136

**GIFCT**
Global Internet Forum
to Counter Terrorism

Who We Are ⌄    What We Do ⌄    Join Us ⌄    News & Events ⌄

this afternoon for anyone interested in an informal conversation with us about the recommendations and look forward to addressing some of the key questions and topics of interest that emerge at a panel discussion focused on the assessment at our global summit next week.

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=aIICr2o3HPM)

While BSR's assessment focused on identifying and making recommendations to address possible adverse human rights impacts, the report also emphasizes the potential of GIFCT to facilitate the realization of human rights, including to life, liberty, security, and freedom of expression, among others. We take this positive responsibility seriously. After months of interviews with a diverse and global set of GIFCT stakeholders, BSR has offered a series of recommendations on how to pursue rights-respecting approaches to achieving our mission of preventing terrorists and violent extremists from exploiting digital platforms. As a starting point, we outline in the roadmap below the commitments we intend to make over the short, medium, and longer term.

## The Recommendations

Based on conversations with 40+ individuals and organizations across our stakeholder community, BSR offered 47 concrete recommendations to GIFCT that spanned nine themes and 35 questions, to include membership, organizational governance, content removal and preservation, and consideration of terrorist and violent extremist content, among others.

## 1. Current Commitments

As BSR's insights helped inform our work in real-time, we have already made significant progress towards implementing numerous key recommendations. On membership, in particular, we collaborated with BSR to refine our guidelines for companies interested in joining GIFCT. The purpose of these enhanced criteria — now available on our website here (https://gifct.org/membership/) — was threefold: to bring greater transparency to the membership process; to set clear expectations and standards for aspiring member companies to meet as a condition of joining the organization; and, above all, to emphasize the complementary and mutually reinforcing nature of combatting terrorism and violent extremism and ensuring respect for human rights.

The BSR report also supports a "big tent" approach to membership, an initiative we have already begun prioritizing with our 2021 strategic objective to take a human rights based-approach to broadening and diversifying membership. By the end of this year, we expect to have doubled the number of GIFCT members since last year's summit. These members represent an increasingly diverse group of companies, showing that it is not just one kind of platform facing terrorist and violent extremist exploitation. We have also already begun a mapping exercise and recruitment effort to engage with more companies outside of the United States and Europe. If you have recommendations for particular companies that would benefit from a conversation with our team, please share them with us here (https://docs.google.com/forms/d/e/1FAIpQLSch9LIZ25LPvDTqYEU5Dlv4ZqmznFOD_1AEDfe3E9PyWA-ImA/viewform).

Another key theme in the BSR report to which we have already committed significant time and focus concerns how bias in the form of a disproportionate focus on Islamist extremist content influences GIFCT human rights impacts. As part of our effort to address this bias in the counterterrorism field at large, as well as to capture an increasingly dangerous and diverse array of terrorist and violent extremist content, we have been leading a global multistakeholder review of the taxonomy of GIFCT's hash-sharing database this year. As the BSR report notes, this project aligns with their recommendations to develop a common understanding of terrorist and violent extremist content, as well as to build that understanding on "behavior" in addition to "groups." We look forward to releasing a publication on this subject with updates on how we'll initially expand the taxonomy and chapters from our team, international experts, and civil society stakeholders in advance of the GIFCT Global Summit next week. If you would like to join our panel discussion on the topic, please register here (https://gifct.org/2021-global-summit/).

A third and final area of progress that I would like to highlight concerns the evolution of GIFCT's incident response framework and increasing transparency around our work to respond to terrorist and mass violent events and our hash-sharing process. It is our standard practice to disclose information about the Content Incident Protocol (https://gifct.org/content-incident-protocol/) (CIP) process and relevant metrics when activated, to conduct a review after the CIP has been initiated, and not to allow governments to add hashes directly to the database. Over the past year,

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Read More (https://gifct.org/privacy-policy/)    ACCEPT

HRIA Response Letter by Nick Rasmussen - GIFCT



we have worked to enhance transparency about collaboration that occurs for incidents not activating the CIP, as well as how the hash- sharing database functions (https://gifct.org/tech- innovation/). We have also emphasized in our refined membership guidelines that companies using the hash-sharing database must have an adequate appeals mechanism and be working on enhancing the capability for remedy when needed.

Other recommendations in the assessment that we have already made progress towards implementing include:

## Human rights impacts:

- Conducting a stakeholder mapping to identify organizations and experts that would increase the diversity of rights holders whose voices are heard in GIFCT activities

## Terrorist and violent extremist content:

- Participating in efforts to pursue counter-terrorism and violent extremism priorities from an holistic and strategic perspective

## Stakeholder engagement:

- Continuing mapping stakeholders to further identify organizations and experts that would increase the diversity of rights holders whose voices are heard in GIFCT activities—and creating plans for their involvement

# 2. Near- and Medium-Term Commitments (6-12 months)

While we have already begun implementing some of their initial recommendations in the report, there is much work to be done as GIFCT continues to grow and develop in its second year as an independent organization. Over the next six to 12 months, we look forward to making significant progress on implementing the following recommendations:

## Mission and goals:

- Create a human rights policy for GIFCT
- Embed a commitment to human rights into other relevant GIFCT governing documents

## Human rights impacts:

- Ensure that addressing the full range of GIFCT human rights impacts are embedded into GIFCT's work plan
- Create a framework for ongoing human rights due diligence

## Content removal and preservation:

- Convene multi-stakeholder discussions to advance acceptance and adoption of legal carve-outs for evidentiary content
- Use a GIFCT "common understanding" of terrorist and violent extremist content to determine inclusion in the hash-sharing database in the medium to long term
- Introduce and expand transparency and oversight mechanisms alongside the extension of content in the hash-sharing database
- Establish a multi-stakeholder process to develop metrics on how the hash-sharing database is used

## Theory of change and programmatic priorities

- Develop position statements on the rights-based laws, policies, regulations, and strategies needed to more effectively address the exploitation of digital platforms by terrorists and violent extremists
- Proactively express this point of view with relevant governments, policy makers, and regulators

## GIFCT membership:

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.

- Establish a tiered membership system for GIFCT

Read More (https://gifct.org/privacy-policy/)     ACCEPT

Click here to view the 2022 Global Summit(https://www.youtube.com/watch?v=ailhCI2o3HPM)



Who We Are ⌄   What We Do ⌄   Join Us ⌄   News & Events ⌄

- Establish a process to (1) expel companies not living up to their membership commitments and / or (2) alter a company's membership tier

- Actively recruit new member companies, especially from non-US locations

- Actively recruit new member companies from elsewhere along the technology "stack"

- Provide technical assistance to smaller companies to address human rights risks

## Stakeholder engagement:

- Establish and maintain closer relationships with the United Nations system

- Train all GIFCT participants in principles of good stakeholder engagement

- Consider geographic diversity when rotating government membership of IAC

## Governance, accountability, and transparency:

- Institute a system of formal recommendations from the IAC to the Operating Board, and formal responses from the Operating Board to the IAC

- Publish summaries of minutes of Operating Board and IAC meetings

- Task the IAC with publishing an annual statement about the performance of GIFCT

## Organizational issues:

- Create a diversity, equity, and inclusion ambition for (1) GIFCT staff and (2) GIFCT participants

- Continue enhancing GIFCT staff support for the IAC and Working Groups

- Create a GIFCT government and management chart

# 3. Longer-Term Commitments and Considerations

As the report notes, not all these recommendations can or should be implemented immediately. Rather, it is suggested that GIFCT set out a yearslong plan of continuous improvement. While some of these recommendations will require significant new investment and discussion from GIFCT stakeholder groups about whether and how to move forward, we remain committed to exploring these proposals in earnest over the coming years as the organization, our membership, our programs, and, of course, the global threats from terrorist and violent extremist activity continue to evolve.

## Content removal and preservation:

- Require contributing companies to conduct human review and approval prior to adding hashes to the database

- Investigate how to enable third-party reviews of the hash-sharing database to assess whether hashes are consistent with the GIFCT taxonomy

- Develop a process for enabling researcher access to the hash-sharing database and associated content

- Require companies that contribute to and utilize the hash-sharing database to commit to specific disclosure

- Enable multi-stakeholder governance of the hash-sharing database to the extent possible under the current management model (i.e., hosted by Facebook Threat Exchange) and develop a plan for long-term governance and oversight

## Governance, accountability, and transparency:

- In two years time, review the merits of transitioning to a multi-stakeholder Operating Board

- Establish a multi-stakeholder process to develop metrics about how the hash-sharing database is used

- Require GIFCT member companies to publish insights into their use of the hash-sharing database as part of their transparency reports, or similar

## Organizational issues:

- Establish a mechanism to provide stipends for non-company / non-government participants in GIFCT

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   **Read**
**More (https://gifct.org/privacy-policy/)**   ACCEPT

Privacy - Terms

- Hire a "Human Rights & Stakeholder Engagement" Director

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=alhCI2o3HPM)

Let me close by expressing my deep gratitude to the BSR team — Dunstan Allison-Hope, Susan Morgan, and Lindsey who have dedicated enormous time and talent to this effort over the past six months. We are also grateful to the dozens of stakeholders around the world who have shared their perspectives and experiences with BSR and GIFCT.

In six months' time, we will hold an open meeting with our stakeholding community to assess progress against the above outlined preliminary commitments and to solicit ideas and feedback on where there remains room for improvement or modification. In the meantime, my door is always open. In the months and years ahead, I very much look forward to working together as GIFCT draws on this foundational report to embed human rights in our strategy, governance, and activities.



This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Read

More (https://gifct.org/privacy-policy/)      ACCEPT

More by GIFCT → (https://gifct.org/author/gifct/)

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=aIhCT2e3HPM)



Who We Are ⌄   What We Do ⌄   Join Us ⌄   News & Events ⌄

 (https://www.facebook.com/sharer/sharer.php?
u=https%3A%2F%2Fgifct.org%2F2021%2F07%2F20%2Fhria-
response-letter-by-nick-rasmussen%2F)

 (https://twitter.com/share?text=HRIA Response Letter by
Rasmussen&url=https%3A%2F%2Fgifct.org%2F2021%2F07
response-letter-by-nick-rasmussen%2F)

 (https://pinterest.com/pin/create/button/?
url=https%3A%2F%2Fgifct.org%2F2021%2F07%2F20%2Fh
response-letter-by-nick-
rasmussen%2F&media=&description=HRIA Response Letter
Nick Rasmussen)

## Quick Links

About (/about/)

FAQs (/explainers/)

Governance (/governance/)

Apply for Membership (/membership/)

## Partners

GNET Research (https://gnet-research.org)

Tech Against Terrorism (https://www.techagainstterrorism.org/)

## Contact Us

outreach@gifct.org (mailto:outreach@gifct.org)

press@gifct.org (mailto:press@gifct.org)

## Newsletter

First Name*

Last Name*

Email*

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read**
More (https://gifct.org/privacy-policy/)   ACCEPT

Privacy - Terms

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=alhCI2o3HPM)



Who We Are ⌄    What We Do ⌄    Join Us ⌄    News & Events ⌄    

©2022 GIFCT | Global Internet Forum to Counter Terrorism · Built by maÿk

(https://mayk.london)

Privacy Policy (https://gifct.org/privacy-policy/)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    **Read**

**More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy - Terms

EXHIBIT C-3

Case 3:22-cv-01101-WHA   Document 46   Filed 08/16/22   Page 75 of 136

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=a1hCI2o3HPM)



Who We Are ⌄    What We Do ⌄    Join Us ⌄    News & Events ⌄     

# Preventing terrorists and violent extremists from exploiting digital platforms

The Global Internet Forum to Counter Terrorism brings together the technology industry, government, civil society, and academia to foster collaboration and information-sharing to counter terrorist and violent extremist activity online.

GIFCT's strategic planning and programming centers on three pillars:



## Prevent

Engaging digital platforms and civil society groups with awareness, knowledge, and tools to develop sustainable programs to disrupt terrorist and violent extremist activity online



## Respond

Bringing together key stakeholders to mitigate the impact of a terrorist or violent extremist attack



## Learn

Supporting cutting-edge, practical research efforts at the intersection of extremism and technology

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Read More (https://gifct.org/privacy-policy/)    ACCEPT

Privacy - Terms

## Research and Resources from our Core Partners

---



## Global Network on Extremism & Technology

Recent insights, reports, and digests from our academic research arm

---

(https://gnet-research.org/2022/07/28/the-writing-on-the-facebook-wall-a-revised-assessment-of-posting-and-support-violence-by-pro-rittenhouse-meme-creators/)



(https://gnet-research.org/2022/07/28/the-writing-on-the-facebook-wall-a-revised-assessment-of-posting-and-support-violence-by-pro-rittenhouse-meme-creators/)

**The Writing on the (Facebook) Wall: A Revised Assessment of Posting and Support for Violence by Pro-Rittenhouse Meme Creators**

By GNET Research ()

The Case Kyle Rittenhouse, the recently-acquitted teen shooter of Kenosha fame, continues to be a...

**Read more (https://gnet-research.org/2022/07/28/the-writing-on-the-facebook-...**

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.     Read More (https://gifct.org/privacy-policy/)     ACCEPT

Privacy - Terms

facebook-
wall-a-
revised-
assessment-
of-
posting-
and-
support-
for-
violence-
by-pro-
rittenhouse-
meme-
creators/)



(https://gnet-research.org/2022/07/26/comparing-online-posting-typologies-among-violent-and-nonviolent-right-wing-
extremists/)

(https://gnet-research.org/2022/07/26/comparing-online-posting-typologies-among-violent-and-nonviolent-right-wing-
extremists/)

## Comparing Online Posting Typologies Among Violent and Nonviolent Right-Wing Extremists

By GNET Research ()

Although many researchers, practitioners, and policymakers are concerned about identifying and characterising online
posting patterns…

**Read more
(https://gnet-
research.org/2022/07/26/comparing-
online-
posting-
typologies-
among-**

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Read
More (https://gifct.org/privacy-policy/)    ACCEPT

Privacy - Terms

violent-
and-
nonviolent-
right-
wing-
extremists/)



## Tech against Terrorism

Latest news from our mentorship and knowledge-sharing partner

(https://www.techagainstterrorism.org/2022/07/22/tech-against-terrorism-mentorship-2021-to-date/)

JUL
22
2022



(https://www.techagainstterrorism.org/2022/07/22/tech-against-terrorism-mentorship-2021-to-date/)

### Tech Against Terrorism Mentorship: 2021 – To Date

By Tech Against Terrorism ()

The Tech Against Terrorism Mentorship Programme Since the launch of our Mentorship Programme in 2018,…

**Read more
(https://www.techagainstterrorism.org/2022/07/22/tech-against-terrorism-mentorship-2021-to-date/)**

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   **Read**

More (https://gifct.org/privacy-policy/)   ACCEPT

Privacy - Terms

Jul
20
2022

(https://www.techagainstterrorism.org/2022/07/20/tech-against-terrorism-publishes-mitigation-strategy-to-counter-terrorist-operated-websites/)



(https://www.techagainstterrorism.org/2022/07/20/tech-against-terrorism-publishes-mitigation-strategy-to-counter-terrorist-operated-websites/)

## Tech Against Terrorism publishes mitigation strategy to counter terrorist operated websites

By Tech Against Terrorism ()

20 July 2022 Tech Against Terrorism is pleased to publish our mitigation strategy for responding…

**Read more
(https://www.techagainstterrorism.org/2022/07/20/tech-against-terrorism-publishes-mitigation-strategy-to-counter-terrorist-operated-websites/)**

## Twitter Feed

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   **Read**

More (https://gifct.org/privacy-policy/)   ACCEPT

Privacy - Terms

**EU Home Affairs (https://twitter.com/euhomeaffairs)** ✓  29 Jul  (https://twitter.com/euhomeaffairs/status/1552913321443135490)

What lessons do we learn from the #Buffalo (https://twitter.com/hashtag/Buffalo) shooting in 🇺🇸? And how to improve future responses terrorists abusing internet platforms?

…

**Dr. Courtney Radsch (https://twitter.com/courtneyr)** ✓  26 Jul  (https://twitter.com/courtneyr/status/1552071660433313792)

The #GIFCTSummit22 (https://twitter.com/hashtag/GIFCTSummit22) conversation abt #CVE (https://twitter.com/hashtag/CVE) online content moderation, counter narratives, stratcomms etc sharing a report I wrote for @CIMA_Media (https://twitter.com/CIMA_Media)

**the godless left (https://twitter.com/diakayyali)** ✓  26 Jul  (https://twitter.com/diakayyali/status/1552073752699092999)

Really interesting to hear from Evie Brown at Discord. Discord does have unique challenges as not one environment but a space of indivi

**Nagham El Karhili (https://twitter.com/nelkarhili)**  26 Jul  (https://twitter.com/nelkarhili/status/1552074180383744000)

So excited to see the WG outputs live on our site! #GIFCTSummit22 (https://twitter.com/hashtag/GIFCTSummit22)
https://twitter.com/tgthorley/status/1552072375037939712 (https://twitter.com/tgthorley/status/1552072375037939712)

**Nusrat Farooq (https://twitter.com/nusfarooq)**  26 Jul  (https://twitter.com/nusfarooq/status/1552077861778907136)

@NicholasRasmu15 (https://twitter.com/NicholasRasmu15) of @GIFCT_official (https://twitter.com/GIFCT_official) at the #GIFCTSumm (https://twitter.com/hashtag/GIFCTSummit22) https://twitter.com/kiwistargazer/status/1552076874859159552 (https://twitter.com/kiwistargazer/status/1552076874859159552)

Load More

# Interested in becoming a member?

**Click Here to Apply (https://forms.gle/AKfbNc83KaHmgjwL8)**

---

## Quick Links

About (/about/)

FAQs (/explainers/)

Governance (/governance/)

Apply for Membership (/membership/)

## Partners

GNET Research (https://gnet-research.org)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Read More (https://gifct.org/privacy-policy/)     ACCEPT

Tech Against Terrorism (https://www.techagainstterrorism.org)

Privacy - Terms

## Contact Us

outreach@gifct.org (mailto:outreach@gifct.org)

press@gifct.org (mailto:press@gifct.org)

## Newsletter

First Name*

Last Name*

Email*

Sign up

©2022 GIFCT | Global Internet Forum to Counter Terrorism · Built by maÿk          Privacy Policy (https://gifct.org/privacy-policy/)

(https://mayk.london)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    **Read**

**More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy · Terms

# EXHIBIT C-4

# Case study: Using the GIFCT hash-sharing database on small tech platforms

This case study is intended to provide insight into how a Public-Private Partnership has contributed to the fight against terrorist use of the internet by using the Global Internet Forum to Counter Terrorism's (GIFCT) hash-sharing database to support small platforms. The study was completed with the assistance of JustPaste.it, one of the leading small platforms that has joined the hash-sharing consortium established by the GIFCT to identify terrorist imagery. This guide provides insight into the benefits and challenges of deploying this technology.

### What is the Global Internet Forum to Counter Terrorism (GIFCT)?

The GIFCT is an industry-led coalition formed by Facebook, Twitter, Google, and Microsoft which collaborates with a wide range of NGOs, academic experts, and governments. The objective of the initiative is to substantially disrupt terrorists' ability to promote terrorism, disseminate violent extremist propaganda, and exploit or glorify real-world acts of violence on the internet. The GIFCT focusses on: conducting and funding research; sharing knowledge, information and best practices; and employing and leveraging technology. The GIFCT is working in close partnership with Tech Against Terrorism initiative to share knowledge and expertise with smaller tech platforms.

### What is JustPaste.it?

JustPaste.it is a "pasting" site that allows users to share content anonymously. The site is run by one person, who works on the site in his spare-time. Unfortunately, groups like ISIS have exploited the site to re-share propaganda material. Despite these challenges, JustPaste.it has made significant strides in removing terrorist content shortly after it is posted.

### The GIFCT's hash-sharing consortium

Terrorist organisations use the internet to recruit, propagandise, and connect. Technology companies, both independently and collectively, are pushing back. This is not easy: smaller platforms in particular often do not have the resources to build large operations teams or develop sophisticated algorithmic policy enforcement tools. That is why the GIFCT has developed a shared database of hashes of known terrorist content. Updated continuously by participating companies, the hash-sharing consortium empowers smaller platforms to find and act on terrorist content on their platforms. Currently, there are more than 80,000 visually distinct images hashed in the database and more than 8,000 visually distinct videos in the database.

### How does it work?

The hash-sharing consortium is designed to be flexible for participating companies. They sign an NDA, MOU, and, if necessary, no-cost licenses to use specific content-hashing techniques. Companies are NOT required to agree on shared content policies in order to participate, which means that if a company finds a match to content in the database they are not obligated to report on that match to the consortium or anyone else. They are not even required to take action. The purpose is simply to empower companies to enforce their own standards more effectively by enabling companies to tip one another off to potentially dangerous material at scale.

The database itself is hosted on Facebook's ThreatExchange platform which was originally developed to allow companies to share hashes of malware with one another. ThreatExchange is secure, flexible, and robust; data shared via the hash-sharing consortium is available only to other members of the consortium, not all users of ThreatExchange. ThreatExchange also has a mature API, and many consortium members choose to integrate with that platform in that way. Others use a graphical interface. The consortium uses multiple hashing techniques to facilitate easy engagement by companies that may have familiarity with one technique over another.

The consortium has developed guidelines for the type of content to be uploaded into the database. When a hash is uploaded it includes metadata that corresponds to the company that uploaded it and a code that corresponds roughly to the type of content reflected in the hash. The hash-sharing consortium does not share personally identifiable information.

**How Do Small Companies Get Involved?**

The first step to joining the hash-sharing consortium is signing an NDA, which facilitates more detailed discussion about ThreatExchange, the coding scheme, and the hashing techniques we use. This also gives existing members of the consortium an opportunity to vet interested companies. Companies then sign an MOU, register for ThreatExchange, and get set up with one or more of the supported hashing techniques. The Facebook team provides support and guidance for all of those technical aspects, and the hash-sharing companies more broadly sometimes collaborate to write and share useful scripts and tools. After that, implementation is a matter of engaging the ThreatExchange API and developing tools and processes for managing matches to hashes that are found on the platform. Many of the GIFCT member companies are happy to provide support and guidance for developing those protocols, but they are ultimately the purview of each platform.

---

**TECH AGAINST TERRORISM**

Tech Against Terrorism is an initiative launched and supported by the United Nations Counter Terrorism Executive Directorate (UN CTED) that supports the tech sector in tackling terrorist exploitation of the internet whilst respecting human rights.

Our work consists of three pillars:

1. **Outreach:** Convening tech companies of all sizes, counter-terrorism experts, government officials, and civil society at in-person workshops and seminars, as well as video conferences, to learn more about the nature of the threat and how smaller companies can play their part to help address terrorist exploitation

2. **Emerging Best Practice and Knowledge-Sharing:** Facilitating knowledge-sharing amongst tech companies through in-person workshops and our online Knowledge Sharing Platform.[1] We work with companies to improve their Terms of Service / Community Guidelines, develop balanced approaches to content moderation, and produce transparency reports to increase accountability. We also collaborate with the GIFCT to facilitate knowledge-sharing with smaller tech companies

3. **Capacity Building:** Working with companies to provide individual training workshops on Terms of Service, Content Moderation and Transparency Reporting. Building online tools to help small tech companies tackle terrorist exploitation of their platforms

**USING THE HASH-SHARING DATABASE**

**Getting access to the hash-sharing database**

JustPaste.it was given access to the GIFCT's hash-sharing database by Facebook. JustPaste.it saw this as a means of getting "the biggest impact possible" in terms of tackling exploitation of the platform and explained that they wanted to examine "all images hosted on the site". Before granting access, JustPaste.it signed a non-disclosure agreement and an agreement "licensing" JustPaste.it to use the GIFCT hash-sharing database.

**The hash-sharing database in practice**

Initially JustPaste.it deployed the hash-sharing database as a one-off procedure but then implemented an almost real-time version of the platform that enables continuous and automated consultation of the database. Given that JustPaste.it does not host video, only photos are matched. In total, this process took around a month.

JustPaste.it received support from Facebook at all stages of the technical integration. For example, Facebook provided JustPaste.it with a handbook containing a detailed description of the technology and on-boarding procedure. Furthermore, a Facebook developer assisted JustPaste.it with building a plug-in for the programming language used by JustPaste.it that was used to generate PDQ hashes[1] from the images on JustPaste.it. Once these hashes were generated, JustPaste.it was able to compare them with the hashes in the GIFCT's hash-sharing database. In order to compare the hashes, Facebook supported JustPaste.it with Hamming distance[2] measuring, a procedure that measures the proximity between hashes and can therefore determine whether two hashes are similar enough to constitute a "match".

JustPaste.it then ran the hashes comparisons between its database and GIFCT's hash-sharing database. As an additional measure, JustPaste.it verified the matches to determine that they had correctly matched identified terrorist content. JustPaste.it told Tech Against Terrorism that all matches were accurately identifying terrorist content, and this allowed for JustPaste.it to remove 10-12,000 entries containing terrorist imagery.

---

[1] PDQ hashes are hashes developed by Facebook

[2] Oxford Math Center, "Hamming Distance and Error Correcting Codes": http://www.oxfordmathcenter.com/drupal7/node/525 (accessed on 14 May 2018).

**CONCLUSIONS**

**1.  Benefits of using the hash-sharing database according to JustPaste.it**

- According to JustPaste.it, all image matches made through the database identified terrorist content with "almost 100% accuracy". As a result, JustPaste.it were able to remove 10-12,000 entries containing terrorist imagery.

- Human verification is still possible. Companies can verify that matches made from the database are correct, thereby ensuring that there is a "human in the loop".

- The database gives platforms more independence in their moderation efforts - having access to the database allows companies to consult verified terrorist content and decreases dependence on user content reporting and government takedown requests.

- Companies do not have to implement the database by themselves and have access to GIFCT support. JustPaste.it received assistance from Facebook in both hash generation and matching.

**2.  Challenges in using the hash-sharing database**

- The process requires some time commitment. JustPaste.it estimates that it took a month from initiated to content removal.

- Using the database once might not be enough. JustPaste.it initially consulted the hash-sharing database as a one-off procedure however then made some changes to its platform allowing the company to examine uploaded imagery against the database in "almost real time".

- Since the process can be time-consuming for a small company with limited time and resources, JustPaste.it suggests starting small and implementing as a one-off procedure rather than trying to immediately implement a "perfect" solution.

**3.  Key learnings**

- The procedure is repeatable, and more small tech companies could use the GIFCT hash-sharing database. Given the assistance supplied by Facebook in hash generation and matching, other companies could replicate JustPaste.it's procedure. Since JustPaste.it does not host video they only used matching for image content, although the database does hold hashes from videos. Platforms hosting video can therefore deploy the database for both types of imagery.

- Examining a platform's entire repository of imagery over all history is time-consuming given that it entails generating hashes and matching them against all content uploaded on the platform. JustPaste.it therefore recommends initially matching content from a more limited time period, for example one month prior, to more easily get a grasp of how the hash-sharing database works.

- Companies should strive towards deploying the database in tandem with Tech Against Terrorism's Knowledge Sharing Platform, which provides companies with operational support on how to moderate content once detected by the hash-sharing database.

EXHIBIT C-5

Click here to view the 2022 Global Summit (https://www.youtube.com/watch?v=a1hCI2o3HPM)

 **GIFCT**
Global Internet Forum
to Counter Terrorism

Who We Are ⌄    What We Do ⌄    Join Us ⌄    News & Events ⌄        

## to Use This Document

for civil society groups, academic researchers, governments,
ng to know more about the resources and information that
e available about their efforts to counter terrorist and violent
loped to combat forms of online radicalization.

irectly to resources on each topic developed by GIFCT
esources from GIFCT and its partners at the Global Network
ttps://gnet-research.org/) (GNET) and Tech Against
ainstterrorism.org/).

## ds

agree to set terms of service before accessing a platform's
e legal parameters for usage, content standards explain in a
s and is not allowed to be shared on a given tech platform.
e to ensure users can use the platforms freely and safely, while
t cross the line and have content removed or engagement on
uidelines are generally global. Most companies design,
rds based on feedback from a range of stakeholders that
ment bodies, and global experts in fields such as technology,
GIFCT members enforce their own respective policies and
esponse to violations of their terms of service or standards
count disabling.

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you
wish.    **Read More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy - Terms

olicies that prohibit terrorist and violent extremist content or
s is required to publish, at a minimum, an annual transparency
how standards are upheld and enforced. Though exact format
om company to company, these reports tend to provide data
ata request processing and wider removal compliance. As a
d ability to build out more nuanced metrics within a
rts might also include data on the appearance and removal of
t and the amount of content on which the platform took
amples of transparency reporting to date these reports
als to report on false/positive removal rates, and even the
n the platform over time.

nalists, and practitioners in the counterterrorism and counter-
ays to mitigate the risks to their personal safety online more
online platforms to research or challenge hate-based
ividual can often put themselves or the sensitive communities
Safety concerns also tend to arise for many activists and
ing interactions with different communities and as a result
Platforms' safety guidelines and resources are, therefore,
that users know how to flag abuse, manage privacy settings,
ially hacked accounts or nefarious activities of dangerous

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you
wish.   **Read More (https://gifct.org/privacy-policy/)**      ACCEPT

Privacy - Terms

**ms**

rns, another GIFCT membership requirement
states that all members must have a functional way to
egal activity or activity violating terms of service." While
ety of ways, all member companies provide public resources
ting illegal and prohibited activity and content.

able email address or direct contact portal is available, by
npany and report content or activity in violation of the
o (https://mailchimp.com/contact/abuse/), MEGA
WhatsApp (https://faq.whatsapp.com/general/security-and-
app/?lang=en) all provide basic outreach portals of this. For
sApp, which feature end-to-end encryption, this is the most
cause the company does not otherwise have access to the
stPaste.It users can directly email the platform at
port@justpaste.it) – instructions for properly submitting
ent can be found here (https://justpaste.it/terms/reporting).

## Counter-Narrative Facilitation

flag harm and on-platform violations that lead to possible
w that removal alone will never solve for the root causes of
extremism. Larger social media platforms have realized that
l tools for activists and practitioners to develop content and
urposes. Some GIFCT members have developed tools that
oices that challenge hate speech and extremism. Supporting
rative efforts emerges out of a recognition that deplatforming
esses symptoms of radicalization, rather than causes.

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you
wish.    **Read More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy - Terms

er-narrative campaigns and initiatives look to disrupt a cycle
alization, many practitioners and researchers have
ent extremism needs to start with better comprehensive digital
ung and old). Digital Literacy is a broad term that refers to a
hat allow individuals and organizations to safely and
rironments by questioning online information and having the
t. While some of the material shared here is targeted at
ful to those unfamiliar with operating on digital platforms and
ger audiences (activists, NGOs, teachers) by providing the
anguage that can be easily communicated to others.

## rketing

s offer advertising and marketing tools for their users based
ize as a platform. While these tools are often developed for
marketplace use cases, we also know that these tools can be
d practitioners to better launch their messaging to target
eech goals. Some companies have advertising and marketing
rganizations and/or activist's campaigns and voices reach the
an be effectively measured.

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   **Read More (https://gifct.org/privacy-policy/)**   ACCEPT

Privacy - Terms

# Membership Criteria and Benefits

isted on our website here (https://gifct.org/membership/). In
must meet the following requirements:

icitly prohibit the promotion of terrorism in their terms of
es, or other publicly available content policies

t on reports of illegal activity or activity violating terms of

nnical solutions to content and conduct challenges

arency

ecting human rights, particularly free expression and privacy,
removal policies

apacity of civil society organizations to challenge violent

GIFCT does not meet certain requirements, GIFCT offers that
r partnership with Tech Against Terrorism
ism.org/membership/tech-against-terrorism-mentorship/).

nash-sharing (https://gifct.org/joint-tech-innovation/)
program

se communications around international terrorist and violent
implications

ciated with the Global Network on Extremism and Technology
ch.org/), the academic research arm of GIFCT

pproaches and solutions

cal workshops, e-learnings and webinars with global experts

ct us at outreach@gifct.org (mailto:outreach@gifct.org).

anage.com/subscribe?
53&id=d458d7f692) to receive email updates from the
r Terrorism

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you
wish.   **Read More (https://gifct.org/privacy-policy/)**   ACCEPT

Privacy - Terms

# esources Index

| | Link |
|---|---|
| ars | Click here to view (https://gifct.org/membership/) |
| | Click here to view (https://gifct.org/transparency/) |
| | Click here to view (https://gifct.org/working-groups/) |
| Newsletter | Click here to view (https://gifct.org/news/) |
| it | Click here to view (https://www.campaigntoolkit.org/) |
| Checklist | Click here to view (http://campaigntoolkit.org/resources/campaign-toolkit-digital-security-check-list/) |
| | Click here to view (https://gifct.us17.list-manage.com/subscribe?u=6c63d1064a67c2bb2ac830e53&id=d458d7f692) |
| | Click here to view (https://www.techagainstterrorism.org/membership/tech-against-terrorism-mentorship/) |
| Events | Click here to view (https://www.techagainstterrorism.org/events/project-events/) |
| ring Platform | Click here to view (https://ksp.techagainstterrorism.org/) |
| ghts and | Click here to view (https://gnet-research.org/) |

# dex

| e | Link |
|---|---|
| | Click here to view (https://www.airbnb.com/trust/standards) |

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy - Terms

Click here to view (https://news.airbnb.com/transparency/)

Click here to view (https://www.airbnb.com/help/topic/1398/safety-and-accessibility)

d   Click here to view (https://www.airbnb.com/neighbors)

Click here to view (https://www.airbnb.com/trust)

e   Click here to view (https://www.airbnb.com/resources/hosting-homes)

Click here to view (https://www.airbnb.com/help/article/2020/how-do-i-report-a-message-or-block-someone-on

e

Click here to view (https://www.airbnb.com/help/article/1433/how-do-i-report-discrimination-to-airbnb)

Click here to view (https://www.amazon.com/gp/help/customer/display.html?nodeId=GLHXEX85MENUE4XF)

'   Click here to view (https://www.amazon.com/gp/help/customer/display.html?nodeId=GYSDRGWQ2C2CRYEF)

Click here to view (https://www.amazon.com/gp/help/customer/display.html/ref=hp_bc_nav?ie=UTF8&nodeId=GI

Click here to view (https://discord.com/guidelines)

Click here to view (https://discord.com/safety/360043712232-Discord's-Transparency-Report)

Click here to view (https://discord.com/safety)

Click here to view (https://discord.com/safety/360057166133-Working-with-CARU-to-protect-users-on-Discord)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you
wish.   **Read More (https://gifct.org/privacy-policy/)**      ACCEPT

Click here to view (https://support.discord.com/hc/en-us/articles/360000291932-How-to-Properly-Report-Issues-t

Click here to view (https://www.dropbox.com/acceptable_use)

Click here to view (https://www.dropbox.com/transparency)

Click here to view (https://help.dropbox.com/accounts-billing/security/report-abuse)

r

Click here to view (https://blog.dropbox.com/topics/company/protecting-our-users-and-society--guarding-against

Click here to view (https://www.facebook.com/communitystandards/)

Click here to view (https://transparency.facebook.com/)

Click here to view (https://www.facebook.com/safety/educators)

Click here to view (https://www.facebook.com/communitystandards/dangerous_individuals_organizations)

Click here to view (https://about.fb.com/news/2019/09/combating-hate-and-extremism/)

Click here to view (https://about.fb.com/news/2018/11/staying-ahead-of-terrorists/)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you

Click here to view (https://www.facebook.com/business) wish. **Read More (https://gifct.org/privacy-policy/)** ACCEPT

Privacy - Terms

:h    Click here to view (https://counterspeech.fb.com/en/)

Click here to view (https://socialimpact.facebook.com/)

Click here to view (https://www.facebook.com/safety)

-   Click here to view (https://www.facebook.com/safety/groups/law)

l   Click here to view (https://www.facebook.com/safety/parents)

-   Click here to view (https://www.facebook.com/safety/youth)

rd   Click here to view (https://www.facebook.com/help/222332597793306/?ref=sc)

t   Click here to view (https://www.facebook.com/help/1380418588640631/how-to-report-things/?helpref=hc_fnav)

Click here to view (https://www.facebook.com/help/instagram/477434105621119)

Click here to view (https://about.instagram.com/blog/announcements/instagram-community-guidelines-faqs)

Click here to view (https://transparency.facebook.com/)

Click here to view (https://help.instagram.com/165828726894770/?helpref=hc_fnav&bc%5B0%5D=Instagram%20Help&bc%5B1%5D=Privacy%20and%20Safety%20Center&bc%5B

Click here to view (https://about.instagram.com/community/)

Click here to view (https://justpaste.it/terms)

Click here to view (https://justpaste.it/transparency_report_2021)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read More (https://gifct.org/privacy-policy/)**    ACCEPT     Privacy  Terms

Click here to view (https://justpaste.it/terms/reporting)

Click here to view (https://www.linkedin.com/legal/professional-community-policies)

Click here to view (https://about.linkedin.com/transparency)

Click here to view (https://www.linkedin.com/help/linkedin/answer/146/report-inappropriate-content-messages-or

Click here to view (https://safety.linkedin.com/identifying-abuse)

Click here to view (https://safety.linkedin.com/staying-safe)

Click here to view (https://mailchimp.com/legal/acceptable_use/)

Click here to view (https://mailchimp.com/transparency-report/)

Click here to view (https://mailchimp.com/contact/abuse/)

Click here to view (https://mega.nz/terms)

Click here to view (https://transparency.mega.io/)

Click here to view (https://mega.io/contact)

Click here to view (https://mega.nz/takedown)

Click here to view (https://answers.microsoft.com/en-us/page/codeofconduct)

Click here to view (https://www.microsoft.com/en-us/concern/hatespeech)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy - Terms

Click here to view (https://www.microsoft.com/en-us/corporate-responsibility/reports-hub)

Click here to view (https://www.microsoft.com/en-us/digitalliteracy)

Click here to view (https://www.microsoft.com/en-us/concern/terroristcontent)

Click here to view (https://nonprofit.microsoft.com/en-us/getting-started)

Click here to view (https://about.ads.microsoft.com/en-gb/h/a/microsoft-advertising)

Click here to view (https://about.ads.microsoft.com/en-gb/get-started/about-microsoft-advertising)

Click here to view (https://www.microsoft.com/en-us/ai/ai-for-good)

Click here to view (https://partner.microsoft.com/en-cy/marketing)

Click here to view (https://www.microsoft.com/en-us/digital-skills/online-safety?activetab=protect-whats-importan

Click here to view (https://www.microsoft.com/en-us/digital-skills/online-safety-resources)

Click here to view (https://www.microsoft.com/en-us/security)

Click here to view (https://www.microsoft.com/en-us/concern/bing)

Click here to view (https://learninglab.about.ads.microsoft.com/)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read More (https://gifct.org/privacy-policy/)**    ACCEPT

Privacy - Terms

Click here to view (https://blogs.microsoft.com/on-the-issues/2017/04/18/microsoft-partners-institute-strategic-dia online-radicalization-violence/)

Click here to view (https://www.microsoft.com/en-hk/sparkhk/support-for-ngos)

Click here to view (https://about.ads.microsoft.com/en-gb/resources/training/courses)

Click here to view (https://about.ads.microsoft.com/en-gb/solutions/ad-products)

Click here to view (https://www.microsoft.com/en-us/digital-skills/digital-civility?activetab=dci_reports:primaryr4)

Click here to view (https://www.microsoft.com/en-us/concern/reinstatecontent)

Click here to view (https://policy.pinterest.com/en/community-guidelines)

Click here to view (https://help.pinterest.com/en/article/transparency-report)

Click here to view (https://help.pinterest.com/en/article/report-something-on-pinterest)

Click here to view (https://help.pinterest.com/en/contact)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read More (https://gifct.org/privacy-policy/)**   ACCEPT

Privacy - Terms

Click here to view (https://www.tumblr.com/policy/en/community)

Click here to view (https://transparency.automattic.com/)

Click here to view (https://tumblr.zendesk.com/hc/en-us/articles/226270628-Reporting-offensive-content)

Click here to view (https://www.tumblr.com/abuse)

Click here to view (https://www.tumblr.com/abuse/terrorism)

Click here to view (https://help.twitter.com/en/rules-and-policies/twitter-rules)

Click here to view (https://about.twitter.com/content/dam/about-twitter/en/tfg/download/campaigning-on-twitter

Click here to view (https://transparency.twitter.com/)

Click here to view (https://help.twitter.com/en/safety-and-security)

Click here to view (https://about.twitter.com/en/our-priorities/healthy-conversations/trust-and-safety-council)

Click here to view (https://business.twitter.com/en/help/ads-policies/brand-safety.html)

Click here to view (https://help.twitter.com/en/rules-and-policies/violent-groups)

Click here to view (https://business.twitter.com/en/help/troubleshooting/how-twitter-ads-work.html)

Click here to view (https://business.twitter.com/en/advertising/targeting.html)

Click here to view (https://business.twitter.com/en/advertising/campaign-types.html)

Click here to view (https://analytics.twitter.com/about)

Click here to view (https://business.twitter.com/en/resources.html)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. **Read More (https://gifct.org/privacy-policy/)** ACCEPT

Click here to view (https://about.twitter.com/en/who-we-are/twitter-for-good)

Privacy - Terms

y

Click here to view (https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy)

s

Click here to view (https://business.twitter.com/en/blog/marketing-team-behind-simonbooks.html)

ty

Click here to view (https://twitter.com/twittersafety)

-

Click here to view (https://help.twitter.com/en/safety-and-security#sensitive-content)

Click here to view (https://business.twitter.com/en/resources/video.html)

Click here to view (https://help.twitter.com/en/rules-and-policies/twitter-report-violation)

1

Click here to view (https://about.twitter.com/content/dam/about-twitter/en/tfg/download/teaching-learning-with-

Click here to view (https://faq.whatsapp.com/general/security-and-privacy/how-to-use-whatsapp-responsibly/?la

Click here to view (https://www.whatsapp.com/safety)

Click here to view (https://www.whatsapp.com/privacy/)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you

**Read More** (https://gifct.org/privacy-policy/)      ACCEPT

Privacy - Terms

Click here to view (https://faq.whatsapp.com/general/security-and-privacy/unauthorized-use-of-automated-or-bu
lang=en)

Click here to view (https://faq.whatsapp.com/general/security-and-privacy/staying-safe-on-whatsapp/?lang=en)

Click here to view (https://wordpress.com/support/user-guidelines/)

Click here to view (https://transparency.automattic.com/)

Click here to view (https://wordpress.com/support/report-blogs/)

Click here to view (https://wordpress.com/support/terrorist-activity/)

Click here to view (https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#community-guidel

Click here to view (https://transparencyreport.google.com/youtube-policy/removals?hl=en)

Click here to view (https://support.google.com/youtube/topic/9386941?hl=en&ref_topic=2803240)

Click here to view (https://support.google.com/youtube/answer/2802245?hl=en&ref_topic=9386941)

Click here to view (https://support.google.com/youtube/answer/2802272?hl=en&ref_topic=9386941)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you

wish.   **Read More (https://gifct.org/privacy-policy/)**      ACCEPT

Click here to view (https://support.google.com/youtube/answer/2802244?hl=en&ref_topic=9386941)

Privacy - Terms

Click here to view (https://support.google.com/youtube/answer/2802327?hl=en&ref_topic=9386941)

Click here to view (https://support.google.com/youtube/answer/9229472?hl=en&ref_topic=9282436)

s

Click here to view (https://support.google.com/youtube/answer/2801939?hl=en-GB)

Click here to view (https://www.youtube.com/intl/en-GB/ads/)

Click here to view (https://www.youtube.com/creators-for-change/)

Click here to view (https://www.google.com/nonprofits/offerings/youtube-nonprofit-program/)

Click here to view (https://socialimpact.youtube.com/)

Click here to view (https://support.google.com/youtube/answer/2802027?hl=en&ref_topic=9387085)

Click here to view (https://support.google.com/youtube/answer/2802057?hl=en&ref_topic=9387085)

Click here to view (https://support.google.com/youtube/answer/7626105?hl=en&ref_topic=9387085)

Click here to view (https://support.google.com/youtube/answer/7554338?hl=en&ref_topic=9387085)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   **Read More (https://gifct.org/privacy-policy/)**   ACCEPT

Click here to view (https://www.youtube.com/intl/ALL_uk/howyoutubeworks/)

Privacy - Terms

Click here to view (https://www.google.com/nonprofits/account/u/0/orgs)

Click here to view (https://explore.zoom.us/en/terms/?_ga=2.248790407.185990712.1634826048-1544303719.163

Click here to view (https://explore.zoom.us/en/trust/)

Click here to view (https://explore.zoom.us/en/trust/security/)

Click here to view (https://explore.zoom.us/en/trust/privacy/)

Click here to view (https://explore.zoom.us/en/trust/legal-compliance/)

Click here to view (https://explore.zoom.us/en/trust/trust-safety/)

Click here to view (https://explore.zoom.us/docs/en-us/privacy.html)

Click here to view (https://explore.zoom.us/docs/en-us/transparency.html?_ga=2.218324377.185990712.16348260

Click here to view (https://explore.zoom.us/docs/en-us/trust/transparency.html)

Click here to view (https://explore.zoom.us/en/trust/community-standards-enforcement/)

Click here to view (https://explore.zoom.us/en/community-standards/)

to
Click here to view (https://explore.zoom.us/en/expression-safety-and-process-at-zoom/)
This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you
wish.   **Read More (https://gifct.org/privacy-policy/)**      ACCEPT
                                                                                                Privacy - Terms

# Table of Contents

Introduction & How to Use This Document

Community Standards

Transparency

Safety Hubs

Reporting Mechanisms

Counter-Narrative Facilitation

Digital Literacy

Advertising and Marketing

Appendix A: GIFCT Membership Criteria

Appendix B: Resources Index

Click to Download the PDF (https://gifct.org/wp-content/uploads/2021/07/GIFCT-Member-Resource-Document-for-NGOs-6.pdf)

## Quick Links

About (/about/)

FAQs (/explainers/)

Governance (/governance/)

Apply for Membership (/membership/)

## Partners

GNET Research (https://gnet-research.org)

Tech Against Terrorism (https://www.techagainstterrorism.org/)

## Contact Us

outreach@gifct.org (mailto:outreach@gifct.org)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you

press@gifct.org (mailto:press@gifct.org) wish.  **Read More (https://gifct.org/privacy-policy/)**     ACCEPT

Privacy - Terms

## Newsletter

First Name*

_____

Last Name*

_____

Email*

_____

[ Sign up ]

©2022 GIFCT | Global Internet Forum to Counter Terrorism · Built by maÿk                    Privacy Policy (https://gifct.org/privacy-policy/)

(https://mayk.london)

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you

wish.    **Read More (https://gifct.org/privacy-policy/)**     ACCEPT

Privacy - Terms

EXHIBIT C-6

On This Page

# ThreatExchange UI Overview

## Finding the UI

Visit https://developers.facebook.com/apps and select your app:



Then find the ThreatExchange product within the navbar on the left:



# Adding team members

- Please visit https://developers.facebook.com/apps and select your app
- Select Roles -> Roles
- Please add teammates as either Administrators or Developers
- Please do not add teammates as Test Users or Analytics Users -- these do not have meaning for ThreatExchange apps
- If your organization has a ThreatExchange app ID but the only administrators/developers have since left your organization, please contact us at **threatexchange@fb.com** so that we can reset an admin to be a current employee of your organization -- at which point you'll be able to self-service add everyone else in your organization.



## Searching Data Using the UI

A variety of search options is supported -- here we'll focus on the power-search option. (As of January 2020 multi-page search results are still in development.)



Here we search for all malicious URLs uploaded in the last week:



# Publishing Data Using the UI

Please see the Submitting Data page for several examples.

## Status

Implemented:

- The ThreatExchange user interface is in general beta as of October 2019.
- The UI is fully up and running for privacy-group and tag editing.
- Descriptors can be created and edited singly; they can be uploaded from CSV or JSON, and downloaded to CSV or JSON.
- Non-paginated query results are available: you can access at most 1000 descriptors from any given query.
- Bulk edit of descriptors (e.g. apply a given tag to all on-screen results)
- Complex queries for descriptors ("power search")
- Support for reactions (see also Reacting to Existing Data)
- Support for creating/editing related-to/connections for descriptors

For bulk download we recommend using the python package cli or consulting the API reference::

- Python Wrapper
- API docs
- Reference Java design wrapping the API for tag-based queries

To be implemented (present in the API, not yet present in the UI):

- Improved user experience for complex descriptor queries
- Full paginated results for queries matching large numbers of descriptors
- Descriptor deletion
- Ability to query for all descriptors which have reactions on them
- Support for non-descriptor malware types

## Feedback

Please contact **threatexchange@fb.com** with any and all feedback on how we can better enable your success in using ThreatExchange!

Alternatively, feel free to use the bugnub to report issues:



## Vocabulary

What do people do with ThreatExchange? Lots of things. Here we focus on the most basic subset:



- People at various organizations want to share information about **threats** -- malware signatures, malicious URLs, and so on.
- A threat indicator is the **objective part** -- a file hash, a URL, and so on -- along with a type (MD5, SHA1, URL, etc.).
- A threat descriptor contains an indicator as well as the **subjective parts** -- how malicious a team thinks it is; when they first saw it; and so on.
- Whereas Facebook privacy revolves around **user IDs**, ThreatExchange revolves around **app IDs**. For example, app ID 1064060043755420 is Media Hash Sharing Test. These are generally of the form *Team T at company C*.
- When people share threat data, they can specify who they want to see each datum -- this is **visibility** or **privacy type**.
  - Visible/public means all ThreatExchange members can see it
  - Or for each datum they can make an app-whitelist of specific teams at specific companies.
  - Or for each datum they can specify a privacy-group which is simply a predefined list of app IDs.

- People can **tag** their descriptors. These are tags in any other tool -- except that ThreatExchange tags have their own metadata including the subjective parts that descriptors have, and they also have their own visiblity (public/app-whitelist/privacy-group).
- There's more about threat descriptors (review status and others), and other types of data shareable on ThreatExchange (malware analyses, malware families, and others) -- but for this little walkthrough we've just stuck to indicators, descriptors, visibility, and tags.

Please continue on to the UI Reference to learn more.

Like 8        Share

**ThreatExchange**

Getting Started

Best Practices

**UI Overview**

UI Reference:

API Overview

API Examples

API Structure

API Reference:

Privacy Controls

Submitting Data

Editing Existing Data

Deleting Data

Re-sharing

Reacting

Submitting Connections

Integrations

Webhooks

FAQ

Webinar

Changelog

EXHIBIT C-7

8/4/22, 8:47 PM

Case 3:22-cv-01101-WHA   Document 46   Filed 08/16/22   Page 117 of 136
Dangerous Individuals and Organizations | Transparency Center



Transparency Center

Home → Policies → Facebook Community Standards

# Dangerous Individuals and Organizations

## Policy details



Change log ⌄

## Policy Rationale

In an effort to prevent and disrupt real-world harm, we do not allow organizations or individuals that proclaim a violent mission or are engaged in violence to have a presence on Facebook. We assess these entities based on their behavior both online and offline, most significantly, their ties to violence. Under this policy, we designate individuals, organizations, and networks of people. These designations are divided into three tiers that indicate the level of content enforcement, with Tier 1 resulting in the most extensive enforcement because we believe these entities have the most direct ties to offline harm.

**Tier 1** focuses on entities that engage in serious offline harms - including organizing or advocating for violence against civilians, repeatedly dehumanizing or advocating for harm against people based on protected characteristics, or

engaging in systematic criminal operations. Tier 1 entities include terrorist, hate, and criminal organizations. We remove praise, substantive support, and representation of Tier 1 entities as well as their leaders, founders, or prominent members. Tier 1 includes hate organizations; criminal organizations, including

Read more

---

∧ User experiences

See some examples of what enforcement looks like for people on Facebook, such as: what it looks like to report something you don't think should be on Facebook, to be told you've violated our Community Standards and to see a warning screen over certain content.

**Note:** We're always improving, so what you see here may be slightly outdated compared to what we currently use.

USER EXPERIENCE
## Reporting



USER EXPERIENCE
## Post-report communication



USER EXPERIENCE

## Takedown experience



USER EXPERIENCE

## Warning screens



---

## ⌄ Data

---

### ⌄ Prevalence

Percentage of times people saw violating content

PREVALENCE

# How prevalent were dangerous organizations violations?



## Terrorism

Views of violating content that contains terrorism are very infrequent, and we remove much of this content before people see it. As a result, many times we do not find enough violating samples to precisely estimate prevalence.

In Q1 2022, this was true for violations of our policies on terrorism, suicide and self-injury and regulated goods on Facebook and Instagram. In these cases, we can estimate an upper limit of how often someone would see content that violates these policies.

In Q1 2022, the upper limit was 0.05% for violations of our policy for terrorism on Facebook. This means that out of every 10,000 views of content on Facebook, we estimate no more than 5 of those views contained content that violated the policy.

## Organized Hate

We cannot estimate prevalence for organized hate right now. We will continue to expand prevalence measurement to more areas as we confirm accuracy and meaningful data.

---

⌃  **Content actioned**

Number of pieces of violating content we took action on

CONTENT ACTIONED

# How much dangerous organizations content did we take action on?







Terrorism    ▲ Organized Hate

How we calculate it  ⓘ Read about this data

---

∧  **Proactive rate**

Percentage of violating content we found before people reported it

PROACTIVE RATE

## Of the violating content we actioned for dangerous organizations, how much did we find before people reported it?

Terrorism  ⌄                                                    🖼  ⊞

Case 3:22-cv-01101-WHA Document 46 Filed 08/16/22 Page 122 of 136





■ Found and flagged by us    ◆ Reported by users

**How we calculate it** ⓘ **Read about this data**

---

⌃ **Appealed content**

Number of pieces of content people appealed after we took action on it

APPEALED CONTENT

# How much of the content we actioned for dangerous organizations did people appeal?







● Terrorism    ▲ Organized Hate

**How we calculate it**  ⓘ **Read about this data**

---

⌃  **Restored content**

Number of pieces of content we restored after we originally took action on it

**RESTORED CONTENT**

# How much actioned content for dangerous organizations was later restored?



Dangerous Individuals and Organizations | Transparency Center



■ Restored without appeal     ◆ Restored after appeal     ▬ Total

**How we calculate it** ⓘ **Read about this data**

## Enforcement

We have the same policies around the world, for everyone on Facebook.

## Review teams

Our global team of over 15,000 reviewers work every day to keep people on Facebook safe.

### Stakeholder engagement

Outside experts, academics, NGOs and policymakers help inform the Facebook
Community Standards.

---

∧  # Get help with dangerous individuals and organizations

Learn what you can do if you see something on Facebook that goes against our
Community Standards.

---

**Visit our Help Center**

↗

---

**NEXT**

# Coordinating Harm and Promoting Crime

---

**PREVIOUS**

# Violence and Incitement

Case 3:22-cv-01101-WHA Document 46 Filed 08/16/22 Page 126 of 136



**POLICIES**

**ENFORCEMENT**

**FEATURES**

**OVERSIGHT**

**DATA**

Data Policy    Terms of Service    Cookies

# EXHIBIT D

Microsoft Whois64.exe output on Aug 11, 2022

Domain Name: SUICIDEGIRLS.COM   ←——————

Registry Domain ID: 69702608_DOMAIN_COM-VRSN

Registrar WHOIS Server: whois.networksolutions.com

Registrar URL: http://networksolutions.com

Updated Date: 2022-04-20T01:29:09Z

Creation Date: 2001-04-20T01:27:31Z

Registrar Registration Expiration Date: 2032-04-20T01:27:31Z

Registrar: Network Solutions, LLC

Registrar IANA ID: 2

Reseller:

Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited

Registry Registrant ID:

Registrant Name: Sg Services, Inc

Registrant Organization: Sg Services, Inc

Registrant Street: 5482 WILSHIRE BLVD # 1925

Registrant City: LOS ANGELES

Registrant State/Province: CA

Registrant Postal Code: 90036-4218

Registrant Country: US

Registrant Phone: +1.8479622802

Registrant Phone Ext:

Registrant Fax:

Registrant Fax Ext:

Registrant Email: lradvinsky@gmail.com

Registry Admin ID:

Admin Name: Radvinsky, Leo   ←——————

Admin Organization:

Admin Street: 5927 FRANKLIN AVE STE B STE B

Admin City: LOS ANGELES   ←——————

Admin State/Province: CA

Admin Postal Code: 90028-5515

Admin Country: US

Admin Phone: +1.8479622802

Admin Phone Ext:

Admin Fax:

Admin Fax Ext:

Admin Email: lradvinsky@gmail.com

Registry Tech ID:

Tech Name: Simitzis, Steve

Tech Organization:

Tech Street: 4104 24TH ST # 577

Tech City: SAN FRANCISCO

Tech State/Province: CA

Tech Postal Code: 94114-3615

Tech Country: US

Tech Phone: +1.4152829979

Tech Phone Ext:

Tech Fax: +1.231231234

Tech Fax Ext:

Tech Email: steve@SATURN5.COM

Name Server: NS1.DNSIMPLE.COM

Name Server: NS2.DNSIMPLE.COM

Name Server: NS3.DNSIMPLE.COM

Name Server: NS4.DNSIMPLE.COM

DNSSEC: unsigned

Registrar Abuse Contact Email: domain.operations@web.com

Registrar Abuse Contact Phone: +1.8777228662

URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/

>>> Last update of WHOIS database: 2022-08-11T18:59:43Z <<<

Domain Name: SUICIDEBOYS.COM

Registry Domain ID: 77946058_DOMAIN_COM-VRSN

Registrar WHOIS Server: whois.networksolutions.com

Registrar URL: http://networksolutions.com

Updated Date: 2021-07-30T08:41:29Z

Creation Date: 2001-09-28T23:11:17Z

Registrar Registration Expiration Date: 2026-09-28T23:11:17Z

Registrar: Network Solutions, LLC

Registrar IANA ID: 2

Reseller:

Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited

Registry Registrant ID:

Registrant Name: Sg Services, Inc

Registrant Organization: Sg Services, Inc

Registrant Street: 5482 WILSHIRE BLVD # 1925

Registrant City: LOS ANGELES

Registrant State/Province: CA

Registrant Postal Code: 90036-4218

Registrant Country: US

Registrant Phone: +1.8479622802

Registrant Phone Ext:

Registrant Fax:

Registrant Fax Ext:

Registrant Email: lradvinsky@gmail.com

Registry Admin ID:

Admin Name: Radvinsky, Leo

Admin Organization:

Admin Street: 5927 FRANKLIN AVE STE B STE B

Admin City: LOS ANGELES

Admin State/Province: CA

Admin Postal Code: 90028-5515

Admin Country: US

Admin Phone: +1.8479622802

Admin Phone Ext:

Admin Fax:

Admin Fax Ext:

Admin Email: lradvinsky@gmail.com

Registry Tech ID:

Tech Name: Simitzis, Steve

Tech Organization:

Tech Street: 4104 24TH ST # 577

Tech City: SAN FRANCISCO

Tech State/Province: CA

Tech Postal Code: 94114-3615

Tech Country: US

Tech Phone: +1.4152829979

Tech Phone Ext:

Tech Fax: +1.231231234

Tech Fax Ext:

Tech Email: steve@SATURN5.COM

Name Server: NS1.DNSIMPLE.COM

Name Server: NS2.DNSIMPLE.COM

Name Server: NS3.DNSIMPLE.COM

Name Server: NS4.DNSIMPLE.COM

DNSSEC: unsigned

Registrar Abuse Contact Email: domain.operations@web.com

Registrar Abuse Contact Phone: +1.8777228662

URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/

>>> Last update of WHOIS database: 2022-08-11T19:02:33Z <<<

Domain Name: suicidegirls.us

Registry Domain ID: D6206871-US

Registrar WHOIS Server:

Registrar URL: whois.biz

Updated Date: 2019-04-10T07:05:56Z

Creation Date: 2004-06-04T10:30:58Z

Registry Expiry Date: 2024-06-03T23:59:59Z

Registrar: Network Solutions, LLC

Registrar IANA ID: 2

Registrar Abuse Contact Email: abuse@web.com

Registrar Abuse Contact Phone: +1.8003337680

Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited

Registry Registrant ID: C7D4C5CD748694EFA9F8B576612064998-NSR

Registrant Name: SG Services, Inc. SG Services, Inc.

Registrant Organization: SG Services, Inc.

Registrant Street: 5482 WILSHIRE BLVD

Registrant Street:

Registrant Street:

Registrant City: LOS ANGELES

Registrant State/Province: CA

Registrant Postal Code: 90036-4218

Registrant Country: US

Registrant Phone: +1.8479622802

Registrant Phone Ext:

Registrant Fax:

Registrant Fax Ext:

Registrant Email: lradvinsky@gmail.com

Registrant Application Purpose: P1

Registrant Nexus Category: C21

Registry Admin ID: CD67BE26C69C547BC9B5C8373863091D9-NSR

Admin Name: Leo Radvinsky

Admin Organization:

Admin Street: 5927 FRANKLIN AVE STE B STE B

Admin Street: Suite B

Admin Street:

Admin City: LOS ANGELES

Admin State/Province: CA

Admin Postal Code: 90028-5515

Admin Country: US

Admin Phone: +1.8479622802

Admin Phone Ext:

Admin Fax:

Admin Fax Ext:

Admin Email: lradvinsky@gmail.com

Registry Tech ID: C8950FB8809974BD891D64453B85DFCC9-NSR

Tech Name: Network Solutions, LLC. Network Solutions, LLC.

Tech Organization: Network Solutions, LLC.

Tech Street: 13861 Sunrise Valley Drive

Tech Street: **

Tech Street:

Tech City: Herndon

Tech State/Province: VA

Tech Postal Code: 20171

Tech Country: US

Tech Phone: +1.8886429675

Tech Phone Ext:

Tech Fax: +1.5714344620

Tech Fax Ext:

Tech Email: customerservice@networksolutions.com

Tech Application Purpose: P1

Tech Nexus Category: C21

Name Server: ns1.dnsimple.com

Name Server: ns2.dnsimple.com

Name Server: ns3.dnsimple.com

Name Server: ns4.dnsimple.com

DNSSEC: unsigned

URL of the ICANN Whois Inaccuracy Complaint Form: https://www.icann.org/wicf/

>>> Last update of WHOIS database: 2022-08-11T19:04:22Z <<<

### CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2022, the foregoing was electronically filed with the Clerk of the U.S. District Court, Northern District of California, using the CM/ECF system, which will send notification of such filing to all parties.

By:*/s/ David Azar*
David Azar
dazar@milberg.com
MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
280 South Beverly Dr., Suite PH
Beverly Hills, CA 90212
Phone: (866) 252-0878