Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

DAWN DANGAARD, on behalf of    )
themselves and all others      )
similarly situated, also known )
as Alana Evans, et al.,        )
                               )
          Plaintiffs,          )
                               )
  VS.                          )    **NO. C 22-01101-WHA**
                               )
INSTAGRAM, LLC, et al.,        )
                               )
          Defendants.          )
_____)

San Francisco, California
Thursday, September 8, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        MILBERG COLEMAN BRYSON
        PHILLPS GROSSMAN, PLLC
        280 South Beverly Drive - Suite PH
        Beverly Hills, California 90212
   BY:  **DAVID E. AZAR, ATTORNEY AT LAW**

        EMERGE LAW GROUP
        100 Spectrum Center Drive - Suite 900
        Irvine, California 92618
   BY:  **TIMOTHY L. ALGER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
         Official Reporter, CSR No. 12219

1   **APPEARANCES**:   (CONTINUED)

2   For Defendants Instagram, LLC,
    Facebook Operations LLC,

3   and Meta Platforms, Inc.:

                          KIRKLAND & ELLIS LLP

4                         1301 Pennsylvania Avenue, N.W.
                        Washington, D.C. 20004

5               BY:  **K. WINN ALLEN, ATTORNEY AT LAW**
                        **DEVIN S. ANDERSON, ATTORNEY AT LAW**

6

                          KIRKLAND & ELLIS LLP

7                         555 California Street - Suite 2700
                        San Francisco, California 94104

8               BY:  **MICHAEL P. ESSER, ATTORNEY AT LAW**

9                         KIRKLAND & ELLIS LLP
                        60 East South Temple

10                      Salt Lake City, Utah 84111
              BY:  **JOHN P. HANNON, ATTORNEY AT LAW**

11

  For Defendants Fenix Internet LLC,

12   Fenix International Inc.,
    and Leonid Radvinsky:

13                      QUINN EMANUEL URQUHART
                        & SULLIVAN, LLP

14                      2601 South Bayshore Drive - Suite 1550
                        Miami, Florida 33133

15               BY:  **JOHN F. O'SULLIVAN, ATTORNEY AT LAW**
                        **JOSHUA FORDIN, ATTORNEY AT LAW**

16

                        QUINN, EMANUEL, URQUHART

17                      & SULLIVAN LLP
                        50 California Street - 22nd Floor

18                      San Francisco, California 94111
             BY:   **VICTORIA B. PARKER, ATTORNEY AT LAW**

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Thursday - September 8, 2022**</u>                    <u>**11:15 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Civil Action 22-1101, Dangaard, et |
| 5 | al., versus Instagram LLC, et al. |
| 6 | Counsel, please state your appearances for the record, |
| 7 | beginning with counsel for plaintiffs. |
| 8 | **THE COURT:**  Can I have the -- okay.  Here it is. |
| 9 | Let's go. |
| 10 | **MR. AZAR:**  Good morning, Your Honor.  My name is David |
| 11 | Azar, from Milberg. |
| 12 | **MR. ALGER:**  Timothy Alger, also on behalf of the |
| 13 | plaintiffs. |
| 14 | **THE COURT:**  Great.  Welcome to you. |
| 15 | And? |
| 16 | **MR. ALLEN:**  Good morning, Your Honor.  Winn Allen from |
| 17 | Kirkland & Ellis on behalf of Instagram, Facebook Operations, |
| 18 | and Meta platforms.  I am joined by Devin Anderson, John |
| 19 | Hannon, and Michael Esser, all from Kirkland. |
| 20 | **THE COURT:**  Great. |
| 21 | **MR. O'SULLIVAN:**  Good morning, Your Honor.  On behalf |
| 22 | of the Fenix defendants, John O'Sullivan from Quinn.  With me |
| 23 | are my colleagues Vicki Parker and Josh Fordin. |
| 24 | **THE COURT:**  Okay.  Is anyone here a young lawyer who |
| 25 | is going to argue something? |

1          **MR. FORDIN:**  I am, sir.

2          **THE COURT:**  How many years out of law school are you?

3          **MR. FORDIN:**  Six years.

4          **THE COURT:**  Six?  Well, maybe for this case I --

5     normally, it's five years or less.  So you're a little bit

6     beyond.

7          **MR. O'SULLIVAN:**  He's a June baby.

8          **THE COURT:**  All right.

9          Well, look, I -- I want you to address my concern first.

10          I'm going to give discovery on the jurisdictional issue.

11     So, Fenix, you're going to have to give discovery.  Does

12     anybody want to try to talk me out of that?

13          You have got two minutes.  Go ahead.

14          I would actually probably rule against you and then say

15     there is personal jurisdiction if I -- if there's no discovery.

16     But I'm going to let discovery because I -- here you are, your

17     company entering into a conspiracy, according to the

18     complaint -- I'm not sure it's true, but that's what the

19     complaint says -- to sabotage somebody using a company here in

20     California to do it.

21          So it seems to me that you -- if you're going to be

22     sabotaging people all over the world, all these competitors,

23     too bad for you; that's the way the complaint is set up now.

24     But I think it would be a better record if we gave discovery to

25     let them see -- go behind -- so that's the way I feel.

PROCEEDINGS

1          **MR. O'SULLIVAN:**  I don't think I'll talk you out of

2     that, Judge.

3          **THE COURT:**  No, you won't.  But I want to hear if you

4     have any good reason -- I do it in every case, if you have a

5     very good reason, I might reconsider.

6          **MR. O'SULLIVAN:**  I would say, Judge, we -- my clients,

7     these defendants have been sued in Florida on exactly the same

8     fact pattern.  Everything --

9          **THE COURT:**  By these plaintiffs?

10         **MR. O'SULLIVAN:**  By these lawyers.

11         **THE COURT:**  Well, no.  How about these plaintiffs?

12         **MR. O'SULLIVAN:**  They have used different plaintiffs

13    in the three cases that they're running against us on the same

14    fact pattern.  But even they called them "related cases."

15         But the point I would make on jurisdiction, Judge, is that

16    everything we're alleged to have done they said was perfectly

17    suited to be litigated in Florida.  They talked about our role

18    from beginning to end, did not the use the word "California,"

19    didn't even use "Facebook."  And in that case there's been some

20    litigation.

21         But one thing that has happened is there is a consent to

22    jurisdiction by all the defendants to be used in our home

23    jurisdiction in the UK.

24         **THE COURT:**  Where?  The UK?

25         **MR. O'SULLIVAN:**  Which is where home is.  If home was

 1  here, people in the UK it would be complaining it's too --

 2       **THE COURT:**  Wait.  You say that Fenix is in the UK?

 3       **MR. O'SULLIVAN:**  Yes.  Fenix International --

 4       **THE COURT:**  Is there anyplace in the United States

 5  that you agree that you could be sued?

 6       **MR. O'SULLIVAN:**  If he puts all the parties together

 7  the way counsel likes it, perhaps not; but he has a pending

 8  suit in Florida against --

 9       **THE COURT:**  No.  You're not answering my question.

10  Where will you concede in the USA you could be subject to

11  suit?

12       **MR. O'SULLIVAN:**  All of the defendants -- one of the

13  defendants is not subject to suit here.

14       **THE COURT:**  So you're not answering the question.  So

15  we're going to allow discovery.

16       **MR. O'SULLIVAN:**  Yes, sir.

17       **THE COURT:**  I'm just going to allow discovery and then

18  I'll decide it after.

19       Now, what that means is, on the plaintiffs' side, you have

20  got to get on an airplane, spend money -- spend money, invest

21  money in the case, develop enough to show that there is

22  personal jurisdiction.  The contacts and impacts in California

23  are critical here.  And I'm not saying you're going to win, but

24  I think you deserve a chance to prove that there's personal

25  jurisdiction.

PROCEEDINGS

1        **MR. AZAR:**  Thank you.

2        **THE COURT:**  I'm going to give you -- I'll figure it

3    out later, but it'll be like three months to take discovery.

4    You've got to get on an airplane and take the depositions and

5    look at the documents.

6        Now, on the other hand, if you ask for too many documents,

7    I'm going to quash it, quash all the discovery, and you will

8    lose out on that.  Be reasonable.

9        **MR. AZAR:**  Absolutely.  Thank you.

10        **THE COURT:**  All right.  Thank you.

11        Okay.  Now, the question I got is:  What is the -- and

12    you've got to stick to what the complaint says.  And let's

13    stick with Fenix for a minute.

14        What did -- here is what I get out of the complaint:  That

15    Fenix is a pornography company and that -- but it has cooked up

16    a deal with Facebook and Instagram so that it can advertise on

17    those platforms and they have decided to exclude the

18    competitors, in this case, the women who are the plaintiffs in

19    this case.

20        So -- now, maybe that's not true, but that's -- it seems a

21    little far-fetched, I'll be honest; but at the same time,

22    that's what you allege.

23        Now, am I leaving something out that is important to the

24    plaintiffs' theory of the case?

25        Please come up here and use the microphone, and identify

PROCEEDINGS

 1  who you are.

 2        **MR. AZAR:**  David Azar, Your Honor.

 3     I think you are close; that you're leaving out a couple

 4  of -- or a few points.

 5        **THE COURT:**  Good.  I want to hear it.  What are they?

 6        **MR. AZAR:**  Sure.

 7     Number one, is that the first step of the scheme was not

 8  against the plaintiffs, it was against the platforms.  So the

 9  first step of this scheme was to corrupt a database used for

10  dangerous organizations or the like, where they labeled

11  platforms that competed with the Fenix business as terrorist

12  organizations.  Step one.

13        **THE COURT:**  Wait.  Wait.  Who did that?  Fenix?

14        **MR. AZAR:**  We're alleging that Fenix provided the

15  names of its competitors.  Fenix, Radvinsky -- the Fenix

16  defendants, generically.  So we have Radvinsky, Fenix

17  International, and Fenix Internet.  Okay?

18     They provided the names of their competitors to certain

19  people in Facebook who inserted the names of those competitors

20  into a database that's supposed to be of terrorist

21  organizations.  Step one.

22        **THE COURT:**  Wait.  Wait.  Still, I'm not following it.

23        **MR. AZAR:**  Sure.

24        **THE COURT:**  Fenix -- let's just take Ms. Dangaard.

25     Did she get put into the database as a terrorist?

**PROCEEDINGS**

1          **MR. AZAR:**  As a second-layer effect.

2      Can I walk through -- I know -- I want to -- I need to

3  explain how this works.

4          **THE COURT:**  All right.

5          **MR. AZAR:**  Because the reason --

6          **THE COURT:**  I want you to explain how it's alleged --

7          **MR. AZAR:**  How it's alleged; right.

8          **THE COURT:**  How -- you can't supplement.  You've got

9  to stick with what's in the complaint.

10      What does the complaint say?

11          **MR. AZAR:**  All right.

12      So the complaint says that, at the first level, the

13  competitors of OnlyFans, of the Fenix entities, were added to a

14  database of terrorist organizations.  Step number one.

15      From there, the people who used those competitor

16  organizations, such as Ms. Dangaard, were viewed as a terrorist

17  sympathizer.  And the --

18          **THE COURT:**  When you say "terrorist," do you mean -- I

19  don't understand what -- terrorist to who?  To the United

20  States?

21          **MR. AZAR:**  Yes.  So it's -- the listing is technically

22  of dangerous individuals and organizations.  That's what the

23  internal database is called at Facebook.

24      So they have a listing of dangerous individuals or

25  organizations --

PROCEEDINGS

1          **THE COURT:**  You have actual proof this happened; that

2     this -- such a list existed and that -- and that Fenix did

3     this?

4          **MR. AZAR:**  Well, we -- do you want me to go beyond the

5     complaint right now?

6          **THE COURT:**  Yeah.  For this purpose, I'd like to know

7     if this is just you making up a theory or there's really proof

8     that this happened.

9          **MR. AZAR:**  Okay.

10         We've received anonymous information indicating that it

11    happened, and we need to verify that through discovery.  So we

12    have a good faith basis.  We have two -- two pieces -- three

13    pieces of information we received -- okay -- leaked information

14    through a whistleblower of some kind.

15         Number one, we have a purported listing by a competitor

16    organization of OnlyFans.  Okay?  We have -- sorry.  We have

17    the listing of competitor organizations that were apparently

18    added to the database as a dangerous organization.  Number one.

19         Number two, we have a purported listing, then, of the

20    people who use some of those competitor platforms, who are then

21    themselves labeled as terrorist sympathizers through the

22    artificial intelligence program.

23         It's almost like Al Qaeda; right?  If you have Al Qaeda as

24    a dangerous organization, and then you have people who link to

25    Al Qaeda from Instagram, they're -- they're viewed as a

PROCEEDINGS

1   terrorist sympathizer.

2            THE COURT:  All right.  Just a second --

3        MR. AZAR:  Then we have -- I'm sorry.  One more.

4            THE COURT:  Okay.

5        MR. AZAR:  Then there were also leaked a money trail

6   of payments -- okay? -- that purportedly went to three bank

7   accounts in the Philippines, to senior Facebook executives,

8   through an intermediary company in Hong Kong that is the --

9   let's call it the agent for the Hong Kong affiliate of the

10  Fenix defendants.

11       And then we have at least one payment, wire transfer

12  record, or information -- details about it, that went from a

13  Fenix bank account in the UK through intermediary banks in the

14  United States, that then bounced to Hong Kong, and one bounced

15  to the offshore bank.

16       So we have, you know, enough grounds to ask for very

17  targeted discovery to figure out if it verifies these things.

18           THE COURT:  All right.  Is there any -- okay.  Just

19  let me ask a different question.

20       With respect to your plaintiffs, describe what they do for

21  a living.

22       MR. AZAR:  All right.  So they are adult entertainment

23  performers who provide content on these paid websites such as

24  the competitor platforms of OnlyFans.  And what they do is, in

25  order to drive traffic to their sites, what was -- what was the

1   main area of driving traffic back when this scheme began, where

2   people had postings on Instagram and it say, hey, if you

3   like -- the equivalent of this -- hey, if you like what you see

4   go to, you know, JFF or some other platform for my paid

5   content.  Because JFF and some of these other platforms, you

6   know, were -- FanCentro -- were labeled as dangerous

7   organizations.  Those links were subject to shadow banning and

8   blocking, and the like.

9          THE COURT:  Wait.  Wait.  Wait.  What I'm trying to

10  figure out first:  Is what your clients do for a living lawful?

11         MR. AZAR:  Yes.

12         THE COURT:  Have they ever been prosecuted for what

13  they do?

14         MR. AZAR:  Not to my knowledge, no.

15         THE COURT:  Is it regarded as pornography?  What

16  is it?

17         MR. AZAR:  You know --

18         THE COURT:  Is it -- well, let me put it differently.

19     Is it the same thing that OnlyFans does?

20         MR. AZAR:  Yes.  But there's a spectrum, of course, in

21  the sense that -- right? -- any individual content provider,

22  you know, what they decide to post is going to depend on --

23  it's a range of things.  But it's just equivalent -- yes, it's

24  equivalent to what with OnlyFans does.  Or sorry.  It's

25  equivalent to the content posted on OnlyFans.

**PROCEEDINGS**

1      Because some of them, when they got affected by the scheme

2  and they couldn't use competitor platforms, they had to switch

3  to OnlyFans for the same content.

4          **THE COURT:**  The same content is now available on

5  OnlyFans?

6          **MR. AZAR:**  Correct.

7          **THE COURT:**  But it was not available on -- what was

8  the other alternative?

9          **MR. AZAR:**  Sure.  So like say -- it's not that it's

10  not available.  It's not available from these performers

11  through links from the social media sites likes Instagram.

12      So the idea is that -- so OnlyFans always had this content

13  because they were a competitor.  What ended up happening was,

14  is you had -- when you had Instagram was affected primarily by

15  the scheme so that links to the competitors of OnlyFans were

16  subject to shadow blocking, disabling, blocking, you had

17  people --

18          **THE COURT:**  Who is being hurt here?  Is it the

19  plaintiffs or is it these other sites?

20          **MR. AZAR:**  Both.  But this case is only about the

21  plaintiffs, the performers.

22          **THE COURT:**  But if they're able to put their content

23  onto OnlyFans where is the damage?

24          **MR. AZAR:**  Well, the damage -- there's two sets of

25  damages on this.

PROCEEDINGS

1        Number one is they initially were damaged when they went

2    through a prolonged period of time when they lost income before

3    some of them switched to OnlyFans potentially.

4        The second damage is that their images, to the best of our

5    understanding, are still in the shared database of terrorist

6    sympathizers, basically.  So they're still subject to the

7    moderation activity, which ties into why we asked for

8    injunctive relief.

9        It's like this, Your Honor.  It's like you take -- again,

10   using Al Qaeda; right?  You have somebody who linked to

11   Al Qaeda, the system says you're a terrorist sympathizer.  It

12   then takes a digital snapshot -- okay? -- of that content,

13   sticks it into a different database so that it can use

14   relational comparisons to say, okay, if anything else is posted

15   that looks like this or from this person or matches that

16   content, we're going to flag that as probably also suspect and

17   terrorist sympathizer.

18        So that -- once that happens, the only -- and that

19   database, by the way, is not subject right now to any review of

20   any kind.  So what we're asking as part of the resolution

21   here -- and this is a very simple thing to do, I think.  We're

22   going to say, hey, look, let's get our plaintiffs, the class,

23   to submit images; we're going to have that hashed; we'll

24   relationally compare it against the database; and if there are

25   sufficient matches, that they're identical so that some content

1    by our -- by the class is still in this terrorist database,

2    they should be removed.

3        And that methodology, by the way, was used in the case

4    study that we submitted by a company that started to use this

5    database.  So we know it's -- it's technically -- not just

6    possible and feasible and expedient; it's easy to do this.

7        So that's one way that we can easily back-end into this to

8    have affirmative proof about which plaintiffs, which adult

9    content providers, have content that's been taken a digital

10   fingerprint of and put into this database of, you know,

11   terrorist sympathizers.

12       **THE COURT:**  And the database is maintained by

13   Instagram or by Facebook?

14       **MR. AZAR:**  Well, it's by Facebook, as we understand.

15   They run it out of -- in this jurisdiction.  And it's -- and

16   the organization for whom it administers it is this nonprofit,

17   the JFCT.

18       Now, they -- they initially formed this database

19   themselves; they and a few other social media companies, but

20   they host it.  They then spun this off into a nonprofit during

21   the course of the class period.  The head of technology of that

22   entity is now based in Los Angeles.  So it still all holds a

23   nexus to California.  And it's -- Facebook can do it.  It's not

24   an issue, in our view.

25       **THE COURT:**  What is the connection between this case

**PROCEEDINGS**

1    and the Florida case?

2        **MR. AZAR:**  So the Florida case is a direct action by

3    one platform, FanCentro, only against the Fenix defendants.  So

4    it is not a case of behalf of the performers.  This is the

5    performer case, performer class action.  And the Florida case

6    does not include the Facebook entities.

7        The -- that was the first filed case, filed in November.

8    That case led to some of these leaks and whistleblower

9    activity.

10       Because what happened is the BBC picked up on the Florida

11   case, and then the BBC published an article, in February, about

12   it.  Because if you look at the article from the BBC, you'll

13   see they have actually done a deep investigation.  They had a

14   bunch of anonymous information that supports this.

15       The BBC is also not the kind of organization that reports

16   just on complaints.  They report based on their investigations.

17   The guy who wrote it for the BBC, you'll see, is an

18   investigative reporter on this.  So he had done his own

19   investigation.  He found out about the complaint.  He published

20   it.  There is other items in his article that provides

21   supporting information that we would add in an amended

22   complaint, you know, at the appropriate time, if we need to.

23   And then, because of that, we received the whistleblower or

24   anonymous information.  All that happened before we filed this

25   case.

**PROCEEDINGS**

 1       And so you have this case for the performers.  You then

 2  have a related state court case in Mateo -- San Mateo, a class

 3  action on behalf of the other platforms, not the -- you know,

 4  because you have one that filed directly in Florida.

 5       They filed in Florida because Mr. Radvinsky lives in

 6  Florida, and we had understood at the time that Fenix Internet

 7  was based in Florida because the Better Business Bureau

 8  reported it as its principal place of business, and because

 9  Fenix Internet uses a Florida mailing address for the tens of

10  thousands of 1099s it sends out around the country to the

11  performers it pays.

12       But then, in Florida, they said, no, no, Fenix Internet is

13  not really based in Florida.  But it makes no sense; right?

14  Because how do you have tens of thousands of 1099s issued from

15  an office in Florida, and no one is in Florida?  Someone has to

16  be there to pick up -- right -- all those 1099s and everything

17  else.  And that's where Radvinsky lives.

18       And then we started doing more investigation, as you saw

19  from my declaration.  And it turns out, this -- Fenix Internet

20  apparently has a bunch of mail drops, and it basically hires

21  people for the main -- Fenix International.  And Radvinsky,

22  apparently, uses some of his trusted people from his

23  MyFreeCams, the adult business he had before this.  And it

24  feels like it's one amalgamated enterprise.  And we'll figure

25  out what's going on from here.

**PROCEEDINGS**

1    But that's why we sued in Florida, because at the time, it

2    seemed like that was the most solid jurisdictional basis for

3    these allegations.

4         **THE COURT:**  Is that in state court in Florida?

5         **MR. AZAR:**  Correct.

6         **THE COURT:**  All right.  Is this the only federal case?

7         **MR. AZAR:**  Yes.

8         **THE COURT:**  All right.  Let me ask you to have a seat

9    for a moment.

10    And I want to ask Fenix to explain your best argument for

11    dismissal.

12         **MR. O'SULLIVAN:**  Our best argument, Your Honor, is --

13         **THE COURT:**  I know you got several, so I -- we're not

14    going to go through -- we'll have to rely on the briefing.  But

15    I'd like for you to focus on your most important point that you

16    want me to have in mind as to why you should be dismissed.

17    This -- I mean, this sounds like despicable conduct.  It

18    sounds like you're bribing people at Facebook to call these

19    people terrorists and get them blacklisted.

20    Now, that's the way it comes across.

21         **MR. O'SULLIVAN:**  It does.  But the lawyers who allege

22    that didn't have the courage to just declare it as an alleged

23    fact.  It's all on this information and belief.

24    In the complaint, Judge, it's fairly simple.  There's a

25    point in their opposition to the motion to dismiss --

 1          **THE COURT:**  Well, is it untrue?

 2          **MR. O'SULLIVAN:**  Pardon?

 3          **THE COURT:**  Do you deny that that's what happened?

 4          **MR. O'SULLIVAN:**  We haven't had to answer yet.  We

 5     will.

 6          **THE COURT:**  You don't deny it yet.

 7          **MR. O'SULLIVAN:**  We haven't had the opportunity.

 8          **THE COURT:**  Well, you ought to know whether you've

 9     been bribing people all over the world.  You ought to know

10     that.

11          **MR. O'SULLIVAN:**  Yes.  We would know that.  And we're

12     good lawyers, so we've certainly asked our clients.

13          But, Your Honor, in this terms of how much more rope those

14     litigants are entitled to get, they admit that if you take away

15     the information and belief and the speculation, they have one

16     core paragraph, 65 --

17          **THE COURT:**  Well, how are they going to -- how are

18     they going to -- they said that they got some informant who --

19     a confidential witness.

20          **MR. O'SULLIVAN:**  So that's -- if that's a good faith

21     basis, some anonymous person off the dark web or a subreddit,

22     sent me their imagination about how this could have happened.

23          When you parse through their papers, what they say is, we

24     have looked at the output of this black box -- whatever it

25     says, how these people move from platform or who gets the

PROCEEDINGS

1    higher rankings.  We've looked that output and we have inferred

2    an international conspiracy, and something in Hong Kong and

3    something -- it's air.

4        Right?  On this pleading, it's air.  So I think this

5    complaint doesn't state a claim.

6        And against us, again, Your Honor, there is no California

7    angle.  We don't have a California strategy.  Counsel, here --

8        **THE COURT:**  But if it's true that you've been paying

9    off people in California at Facebook, Facebook is a California

10   company.

11       **MR. O'SULLIVAN:**  It didn't allege that, Judge.  It

12   doesn't say we came to California and paid anybody.  It says --

13       **THE COURT:**  It says you paid people to do things in

14   California, not that you came to California.  No.  That's --

15   but that's -- but whatever you paid Facebook to do, they're in

16   California.

17       **MR. O'SULLIVAN:**  Well, one of the things their expert

18   says, Judge, is, in terms of how people get on this list and

19   how seriously it should be taken, everybody wants to know the

20   source.  You say someone is a terrorist, we need to have this

21   database adjusted so that we can get the attribution so we know

22   whether to trust it.

23       There's no trust we can attribute to this source.  People

24   say everything on the Internet these days, Judge.  If you just

25   take that and say:  Somebody said it, and I sent it to a

1   reporter and he said it again; and that's my good faith basis

2   in federal court to have to have millions of dollars spent on

3   motion practice --

4           **THE COURT:**  Well, wouldn't these plaintiffs we have

5   here have personal knowledge, that they -- that every time they

6   try to put up the advertisement for their link, it gets taken

7   down?

8           **MR. O'SULLIVAN:**  They said in their declarations what

9   knowledge they have.  They said:  Gee, back in the day, I was

10  getting 5,000 hits, and then I started getting 4,000.  I met a

11  plaintiff's lawyers who told me it must be because of this

12  conspiracy.

13      It could be a hundred reasons.  Our company has a better

14  deal.

15          **THE COURT:**  You mean, they say that -- wait a minute.

16      I thought they were -- I thought they were -- that they

17  are alleging that the link was just taken down completely

18  because -- for whatever reason right now.

19      That's not true?

20          **MR. O'SULLIVAN:**  No.  They have some layered impact.

21  They say some people might have been true terrorists and

22  banned; some people might have just been dangerous and then

23  they don't get as many hits; there shad- -- they have different

24  ideas about the impacts.  But there's no clean breaks or any

25  allegation.

**PROCEEDINGS**

 1        These plaintiffs, all they know is:  I was doing good and

 2   then I wasn't doing good.  And it could be what I'm putting in

 3   my content or it could be something else.

 4        **THE COURT:**  Where do I find that in the complaint?  I

 5   was doing good, but now I'm not doing good.

 6        **MR. O'SULLIVAN:**  It's not even in the complaint.  In

 7   his declaration -- I'm sorry.

 8        In Mr. Azar's declaration, he attaches two of the

 9   performers' declarations.

10        Let me get my binder, Your Honor.

11        **THE COURT:**  Well, I'm going to ask the plaintiffs.

12        I've got the complaint right here.  Show me in the

13   complaint where the most telling thing about the -- they got

14   completely cut off.  That's what I thought you were alleging,

15   but now counsel is saying you're not even alleging that.

16        **MR. AZAR:**  Your Honor, I think -- if you look, for

17   example -- I'll give you some paragraphs.

18        Okay.  Paragraph 4 provides a very good summary, at the

19   top, of what the complaint alleges and it independently alleges

20   that --

21        **THE COURT:**  All right.  Here.  Let me --

22        **MR. AZAR:**  Do you want me to go through and summarize

23   it?

24        **THE COURT:**  No, I'll summarize it.  Paragraph 4 says

25   (as read):

**PROCEEDINGS**

1           "Up until late 2018 or early 2019, the online

2     adult entertainment industry was a vibrant,

3     competitive market.  That is when AE providers that

4     had promoted competitors of OnlyFans suddenly

5     experienced a dropoff in traffic and user engagement

6     on social media platforms.  The deletion and hiding

7     of posts and reduction in social media traffic for

8     certain providers was so substantial and so dramatic

9     that it could not have been the result of filtering

10    by human reviewers of social media content.  The

11    business lifeblood of certain AE providers and AE

12    platforms appeared to be blocked so consistently that

13    only automated processes could be responsible.

14          "But performers associated exclusively with

15    OnlyFans were not affected in the same way.  As a

16    result, OnlyFans began to grow incrementally and then

17    exponentially, rocketing up the Internet traffic

18    rankings and quickly becoming one of the most

19    dominant players in the adult industry, while most

20    OnlyFans competitors stagnated or saw dramatically

21    reduced traffic and revenues."

22    All right.  Now, do you --

23          **MR. AZAR:**  May I also point out --

24          **THE COURT:**  Wait.

25    In here, do you explain the specifics of what happened to

**PROCEEDINGS**

1    the plaintiffs?

2              **MR. AZAR:**  Yes.

3              **THE COURT:**  Where is that?  Or just give me the best

4    example you got in the actual document.

5              **MR. AZAR:**  Sure.  Okay.

6        So the -- each plaintiff has a few paragraphs of their own

7    that starts at paragraph 43.  So their individual experiences

8    comport with the allegations as specific examples of what we're

9    alleging.

10       One of the other sort of important facts, by the way, that

11   we allege -- I'm not sure if you had highlighted as you read

12   it.  But, for example, in paragraph 38 and 62, we also allege

13   that not just OnlyFans, but the other Radvinsky-affiliated

14   entity, MyFreeCams, for example, were not affected by this.

15       So you have this anomaly; right?  You have the competitors

16   of OnlyFans --

17             **THE COURT:**  You say not affected.  But here it says

18   significantly less likely to be impacted.

19             **MR. AZAR:**  Right.

20             **THE COURT:**  Those aren't the same thing.

21             **MR. AZAR:**  Okay.  Let me explain to you why we're

22   using that language.

23       The reason we're using that language is because it's

24   not -- it's not necessarily an all-or-nothing because it's

25   the -- you know, the -- I guess, the way I -- the way I

1    provide, like, an analogy to this is that particular content

2    and particular people -- we don't have the insight yet into the

3    specific mechanics.

4         But I'll say that Dangaard is the president of the adult

5    performers union.  Okay?  So from her experience speaking with

6    thousands of members, she did not see people who were promoting

7    OnlyFans and MyFreeCams, for example, as being affected.  The

8    data that we have since -- from similar -- we have also

9    indicates that they were not affected.

10        And so what -- the reason it was said that way -- I can't

11   say they weren't affected at all in any capacity in a

12   statement, but we can say that -- that the level of effect was

13   minimal compared to everybody else such that it caused a

14   competitive change in the marketplace.

15        **THE COURT:**  All right.  I want to take an -- take

16   number 43, the case of Evans.

17        All right.  I'm at paragraph 45.  (as read):

18           "Instagram deleted her account so that none of

19        content in her account could be seen and she could

20        not log in to make new posts."

21        Now, I don't know -- I'm not on Instagram for ethics

22   reasons.  How -- does she have a right to be on Instagram?

23        **MR. AZAR:**  It's not the issue of whether she has the

24   right to be on Instagram or not.  The issue here is that there

25   was a sudden surge -- okay? -- of takedowns and actioning on

PROCEEDINGS

1  people's accounts that happened to people who were promoting

2  competitors of OnlyFans, and not OnlyFans.

3      So the argument is not whether she has a right to be on

4  Instagram.  The question is whether or not the people, the

5  defendants that wrongly corrupted the database of dangerous

6  organizations, caused her harm.

7      And it did cause her harm.  She lost a ton of money.  She

8  lost followers.  She lost tons of business.  And that's how

9  she's impacted.

10     **THE COURT:**  How long -- it doesn't say here, but tell

11  me:  How long was she off of Instagram?

12     It says here she was reinstated.  Was it a week?  Was it

13  month or a year or what?

14     **MR. AZAR:**  I don't have that -- I don't have the data

15  off the top of my head.  But I will say that -- yeah, I don't

16  have that specific data to provide you today.

17     I think that if you wanted to look at -- again, if you

18  want to go beyond the complaint, she submitted a supporting

19  declaration in case we had gotten to step two of the

20  anti-SLAPP.  And there's extra information about each of these

21  plaintiffs there, to the extent you're interested.

22     Obviously, we can add extra information to the amended

23  complaint, if necessary.  But -- you know, if you decide that's

24  required.

25     **THE COURT:**  Well, and the next paragraph says (as

**PROCEEDINGS**

1   read):

2            "While Evans remained a popular performer so

3        that increasing numbers of potential customers

4        followed her on Instagram, the content that she

5        produced was not served to most of her followers."

6            **MR. AZAR:**  Right.  So that refers to --

7            **THE COURT:**  What does "served" mean?

8            **MR. AZAR:**  So -- means that, if you post something but

9   no one gets to see it because it's blocked by the system,

10  that's what we were referring to by "served."

11           **THE COURT:**  All right.  So let's say she had 300,000

12  followers and she posts something, but -- okay -- 298,000 don't

13  get to see the post because they're blocked?

14           **MR. AZAR:**  Exactly.  That's called shadow -- that's an

15  example of shadow banning, meaning that you're not informed, no

16  one is informed that your content is blocked, but the

17  artificial intelligence system behind the scenes is taking

18  action accordingly.

19           **THE COURT:**  How do you -- but then how do you know

20  that only 2,000 are viewing her?

21           **MR. AZAR:**  Well, how does she know that?  Because

22  there are metrics associated that she has access to, and that's

23  how she got the information.

24           **THE COURT:**  Well, on Instagram, if she has 300,000

25  followers and she posts something, is it supposed to go to all

PROCEEDINGS

1  300,000?

2          MR. AZAR:  Yes.

3          THE COURT:  And she has information that confirms it

4  was only going to 2,000?

5          MR. AZAR:  Well, I think, the way it works -- which

6  she -- the way I understand, is that, you know, if you post

7  something, based on the number of followers -- you know, it's

8  almost like with marketing, right?  You post 200,000, you're

9  expecting a certain number of reactions.

10         You know, let's say, empirically, you have 50,000

11  reactions to 200 -- let's say you have 50,000 out of 200,000

12  followers empirically are reacting.  Okay?  So you know that a

13  substantial number of people are going to react.  Then, if you

14  suddenly have, like, a switch almost turns, and you suddenly

15  have 2,000 instead of the 50,000, then you know you -- you have

16  an inference of shadow banning, blocking because there's that

17  lack of engagement.

18         It's, again, almost like, you know, in the marketing

19  aspect, where you send out a bunch of content, you're expecting

20  a certain amount of return and there's empirical data about

21  that?  Same thing on this -- in this area.

22         THE COURT:  Well, it says "But many of her posts are

23  viewed."

24         Now, is it possible that the -- her posts were served to

25  all 300,000, but only a few of them chose to look at it?

**PROCEEDINGS**

1          **MR. AZAR:**  Again, what makes a difference is that she

2     had empirical data of what it was before this time period, and

3     then it switched and matches exactly with these other

4     allegations.

5          So that's why we believe we have enough -- we have enough

6     evidence to really force defendants to ask the question.  I

7     mean, to provide an answer to the question.

8          And it's a very simple question to defendants.  We say,

9     okay, you know, show us the content actioning history for

10    this Instagram account.  Show us if it's indeed affiliated as

11    an associated dangerous person with the following platforms.

12         That would validate.  We say:  Here is an image of her.

13    Run it through your database of terrorists or terrorist

14    affiliates and let's see if her face shows up.

15         **THE COURT:**  Is -- what reason would she -- would there

16    be for her to be a terrorist?

17         Because she -- again, using my Al Qaeda example; right?

18    So if you take one of the platforms that she was on -- because

19    she was not on OnlyFans at that time.  Okay?

20         You take a platform she was on.  The platform was labeled

21    a terrorist organization in the DIO list, dangerous

22    organization.  Then she links to that organization; she is

23    viewed as a terrorist sympathizer; she's attacked by the

24    system --

25         **THE COURT:**  All right.  Well, that other platform, why

1    would it be a terrorist organization?

2         **MR. AZAR:**  Because someone bribed them because they

3    wanted to improve OnlyFans' market position.  That's why.

4         **THE COURT:**  But, I mean, maybe it did have a

5    connection to Al Qaeda.

6         **MR. AZAR:**  Except we allege that they did not.

7         **THE COURT:**  Is this side is going to say, yes, it was

8    an Al Qaeda sight?

9         **MR. AZAR:**  I don't think they're going to say that.  I

10   don't think -- just like counsel could not answer your question

11   saying that the scheme did not exist, did not happen, he's not

12   going to be able to say that these platforms are Al Qaeda

13   sites.

14        **MR. O'SULLIVAN:**  That's true.  I'm not going to assert

15   that.  I'm not going to assert that they really were.

16   Obviously, we didn't involve ourselves in any of this.

17        But, Judge, in terms of the bottom line, there are two

18   things going on in this complaint.  There's this data analysis;

19   right?  They look at the data and they say it's unfair, there

20   must be an explanation.  And maybe you could infer from those

21   few facts -- that's paragraph 65 -- that something happened in

22   the algorithms.

23        That second leap, that it was the result of an

24   international conspiracy, there's nothing in the complaint

25   about the basis for that information and belief.  And that's

PROCEEDINGS

1  all it is, information and belief.

2      And if he's disclosing his anonymous source now, today,

3  for the first time, can somebody really come into federal court

4  and say, "I want to launch this international investigation

5  into this possibility of all these senior people doing these

6  things," and "What do I have as a basis to launch those

7  thousands ships?  An anonymous source."

8          **THE COURT:**  Well, he says he's got the BBC.

9          **MR. O'SULLIVAN:**  Pardon?

10         **THE COURT:**  He said the BBC.

11     Didn't you say the BBC?

12     **MR. AZAR:**  I said the BBC article from early February,

13 you'll see it includes anonymous information that they obtained

14 about -- that tracks with what we allege.

15     Again, at this point in time, Your Honor, it's -- we

16 explain -- okay? -- why there are connections and why this

17 happens.

18     In this situation too, you can allege information and

19 belief in situations where the other side has the evidence.  In

20 this situation, the other side has the evidence.  We have very

21 targeted and focused requests that we could ask -- that we

22 could send out next week that will allow you to quickly figure

23 out if there's meat to this.  And I suggest we do that.

24         **THE COURT:**  What is the -- is your best example of

25 something narrow and targeted?

1    **MR. AZAR:**  Okay.  I have transactions that went

2    through HSBC USA -- so we have jurisdiction in the United

3    States -- okay? -- because it was acting as an intermediary

4    bank -- for wire transfers, apparently, that went -- at least

5    one went from Fenix UK to Hong Kong, and then went to a -- went

6    to Facebook executives' bank accounts in the Philippines.

7        I have a list of a bunch of other transactions, wire

8    transfers, that went from the -- Hong Kong through an

9    intermediary bank in the United States to the Philippines, to

10   trust accounts that are purportedly in the name of three of

11   Facebook executives.

12       So if Your Honor would give me permission -- now, that's

13   subpoena has been served on HSBC.  Okay?  That has been paused

14   temporarily because Fenix objected to it.  I say, Your Honor,

15   let's just let that roll through.  Let's let HSBC produce that

16   information.  That's number one.

17       The second easy way to verify this would be, if you let me

18   go ahead and submit this list that we received that's very

19   detailed -- okay? -- asking for the content actioning history

20   of these specified people on the spreadsheets.

21       And the third thing -- and the third easy way to do it is,

22   let me collect some images from class members, and then let the

23   JFCT, which Facebook administers, run it through the database

24   and let's see if they're matches.  That would empirically

25   resolve this without a lot of time and effort and it it's super

1    simple.  Or super straightforward, let's put it that way.

2           **MR. O'SULLIVAN:**  Your Honor, as to those subpoenas,

3    he's been pursuing that in Florida.  He's had the right to take

4    discovery for eight months.  He's gone nowhere with that.

5           **MR. AZAR:**  Actually -- wait.  That's not accurate.

6        You obtained -- they obtained a stay in Florida against

7    discovery because they said that they have no jurisdiction in

8    Florida.  And because then they started to fight this here, and

9    because Meta said that they were going to file an anti-SLAPP,

10   and they knew that would stay discovery, in an exercise of,

11   you know, efficiency, instead of filing the discovery and then

12   letting Meta come in and say, oh, we're filing the anti-SLAPP,

13   since I knew they were filing the anti-SLAPP, I'm not going to

14   waste your time and everybody's time preemptively serving

15   discovery if it's about to be stayed.

16       They were very reasonable about accommodating a briefing

17   schedule.  They initially wanted to file theirs earlier, and we

18   agreed to have everything go on to the Fenix track.  So I'm not

19   going to penalize them by doing that.

20          **THE COURT:**  I'm going to change subjects.  I want to

21   turn to Meta for a moment.

22       If the allegations are true in the complaint, Facebook is

23   involved in maybe a criminal conspiracy to sabotage these

24   plaintiffs.  And if it's true, and a conspiracy to restrain

25   trade under the Sherman Act and UCL in California -- I'm not

 1   saying that's actually happening; but what I am saying is

 2   that's what alleged -- I have a hard time believing that the

 3   Section 230 of the Decency Act would immunize someone from that

 4   kind of anticompetitive behavior.  So I want to -- and I'm

 5   going to ask you for briefing on this, both sides.

 6       I want you to be aware that one of the stated purposes of

 7   Section 230 -- I've got it right here, findings by Congress,

 8   policy -- Number 2:  To preserve the vibrant and competitive

 9   free market that presently exists for the Internet --

10   et cetera, et cetera.

11       And here you are trying to turn this statute on its head

12   and say -- and to use it to suppress competition -- if this is

13   true in the complaint.

14       Now, I don't know if it's true.  But the way it comes

15   across to me is that somebody who has a competitive

16   organization has tried to sabotage the competitors and keep

17   them off of Facebook and Instagram so that their content gets

18   more play.  To me, that would be -- if Facebook is involved in

19   that, you got a -- you're in a lot of trouble.

20           **MR. ALLEN:**  Your Honor, first of all, we would like

21   the opportunity to brief any questions that are in the Court's

22   mind.  We're happy to do that.

23           **THE COURT:**  Good.

24           **MR. ALLEN:**  Secondly, there is no Sherman Act claim

25   here --

PROCEEDINGS

1          THE COURT:  I know there's not, but there is a UCL

2     claim.

3          MR. ALLEN:  There is.  But it's not a UCL claim based

4     off of Facebook trying to monopolize a certain market or

5     agreement in restraint of trade in a market in which Facebook

6     competes.  There is no market power allegation with respect to

7     the social media platforms that Facebook operates.

8          Again, I think it's important to remember, this is content

9     that violates Facebook's policies.  Facebook does not allow

10    pornography.  It doesn't allow content that links to

11    pornography --

12         THE COURT:  Well, then -- why do you allow OnlyFans

13    then?

14         MR. ALLEN:  Your Honor, again, two responses to that:

15    One is, we do action OnlyFans content when it violates our

16    policies.  And I don't believe the allegations in the complaint

17    that claims we don't are adequately pleaded; they're alleged

18    entirely on information and belief.

19         And secondly, if we're not perfect in implementing our

20    policies against pornographic content or content that links to

21    pornographic content, that's a heartland of CDA 230 and the

22    First Amendment that recognizes that theories of liability that

23    seek to hold us liability [sic] for our publication decisions,

24    decisions about what content to promote, what content not to

25    promote, whether we're -- whether we're accurately enforcing

1    our policies in all instances, those are routinely barred by

2    Section 230.  And that's core to --

3           **THE COURT:**  That's not routinely.  I've looked hard

4    for a case just like this with the anticompetitive -- I can't

5    find one.

6           **MR. ALLEN:**  Again, Your Honor -- and I look forward to

7    briefing this to the Court.  I don't think they're alleging

8    anticompetitive conduct by Meta.  They're not saying Meta is

9    seeking to include --

10          **THE COURT:**  Yes, they are.

11     No.  They're saying that you are part of a conspiracy that

12   involves Fenix to suppress competition in this industry, and

13   you have been paid off, your employees are being paid off to do

14   it.

15          **MR. ALLEN:**  We don't compete in the industry for adult

16   entertainment --

17          **THE COURT:**  Right.  You don't have to be a competitor

18   to facilitate somebody else's restraint of trade.

19          **MR. ALLEN:**  I would also say, you know, we don't

20   exercise market power in that instance.  But, again, we're

21   happy to address that.

22     But I think, at the end of the day, Your Honor, A, I don't

23   believe --

24          **THE COURT:**  You're going to have to have -- it would

25   turn the statute on its head to allow you to suppress a vibrant

1  and competitive free market.  So you're going to have to

2  convince me that this statute should -- that 230 gives you to

3  the right to squash these poor women and their competition

4  and -- with the alleged bad guy here, who's Fenix.

5      **MR. ALLEN:**  Again, Your Honor, we look forward to

6  briefing that on the competitive issues.

7      But, again, I just -- two points that I would leave

8  the Court with.  Just -- again, there's a lot of talk from

9  counsel about what they've alleged; but if you look at the

10  complaint, it's all alleged on information and belief.  The

11  existence of the alleged scheme --

12     **THE COURT:**  Sometimes you have to do it on information

13  and belief because all the true facts are in the -- in the

14  secret files of Facebook.

15     **MR. ALLEN:**  One the other point I would make, Your

16  Honor.  They allege at paragraph -- I believe it's paragraph 6

17  of their complaint -- that Meta investigated these claims and,

18  quote, found no evidence that this alleged scheme occurred.

19     I'm bound by what's in the complaint, but even in their

20  complaint, you know, they allege we investigated this and found

21  no evidence it occurred; that these deeply implausible,

22  frankly, wild allegations took place.  I just don't think

23  there's a basis to believe that they did.  And I don't think

24  they've alleged it in the complaint.

25     And, again, Your Honor, we'll brief the competitive

1  issues.  But I do think, at the end of the day, they are

2  complaining about, quote -- that we took action to, quote,

3  eliminate or reduce their visibility on social media.  That's

4  paragraph 3.

5      And, again, how we decide to enforce our content policies,

6  what content we publish or don't publish, those are right in

7  the heartland of Section 230 and the First Amendment, Your

8  Honor.  And I don't believe this is an appropriate Sherman Act

9  or UCL case that talks about us trying to monopolize or

10  exercise market power.

11      **THE COURT:**  If that was all that was involved, I might

12  agree with you.  But they are saying that your people are being

13  paid off with bribes through Hong Kong to allow pornography by

14  OnlyFans, but not to allow equivalent pornography by their --

15  by them.  That is a suppression of competition, and you're

16  being paid off with money to do that.

17      **MR. ALLEN:**  Again, I don't think those allegations are

18  true.  I don't think they are adequately pleaded.  And I don't

19  think it's a sensical theory for Facebook employees -- for

20  Facebook, as a company, to be trying to exert market power in

21  markets it doesn't compete in.

22      And, again, if -- if this involved conduct, Your Honor, in

23  a market we competed in, and they were alleging that we were

24  trying to exclude the Googles and Twitters of the world, then

25  you might be right, Your Honor, that we would have to overcome

1   Sherman Act in claims like that.  But this -- these are not

2   markets we compete in.  They're not markets we seek to exercise

3   market power in.  And it, frankly, doesn't make sense for us to

4   try to engage in some pay-for-content-deletion scheme in

5   markets that we don't complete in.  But we look forward to

6   briefing that.

7          **THE COURT:**  All right.  I'll give you that

8   opportunity.

9      What about the subpoena to HSBC?  What court is that out

10  of?

11         **MR. AZAR:**  It was issued out of Florida.

12         **THE COURT:**  All right.  As far as I'm concerned, that

13  should go forward.  And I'm in no way staying that.

14         **MR. AZAR:**  Right.

15         **THE COURT:**  So you tell the judge there that the judge

16  here -- I'm not -- there could be other reasons to stay it, but

17  don't stay it on account of this case.

18         **MR. AZAR:**  Could I ask you this, Your Honor?

19         **THE COURT:**  Yeah.

20         **MR. AZAR:**  Okay.  That proposed order, that we

21  disagree with, has been sitting with the Court in Florida for,

22  I think, six months --

23         **THE COURT:**  I'm not going to issue a subpoena here.

24  No.

25         **MR. AZAR:**  Okay.

PROCEEDINGS

1          **THE COURT:**  No.  No.  Now -- no.

2      What do you want me to do?  Reach out across the country

3   and tell that judge -- no, I'm not going to do that.

4          **MR. AZAR:**  I'd like to be able to issue the subpoena

5   in this action, that single third-party subpoena.

6          **THE COURT:**  No.  No.  I'm not going to let you do

7   that.  You already got the subpoena going in Florida.

8      But what I'm saying is, you seem to be thinking that you

9   had to stay your hand on account of this being an alleged

10  anti-SLAPP.  Well, that's not a good enough reason, in my view,

11  to stay.  Now, there may be other reasons that the Florida

12  judge has.  So that's up to him or her.

13         **MR. AZAR:**  I'm sorry.  Let me just clarify.

14     They obtained a stay of the subpoena in Florida.  We have

15  a competing order about that, but I will tell the judge in

16  Florida that, from Your Honor's perspective, it should go

17  forward.

18         **THE COURT:**  I'm not saying it should go forward.  I'm

19  saying there's nothing about my case that would -- that, in my

20  view, should result in a stay there.  But there could be other

21  reasons that I don't know about that the judge there has

22  perfectly good reasons to stay it.  But the way you pitched it

23  a moment ago, it sounded like part of the reason was this case

24  was pending.

25         **MR. AZAR:**  I'm sorry.  Let me clarify.

**PROCEEDINGS**

1      What I said -- when counsel said that I had been able to

2  take discovery for eight months and haven't done anything, I

3  was responding to that; which is that he obtained a stay of

4  discovery in Florida.  And then, instead of filing that exact

5  same subpoena in the state court here -- because I couldn't do

6  it in federal court -- I didn't do it because Meta indicated

7  they were going to file an anti-SLAPP.  That's an automatic

8  discovery stay.  That's what I was trying to get at.

9      **THE COURT:**  All right.  Well, then, nevertheless,

10  there's nothing about this -- the pendency of this case that

11  should affect one way or the other whether that subpoena goes

12  forward.

13      **MR. AZAR:**  Thank you.

14      **THE COURT:**  That's all I'm saying and nothing more.

15      **MR. O'SULLIVAN:**  Just for clarity, Your Honor, the --

16  jurisdictional discovery is not stayed in Florida.  If he

17  thinks that gives him jurisdictional facts, he could have been

18  pursuing it this whole time.

19      **THE COURT:**  Well, I am allowing jurisdictional

20  discovery here.

21      **MR. AZAR:**  Okay.  In any event --

22      **THE COURT:**  And I will explain in the order what the

23  timeline on that is this.

24      **MR. AZAR:**  All right.

25      **THE COURT:**  It will be prompt, so you should be

**PROCEEDINGS**

 1   getting your subpoenas underway and trying to prove up whatever

 2   you can with respect to Fenix.

 3            **MR. AZAR:**  Thank you.

 4            **THE COURT:**  Now, you might have to use the Hague

 5   Convention.  I don't know --

 6            **MR. AZAR:**  Okay.

 7            **THE COURT:**  -- if they're in England.  So better get

 8   cracking.

 9            **MR. AZAR:**  Will do.

10         Can I -- when you set your schedule, if you would just

11   consider the following, if you could --

12            **THE COURT:**  What?

13            **MR. AZAR:**  When you set the schedule for the actions

14   after today, I have a month-long trial beginning on

15   September 27th.  I have a set of other team members, but I

16   would like to become involved in it.  So to the extent you can

17   accommodate some of that in your timing, I would appreciate it.

18            **THE COURT:**  Well, maybe.

19         Are you also here on a CMC, case management conference?

20            **MR. AZAR:**  No.  You had continued that until, I think

21   it was the end of November --

22            **MR. ALLEN:**  Early November.

23            **MR. AZAR:**  Or early November.  Thank you.

24            **THE COURT:**  Well, I'm going to give you discovery that

25   would go into, probably, about January 31 --

1     **MR. AZAR:**  Great.  Thank you.

2     **THE COURT:**  -- and then supplement your showing.

3     All right.  I'm going to bring it to a close.  Anything --

4 I'm going to let anybody who is dying to say something say one

5 more thing.

6     **MR. O'SULLIVAN:**  If I could just make one final point,

7 Judge.

8     I mean, counsel has explained his basis, and it's this

9 anonymous tip.  And if we do another several hundred thousand

10 dollars of work and it turns out it was just wrong, it was just

11 some delusional person on a subreddit, this is our marker.

12     **THE COURT:**  Well, maybe you'll get some attorneys'

13 fees from them, if it's that flimsy.

14     **MR. AZAR:**  Well, the other option, Your Honor -- well,

15 I guess I can reinvite him.  I invite him to withdraw his

16 objection to the HSBC subpoena in Florida -- because that will

17 be empirical; we either have bank records or not.  That is a

18 simple way of saving his client hundreds of thousands of

19 dollars.

20     And then I invite Facebook to stipulate to doing two data

21 searches, to do the data search to see if the data we got of

22 people impacted who were on the --

23     **THE COURT:**  Will you pay for all the time and effort

24 it takes for Facebook to make that kind of inquiry?

25     In other words -- all right.  Let's say it costs $35,000

PROCEEDINGS

```
 1   of their time to generate that; will you pay for that?
 2           MR. AZAR:  35?  Yes.
 3           MR. ALLEN:  It's not going to be 35.
 4           MR. O'SULLIVAN:  It's not going to be 35.
 5           THE COURT:  Well, it might be.  Look how many people
 6   you got here.  You don't need all these people here for -- I
 7   think you could do it for $35,000.  I'm not saying you should
 8   do it yet, though; I need to do some thinking.  All right.
 9           MR. AZAR:  Thank you.
10           THE COURT:  I'm going to bring it to a close.
11       Thank you, counsel.
12           THE CLERK:  Court is adjourned.
13               (Proceedings adjourned at 12:07 p.m.)
14                           ---o0o---
15                    CERTIFICATE OF REPORTER
16       I certify that the foregoing is a correct transcript
17   from the record of proceedings in the above-entitled matter.
18
19   DATE:  Saturday, September 10, 2022
20
21
22
23   _____
        Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
24            Official Reporter, U.S. District Court
25
```