Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
United States
Telephone: +1 415 439 1400
Facsimile: +1 415 439 1500
michael.esser@kirkland.com

K. Winn Allen, P.C. (admitted *pro hac vice*)
Devin S. Anderson (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
winn.allen@kirkland.com
devin.anderson@kirkland.com

*Attorneys for Defendants Instagram, LLC, Facebook Operations, LLC, and Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DAWN DANGAARD, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>INSTAGRAM, LLC, *et al.*,<br><br>Defendants. | CASE NO. 3:22-cv-01101-WHA<br><br>**DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AND STRIKE THE SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Complaint Filed Date: Sept. 28, 2022<br>Judge: William Alsup<br>Hearing Date: November 16, 2022<br>Time: 11:30 am<br>Courtroom: 12, 19th Floor |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on November 16, 2022 at 11:30 am, pursuant to this Court's April 9, 2022 order, the undersigned will appear before the Honorable William Alsup of the United States District Court for the Northern District of California in Courtroom 12, 19th Floor, at the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, and shall then and there present defendants Instagram, LLC, Facebook Operations, LLC, and Meta Platforms, Inc.'s Motion to Dismiss and Strike the Second Amended Class Action Complaint (the "Motion").

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Supporting Declaration of Devin S. Anderson (the "Anderson Decl.") and exhibits attached thereto, the pleadings and other papers on file in this action, any oral argument, and any other evidence the Court may consider in hearing this Motion.

## RELIEF REQUESTED

Instagram, LLC, Facebook Operations, LLC, and Meta Platforms, Inc. (collectively, "Meta") request that the Court strike or dismiss the second amended complaint with prejudice.

## STATEMENT OF THE ISSUES TO BE DECIDED

On September 28, 2022, plaintiffs, who seek to represent a class of adult-entertainment performers, filed a second amended complaint alleging that Meta employees have engaged in a multi-layered scheme to "blacklist" or remove, block, and otherwise reduce the visibility of plaintiffs' posts and accounts on social media.  Plaintiffs bring claims for tortious interference with contract, tortious interference with business relationships, and a violation of California's Unfair Competition Law (UCL), Business and Professions Code, § 17200 et seq.  Meta moves to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6), or alternatively, to strike the second amended complaint under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16.  This Motion raises the following issues:

1.   Whether plaintiffs' claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6), because:

    a.   Plaintiffs have not plausibly alleged facts showing entitlement to relief.

    b.   Plaintiffs' claims are barred by Section 230 of the Communications Decency Act and the First Amendment of the U.S. Constitution.

    c.   Meta is not vicariously liable for the alleged conduct of John Doe defendants.

2.      Whether plaintiffs' claims should be stricken under California's anti-SLAPP statute, Section 425.16, because:

a.      Plaintiffs' claims arise from allegations about conduct that is protected under the First Amendment of the U.S. Constitution and is in connection with an issue of public interest, and therefore falls within the scope of Section 425.16.

b.      Plaintiffs have not shown a reasonable probability of prevailing on their claims.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 2

LEGAL STANDARDS ............................................................................................................. 6

ARGUMENT ............................................................................................................................ 6

I.      Plaintiffs' Blacklisting Theory Is Not Plausible ................................................... 6

II.     Plaintiffs Have Not Pleaded Actionable Injuries ................................................. 15

III.    CDA 230 And The First Amendment Bar Claims Seeking To Hold Meta Liable
        For Decisions To Remove Content ...................................................................... 16

IV.     Meta Is Not Liable For The Alleged Conduct Of Its Employees Under Any Theory
        Of Liability ......................................................................................................... 21

V.      Plaintiffs' Claims Are Subject To And Should Be Stricken Under The Anti-
        SLAPP Statute .................................................................................................... 24

CONCLUSION ....................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
   727 F.3d 502 (6th Cir. 2013) ..................................................................................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................................................7

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ........................................................................................17, 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................................7, 12

*Calise v. Meta Platforms, Inc.*,
   2022 WL 1240860 (N.D. Cal. Apr. 27, 2022) ........................................................................19

*Caraccioli v. Facebook, Inc.*,
   700 F. App'x 588 (9th Cir. 2017) ..........................................................................................19

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) ..........................................................................................................20

*Cross v. Cooper*,
   197 Cal. App. 4th 357 (2011) ................................................................................................25

*Cross v. Facebook, Inc.*,
   14 Cal. App. 5th 190 (2017) ..................................................................................................17

*Davison v. Facebook, Inc.*,
   370 F. Supp. 3d 621 (E.D. Va. 2019) ....................................................................................18

*Doe v. Twitter, Inc.*,
   555 F. Supp. 3d 889 (N.D. Cal. 2021) ..................................................................................19

*Ebeid v. Facebook, Inc.*,
   2019 WL 2059662 (N.D. Cal. May 9, 2019) ........................................................................17

*Eco Elec. Sys., LLC v. Reliaguard, Inc.*,
   2022 WL 1157481 (N.D. Cal. Apr. 19, 2022) ......................................................................15

*Emery v. Visa Int'l Serv. Ass'n*,
   95 Cal. App. 4th 952 (2002) ..................................................................................................22

*Enhanced Athlete Inc. v. Google LLC*,
   479 F. Supp. 3d 824 (N.D. Cal. 2020) ..................................................................................19

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ..................................................................................20

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Exxon Corp. v. Super. Ct.*,
  51 Cal. App. 4th 1672 (1997) ............................................................................20, 21

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) .................................................................................17

*Fyk v. Facebook, Inc.*,
  808 F. App'x 597 ..............................................................................................17, 18

*Gentry v. eBay, Inc.*,
  99 Cal. App. 4th 816 (2002) ....................................................................................19

*Ginsberg v. Google Inc.*,
  2022 WL 504166 (N.D. Cal. Feb. 18, 2022) ...........................................................19

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014) ...................................................................................25

*Gutierrez v. Wells Fargo & Co.*,
  622 F. Supp. 2d 946 (N.D. Cal. 2009) .....................................................................20

*Hahn v. Diaz-Barba*,
  194 Cal. App. 4th 1177 (2011) ................................................................................15

*Hinman v. Westinghouse Elec. Co.*,
  2 Cal. 3d 956 (1970) ................................................................................................23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ...........................................................................................18, 19

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) .................................................................................14

*In re Firearm Cases*,
  126 Cal. App. 4th 959 (2005) ..................................................................................22

*Kelsey K. v. NFL Enters., LLC*,
  254 F. Supp. 3d 1140 (N.D. Cal. 2017) .....................................................................7

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ...................................................................................4

*La'Tiejira v. Facebook, Inc.*,
  272 F. Supp. 3d 981 (S.D. Tex. 2017) .....................................................................18

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*,
  12 Cal. 4th 291 (1995) ......................................................................................23, 24

*Lusk v. Kellogg*,
  2011 WL 13225140 (C.D. Cal. Aug. 10, 2011)........................................................23

*Maloney v. T3Media, Inc.*,
  853 F.3d 1004 (9th Cir. 2017) .................................................................................24

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Manhattan Cmty. Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) ....................................................................................................17

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
   200 Cal. App. 4th 480 (2011) ....................................................................................20, 21

*Marshall's Locksmith Service Inc. v. Google, LLC*,
   925 F.3d 1263 (D.C. Cir. 2019) ................................................................................19, 20

*Mejia v. Cmty. Hosp. of San Bernardino*,
   99 Cal. App. 4th 1448 (2002) .........................................................................................22

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ..................................................................................................17, 18

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) ............................................................................................8

*Multimedia Patent Tr. v. Microsoft Corp.*,
   525 F. Supp. 2d 1200 (S.D. Cal. 2007) ...........................................................................15

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021) ..............................................................................................17

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ...........................................................................18

*Pallamary v. Elite Show Servs., Inc.*,
   2018 WL 3064933 (S.D. Cal. June 19, 2018) .................................................................8, 9

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) .........................................................................................19

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
   494 F.3d 788 (9th Cir. 2007) ...........................................................................................22

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018) .............................................................................................6

*Rodgers v. Kemper Constr. Co.*,
   50 Cal. App. 3d 608 (1975) .............................................................................................23

*Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) .....................................................................17, 18

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) .............................................................................................1

*Stackla, Inc. v. Facebook, Inc.*,
   2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ................................................................25

*Tietsworth v. Sears, Roebuck & Co.*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010) .......................................................................6, 14

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

**Page(s)**

*Tomerlin v. Canadian Indem. Co.*,
   61 Cal. 2d 638 (1964) ...........................................................................................21

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ..................................................................................6

**Statutes**

47 U.S.C. § 230..........................................................................................................17

47 U.S.C. § 230(c)(1)........................................................................................ *passim*

Cal. Bus. & Prof. Code § 17204 ................................................................................15

Cal. Civ. Code § 2317................................................................................................22

Cal. Civ. Code § 2330................................................................................................21

Cal. Civ. Proc. Code § 425.16 ....................................................................................6

Cal. Civ. Proc. Code § 425.16(b)(1)..........................................................................25

Sherman Anti-Trust Act (1890) .................................................................................20

**Court Rules**

Fed. R. of Civ. P. 11...................................................................................................12

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

This Court dismissed plaintiffs' original complaint because they failed to "plead 'enough facts to state a claim to relief that is plausible on its face' and to 'nudge[] their claims across the line from conceivable to plausible." ECF No. 71 at 1–2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court directed plaintiffs to come forward with "their best case." *Id.* at 1. Plaintiffs filed a second amended complaint, but it only confirms that plaintiffs' best case is no case at all. It turns out there was a reason why plaintiffs "chose not to" plead more than they had in their prior complaint, *id.*: the "information" that supposedly backed up their information-and-belief allegations in no way contains "factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). Plaintiffs still have no *facts* that plausibly support their story that OnlyFans paid Meta employees to place plaintiffs on internal terrorist lists—and thereby remove or deprioritize plaintiffs' content—because plaintiffs linked to pornographic websites that were not OnlyFans.

Plaintiffs' "new" evidence only confirms that their claims fail the plausibility test. The "wire transfer" evidence is not a wire transfer at all but a conspiracy-theory-tinged email that says "Follow the money" and has account information that does not even line up with a Meta employee that plaintiffs claim is at issue. *See* Second Am. Compl. (ECF No. 74) ("SAC") Ex. D. Elsewhere, plaintiffs refer to an attorney who reviewed "more than 200 pages of internal Facebook documents," SAC, ¶ 1(d), but those documents are not quoted or attached, the attorney is unnamed and conspicuously absent from plaintiffs' pleadings, and the counsel who actually signed plaintiffs' complaint conspicuously avoids alleging those facts himself. Another piece of evidence is simply a list of names of adult entertainers and pornographic companies—nothing else. And plaintiffs cite a BBC article that simply recites and relies on the allegations plaintiffs are making in this case. *See id.* at Exs. B–C. This is not the stuff of a well-pled complaint.

Plaintiffs ultimately offer their "belie[f]" that the "allegations . . . will likely have evidentiary support after a reasonable opportunity for . . . discovery," which is a formulation they use at least 13 times in the second amended complaint. *See, e.g.*, SAC ¶¶ 8, 27, 64, 66, 67, 73, 88. That gets things backwards. Federal-court class actions do not proceed on a hope and a prayer that plaintiffs might develop support for

their claims in discovery.  The fundamental facts are these: plaintiffs allege that they publish content on Meta's Instagram and Facebook platforms that attempts to direct traffic to known pornographic websites like cams.com, chaturbate.com, and streamate.com.  Doing so unquestionably violates Meta's policies. Plaintiffs claim they had posts that were suppressed or removed, which resulted in less traffic to their pages on the pornographic websites.  And plaintiffs claim that while the pornographic websites they used decreased in popularity, OnlyFans was increasing in popularity.  These are the only well-pled facts in the complaint—the rest is just smoke and mirrors, as plaintiffs' own exhibits show.

These allegations do not state a claim.  Plaintiffs' theory does not pass Rule 8's plausibility standard, given the obvious and more-plausible alternative explanations for the removal of plaintiffs' content (they link to pornography in express violation of Meta's policies) and OnlyFans' increased popularity (OnlyFans received extensive coverage in the news media and pop culture).  This case therefore resembles *Twombly* in every way that matters.  And even if plaintiffs had plausibly alleged that Meta was taking action to prefer OnlyFans-affiliated content over content that was not associated with OnlyFans, that content-moderation action would be subject to the immunity provided by Section 230(c)(1) of the Communications Decency Act ("CDA") and within Meta's First Amendment rights.  It is of no moment that plaintiffs claim the conduct was "anticompetitive" because plaintiffs have not pleaded that Meta engaged in actionable anticompetitive conduct.  Nor could they, as Meta is not in the adult-entertainment business at all.  For these reasons and those that follow, this Court should strike or dismiss the second amended complaint with prejudice.

## BACKGROUND

Facebook and Instagram are online services that enable millions of users worldwide to connect and share information, including photographs and videos with family, coworkers, friends, and the broader public (if they so choose).  Plaintiffs Dawn Dangaard (stage name: Alana Evans), Kelly Gilbert (stage name: Kelly Pierce), and Jennifer Allbaugh (stage name: Ruby) are adult entertainers.  SAC ¶¶ 13–15. Plaintiffs' business model is to post pictures and links on Facebook or Instagram (or both) to "reach" potential consumers on those platforms, and then to "drive" these viewers to their "accounts" on third-party, adult-entertainment platforms where plaintiffs sell pornographic content.  *Id.* ¶¶ 36, 101; *see also*

*id.* ¶ 5 (adult entertainers "rely on interactions on social media platforms such as Instagram and Twitter to guide customers to their pages on AE Platforms"). "Consumers are charged to access the content on" the pornographic websites, "with the revenue split between" the platform and the adult entertainer. *Id.* ¶ 5. Plaintiffs' use of Facebook and Instagram to "drive traffic" to their pornographic content is the "lifeblood" of their businesses. *E.g.*, *id.* ¶¶ 7, 41. Plaintiffs allege that they link to websites like cams.com ("Hook up online with hot cam models around the world for live adult chat and video sex here"), chaturbate.com (a hybrid of two words that speaks for itself), and streamate.com (also self-explanatory). *Id.* ¶¶ 98, 104.

Plaintiffs complain about the removal of some of their posts (the content of which they notably omit) or that their accounts were suspended altogether. *Id.* ¶¶ 98–110. Each plaintiff links to OnlyFans as well as other pornographic websites that are not affiliated with OnlyFans. *Id.* ¶¶ 103–04, 109. Evans claims that "her followers were receiving many fewer of her posts than they had previously received" and that her Instagram account was deleted. *Id.* ¶¶ 99, 101. The account was restored "three days later." *Id.* ¶ 101. Over the course of the purported scheme, Evans alleges that the number of her followers has *increased* from "105,000 in July 2020" to "almost 300,000 followers" today, but that "many of her posts are viewed by less than 2,000 users." *Id.* ¶¶ 101–02. Evans has used both cams.com and OnlyFans. *Id.* ¶ 103.

Pierce has used Instagram to link to OnlyFans, chaturbate.com, and streamate.com. *Id.* ¶ 104. Pierce claims that her Instagram site was deleted, but that Instagram allowed her to set up a new account after meeting with her union's lawyer about the enforcement of Meta's policies concerning sexually explicit content. *Id.* ¶ 105. She alleges that Twitter and Snap deleted her accounts, too, after she used those sites to link to pornographic websites. *Id.* ¶¶ 105–06. Pierce "thinks social media companies are gaining too much power on data as well as censorship hurting thousands of adult models all over the world every day." *Id.* ¶ 107.

Ruby says she uses sexpanther.com ("Explore your fantasies and sext with your favorite models today!"), loyalfans.com, OnlyFans, and two defunct websites (unfiltered.com and stars.avn.com). *Id.* ¶ 109. She claims that some of her Instagram posts were deleted and that she has "been blocked from

posting on Facebook for 30 day periods because of purported violations of Community Standards" that she disagrees with.  *Id.* ¶ 110.

Plaintiffs' business model has at all relevant times violated Meta's Community Standard governing Sexual Solicitation.   Under that policy, users may not post content that offers "[s]ex chat[s] or conversations," or "[n]ude photos/videos/imagery/sexual fetish items."[1]  Nor may users link to outside websites that contain that sort of content.  Meta's Sexual Solicitation Community Standard expressly tells users that they must "not post" content that "links to external pornographic websites."[2]  *Id.*  If a user posts content that violates the Sexual Solicitation (or any other) Community Standard, "Meta will remove it." Meta tracks users' violations (what Meta calls "strikes"), and depending on a user's "number of strikes," Meta may "restrict[] or disable[]" that user's account.[3]

Plaintiffs allege that their content or accounts were removed or deprioritized by Meta not for their violations of the Sexual Solicitation standard, but rather because their content linked to adult-entertainment platforms that were not affiliated with OnlyFans (even though plaintiffs themselves linked to OnlyFans, too).  They claim that their content or accounts were deleted or deprioritized as part of a "blacklisting" scheme, which plaintiffs define as "a process whereby social media platforms suspend or delete particular accounts or otherwise reduce their visibility."  SAC ¶ 33.  Plaintiffs allege that this "blacklisting" was accomplished by adding "false classifier/filtering information to . . . individual databases/training data and/or lists of dangerous organizations and individuals . . . , some or all of which were then included in one or more shared databases or lists," thereby "falsely identifying" adult entertainers or the adult-entertainment platforms they use as related to terrorism.  *Id.* ¶ 66.  Each plaintiff claims their "revenue" was "adversely affected" by the blacklisting, but no plaintiff provides specifics. *Id.* ¶¶ 102, 107, 110.

---

[1] Anderson Decl. Ex. 1, Meta's Community Standards – Sexual Solicitation.  Plaintiffs' complaint references and relies upon Meta's Community Standards, SAC ¶¶ 36, 110, which are therefore incorporated into the complaint by reference.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[2] Anderson Decl. Ex. 1.

[3] Anderson Decl. Ex. 2, How Meta enforces its policies – Taking down violating content.

The alleged purpose of this blacklisting scheme was to promote OnlyFans at the expense of the other adult-entertainment platforms.  In support of this "blacklisting" theory, plaintiffs allege (1) that in late 2019, web traffic to OnlyFans began increasing; and (2) web traffic to three unidentified adult-entertainment platforms began decreasing.  *Id.* ¶¶ 7, 94, 96.  While OnlyFans' web traffic increased moderately in late-2019, traffic on the site skyrocketed beginning in March of 2020, which was the onset of the global COVID-19 pandemic.  *See id.* ¶ 94.  In March of 2020, 60,000 content creators flocked to OnlyFans.[4]  And in April of 2020, popular recording artists Beyoncé and Megan Thee Stallion released the song "Savage Remix," in which Beyoncé referenced OnlyFans.[5]  In the 24-hour period following the song's release, OnlyFans experienced a 15% spike in internet traffic,[6] and observed daily sign-ups of 200,000 users and 7,000–8,000 creators.[7]

Meta moved to dismiss or strike plaintiffs' prior complaint.  After plaintiffs' counsel referenced "information outside the pleadings that may support their claims," the Court directed plaintiffs to "re-plead their complaint to meet the issues raised" in Meta's prior motion.  ECF No. 71 at 1.  The Court specifically referenced plaintiffs' allegations made "on information and belief" when plaintiffs "could have gathered such information from th[e] adult . . . performers themselves."  *Id.* at 2.  The Court further noted that the alleged "automated takedowns is only one potential explanation" for increased web traffic to OnlyFans, and that "plaintiffs need to provide factual information that makes such an inference plausible."  *Id.*  Finally, the Court found "plaintiffs' allegations of harm [to be] vague," and thus directed plaintiffs to "provide more detailed allegations regarding the extent of their injuries."  *Id.*  Plaintiffs filed a second amended complaint that includes "key additional allegations" and exhibits, all but one of which plaintiffs submitted with the prior briefing.  SAC ¶ 2; *see* ECF Nos. 43-1 through 43-7, 46–47.

---

[4] Anderson Decl. Ex. 3, Gabrielle Drolet, *The Year Sex Work Came Home*, N.Y. Times, Apr. 10, 2020, https://www.nytimes.com/2020/04/10/style/camsoda-onlyfans-streaming-sex-coronavirus.html.

[5] Anderson Decl. Ex. 4, Marlow Stern, *Beyoncé Gives Adult Site OnlyFans Big Bump With 'Savage' Remix Shout-Out*, The Daily Beast, Apr. 30, 2020, https://www.thedailybeast.com/adult-site-onlyfans-experiences-big-beyonce-bump-following-savage-remix.

[6] *Id.*

[7] Anderson Decl. Ex. 5, Otillia Steadman, *Everyone Is Making Porn At Home Now.  Will The Porn Industry Survive?*, BuzzFeed News, May 6, 2020, https://www.buzzfeednews.com/article/otilliasteadman/coronavirus-amateur-porn-onlyfans.

**LEGAL STANDARDS**

In ruling on a motion to dismiss, courts "need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences." *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123, 1132 (N.D. Cal. 2010). And "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim," the analysis of plaintiff's likelihood of success merges with the Rule 12(b)(6) analysis. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).

**ARGUMENT**

Plaintiffs' second amended complaint does not remedy the problems with the prior version, and their claims should be dismissed with prejudice. First, none of plaintiffs' new allegations pushes their claims across the plausibility line. Indeed, most of the purportedly new allegations are simply restatements of the same "information and belief" allegations about which this Court previously expressed skepticism. And what additional information plaintiffs supply only underscores the bankruptcy of their theory. There are simply no allegations of *fact* that plausibly show that plaintiffs' posts and accounts were removed because Meta employees were working at the behest of OnlyFans to suppress content that linked to non-OnlyFans websites. The alleged experiences of plaintiffs—who each used OnlyFans themselves and were still subject to enforcement—show the opposite. Second, plaintiffs have not adequately pleaded that they experienced an actionable injury caused by the purported scheme. Plaintiffs have declined the Court's invitation to be more specific about their injuries. Third, even if plaintiffs' allegations were true, an editorial decision by Meta not to subject OnlyFans-related content to enforcement is protected twice over by the First Amendment and Section 230(c)(1) of the CDA. Fourth, plaintiffs' claims also suffer from state-law-specific defects. Plaintiffs' speech-targeting claims also fall squarely within California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16.

**I.     Plaintiffs' Blacklisting Theory Is Not Plausible**

Plaintiffs' second amended complaint does not bring plaintiffs any closer to clearing the threshold plausibility requirement. "Under Rule 12(b)(6), a complaint should be dismissed if it fails to include 'enough facts to state a claim to relief that is plausible on its face.'" *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 617 (9th Cir. 2022) (quoting *Twombly*, 550 U.S. at 570). Claims are plausible only

when the well-pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) [liability] reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 557. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678. "[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.'" *Twombly*, 550 U.S. at 559. And claims are not plausible when based on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678.

*Twombly* itself is right on point here. In that case, the plaintiffs alleged facts that were merely "consistent with [a] conspiracy" to engage in anticompetitive conduct, but were "just as much in line with a wide swath of rational and competitive business strategy." 550 U.S. at 554. And plaintiffs' "ultimate allegations" that defendants had in fact entered into an anticompetitive contract or combination was alleged exclusively "upon information and belief." *Id.* at 551. The Supreme Court held that "a bare assertion of conspiracy" did not "nudge[] [the plaintiffs'] claims across the line from conceivable to plausible." *Id.* at 556, 570.

As Meta's prior motion to dismiss emphasized, plaintiffs allege a sensational, multi-faceted conspiracy between Meta employees and individuals or entities affiliated with OnlyFans involving covert payments and manipulation of both shared terrorism-related databases and Meta's own internal algorithms. But each of the critical links in this alleged scheme was supported only by allegations "on information and belief"—a pleading crutch that was employed 39 times in the prior complaint. "For a conspiracy of the scale alleged by this complaint, one would expect at least some evidentiary facts to have been located and pled." *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1144 (N.D. Cal. 2017). Plaintiffs had none. Instead, plaintiffs' allegations that their content was removed or their accounts suspended were easily explained by Meta's enforcement of its Sexual Solicitation Community Standard,

which flatly prohibits content that links to pornographic material.  Anderson Decl. Ex. 1.  And the fact that OnlyFans grew in popularity was most obviously explained by the fact that prominent celebrities became early adopters or endorsers of OnlyFans, catapulting the platform into the pandemic-era zeitgeist. In response to Meta's prior motion and plaintiffs' references at the hearing to evidence that they apparently had but did not plead, this Court gave plaintiffs another shot.  But the Court warned plaintiffs that they needed to come forward with "factual information that makes" plaintiffs' theory "plausible."  ECF No. 71 at 2.

Plaintiffs' second amended complaint confirms that they do not have the goods.  In many places, their complaint simply replaces what plaintiffs previously alleged "on information and belief" with a statement that plaintiffs "believe" their "allegations will likely have evidentiary support after a reasonable opportunity for discovery."  SAC at 1,; *id.* ¶¶ 8, 27, 64, 66, 73, 88.  Some version of this formulation appears at least 13 times in plaintiffs' complaint.  But this please-let-us-take-discovery formulation is no better than the information-and-belief formulation this Court faulted plaintiffs for on the prior complaint. Plaintiffs do not get to make outrageous allegations about a conspiracy while acknowledging in the same breath that they need discovery to actually come forward with evidence of that conspiracy.  Plaintiffs must plead facts plausibly showing a claim and *then* they get discovery—not the other way around.  *See, e.g.*, *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 (9th Cir. 2014) ("The Supreme Court has stated, however, that plaintiffs must satisfy the pleading requirements of Rule 8 *before* the discovery stage, not after it."); *Pallamary v. Elite Show Servs., Inc.*, 2018 WL 3064933, at *4 (S.D. Cal. June 19, 2018) ("[T]he Ninth Circuit Court of Appeals and the United States Supreme Court have both determined that a plaintiff must satisfy the pleading requirements of [Rule 8] *before* proceeding to discovery." (emphasis added)). Plaintiffs' new amended complaint identifies several "key additional allegations."  SAC ¶ 2.  But none of these allegations supplies the missing factual information that would make their far-fetched conspiracy theory plausible.

**BBC article.**  Plaintiffs added quotes from a BBC article that was published on the eve of the filing of plaintiffs' first amended complaint.  SAC ¶¶ 2(a), 9; SAC Ex. A ("OnlyFans accused of conspiring to blacklist rivals").  But the BBC article is simply reporting on a related case that plaintiffs' counsel had

filed in Florida state court against the Fenix defendants.  The article restates the allegations from the complaint in the Florida case, which contained the same allegations that were already in this complaint. SAC Ex. A at 2 ("BBC News has learned that rival adult website FanCentro has begun legal action"); *id.* ("[t]he claim . . . alleges"); *id.* ("FanCentro claims"); ("[a]ccording to the legal action"); *id.* ("according to the filing"); *id.* at 3 ("it is alleged").  The article goes on to quote plaintiffs' counsel about his plans to issue a subpoena, and quotes one of the named plaintiffs in this case, Evans, who said "[w]e were seeing mass deletions without any real clear reason as to what was happening or why."  *Id.* at 3–4.  The article also reports on an individual named "Camila" who posted photos linking to a pornographic website and who "began receiving violation notifications for content removed by Instagram."  *Id.* at 4–5.  BBC claims to have "learned that Camila's Instagram account status - only visible by engineering staff - was changed to 'critical,'" which "meant it was not promoted as prominently any more [sic]."  *Id.* at 5.  BBC also spoke to another pornographic platform that "felt like a 'bomb' had been placed under his business," when Instagram accounts stopped driving traffic to the site.  *Id.* at 5–6.  The article includes quotes from Meta, which stated that the "allegations were without merit" and that Meta "had investigated and found no evidence the shared hash database had been abused."  *Id.* at 3.  The Global Internet Forum to Counter Terrorism (GIFCT)—the entity that plaintiffs claim was used to effectuate the scheme—also commented: "[w]e are not aware of any evidence to support the theories presented in this lawsuit."  *Id.* at 6.

The BBC article does not advance the ball.  The only facts the article adds are: (1) an adult entertainer who used Instagram to link to pornography had posts removed and her account's visibility diminished, and (2) a pornography website saw diminished traffic from Instagram.  These facts mirror what plaintiffs have already alleged in this case: they use Instagram to drive traffic to pornographic websites and their Instagram posts were removed or suppressed.  The most obvious explanation for that phenomenon isn't a conspiracy to secretly manipulate terrorist databases.  It is enforcement of Meta's Sexual Solicitation Community Standard, which at all relevant times expressly prohibited content that "links to external pornographic websites."   Anderson Decl. Ex. 1.  If anything, the BBC article significantly undermines plaintiffs' claims because it reports—accurately—that Meta and GIFCT investigated these claims and found no evidence to support plaintiffs' theories.  And the fact that one of

9

the named plaintiffs admitted to the BBC that she did not see "any real clear reason as to what was happening or why" only further underscores that plaintiffs' alleged conspiracy is make-believe.  SAC Ex. A at 4.

*"Follow the money" email.*  Plaintiffs next point to "detailed information about some of the alleged wire transfers" from the Fenix Defendants to Meta employees.  SAC ¶ 2(c).  Plaintiffs claim these are "cop[ies] of . . . genuine wire transfer[s]," *id.* ¶ 77, but the exhibit they cite is not a wire transfer at all. It is an email with the conspiracy-theory-laden subject line "Follow the money," and the information about the email's provenance (who sent it to whom and when) is redacted.  SAC Ex. D at 1.  ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████

The "Follow the money" email contains obvious indicia of unreliability and provides no plausible support for plaintiffs' allegation that there were payments.  ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

  ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

1

2

3 ███████████████████████████████████████ Even plaintiffs recognize

4 how far-fetched their claim really is, acknowledging that "[p]laintiffs need discovery to ascertain whether"

5 these accounts "indeed are associated with those executives."  *Id.* ¶ 2(c).

6 　　Other indicators abound that drain any semblance of credibility from the "Follow the money"

7 email.  ████████████████████████████████████████

8

9

10

11

12

13

14 ████████████████████████████████ The document's

15 "format[ting]," containing peculiar bold emphases in random letters, itself bears indicia of unreliability.

16 　　In addition, plaintiffs claim that they have "retained" "[b]anking experts" who have "concluded

17 that the level of detail and format of the information had indicia of reliability sufficient to merit further

18 inquiry."  SAC ¶ 2(c).  But that is hardly a ringing endorsement, and plaintiffs notably did not provide any

19 actual statements or evidence from these purported experts.  Plaintiffs also reference a "phone call" from

20 a "very experienced and credible" "attorney who said he reviewed wire transfer records that appear to

21 have included at least some of the same transfers, and they appeared to him to have sufficient indicia of

22 reliability in that they did not appear to be faked."  *Id.*  The extensive hedging in these statements and the

23 absence of that attorney's name and signature from the complaint is all the evidence this Court needs to

24 disregard these allegations.

25 　　Moreover, plaintiffs' complaint does not actually connect the alleged payments to any actions by

26 ███████████████████. They do not allege that these individuals engaged in any "blacklisting."

27 They do not allege that these individuals have any involvement with the databases at issue.  And they

28

certainly do not tie anything that these three individuals did to harm experienced by the plaintiffs themselves. The "Follow the money" email is so devoid of reliability and relevance that it cannot "nudge[]" plaintiffs' claims any closer to the plausibility line. *Twombly*, 550 U.S. at 570.

      ***The "200 pages" of Facebook documents.*** Plaintiffs next reference a conversation with this same unnamed attorney who "stated that he also reviewed a sample of what appeared to be more than 200 pages of internal Facebook documents concerning an inquiry into possible abuse of the shared hash database of the GIFCT." SAC ¶ 2(d). The paragraph goes on to use the word "appeared" (or "appear") two more times and adds an "on information and belief" statement for good measure. *Id.* These 200 pages of documents are not included with the complaint, nor are their contents quoted or referenced anywhere. The attorney remains unidentified. The attorney was not willing to sign a pleading in federal court under Rule 11 that details what these "app[arently]" internal Facebook documents said. Plaintiffs' counsel was not willing to allege those facts either, as shown by the careful wording in this paragraph. And it is of course no secret that Meta conducted an investigation into plaintiffs' allegations. As the BBC article plaintiffs attach notes, Meta did not find any supporting evidence. SAC Ex. A at 3.

      ***The alleged coverup.*** Although plaintiffs were supposed to provide factual information in this new complaint, they revert to form with the next allegation: "[o]n information and belief, at some point, there was an attempted coverup of the scheme, after some of the datasets were sufficiently corrupted, in which affected performers and platforms were shifted from a dangerous organization (terrorist) designation to a new sexual solicitation category (used also for trafficking)." SAC ¶ 2(e). This "information and belief" allegation should not be credited, and plaintiffs advance no actual facts to support it. Plaintiffs even acknowledge that they need discovery to develop support for this claim. *Id.* ¶ 88. And to reiterate, Meta has always had a Sexual Solicitation policy during the relevant time period, and by their own allegations, plaintiffs' actions were always in violation of that policy.

      ***The "whistleblower."*** Plaintiffs next allege that they "have been informed that at some point, a whistleblower made a report to intergityline.facebook.com [sic] that overlaps with some of the allegations alleged herein." SAC ¶ 2(f). Plaintiffs do not explain how, when, or by whom they were "informed" of the alleged existence of a "whistleblower" report or what the report says. It does not sound like they have

this information, because they immediately admit they "need copies of all internal analyses and writing related to the allegations of this Second Amended Complaint to plead with greater particularity." *Id.*

**The 21,000 Instagram accounts.**  Plaintiffs allege that their counsel received an anonymous email setting forth the usernames of more than 21,000 Instagram users.  SAC ¶ 67.  This tip allegedly bears the following heading: "20k+ ig users that FB labeled 'dangerous individuals' because they used sites that competed with onlyfans…most pages either deleted or shadow banned."  *Id.* ¶¶ 2(g), 67.  But plaintiffs did not submit this email to the Court.  They simply rely on a report prepared by a retained expert Jonathan Hochman, which is the same report he submitted in opposition to Meta's first motion to dismiss.  Mr. Hochman's own description of the list makes clear that it could not possibly contain "users that FB labeled 'dangerous individuals' because they used sites that competed with onlyfans," as the anonymous tipster claims.  *Id. OnlyFans itself* appears on the list, along with Instagram's *own* account (@instagram), as well as an unknown number of "famous Instagram personalities and other major brands" whom Mr. Hochman declines to identify.  SAC Ex. B at 8 n.5.  It is facially implausible that a list containing Instagram's own account, OnlyFans, and other "famous Instagram personalities" and "major brands" is actually a list of usernames designated as "dangerous individuals" because the sites compete with OnlyFans.  Mr. Hochman breezes past this obvious point and urges that the list of names is "authentic" because he "***infer[s] that the 21K list is unlikely to be a recent creation, but more likely an authentic list of accounts that was created after the alleged scheme was implemented***."  *Id.* ¶ 85 (emphasis Hochman's).  But this opinion, unsupported as it is, says nothing about whether the accounts were in fact designated as "dangerous individuals."  Again, the list of Instagram accounts that plaintiffs chose not to provide to the Court does nothing to fill the holes between plaintiffs' conspiracy story and the actual facts that are pleaded.

**The list of adult-content platforms.**  Plaintiffs' final piece of information is a spreadsheet they claim they received from a tipster.  SAC ¶¶ 2(h), 68.  This document is just a list of pornographic websites.  SAC Ex. C.  Plaintiffs do not include the submission from the tipster.  Plaintiffs do not include any factual information that would tie this list to anything relating to Meta.  All they allege is that the list does not include OnlyFans.  But a list of pornographic companies does nothing to fill in the factual information

that is actually missing here: evidence that plaintiffs' accounts were removed not for linking to pornographic websites in violation of Meta's policies, but instead because there was a covert effort directed by senior Meta executives to remove accounts that were not affiliated with OnlyFans.

\*   \*   \*

Stripped of "allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences," *Tietsworth*, 720 F. Supp. 2d at 1132, what do plaintiffs have?   Just the following: (1) plaintiffs' business model involves using Meta's platforms to link to pornographic websites; (2) plaintiffs were also linking to OnlyFans; (3) plaintiffs had posts removed and, in some instances, their accounts suspended; and (4) OnlyFans experienced an increase in popularity, while other subscription-based pornographic websites saw more of a decline.   SAC ¶¶ 36, 94, 96, 98, 101, 103–06, 109–10. Plaintiffs are back where they started: the actual allegations of fact are more consistent with enforcement of Meta's Community Standards, not a conspiracy.   Indeed, the fact that plaintiffs were linking to OnlyFans alongside other sites and were still subject to removal makes this explanation far and away the most obvious one.

This case therefore involves a straightforward application of *Twombly*.   Plaintiffs' "ultimate allegations" regarding the underlying cause driving these claims "are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told [courts] to ignore when evaluating a complaint's sufficiency." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (affirming dismissal of complaint where allegations of racially disparate treatment were made exclusively on information and belief).   "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013).   Rather, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.*   Plaintiffs have not come close to clearing this hurdle, despite this Court inviting them to bring their "best case." ECF No. 71 at 1.

## II. Plaintiffs Have Not Pleaded Actionable Injuries

Plaintiffs have also not sufficiently alleged that they were injured by any purported scheme. Plaintiffs can recover under their UCL claim only if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.  Under California law, "[l]ost profits are damages, not restitution, and are unavailable in a private action under the UCL." *Eco Elec. Sys., LLC v. Reliaguard, Inc.*, 2022 WL 1157481, at *10 (N.D. Cal. Apr. 19, 2022) (brackets in original) (quoting *Lee v. Luxottica Retail N. Am., Inc.*, 65 Cal. App. 5th 793, 797 (2021)).  Plaintiffs' economic-tort claims likewise are viable only if they can establish that they were injured because of the defendants' conduct.  *See Hahn v. Diaz-Barba*, 194 Cal. App. 4th 1177, 1196 (2011) (reciting elements of intentional interference with contract, including "resulting damage"); *Multimedia Patent Tr. v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1215 (S.D. Cal. 2007) (reciting elements of tortious interference with prospective economic advantage, including "damages").  This Court previously noted that "plaintiffs' allegations of harm" such as reduced revenue "[we]re vague" and "lack[ed] specificity."  ECF No. 71 at 2.  Plaintiffs have not remedied that problem.[8]

*Evans.*  Evans alleges that in 2019, she had 100,000 followers on Instagram.  SAC ¶ 98.  Despite alleging that her account was deleted and reinstated three days later in January of 2020, Evans confirms that her follower count in fact substantially *increased* from 2019 to present: "Her follower count was at 105,000 in July 2020, 199,000 in April 2021, . . . 283,000 in October 2021," and "almost 300,000" at present day.  *Id.* ¶¶ 101–02.  Evans insists that she was harmed, however, because "her posts were not reaching as many of her followers as had been the case before 2019."  *Id.*  The complaint contains no specific allegations regarding the "reach" of Ms. Evans' posts today in relation to their "reach" in 2019, much less explain how that reduced reach has translated into lost revenue.  In fact, the complaint acknowledges that Evans has simply transferred her business from cams.com to OnlyFans.  *Id.* ¶ 103.

---

[8] The named plaintiffs resubmit the same affidavits they (improperly) attached in opposition to Meta's first motion to dismiss and strike, which do no more than attest to the accuracy of the harm allegations contained in the operative complaint.  *See* SAC Exs. G–I

***Ruby.***   Ruby does not even try to articulate specific harm.   All she claims is that she now has "about 2,000 followers on Instagram."   She does not compare that count to prior years, nor does she explain how she has lost money or property as a result of any action taken against her account.   *Id.* ¶ 110.

***Pierce.***   Pierce provides the most specific allegations of harm, but she fails to tie that harm to anything Meta did.   Pierce alleges that she suffered a reduction in followers following the deletion of her Instagram account in March of 2021, from 75,000 followers to 6,000 followers.   *Id.* ¶¶ 104–05.   Pierce alleges that this reduction caused her revenue to decline "from $74,000 in 2020 to $61,000 in 2021, to only $43,000 in the first eight months of 2022."   *Id.* ¶ 108.   That means Pierce is on track to earn $64,500 this year, which is an *increase* from the prior year.   And Pierce does not allege facts showing that the alleged scheme between Meta and OnlyFans was the reason her Instagram account was deleted.   The deletion of Ms. Pierce's Instagram account is equally, if not more, consistent with Meta's enforcement of its Sexual Solicitation Community Standard, which prohibits offers of "pornographic material (including, but not limited to, sharing of links to external pornographic websites."   Anderson Decl. Ex. 1.   Pierce herself acknowledges that action had been taken against her account "for sexual [sic] explicit content."   SAC ¶ 105.   Nor does the complaint allege facts suggesting that the deletion of Ms. Pierce's account and the significant reduction in her follower count caused her minor variations in revenue.   The decrease and subsequent increase in Pierce's revenue is equally consistent with normal market fluctuations caused by shifting consumer preferences.   Plaintiffs' failure to plead actionable harm is fatal to each of their claims.

## III.   CDA 230 And The First Amendment Bar Claims Seeking To Hold Meta Liable For Decisions To Remove Content

Even if plaintiffs had adequately pleaded facts to make their purported scheme plausible, their claims still fail because they are ultimately complaining about content-moderation decisions that are legally protected.   Stripped of boilerplate allegations and legal conclusions, the alleged "scheme" boils down to this: Meta employees took actions to remove or demote plaintiffs' content that linked to pornographic websites but did not do so as aggressively against other, unnamed individuals who linked to OnlyFans.   SAC ¶ 7 (alleging "[t]he deletion and hiding of posts"); *id.* ¶ 8 (social media platforms "suspend[ed] or delete[d] [plaintiffs'] accounts or otherwise reduce[d] their visibility"); *id.* ¶¶ 33, 40–41, 56, 60, 92, 95 (similar).   Plaintiffs claim Meta accomplished this scheme by identifying their content for

inclusion in shared databases for dangerous or terrorism-related content.  *Id.* ¶¶ 8, 57, 62–63.  Plaintiffs allege that Meta employees took those actions out of greed or avarice, in exchange for payment from OnlyFans.  *Id.* ¶¶ 73, 79.  While the alleged technical mechanics of the purported "blacklisting" and payments are convoluted, the bottom line is not.  The operative and dispositive allegations are that Meta engaged in identification, flagging, removal, and classification of content or user accounts.  That action is doubly protected by both Section 230 of the CDA and the First Amendment.

Section 230(c)(1) of the CDA protects from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009); *see* 47 U.S.C. § 230(c)(1).  At bottom, this provision bars any claims that rest on "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online."  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008).  "Courts have routinely rejected a wide variety of civil claims . . . that seek to hold interactive computer services liable for removing or blocking content or suspending or deleting accounts (or failing to do so) on the grounds they are barred by the CDA."  *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 27 (2021).  Courts have applied these principles to dismiss claims brought against Meta for its decisions to remove content.  *See, e.g.*, *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598; *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *3–5 (N.D. Cal. May 9, 2019); *Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1092–96 (N.D. Cal. 2015).

Decisions to remove or deprioritize content posted by others are also protected by Meta's First Amendment right to exercise editorial discretion over its private forums.  *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) ("when a private entity provides a forum for speech," it may "exercise editorial discretion over the speech and speakers in the forum").  Such publication choices by private entities—"whether fair or unfair—constitute the exercise of editorial control and judgment" protected by the First Amendment.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  Courts have employed the First Amendment to dismiss lawsuits challenging Facebook's content-moderation decisions.  *See, e.g.*, *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 202 (2017) ("[T]he source

of . . . alleged injuries . . . is the content of the pages and Facebook's decision not to remove them, an act 'in furtherance of the . . . right of petition or free speech.'"); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (acknowledging "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit."). "[W]hatever the reason" a speaker may have for choosing to display (or not to display) particular speech, that decision "is presumed to lie beyond the government's power to control."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575 (1995).

This case involves a straightforward application of these principles.  When the complaint's rhetoric and conclusory allegations are disregarded, the factual allegations are nothing more than complaints about content-moderation decisions.  The relevant content here for purposes of both the CDA and the First Amendment is the plaintiffs' content that was allegedly removed from Facebook or Instagram.  It is the removal of that content that purportedly injured plaintiffs.  Because "removing content is something publishers do, . . . to impose liability on the basis of such conduct necessarily involves treating" Meta as a publisher of content created by plaintiffs in violation of the CDA.  *Barnes*, 570 F.3d at 1103.  Likewise, decisions by Meta to remove content created by others from its platforms falls within the heartland of the editorial decision-making protected by the First Amendment.  *See, e.g.*, *Hurley*, 515 U.S. at 575; *Tornillo*, 418 U.S. at 258; *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022).

The protections afforded by Section 230(c)(1) and the First Amendment are not contingent on the alleged motives underlying Meta's decision to remove content posted by others.  Courts have repeatedly held that it is immaterial for Section 230(c)(1) purposes whether the plaintiff claims that Facebook's removal of content was made for allegedly illegitimate reasons.  *See Sikhs for Justice*, 144 F. Supp. 3d at 1095–96 (applying Section 230(c)(1) to bar claims alleging that Facebook's removal of third-party content was motivated by racial discrimination and political pressure); *Fyk*, 808 F. App'x at 598 ("That Facebook allegedly took its actions for monetary purposes" is immaterial because "nothing in § 230(c)(1) turns on the alleged motives underlying the editorial decisions of the provider of an interactive computer service."). The same principle holds in the First Amendment context.  In *Hurley*, an LGBTQ group claimed that the

defendant's refusal to allow the group to participate in a parade violated a Massachusetts anti-discrimination law. 515 U.S. at 561. The Supreme Court emphasized that, even if the parade organizers excluded the group on grounds that would otherwise violate the law, the "general rule of speaker's autonomy," *id.* at 578, means that "[w]hatever the reason[s]" a speaker may have for choosing *not* to repeat speech, that decision is "presumed to lie beyond the government's power to control"—whether the reasons for the choice are good or bad, *id.* at 575.

It is therefore of no moment that plaintiffs claim the conduct was "anticompetitive" and violated the UCL. At no point has the Ninth Circuit ever held that the protections of Section 230(c)(1) dissipate whenever a plaintiff merely characterizes the conduct at issue as "unfair" or "anticompetitive." To the contrary, courts routinely apply Section 230(c)(1) to bar UCL claims, including claims alleging unfair or anticompetitive conduct. *See, e.g.*, *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 932 (N.D. Cal. 2021); *Ginsberg v. Google Inc.*, 2022 WL 504166, at *2, *5 (N.D. Cal. Feb. 18, 2022) (applying Section 230 to bar "violation of the unfair prong of California's UCL"); *Calise v. Meta Platforms, Inc.*, 2022 WL 1240860, at *2, *4 (N.D. Cal. Apr. 27, 2022) (applying Section 230 to bar UCL and tort claims because all claims were "premised on Meta's publication of . . . third-party advertisements"); *Caraccioli v. Facebook, Inc.*, 700 F. App'x 588, 590 (9th Cir. 2017) (affirming application of Section 230 to bar UCL claim); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1121 (9th Cir. 2007) ("The district court's decision [granting] CDA immunity is affirmed as to the unfair competition and false advertising claims . . . ."); *Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 828–30, (N.D. Cal. 2020) (applying Section 230(c)(1) to bar claim for "unfair competition, in violation of California's Unfair Competition Law"); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 836 (2002) (similar).

The D.C. Circuit's decision in *Marshall's Locksmith Service Inc. v. Google, LLC*, 925 F.3d 1263 (D.C. Cir. 2019), is instructive. The plaintiffs in *Marshall's* alleged that Google and other search engines had used their power in the market for search engine services to "flood" their search-engine results with advertisements for "scam locksmiths." *Id.* at 1265. The plaintiffs further alleged that this conduct caused "[l]egitimate locksmith businesses" to suffer "significant economic losses due to competition from scam locksmiths." *Id.* at 1266. Based on this conduct, the plaintiffs asserted a variety of state tort and unfair

competition claims, and Sherman Act claims under both Section 1 and Section 2 of that Act.  *Id.*  Even though the complaint alleged anticompetitive harm in the market for locksmith services, the D.C. Circuit had no problem concluding that the search-engine defendants were entitled to protection under the CDA where the entire basis for liability rested on decisions made by the defendants regarding the publication of third-party advertising content.  *Id.* at 1268–71.

So too here.  As in *Marshall's*, plaintiffs here seek to impose liability on Meta for harms suffered in a market—the online adult-entertainment industry—in which Meta does not compete.  They do so, moreover, through claims that focus entirely on publication decisions that Meta allegedly made: publishing or promoting certain content, while not similarly publishing or promoting other content.  As the D.C. Circuit concluded in *Marshall's*, Section 230(c)(1) bars such claims, despite plaintiffs' attempts to cloak their challenges to Meta's publication decisions in claims of "unfair" trade practices.

Moreover, plaintiffs have not actually pleaded actionable anticompetitive conduct.  As this Court has repeatedly recognized, the California Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 186–87 (1999), supplies the relevant test for "determin[ing] whether a practice was unfair under Section 17200."  *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 953–54 (N.D. Cal. 2009).  *Cel-Tech* requires plaintiffs to plead and prove "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Gutierrez*, 622 F. Supp. 2d at 953–54.  "It is well accepted that 'the antitrust laws . . . were enacted for the protection of competition, not competitors.'"  *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 495 (2011).  "Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws."  *Cel-Tech Commc'ns*, 20 Cal. 4th at 186.  "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1014 (N.D. Cal. 2021).  Indeed, without defining the relevant market, antitrust plaintiffs cannot meet their burden "to prove market power," which "is a threshold consideration in an antitrust case and is the sine qua non of recovery."  *Exxon Corp. v. Super. Ct.*, 51 Cal. App. 4th 1672, 1681 (1997).  And "where an antitrust

plaintiff alleges vertical restraints, facts must be pled showing 'some anti-competitive effect in the larger, interbrand market.'"  *Marsh*, 200 Cal. App. 4th at 495.  "[I]t is plaintiff's burden to make the required showing of a 'substantially adverse effect on competition in the relevant market.'"  *Exxon Corp.*, 51 Cal. App. 4th at 1681.

Plaintiffs have not even attempted to plead these foundational elements of an anticompetitive claim.  Their operative complaint is wholly devoid of allegations establishing market definition, market power, or harm to *competition*.  Nor is this a mere pleading deficiency that can be remedied: Meta does not now, nor has it ever, competed in the market for online adult entertainment, and plaintiffs could not possibly allege that Meta made the alleged publication decisions for the purpose or effect of gaining a competitive advantage in the markets in which it does compete.

## IV.   Meta Is Not Liable For The Alleged Conduct Of Its Employees Under Any Theory Of Liability

Plaintiffs' claims should also be dismissed because they have not pleaded the facts necessary to establish that Meta is liable for the alleged conduct of the employees who allegedly abused Meta's own internal processes.  While plaintiffs now identify three Meta employees ████████████████ ████████  who allegedly received wire-transfer payments, the complaint does not allege that those individuals actually did anything.  The complaint does not allege, for example, that the three individuals themselves took any content-moderation action or directed others to take such action.  The actions of those three individuals are therefore not truly at issue.  Instead, plaintiffs are claiming that some unidentified John Does at Meta placed plaintiffs on internal content-moderation lists designed for terrorist content. Plaintiffs claim Meta is liable for the John Does' conduct under principles of agency liability and vicarious liability, but neither works.

*Agency.*  A principal is liable for the conduct of an agent only when the agent acted with actual or ostensible authority.  *See* Cal. Civ. Code § 2330.  "Actual authority arises as a consequence of conduct of the principal which causes *an agent* reasonably to believe that the principal consents to the agent's execution of an act on behalf of the principal."  *Tomerlin v. Canadian Indem. Co.*, 61 Cal. 2d 638, 643 (1964) (citing Cal. Civ. Code § 2316).  Plaintiffs do not allege any facts showing that the John Does engaged in the alleged scheme with actual authority from Meta.  If anything, plaintiffs allege that these

John Does went rogue by manipulating and corrupting automated processes and databases that Meta had established for purposes of combating terrorism, deploying those methods to attack competitors of an adult-entertainment company, and then "attempt[ing] to cover their tracks" to ensure Meta could not learn of their aberrant behavior. SAC ¶ 88. Those allegations are flatly inconsistent with any argument that the employees were acting with actual authority.

A similar conclusion follows for apparent or ostensible authority. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ. Code § 2317. The "ostensible authority" analysis focuses on the conduct of *the principal* in causing *third parties* to believe that the principal's agent possessed authority to engage in the alleged conduct. *See Mejia v. Cmty. Hosp. of San Bernardino*, 99 Cal. App. 4th 1448, 1456–57 (2002) (ostensible authority established only when a third party's belief that the agent possesses its principal's authority is "generated by some act or neglect of the principal sought to be charged"). Plaintiffs fail to allege how *Meta* did anything to lead third parties to believe that the John Does were authorized to manipulate Meta's content-moderation tools for the purpose of benefitting one adult-entertainment platform over its competitors.

***Vicarious Liability.*** The vicarious-liability analysis differs between plaintiffs' UCL claim and their economic tort claims. Under the UCL, a "defendant's liability must be based on his *personal* '*participation* in the unlawful practices' and 'unbridled control' over the practices that are found to violate sections 17200 or 17500." *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002) (emphasis added). Because of the "personal participation" requirement, the "concept of vicarious liability has no application to actions brought under the unfair business practices act." *Id.* (quoting *People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984)); *see also In re Firearm Cases*, 126 Cal. App. 4th 959, 983 (2005); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 808–09 (9th Cir. 2007). Plaintiffs do not have a single allegation establishing Meta's "personal participation" or "unbridled control" over the alleged conduct of the John Does. To the contrary: plaintiffs' theory appears to be that individual rogue employees abused Meta's systems and processes at the behest of OnlyFans.

For their economic-tort claims, plaintiffs must plead facts sufficient to establish that the John Does' alleged economic torts were "engendered by" their employment with Meta.  They have not done so. Plaintiffs seeking to impute liability to an employer for the tortious conduct of its employee must establish that the conduct was "engendered by or ar[o]se from the work."  *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 298 (1995).  "That the employment brought tortfeasor and victim together in time and place is not enough."  *Id.*   Rather, "the risk of tortious injury must be 'inherent in the working environment' or 'typical of or broadly incidental to the enterprise [the employer] has undertaken.'"  *Id.* In determining whether an employee's conduct was "engendered by" his work, the core inquiry is foreseeability: "Respondeat superior liability should apply only to the types of injuries that . . . 'as a practical matter are sure to occur in the conduct of the employer's enterprise.'"  *Id.* at 299; *see also Hinman v. Westinghouse Elec. Co.*, 2 Cal. 3d 956, 959–60 (1970).  "The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought."  *Lisa M.*, 12 Cal. 4th at 299.  Conduct is foreseeable, and therefore is "engendered by" the employment, only when "an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business."  *Id.*; *see also Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 618 (1975).  "An act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way."  *Lisa M.*, 12 Cal. 4th at 292.  Whether an employee has acted within the scope of employment is a question of law that can be resolved on a motion to dismiss if the necessary facts are absent from the face of the complaint.  *See, e.g.*, *Lusk v. Kellogg*, 2011 WL 13225140, at *2–3 (C.D. Cal. Aug. 10, 2011) (granting motion to dismiss).

Plaintiffs allege that the John Does manipulated a variety of tools for purposes of harming competitors of a subscription-based, adult-entertainment platform.  It is eminently unforeseeable that employees tasked with identifying and eradicating harmful content on social-media apps would manipulate content-moderation tools for purposes of benefiting one adult-entertainment platform over its competitors.  Neither is this conduct the type that "as a practical matter [is] sure to occur in the conduct of" Meta's "enterprise[s]."  *Lisa M.*, 12 Cal. 4th at 299.  Rather, the alleged conduct of the John Does is

"so unusual [and] startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.*

Lisa M. is instructive. The plaintiff there sought to impose vicarious liability on a hospital for a sexual assault by an ultrasound technician. *See* 12 Cal. 4th at 296. But the "technician's decision to engage in conscious exploitation of the patient did not *arise out of* the performance of the examination, although the circumstances of the examination made it possible." *Id.* at 301. "The assault, rather, was the independent product of" the technician's "aberrant decision to engage in conduct unrelated to his duties." *Id.* at 303. *Lisa M.* confirms that plaintiffs' claims fail. As in *Lisa M.*, the alleged conduct of the John Doe defendants was—by plaintiffs' own allegations—the independent product of their "aberrant decision" to accept bribes to harm competitors of an adult-entertainment platform. While the alleged conduct was made possible by their employment and access to the shared databases at issue, plaintiffs have not alleged facts sufficient to establish that the Meta employees' employment was "such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." *Id.* at 299. To the contrary, the alleged conduct is "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* Because the alleged conduct of the John Does was not foreseeable, and further because plaintiffs allege that those employees acted in their own pecuniary interest rather than that of their employer, the complaint does not allege facts sufficient to establish Meta's vicarious liability for the alleged economic torts.

## V. Plaintiffs' Claims Are Subject To And Should Be Stricken Under The Anti-SLAPP Statute

Plaintiffs' claims fall within California's Anti-SLAPP statute and should be stricken. The statute "permits defendants to file a 'special motion to strike' any 'cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.'" *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 (9th Cir. 2017) (quoting Cal. Civ. Proc. Code § 425.16(b)(1)). Plaintiffs' claims arise from Meta's exercise of its First Amendment-protected editorial decision to block, filter, or de-prioritize certain content created and posted by adult-entertainment performers, and plaintiffs' claims therefore "aris[e] from" acts in furtherance of Meta's First Amendment rights. *See supra* Argument § III.

Meta's editorial decisions about disseminating and presenting adult-entertainment content to millions of users on its apps constitutes conduct "in connection" with an issue of public interest under the anti-SLAPP statute.   Cal. Civ. Proc. Code § 425.16(b)(1), (e)(4).   Indeed, this action presents the paradigmatic public-interest case.   Billions of people use Meta's platforms, and they have a substantial interest in Meta's policies and actions of removing or filtering adult-entertainment content.   And the speech at issue—the alleged selective enforcement of Meta's Community Standards against OnlyFans' competitors—is not only "in connection" with that issue of public interest, it is itself an issue of public interest.   Given the wide reach of online platforms, courts have found that "Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest."   *Stackla, Inc. v. Facebook, Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019).   Courts routinely find the public-interest requirement met when "the statement or activity precipitating the underlying cause of action 'involved conduct that could affect large numbers of people beyond the direct participants.'"   *Cross v. Cooper*, 197 Cal. App. 4th 357, 373–74 (2011).   And an action that "directly targets the way a content provider chooses to deliver, present, or publish" content is an issue of public interest, and such "action is based on conduct in furtherance of free speech rights and must withstand scrutiny under California's anti-SLAPP statute."   *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 424–25 (9th Cir. 2014).   Plaintiffs have not carried their burden to establish a reasonable probability of prevailing on the merits of their claims, and the complaint should thus be stricken.

## CONCLUSION

This Court should strike or dismiss the second amended complaint with prejudice.

DATED:  October 11, 2022

KIRKLAND & ELLIS LLP

Respectfully submitted,

/s/ *K. Winn Allen*

K. Winn Allen, P.C. (admitted *pro hac vice*)
Devin S. Anderson (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
winn.allen@kirkland.com
devin.anderson@kirkland.com

Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
United States
Telephone: +1 415 439 1400
Facsimile: +1 415 439 1500
michael.esser@kirkland.com

*Attorneys for Defendants Instagram, LLC,*
*Facebook Operations, LLC, and Meta*
*Platforms, Inc.*

**CERTIFICATE OF SERVICE**

On October 11, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

/s/ *K. Winn Allen*
K. Winn Allen, P.C.