MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
David E. Azar (SBN 218319)
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com

EMERGE LAW GROUP, P.C.
Timothy L. Alger (SBN 160303)
100 Spectrum Center Drive, Suite 900
Irvine, California 92618
Telephone: 949-936-2610
tim@emergelawgroup.com

*Plaintiffs' Attorneys*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN DANGAARD, a/k/a ALANA EVANS; KELLY GILBERT, a/k/a KELLY PIERCE; JENNIFER ALLBAUGH, a/k/a RUBY, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>   v.<br><br>INSTAGRAM, LLC; FACEBOOK OPERATIONS, LLC; META PLATFORMS, INC.; FENIX INTERNATIONAL INC.; FENIX INTERNET LLC; LEONID RADVINSKY, and JOHN DOES 1-10, Defendants.,<br><br>               Defendants. | Case No. 3:22-cv-01101-KAW<br><br>**PLAINTIFFS' OPPOSITION TO FENIX DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br><br>Judge: Hon. William Alsup<br>Location: Courtroom 12, 9th Floor<br>Date: November 16, 2022<br>Time: 11:30 a.m. |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    SUMMARY OF KEY FACTUAL ALLEGATIONS ............................................ 1

III.   LEGAL STANDARD ........................................................................................... 6

IV.   ARGUMENT ........................................................................................................ 7

    A.  Plaintiffs Have Adequately Alleged a Factual Bases for Their Claims ........................... 7

        1.  There are no heightened pleading standards for allegations based on anonymous sources ............................................................................................................... 10

        2.  The BBC article provides factual support that meets the requirements of Rules 8 and 11 ...................................................................................................................... 12

    B.  Plaintiffs Have Responded to the Court's Instructions ................................................... 13

    C.  Plaintiffs Have Stated Claims Against Radvinsky ........................................................ 15

V.    CONCLUSION .................................................................................................... 20

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                                    **Page(s)**

3

*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ....................................................................... 6

4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007) ........................................................ 6

5

*BMA LLC v. HDR Glob. Trading Ltd.*, 2021 WL 949371 (N.D. Cal. Mar. 12, 2021), ......................... 10

6

*Celgard, LLC v. Shenzen Senior Tech. Material Co. (US) Rsch. Inst.*, 2020 WL 7392909, at *5 (N.D.

7

Cal. July 23, 2020)............................................................................................................ 9

8

*City of Livonia Emp.'s Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 178-181 (N.D. Ill. 2014)................ 13

9

*Fernandez v. 23676-23726 Malibu Road LLC*, 2021 WL 5264242, at *2 (C.D. Cal. Sept. 30, 2021) .. 11

10

*In re Autodestk, Inc. Sec. Lit.*, 132 F. Supp. 833, 838-839 (N.D. Cal. 2000) ........................................ 11

11

*In re Dao Systems, Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005).......................................................... 11

12

*In re Northpoint Communications Group, Inc., Sec. Lit.*, 221 F. Supp. 2d 1090, 1097–98 (N.D. Cal.

13

2002)............................................................................................................................. 11

14

*Kamerman v. Steinberg*, 113 F.R.D. 511, 514-15 (S.D.N.Y. 1986) ........................................................ 12

15

*Kovach v. Access Midstream Partners, L.P.*, 2016 WL 1162061, *7 (N.D. Ohio Mar. 23, 2016) ........ 12

16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ................................................................... 12

17

*Mey v. Medgard Alert, Inc.*, 2020 WL 1258639, *3 (N.D. W.Va. Mar. 16, 2020) ............................... 12

18

*N. Star. Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983)................................................. 6

19

*Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1990)..................................................... 6

20

*Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 842 (9th Cir. 2007). ................................. 6

21

*Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ............................................................... 6, 7

22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) .............................................. 10

23

*Twombly*, 550 U.S. at 556.n.............................................................................................................. 6, 11

24

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ................................................... 11

25

*Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801 (E.D. Va. 2007) ..................................................... 13

26

27

28

**Rules**

Fed. R. Civ. P. 8 ..................................................................................................6, 7, 10, 14

Fed. R. Civ. P. 12(b)(6) ............................................................................................6, 15, 18

Fed. R. Civ. P. 8(a) ................................................................................................................7

Fed. R. Civ. P. 9(b) ........................................................................................................7, 12

Fed. R. Civ. P. 11 ................................................................................................................12

1

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

2

**I.   INTRODUCTION**

3

4

5

6

7

8

9

10

11

12

13

14

15

       This Court is familiar with the allegations in this lawsuit, and Plaintiffs' Second Amended Complaint more than satisfies federal pleading requirements.  It contains not just allegations, but also Plaintiffs' factual showing (multiple declarations, including an expert report) to meet their burden under Step 2 of the anti-SLAPP statute.  To summarize the big picture, the complaint alleges: (1) what happened, (2) how it was successful and damaged plaintiffs; (3) why Plaintiffs have a good faith basis to make their core allegations; (4) that Meta Defendants investigated and confirmed the core allegations (per review of documents by an attorney apparently retained by a whistleblower); (5) that Meta Defendants then engaged in a coverup to change the classification codes after the scheme had accomplished its core objective; (6) that there was also a whistleblower report; and (7) that Meta Defendants wrongfully claimed to the press in 2022 that it had investigated and could not confirm the allegations.  The Complaint also alleges the involvement of Fenix, and through its exhibits, supports jurisdiction in California and the alter ego allegations among the three Fenix Defendants.[1]

16

**II.   SUMMARY OF KEY FACTUAL ALLEGATIONS**

17

18

19

20

21

22

23

       Plaintiffs seek to hold accountable entities and individuals that own or control Facebook, Instagram, and the OnlyFans adult-content internet platform.  Plaintiffs allege that the Defendants engaged in a scheme to misuse a terrorist blacklist to suppress certain social media postings by Plaintiffs, including those that referenced/referred to online platforms used by Plaintiffs that compete with OnlyFans. The false classification by the Meta Defendants of OnlyFans' competitors as dangerous organizations, and the Meta Defendants' subsequent classification of Plaintiffs as sympathizers of those "dangerous" competitors – while *not* doing the same to OnlyFans and adult

24

25

26

27

28

---

[1]  The exhibits to the SAC are: <u>Exhibit A</u>, Doc. 74-1, BBC article; <u>Exhibit B</u>, Doc. 74-2, Hochman expert declaration; <u>Exhibit C</u>, Doc. 74-3, List of Platforms targeted; <u>Exhibit D</u>, Doc. 74-4, "Follow the Money" email, filed under seal; <u>Exhibit E</u>, Doc. 74-5, Azar Declaration; <u>Exhibit F</u>, Doc. 74-6, Aaronson Declaration; <u>Exhibit G</u>, Doc. 74-7, Dangaard Declaration; <u>Exhibit H</u>, Doc. 74-8, Gilbert Declaration; <u>Exhibit I</u>, Doc. 74-9, Albaugh Declaration; <u>Exhibit J</u>, Doc. 74-9, Holt Declaration<u>; Exhibit K</u>, Doc. 74-11, Opposition to prior Fenix MTD with alter ego and jurisdictional argument.

entertainers that had only used the OnlyFans platform – caused OnlyFans to drastically enlarge its market share pre-pandemic while its competitors stagnated or declined.

The scheme started with alleged payoffs by OnlyFans Defendants to Meta executives that caused the Meta Defendants to add certain adult content platforms that were competitors of OnlyFans to the Facebook Dangerous Individual and Organization List ("DIO"), even though they were not "dangerous." After that designation, that information appears to have been integrated into the Facebook Threat Exchange, causing the blacklisting, and blocking by the AI system. These secondary effects happened either at Facebook/Instagram directly, and by means of the Global Internet Forum to Counter Terrorist ("GIFCT") shared hash database, which is hosted by Facebook through its Threat Exchange Platform. (*See, e.g.*, Second Amended Complaint (hereinafter "SAC") Ex. B., Hochman Declaration ¶ 10.) This scheme alleged by Plaintiffs is more than just plausible on its face; in fact, Plaintiffs have retained an expert who has backed that up with data. (*Id.*, *e.g.*, ¶¶7-14, 18-23.)

Plaintiffs allege that Fenix Defendants gained an unfair advantage by manipulating hash databases. Given the breadth and scope of the removals, there is no other possible way it could have been done. Plaintiffs have specified the time period in which this took place. Radvinsky acquired OnlyFans and its traffic immediately exploded while its competitors plummeted. This coincided with Meta's dramatic increase in content filtering. Our clients began to have their content removed or hidden form their followers, but OnlyFans remained unaffected. This is further corroborated by the list of thousands of accounts given to us by the anonymous source and the fact that Meta has performed an internal investigation of these accusations. Taken together, all of these allegations plead a plausible claim that Fenix and Meta engaged in an anti-competitive scheme. We know how it happened, but all of the evidence is in Defendants' possession.

Meta's actions do not merely affect the Facebook and Instagram social media services. Inclusion in the terrorist list has negatively affected OnlyFans' competitors and their users on other internet social media networks, many of which cooperate in identifying and blocking dangerous people and entities from using their services through a shared database of hashes and URLs. Plaintiffs allege that Meta, in collaboration with the other Defendants, has engaged in unfair business conduct by the

above-described conduct as to its internal DIO list, and misusing the GIFCT database for the purpose of suppressing traffic to OnlyFans' competitors' sites and harming performers who had supported those sites. Neither the actions of Meta nor the Fenix Defendants involved the exercise of editorial discretion over particular user conduct. Rather, the illegal conduct here is the exclusion of certain people from online services – based on the lie that they were "dangerous," or supporters of dangerous organizations or persons – for the purpose of crushing OnlyFans' competition.

As a result of the public attention to this and related lawsuits, whistleblowers came forward and provided tips to Plaintiffs' counsel about the alleged scheme. Key additional allegations in this Second Amended Complaint are summarized in the Introduction, particularly paragraphs 2 and 10, including the following:

-- The BBC published an article on February 22, 2022, which is attached to SAC as Exhibit A. In the second part of the article (after it discusses the Florida complaint), it summarizes interviews with two anonymous sources, one from an adult performer and one from a platform that was affected. The article reports that the performers' account was flagged with an internal code that is only available to someone in the Facebook engineering department. It states: "BBC News has learned that Camila's Instagram account status - only visible by engineering staff - was changed to 'critical'.  This meant it was not promoted as prominently anymore, leading to reduced visibility." That quote suggests that a person inside Meta provided the BBC with this information because only a person with internal access would know of such code and that it was applied to a particular performer's account.  ***None of those facts were in the Florida complaint reported by the BBC at the top of its article, meaning the BBC had at least 3 additional sources***.  Also, the fact the BBC included the experiences of those two sources (performer and platform), with a reference to a limited access status code at Facebook that reduces visibility, and all of this information is in the same article that breaks the story of about the allegations in this case (as first substantially alleged in an earlier-filed action in Florida), suggests that the BBC editors determined they are all connected. BBC editorial policies require more than one source of corroboration for statements made in an article.

-- Counsel received a listing of more than 21,000 Instagram accounts affected by the scheme that was analyzed by expert Jonathan Hochman, who concluded that the list of 21,000 names had sufficient indicia of reliability and explained why the alleged scheme was plausible and supported by available data. That report is attached to the SAC as Exhibit B.[2]

-- Counsel for Plaintiffs received a separate list of 97 adult content platforms that allegedly were designated as dangerous organizations, and that list is attached to the SAC as Exhibit C (see also SAC ¶ 68). The list includes competitor platforms to OnlyFans, but does not include OnlyFans or the Radvinsky affiliated entities, even though they have substantially similar content as the platforms included in the list. For each of those platforms, counsel received a list of Instagram account names that were purportedly associated with that platform, and thus were essentially deemed to be sympathizers of dangerous organizations. There is a sufficient overlap of these Instagram account names with those analyzed in the Hochman report to provide sufficient indicia of reliability to justify discovery from the Meta Defendants.  This is part of the two data searches that the Court and the parties discussed at the last hearing, where the Court asked if Plaintiffs' counsel if they would pay $35,000 for Facebook to make the inquiry, and Plaintiffs' counsel said yes, and the Court said it would "do some thinking" about it.  (Sept. 8, 2022 Transcript at 43:20-44:8.)

-- Counsel received detailed information about some of the alleged wire transfers related to the scheme from accounts affiliated with a Fenix Defendant to three trust accounts in the Philippines, with the name of the three accounts corresponding to the names of two Facebook executives and the name of a third, high-ranking Facebook executive's young son. That anonymous tip – titled "Follow the money" – is attached to the SAC as Exhibit D and has been filed under seal. The memo line in one of the wire transfers lists the names of some of the platforms identified in Exhibit C that allegedly were wrongfully designated as dangerous organizations.  Banking experts retained by Plaintiffs' counsel

---

[2]  The listing of 21k Instagram accounts remains available to Defendants, as explained in that report and the Azar Declaration ¶14, but Defendants have not yet asked for that list and the Court did not order them filed with the amended complaint (as it did with the list of platforms).  As can be seen from the mistaken filing of the unredacted version of a moving brief – which was obtained and published by a reporter before it was stricken -- it is safer to exchange that list among counsel unless the Court would like a version submitted to it.

have concluded that the level of detail and format of the information had indicia of reliability sufficient to merit further inquiry.

-- Further, Plaintiffs' counsel received a phone call from an attorney apparently retained by a whistleblower who said he reviewed wire transfer records that appear to have included at least some of the same transfers, and they appeared to him to have sufficient indicia of reliability in that they did not appear to be faked. (SAC ¶ 2(c) (middle).)  Plaintiffs conducted a reasonable background inquiry of this attorney and he appears to be very experienced and credible. Plaintiffs are aware of no legitimate reason for payments from bank accounts associated with the Fenix Defendants to those Facebook executives through trust accounts in the Philippines, and such payments are circumstantial evidence of the alleged scheme. The amounts of some of the wire transfers appear consistent with suspicious activity reports and reporting regarding Defendant Radvinsky obtained by Forensic News. (SAC ¶ 84 & n.18.)

-- The same attorney stated that he also reviewed a sample of what appeared to be more than *200 pages of internal Facebook documents* concerning an inquiry into possible abuse of the shared hash database of the GIFCT *that validated the material allegations of Plaintiffs' SAC*, and that the documents appeared to him to have sufficient indicia of reliability in that they appear to have been an internal analysis of the scheme. In other words, *some people at Facebook apparently determined that the material aspects of this scheme occurred*.  (Plaintiffs do not have those documents.)

-- At some point, there was an attempted coverup of the scheme, after some of the datasets were sufficiently corrupted, in which affected performers and platforms were shifted by the Meta Defendants from a dangerous organization (terrorist) designation to a new sexual solicitation category (used also for trafficking).

-- Plaintiffs also have been informed that at some point, a whistleblower made a report to intergityline.facebook.com that overlaps with some of the allegations alleged herein.

-- The existence of at least one internal inquiry was confirmed by a Meta representative, as reported by the BBC. (SAC Ex. A (Meta "added that it had investigated and found no evidence the shared hash database had been abused.").)  Thus, the allegations were of sufficient substance that Meta

claimed to the BCC to have investigated it; otherwise, why would they spend the time and money?  In any event, given the allegations that Meta actually confirmed the scheme in one investigation, and then attempted to cover it up, and then there was a whistleblower report in 2022 – sufficient basis exists to proceed to discover what happened.  Was the original coverup successful enough that different people in Meta investigated and could not verify it?  Or was the denial part of the coverup?  Plaintiffs have alleged sufficient facts to proceed to discovery to determine the truth.

## III.   LEGAL STANDARD

"The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star. Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983). In ruling on a motion to dismiss under Rule 12(b)(6), the Court takes "all allegations of material fact as true and construe(s) them in the lights most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1990). The complaint need not contain "detailed factual allegations," but must allege facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). This standard "does not impose a probability requirement at the pleading stage; *it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement*." *Twombly*, 550 U.S. at 556 (emphasis added). "[W]hen notice of a claim is given that satisfies Rule 8, concerns about specificity in a complaint are properly addressed through discovery devices." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 842 (9th Cir. 2007). "The *Twombly* plausibility standard ... does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).

1

## IV.   __ARGUMENT__

2

Plaintiffs' allegations in the Second Amended Complaint ("SAC") exceed the standard for

3

plausibility under *Twombly* and state a claim to relief under Rule 8. While the Fenix Defendants have

4

abandoned their argument that Plaintiff must meet Rule 9(b)'s heightened pleading standards, they

5

now argue for a higher pleading standard for anonymous sources under a federal statute that does not

6

apply in this case. Plaintiffs have complied with the Court's Order (ECF No. 71) by identifying the

7

adult content platforms included in Meta's DIO (terrorist) lists and added allegations relating to their

8

damages. Finally, as the mastermind and ostensible controller of the Fenix Defendants, Plaintiffs have

9

more than sufficiently alleged Leonid Radvinsky's role in the scheme to suppress the content of

10

OnlyFans' competitors, along with allegations that the Fenix Defendants are alter egos and subject to

11

this Court's jurisdiction.

12

### A.       **Plaintiffs Have Adequately Alleged a Factual Basis for their Claims**

13

The SAC begins by stating that Plaintiffs' allegations are based upon personal knowledge and

14

the investigation of counsel after a reasonable inquiry under the circumstances. (SAC at 1.) Where

15

necessary, Plaintiffs have indicated where their allegations will have evidentiary support after

16

investigation or discovery. (*Id*.) Finally, any of Plaintiffs' allegations on information and belief are

17

solely within the possession and control of Defendants. (*Id*.) This is nothing close to – as the Fenix

18

Defendants erroneously argue – some sort of "global hedge." (ECF No. 79 at 9.) Plaintiffs have

19

provided the Court and Defendants with a great deal of information supporting their claims and have

20

easily cleared the plausibility hurdle established in *Twombly*.

21

22

Defendants attempt to turn Rule 8(a) on its head by requiring Plaintiffs to conclusively prove

23

liability at the pleading stage. The Court has not required this, nor can it. In its Order, the Court

24

correctly stated that the *Twombly* standard does not prevent allegations based on information and

25

belief, especially when the facts are solely within the possession and control of the defendants. (ECF

26

No. 71 at 2.) When that is not the case, allegations based on information and belief must be "based on

27

factual information that makes the inference of culpability plausible." (*Id*. (*quoting Soo Park v.

28

Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)).)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In reviewing the First Amended Complaint, the Court found that "it is not clear that all the allegations on information and belief are based on facts peculiarly within defendants' possession." (ECF No. 71 at 2). Accordingly, where that is the case "plaintiffs need to provide factual information that makes such an inference plausible." (*Id.*) In other words, the Court did not categorically reject Plaintiffs' information and belief allegations, but stated that, where they rely on facts not solely within defendants' control, Plaintiffs must provide additional detail. The SAC does just that.

As also discussed in detail in Plaintiffs' Opposition to the Meta Defendants' motion to dismiss, Plaintiffs have supplemented the SAC with additional allegations that give rise to a plausible inference of Defendants' wrongful anticompetitive conduct. For example, Plaintiffs have included a BBC article that contains information from at least three anonymous sources – someone from Facebook's engineering staff with high level access into the coding of a particular person's account, and one adult content creator and one adult content platform that experienced the same type of unexplained content suppression as Plaintiffs within the same time frame. (SAC ¶¶ 2(a), 9, Ex. A.) Plaintiffs have attached information received from an anonymous source which shows wire transfers between an entity related to Fenix and high-level Facebook executives using a bank in the Philippines. (*Id*. ¶¶ 2(c), 10(b), 77-83.) In one of these wire transfers, the memo line specifically lists adult content platforms that competed with OnlyFans and were harmed by the scheme. (*Id*. ¶ 78, *see also* Ex. C). These wire transfers have also been described in a public news article (*Id*. ¶ 84) and an attorney apparently retained by a whistleblower confirmed them as well and described them as appearing credible (*Id.* ¶ 2(c) (middle)).

Plaintiffs submitted an anonymously submitted list of adult websites that were falsely designated by the Meta Defendants as dangerous organizations. (*Id*. ¶ 2(h), SAC Ex. C.) The competitor website on this list also includes a list Instagram accounts that were associated with each platform as, essentially, sympathizers of them as dangerous organizations (SAC ¶ 68), which overlapped in large part with another list of over 21,000 Instagram handles, also sent to Plaintiffs' counsel anonymously, that had their pages deleted or shadow-banned. (*Id*. ¶¶ 67-68.) Plaintiffs' expert submitted a declaration that he conducted a statistical analysis of the 21,000 Instagram handles, "looking for any indication that it might

8

be fake or forged. I have found no indication that the list is not authentic." (Hochman Decl. ¶ 25; SAC ¶ 68.)

The SAC also details specific information regarding wire transfers to support Plaintiffs' allegations of the Fenix Defendants' and Meta's involvement in the anticompetitive scheme. Those wire transfers were originated by Smart Team International Business Limited ("Smart Team"), an entity with the same physical address as Fenix International Limited Hong Kong, an affiliate of the Fenix Defendants. (SAC ¶ 76.) Those wire transfers were directed to three accounts which corresponded to the names of two Facebook executives and the name of a third Facebook executive's son. (*Id*. ¶ 2.) In one transfer of funds from Fenix International Ltd. to Smart Team, the memo line lists the names of adult entertainment platforms that were included in the Facebook Dangerous Individual and Organization List ("DIO") Spreadsheet. (*Id*. ¶ 78, Ex. C.) These transfers occurred at the same time that Plaintiffs allege the scheme commenced. (*Id*. ¶¶ 82-83.) These payments are consistent with information shared with the Forensic News by an anonymous source. (*Id*. ¶ 84.) Taken together, along with the other allegations summarized above and in the SAC, the allegations support an inference that OnlyFans paid money to Facebook executives *relating to adult entertainment platforms that compete with OnlyFans*.

The cases relied upon by Defendants are readily distinguishable, and thus not applicable. In *Celegard*, "nearly all" of the plaintiff's allegations of patent infringement against one defendant were based on information and belief. *Celegard, LLC v. Shenzen Senior Tech. Material Co. (US) Rsch. Inst*., 2020 WL 7392909, at *5 (N.D. Cal. July 23, 2020). In contrast, the majority of the SAC's allegations are not based on information and belief, and Plaintiffs provide an expert report and other information. Next, *Celegard* plaintiff had access to defendant's publicly available product, whereas much of the facts in this case are not publicly available. *Id*. (contrasting the public availability of products verses confidential methods). Finally, the plaintiff in *Celegard* failed to allege *any* facts demonstrating plausible culpability. *Id*. at *6. Here, in contrast, Plaintiffs have sufficiently alleged Defendants' culpability. (SAC ¶¶ 2(c), 42, 58, 74-84.)

9

*BMA LLC v. HDR Glob. Trading Ltd*., 2021 WL 949371 (N.D. Cal. Mar. 12, 2021), is similarly inapplicable. Like *Celegard*, "most if not all of the allegations that refer to plaintiffs' alleged market manipulation theory are pleaded on information and belief, with no explanation of the basis for such beliefs or of facts that would make their allegations plausible." *Id.* at *9. The *BMA* court also noted that plaintiffs could have alleged some facts but chose not to, such as publicly available time and sales data from third-party cryptocurrency exchanges, even if they did not provide trader identify. *Id.* at *6. Additionally, the BMA Court said that "[m]uch of plaintiffs' purported 'factual information' consists of allegations regarding defendants' and defendants' lawyers' purported conduct in other lawsuits" which "does not help the plausibility of their claims." *Id.* at *6-9. Here, the SAC goes well beyond just pointing to Defendants "motive, means, and opportunity." *Id.* at *9. Plaintiffs have alleged that Meta conducted an internal investigation that validated the scheme, along with the existence of wire transfers between Defendants and high-level Meta employees that were well-positioned to implement the anti-competitive scheme. (SAC ¶¶ 2(c), 74-84.) Plaintiffs have pointed to publicly available data that shows that the OnlyFans adult content platform flourished while its competitors suffered due to content suppression – even though OnlyFans and its competitors host the same type of content, and the adult performers post similar content on the Meta Defendants' social networks. (*Id*. ¶¶ 94-97.) These and other factual allegations (*see id*. ¶¶ 2, 10) are "enough to cross the probability line" and satisfy Rule 8. *BMA LLC*, 2021 WL 949371, at *9.

### 1. There are no heightened pleading standards for allegations based on anonymous sources

Defendants make several arguments to discount Plaintiffs' allegations, and all of them fail.

First, Defendants' argument that there is no case where a court has allowed a claim of tortious interference based on anonymous sources (ECF No. 79 at 12), mischaracterizes the law and the SAC. Plaintiffs' allegations do not rely exclusively on anonymous sources, and a court "must consider the complaint in its entirety" including "documents incorporated into the complaint by reference" when deciding a 12(b)(6) motion (such as the expert report and other declarations submitted as exhibits here). *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).  Plaintiffs have also

explained in the SAC why they believe the information provided by anonymous sources have sufficient indicia of reliability to be the source of their allegations.

Second, there is no case law to suggest that there are special pleading rules for allegations regarding anonymous sources. This is not a PSLRA case, but Defendants cite to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which added additional requirements for pleading securities fraud. *See In re Autodesk, Inc. Sec. Lit*., 132 F. Supp. 833, 838-839 (N.D. Cal. 2000). The Ninth Circuit interprets the PSLRA to require a plaintiff to "provide a list of all relevant circumstances *in great detail*." *In re Silicon Graphics Sec. Lit*., 183 F.3d 970, 984 (9th Cir.1999) (emphasis added). If a plaintiff alleging securities fraud relies on an anonymous source to prove scienter, allegations must be "accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *In re Northpoint Communications Group, Inc., Sec. Lit*., 221 F. Supp. 2d 1090, 1097–98 (N.D. Cal. 2002).

But this is all irrelevant because Plaintiffs have not alleged a PLSRA violation. Plaintiffs need not meet the higher pleading standard for fraud. *In re Dao Systems, Inc*., 411 F.3d 1006, 1014-15 (9th Cir. 2005). Plaintiffs "need only satisfy the ordinary notice pleading standards or Rule 8(a)." *Id*. at 1027 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003)). Plaintiffs' allegations in their SAC satisfy *Twombly* as they provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.n

Additionally, throughout their motion, Defendants improperly raise a number of factual disputes, which are not appropriate on a motion to dismiss. (ECF No. 79 at 11 (asking the Court to weigh the credibility of an anonymous source)); (*Id*. at n.5) (asserting that "Fenix International has never had a bank account with Barclays)); (*Id.* at n.10) (stating that "Fenix International Limited Hong Kong…appears to have no connection to the Fenix entities named in this lawsuit.")). Asking the Court to wade into these factual disputes is improper at the pleading stage. *Fernandez v. 23676-23726 Malibu Road LLC*, 2021 WL 5264242, at *2 (C.D. Cal. Sept. 30, 2021) ("At the pleading stage, a plaintiff need only allege general facts of injury resulting from the defendant's conduct, and on a

motion to dismiss, the court presumes that 'general allegations embrace those specific facts that are necessary to support the claim.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

### 2. The BBC article provides factual support that meets the requirements of Rules 8 and 11

The BBC article filed with the SAC as Exhibit A raises further plausible inferences regarding Plaintiffs' claims against Defendants. That article, based upon an independent investigation, cites more than just statements from Plaintiff Evans and Plaintiffs' counsel, but also contains information from at least three anonymous sources – someone who has access to individual account coding only available to Facebook's engineering staff, and also an adult content creator and a representative of an adult platform who report similar experiences with content suppression that Plaintiffs allege. The BBC is a respected news organization with strict policies for its reporting and use of anonymous sources; its article can be relied upon in stating plausible claims. *See Kovach v. Access Midstream Partners, L.P.*, 2016 WL 1162061, *7 (N.D. Ohio Mar. 23, 2016) ("Courts have held that plaintiffs can rely on news articles from trusted sources to satisfy Rule 9(b) pleading requirements, as well as Rule 11 pre-filing investigation requirements." (*citing Kamerman v. Steinberg*, 113 F.R.D. 511, 514-15 (S.D.N.Y. 1986)); *Mey v. Medgard Alert, Inc.,* 2020 WL 1258639, *3 (N.D. W.Va. Mar. 16, 2020) (approving use of newspaper report at the pleading stage; "Defendants may seek to obtain more information . . . through discovery, and if information is lacking, are free to move for summary judgment. . . Evaluating the veracity of the allegation is not the standard on a motion under 12(b)(6).").

Plaintiffs have not cited to the BBC article to "fill holes" in their complaint, as the Fenix Defendants contend. (ECF No. 79 at 14.) Instead, the BBC article provides further support and validation of the allegations already made. Both anonymous sources stated that they experienced the same harm already articulated by Plaintiffs – namely content suppression and viewer restriction. However, the article stated that: "BBC News has learned that Camila's Instagram account status - only visible by engineering staff - was changed to 'critical'. This meant it was not promoted as prominently anymore, leading to reduced visibility." That quote suggests that the BBC had an inside source that

told them that information, because only someone inside Facebook with appropriate access would know of such code and that it was applied to a particular performer's account." (SAC ¶ 2(a).)

Accordingly, the case cited by Fenix Defendants, *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801 (E.D. Va. 2007), is inapposite. In that case, the plaintiffs heavily relied on a New York Times article's citation to just one anonymous source to allege defendant's liability. *Id.* at 807. Additionally, the single anonymous source was contradicted by the article itself. *Id.* at 805. Those facts are simply not present here. Plaintiffs have alleged the necessary facts to make out plausible claims without relying totally on a single news article or a single source that might remain unknown forever. Defendants' reliance on *City of Livonia*, yet another PLSRA case, is similarly misplaced because the plaintiffs in that case relied entirely upon a single confidential source that they had reason to know was unreliable and failed to make a reasonable inquiry before filing their amended complaints. *City of Livonia Emp.'s Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 178-181 (N.D. Ill. 2014). That is certainly not the situation here.

**B.     Plaintiffs Have Responded to the Court's Instructions**

Contrary to Defendants' claim, Plaintiffs have identified the adult platforms believed to be at issue in this case.  The list of 95 platforms appears in Exhibit C; in addition, examples of the effects on a sample of the platforms appear in SAC ¶ 41, and in Exhibit B, The Hoffman Report ¶¶ 74-82. In addition, each of the Plaintiffs identified the Platforms with which they were associated, and, and stated that these Platforms were affected. (SAC ¶¶ 47, 48, 51; Exhs. G, H, and I.)

Defendants also complain that the SAC discusses but does not contain the list of 21,000 Instagram handles. The Court requested only that the list of Platforms be included in the Complaint not the much longer (and less informative) list of handles. Attaching such a list – which would run over 200 pages – to the SAC would not serve any useful purpose at this time except to risk publication of those names in the media, as occurred accidentally with the three Facebook executives with the filing of the Fenix motion (which a reporter downloaded and published before the filing was withdrawn).   In any event, Plaintiffs have offered Defendants the list since their filing on August 11 upon entry of a protective order or interim confidentiality agreement (SAC Ex. E, Azar Declaration ¶ 14), but

1    Defendants have not asked for it.  Plaintiffs expect that these discussions will be part of the discussions

2    with Defendants about performing an analysis of the data sets as discussed during the hearing before

3    this Court and then in the related state court action before Judge Foiles, in which he directed the parties

4    to meet and confer about the four confirmatory analytical steps discussed, including preparing a

5    database of content from performers to hash and then compare against versions of the GIFCT shared

6    hash database.  *See* Doc. 72-1 (transcript) at 19-21 (counsel discussing the four steps, and then Judge

7    Foiles stating: "I'd like you all to meet and confer as to those . . . four prongs . . . to see if you can

8    work together . . . to put together . . . a mechanism to get this information sooner as opposed to later.")

9         Next, the defendants quibble with the pleadings of each of the three Plaintiffs regarding injury.

10   However, each of the Plaintiffs did plead that they suffered injuries to their businesses because of

11   intermittent exclusion from social media, which resulted in a loss of followers and overall loss of

12   "reach," *i.e.*, their posts were no longer being communicated to individuals who wished to receive

13   them – and who might have shared them with others, typically resulting in more followers and

14   additional traffic to the platforms where Plaintiffs posted adult content. Each also states that they were

15   injured by deletions of posts, and sometimes of accounts, that were not explicable on the basis of the

16   rules of each platform. (*See* SAC ¶¶ 102, 105, 110.) The Complaint also explains the mechanism

17   through which this occurred. (*See* ¶¶ 55-58 and Exhibit B ¶¶ 9-13.)

18        In response, the Fenix Defendants offer quibbles and non sequiturs. For example, they note that

19   Pierce's business was no worse in 2022 than in 2021, an irrelevancy since there is no doubt that

20   Pierce's revenue had decreased in both years compared into 2020, and in any event, Pierce began to

21   feel the effects of blacklisting in 2019. Again, this does not disprove that Pierce suffered injuries, as

22   the SAC clearly pleads that Pierce's social media reach remains well below the level it had reached

23   before the scheme. (SAC ¶¶ 105-07; Ex. H ¶¶ 4-5.) Fenix Defendants assert that Ruby did not provide

24   hard data concerning the number of followers lost, but she clearly pleaded that she was contending

25   with unexplained deletions and loss of distribution of posts to her followers beginning in 2018, and

26   that she has suffered financial loss. (SAC ¶ 110.) This is sufficient pleading of damages under Rule 8.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, Defendants' attempt to advance alternative explanations for Plaintiffs' damages is inappropriate at the pleading stage and misstates Plaintiffs' burden yet again. First, Defendants offer the circular argument that the plausible explanation for Plaintiffs' damages is that they failed "to use a more popular platform." (ECF No. 79 at 16). That is just another way to restate the key allegations of the SAC – that Plaintiffs were harmed because they used adult platforms that competed with OnlyFans. The main point of this lawsuit is that the Defendants engaged in illegal conduct to make OnlyFans "a more popular platform" – indeed, the *dominant* one. OnlyFans was not the more popular platform as the time the alleged scheme started, and the SAC alleges that there is no benign reason to justify the shift in the competitive landscape in favor of OnlyFans at the relevant time period. *See, e.g.,* SAC Ex. F, Aaronson Declaration ¶ 12 ("I am not aware of any market or other normal competitive reason that could have caused network referrals to JFF to decline beginning in early 2019, while in the same period OnlyFans' web traffic was increasing," and then providing a detailed explanation supporting that statement).

Next, even if "market demand" is a plausible explanation for Plaintiffs' damages that could be considered on a motion to dismiss as a matter outside of the complaint – and Plaintiffs do not contend that it is – it is not Plaintiffs' burden to rebut that explanation at the pleading stage. It is Plaintiffs' responsibility at this point to allege plausible claims and nothing more. *Starr v. Baca*, 652 F.3d 1202, 126 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." (emphasis in original)). Defendants' vague, unsupported references to "market demand" are not enough to render Plaintiffs' allegations implausible. Defendants will have every opportunity to advance their own theories as to Plaintiffs' damages, but such efforts are clearly premature at the pleadings stage.

### C.    Plaintiffs Have Stated Claims Against Radvinsky

The Fenix Defendants also argue that Plaintiffs have failed to allege any "additional facts or misconduct pertaining to Mr. Radvinsky." (ECF No. 79 at 11-13.) As an initial matter, the Fenix Defendants never moved to dismiss the claims against Leonid Radvinsky in their original motion to

dismiss, and the Court's order on the original motion to dismiss did not mention anything about those claims, so it's unclear why the Fenix Defendants are moving to dismiss those claims now. In that vein, the Plaintiffs did not need to allege any "additional" facts or misconduct. In any event, Plaintiffs have clearly stated a claim against Radvinsky.

First, the Fenix Defendants wrongly characterize the allegations against Radvinsky as being only that he "must have" participated in the conspiracy because he had something to gain by it. (ECF No. 79 at 11-12). To the contrary, the SAC alleges that Radvinsky was the mastermind behind *all* of the Fenix Defendants and the entire conspiracy at issue. (SAC ¶¶ 2; 18; 40; 42; 55-97). He was not some ancillary player who just happened to have something to gain; he literally directed all of the key overt acts, including the central act of getting OnlyFans' competitors put onto the watchlist. The Fenix Defendants complain that Radvinsky was grouped with Fenix International and Fenix International into "the Fenix Defendants" (which is an implicit acknowledgment that the allegations against the group as a whole are sufficient), but they were grouped like that because Radvinsky controls those entities and acts through them—which is why Plaintiffs alleged alter ego liability (addressed below). There's nothing wrong in many cases with alleging facts against a group of defendants, and that's especially true in a situation like this one where one human defendant is controlling two related entity defendants.

Second, the Fenix Defendants note that Plaintiffs have alleged that Facebook's internal reporting shows a sharp increase in terrorism-related and nudity/sexuality-related content removal shortly before ("just months before") Radvinsky acquired OnlyFans. (ECF No. 79 at 12). They acknowledge that Plaintiffs have alleged that the content suppression and removals began at that point because the conspirators were testing the scheme and preparing to implement it, but they argue that that's "conspiratorial speculation." (*Id.* at 12).  First, the fact that the data suggests that the scheme was tested before the official closing of the Radvinsky acquisition does not mean he is not liable for what is alleged to the be the fuller implementation of the scheme starting in October 2018, along with alleged payments at least well into 2019 and likely beyond.  The SAC is explicit about connecting the scheme and its impacts to Radvinsky's acquisition:  (1) "The scheme appears to have commenced soon after Radvinsky

acquired OnlyFans in October 2018 (¶ 55); "Soon after Radvinsky's acquisition of OnlyFans through his purchase of Fenix, AE Providers that had worked with competitors of OnlyFans, including the Plaintiffs in this Action, suddenly began to experience a drop-off in traffic and user engagement on social media platforms" (¶ 40); and "(i) sudden volume of increased content classification/filtering starting close to October 2018 across multiple online platforms" (¶ 60).

Yet again, the Fenix Defendants demand too much, and there is nothing "speculative" about that allegation—although it's certainly "conspiratorial" *because there was a conspiracy here*. They also completely ignore Plaintiffs' allegation that it is unclear whether the content was posted or removed at the dates listed. (SAC ¶ 55.) The content could have been posted on the dates listed but actually removed later, after Radvinsky acquired OnlyFans. They also ignore that the fact that the process for Radvinsky to acquire OnlyFans didn't occur over one day, so that it would be entirely reasonable for Radvinsky either to exercise control over the business start the scheme months before the acquisition closed, or at minimum, aid and abet it, or use the knowledge of the scheme in deciding to purchase OnlyFans.  Regardless, the SAC focuses on his liability for the period after his acquisition, based on currently available information.

Third, the Fenix Defendants argue that the SAC "contradicts itself" by alleging that the content removals also affected adult performers who appeared on OnlyFans. (ECF No. 79 at 12). They have made this argument before, and Plaintiffs have explained before that it is untrue and nonsensical: the SAC alleges that the content removals affected people who appeared on the sites for the competitors of OnlyFans, even if they *also* appeared on OnlyFans, *but the content removals did not affect people who appeared exclusively on OnlyFans* (or on the sites of Mr. Radvinky's other companies). (SAC ¶¶ 7-8; 42; 56; 92).  So, Instagram accounts that only promoted OnlyFans were not affected.   That the Fenix Defendants keep resorting to this argument highlights their real tactic: not addressing the actual facts stated in pleadings, but spinning every allegation in the light most favorable to them.  It is also worth noting that there may be unintended consequences when you corrupt a data set.  Plaintiffs do not need to prove that OnlyFans knew that some of its performers would be impacted if they had also promoted competitor websites.  It does not matter if they knew that, and Radvinsky figured out that there would

17

be a net gain to his business regardless, or whether it was not expected.  The result was still the same: a shift in the competitive landscape due the scheme, that damaged plaintiffs, the putative class, and competing platforms that relied on referral traffic.

Fourth, Fenix Defendants argue that the new allegations about the wire transfers are somehow not plausible. (ECF No. 79 at 12-13.) But those allegations are very specific and directly tie Radvinsky to the central conspiracy here. (SAC ¶¶ 2; 10; 77.) And those allegations reference not only the Fenix entities, which Radvinsky controls, but they reference Radvinsky personally as well (despite the Fenix Defendants' implication to the contrary). Similarly, the Fenix Defendants attack the SAC's allegation that Radvinsky had control over Smart Team, a Hong Kong-based entity that was involved in the transfers and that shared an office with Fenix International Hong Kong, suggesting—without evidence and without even claiming on the record – that Fenix International Hong Kong is entirely unrelated to Radvinsky or the Fenix Defendants. (ECF No. 79 at 13). That is not how a motion to dismiss works, especially when the Defendants have never actually denied these allegations. In short, the Fenix Defendants' entire argument appears to be that the SAC does not allege that these transfers had *anything at all* to do with Radvinsky and this case, but that is simply untrue, and the Fenix Defendants again try make every possible inference in their own favor, in violation of the Rule 12(b)(6) standard. Finally, the allegations about these wire transfers are cumulative, and the SAC states a claim against Radvinsky even without them.

Fifth, the Fenix Defendants attack Plaintiff's central allegation in this case: that Radvinsky and the other Fenix Defendants gave information to agents of Meta in order to blacklist OnlyFans' competitors, arguing that that allegation is not "plausible." (ECF No. 79 at 13). But Plaintiffs have clearly alleged that concrete and specific fact, which would give rise to liability if true, and they need not do more right now—especially with all of the corroborating facts that Plaintiffs have alleged all over the place, as noted above. Indeed, the Fenix Defendants let their mask slip a little when they write that "Plaintiffs concede that they have no evidence that Radvinsky took any action(s)" and that the SAC lacks "evidentiary support," and when they chastise Plaintiffs for acknowledging that they need discovery. (ECF No. 79 at 13-14). But a motion to dismiss is not the time for *evidence*; what matters is

1
2
3
4

whether there are allegations sufficient to state a claim. The Fenix Defendants' motion presents a master class is applying the wrong standard on a motion to dismiss and pretending that *Twombly* and *Iqbal* say more than they do.  If Plaintiffs' plausible allegations are true, the Radvinsky will be liable to Plaintiffs, and that is all that matters at this point.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

        Finally, the Fenix Defendants argue that the SAC fails to sufficiently allege a veil-piercing theory against Radvinsky. (ECF No. 79 at 14). Their motion references their earlier motion to dismiss on that ground, and it states nothing new, therefore Plaintiffs incorporate by reference their earlier response about that. (ECF No. 45 at  7-8, 16-17.) In short, Plaintiffs have alleged sufficient facts showing alter ego/veil piercing, or alternatively, agency or other vicarious liability principles, that the Fenix entities are shams (SAC ¶¶ 19; 25; 28; 72) and controlled by Radvinsky.  For example, Plaintiffs have alleged, and provided details of their investigations, including that: (1) Radvinsky "allegedly used trusted staff from affiliated entities to perform day-to-day services for OnlyFans," such "as Alec, Katie, and Alex" (e.g., not observing corporate form, and controlling the entity through key trusted staff from other entities); (2) "[d]uring the relevant period, Mr. Radvinsky, was not only the sole owner of OnlyFans through Fenix International, the holding company, but also one of only two 'directors' running it" (which supports direct liability as well, since it is unlikely someone did Radvinsky a multi-billion dollar favor without telling him; (3) Fenix Internet is used to hire and pay people to work for core operational units on the OnlyFans site (meaning Fenix is not just a payment processor for the UK parent entity, as they represented to the Court); (4) Fenix Internet hires them in the U.S. as independent contractors, which is a misclassification, and fails to file 1099s to keep the links hidden.  SAC Ex. E, Doc. 74-5, Azar Declaration ¶¶ 2-12.  Alter ego, and Piercing have been sufficiently alleged, along with sufficient facts to create liability against Radvinsky on agency, aiding and abetting, or other vicarious liability principles as alleged; currently pending jurisdictional discovery is expected to develop further facts about the alter ego allegations as well.

26
27
28

1

**V.**     **CONCLUSION**

2

3

For the foregoing reasons, Defendants' motion should be denied in its entirety.

4

Dated: October 25, 2022                    Respectfully submitted,

5

By: */s/* David Azar

6

7     MILBERG COLEMAN BRYSON
      PHILLIPS GROSSMAN PLLC
8     David E. Azar
      280 S. Beverly Drive, Suite PH
9     Beverly Hills, California  90212
      Telephone: 1-866-252-0878
10    dazar@milberg.com

11    EMERGE LAW GROUP, P.C.
12    Timothy L. Alger
      100 Spectrum Center Drive, Suite 900
13    Irvine, California 92618
      Telephone: 949-936-2610
14    tim@emergelawgroup.com

15
16    *Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 25, 2022, the foregoing was electronically filed with the Clerk

3

of the U.S. District Court, Northern District of California, using the CM/ECF system, which will send

4

notification of such filing to all parties.

5

6

By:/s/ David Azar

7

David Azar
dazar@milberg.com

8

MILBERG COLEMAN BRYSON PHILLIPS

9

GROSSMAN, PLLC
280 South Beverly Dr., Suite PH

10

Beverly Hills, CA 90212
Phone: (866) 252-0878

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28