1  MILBERG COLEMAN BRYSON
   PHILLIPS GROSSMAN PLLC
2  David E. Azar (SBN 218319)
3  280 S. Beverly Drive, Suite PH
   Beverly Hills, California 90212
4  Telephone: 1-866-252-0878
   dazar@milberg.com
5
   EMERGE LAW GROUP, P.C.
6  Timothy L. Alger (SBN 160303)
7  100 Spectrum Center Drive, Suite 900
   Irvine, California 92618
8  Telephone: 949-936-2610
   tim@emergelawgroup.com
9
10 *Plaintiffs' Attorneys*

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

14 DAWN DANGAARD, a/k/a ALANA          Case No. 3:22-cv-01101-KAW
   EVANS; KELLY GILBERT, a/k/a KELLY
15 PIERCE; JENNIFER ALLBAUGH, a/k/a    **PLAINTIFFS' OPPOSITION TO**
   RUBY, on behalf of themselves and all others  **META DEFENDANTS' MOTION TO**
16 similarly situated,                 **DISMISS PLAINTIFFS' SECOND**
                                       **AMENDED COMPLAINT**
17
                        Plaintiffs,
18     v.
                                       Judge: Hon. William Alsup
19 INSTAGRAM, LLC; FACEBOOK            Location: Courtroom 12, 9th Floor
   OPERATIONS, LLC; META PLATFORMS,    Date:  November 16, 2022
20 INC.; FENIX INTERNATIONAL INC.;     Time:  11:30 a.m.
   FENIX INTERNET LLC; LEONID
21 RADVINSKY, and JOHN DOES 1-10,
   Defendants.,
22
23                      Defendants.
24
25
26
27
28

                                   i

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     SUMMARY OF KEY FACTUAL ALLEGATIONS ............................................... 1

III.    LEGAL STANDARD ............................................................................................... 3

IV.     ARGUMENT ............................................................................................................ 3

    A.  Plaintiffs Have Stated Plausible Claims Under *Twombly* .................................... 3

    B.  Plaintiffs Have Pleaded Actionable Injuries ........................................................ 9

    C.  The CDA Does Not Bar Plaintiffs' Claims ......................................................... 10

    D.  The First Amendment Does Not Bar Plaintiffs' Claims ..................................... 13

    E.  Meta is Liable for the Alleged Conduct of Its Senior Employees ..................... 16

        1.   Direct Liability: Agency Theory ................................................................ 16

        2.   Vicarious Liability: Respondeat Superior ................................................. 18

        3.   Ratification ................................................................................................. 20

    F.  The California Anti-SLAPP Statute is Inapplicable ........................................... 21

        1.   Plaintiffs' claims do not arise from protected conduct ............................. 22

        2.   The conduct was not undertaken in connection with a public issue ......... 23

V.      CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                                               **PAGE(S)**

*Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021)................................................................. 10

*PCO, Inc. v. Crhistiansen, Miller, Fink, Jacobs, Glaser, Weil, & Shapiro, LLP,* 150 Cal.App.4th 384,
    393-94 (2007) ........................................................................................................................ 19

*Gamble v. Kaiser Foundation Health Plan, Inc.*, 348 F.Supp.3d 1003, 1024-25 (N.D. Cal. 2018) ...... 23

*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ........................................................................................ 3

*Associated Press v. Labor Board*, 301 U.S. 103, 130-33 (1937)........................................................ 15

*Associated Press v. United States*, 326 U.S. 1, 7 (1945) ................................................................... 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007) ....................................................................... 3

*C.R. v. Tenet Healthcare Corp.*, 169 Cal.App.4th 1094, 1110 (2009) .................................................. 20

*Citizen Publishing Co. v. United States*, 394 U.S. 131, 140 (1969) ................................................... 14

*City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002) ......................................................................... 22

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Marketing, LLC*, 541 F.Supp.3d 1020, 1030
    (C.D. Cal 2021) ..................................................................................................................... 21

*Diamond Resorts*, 541 F. Supp.3d at 1030 ....................................................................................... 22

*DJO Global, Inc. v.* Glader, 2016 WL 11622009 at *8 (S.D. Cal. Dec. 2, 2016) ................................ 15

*Fair Housing Council v. Roommates.com, LLC* ("*Roommates*"), 521 F.3d 1157, 1163-64 (9th Cir.
    2008) ...................................................................................................................................... 11

*Fernandez v. 23676-23726 Malibu Road LLC*, 2021 WL 5264242, at *2 (C.D. Cal. Sept. 30, 2021) .... 6

*FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 139 (2019)....................................................... 21

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) ................................................................... 12

*FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ............................................................. 12

*Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal.App.4th 1388 (2002) ............................. 23

*Gentry v. eBay, Inc*., 99 Cal.App.4th 816, 836 (2002) ....................................................................... 13

*Gevarter v. Maple Ridge Mobile Homes*, 2002 WL 31058040 at *2 (Cal. App. Sept. 17, 2002).......... 17

*Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949)........................................................ 14

*Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 953–54 (N.D. Cal. 2009) ............................... 16

*Heineke v. Santa Clara University*, 2017 WL 6026248, *5-6 (N.D. Cal. 2017).................................... 21

*Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010) ........................................................... 21

*Homeaway*, 918 F.3d at 685-86 ....................................................................................................... 15

*Iglesia Ni Cristo v. Cayabyab*, 2019 WL 3997474 (N.D. Cal. 2019)...................................................22

*Inter Mountain Mortg., Inc. v. Sulimen*, 78 Cal.App.4th 1434, 1442 (2000) ........................................19

*Jane Doe No. 14 v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) ("*Internet Brands*")......10

*Khraibut v. Chahal*, 2021 WL 1164940, at *13 (N.D. Cal. March 21, 2021) .........................................18

*Lisa M v. May Newhall Memorial Hospital*, 12 Cal.4th 291, 296 (1995) ..............................................18

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)...................................................................14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) .......................................................................7

*Marshall's Locksmith Serv. Inc. v. Google*, LLC, 925 F.3d 1263 (D.C. Cir. 2019)............................12

*Mary M. v. City of Los Angeles*, 54 Cal.3d 202 (1991) ........................................................................19

*Metabolife Int'l., Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001)....................................................21

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ...........................................................14

*Montague v. AMN Healthcare, Inc.,* 223 Cal.App.4th 1515, 1521 (2014) ............................................18

*National Society of Professional Engineers v. United States*, 435 U.S. 679, 697 (1978) ....................14

*Navellier v. Sletten*, 29 Cal.4th 82, 89 (2002)......................................................................................22

*NorthBay Healthcare Group, Inc. v. Kaiser Foundation Health Plan, Inc.*, 838 Fed. Appx. 231, 234

   (9th Cir. 2020) .......................................................................................................................................4

*OneLegacy v. City of Monterey Park*, 2019 WL6729723, *3 (C.D. Cal. 2019).....................................21

*Park v. Bd. of Trustees of Cal. St. Univ.*, 2 Cal.5th 1057, 1060 (2017)................................................21

*Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1990)....................................................3

*Penrose Hill, Ltd. v. Mabry*, 479 F.Supp.3d 840, 855 (N.D. Cal. 2020*)* .............................................22

*People v. JTH Tax, Inc.,* 212 Cal.App.4th 1219, 1242 (2013) ..............................................................17

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.App.4th 658, 673

   (2005)..................................................................................................................................................23

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 834-35 (9th Cir.

   2018), *amended*, 897 F.3d 1224 (9th Cir. 2018) ...............................................................................21

*Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73 (1972) .................................................................................20

*Rose v. Seamless Financial Corp.*, 916 F.Supp.2d 1160, 1168 (S.D. Cal. 2013)..................................17

*Rutherford v. Rideout Bank,*  11 Cal.2d 479, 484 (1938) .....................................................................17

*Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016) ........................................................................21

*See Doe v. Twitter, Inc.*, 555 F.Supp.3d 889, 932 (N.D. Cal. 2021) ....................................................12

*Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ....................................................................3

*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ............................................................ 13

*Starr v. Baca*, 652 F.3d 1202, 126 (9th Cir. 2011) ..................................................................... 5

*Stetson v. West Pub. Corp.*, 4567 Fed. Appx. 705, 707 (9th Cir. 2011) ..................................... 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ..................................... 4

*Twombly*, 550 U.S. at 556 ...................................................................................................... 3, 7

*ValueRock TN Properties, LLC v. PK II Larwin Square SC LP*, 36 Cal.App.5th 1037, 1047 (2019) ... 23

*Ventura v. ABM Industries, Inc.*, 212 Cal.App.4th 258, 271-72 (2012) ................................... 20

*Wilbanks v. Wolk*, 121 Cal.App.4th 883, 898 (2004) ............................................................. 22

*Wilson v. Cable News Network, Inc.*, 7 Cal.5th 871, 884 (2019) ............................................ 21

*Zeff v. Greystar Real Estate Partners, Inc.,* 2021 WL 632614, at *8 (N. D. Cal. Feb. 18, 2021) ......... 17

**STATUTES**

Business & Professions Code section 17200 ............................................................................ 23

Cal. Civ. Code § 2307 ............................................................................................................. 20

Cal. Civ. Code § 2317 ............................................................................................................. 17

Cal. Civil Code § 2330 ............................................................................................................ 17

Code Civ. Proc. § 425.16 ................................................................................................... 21, 22

Federal Trade Commission Act, 15 U.S.C. § 45(a) ................................................................. 12

**RULES**

Fed. R. Civ. Pro. 12(b)(6) ................................................................................................ 3, 5, 21

PLAINTIFFS' OPPOSITION TO META DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

2
## I.   INTRODUCTION

3

4        This Court is familiar with the allegations in this lawsuit, and Plaintiffs' Second Amended

5   Complaint more than satisfies federal pleading requirements. It contains not just allegations, but also

6   Plaintiffs' factual showing (multiple declarations, including an expert report) to meet both their

7   pleading burden and also Step 2 of the anti-SLAPP statute. To summarize, the complaint alleges: (1)

8   what happened, (2) how it was successful and damaged plaintiffs; (3) why Plaintiffs have a good faith

9   basis to make their core allegations; (4) that Meta Defendants investigated and confirmed the core

10   allegations (per review of documents by an attorney apparently retained by a whistleblower); (5) that

11   Meta Defendants then engaged in a coverup to change the classification codes after the scheme had

12   accomplished its core objective; (6) that there was also a whistleblower report; and (7) that Meta

13   Defendants wrongfully claimed to the press in 2022 that it had investigated and could not confirm the

14   allegations. The Complaint also alleges the involvement of Fenix, alter ego and other vicarious liability

15   allegations among the three Fenix Defendants.

16
## II.   SUMMARY OF KEY FACTUAL ALLEGATIONS

17        Plaintiffs' Second Amended Complaint ("SAC") sets out detailed facts about the Meta

18   Defendants' involvement in the anti-competitive scheme to blacklist OnlyFans' competitors and force

19   adult content creators to exclusively use the OnlyFans platform – causing OnlyFans to drastically

20   enlarge its market share pre-pandemic while its competitors stagnated or declined.  The SAC includes

21   multiple declarations supporting Plaintiffs' allegations, citations to multiple national and international

22   media reports consistent with Plaintiffs' allegations, and allegations about  a whistleblower report

23   supporting Plaintiffs' allegations, as well as an extraordinary factual support including information

24   about wire transfers of some of the alleged payoffs and an internal investigation at Meta that validated

25   the key allegations of the SAC.

26        As detailed in Plaintiffs' SAC, the scheme included alleged payoffs by OnlyFans Defendants to

27   Meta executives that caused the Meta Defendants to add certain adult content platforms that were

28   competitors of OnlyFans to the Facebook Dangerous Individual and Organization List ("DIO"), even

though they were not "dangerous." After that designation, that information appears to have been integrated into the Facebook Threat Exchange, causing the blacklisting, and blocking by the AI system. These secondary effects happened either at Facebook/Instagram directly, and by means of the Global Internet Forum to Counter Terrorist ("GIFCT") shared hash database, which is hosted by Facebook through its Threat Exchange Platform. (*See, e.g.*, Second Amended Complaint (hereinafter "SAC") Ex. B., Hochman Declaration ¶ 10.) This scheme alleged by Plaintiffs is more than just plausible on its face; in fact, Plaintiffs have retained an expert who has backed that up with data. (*Id.*, *e.g.*, ¶¶7-14, 18-23.)  Taken together, along with the other allegations, Plaintiffs plead a plausible claim that Fenix and Meta engaged in an anti-competitive scheme; further evidence is in Defendants' possession.

Neither the actions of Meta nor the Fenix Defendants involved the exercise of editorial discretion over particular user conduct. Rather, the illegal conduct here is the exclusion of certain people from online services – based on the lie that they were "dangerous," or supporters of dangerous organizations or persons – for the purpose of crushing OnlyFans' competition.

Further, Plaintiffs' counsel received a phone call from an attorney apparently retained by a whistleblower who said he reviewed a sample of what appeared to be more than ***200 pages of internal Facebook documents*** concerning an inquiry into possible abuse of the shared hash database of the GIFCT ***that validated the material allegations of Plaintiffs' SAC***, and that the documents appeared to him to have sufficient indicia of reliability in that they appear to have been an internal analysis of the scheme. In other words, ***some people at Facebook apparently determined that the material aspects of this scheme occurred***.  (Plaintiffs do not have those documents.)

Plaintiffs also allege that at some point, there was an attempted coverup of the scheme, after some of the datasets were sufficiently corrupted, in which affected performers and platforms were shifted by the Meta Defendants from a dangerous organization (terrorist) designation to a new sexual solicitation category (used also for trafficking).  Plaintiffs also have been informed that at some point, a whistleblower made a report to intergityline.facebook.com that overlaps with some of the allegations alleged herein.  According to the FAC, the existence of at least one internal inquiry was confirmed by

a Meta representative, as reported by the BBC. (SAC Ex. A (Meta "added that it had investigated and found no evidence the shared hash database had been abused.").)  Thus, the allegations were of sufficient substance that Meta claimed to the BCC to have investigated it; otherwise why would they spend the time and money?  In any event, given the allegations that Meta actually confirmed the scheme in one investigation, and then attempted to cover it up, and then there was a whistleblower report -- sufficient basis exists to proceed to discover what happened.  Was the original coverup successful enough that different people in Meta investigated and could not verify it?  Or was the denial part of the coverup?  Plaintiffs have alleged sufficient facts to proceed to discovery to determine the truth.

## III.   LEGAL STANDARD

"The Twombly plausibility standard ... does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). In ruling on a motion to dismiss under Rule 12(b)(6), the Court takes "all allegations of material fact as true and construe(s) them in the lights most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1990). The complaint need not contain "detailed factual allegations," but must allege facts sufficient to "state a claim to relief that is plausible on its face." <u>*Ashcroft v. Iqbal*</u>, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556 (emphasis added).

## IV.   ARGUMENT

### A.   Plaintiffs Have Stated Plausible Claims Under *Twombly*

The SAC, including its exhibits, states plausible claims under *Twombly*. Defendants have disputed the allegations in the SAC, contending that there are alternative explanations for the

blacklisting and economic injuries suffered by Plaintiffs, but those objections are irrelevant on a motion to dismiss. *In re Capacitors*, 106 F. Supp.3d at 1063.

Plaintiffs have sufficiently alleged the material details as indicated above, along with when the scheme took place (e.g., SAC ¶ 40), how it worked (e.g., *id.* ¶¶ 55-57), why it is plausible and supported by available data (Hochman Declaration), who was involved (e.g., *id.* ¶¶ 79-84), and how Plaintiffs were damaged (e.g., *id.* ¶¶ 102-103, 108) among other things (see SAC introduction). Defendants' make hyperbolic references to Plaintiffs' allegations as "sensational;" which literally just means that the allegations stand out, as these do. (ECF No. 78 at 15.) But that is not a legal argument, and to the extent Meta argues that it means implausible, that is contradicted by allegations that Meta investigated this scheme (perhaps twice) and confirmed its existence at least once, along with the other allegations supporting plausibility. Clever and unique schemes will always be sensational: who would have expected, as one example, that engineers at Volkswagen would program its emissions system to act differently when being tested? In any event, courts proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *See NorthBay Healthcare Group, Inc. v. Kaiser Foundation Health Plan, Inc*., 838 Fed. Appx. 231, 234 (9th Cir. 2020) ( (quoting *Twombly*, 550 U.S. at 555)). The Court "must consider the complaint in its entirety," including documents incorporated into the complaint by reference – here, Exhibits A-K, consisting of declarations and other evidence. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). The proper focus is whether Plaintiffs have advanced plausible *claims* – and Plaintiffs have done so.

Pursuant to this Court's Order (ECF No. 71), Plaintiffs attached a BBC article which supports the plausibility of some of Plaintiffs claims. (*See* SAC, Ex. A.) That article, based upon independent investigation and adherence the BBC's journalistic standards, starts by discussing an earlier-filed case based on the same allegations in Florida state court. (*Id*.) The article then discusses information from three anonymous sources: someone with inside information about coding on specific accounts available only to some Facebook engineers, and also an adult performer and an adult platform, both with similar experiences to Plaintiffs in this and the related actions. (*Id*.) None of those facts were in the Florida complaint reported by the BBC at the top of its article, meaning the BBC had at least 3

4

1  additional sources.  Defendants' attempts to explain the article away and convince the Court to dismiss

2  this lawsuit should be rejected.

3      Defendants argue that the "most obvious" explanation for the article's reported complaints

4  about the removal of content and accounts on Instagram is that Meta was enforcing its Sexual

5  Solicitation Community Standard. (ECF No. 78 at 17.) This "obvious" explanation is not found

6  anywhere in the BBC article, and in fact Meta *declined* to provide BBC with that explanation. (SAC,

7  Ex. A.) It also overlooks the fact that the SAC alleges that performers exclusively associated with

8  OnlyFans did not experience the same content suppression, even though OnlyFans was posting similar

9  content. (*Id*. ¶ 91; *see also id.* Ex. F ¶ 12.) Meta's argument also ignores the fact that non-nude

10  mundane images were also deleted, indicating the removals had zero to do with Instagram sexual

11  standards. In any event, on a motion to dismiss, the Court's concern is whether the SAC's claims are

12  plausible, not whether each allegation is "most obvious." It is curious that the Meta Defendants make

13  that particular argument given that the SAC alleges that Meta attempted to coverup the DIO version of

14  the scheme after it confirmed is existence by shifting it to the new sexual solicitation category.  SAC ¶

15  2(e), 10(d) and 89.

16

17      Moreover, Meta's contentions about the application of its sexual standards is really a factual

18  counterargument, which is improper. It is Plaintiffs' responsibility at this point to allege plausible

19  claims and nothing more. *Starr v. Baca*, 652 F.3d 1202, 126 (9th Cir. 2011) ("If there are two

20  alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which

21  are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's

22  complaint may be dismissed only when defendant's plausible alternative explanation is so convincing

23  that plaintiff's explanation is *implausible*." (emphasis in original)).

24      It actually is Meta's alternative explanation that is implausible, because entertainers that

25  exclusively used the OnlyFans platform for their adult content would have been affected similarly to

26  Plaintiffs, but were not, as Plaintiffs allege.

27      Additionally, the BBC article doesn't "undermine" anything in the SAC, as Meta contends, but

28  rather bolsters Plaintiffs' allegation of both coverup and ratification by Meta Defendants, supporting

liability. The article reports on Meta's self-serving claim that it "investigated and found no evidence the shared hash database had been abused." (SAC, Ex. A.)  How many defendants admit their wrongdoing in the first instance? How many times did Lance Armstrong deny doping ? If a denial to the press was sufficient to dismiss a plausible complaint, it would turn Rule 8 on its head and require plaintiffs to conclusively prove liability prior to discovery. Moreover, Plaintiffs allege that Meta validated the claim with an internal investigation, based on the review of Meta documents by an attorney who represents someone who has those documents. Meta's claim that there was an investigation confirms the plausibility and raises more questions about Meta's conduct than it settles.

The SAC also details specific information regarding wire transfers to support Plaintiffs' allegations of Meta's involvement in the anticompetitive scheme. Those wire transfers were originated by Smart Team International Business Limited ("Smart Team"), an entity with the same physical address as Fenix International Limited Hong Kong. (SAC ¶ 76.) Those wire transfers were directed to three accounts which corresponded to the names of two Facebook executives and the name of a third Facebook executive's son. (*Id*. ¶ 2.) In one transfer of funds from Fenix International Ltd. to Smart Team, the memo line lists the names of AE platforms that were included in the DIO Spreadsheet. (*Id*. ¶ 78, Ex. C.) These transfers occurred at the same time that Plaintiffs allege the scheme commenced. (*Id*. ¶¶ 82-83.) These payments are also consistent with information shared with the Forensic News by an anonymous source. (*Id*. ¶ 84.) Taken together, these allegations support an inference that OnlyFans paid money in the Philippines to Facebook executives *relating to AE platforms that compete with OnlyFans*.

Citing no law at all, Defendants now improperly argue that the Court should disregard these allegations as unreliable. (ECF No. 78 at 18-20.) Plaintiffs amended their complaint to include information regarding the wire transfers pursuant to this Court's Order, "to support reasonable inferences of misconduct" and that is what these allegations do. (ECF No. 71 at 1.) Plaintiffs also explain that they showed the information to banking experts, and also that they were contacted by an attorney who says he saw wire transfer records that appear genuine. By asking the Court to find the wire transfer allegations unreliable, Defendants are improperly asking the Court to weigh evidence.

*Fernandez v. 23676-23726 Malibu Road LLC*, 2021 WL 5264242, at *2 (C.D. Cal. Sept. 30, 2021) ("At the pleading stage, a plaintiff need only allege general facts of injury resulting from the defendant's conduct, and on a motion to dismiss, the court presumes that 'general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

*Twombly* states that a conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The SAC does that. The BBC article was based on an independent investigation that corroborates some of the SAC's allegations. (SAC ¶¶ 2(a), 9.) A Radvinsky-affiliated entity sent wire transfers, naming websites that would later be harmed by the scheme, to Facebook executives at the same time the scheme went into effect. (*Id.* ¶¶ 2(c), 10(b), 77-84.) These three wire transfer recipients were well-positioned to direct that data be entered into the DIO list/Threat Exchange or the GIFCT. (*Id.* ¶¶ 81-83.) Plaintiffs have included a list of adult websites harmed by the scheme and Plaintiffs were able to verify that the websites they contracted with on that list were affected by the scheme. (SAC Exhs. C, G, H, and I.) Plaintiffs have also reported that a whistleblower made an internal report at Facebook, corroborating many of Plaintiffs' allegations. (*Id.* ¶ 2(f).) Accordingly, the SAC alleges "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

Exhibit C to the SAC is an anonymously submitted list of adult websites that were allegedly falsely designated as dangerous organizations, which included Instagram account names associated with each of those platforms as deemed to be providing praise, substantive support, or representation of them (SAC 113, 118(e), 118(g)). The names on this list were also found on another list of over 21,000 Instagram handles, also sent to counsel anonymously, which were labelled "dangerous individuals" and which had their pages deleted or shadow-banned. (*Id.* ¶¶ 67-68.) Plaintiffs' expert submitted a declaration that he conducted a statistical analysis of the 21,000 Instagram handles and concluded that it could not be a forgery. SAC Ex. B, Doc. 74-2, ¶ 68 (Hochman Declaration).

Plaintiffs have also identified the adult platforms believed to be at issue in this case. The list of 97 platforms appears in Exhibit C to the SAC; in addition, examples of the effects on a sample of the

platforms appear in SAC ¶ 41, and in Exhibit B, The Hochman Declaration ¶¶ 74-82.  In addition, each of the Plaintiffs identified the Platforms with which they were associated, and, and stated that these Platforms were affected. (SAC ¶¶ 47, 48, 51; Exhs. G, H, and I.) Defendants complain that the SAC does not contain one of "the submission[s] from the tipster" – a list of 21,000 Instagram handles. (ECF No. 78 at 21-22.)  The Court requested only that the list of Platforms be included in the Complaint – not the much longer (and less informative) list of 21,000 handles discussed at the hearing. (ECF No. 71 at 3.)  Plaintiffs have offered Defendants that list since August 11 upon entry of a protective order or interim confidentiality agreement (SAC Ex. E, Azar Declaration ¶ 14), but Defendants have not asked for it.[1]  Plaintiffs can file it if the Court requests.[2]

In *Twombly*, the complaint "contained allegations of parallel conduct that were accompanied by nothing more than naked and conclusory assertions that an anti-competitive agreement had been made." *Stetson v. West Pub. Corp.*, 4567 Fed. Appx. 705, 707 (9th Cir. 2011). Here, the SAC sets out detailed facts about the Meta Defendants' involvement in the anti-competitive scheme to blacklist OnlyFans' competitors and force adult content creators to exclusively use the OnlyFans platform.

In the SAC, Plaintiffs allege that Radvinsky's acquisition of the OnlyFans website coincided with a dramatic rise in content suppression of OnlyFans' competitors' platforms and content creators that used those competitor platforms. (SAC ¶ 40.) This scope and breadth of content removal and suppression could not be performed by human moderators, but by computer algorithms that filter content. (*Id*. ¶ 41.) At that time, the only automated process capable of performing this was Threat Exchange and the GIFCT. (*Id*.) While its competitors were being effectively cut off from consumers, OnlyFans flourished – even though OnlyFans' performers linked to the very same adult content that

---

[1]  Plaintiffs expect that the exchange of data will be part of the discussions with Defendants about performing an analysis of the data sets as discussed during the hearing before this Court and then in the related state court action before Judge Foiles, in which he directed the parties to meet and confer about the four confirmatory analytical steps discussed, including preparing a database of content from performers to hash and then compare against versions of the GIFCT shared hash database.  *See* Doc. 72-1 (transcript) at 19-21 (counsel discussing the four steps, and then Judge Foiles stating: "I'd like you all to meet and confer as to those . . . four prongs . . . to see if you can work together . . . to put together . . . a mechanism to get this information sooner as opposed to later.").

[2]  As can be seen from the mistaken filing of the unredacted version of one of the recent motions to dismiss – which was obtained and published by a reporter before it was stricken -- it is safer to exchange that list among counsel unless the Court would like a version submitted to it.

Meta asserts violated its standards. This cannot be explained by market forces, but rather an anti-competitive scheme by the Fenix and Meta Defendants. (*Id.* ¶¶ 10(f); 58.) Plaintiffs' SAC is nothing close to "a formulaic recitation of the elements of a cause of action" that would fail the *Twombly* standard. 550 U.S. at 555.

> **B.**    **Plaintiffs Have Pleaded Actionable Injuries**

The Meta Defendants also contend that Plaintiffs have insufficiently pleaded that they were injured by the actions alleged in the SAC. (ECF No. 78 at 23.) They are wrong.

As an initial matter, the Court need not resolve whether restitution is available as a remedy for deprivation of profits in the unusual circumstances of this case, because it cannot be the basis for dismissal of any part of the SAC.  Only the state unfair competition claim (SAC ¶¶ 135-45) is limited to equitable relief, and the SAC properly seeks injunctive as well as monetary relief. (SAC, Relief Demanded, ¶¶ b, g, h and i.) Moreover, monetary relief is unquestionably available if Plaintiffs are able to prove their entitlement to relief for Counts I and II. (SAC ¶¶ 123-29 (tortious interference with contract)); 130-34 (intentional interference with contractual relations).)

The Meta defendants quibble with the pleadings of each of the three plaintiffs regarding injury. However, each of the plaintiffs plead that they suffered injuries to their businesses because of intermittent exclusion from social media for, loss of followers, and loss of "reach," so that their posts were no longer being communicated to individuals who wished to receive them. The SAC also explains the mechanism through which this occurred. (SAC ¶¶ 55-58 and Exhibit B ¶¶ 9-13.) In response, the Meta Defendants offer quibbles and non sequiturs. For example, they assert Ms. Evans was able to increase her number of followers in 2021, although she was not able to communicate with them due to the blacklisting. Even if she were no longer suffering any detrimental effects from blacklisting by 2021, Evans would still be entitled to recover for lost profits in the previous two years. Similarly, the Meta defendants argue that Pierce's revenue is beginning to recover from the low point that it reached in 2021, although it remains well below the level of 2020 and earlier years. Again, this does not disprove that Pierce suffered injuries, as the allegations clearly plead that Pierce's social media reach remains well below the level it had reached before the scheme. (SAC ¶¶ 105-07; Ex. H ¶¶

9

4-5.) And all three Plaintiffs clearly plead the causal mechanism that caused their declining revenue: They were unable to communicate effectively with their customers.

### C.        The CDA Does Not Bar Plaintiffs' Claims

Meta argues that Section 230 of the CDA and the First Amendment bar Plaintiffs' claims because, supposedly, all of the allegations relate merely to innocent content moderation decisions by Meta. (ECF No. 78 at 16-21.) This argument is largely identical to the argument that Meta made in its first motion to dismiss, and so Plaintiffs incorporate by reference their opposition to that motion. (ECF No. 43 at 10-17). The Court gave Meta a final chance to submit supplemental authority regarding the CDA and anti-competitive conduct (ECF No. 69, 70).  None of Meta's cases involved anything close to the issue here -- a scheme alleged between the interactive computer service and another entity that was designed to harm the other entity's competitors.  Instead, the other cases cited by Meta in its supplemental brief are "standard fare" where plaintiffs are unhappy about user postings, or removals, and they contend that the interactive computer service engaged in unfair business practices by exercising its discretion to allow or remove the user postings.

The CDA does not require dismissal because: (1) under section 230(c)(1),[3] Plaintiffs are not seeking to hold Meta liable for any speech by its users, rather they are seeking to hold Meta liable for its *own conduct*; and (2) under 230(c)(2), the SAC clearly alleges that Meta did not act towards Plaintiffs in "good faith" when it removed certain user content.

Section 230(c)(1) "protects websites from liability for material posted on the website by someone else."  *Jane Doe No. 14 v. Internet Brands, Inc.*, 824 F.3d. 846, 850 (9th Cir. 2016) ("*Internet Brands*"). At issue here is Meta's *own business conduct* and its *own content* (placing non-terrorists on its internal DIO list to advance the interests of the Fenix Defendants). That makes Section 230(c)(1) unavailable. It is Meta's act of falsely designating that is at issue. *See, e.g., Lemmon v. Snap, Inc*., 995

---

[3] When it comes to the CDA, and as it did before, Meta focuses only on section 230(c)(1), even though section 230(c)(2) is the provision that is most appropriately applied here, if the CDA is implicated at all. Meta probably avoids discussing section 230(c)(2) because it requires proof by Meta of "good faith" behavior relating to user content – which would be a factual issue. Plaintiffs have clearly alleged lack of good faith here.

F.3d 1085, 1093 (9th Cir. 2021) (because plaintiff "seek[s] to hold Snapchat liable for its own conduct, principally for the creation of the Speed Filter, § 230(c)(1) immunity is unavailable").

The legal duty that is being sued over is *the intentional suppression of competition*, not editorial choices to allow or remove particular postings by third parties. The Ninth Circuit made crystal-clear in *Fair Housing Council v. Roommates.com, LLC* ("*Roommates*"), 521 F.3d 1157, 1163-64 (9th Cir. 2008) (*en banc*), that it was "the intent of Congress to preserve the free-flowing nature of Internet speech and commerce *without unduly prejudicing the enforcement of other important state and federal laws.*" *Id*. at 1175 (emphasis added). Accordingly, the Ninth Circuit allowed claims alleging that a website violated fair housing laws to proceed because the online service's questions, filtering and search functions materially contributed to the allegedly unlawful content. Congress, the court said, "didn't intend to prevent the enforcement of all laws online." *Id.*

That enforcement of laws of general applicability might have a downstream effect on an online service's hosting of user-created content makes no difference. In *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), the Ninth Circuit rejected the contention by online booking services that the CDA preempted an ordinance regulating short-term rentals. That the ordinance might compel the services to remove listings posted by users was "not 'inconsistent' with the CDA, and is therefore not expressly preempted by its terms." *Id*. at 683. Section 230 could not be read as rendering "unlawful conduct 'magically . . . lawful when [conducted] online,' and therefore 'giv[ing] online businesses an unfair advantage over their real-world counterparts.'" *Id.* (quoting *Roommates*, 521 F.3d at 1164-65, n.15).[4]

---

[4] Earlier this year, Judge Orrick declined to dismiss claims brought under the state Unfair Competition Law and the Consumers Legal Remedies Act alleging that a gaming site incentivized minors to purchase items for their avatars and then deleted the items, thereby causing more purchases and more profits. *Doe v. Roblox Corp*., 2022 WL 1459568 (N.D. Cal. May 9, 2022). The claims "do[] not seek to treat Roblox as a publisher or speaker of the user-generated content. Liability would instead attach for Roblox's own failure to disclose that it can delete previously purchased items with no warning." *Id.* at *8-9. In another recent case, Judge Orrick refused to dismiss UCL and right-of-publicity claims alleging that Spokeo misappropriated the identities of real people to market its information aggregation service. *Kellman v. Spokeo, Inc*., 2022 WL 1157500 (N.D. Cal. April 19, 2022). "Spokeo is not alleged to merely host *user-generated* content, it is alleged to actively take content from other sources, curate it, and upload it to its site in a novel configuration for repurposed uses." *Id.* at *13 (original emphasis).

11

Consistent with the statute's goals, courts have refused to allow those who operate websites from using the CDA to give them cover for improper business tactics. The Tenth Circuit held in *FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009), that an online service that solicited and sold confidential telephone records was not immune under Section 230(c)(1). Plaintiffs' allegations in this litigation concern activity that is difficult to distinguish from that in which was considered an unfair practice under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). Similarly, in *FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016), the Second Circuit held that the defendant was not entitled to immunity under Section 230 because of its participation in creation and dissemination of deceptive advertisements disguised as news articles.  That the defendant was an interactive computer service that used third-party content made no difference.  *Id.* at 176-77 ("LeadClick is being held accountable for its *own* deceptive acts or practices—for directly participating in the deceptive scheme.").  Similarly here, Defendants are accused of creating the unlawful content – a corrupted DIO that was used to advance the interests of OnlyFans and its owners and injure Plaintiffs, other performers, and adult content platforms that compete with OnlyFans.

Meta argues that courts "routinely apply Section 230(c)(1) to bar UCL claims, including claims alleging unfair or anticompetitive conduct." (ECF No. 78 at 19). But none of the cases cited by Meta involved claims against an online platform for its own unfair or anticompetitive conduct. Meta's main case, *Marshall's Locksmith Serv. Inc. v. Google*, LLC, 925 F.3d 1263 (D.C. Cir. 2019), is inapplicable to this situation.  It accused Google of including scam websites in its search results – i.e., not sufficiently policing its search engine.  The facts fall squarely with the protection of Section 230, and dismissal was appropriate.  The rest of their cases do not involve conduct by the online service, but the speech of users.  None of them involved a scheme alleged between the interactive computer service and another entity that was designed to harm the other entity's competitors.  Instead, the other cases cited by Meta are "standard fare" where plaintiffs are unhappy about user postings, or removals, and they contend that the interactive computer service engaged in unfair business practices by exercising its discretion to allow or remove the user postings.  *See Doe v. Twitter, Inc.*, 555 F.Supp.3d 889, 932 (N.D. Cal. 2021) (claim that Twitter was liable for pornographic content posted by a user); *Ginsberg v.*

*Google Inc*., 2022 WL 504166, at \*2, \*5 (N.D. Cal. Feb. 18, 2022) (claim that Google was liable for terrorist and racist app created by a user); *Calise v. Meta Platforms, Inc*., 2022 WL 1240860, at \*2, \*4 (N.D. Cal. Apr. 27, 2022) (claim that Meta was liable for advertisements created by users); Caraccioli v. Facebook, Inc., 700 F.App'x 588, 590 (9th Cir. 2017) (claim that Facebook was liable for private images and videos posted by a user); Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1121 (9th Cir. 2007) (claim that web hosting company was liable for stolen images posted by user); *Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 828–30, (N.D. Cal. 2020) (claim involving a user's video and whether defendant was liable for that video); *Gentry v. eBay, Inc*., 99 Cal.App.4th 816, 836 (2002) (claim that eBay was liable for fake memorabilia posted and sold by users). [5]

### D.  The First Amendment Does Not Bar Plaintiffs' Claims

The United States Supreme Court has held, repeatedly, that the First Amendment does not protect unlawful restraint of trade. The Court has distinguished between "restrictions on protected expression," which are subject to First Amendment scrutiny, and "restrictions on economic activity or, more generally, on nonexpressive conduct," which do not ordinarily implicate the First Amendment. *Sorrell v. IMS Health Inc*., 564 U.S. 552, 567 (2011).

Thus, the First Amendment does not protect anti-competitive conduct such as that alleged in this lawsuit. "The fact that [a] publisher handles news while others handle food does not . . . afford the publisher a peculiar constitutional sanctuary in which he can with impunity violate laws regulating his business practices." *Associated Press v. United States*, 326 U.S. 1, 7 (1945). The Supreme Court rejected

---

[5] California appellate courts have followed the Ninth Circuit's lead and refused to apply Section 230 where the defendant is alleged to have violated laws that are independent of liability that might arise from republication of user-generated content. In *Bolger v. Amazon.com, LLC*, 53 Cal.App.4th 431 (2020), the Court of Appeal held that the CDA did not bar strict product liability claims against an online marketplace. The plaintiff's claims "are based on Amazon's role in the chain of production and distribution of an allegedly defective product," not its publication of third-party listings. *Id.* at 465. In *Lee v. Amazon.com, Inc*., 76 Cal.App.4th 200 (2022), the Court of Appeal refused to dismiss claims that Amazon failed to include Prop 65 warnings on third-party postings for skin-lightening face creams allegedly containing mercury. The warning requirement was not inconsistent with and preempted by the CDA, the court said; "imposing liability on Amazon for failing to comply with its own, independent obligations under Proposition 65 does not require treating Amazon as the publisher or speaker of third-party sellers' content." *Id*. at 259-60.

---

AP's argument that it was exempt from antitrust enforcement under the First Amendment because publishers had "pooled their economic and news control power," and this was indistinguishable from other combinations to restrain trade in such industries as the sale of tiles, enameled iron ware, lumber, women's clothes, or motion pictures.  *Id.* at 18-19.

Particularly valuable in *Associated Press* is the discussion majority opinion by Justice Black of how the Sherman Act actually *advanced* First Amendment interests:

> The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary.  That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society.  Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. . . . Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. . . . *The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity*.

*Id.* at 20 (emphasis added).

In *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), the Supreme Court upheld an injunction against a newspaper publisher that refused to publish ads by businesses who also advertised on a local radio station. The district court "found expressly that the purpose and intent of this procedure was to destroy the broadcasting company. The court characterized all this as 'bold, relentless and predatory commercial behavior.'" *Id*. at 148-49. Like Meta, the "publisher claim[ed] a right as a private business concern to select its customers and to refuse to accept advertisement from whomever it pleases." *Id*. at 155. The Supreme Court flat-out rejected this defense: "The right claimed by the publisher is neither absolute nor exempt from [antitrust] regulation." *Id.*; *accord Citizen Publishing Co. v. United States*, 394 U.S. 131, 140 (1969). "'The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity.'" (*quoting Associated Press*); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 697 (1978) ("The First Amendment does not 'make it . . . impossible ever to enforce laws against agreements in restraint of trade.'" *Id*. at 697 (*quoting Giboney v. Empire Storage & Ice*

*Co.*, 336 U.S. 490, 502 (1949)).

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), and the other cases cited by Meta are completely inapposite. The watershed *Tornillo* decision rejected a law stripping newspapers of the right to decide what they want to publish in their news pages about political races. This lawsuit does not involve an unconstitutional statute or ordinance imposing government control over privately owned media, triggering strict scrutiny under the First Amendment. Rather, this lawsuit alleges that Meta has abused a blacklist used by numerous online providers to advance the economic interests of its co-defendants, and to crush its codefendants' competitors. This lawsuit is all about "nonspeech, nonexpressive conduct" that does not implicate a private entity's right to publish under the First Amendment. That Meta is in the online media business, and compliance with generally applicable laws (such as those prohibiting unfair business practices) might have an incidental effect on speech, does not require First Amendment scrutiny. *Homeaway*, 918 F.3d at 685-86; see also *Associated Press v. Labor Board*, 301 U.S. 103, 130-33 (1937) (rejecting argument that news organization was protected by the First Amendment for discharging an employee for union activity; "[t]he publisher of a newspaper [has] no special immunity from the application of general laws").

Finally, in a new argument that it never made before, Meta argues that Plaintiffs have "not actually pleaded actionable anticompetitive conduct" under the "unfairness" prong of the UCL (ECF No. 78 at 28-29. As an initial matter, Meta ignores that Plaintiffs have alleged a violation of the "unlawful" prong of the UCL as well.[6] (SAC ¶ 236.) *DJO Global, Inc. v.* Glader, 2016 WL 11622009 at \*8 (S.D. Cal. Dec. 2, 2016) ("considering the adequately pled tortious interference claims, the Court concludes that these claims are sufficient to provide a basis for alleging "unlawful" and "unfair" conduct under the UCL"). Anyhow, despite the clear nature of the conspiracy alleged here, Meta asserts that the UCL unfairness claim fails because Plaintiffs have failed to allege what the relevant market is or otherwise failed to allege the specific particulars of an actual antitrust claim. (ECF No. 78 at 28-29). That is demanding way too much at the motion to dismiss stage. First, under *Cel-Tech*, a

---

[6] The primary case cited by Meta, *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187, 973 P.2d 527, 544 (1999), explicitly noted that its holding did not apply to claims by consumers or claims by competitors under the "unlawful" or "deceptive" prongs of the UCL.

plaintiff need not allege (or even later establish) a full-blown anti-trust claim; rather, alleging (and showing later) a violation of the "policy or spirit" of the antitrust laws or activity that "significantly threatens or harms competition" is enough. *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 953–54 (N.D. Cal. 2009). Plaintiffs have clearly done that here: it's hard to imagine a clearer or more anti-competitive conspiracy—one that violates the "policy or spirit" of antitrust law or "threatens competition"—than the one alleged here. Meta is wrong that Plaintiffs must allege all of the elements of an actual antitrust case.

Second, even if Plaintiffs were somehow obligated to allege statutory antitrust causes of action, they have alleged that Meta and the Fenix Defendants wrongly used their market power to cause OnlyFans to corner the market (which is, roughly, the market for amateur adult videos created in the OnlyFans-like space, which is so narrow that "OnlyFans" is now often used as a shorthand for that space). (SAC ¶¶ 1; 7; 38; 63.) That is sufficient at this stage.[7] Again, the scheme alleged here is clear and clearly anti-competitive; the alleged injury here was not just to Plaintiffs, but to the entire market for adult online services similar to those of OnlyFans. Meta can claim that the allegations are false (although it hasn't done so), but it can't credibly claim that the allegations don't establish "unfairness" under the UCL if they are indeed true.

### E.   Meta is Liable for the Alleged Conduct of Its Senior Employees

The Second Amended Complaint properly pleads that Meta is directly and vicariously liable for the actions of its agents and employees, and is also liable under the law of ratification. (*E.g.*, SAC ¶¶ 24, 125 ("Meta and its subsidiaries are vicariously liable for the acts of their agents and employees enumerated in this Complaint as the tortious acts of its employees arose out of and are engendered by their employment, are directly liable following the principle of *respondeat superior*"; "Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts of tortious

---

[7]  The cases cited by Meta do not suggest to the contrary. *See Epic Games, Inc. v. Apple Inc.*, 559 F.Supp.3d 898, 1014 (N.D. Cal. 2021) (holding after bench trial); *Exxon Corp. v. Superior Court*, ]51 Cal.App.4th 1672, 1676 (1997), as modified on denial of reh'g (Feb. 13, 1997) (holding on summary judgment).

interference undertaken by their agents and employees. . . because their participation in the scheme arose from and was engendered by their employment and /or association with these Defendants.”))

### 1.   Direct Liability: Agency Theory

"A principal is liable to third parties for an agent's acts within the scope of the agent's actual or ostensible authority, . . . Further, a principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." *Gevarter v. Maple Ridge Mobile Homes*, 2002 WL 31058040 at *2 (Cal. App. Sept. 17, 2002) (nonprecedential) (sustaining UCL Complaint against employer for employee's acts based on agency theory) (*quoting Rutherford v. Rideout Bank,* 11 Cal.2d 479, 484 (1938)); *Rose v. Seamless Financial Corp.*, 916 F.Supp.2d 1160, 1168 (S.D. Cal. 2013) (UCL case: "Under traditional agency principles, a principal may be liable for the acts of his agent if the principle consents to the agent acting on his behalf and subject to his control, and the agent consents to act for the principal."); *see also Rutherford*, at 483 (bank liable where a bank manager "made a fraudulent use for the authority conferred upon him by the bank" after accepting a bribe; no indication that the bank profited from the fraud in any way). "Normal agency theory applies to UCL suits." *Zeff v. Greystar Real Estate Partners, Inc.,* 2021 WL 632614, at *8 (N. D. Cal. Feb. 18, 2021) (*citing People v. JTH Tax, Inc.,* 212 Cal.App.4th 1219, 1242 (2013)).

That three executives at are alleged to have accepted bribes while employed by the Meta Parties falls within actual or ostensible authority under California law. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ. Code § 2317. "An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal."  Cal. Civil Code § 2330.  Thus, if the agents acted within their ostensible authority, Meta is as liable as its ostensible agents were.[8] By bestowing senior executive titles, and genuine

---

[8] Defendants' citation to Cal. Civ. Code § 2316, which concerns only actual, not ostensible agency, is thus inapposite.

authority that comes with such titles, upon senior executives, and permitting them to represent Meta publicly (SAC ¶¶ 79-84), Meta's junior employees and contractors, and third party GIFCT, and others who were dealing with these executives reasonably believed their actions and promises were within the authority granted to them by Meta. In this case, the relevant actions are the entry of data into the GIFCT and Threat Exchange databases, with the result that Plaintiffs were treated as if they were terrorists. The actions that injured Plaintiffs would not have occurred if these individuals did not have actual or ostensible authority to act on behalf of Meta.

Meta is liable for injury caused by its employees' and agents' providing information to GIFCT, if providing information to GIFCT was within the scope of their actual, apparent, or ostensible authority. The SAC pleads that the scheme depended on actions taken by agents and employees of Meta who had this authority—if they had not had credentials from Meta, they would not have been able to provide misinformation to GIFCT.  Meta may be liable for their acts and the claims should not be dismissed out of the gate.

### 2.   Vicarious Liability: Respondeat Superior

"[A]n employer is vicariously liable for the torts of its employees committed within the scope of the employment." *Lisa M v. May Newhall Memorial Hospital*, 12 Cal.4th 291, 296 (1995). Employee conduct is within the scope of employment if the conduct either "(1) is required by or incidental to the employee's duties, or (2) it is reasonably foreseeable in light of the employer's business." *Khraibut v. Chahal*, 2021 WL 1164940, at *13 (N.D. Cal. March 21, 2021) (*quoting Montague v. AMN Healthcare, Inc.,* 223 Cal.App.4th 1515, 1521 (2014)). In *Khraibut*, the court found that an executive employee whose responsibilities included monitoring computer usage of other employees, and who used his position to maliciously install spyware on another employee's computer, was acting within the scope of employment even though he may have had personal motivations for his actions. *Id.* The court also found that both the employer and the executive employee were liable under the UCL. *Id.* at *11.[9] *See also Inter Mountain Mortg., Inc. v. Sulimen*, 78 Cal.App.4th 1434, 1442

---

[9] *People v. Toomey*, 157 Cal.App.3d 1, 14 (1984), relied upon by Meta, actually holds: "Holiday [the corporate entity] can, of course, be held liable for violations of sections 17200 and 17500 by its employees."  The other cases cited by Meta, *In re Firearm Cases*, 126 Cal.App.4th 959 (2005), and

PLAINTIFFS' OPPOSITION TO META DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

(2000), (court sustained a complaint holding an employer responsible for the act of an employee realtor who submitted a fraudulent loan application on forms provided by the employer); *PCO, Inc. v. Crhistiansen, Miller, Fink, Jacobs, Glaser, Weil, & Shapiro, LLP,* 150 Cal.App.4th 384,  393-94 (2007) (law firm vicariously liable for act of employee lawyer who removed large amount of cash from home of law firm's client).

The SAC pleads Meta's liability for specific acts of its employees and agents. The SAC alleges that the GIFCT and Threat Exchange databases were created by Meta, working with a few other social media businesses, and that at all times Meta had the authority to permit its employees to enter data on its behalf. (SAC ¶ 41, Ex. B, ¶¶ 42-52.) The employees' acts of entering data into its DIO list, which led both to the false classifications about class members as sympathizers of dangerous organizations and the wrongful hashing of their content and addition of it to the GIFCT was part of and arose from their employment; those actions fell within their professional responsibilities, and they were able to accomplish this only because their Meta authorized them to do so.  The tortious acts alleged in the SAC were "required by or incidental to the employee's duties."

Whether or not Meta explicitly authorized its employees and agents to destroy Plaintiffs' livelihoods, and whether or not Meta itself profited from these acts, cannot be decided on a motion to dismiss. "The fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer . . . . The proper inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." *Mary M. v. City of Los Angeles*, 54 Cal.3d 202 (1991) (internal citations omitted.) "Tortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment.  So may acts that do not benefit the employer, or are willful or malicious in nature." *Id.* at 209, (internal citations omitted.)

---

*Emery v. VISA International Service Ass'n*, 95 Cal.App.4th 952 (2002), involve attempts to hold corporations liable for acts of their *customers*, not their senior employees.

Even if the act of entering data were found to be outside of the employees' scope of employment, Meta remains liable for the employees' acts because their tortious actions were reasonably foreseeable in light of Meta's business. As the operator of the world's largest social media networks, Meta was fully aware that many people and businesses depend for their livelihoods on social media visibility on their platforms. It was aware that the precise purpose of its DIO list, and also the GIFCT database, was to reduce or eliminate the visibility of listed individuals and businesses on their platforms, and on other platforms as well. (SAC ¶ 43.) Thus, it was easily foreseeable that employees entrusted to list organizations and individuals as "Dangerous Individuals or Organizations" had the ability not only to disempower actual terrorists, but also to destroy legitimate businesses that depended on social media visibility. That such power would create a temptation by the holders to attempt to personally profit is unfortunate but foreseeable. The crime that occurred here was foreseeable to Meta. At the very least, discovery is required.

### 3.   Ratification

The SAC also sufficiently pleads that the Meta Defendants ratified the conduct of employees who ordered or carried out the blacklisting of Plaintiffs and the platforms that competed with the Fenix Defendants. The SAC alleges that Facebook investigated internally, and validated the scheme, and then didn't fix it, and instead allowed the scheme to be covered up (and still denies its results). (SAC ¶¶ 2(d),(3), 10(c), and Ex. A.)

This is a form of ratification, and thus makes the Meta Defendants liable even they did not expressly endorse or approve misuse of systems and procedures designed to suppress postings by dangerous persons and entities. *See* Judicial Council of California Civil Jury Instructions (CACI) 3710, https://www.courts.ca.gov/partners/317.htm;  *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73 (1972) ("A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.'"); Cal. Civ. Code § 2307; *see also Ventura v. ABM Industries, Inc.*, 212 Cal.App.4th 258, 271-72 (2012) ("The failure to discharge an employee who has committed

20

misconduct may be evidence of ratification."); *C.R. v. Tenet Healthcare Corp.*, 169 Cal.App.4th 1094, 1110 (2009) (same);.

### F. <u>The California Anti-SLAPP Statute is Inapplicable</u>

When an anti-SLAPP motion to strike only challenges the legal sufficiency of a claim, the court should apply the standard under Fed. R. Civ. Pro. 12(b)(6). *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018). However, if the anti-SLAPP motion challenges the factual sufficiency of the claim, the standard under Rule 56 shall apply and discovery must be allowed. *Id*. An anti-SLAPP motion brought in federal court does not stay discovery because such a stay would conflict with Rule 56 of the Federal Rules of Civil Procedure. *Metabolife Int'l., Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).

Courts employ a two-step process to evaluate anti-SLAPP motions. *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016). The defendant must first show that the lawsuit arises from protected activity, which includes "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." Code Civ. Proc. § 425.16(e)(4); *Sarver*, 813 F.3d at 901. Second, if the defendant has made such showing, the court evaluates whether the plaintiff has "establish[ed] a reasonable probability that the plaintiff will prevail on his or her ... claim." *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 139 (2019); *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010). Plaintiffs responding to anti-SLAPP motions need only show that its claims have "minimal merit," and a defendant can defeat the claims with an affirmative defense in the second step only if it establishes it can prevail on its defense as a matter of law. *Hilton*, 599 F.3d at 908, 910 (emphasis added).

The phrase "arising from" in subsection (b)(1) restricts the statute to situations where "'the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'" *Wilson v. Cable News Network, Inc.*, 7 Cal.5th 871, 884 (2019) (quoting *Park v. Bd. of Trustees of Cal. St. Univ.*, 2 Cal.5th 1057, 1060 (2017)) (original emphasis); *accord Diamond Resorts U.S. Collection Dev., LLC v. Pandora Marketing, LLC*, 541 F.Supp.3d 1020, 1030 (C.D. Cal 2021); *OneLegacy v. City of Monterey Park*,

2019 WL6729723, *3 (C.D. Cal. 2019); *Heineke v. Santa Clara University*, 2017 WL 6026248, *5-6 (N.D. Cal. 2017). "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute . . . [T]hat a cause of action arguably may have been 'triggered' by protected activity does not [mean] that it is one arising from such." *Navellier v. Sletten*, 29 Cal.4th 82, 89 (2002).

The phrase "in connection with" in subsection (e)(4) has been interpreted by the California Supreme Court as restricting the SLAPP statute's "catchall provision" to situations where "a defendant – through public or private speech or conduct – participated in, or furthered, the discourse that makes an issue one of public interest." *FilmOn*, 7 Cal.5th at 151. "'[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.'" *Id*. (quoting *Wilbanks v. Wolk*, 121 Cal.App.4th 883, 898 (2004)); accord *Penrose Hill, Ltd. v. Mabry*, 479 F.Supp.3d 840, 855 (N.D. Cal. 2020)*; Iglesia Ni Cristo v. Cayabyab*, 2019 WL 3997474 (N.D. Cal. 2019); *Diamond Resorts*, 541 F. Supp.3d at 1030.

### 1.    Plaintiffs' claims do not arise from protected conduct

The anti-SLAPP statute is inapplicable because Plaintiffs' claims do not "arise from" protected activity and therefore do not fall within the scope of Section 425.16. Although Meta operates social networks used by millions of people, its blacklisting of Plaintiffs and others in order to advance the interests of OnlyFans is not an act that "itself . . . was in furtherance of Meta's right of petition or free speech." *City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002). "[A] claim may be struck only if the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." *Park*, 2 Cal.5th at 1060 (original emphasis).

While Meta might have a First Amendment right to publish (or not publish) postings of particular users of Facebook and Instagram, Plaintiffs are alleging that Meta's wrongdoing was the act of causing OnlyFans' competitors and their content providers "to be falsely designated as a Dangerous Individual or Organization." This was part of a scheme to give preferential treatment to, and benefit, OnlyFans in order to advance OnlyFans' commercial interests and crush its competitors. That

22

Plaintiffs' evidence of this scheme and Plaintiffs' damages involve social media postings does not mean the wrongful conduct (the blacklisting through false designation) arises from protected conduct and triggers the anti-SLAPP statute.

The statute's "definitional focus is not the form of the plaintiffs' cause of action but, rather, the defendant's activity that gives rise to his or her asserted liability – and whether that activity constitutes protected speech or petitioning." *Navellier*, 29 Cal.4th at 92. "[T]he fact a cause of 'may have been triggered by protected activity' or the 'fact that protected activity may lurk in the background – and may explain why the rift between the parties arose in the first place' does not mean the alleged SLAPP arises from protected activity." *ValueRock TN Properties, LLC v. PK II Larwin Square SC LP*, 36 Cal.App.5th 1037, 1047 (2019) (citations omitted) (original emphasis); *accord Gamble v. Kaiser Foundation Health Plan, Inc.*, 348 F.Supp.3d 1003, 1024-25 (N.D. Cal. 2018).

In *Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal.App.4th 1388 (2002), the plaintiff sued State Farm for claims handling misconduct in violation of Business & Professions Code section 17200. The complaint included references to an investigation conducted by the California Department of Insurance. The trial court granted an anti-SLAPP motion, but it was reversed because the complaint alleged "State Farm engaged in certain claims handling misconduct and violated a number of statutory and regulatory rules. [Plaintiff] seeks ... to call State Farm to task for that conduct. . . ." *Id*. at 1399. The Court of Appeal rejected "out of hand" State Farm's argument that its communications with a regulatory agency were protected. "This contention confuses State Farm's allegedly wrongful acts with the evidence that plaintiff will need to prove such misconduct. Plaintiff seeks no relief from State Farm for its communicative acts, but rather for its alleged mistreatment of policyholders and its related violations and evasions of statutory and regulatory mandates." *Id*. (emphasis added); *see also Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.App.4th 658, 673 (2005) (distinguishing cases where defendants' communications were evidence of liability, not the basis of liability).

### 2. The conduct was not undertaken in connection with a public issue

Meta also fails to meet the requirement that the speech or conduct it is being sued over contributed to a public issue. "[A] defendant who claims its speech was protected as 'conduct in furtherance of the exercise of [free speech rights] in connection with a public issue or an issue of public interest' . . . must show not only that its speech referred to an issue of public interest, but also that its speech contributed to public discussion or resolution of the issue.'" *Wilson*, 7 Cal.5th at 900 (emphasis added). "'What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern.'" *Id*. (citation omitted).

Meta ignores the California Supreme Court's decision in *Wilson*, which controls here and explicitly rejects the "synecdoche theory of public issue in the anti-SLAPP statute." 7 Cal.5th at 902. In *Wilson*, CNN contended that its firing of a writer for plagiarism was a public issue because it implicated "ethical lapses of all journalists everywhere." The Supreme Court held that the existence of a larger public issue does not mean the conduct or speech in dispute is "in connection" with that issue. Rather, the targeted conduct or speech must contribute to the public discussion. The fact that a defendant is a publisher does not change the analysis. "We . . . do not read the anti-SLAPP statute to call for preliminary screening of every claim that might be brought against a news organization, merely because the claim might have incidental effects on the organization's operation." *Id*. at 894.

Meta is making the exact same argument here, and the Court should reject it. This lawsuit is *not* about Meta's "policies and actions of removing or filtering adult entertainment content" (ECF No. 78 at 25); it's about the false designation of particular people and companies as being dangerous for anti-competitive reasons. Meta's blacklisting of Plaintiffs and others does not contribute to public discourse about a pressing issue.

Accordingly, Meta fails to establish that the conduct complained of by Plaintiffs arises from protected speech or is in connection with a public issue. Meta's inability to meet its burden in the first step of the anti-SLAPP analysis requires the Court to deny Meta's motion. Further, Plaintiffs have sufficiently pleaded claims to meet the legal standards of Rule 8 and Rule 12, and Exhibits A-J provide

sufficient evidence to satisfy their second step burden (even if somehow the Meta Parties were able to meet the requirements for the first step).

## V.      **CONCLUSION**

None of the arguments raised by the Meta Defendants support dismissal of the Second Amended Complaint.  Their motion should be denied.


Dated: October 25, 2022                          Respectfully submitted,

By: */s/ David Azar*

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
David E. Azar
280 S. Beverly Drive, Suite PH
Beverly Hills, California  90212
Telephone: 1-866-252-0878
dazar@milberg.com

EMERGE LAW GROUP, P.C.
Timothy L. Alger
100 Spectrum Center Drive, Suite 900
Irvine, California 92618
Telephone: 949-936-2610
tim@emergelawgroup.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2022, the foregoing was electronically filed with the Clerk of the U.S. District Court, Northern District of California, using the CM/ECF system, which will send notification of such filing to all parties.

By:/s/ David Azar
David Azar
dazar@milberg.com
MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
280 South Beverly Dr., Suite PH
Beverly Hills, CA 90212
Phone: (866) 252-0878

PLAINTIFFS' OPPOSITION TO META DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT