1  Michael P. Esser (SBN 268634)
   KIRKLAND & ELLIS LLP
2  555 California Street
   San Francisco, CA 94104
3  United States
   Telephone: +1 415 439 1400
4  Facsimile: +1 415 439 1500
   michael.esser@kirkland.com
5
   K. Winn Allen, P.C. (admitted *pro hac vice*)
6  Devin S. Anderson (admitted *pro hac vice*)
   KIRKLAND & ELLIS LLP
7  1301 Pennsylvania Avenue, N.W.
   Washington, D.C. 20004
8  United States
   Telephone: +1 202 389 5000
9  Facsimile: +1 202 389 5200
   winn.allen@kirkland.com
10 devin.anderson@kirkland.com

11 *Attorneys for Defendants Instagram, LLC,*
   *Facebook Operations, LLC, and Meta*
12 *Platforms, Inc.*

13

14                **UNITED STATES DISTRICT COURT**

15              **NORTHERN DISTRICT OF CALIFORNIA**

16                 **SAN FRANCISCO DIVISION**

17 DAWN DANGAARD, *et al.*,          CASE NO. 3:22-CV-01101-WHA

18          Plaintiffs,             **REPLY MEMORANDUM IN**
                                     **SUPPORT OF DEFENDANTS**
19                                   **INSTAGRAM, LLC, FACEBOOK**
        v.                           **OPERATIONS, LLC, AND META**
20                                   **PLATFORMS, INC.'S MOTION TO**
                                     **DISMISS AND STRIKE THE SECOND**
21 INSTAGRAM, LLC, *et al.*,         **AMENDED CLASS ACTION**
                                     **COMPLAINT**
22          Defendants.

23
                                     Complaint Filed Date: September 28, 2022
24                                   Judge:                William Alsup
25                                   Hearing Date:         November 16, 2022
                                     Time:                 11:30 am
26                                   Courtroom:            12, 19th Floor

27

28

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT....................................................................................................................... 2

I.    Plaintiffs' Blacklisting Theory Is Not Plausible ......................................................... 2

    A.    The Alleged Payments........................................................................................ 3

    B.    The Alleged "Blacklisting" ................................................................................ 5

II.    Plaintiffs Have Not Pleaded Actionable Injuries ...................................................... 9

III.    CDA 230 Bars Claims Seeking To Hold Meta Liable For Decisions To Remove
Content ................................................................................................................ 10

IV.    The First Amendment Bars Claims Seeking To Hold Meta Liable For Decisions
To Remove Content............................................................................................. 13

V.    Meta Is Not Liable For The Alleged Conduct Of The John Does .................................. 14

VI.    Plaintiffs' Claims Are Subject To And Should Be Stricken Under The Anti-
SLAPP Statute ..................................................................................................... 15

CONCLUSION ................................................................................................................. 15

META'S REPLY MEMORANDUM IN SUPPORT
OF MOTION TO DISMISS AND STRIKE COMPL.

i

CASE NO. 3:22-CV-01101-WHA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Associated Press v. Labor Board*,
    301 U.S. 103 (1937)...................................................................................13

*Associated Press v. United States*,
    326 U.S. 1 (1945)....................................................................................13

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ..............................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................1, 2, 3, 4, 8

*Citizen Publ'g Co. v. United States*,
    394 U.S. 131 (1969).................................................................................13

*DJO Global, Inc. v. Glader*,
    2016 WL 11622009 (S.D. Cal. Dec. 22, 2016).........................................12

*Doe No. 14 v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ..................................................................11

*Doe v. Roblox Corp.*,
    2022 WL 1459568 (N.D. Cal. May 9, 2022) ...........................................11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...............................................................10

*Force v. Facebook*,
    934 F.3d 53 (2d Cir. 2019)......................................................................11

*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) .............................................................11

*FTC v. LeadClick Media, LLC*,
    838 F.3d 158 (2d Cir. 2016)....................................................................11

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ..................................................................11

*Kellman v. Spokeo, Inc.*,
    2022 WL 1157500 (N.D. Cal. April 19, 2022)........................................11

*Lemmon v. Snap, Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ...............................................................10

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*,
    12 Cal. 4th 291 (1995).............................................................................14

META'S REPLY MEMORANDUM IN SUPPORT
OF MOTION TO DISMISS AND STRIKE COMPL.

ii

CASE NO. 3:22-CV-01101-WHA

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951).............................................................................13

*Marshall's Locksmith Services, Inc. v. Google, LLC*,
  925 F.3d 1263 (D.C. Cir. 2019)..........................................................11

*Mejia v. Cmty. Hosp. of San Bernardino*,
  99 Cal. App. 4th 1448 (2002)...............................................................14

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  2022 WL 1990225 (N.D. Cal. June 6, 2022) .......................................12

*Mujica v. AirScan Inc.*,
  771 F.3d 580 (9th Cir. 2014) .................................................................4

*Nat'l Society of Pro. Engineers v. United States*,
  435 U.S. 679 (1978)..............................................................................13

*Obesity Research Institute, LLC v. Fiber Research Int'l, LLC*,
  165 F. Supp. 3d 937 (S.D. Cal. 2016)..................................................12

*Soo Park v. Thompson*,
  851 F.3d 910 (9th Cir. 2017) .............................................................6, 7

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..............................................................................13

*Tietsworth v. Sears, Roebuck & Co.*,
  720 F. Supp. 2d 1123 (N.D. Cal. 2010) .............................................1, 3

**Statutes**

47 U.S.C. § 230(c)(1)...............................................................1, 10, 11, 12

Cal. Bus. & Prof. Code § 17200 et seq. .............................................11, 15

Cal. Civ. Code § 2316..................................................................................14

**Rules**

Federal Rule of Civil Procedure 8 .......................................................2, 4, 9

Federal Rule of Civil Procedure 12(b)(6) ..................................................13

**PRELIMINARY STATEMENT**

Plaintiffs' opposition confirms that their complaint fails to state a claim. When pressed by this Court to plead their "best case," ECF No. 71 at 3, all plaintiffs can muster are "allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences" that may not be credited at the motion to dismiss stage. *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123, 1132 (N.D. Cal. 2010). Take this sentence, for example, which plaintiffs offer as emblematic of the "extraordinary factual support" for their claims: "Plaintiffs' counsel received *a phone call* from an attorney *apparently* retained by a whistleblower *who said he reviewed a sample* of what *appeared* to be more than 200 pages of internal Facebook documents concerning an inquiry into *possible* abuse of the shared hash database of the GIFCT that validated the *material* allegations of Plaintiffs' SAC, and that the documents *appeared to him* to have sufficient indicia of reliability in that they *appear* to have been an internal analysis of the scheme…. (Plaintiffs do not have these documents.)" Opp. 1, 2 (emphasis added). In other words, plaintiffs' counsel talked to somebody who talked to somebody else who said they saw some documents that may (or may not) be related to Facebook and that may (or may not) support some (but not all) of plaintiffs' allegations, but plaintiffs cannot tell the parties or the Court one way or the other because they do not have the documents. Such tortured hedging does not plausibly suggest anything, let alone "nudge[]" plaintiffs' "claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Examined separately or together, none of the additional "evidence" that plaintiffs included makes it plausible that the named plaintiffs had posts taken down because entities affiliated with OnlyFans paid Meta personnel to manipulate terrorism-related content-moderation tools to punish individuals who did not exclusively use OnlyFans. It is equally plausible (if not more so) that the named plaintiffs' content was removed because they were linking to pornography or otherwise posting content that violated Meta's Community Standards. This is not a matter of "weigh[ing] evidence," as plaintiffs claim, Opp. 6, but instead a matter of looking at the "factual" information plaintiffs have submitted to see whether it actually supports plaintiffs' otherwise conclusory allegations about the purported scheme. It does not.

Plaintiffs' claims also fail for a host of other reasons. As they acknowledge, a "standard fare" case for dismissal under Section 230(c)(1) of the CDA involves "plaintiffs" who "are unhappy about user postings, or removals, and" who "contend that the interactive computer service engaged in unfair business

practices by exercising its discretion to allow or remove the user postings." Opp. 10. That is a perfect description of this case. Plaintiffs' claim that conduct in violation of the antitrust laws is exempt from CDA and First Amendment protection is of no moment because plaintiffs have not even tried to plead facts supporting an antitrust claim. The Court should dismiss the complaint with prejudice.

## ARGUMENT

### I.    Plaintiffs' Blacklisting Theory Is Not Plausible

Plaintiffs' Second Amended Complaint fails Rule 8's plausibility test for the same reason that their previous complaint did: the only well-pleaded allegations are merely consistent with, not suggestive of, the existence of plaintiffs' alleged scheme. *See* Fed. R. Civ. P. 8(a)(2). Instead of responding to Meta's detailed plausibility analysis of plaintiffs' "key additional allegations," plaintiffs simply characterize their new allegations as "extraordinary factual support," Opp. 1; SAC ¶ 2, and suggest that Meta's plausibility defenses "are irrelevant on a motion to dismiss,"Opp. 3–4. But there is nothing "irrelevant" about pointing out equally, if not more, plausible explanations for plaintiffs' allegations. Indeed, this is the precise analysis required by *Twombly*, 550 U.S. at 544, in which the Supreme Court held that when allegations are "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy," plaintiffs must plead *facts* "plausibly suggesting (not merely consistent with)," their theory of liability. *Id.* at 554, 557.

The only well-pleaded allegations in the Second Amended Complaint are (1) the named plaintiffs' business model involves using Meta's platforms to link to pornographic websites; (2) plaintiffs were also linking to OnlyFans; (3) plaintiffs had posts removed and, in some instances, their accounts suspended; and (4) OnlyFans experienced an increase in popularity, while three unidentified subscription-based pornographic websites saw more of a decline. SAC ¶¶ 36, 94, 96, 98, 101, 103–06, 109–10. These allegations are fully consistent with (1) Meta's enforcement of its Sexual Solicitation Community Standards, which have at all relevant times prohibited "pornographic material (including, but not limited to, sharing of links to external pornographic websites.)," Anderson Decl. (ECF No. 78-1), Ex. 1; and (2) OnlyFans' commercial success, including extensive coverage in the news media and pop culture.

Plaintiffs incorrectly cast these alternative explanations as factual disputes that "are irrelevant on a motion to dismiss." Opp. 3–4. But Meta has not asked the Court to find facts or draw inferences in

Meta's favor.  Instead, Meta has set forth "obvious alternative explanation[s]" for plaintiffs' alleged content removals and OnlyFans' increased popularity that follow from the allegations in plaintiffs' own complaint.  *Twombly*, 550 U.S. at 567.  Plaintiffs themselves allege that the content they post on Meta's platforms links to obvious pornographic websites like cams.com, chaturbate.com, and streamate.com. SAC ¶¶ 98, 104.  And plaintiffs allege the removal or suppression of some of their posts or that their accounts were intermittently suspended altogether.  *Id.* ¶¶ 98–110.  Thus, by plaintiffs' own allegations, the content they post on Meta's platform violates Meta's Sexual Solicitation Community Standards, which expressly tell users that they must "not post" content that "links to external pornographic websites" and that they will be subject to enforcement if they do.[1]  Anderson Decl., Ex. 1.  And as the Court noted, plaintiffs' alleged scheme "is only one explanation for" allegations that web traffic to OnlyFans increased while traffic to three unidentified competitors of OnlyFans decreased, and that "plaintiffs need to provide factual information that makes such an inference plausible."  ECF No. 71 at 2.  They have not done so.

Plaintiffs advance an alternative explanation for the alleged removal of their posts and the popularity of OnlyFans: a wide-ranging, globe-trotting conspiracy between OnlyFans-affiliated individuals and entities on the one hand, and named and unascertained Meta employees on the other, to harm adult entertainers who sell pornographic content on sites that compete with OnlyFans.  To clear the plausibility hurdle, plaintiffs must plead facts that support the foundations of their preferred explanation, namely (1) factual allegations showing payments from OnlyFans to Meta employees; and (2) factual allegations showing internal "blacklisting" of plaintiffs on Meta's platforms by the individuals who received payments.  But all plaintiffs have are "allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Tietsworth*, 720 F. Supp. 2d at 1132.

### A.    The Alleged Payments

Plaintiffs attempt to plead the existence of payments from OnlyFans to Meta employees by (1) an anonymous email entitled "Follow the money," and (2) a phone call between plaintiffs' counsel and an unnamed attorney.  Neither allegation offers facts that make it plausible that Meta employees received payments in exchange for the purported blacklisting.

---

[1] Plaintiffs do not dispute Meta's contention that the Second Amended Complaint incorporates Meta's Community Standards into that complaint by reference.  *See* SAC ¶¶ 36, 110; Meta's Mot. 4 n.1.

***The "Follow the money" email.*** Plaintiffs have no response to Meta's detailed explanation for why the "Follow the money email" does not provide factual support for plaintiffs' claims. For example, as Meta noted, the "Follow the money" email purports to contain records for a series of wire transfers to a " █████████████ " account, but plaintiffs nowhere allege that anyone named ███████████ was involved in the scheme at all. Plaintiffs instead identify Meta employee ██████████ as the alleged recipient of such wires. *See* SAC Ex. D. at 1–4; SAC ¶ 83. Obviously, purported wire transfers to a ████████████ trust account do not establish the existence of wire transfers to Meta employee ██████ █████ . The monetary amounts are inconsistent, too. Plaintiffs allege that Fenix International transferred $6,900 to Smart Team International, but then plaintiffs allege that Smart Team International wired hundreds of thousands of dollars to the trust accounts. Plaintiffs offer no explanation for why the Court should credit the "Follow the money" email when the names and amounts do not even line up.

Plaintiffs instead implore the Court to trust their unidentified "banking experts," who apparently "concluded that the level of detail and format of the information had indicia of reliability sufficient to *merit further inquiry*." SAC ¶ 2(c); Opp. 6. This argument is remarkable. Neither plaintiffs nor their unidentified "banking experts" are willing to defend the reliability of the "Follow the money" email on its merits, and instead ask for discovery to conduct "further inquiry." But "plaintiffs must satisfy the pleading requirements of Rule 8 *before* the discovery stage, not after it." *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 (9th Cir. 2014).

Moreover, plaintiffs have not tied the supposed wire transfers to any conduct undertaken by the named Meta employees. As Meta noted in its motion, plaintiffs "do not allege that these individuals engaged in any 'blacklisting,'" they "do not allege that these individuals have any involvement with the databases at issue," and "they certainly do not tie anything that these three individuals did to harm experienced by the plaintiffs themselves." Meta's Mot. 11–12. Plaintiffs again have no response. Even taken at face value, the "Follow the money" email does not establish the connections plaintiffs need to plausibly plead a claim. *See Twombly*, 550 U.S. at 570.

***Plaintiffs' counsel's phone call with an unidentified attorney.*** Plaintiffs try to fill the gaps in the "Follow the money email" by reference to a phone call between plaintiffs' counsel and an unknown attorney who claims to have seen "wire transfer records that *appear* genuine." Opp. 6 (emphasis added).

Even crediting the unidentified attorney's alleged statements, plaintiffs offer nothing about the supposed "wire transfer records" at all, let alone why they "appear[ed] genuine" to the unnamed attorney. *Id.* It is entirely unclear whether these records include any of the individuals or entities plaintiffs have put at issue in this case. In fact, the complaint provides no information at all about these records. If the purported "records" reviewed by the unidentified attorney actually fixed the facial inconsistencies with the "Follow the money" email, plaintiffs would surely have so alleged to "plead their best case" as the Court directed. ECF No. 71 at 3. Plaintiffs have not adequately pleaded facts supporting the existence of payments to Meta employees.

### B. The Alleged "Blacklisting"

To establish that plaintiffs' content was allegedly removed not because it violated Meta's Sexual Solicitation Community Standards, but rather because of their affiliation with OnlyFans' competitors, plaintiffs rely on (1) a news article; (2) plaintiffs' counsel's phone call with an unidentified attorney about 200 pages of documents plaintiffs do not have; (3) a list of Instagram accounts (provenance unspecified); (4) a list of adult-entertainment platforms (provenance unspecified); (5) an unsupported, conclusory allegation that Meta attempted to "coverup" the blacklisting scheme; and (6) a purported whistleblower report. None of these allegations, alone or together, plausibly show that plaintiffs were "blacklisted" because of their relationships with OnlyFans' competitors as opposed to standard enforcement against individuals or entities who link to pornography.

***BBC article.*** The BBC article adds no allegations that are not already included in plaintiffs' Second Amended Complaint. The article reports that an adult entertainer named "Camila" experienced deletion of posts that "feature[ed] her in a bikini or underwear" alongside "links to an adult website." SAC, Ex. A; Opp. 4. This is *precisely* what plaintiff Pierce alleges in the Second Amended Complaint. SAC ¶ 107. Plaintiffs could amend their complaint today to include "Camila" as a named plaintiff, and their complaint would remain just as deficient. If anything, that another individual who linked to pornography in violation of Meta's Community Standards was subject to enforcement further bolsters Meta's point, not plaintiffs. In an attempt to strengthen the utility of the BBC article, plaintiffs attribute to that article the existence of a third "anonymous source"—"someone with inside information about coding on specific accounts." Opp. 4. But the BBC article reports on only two anonymous sources

("Camila" and the owner of an adult-entertainment platform), and makes no mention of any other individual, let alone an individual "with inside information about coding on specific accounts."  Opp. 4; SAC, Ex. A.  The BBC article does nothing to help the plausibility of plaintiffs' alleged "blacklisting" scheme.

**The "200 pages" of Facebook documents.**  Plaintiffs' allegations based on their counsel's purported phone call with an unidentified attorney do not plausibly allege the existence of the "blacklisting" scheme.  The unidentified attorney allegedly told plaintiffs' counsel that:

> [H]e . . . reviewed a sample of what *appeared to be* more than 200 pages of internal Facebook documents concerning *possible* abuse of the shared hash database of the GIFCT that validated the *material* allegations of th[e] Second Amended Complaint, and that the documents *appeared to him* to have sufficient indicia of reliability in that they *appear* to have been an internal analysis of the scheme.

SAC ¶ 2(d); Opp. 2 (emphasis added).  This allegation does nothing to support plaintiffs' claims of blacklisting and confirms that when plaintiffs previously made allegations "on information and belief," they did not have "factual information that makes the inference of culpability plausible."  *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).  Plaintiffs have not alleged that (a) they have seen these documents themselves; (b) they are in fact Facebook documents; (c) they actually show "abuse of the shared hash database of the GIFCT"); or (d) which "material allegations" these unspecified documents "validated."  Opp. 2.  Plaintiffs offer no explanation for why they could not obtain and review these "documents" themselves, especially in light of the Court's direction that plaintiffs "plead their best case."  ECF No. 71 at 1, 3.  The unidentified attorney apparently withheld permission from plaintiffs to identify him in the Second Amended Complaint, and apparently did not have sufficient conviction in his assessment of the "appear[ance]" of these supposed documents to submit a declaration or even to give these documents to plaintiffs' counsel.

**The 21,000 Instagram accounts.**  Plaintiffs' list of 21,000 Instagram accounts adds no factual allegations.  As Meta noted, it is facially implausible this alleged "list" of 21,000 Instagram handles contains the names of accounts that were deemed "Dangerous Individuals or Organizations" as part of plaintiffs' alleged scheme to promote OnlyFans.  Meta's Mot. 13.  That is because the list plaintiffs' expert discusses includes *OnlyFans itself*, along with Instagram's *own* account (@instagram), as well as an

unknown number of "famous Instagram personalities and other major brands."  SAC Ex. B at 8 n.5.
Plaintiffs offer no explanation for why a plot to attack OnlyFans competitors would include OnlyFans,
too, much less a broad swath of major commercial brands and famous Instagram personalities, all of whom
only *support* Instagram's commercial success.

*The list of adult-content platforms.*  Plaintiffs' "list" of adult-entertainment platforms also does
not plausibly plead the existence of a "blacklisting" scheme.  Exhibit C to the Second Amended Complaint
is just a list of names of adult-entertainment platforms apparently created by plaintiffs' counsel.  There
are no allegations of fact establishing what this list is and how it relates, if at all, to plaintiffs' purported
scheme.  None of plaintiffs' "extraordinary factual support," Opp. 1, actually supports the existence of
plaintiffs' alleged scheme.

*The alleged coverup.*  Plaintiffs' allegations of a supposed "coverup" of the alleged scheme are
insufficient.  Plaintiffs have no facts to support their conclusory allegation that "[o]n information and
belief, at some point, there was an attempted coverup of the scheme, after some of the datasets were
sufficiently corrupted, in which affected performers and platforms were shifted from a dangerous
organization (terrorist) designation to a new sexual solicitation category (used also for trafficking)."  SAC
¶ 2(e).  The Court reminded plaintiffs that they needed to offer "factual information" that makes an
information-and-belief allegation "plausible."  ECF No. 71 at 2 (quoting *Soo Park*, 851 F.3d at 928).

*The Whistleblower.*  Plaintiffs claim "a whistleblower made a report to intergityline.facebook.com
that overlaps with some of the allegations alleged herein."  Opp. 2.  Plaintiffs make no attempt to allege
the contents of the purported whistleblower report, let alone identify which "allegations" in that report
"overlap[]" with plaintiffs' claims.  On November 1, 2022—right as Meta was preparing to submit this
reply brief—plaintiffs filed a motion asking the Court to permit them to supplement their opposition with
the purported whistleblower report and a related news article.  ECF No. 89.[2]  The Court need not consider
this belated submission, since plaintiffs' obligation was to plead their best case in their second amended
complaint.  But even if the Court were inclined to consider the whistleblower report and article, they only

---

[2] Meta will respond to this motion in due course, but there is no excuse for plaintiffs to have waited until
the evening of the day the reply brief was due to submit an article that had been published several days
earlier.

show the *lack* of plausibility to plaintiffs' claims.  As the article reports, the individual who submitted the report through Meta's publicly accessible website refused to meet with Meta to provide evidence (i.e., factual information) to substantiate the allegations.  ECF 89 at 19.  This so-called whistleblower report suffers from the exact same flaws as plaintiffs' complaint: an inability to come forward with factual information that would "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 544 U.S. at 570.

* * * * *

Perhaps recognizing that Meta's enforcement of its Sexual Solicitation Community Standards is a far more plausible explanation for the alleged content removals than the scheme set forth in their Second Amended Complaint, plaintiffs argue (1) that "the SAC alleges that performers exclusively associated with OnlyFans did not experience the same content suppression," and (2) that "mundane images were also deleted, indicating the removals had zero to do with Instagram sexual standards." Opp. 5.  But plaintiffs do not allege any facts supporting these claims.  The Court invited plaintiffs to "gather[] . . . information from . . . adult entertainment performers themselves" to bolster plaintiffs' deficient allegation that "on information and belief," adult entertainers "who had only promoted [their content on] OnlyFans online or the Radvinsky-affiliated sites, and [who] had never . . . affiliated online with any of OnlyFans' competitors, appeared unaffected by [the] automated takedowns and reduced traffic."  ECF No. 71 at 2 (quoting 1st Am. Compl. ¶ 36).  Plaintiffs declined the Court's invitation and reasserted the same allegations as they did in their prior complaint.

Plaintiffs claim that their posts featuring "mundane images were also deleted," Opp. 5, but that allegation appears nowhere in the Second Amended Complaint.[3]  Indeed, aside from describing some of their posts as "bikini clad photos advertising other sites," SAC ¶ 107, plaintiffs do not allege the substance of the content that was allegedly removed or suppressed.  But the pornographic sites that plaintiffs concededly link to is all the Court needs to know about whether plaintiffs' content violated Meta's Community Standards: Plaintiffs allege that they link to websites like sexpanther.com ("Explore your

---

[3] Plaintiffs' suggestion that they experienced removals of "non-nude" images is immaterial.  Opp. 5. Meta's Sexual Solicitation Community Standard proscribes *all* posts that *link* to third-party pornographic websites.

fantasies and sext with your favorite models today!"), cams.com ("Hook up online with hot cam models around the world for live adult chat and video sex here"), chaturbate.com (a hybrid of two words that speaks for itself), and streamate.com (also self-explanatory). *Id.* ¶¶ 98, 104, 109.  Because the only well-pleaded allegations are equally consistent with alternative explanations for which Meta cannot be held liable, plaintiffs have not cleared Rule 8's plausibility standard.

## II.     Plaintiffs Have Not Pleaded Actionable Injuries

The Court observed that the prior complaint's "allegations of harm are vague," and directed plaintiffs to "provide more detailed allegations regarding the extent of their injuries."  ECF No. 71, 2.  But plaintiffs have not alleged any facts that make their alleged harm more definite.  Plaintiffs' sole argument is that it suffices for them to allege that the "reach" of their social-media posts was diminished.  Opp. 9.  Merely alleging that their posts reached fewer people is insufficient as a matter of law.  Plaintiffs must translate that purportedly diminished reach into an actual, concrete harm or damage.  *See Rojas v. Bosch Solar Energy Corp.*, 386 F. Supp. 3d 1116, 1130 (N.D. Cal. 2019) ("Plaintiffs must allege facts showing . . . that they lost *money or property* as a result of the unfair competition.").  They have not done so.

Moreover, even the allegation of diminished "reach" is insufficiently supported.  Pierce offers a conclusory allegation that she "began to notice that her posts were reaching fewer followers."  SAC ¶ 105.  Ruby alleges that she experienced an "unexplained loss of distribution of her posts to followers."  And while Evans actually articulates the general "reach" of her posts at present day, she makes no allegation regarding the "reach" of her posts before the alleged scheme.  These vague and conclusory allegations do not adequately establish that plaintiffs' social-media posts actually reach fewer followers than they did before the alleged scheme.  Indeed, these same "reach" allegations appeared in the First Amended Complaint.  *See* 1st Am. Compl. ¶¶ 46 (ECF No. 4) ("Evans now has almost 300,000 followers, but many of her posts are viewed by less than 2,000 users, indicating that the content is not reaching the vast majority of her followers."); 49 ("Pierce began to notice that her posts were reaching fewer followers . . . ."); 52 ("[Ruby] has experienced [an] unexplained loss of distribution of her posts to followers").  The Court accurately described these allegations of harm as "vague."  ECF No. 71 at 2.

And even if plaintiffs had pleaded facts showing a diminished "reach" of their posts, they do nothing to plausibly allege that *Meta* is responsible for any reduced "reach."  The "reach" of an individual

post (the proportion of a user's followers who view the post at least once) is dependent on the user's content and posting frequency (supply), and the behavior of a user's followers (demand).  People decide not to follow or view social-media posts for a host of different reasons.  And Meta does take action against content that violates its Community Standards, such as content that links to pornographic websites. Plaintiffs have not explained why any decline in their "reach" is attributable to the alleged scheme.

**III.     CDA 230 Bars Claims Seeking To Hold Meta Liable For Decisions To Remove Content**

Section 230(c)(1) of the CDA protects from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009); *see* 47 U.S.C. § 230(c)(1).  In response to the numerous cases Meta cited, plaintiffs argue that those cases are "'standard fare' where plaintiffs are unhappy about user postings, or removals, and they contend that the interactive computer service engaged in unfair business practices by exercising its discretion to allow or remove the user postings."  Opp. 12.  But that summary applies equally to plaintiffs: here, the "plaintiffs are unhappy about user . . . removals, and they contend that the interactive computer service engaged in unfair business practices by exercising its discretion to . . . remove the user postings."  *Id.*  Plaintiffs' claims seek liability against (1) Meta (uncontrovertibly an "interactive computer service"), (2) under a state law cause of action for Meta's alleged de-publication decisions, (3) of content that was created solely by third parties (i.e., the plaintiffs).  *See Barnes*, 570 F.3d at 1100–01.  Plaintiffs' claims thus squarely implicate Section 230(c)(1) of the CDA.

Plaintiffs' focus on how Meta allegedly removed their content misses the mark.  Section 230(c)(1) is entirely unconcerned with how an interactive computer service is alleged to have published or de-published content created by third parties, and plaintiffs have identified no authority to the contrary. Plaintiffs rely exclusively on cases denying Section 230 immunity to interactive computer services who are alleged to have created, or materially contributed to the creation of, the *published* content that forms the basis of the lawsuit.[4]  No court has *ever* found that the technology that implements content-moderation

---

[4] *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1172 (9th Cir. 2008) (Roommates.Com "materially contributed" to a violation of fair housing laws by "both elicit[ing] the allegedly illegal content and mak[ing] aggressive use of it in conducting its business"); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021) (lawsuit based on SnapChat's *own creation* of a

is somehow the relevant "content" for purposes of Section 230, and for good reason: if plaintiffs were permitted to recover for the removal of posts whenever automated content-moderation tools were used, Section 230(c)(1) would be rendered a nullity. That is not the law. *See Force v. Facebook*, 934 F.3d 53, 67 (2d Cir. 2019) ("[I]t would turn Section 230(c)(1) upside down to hold that Congress intended that when publishers of third-party content become especially adept at performing the functions of publishers [through use of behind-the scenes technical content-moderation tools], they are no longer immunized from civil liability.").

Plaintiffs attempt to evade Meta's Section 230(c)(1) defense by manufacturing a purported conflict between the purposes underlying the CDA and their assertion of a claim under the Unfair Competition Law (UCL), Business and Professions Code, § 17200 et seq, based on supposed anticompetitive conduct. Opp. 12. Plaintiffs concede that the facts in *Marshall's Locksmith Services, Inc. v. Google, LLC*, 925 F.3d 1263 (D.C. Cir. 2019), "fall squarely with[in] the protection of Section 230," Opp. 12, but they offer no basis for distinguishing that case. There, as here, the plaintiffs asserted unfair competition claims based on the defendants' use of their "market power" to "flood" (i.e., publish) their search engine results with "scam locksmith" advertisements created by third parties, in turn causing harm to legitimate locksmith

---

"Speed Filter" that allegedly "entice[d] young Snapchat users to drive at speeds exceeding 100 MPH"); *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (city ordinance banning short-term rentals did not treat AirBnB as a publisher because the duty imposed "could have been satisfied without changes to content posted by the website's users"); *Doe No. 14 v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (negligent failure-to-warn claim not precluded because claim depended on defendant's knowledge obtained from an outside source and unrelated to any content on its platform); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1199–1200 (10th Cir. 2009) (denying CDA immunity where defendant "solicited requests for [personal] confidential information and then paid researchers to obtain it," and subsequently "knowingly sought to transform virtually unknown information into a publicly available commodity"); *FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) (denying CDA immunity because defendant "participated in the development of its affiliates' deceptive websites, 'materially contributing to [the content's] alleged unlawfulness.'"); *Doe v. Roblox Corp.*, 2022 WL 1459568 (N.D. Cal. May 9, 2022) (denying CDA immunity to Roblox from liability based on its *own content* that incentivized minors to make in-app purchases without notice that Roblox could unilaterally delete the purchased content); *Kellman v. Spokeo, Inc*., 2022 WL 1157500 (N.D. Cal. April 19, 2022) (denying CDA immunity to Spokeo because "Spokeo is not alleged to merely host *user-generated* content, it is alleged to actively take content from other sources, curate it, and upload it to its site in a novel configuration for repurposed uses"). Plaintiffs have not alleged that Meta played *any* role in the creation of plaintiffs' posts on Meta's platforms, let alone that it "materially contributed" to the content's creation.

---

businesses.  *Id.* at 1266.  The D.C. Circuit affirmed "dismissal of the complaint as barred by § 230 of the [CDA]."  *Id.* at 1272.  This Court should reach the same result.

Moreover, there is no conflict between Section 230(c)(1) and the UCL for the basic reason that plaintiffs' have not pleaded an actionable violation of the antitrust laws.  Plaintiffs respond that they need not plead market definition, market power, and harm to competition (rather than harm to competitors) because their UCL claim merely seeks liability for a violation of the "policy or spirit" of the antitrust laws rather than "a full-blown anti-trust claim."[5]  Opp. 16.  But courts do not dispense with the basic pleading requirements for an antitrust claim just because a plaintiff claims a violation of the "policy or spirit" of the antitrust laws.  *See, e.g.*, *Obesity Research Institute, LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 953–54 (S.D. Cal. 2016) (dismissing "unfair" prong UCL claim premised on alleged violation of "the spirit of the antitrust laws" for failure to allege harm to competition—"[i]njury to a competitor is not equivalent to injury to competition").  Plaintiffs have made no attempt to define the relevant market or plead facts showing that Meta possesses power in such market.  Nor could they.  Meta is not a relevant participant in the market for adult-entertainment content.  Plaintiffs' comparison of web-traffic trends over a two-year period between OnlyFans and three unidentified competitors of OnlyFans tells the Court and the defendants nothing about the competitive state of the online adult-entertainment industry.

And a "party seeking to establish a violation of the 'spirit' of the antitrust laws for the purpose of" a UCL claim, "without showing an actual violation, must identify and prove some 'unusual' aspect of the alleged conduct that would make that conduct something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves."  *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 2022 WL 1990225, at *15 (N.D. Cal. June 6, 2022).  Even if plaintiffs had alleged the indispensable foundation of their UCL claim (market definition, market power, and harm to competition), their UCL claim is

---

[5]  Plaintiffs separately suggest that their UCL claim is viable because they have alleged tortious interference claims, which suffice to establish an "unlawful" prong UCL claim.  Opp. 15; *see DJO Global, Inc. v. Glader*, 2016 WL 11622009, at *7 (S.D. Cal. Dec. 22, 2016) ("Adequately pled causes of action for . . . tortious interference will support claims under the UCL's 'unlawful' prong.").  To the extent plaintiffs intend to rely only on their economic torts to establish their UCL claim under the "unlawful" prong, rather than the "unfair prong," plaintiffs' complaint merely asserts garden variety torts that are squarely barred by Section 230(c)(1).

separately doomed by their failure to identify any "unusual aspect" of their complaint that would suffice to state a UCL claim based on a violation of "the spirit" of the antitrust laws.

## IV. The First Amendment Bars Claims Seeking To Hold Meta Liable For Decisions To Remove Content

With respect to Meta's First Amendment defense, plaintiffs rely *exclusively* on cases denying First Amendment protection from black-letter antitrust claims.[6]  As discussed, plaintiffs have not come close to pleading a violation of the antitrust laws, which makes these cases inapplicable.  Moreover, none of plaintiffs' cases hold that the mere presence of allegations of anticompetitive conduct vitiate a defendant's First Amendment defense; instead, each of those cases reject attempts by defendants to cloak *non-expressive* activity in the guise of protected speech.  *See, e.g.*, *Associated Press v. United States*, 326 U.S. 1, 18–20 (1945) (denying First Amendment immunity from Sherman Act suit based on the Associated Press's bylaws); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (reciting the inapplicable and uncontroversial proposition that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct"); *Lorain Journal Co. v. United States*, 342 U.S. 143, 149 (1951) (newspaper may "freely . . . exercise [its] own independent discretion as to parties with whom [it] will deal" so long as it did not wield that right "to create or maintain a monopoly"); *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 133–34 (1969) (similar); *Nat'l Society of Pro. Engineers v. United States*, 435 U.S. 679 (1978) (engineering organization's prohibition on its members' submission of competitive bids to prospective clients was not protected "expression on the ethics of competitive bidding"); *Associated Press v. Labor Board*, 301 U.S. 103, 130-33 (1937) (termination of employee for engaging in union organizing was not protected activity).

Meta is not attempting to paint non-expressive activity as First Amendment-protected activity.  Rather, plaintiffs' claims seek liability for Meta's exercise of its First Amendment right to exert editorial discretion over the content published on its private platforms, including—in plaintiffs' telling—by

---

[6] Plaintiffs disingenuously suggest that "Meta can claim that the allegations are false (although it hasn't done so)."  Opp. 16.  But a Rule 12(b)(6) motion to dismiss is *not* a vehicle through which to assert a formal denial of a complaint's veracity.  Rather, motions to dismiss test the legal sufficiency—by the complaint as alleged.

allegedly determining that it prefers links to OnlyFans content over links to non-OnlyFans content. The First Amendment bars plaintiffs' claims.

## V.    Meta Is Not Liable For The Alleged Conduct Of The John Does

For purposes of Meta's motion to dismiss, Meta has not argued that actions allegedly undertaken by the named Meta employees could not, in appropriate circumstances, give rise to liability as against Meta. But plaintiffs have not alleged that these individuals did *anything* relating to plaintiffs. Plaintiffs have not alleged that these individuals did anything or interacted with *anyone*. Instead, plaintiffs posit that each employees' roles meant that they were "well-positioned" or "able to" direct that data be entered into the databases at issue. SAC ¶¶ 81–83. That is not enough: plaintiffs needed to have alleged that the named Meta employees actually took *action* in furtherance of the alleged scheme. Their failure to do so is fatal to any theory of liability against Meta.

Instead, plaintiffs appear to claim that unnamed John Does were responsible for the execution of the purported scheme. SAC ¶¶ 124, 126, 131, 136. But plaintiffs have not pleaded facts showing Meta's liability for those John Does under agency or vicarious liability theories. Plaintiffs disavow any "actual authority" theory and instead argue that Meta is liable for the John Does under an ostensible authority theory or a vicarious liability theory. *See* Opp. 17 n.8 ("Defendants' citation to Cal. Civ. Code § 2316, which concerns only actual, not ostensible authority, is . . . inapposite."). But plaintiffs have made no allegation that Meta engaged in any "act or neglect" that caused a third party to reasonably believe that the John Does possessed Meta's authority to participate in the alleged scheme. *See Mejia v. Cmty. Hosp. of San Bernardino*, 99 Cal. App. 4th 1448, 1457 (2002). And plaintiffs have failed to offer any factual allegations establishing that the alleged "blacklisting" scheme was "engendered by" the John Does' work as required to plead vicarious liability. *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 298 (1995). Instead, plaintiffs reason that because Meta authorized the John Does to "enter data into [Meta's] DIO list," Meta is liable for their alleged manipulation of those systems. But California law expressly rejects this kind "but for" vicarious liability theory: "The nexus required for respondeat superior liability . . . is to be distinguished from 'but for' causation. The fact that the employment brought the tortfeasor and victim together in time and place is not enough." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 298 (1995). Rather, Instead, "[r]espondeat superior liability should apply only to

the types of injuries that . . . as a practical matter, [*are*] *sure to occur* in the conduct of the employer's enterprise." *Id.* at 292 (emphasis added).

Plaintiffs also argue that Meta is liable for the John Does on a "ratification" theory.  Opp. 20.  But there is no theory of ratification liability pleaded in the complaint.  And the complaint does not adequately allege that Facebook "validated the scheme, and then didn't fix it, and instead allowed the scheme to be covered up," so it is of no moment whether those conclusory allegations, had they been properly pleaded, could amount to Meta's "ratification" of the alleged scheme.  *Id.*

## VI.    Plaintiffs' Claims Are Subject To And Should Be Stricken Under The Anti-SLAPP Statute

Plaintiffs argue that their complaint does not implicate California's anti-SLAPP statute because their claims do not "arise from" Meta's alleged removal or suppression of their social-media content.  Opp. 22.  Meta's liability is entirely dependent on allegations that Meta removed or suppressed plaintiffs' content.  Without such allegations, there is no alleged unfair conduct that caused harm to plaintiffs' property or business. See Cal. Bus. & Prof. Code § 17204.  There is no intentional act that allegedly interfered with plaintiffs' contracts or business relationships.  Without the alleged content removals, Meta could not possibly be liable for plaintiffs' decreased "reach" on social media.  As such, plaintiffs' claims "arise from" Meta's exercise of First Amendment-protected editorial discretion.

And as explained in Meta's motion, Meta's editorial decisions regarding the dissemination and presentation of adult-entertainment to content to millions of users is also conduct "in connection" with an issue of public interest under the anti-SLAPP statute.  Billions of people use Meta's platforms, and they have a substantial and demonstrated interest in Meta's content-moderation policies and enforcement of those policies as to adult-entertainment content.  Indeed, the speech at issue—the alleged selective enforcement of Meta's Community Standards against OnlyFans' competitors—is not only "in connection" with an issue of public interest, but is also itself an issue of public interest.  And for the reasons above, *see* § I.–IV., plaintiffs have not carried their burden to establish a reasonable probability of prevailing on the merits of their claims, and the Second Amended Complaint should be stricken.

## CONCLUSION

This Court should strike or dismiss the Second Amended Complaint in its entirety.

DATED:  November 1, 2022

KIRKLAND & ELLIS LLP

Respectfully submitted,


/s/ *K. Winn Allen*
K. Winn Allen, P.C. (admitted *pro hac vice*)
Devin S. Anderson (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
winn.allen@kirkland.com
devin.anderson@kirkland.com

Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
United States
Telephone: +1 415 439 1400
Facsimile: +1 415 439 1500
michael.esser@kirkland.com

*Attorneys for Defendants Instagram, LLC,*
*Facebook Operations, LLC, and Meta*
*Platforms, Inc.*

META'S REPLY MEMORANDUM IN SUPPORT
OF MOTION TO DISMISS AND STRIKE COMPL.

CASE NO. 3:22-CV-01101-WHA

**CERTIFICATE OF SERVICE**

On November 1, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

/s/ *K. Winn Allen*
K. Winn Allen, P.C.