Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

| | |
|---|---|
| DAWN DANGAARD, a/k/a ALANA EVANS, )<br>KELLY GILBERT, a/k/a KELLY PIERCE, )<br>JENNIFER ALLBAUGH, a/k/a RUBY, on )<br>behalf of themselves and all others )<br>similarly situated, )<br> )<br>          Plaintiffs, )<br>  VS.                     )<br> )<br>INSTAGRAM, LLC; FACEBOOK OPERATIONS,)<br>LLC; META PLATFORMS, INC.; FENIX )<br>INTERNATIONAL, INC.; FENIX INTERNET )<br>LLC; LEONID RADVINSKY, and JOHN )<br>DOES 1-10, et al., )<br> )<br>          Defendants. )<br>_____) | NO. 22-cv-01101-WHA<br><br><br>San Francisco, California |

Wednesday, November 16, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          MILBERG COLEMAN BRYSON
            PHILLIPS GROSSMAN, PLLC
          280 South Beverly Drive
          Suite PH
          Beverly Hills, California  90212
     BY:  **DAVID E. AZAR, ESQ.**

          EMERGE LAW GROUP
          100 Spectrum Center Drive
          Suite 900
          Irvine, California  92618
     BY:  **TIMOTHY L. ALGER, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
          Official Reporter, U.S. District Court

     (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Defendants Instagram, LLC; Facebook Operations, LLC; and
Meta Platforms, Inc.:

                    KIRKLAND & ELLIS LLP
                    1301 Pennsylvania Avenue, N.W.
                    Washington, D.C.  20004
       BY:  **K. WINN ALLEN, ESQ.**
           **DEVIN S. ANDERSON, ESQ.**


For Defendants Fenix Internet LLC, Fenix International Inc. and
Leonid Radvinsky:

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    2601 South Bayshore Drive
                    Suite 1550
                    Miami, Florida  33133
       BY:  **JOHN F. O'SULLIVAN, ESQ.**
           **JASON STERNMBERG, ESQ.**
           **DANIEL HUMPHREY, ESQ.**

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    50 California Street
                    22nd Floor
                    San Francisco, California  94111
       BY:  **VICTORIA B. PARKER, ESQ.**

1   **Wednesday, November 16, 2022**            **11:28 a.m.**

2                   **P R O C E E D I N G S**

3       **THE COURTROOM DEPUTY:** Calling Civil Action 22-1101,

4 Dangaard versus Instagram, et al.  Counsel, please approach the

5 podium and state your appearances for the record, beginning

6 with counsel for the plaintiffs.

7       **MR. AZAR:** Good morning, Your Honor.  David Azar for

8 plaintiffs.

9       **MR. ALGER:** Good morning, Your Honor.  Timothy Alger

10 on behalf of plaintiffs.

11       **THE COURT:** Welcome to both of you.  And?

12       **MR. ALLEN:** Good morning, Your Honor.  Winn Allen on

13 behalf of the Meta defendants.  And I'm joined by Devin

14 Anderson, also for the Meta defendants.

15       **THE COURT:** Welcome to you.

16       **MR. O'SULLIVAN:** Good morning, Your Honor.  John

17 O'Sullivan for the Fenix defendants and Mr. Radvinsky.  And I'm

18 here with my colleagues Vicki Parker, Jason Sternberg, and

19 Daniel Humphrey.

20       **THE COURT:** Welcome to all of you.

21   All right.  So this is your motion, right?

22       **MR. ALLEN:** Yes, Your Honor.  Both the Meta defendants

23 and the Fenix defendants have filed motions.

24       **THE COURT:** All right.  Make your -- I can't hear the

25 entire motion.  I could just -- it's too long.  But I think you

 1  should make your most important point.  And I'll let the other

 2  side respond.  Then they get to make their most important point

 3  and you get to respond, and we'll do the same thing for the

 4  other defendant.

 5          **MR. ALLEN:**  You got it, Your Honor.

 6          **THE COURT:**  Go ahead.

 7          **MR. ALLEN:**  My most important point is plaintiffs have

 8  not fixed the fundamental pleading problems with their

 9  complaint.

10      And I think the starting point to remember here,

11  Your Honor, is that by their own admission, these plaintiffs

12  posted content on Meta's platforms that violated Meta's

13  policies.  It's therefore no surprise that their content was

14  removed or their accounts were suspended because Meta, of

15  course, takes action against content that violates its

16  policies.

17      But what plaintiffs are claiming here is that their

18  content wasn't removed because Meta was engaged in normal

19  enforcement of its policies, but because of some alleged

20  far-fetched global conspiracy involving alleged bribery,

21  manipulation of terrorist content lists.

22      But to take this from a normal --

23          **THE COURT:**  I mean, that's -- I mean, you say it like

24  it's impossible and it could not possibly have happened.  But,

25  don't they have wire transfers alleged, that seemed to show

 1   bribery going on?

 2          MR. ALLEN:  They do not adequately allege that,

 3   Your Honor.  They're relying on -- for wire transfers, they

 4   rely on a conspiracy theory email from an unidentified person.

 5   It's not actually a wire transfer.

 6          THE COURT:  Wait, wait.  I didn't hear that.  They

 7   rely on a what?

 8          MR. ALLEN:  They received an anonymous email, then

 9   they redacted the sender of, that contains what they allege to

10   be wiring information.

11       It's not actual bank wiring information.  It's just an

12   anonymous email that they received.  That email isn't real wire

13   information; it's just text in an email.  It contains no

14   indicia of authenticity.  And it contains internal

15   inaccuracies.

16       For example, they say that the -- the wiring information

17   was sent to an individual named Christian Peralta.  And then

18   they allege that a different individual named Christian Parella

19   was the Meta employee allegedly involved, Your Honor.

20       And, again, the monetary amounts don't line up.  These are

21   not actually reliable wiring information.  It's just an

22   anonymous email that they received.

23       And I think that's indicative of the allegations that

24   they're bringing forth to this Court to try to prove this up,

25   Your Honor.  All they have are anonymous sources of unknown

reliability and no -- with no corroborating facts, conspiracy
theory emails from unidentified senders, and hearsay
conversations with another lawyer who refused to sign the
complaint and be subject to Rule 11.

And these wire transfers, at least according to the reply
brief filed by the Fenix defendants, Your Honor, plaintiffs
served a subpoena on HSBC seeking evidence of these wire
transfers.  And HSBC responded by saying: We have no evidence
of these wiring transfers having occurred.

So the most important point I would want to make to
Your Honor is when you have a case that involves content that,
by admission of the plaintiffs, violates our policies, there's
a straightforward, plausible, benign explanation for why that
content was removed.  It violated our policies.

For them to take that and move past Rule 8, satisfy *Iqbal*
and *Twombly*, they have to come forward with plausible factual
allegations as to why we should disregard that plausible benign
explanation, and believe these allegations about a conspiracy.
And they just haven't done that here.  Again, it's an
amalgamation of anonymous sources of unknown reliability.

And there's something very odd going on here in the sense
that the plaintiffs here aren't really alleging it, themselves;
they're saying:  Oh, I spoke to a guy who spoke to a guy who
said this might have substance to it.  And that's not enough
for a federal report complaint, Your Honor, particularly when

1  we have an obvious explanation in front of us as to why this

2  content was removed.

3        **THE COURT:**  All right.  I'll give you a rebuttal on

4  this, so let's hear from the other side.

5        **MR. AZAR:**  Thank you, Your Honor.

6     We just have to establish that the allegations are

7  plausible.  We allege plenty of facts that have nothing to do

8  with these anonymous sources.

9        Fundamentally, Your Honor, I direct to you Paragraphs 58

10 and 60.

11       **THE COURT:**  Wait a minute.  I don't have the complaint

12 here.

13       **MR. AZAR:**  I'm just basically --

14       **THE COURT:**  Can my law clerk give me the complaint?

15 I would like to follow what you're saying.

16       **MR. AZAR:**  Sure.

17       **THE COURT:**  Can I get the complaint?

18       **THE LAW CLERK:**  Do you want me to get it?

19       **THE COURT:**  Yeah.  If you have a copy of it there.

20       **MR. AZAR:**  Sure.  So, okay.  So before any of these

21 complaints and whistleblower reports and the like, okay, we

22 actually have data from platforms, from clients, that it was a

23 sudden dramatic change in the dynamic and the competitive

24 industry, and how they were content-actioned and classified --

25 content-actioned, back, starting in late 2018.  Okay?  Those

1    allegations have nothing to do with the wire transfer, nothing

2    to do with the whistleblower tips, have nothing to do with

3    anything else like that.  All of that stuff just provides

4    confirmatory evidence that we are on the right track.

5        And that information came because this case and the

6    related actions got publicity.  And when they got publicity,

7    people decided that:  Hey, this is coming out, and we feel more

8    comfortable maybe putting our toe in the water.

9        But in this environment today, it's very difficult being a

10   whistleblower.  Very difficult.  It's not a thankful task; you

11   don't know when you want to get involved with this.

12       And they did us a favor, accidentally.  Because when the

13   Fenix defendants accidentally filed their opposition brief --

14   sorry, their moving -- they filed their moving papers not under

15   seal, and they disclosed the name of some of these Facebook

16   people, that caused other people to come out.  Okay?  So it

17   went to Gizmodo; they've come to us, because people feel more

18   comfortable.

19       So my point to you, Your Honor, is that we have core

20   allegations here where we list a bunch of actual facts,

21   including disproportionate effects on all competitor platforms

22   and people who use those competitor platforms that did not

23   apply to OnlyFans, that did not apply to the

24   Radvinsky-affiliated sites.

25       That, by itself -- and then we also allege as a factual

1    matter that there's no other benign explanation for it.   And

2    our expert also says that there's no statistical way this could

3    happen.   Okay?   Other than through these automated processes.

4    So you don't have a situation in which suddenly, right,

5    everybody else gets impacted, and it somehow applies to the

6    normal content actioning policy of Facebook.   Okay?

7         In contrast --

8              **THE COURT:**  But, but, but, wait, wait.

9         What is your best evidence alleged in the complaint that

10   bribes have been accepted by these people at Facebook?

11             **MR. AZAR:**  Well, I would say this.   The best evidence

12   in the complaint that bribes were accepted would be the wire

13   transfer information we got that our expert said have indicia

14   reliability.

15        But let me step back for a second, because we actually

16   allege there was an internal investigation happening at

17   Facebook, okay, that actually validated the fact that people

18   were put on the DIO list -- or platforms were put on the DIO

19   list that were competitors of OnlyFans.   Okay?   And that is the

20   key fact here.

21        The key fact here is that you have a disproportionate --

22   sorry -- you have the actions at the Facebook level that we

23   allege were caused by manipulation of their artificial

24   intelligence system --

25             **THE COURT:**  I need the complaint.   Please get me the

 1    complaint.

 2         **MR. AZAR:**  -- that benefited OnlyFans, and that there

 3    was some sort of *quid pro quo* or something else in there that

 4    made it happen.  Okay?

 5         Now, whether it's -- you know, there could be various

 6    reasons why it happened here, so I don't want to get focused on

 7    the bribe -- I want to get focused on --

 8         **THE COURT:**  I thought that was your whole theory, is

 9    that somebody was taking bribes at Facebook to -- to do damage

10    to the plaintiffs.

11         **MR. AZAR:**  Well, exactly.  But the point -- but the

12    whole theory actually is before that.  The key part about

13    this -- because, again, I'm trying to distance this from what

14    their arguments are here.  Because I'm telling you, what our

15    position is, is that that does not matter for the purpose of

16    understanding whether or not the actual wrong occurred.

17         And the wrong occurred, we're alleging, factually, not

18    based on these -- because they're challenging the evidence we

19    have of the bribery.  Okay.

20         But I'm saying to you there's enough other things in the

21    complaint that even if you discount any of those allegations,

22    you have actual allegations of a disproportionate effect on the

23    competitive market that could only happen from manipulation,

24    that did not affect OnlyFans, did not affect the competitor

25    sites, and gave a pass to people who only listed on the

 1   OnlyFans site.  So that's an actual allegation.

 2       We then have a whistleblower report, okay, internally to

 3   Facebook, that also is consistent with that, saying it happens,

 4   including talking about payoffs.  And that was reported to the

 5   Facebook integrity line.

 6       And then we also allege that there was this separate --

 7   some investigation or some analysis that happened internally at

 8   Facebook, that also validated the scheme.  So we have those

 9   things out there.  So this is not a situation in which it's

10   just the normal implementation of Facebook's policy.  This is

11   an anti-competitive action to favor one competitor, OnlyFans,

12   over the others.

13       And, you know, one way of looking at this, Your Honor, is

14   that -- maybe a metaphor is almost like smuggling.  Right?

15   Let's say that in a smuggling situation, you know, because

16   they're alleging that there was a violation of their standards.

17   Let's said 20 percent, okay, is caught on a regular basis.  But

18   if you alter the market, so to speak, whereby the competitors

19   of OnlyFans get caught 50 percent of the time and OnlyFans only

20   get caught 20 percent of the time, you're still altering the

21   competitive dynamic entirely.  And that's what you see.

22       We provide evidence of charts and data showing that

23   OnlyFans increased while other competitors declined.  We

24   provide evidence in the form of the Aaronson declaration and in

25   the allegations that there's no benign explanation for this.

1   There's no, you know, intellectual property; there's no unique

2   marketing activity.  None of that stuff can apply.  So we have

3   those core allegations that make our claim plausible.  And then

4   it's supported by these anonymous tips that we get.

5       And what I would challenge, Your Honor, is I would

6   challenge Facebook and OnlyFans, okay, to agree, stipulate,

7   that they will provide whistleblower protection to any former

8   or current employee who has information about this; they will

9   not retaliate in any way.  And if anyone's subject to an NDA

10  that would otherwise prevent them from speaking about this,

11  that they give them the pass to speak about these issues.

12      I think if Your Honor or if they were to open that up,

13  then you would get a lot more people on the record who do not

14  fear the retaliation.  Because that's kind of what's happening.

15          **THE COURT:**  All right.  Let's hear the rebuttal.

16      **MR. ALLEN:**  Your Honor, what struck me about that

17  argument is plaintiffs' counsel seems to be saying:  Don't

18  worry about the new allegations that I added to my amended

19  complaint, because my original complaint had enough.

20      Well, Your Honor obviously already determined that the

21  original complaint did not have enough.

22          **THE COURT:**  Well, wait.  When did I determine that?

23      **MR. ALLEN:**  Your Honor filed an order back in late

24  September or October ordering plaintiffs to refile their

25  original complaint --

1          **THE COURT:**  Wasn't that after they offered to do so in

2     court?  And, did I actually rule that the prior one was

3     insufficient?

4          **MR. ALLEN:**  I interpret -- Your Honor obviously has a

5     better understanding of how you ruled than I -- I read your

6     order as finding that what they alleged so far was not

7     sufficient.  Or at least raised enough concerns that they

8     should be ordered to --

9          **THE COURT:**  Well, the way I remember it was that we

10     were debating it, and then counsel said he had more he could

11     allege.  And rather than write two orders, I decided I would

12     like to see what the additional allegations could be, and then

13     decide it at once.  But I don't think I actually ruled that it

14     was insufficient.

15          **MR. ALLEN:**  Fair enough, Your Honor.  And I certainly

16     defer to your views of what the order says.

17          But I would say that even the allegations taken in the new

18     complaint, that we have in their entirety, are not sufficient.

19     What we heard from plaintiff's counsel was:  Well, we've

20     alleged that Facebook didn't take action against OnlyFan

21     content and it did take action against competitors of OnlyFan

22     content.

23          That is not adequately supported in the complaint.  They

24     just say that, as a matter of *ipse dixit*.  They don't support

25     that.  They don't include actual analysis showing, as a matter

1   of statistics or evidence, that OnlyFans content was more

2   favorably treated than other content.  They don't identify a

3   bunch of OnlyFans posts that should have been removed that

4   weren't.

5        In fact, the plaintiffs in this case who had their content

6   removed, they use OnlyFans.  They use OnlyFans.  And they had

7   their content removed, as well.

8        Indeed, plaintiffs have submitted a list of 21,000

9   Instagram accounts that they claim reflect actions by -- or

10  referred to, they haven't even submitted to the Court, they

11  refer to that reflect action by the Meta defendants.  And that

12  makes no sense at all, because that list includes the OnlyFans

13  account, itself.

14       So these allegations that there's some disparity of

15  enforcement between OnlyFans and other platforms are not

16  adequately supported here.

17       Mr. Azar mentioned that in his complaint, he submits some

18  charts comparing OnlyFans performance in the market to, he

19  said, all other competitors.  That is not accurate.

20       If Your Honor looks at Page 90 -- at Paragraph 96 of the

21  complaint, which is Pages 36 to 37, OnlyFans's performance is

22  only compared to three cherry-picked unnamed competitors.

23  Competitor A, Competitor B, Competitor C.  There are --

24            **THE COURT:**  What is that?  Is that is the complaint?

25       (Document handed up to the Court)

1              THE COURT:  Thank you, counsel.  What paragraph do you

2    want me to look at?

3              MR. ALLEN:  I'm looking at Paragraph 96, Your Honor,

4    which is at Pages 35, 36 and 37.

5              THE COURT:  96?

6              MR. ALLEN:  Yes, sir, 96.  And in that, they're

7    comparing OnlyFans' third-party traffic data to third-party

8    traffic data for certain competitors of OnlyFans.  And if you

9    look on the next page, 36 and 37, they list three competitors.

10        And the point I wanted to make, Your Honor, was that

11   plaintiffs' counsel said they compared OnlyFans to all other

12   competitors.  They don't.  They compared them to three

13   cherry-picked competitors.  And by their own admission, there

14   are dozens and dozens of competitors in this space.  They have

15   attached Exhibit C to their complaint which lists over 90

16   competitors in this space.

17        So they haven't even adequately alleged that there's some

18   disparity of enforcement between OnlyFans and competitor

19   websites, or that there's disparity in effect between OnlyFans

20   and these competitor websites.

21        The last point I'd make, Your Honor, is plaintiffs'

22   counsel mentioned that they had allegations about an

23   investigation that happened inside of Meta.  Those allegations,

24   as I understand it from their complaint, are based off a phone

25   call that plaintiffs' counsel had with an unidentified attorney

1    who no one knows the identity of,  except for plaintiffs'

2    counsel, and they have not alleged that person --

3               THE COURT:  What paragraph should I look at here?

4          MR. ALLEN:  Yes, Your Honor.  I would direct you to --

5    it's mentioned a number of times.  But if you look at Paragraph

6    -- sorry, Page 3, Paragraph 2.c., Your Honor.

7               THE COURT:  Yes.

8          MR. ALLEN:  And at the beginning of 2.c. -- sorry,

9    it's at the very bottom of the page, Your Honor, of that

10   paragraph there, three lines from the bottom, three lines from

11   the bottom of Page 3, where it says:

12               "Further, counsel received a phone call from

13               an attorney who said he reviewed wire

14               transfer records..."

15       And then if you turn to the next page, Your Honor,

16   Paragraph 2.d., Page 4, 2.d., at the bottom it says (As read):

17               "The same attorney stated that he has also

18               reviewed a sample of what appeared to be more

19               than 200 pages of internal Facebook documents

20               concerning an inquiry into possible abuse of

21               the shared hash database..."

22       And it goes on.  The point I would make about that,

23   Your Honor -- or two points.  One is this is an unnamed

24   attorney who has not signed a complaint in this case, has not

25   subjected himself to Rule 11.  And I don't think you can

1    outsource your obligations under Rule 11 like that.

2         The other thing is nobody in this courtroom has seen these

3    200 documents.  Not me, not my co-counsel, not Fenix, not

4    plaintiffs' counsel, as I understand it.  This is just a phone

5    call from some unnamed attorney who said he looked at 200

6    documents.  No one knows what they say or don't say, where they

7    came from, who provided them, whether they're authentic.

8         That's just not sufficient to plead a federal court case

9    of this significance, Your Honor.

10        **THE COURT:**  Okay.  I'm going to let the plaintiff

11   raise your main point that you would like to make on this

12   particular motion.  And then I'll let the other side respond.

13   So you don't have to, but I'll give that you opportunity.

14        (Document handed up to the Court)

15        **MR. AZAR:**  I think our main point, Your Honor, is that

16   this -- that defendants are trying to hold us to some sort of a

17   summary judgment standard here.  Okay?

18        I believe that this complaint, both based on the

19   allegations from our clients and based on the BBC article,

20   based on the other data that we've submitted, and the

21   allegations, you know, more than comply with the plausibility

22   and the other standards relating to the federal rules to make a

23   short and plain statement.

24        The fact is that we provide authority that we can rely on.

25   News articles; we certainly can rely on anonymous sources.  I

1    provide evidence --

2         **THE COURT:**  Where does it say you can -- can rely on

3    anonymous sources?  What law says that?

4         **MR. AZAR:**  Well, I think we have the --

5         **THE COURT:**  See, here's the way I typically allowed

6    for confidential witnesses.  It comes up sometimes in

7    securities cases, where you have whistleblowers.

8         I have allowed a complaint to say Confidential Witness

9    No. 1, Confidential Witness No. 2.  But the attorney knows who

10   they are.  And then if the complaint is sustained, they must be

11   disclosed.  As to who they are.  You can't -- this is still

12   America.  You can't have faceless people in the Philippines

13   saying:  They're guilty, and therefore, let us go... It's got

14   to be better than that.

15        I have never allowed a lawyer -- I've allowed employees,

16   because they are employees, to be confidential for a while.

17   But I've never allowed some independent lawyer in the

18   Philippines -- why -- they have no business saying: Keep my

19   name out of this.

20        **MR. AZAR:**  Well, it's not a lawyer in Philippines.  I

21   think --

22        **THE COURT:**  Who is it?

23        **MR. AZAR:**  It's a lawyer in Connecticut.

24        **THE COURT:**  All right.  Why can't they be disclosed?

25        **MR. AZAR:**  Because right now they're subject to work

1   product.  Look, maybe -- Your Honor, if we can --

2          THE COURT:  What do you mean, "subject to work

3   product"?

4          MR. AZAR:  Well, it's an interview with a confid- --

5   with someone providing information.  If Your Honor requires us

6   to disclose him, I can disclose him.  But the fact is that --

7   you know, the purpose of getting Your Honor's guidance is to

8   understand --

9          THE COURT:  I'm not -- don't -- don't do that to me,

10  because I did -- I let you do that, once before.  You said:  I

11  can always plead more.  I said:  Plead your best case.

12      I don't think it's proper to say:  An unnamed lawyer that

13  I won't tell you, I know who he is but I won't let you -- I

14  won't let anyone else know, told me the following.

15      And the fact that it's work product, that doesn't cut any

16  mustard.  So what?  It's not like they're working for the

17  company, and will be terminated.  That's -- that, I understand.

18  But this, I don't understand.

19      Why didn't you look at the documents, yourself?

20         MR. AZAR:  Well, I now have more detailed information

21  about those documents.  Because, don't forget, Your Honor, this

22  happened sequentially.

23      I only found out about that, okay, I only got the call

24  from the lawyer as I was filing -- as I was preparing the

25  amended complaint.  And then subsequent to that, because like

 1  Your Honor indicated, right, I wanted to have information,

 2  okay, I arranged to get more information.  Now I have detailed

 3  information about the internal investigation that happened.

 4  And how this happened, and what happened, and the scheme.

 5      So I'm prepared, for example, like, if Your Honor wanted,

 6  okay, I could -- again, because all this information came after

 7  filing the amended complaint.  So I have new information.

 8      So for example, I could go ahead and take the information

 9  that I understand is in the report, okay, and I could plead

10  that.  Or we could arrange, for example, for a special master

11  to look at it.  Or we could do something like this.

12      But the fact is, is that --

13      **THE COURT:**  Well, I'm not going to do the special --

14  no.  I'm not even saying I'm going to allow you to do this.

15  I've already done it once.  I said:  Plead your best case.

16      And now you are saying -- giving me the same thing, like a

17  broken record.  You -- if I were to do that, you'd have to pay

18  for their expenses and their attorneys' fees to do it all over

19  again.  That could be $100,000.

20      **MR. AZAR:**  Well, okay, Your Honor, I think our

21  complaint actually suffices and meets the pleading standard, as

22  it is.  The overall point I'm making to Your Honor is that the

23  allegations we make more than satisfy the pleading standards.

24  And, you know, we believe that it meets the pleading standards

25  under the federal rules.  We do.  Okay?  We can --

1          THE COURT:  I'm not going to give any weight to

2    anonymous information like this, from some lawyer.

3          MR. AZAR:  Okay.  Then you can give it --

4          THE COURT:  That's not --

5          MR. AZAR:  You can give it to the whistleblower

6    complaint that was made to Facebook.  Okay?  Which alleges --

7          THE COURT:  Show me what paragraph to look at for

8    that.

9          MR. AZAR:  Sure.

10        All right, Paragraph f. alleges the whistleblower report.

11    And then subsequent to our making this complaint, the

12    whistleblower report was provided to Gizmodo, and then we

13    submitted that to the Court.

14          THE COURT:  Hang on, a minute, f., on Page 5?

15          MR. AZAR:  Yes, f.

16          THE COURT:  All right.  It says (As read):

17              "Plaintiffs have also been informed that at

18              some point, a whistleblower made a report to

19              integrityline.facebook.com that overlaps with

20              some of the allegations herein."

21          MR. AZAR:  Right.

22          THE COURT:  (As read)

23              "Plaintiffs need copies of all internal

24              analyses and writing relating to the

25              allegations of the Second Amended Complaint

```
 1              to plead with greater particularity, all

 2              of..."

 3      Well, that --

 4              MR. AZAR:  Well, but, Your Honor --

 5              THE COURT:  That doesn't give me any information

 6              MR. AZAR:  No, but, but then we -- we then, after we

 7     filed this, okay, and after the Fenix defendants went ahead and

 8     disclosed the names there, someone provided the whistleblower

 9     complaint to Gizmodo.  We obtained a copy from Gizmodo and were

10     asked to comment, and we submitted to the Court.

11         So we have an administrative motion pending before the

12     Court to attach the whistleblower report that we subsequently

13     received.  And if Your Honor looks at that whistleblower

14     report, you'll see --

15              THE COURT:  Can you show me that?  Is that --

16              MR. AZAR:  It's in the record, yeah.

17              THE COURT:  Hand it up to me.  I don't have that here.

18              MR. AZAR:  I only have a copy of it in hard copy.

19              MR. O'SULLIVAN:  Judge --

20              THE COURT:  Here, somebody's got it back there.

21              MR. ALGER:  I have a copy.

22              MR. AZAR:  Okay, sorry.

23      (Off-the-Record discussion between counsel)

24              THE COURT:  Well, give it to the clerk, please.

25              MR. AZAR:  Sure.
```

1          **THE COURTROOM DEPUTY:**  Thank you.

2      (Document handed up to the Court)

3          **THE COURT:**  I'm sorry, the print's so small I can't

4  read it.  At my age it's just too, too tiny.  What does it say?

5  Help me find the page that matters, and help me read what's on

6  that page.

7          **MR. AZAR:**  Sure.

8      (Off-the-Record discussion between counsel)

9          **MR. AZAR:**  So on the first page there, which is Page 6

10  of Docket 89.

11          **THE COURT:**  Yeah.

12          **MR. AZAR:**  So this is to the Facebook internal or the

13  third-party whistleblower site that they use.  Okay?

14          **THE COURT:**  Uh-huh.

15          **MR. AZAR:**  (As read)

16       "Certain employees are taking bribes..."

17          **THE COURT:**  Whoa, whoa, wait.

18          **MR. AZAR:**  I'm sorry.  Under Paragraph 3 --

19          **THE COURT:**  Read it slowly.  Read it very slowly.

20          **MR. AZAR:**  Sure.

21          **THE COURT:**  So we all can follow.

22       "Certain employees are taking bribes..."

23          **MR. AZAR:**  (As read)

24       "...bribes to protect OnlyFans on the

25          platform.  This has been going on for months,

if not years.  The London office has at least
a dozen employees on the payroll and it goes
all the way to the top.  They have taken down
every OnlyFans competitor and flagged the
competing URLs (for sites like ManyVids,
Patreon, Fan Centro, all the MindGeek sites,
etc., even things like Literotica!).  From
what I have overheard, the top executives
involved in this get a revenue share of the
growth, which has been enormous since we have
begun favoring OnlyFans within the content
moderation algorithms and not flagging it as
outright pornography.  I believe the early
stages use the GIFCT database erroneously for
this purpose but things have evolved from
there.

"They also take individual action against
women that have refused to use OnlyFans and
have insisted on using a competitor site.
The OnlyFans people have instructed internal
Facebook employees to 'send a message' at
various times by permanently disabling the
accounts of women that they are [sic]
rebuffing the OnlyFans recruitment efforts.
This is a widespread bribery problem and is

1          occurring at both the EMEA..."

2     Which is Europe, Middle East, Africa, I think it is.

3          "...and in the main Menlo Park office.  Just

4          look at the emails between OnlyFans people

5          and Facebook employees and you'll see the

6          truth plain as day.  I have seen copies.

7          "They created this legal fiction and are even

8          taking official stances that OnlyFans isn't a

9          porn site.  It's such a joke.  I truly think

10         it is putting the entire Company at risk and

11         I really need to speak out so someone gets to

12         the bottom of this.  I've heard rumors that

13         the guy behind OnlyFans has ties (sic) to the

14         russian intelligence and people are truly

15         scared to speak out.

16         "I've heard further rumors that the

17         competitors are catching wind of this and a

18         big lawsuit is coming.  We need to limit our

19         exposure right away.

20         "I'm having a friend submit this on an

21         anonymous device on a VPN from a remote

22         location for my own safety.  You will not be

23         able to follow up with me.  Please get to the

24         bottom of this.  I want my stock option to

25         stay valuable and provide for my children.

```
 1              This could be the straw that broke the

 2              camel's back and gets 230 revised or

 3              otherwise gets us regulated."

 4         Then it says who's involved when it happened.  He says:

 5              "EMEA team, Integrity, Machine Learning,

 6              pretty much everyone under..."

 7         And then gives the name of one of the people we redacted.

 8              "I think [that person] is getting the biggest

 9              kickback, as scary as this is.

10              "When did this happen?

11              "Beginning in summer of 2018 apparently.

12              "How did you become aware?"

13         The answer is:

14              "I observed it."

15         THE COURT:  How did you get your hands on this

16    document?

17         MR. AZAR:  We got it, and I -- we got -- as you --

18    mentioned in the administrative motion.  We got it from

19    Gizmodo.  So the news publication, Gizmodo.

20         So what happened was when Fenix published the redacted

21    names, this person or someone who has a copy of this

22    whistleblower report gave it to the Gizmodo news organization.

23    They then wrote an article.

24         But before they published it, they contacted us, and they

25    contacted Facebook.  And they said: We'd like you to comment on
```

1  this.  Okay?  So they gave me a copy of the whistleblower

2  report so I could comment on what it meant.  I did not comment,

3  substantively.

4      And then, they said that after they published it, we could

5  submit it to Your Honor, and that's what we did.

6          **THE COURT:**  So, so how did the publication get their

7  hands on this?

8          **MR. AZAR:**  They got it from, I guess, a Facebook

9  person who gave them information.  I mean, that's obviously

10 pretty typical, right, in reporter context, is -- that's why

11 you have anonymous sources.  That's why you had, you know,

12 Watergate and everything else like that.  You know, because

13 people are nervous.

14     I mean, the defendants here are among the most powerful

15 people and entities in the world.  So before someone sticks

16 their neck out, they're going to have to be careful.  And so

17 this person felt comfortable --

18         **THE COURT:**  How many other -- I can't read the print.

19 Next time -- this is so faint, I can't read it.  But, are there

20 other similar reports?  I mean, you only read two pages.  So --

21         **MR. AZAR:**  Correct.

22         **THE COURT:**  What does the rest of Exhibit L say?

23         **MR. AZAR:**  The rest of Exhibit L has someone from Fa-

24 -- so basically this is like the chat within the whistleblower

25 system, and you have someone from Facebook reaching out, trying

to interview this person.

And the person goes back and forth, and initially says they're willing to be interviewed, and then it stops.

**THE COURT:**  There's no name here, right?

**MR. AZAR:**  Correct.

**THE COURT:**  All right.  So when did you get this?

**MR. AZAR:**  I got this after defendants filed their motion.  So this is -- so basically, defendants filed their motion to dismiss.  And then I got it -- basically, I got this before they filed their reply.  And so I filed this with the Court the day that they filed the reply.  So Gizmodo came out with their article, I think, like on a Friday or something. And then I filed this the following Tuesday.

**THE COURT:**  So when you filed the original lawsuit, you didn't have this (Indicating)?

**MR. AZAR:**  Correct.  I heard that there was a whistleblower report.

The reason I heard there was a whistleblower report is because when the BBC broke this story in February, the BBC asked me for a comment about a whistleblower report.  Because apparently, the early version of their article included reference to whistleblower report that they had access to, okay?  And so they asked Meta for comment, and then they asked me for comment.  But I had never seen it.  But apparently they removed that part from the final version of the story, and

1    that's why it doesn't appear in the BBC article.

2        So, I knew a whistleblower report existed, but I didn't

3    have it.  And then I got it a few days before the reply briefs

4    were filed in this case.  And so then I submitted it to

5    Your Honor.  And --

6        **THE COURT:**  Let me ask the other side a question.

7        Let's assume, for the sake of argument, something that's

8    not true yet.  But, let's say that the complaint, as amended,

9    did in fact include this Facebook whistleblower information.

10   What would be your argument against placing reliance on that?

11       **MR. ALLEN:**  I would make three points, Your Honor.

12   First of all, it's -- this is a report from an unknown person,

13   an anonymous source.  Nobody knows who this is.  This person

14   has unknown reliability, unknown motives, and unknown access.

15   As the Gizmodo article reports, the Facebook whistleblower

16   hotline is publicly available.  Anyone can post to it.  It's

17   not just limited to Facebook employees.  So we don't even know

18   if this is a Facebook employee.

19       Secondly, I would argue that these allegations are

20   unsupported, much like the allegations in the complaint.  By

21   their own allegation, they are based off of rumors and hearsay.

22   There are no supporting documents, emails, evidence attached to

23   it to support.

24       The third point I would make, Your Honor, is directing

25   your attention to the final page of the whistleblower report --

not sure which version you have, but in mine it's Page 10 of

22, at the top.

     But it says when Facebook received this report, here's

what it said back it said (As read):

               "Thank you very much for submitting this

               allegation to us.  We take these allegations

               very seriously.  As a whistleblower, you are

               entitled to certain protections.  If you wish

               to remain anonymous, you are entitled to do

               so.  It would help our investigation greatly

               if we can speak with you about the content

               that you -- conduct that you have reported;

               even if you choose to remain anonymous.  For

               instance, we would like to gather the names

               of persons who you mentioned are actively

               involved in the conduct, the nature of the

               conduct you have observed and the actions

               undertaken thereof.  We would like -- we also

               would like more information on the rumors

               being circulated and the -- and about the

               lawsuit that is coming.  Any further detail

               that you can provide would be greatly

               appreciated.  If you are not willing to speak

               with us please, let us know if you are

               willing to answer questions that we post

1          here.  Many thanks."

2      And then this individual responded by saying:

3          "I will meet with you if my anonymity is

4          protected.  Let me know how I can contact

5          you."

6      And then the Facebook employee who's conducting this

7  investigation responds and says:

8          "Thank you for your response and for

9          accepting to speak with us as a

10         whistleblower.  You are entitled to the

11         protections offered by the Facebook

12         whistleblower policy."

13     And then it goes on to show, Your Honor, that Facebook

14 tried to meet with this individual three separate times,

15 including in ways that would protect this individual's

16 anonymity, and allow them to, in an anonymous fashion, report

17 on the allegations they made here.  This individual refused to

18 meet with Facebook three times, when Facebook tried to

19 investigate this.

20     So I would make the point, Your Honor, that this really

21 doesn't add much, if anything, to what's in the complaint.

22 Because what we have is an anonymous source who we tried to

23 meet with three times, wouldn't meet with us.  There's no

24 actual facts backing any of this up.  There's no evidence

25 supporting it; there's no documents attached.  All we have is

 1    rumors and innuendo from an anonymous source.

 2         **THE COURT:**  Wait, wait, that's not quite true.  Unlike

 3    the unnamed lawyer in Connecticut -- I thought it was the

 4    Philippines, but -- unlike that, this is on your own system.

 5         **MR. ALLEN:**  It is.

 6         **THE COURT:**  So this time it has -- I mean, why would

 7    Facebook set this system up if it was then going to turn around

 8    and say you can't rely on it?

 9         **MR. ALLEN:**  Well, Your Honor, I think the idea of a

10    whistleblower -- I'm not an expert in whistleblower laws, but I

11    think the idea would be we want to set up a system that's open

12    to folks to be able to anonymously submit reports or concerns

13    they might have.  But that doesn't mean that anything that's

14    reported to the system has validity or correctness or accuracy

15    to it.

16       And that's why we -- Facebook wanted to meet with this

17    individual.  That's why they wanted to gather the facts and

18    evidence that -- that purportedly backed up what this unnamed

19    person was putting here.  This person wouldn't even meet with

20    us to do that.

21       So what we're left with is a completely anonymous

22    submission from a person who wouldn't meet with us, with no

23    evidence or factual background.  And again, we don't even know

24    if this is a Facebook employee, because, as the Gizmodo article

25    reports, anyone could submit something to this.

1      So, again, I don't think it's enough to get past Rule 8 or

2   *Iqbal* and *Twombly*, particularly when there's an obvious

3   alternative explanation for why this content was removed.

4          **THE COURT:**  All right.  What was Exhibit -- what did

5   Exhibit M -- what was Exhibit M?

6          **MR. ALLEN:**  I think that's the Gizmodo article,

7   Your Honor.

8          **THE COURT:**  Oh, that's Gizmodo.

9          **MR. ALLEN:**  The news publication that publishes.

10         **THE COURT:**  I see it, okay.

11         **MR. AZAR:**  And that's actually worth looking at,

12   Your Honor, for two reasons.

13      Number one is that what Gizmodo emphasizes is that they

14   did a search to see whether or not this link to the Facebook

15   integrity line was really public.  And they said they could not

16   find -- from their search, it was not, like, publicly available

17   at the time.  We had -- you'll see what he says about this.

18      So they attempted to vet the fact, and they attempted it

19   as best they could, to figure out whether or not it really

20   was -- so --

21         **THE COURT:**  What did Gizmodo -- what did it conclude

22   was going on?

23         **MR. AZAR:**  Well, listen.  They were speaking to --

24   they were speaking to this person.  And this person also

25   apparently told them about the whitelisting --

1          **THE COURT:**  The same person who wrote the --

2          **MR. ALLEN:**  No.

3          **MR. AZAR:**  Listen, we don't know if it's the same

4   person who wrote the whistleblower article -- I mean, made the

5   report or had access to --

6          **MR. ALLEN:**  But we do know that.  Because the Gizmodo

7   article does report that they were not able to identify the

8   identity of the whistleblower.

9          **MR. AZAR:**  No, it's a different issue.

10      Okay, well, let's put it this way.  We have either Gizmodo

11  either speaking to somebody who has either a copy of the

12  whistleblower report, and additional information about the

13  whitelisting scheme.

14      So apparently what Gizmodo was told and the article talks

15  about this in detail, is that in addition to this blacklisting

16  scheme, there was also a whitelisting scheme whereby they would

17  give preferential treatment by exempting -- they had the

18  ability, basically, to exempt organizations or people they want

19  to exempt.

20      And apparently, this was -- is public already, the fact

21  that Facebook did this in a very ad hoc way.  This came from

22  the Frances Haugen leak of information, and other articles by

23  the *Wall Street Journal*, and otherwise.

24      So they framed this as being an integrated scheme in which

25  you have blacklisting on one hand, okay, and then you also have

 1   whitelisting to protect OnlyFans and other people.  And that's

 2   kind of the setup of how Gizmodo had laid this out.

 3        We had not been familiar with the whitelisting aspect

 4   about this.  But the whitelisting aspect makes a lot of sense

 5   in terms of reconciling some of -- how this goes.

 6        In any event, Your Honor, the question for the moment is:

 7   Is there enough here to help us to get some discovery?  Okay?

 8        I would submit, Your Honor, that we have alleged enough in

 9   the complaint -- and by the way, also, the other thing I want

10   to emphasize is we submitted a detailed expert declaration with

11   analysis of the data that we had.  Okay?

12             **THE COURT:**  Is that in the complaint?

13             **MR. AZAR:**  Yes.  It's attached to the complaint.

14   Exactly.

15             **THE COURT:**  Attached -- but it was part of the

16   complaint.

17             **MR. AZAR:**  Yes.

18             **THE COURT:**  Attached thereto.  All right.

19             **MR. AZAR:**  Yes.  Because what we did was, Your Honor,

20   we attached all the evidence that we submitted in support of

21   the Step 2 burden under the anti-SLAPP, to -- and that burden,

22   by the way, on Step 2, is greater than the pleading burden.

23        So we submitted multiple declarations, evidentiary

24   declarations, including a very detailed expert report, that

25   analyzed, you know, competitor information in terms of traffic,

1   the Instagram names we had --

2          **THE COURT:**  What exhibit number is that of the

3   complaint?

4          **MR. AZAR:**  Sure.  I'll tell you, Your Honor.

5     So Your Honor, if you look at -- so, Exhibit B as in boy

6   is the Hochman expert declaration.

7          **THE COURT:**  I don't have that.  Mine goes to D.

8          **MR. AZAR:**  Right, B as in boy.

9          **THE COURT:**  Let me see if this has it.  I don't have

10  the exhibits.  I don't have that exhibit.  All right.

11         **MR. AZAR:**  So, um...

12         **THE COURT:**  Wait.  This -- what is your name?

13         **MR. PARKER:**  Vicki Parker.

14         **THE COURT:**  I didn't hear it.

15         **MR. PARKER:**  Vicki Parker.

16    (Document handed up to the Court)

17         **THE COURTROOM DEPUTY:**  Vicki Parker.

18         **THE COURT:**  Thank you very much.  You are the only one

19  in the room who is totally prepared to give me what I need, and

20  it's been a blessing.  Thank you.

21         **MR. PARKER:**  (Nods head)

22         **THE COURT:**  What do I want to look at in Exhibit B?

23         **MR. AZAR:**  Um, I would suggest you look at the summary

24  of -- the easiest thing to do is to look at the summary of the

25  analysis at the beginning of it.  That explains the expert's

analysis about --

      **THE COURT:**  Okay, where is the summary?

  Here it is.  Okay.  Just a minute.

  (The Court examines document)

      **THE COURT:**  Well, I can see that it is more than I have time to read right now.  But, all right.  Tell me what your main point is on this.

      **MR. AZAR:**  The main point is between the Hochman declaration which provides an expert statistical detailed analysis of the social media traffic that we had plus the competitor information, and combined with the other evidentiary documents we submit -- okay, you have a bunch of declarations and the like that are attached to the complaint -- plus the complaint allegations, you know, we more than meet the pleading allegations to get to discovery.

  We can provide some very focused discovery to move this along, to identify very quickly whether we can substantiate our claims or not.  And that's what we suggest, Your Honor.  And we believe that we've met our burden, and it's time to move to some sort of, you know, effort to validate it.

      **THE COURT:**  I don't know.  All right.  I've got to go to the other motion.

  Give the other defendant a chance to summarize your motion.  Just stick to the main point, please.  Go ahead.

      **MR. O'SULLIVAN:**  Your Honor, John O'Sullivan.

 1      My first main point is that I was very surprised to hear

 2   counsel say:  Well, this case really isn't about the bribes, I

 3   don't need the bribes.

 4      We were here last time.  And we spent a lot of time

 5   talking about how there was no corroboration of anything in the

 6   real world that really happened, for this story.  All he knew

 7   was his four plaintiffs had some ups and downs in their

 8   business.  And that's all they know.  They don't know how it

 9   happened; they don't know why it happened.  That's what the

10   plaintiff knows.  It's a tortious interference case.

11      He went from there to this whole scheme, and he had this

12   email that said follow the money around all these accounts in

13   the Philippines, and he got up and said:  That's a real thing;

14   that's corroboration.  There will be bank records to support

15   that, and you can connect all this other stuff that allegedly

16   happened to -- my clients, the Fenix defendants.

17      It's a dry hole.  HSBC, they don't have records showing

18   any of those transactions.  I mean, he staked his credibility

19   on that.  And now he's asking us to go into these other

20   anonymous -- behind Door 3, behind Door 4.

21      The core thing that is going on here, Judge, is he's

22   outsourcing his Rule 11 obligations.  It can't be that we have

23   a system that says we have two competing versions of the world,

24   a dispute; we're going to let this guy's version be taken as

25   true, period.  That doesn't make any sense.  Unless he has some

 1   obligations to due diligence, to corroborate.  To --

 2        **THE COURT:**  Well, he's got a Facebook website where an

 3   anonymous person who -- Facebook invites them to do it.  They

 4   set it up.  Saying:  You don't have to give us your name; we

 5   want to know if there is wrongdoing going on.

 6        Somebody says:  Yeah, they're taking bribes, and I

 7   observed it, myself.

 8        And then you say:  Well, no, that's anonymous, so we can't

 9   rely on that.

10        **MR. ALLEN:**  What if we knew what you would want to

11   know, Judge?  You want to know who they are.  Are they in a

12   position to know.

13        What if they said:  Well, I'm a long-time resident of the

14   Institute for Criminally Insane People in Des Moines.  And this

15   is really what I feel like is going on in the world.

16        There is nothing in this record to exclude that as being

17   the identity of that person.  There just isn't.  Right?

18   Anybody --

19        **THE COURT:**  It could be anybody.

20        **MR. O'SULLIVAN:**  It could be anybody.

21        **THE COURT:**  Could be anybody, but --

22        **MR. ALLEN:**  -- would never admit that document --

23        **THE COURT:**  But then, why would Facebook set up a

24   system where anyone could make a complaint like that?

25        **MR. O'SULLIVAN:**  Because that's the responsible way to

1   do it.  You want all comers, and then you follow up.  Do you

2   have some proof?  Did you really work here?

3       I mean, if you read into that document, it says:  Where

4   did this happen?

5       He says:  It happened in the United Kingdom.  That's

6   what's in his exhibit.

7              **THE COURT:**  Yeah.  What's wrong with that?

8              **MR. O'SULLIVAN:**  I thought he told us it happened in

9   California.

10      Anyway, without the HSBC wire, Judge, he has no connection

11  to the Fenix defendants.  He says:  This happened, and we put

12  him up to it.  And my one link is I've got somebody who wrote

13  me an email, says:  This is how it happened.

14      And he got up here and said:  Judge, this is what I need.

15  This will blow the lid off this thing.  You'll see something

16  that, in an evidentiary sense, you would be used to seeing and

17  admitting and saying "I could give some credit to that," as

18  opposed to just the rantings of somebody.

19      And he went to HSBC and said --

20             **THE COURT:**  Well, counsel says if we get discovery, he

21  believes that he will find that very evidence in your own

22  files.

23             **MR. O'SULLIVAN:**  And what did he say when you asked

24  him that question?  You said:  What's your best evidence of the

25  bribe?  What did he say?  "I don't want to talk about the

 1   bribe.  I have these other statistics over here."

 2       I mean, that's the only link to my client, and he doesn't

 3   have it.  And again, Judge, are these people,

 4   Mr. Whistleblower, and the guy, the lawyer in Conn- -- are they

 5   going to write a check for the fees?  He's the only one here.

 6           **THE COURT:**  Say it again?  They're going to write a

 7   check for what?

 8           **MR. O'SULLIVAN:**  Say this is all fake.

 9           **THE COURT:**  Yeah.

10           **MR. O'SULLIVAN:**  We've put all this effort in, we're

11   running down these foul balls.  And he says:  Well, I told you

12   I had these things, and with my inferences I thought they got

13   you to this great story; I guess I was wrong; see you next

14   case.

15       Who do we go to?  It's all behind these curtains.  There's

16   nobody -- and giving him the presumption of truth even at the

17   pleading stage, without any policing on what you can say in

18   those pleadings -- and he's being very open about it.  He's not

19   vouching.

20       He's saying, even after all this -- you pushed him, we

21   pushed him -- he's saying:  I'm still keeping them hidden back

22   here; I'll show you a little bit more, a little bit more.  I'll

23   show you this document that doesn't have a name; maybe I -- on

24   the next round I can give you more.

25           **THE COURT:**  This Facebook document that doesn't have a

1    name.

2              **MR. O'SULLIVAN:**  Doesn't have a name of the source.

3              **THE COURT:**  Yeah.  Facebook says you don't have to put

4    a name on it.

5              **MR. O'SULLIVAN:**  Right.  Because we want everybody,

6    even the lunatics, to come in and report.  And then we'll

7    investigate.

8              **THE COURT:**  Doesn't read like a lunatic wrote it.  It

9    reads coherently.  Doesn't it?

10             **MR. O'SULLIVAN:**  I don't know.

11             **THE COURT:**  Well, what do you think is the --

12             **MR. O'SULLIVAN:**  The person wasn't willing to answer

13   one followup question about it.

14             **THE COURT:**  Well, maybe they work for the company, and

15   don't want to be fired.

16             **MR. O'SULLIVAN:**  I mean, maybe I don't understand -- I

17   just didn't know you could launch a lawsuit on some random

18   document without a name on it.  I mean, it's -- as you said,

19   anonymous sources -- this is America.  How do you defend

20   against the credibility or truth of someone we're never going

21   to see?  Even in the securities cases, you say:  I'm going to

22   make them disclose the next day.

23        I mean, what -- how does this move the needle?  He's never

24   going to get that admitted.  And he's told you he has no way to

25   get from there to truth.

1    So, our best point is that the one thing that links us is

2  the HSBC.  He's been telling you:  The dog ate my homework.

3  And that was the one place he was going to get real bank

4  records from a real third party that would say this happened in

5  realtime, and he swung and he missed.

6    So I don't know how you can keep us in the case, in the

7  absence of that link.

8        **THE COURT:**  All right.  Okay.  Hold that.

9    Answer that point.  What -- you did tell me you would get

10  some bank records, and -- but you did not.  What did you get?

11      **MR. AZAR:**  Actually, what he's referring to is

12  already -- that's either triple or quadruple hearsay at this

13  point.  There's been no response by HSBC.  There's been no

14  response to subpoena.  The subpoena against HSBC remains

15  stayed.  Okay?  We have nothing sworn on the record from them.

16  I have no official response.  We had none of the

17  meet-and-confer followup that may happen.  We've basically --

18        **THE COURT:**  Where did the subpoena get issued out of?

19      **MR. AZAR:**  Florida.  Florida, and they moved to stay

20  it.  What happened was, subpoena issued in Florida.  They moved

21  to stay.  It's in limbo, in a way, about whether it's stayed or

22  not stayed.  But right now, it's stayed.  Okay.  The -- the

23  San Mateo judge, okay, said we could issue a subpoena to HSBC.

24    I then contact the HSBC, the lawyer who I spoke with over

25  there who handled that subpoena.  I said:  Are you willing to

1   accept service of this subpoena that I'm now allowed to issue

2   out of the California state court?  So that doesn't go into the

3   miscellaneous HSBC system; at least it goes to somebody who

4   knows what they're talking about with this case.  Okay?

5        And, I said:  You've had enough time now; have you guys

6   done any searches to figure this stuff out?

7        Okay, he finally gets back to me.  And he says:  Look, I

8   need your help.  I need some help knowing where to look and

9   what to look for.

10       I said:  Well, where have you looked?"

11       He says: I don't know.

12       I said: Well, what did match up?

13       He says: I'm not really sure; I don't have the details.

14       Okay?  I said:  How about -- I said: We have two HSBC

15   former-employee experts who are working with us who are

16   intimately familiar with their system.  I said:  How about we

17   have our experts meet with your experts, so we can figure out,

18   you know, where you've looked, and where to look, to figure

19   this out?

20       He's like:  Let's hold off on that for the moment.

21       I said:  Well, why don't you at least tell me what you've

22   actually done, where you've looked, and what you found.

23       And then again, by the way, this is all before official

24   discovery response.  So it's completely inappropriate for

25   counsel to be representing second- and third-hand what HSBC

1  apparently did.  I mean, we've all been through the mill where

2  a party who's been subpoenaed at the first blanch doesn't find

3  the document, doesn't produce the document.  Right?  And that's

4  why you have discovery fights.

5              THE COURT:  Well, did the subpoena ever get served on

6  HS- --

7              MR. AZAR:  HSBC?  Yeah.

8              THE COURT:  Yeah.

9              MR. AZAR:  It was served on them, but they haven't

10  responded yet.

11              THE COURT:  When did you serve it?

12              MR. AZAR:  We served it to them in -- I think it was

13  April.  March or April.

14              THE COURT:  Out of San Mateo.

15              MR. AZAR:  No.  Served it to them out of the Florida

16  case.

17              THE COURT:  But that one is, arguably, stayed.

18              MR. AZAR:  Right.

19              THE COURT:  How about out of San Mateo?

20              MR. AZAR:  That has not been served yet, because I

21  wanted to see if this guy would accept service, and I wanted to

22  see --

23              THE COURT:  And he has not.

24              MR. AZAR:  And he -- right.  And so, it hasn't been

25  issued.  We have no response; we have nothing going on with it.

 1   This is -- we're kind of in the early meet-and-confer process,

 2   perhaps.

 3        The other thing I asked him, by the way --

 4        **THE COURT:**  Why didn't you just -- why -- didn't we

 5   cover some of this ground last time?  Seems like Florida and

 6   San Mateo came up.

 7        What did I say then?

 8        **MR. AZAR:**  You said that you would not authorize us to

 9   issue a subpoena out of this court because I'd have to go to

10   Florida.

11        The San Mateo issue happened the next day, where the judge

12   said we could issue the HSBC subpoena.  Okay?  And then I

13   contacted HSBC, and I said, you know:  Are you able to accept

14   service, whatever it might be, and to -- because it --

15        **THE COURT:**  Well, why didn't you just serve the

16   subpoena?  Why were you trying to do it on the cheap?

17        Why didn't you get the subpoena issued, and take it over

18   to this bank and serve it on whoever is there?  Instead of

19   trying to get some lawyer to accept it, which was just going to

20   invite reams of trouble.

21        **MR. AZAR:**  Listen, I didn't think -- I didn't think it

22   would invite reams of trouble at that time.  There's two things

23   that happened here, okay?  Number --

24        **THE COURT:**  You were supposed to get the records, and

25   you didn't.  You could have subpoenaed them.

1          **MR. AZAR:**  Well --

2          **THE COURT:**  That's true, isn't?

3          **MR. AZAR:**  No, I did subpoena them.  The fact is --

4          **THE COURT:**  No, you didn't.  In Florida, where it's

5     been stayed.

6          **MR. AZAR:**  All right.  I -- it's true, Your Honor,

7     that I did not issue the subpoena out of the *JFF* case.  It's

8     also true, as I mentioned to you last time I was here, as I was

9     beginning a jury trial about a week after that was going on, it

10    lasted three and a half weeks.

11         So the fact is that I reached out to sort of coordinate

12    with the HSBC lawyer to figure out what he's found -- because,

13    look, I wanted to meet and confer with him to see, since he's

14    had this subpoena from Florida, if he had any edits, any

15    comments, anything we can work out ahead of time.  Okay?

16         In addition to that, by the way, Your Honor, what I asked

17    him for is I said, I said where -- the point is, I have no

18    response yet from HSBC about it.  Okay?

19         We don't even have a -- we don't have a -- I don't -- I

20    don't know if they have records or don't have records.  I have

21    to look at the audit logs for this.

22         Like, one thing I told the lawyer is I said:  Look, when I

23    spoke with the banking expert, okay, who had an issue, they had

24    an issue whereby the bank that they subpoenaed did not produce

25    the records they knew existed.  They had to go into the audit

1   logs to recreate them.  I said:  So have you looked there?

2        Okay, because sometimes people can go in -- I mean, we're

3   talking about massive amounts of money that are at issue here.

4   It's not -- it's not inconceivable that someone would try to

5   alter records.  And that's what happened in that one situation.

6        So the point is we're at the very preliminary part of this

7   process.  Okay?

8        **THE COURT:**  Now it does sound like the conspiracy

9   theory, and the grassy knoll.  The people are altering records

10  already, and before you even get the subpoena issued, they're

11  altering records.

12       **MR. AZAR:**  No, I'm saying this to you, Your Honor, is

13  I asked for the audit logs as part of the analysis.  We don't

14  know if they looked at them.  We don't know what -- and have no

15  response from HSBC.  Okay?  So my point to you is that --

16       **THE COURT:**  But, but, that's because you haven't

17  subpoenaed them, properly.  The one that you did has been

18  stayed.  And the other one, you blew it off.

19       **MR. AZAR:**  I didn't blow it off.  I consulted with

20  them.

21       **THE COURT:**  Yes, you did.  You did not serve the

22  subpoena.  You should have served the subpoena.  Put them under

23  legal compulsion.

24       If it had been my court, the guy from the bank would be

25  sitting on the stand, under oath, and we would be asking him

1    questions.  But I can't give that to you yet, because you don't

2    have a complaint that will hold up.

3           MR. AZAR:  Okay.

4           THE COURT:  But the San Mateo judge might have done

5    the same thing, if you had served the subpoena.

6           MR. AZAR:  All right.  Well, I thought I would --

7    dealt with it in a way that I thought was professional and

8    productive, okay, to allow -- the point, the overall point,

9    Your Honor, really is that even if I'd served the subpoena, it

10   doesn't affect the pleading challenge, because at that point in

11   time we still had to file our second amended complaint; we have

12   not had that evidence yet.

13         We're getting ahead of ourselves, because the issue here

14   is whether or not we have alleged enough.  The HSBC subpoena

15   and the bank records are not the only thing tying the Fenix

16   defendants to what happened here.  You had somebody give the

17   people at Facebook the names of competitors of OnlyFans.  Fenix

18   is the one who benefited from that.  Okay?  And --

19         THE COURT:  I thought OnlyFans was connected to Fenix.

20         MR. AZAR:  Yes.

21         THE COURT:  Okay.

22         MR. AZAR:  What I'm saying to you, OnlyFans is run by

23   Fenix.  Okay?  Technically, they say it's Fenix International.

24   We've provided evidence in my declaration that's attached that

25   actually -- so, you'll see, I spoke with two Fenix Internet

1    employees who actually worked -- independent contractors who

2    actually worked for OnlyFans.

3         So what happens here, the evidence I have is that Fenix

4    Internet hires people to do core work for OnlyFans, itself.

5    The entity that is supposedly owned by Fenix International.  So

6    what you have is you have the domestic entity, Fenix Internet,

7    okay, that has independent contract agreements with people who

8    work in core functionality in only -- for OnlyFans.  Supposedly

9    run by Fenix International.

10        So you have a mingling here.  You have a situation where

11   this domestic entity, Fenix Internet, is not just a payment

12   processor, as their declaration submitted.  It looks like it's

13   actually employing people who are doing core functionality for

14   OnlyFans.

15        And I -- and I provide -- my investigation to that in the

16   declaration, my declaration, okay.  And then I indicate that

17   I've confirmed the fact that Fenix Internet takes these people,

18   and does not even file the W-9 for them, okay, so it's kind of

19   all secret behind the scenes.

20        I also allege, through this person for Fenix Internet,

21   that Mr. Radvinsky is using at least three people from his

22   affiliate company to help run OnlyFans, and they interacted

23   with him.

24        So you have this interaction of the three different Fenix

25   entities, or Fenix defendants -- you have Radvinsky, Fenix

1   Internet, Fenix International -- all involved with the process

2   of running the OnlyFans business.

3        So my point, Your Honor, is that somebody's giving --

4   somebody gave the Facebook people names of competitors to

5   target.  Somebody gave Facebook people the names of performers

6   to punish, which ties in to the -- the whistleblower report you

7   just saw.  And, and it has to be from OnlyFans, because they're

8   the ones who are benefiting from it.

9        Again, the fact is, Your Honor, that if you look again at

10  the Hochman declaration --

11       **THE COURT:**  You know, in the JFK assassination, there

12  are a million conspiracy theories.  And what -- they have no

13  proof.  But what they do is they say:  Well, who had a motive?

14  And then they say:  Well, because they have a motive, they must

15  have done it.

16       **MR. AZAR:**  Well --

17       **THE COURT:**  That's kind of what you are telling me,

18  isn't it?  There was a motive, so they must have done it.

19       **MR. AZAR:**  Well, actually, I have more than that right

20  now, in this respect.  Okay?  We allege, first of all, that

21  there was a memo -- there's two things I'll share with you.

22       One is we do allege in the complaint that there was a memo

23  internally to OnlyFans, indicating they have a special

24  relationship with Facebook.  That's alleged in the complaint.

25       And I'll also tell you that, based on my further vetting

1   of the internal investigation report, this whole thing started

2   when -- when someone went to one of the Facebook executives

3   and -- who apparently had been a donor of that person, okay,

4   and said:  Hey, I want you to punish this particular performer

5   who's not -- um, you know -- agreeing to promote the site,

6   OnlyFans site.  Okay?  So that's what, as I understand, the

7   internal Facebook investigation report indicates.

8        So if we're going off the complaint, going away from this,

9   going to my further investigation over the past two weeks or

10  so, okay, I have other reasons that are consistent with the

11  allegations in the complaint to indicate -- and consistent, by

12  the way, with the whistleblower report -- indicating that

13  OnlyFans was seeking retribution against certain performers who

14  were not supporting it.  And that explains why the platforms

15  and individuals were targeted.

16       So, that's what ends up happening.  And then, the

17  complaint is pretty clear and the expert report supports the

18  fact that, corrupting the DIO list, the dangerous organizations

19  list, you know, allowed -- and then, now combined with the

20  Gizmodo article about the whitelisting scheme, it's a way that

21  you can change the competitive balance here.

22       And we allege very clearly in the complaint and we support

23  it by the Aaronson declaration, that there's no benign

24  explanation for this.  There's no reason in the industry why

25  OnlyFans would suddenly skyrocket, and the other competitors

1   declined.

2       And by the way, even though we just included two charts in

3   complaint that's illustrative, the complaint's allegation is

4   far broader.  Applies to the competitors, generally, and that's

5   also supported by, again, the Aaronson declaration, which is a

6   statement by a platform, under oath, so it's not anonymous.

7   You have a platform owner, okay, who is standing in for the

8   class of platforms, who's making the statement, under oath.

9           **THE COURT:**  All right.  I'm going to bring this to a

10  close.  I'll let you have a rebuttal, and then I think we're

11  done for now.

12          **MR. O'SULLIVAN:**  I guess I would just point out,

13  Judge, I mean, the floor fell out on the main part of his case.

14  And he --

15          **THE COURT:**  What do you mean, it fell out?

16          **MR. O'SULLIVAN:**  That it's all about these wire

17  transfers.  That's his basis for jurisdiction; that's his basis

18  for connecting it.  And now, you basically said "well, you

19  don't have that; what do you have?

20      And he said it seemed to benefit them; they would have a

21  motive; it must have been them.

22      I mean, we're in Federal Court.  We have all these people

23  here, for that?  There's no reliability to it.

24      The last thing I would say, just because we're here on

25  *Iqbal* and *Twombly*, is he has an individual claim against the

1    100 percent shareholder of my client, Mr. Radvinsky.  There is

2    nothing about him doing anything at any time in any place,

3    having anything to do with this.

4         And in *Twombly*, I mean, when you talk enough about their

5    case, you hear what's behind it.  In that case, they said:

6    Well, Ashcroft's the head of the DOJ, Bob Mueller is the head

7    of the FBI; all of these bad things happened to Muslims down on

8    the streets.  It must have been their fault.  And since they

9    are in charge and they control everything, they're individual

10   defendants.

11        That's what that case was about.  And the Court said:  No,

12   you can't go into these inferences about control, and then have

13   that taken as a fact, as true.  It -- it stretches too far.

14        And that's all it is here.  I mean, unless he has

15   something else to say, he has nothing that would say this

16   person did anything on any day, at any time, has any connection

17   to this.

18        He doesn't dispute that it happened before our guy even

19   invested in the company.  There's just no plausibility to any

20   of it.

21            THE COURT:  Wait a minute.  Radvinsky invested in the

22   company after these events?

23            MR. O'SULLIVAN:  After these payments.

24            MR. AZAR:  No.  That's not accurate.  It's not what's

25   alleged.  I could -- okay.  Sorry.

1          **THE COURT:**  Please, address that point.

2          **MR. AZAR:**  Sure.  Radvinsky purchased OnlyFans,

3   October, 2018.  We allege that after the purchase, okay, is

4   when you suddenly have this spike in the effects happening.  We

5   also say that there's some indication that a test run of it

6   happened before then.  Okay?

7          So, you have -- the bulk of the impacts of it happened

8   after Radvinsky purchased.  Okay?  And through the time period

9   of later 2018, into 2019, and accordingly.  So the vast

10  majority of this happened during the time that he owned it.

11         And the payments, okay, that are in the exhibit, okay,

12  that we received, they start, October 2018, which is when

13  Radvinsky purchased it.  October 2018, through into -- I think

14  it's November, 2019.

15         So the fact is that, you know, counsel's incorrect to say

16  that this, you know, occurred all before Radvinsky purchased

17  it.  That's not accurate.

18         **MR. O'SULLIVAN:**  Judge, if I could just say, just to

19  stand here and listen to it, he alleged the payment on

20  October 1 before our client bought anything that had to do with

21  OnlyFans.  He alleged that.

22         **THE COURT:**  Any payment -- or were there any payments

23  thereafter, alleged?

24         **MR. O'SULLIVAN:**  In the email that doesn't correspond

25  to real-world bank records, yes, there were.  But the first one

1   was before the guy was even in the game.

2           **MR. AZAR:**  Let's just say this.  If it closes on

3   October 1st, that means they were negotiating a big acquisition

4   like this at least a month, if not two or three months,

5   beforehand.  So to peg it off at October 1st as the closing

6   date of the transaction ignores the reality that you're

7   negotiating the transaction for quite some time before then.

8   Papering it, and doing everything.

9       It's not like you walk into Best Buy, and you buy, like,

10  something off the shelf and that's your purchase date, when you

11  buy a company like OnlyFans.

12          **MR. O'SULLIVAN:**  It's a tortious interference case,

13  Judge.  He could plead it in two pages if he really had the

14  goods.

15          **MR. AZAR:**  We have more than the goods --

16      (Multiple speakers)

17          **MR. O'SULLIVAN:**  -- of the contract, interference

18  damages.

19          **THE COURT:**  We've been going an hour and ten minutes,

20  and I don't have an answer for you.  So I'll take it under

21  submission.

22          **MR. AZAR:**  Thank you.

23          **MR. O'SULLIVAN:**  Thank you, Judge.

24      (Proceedings concluded)

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Thursday, November 17, 2022