UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN DANGAARD, KELLY GILBERT, and JENNIFER ALLBAUGH,<br><br>          Plaintiffs,<br><br>     v.<br><br>INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, FENIX INTERNET, LLC, FENIX INTERNATIONAL, LTD., META PLATFORMS, INC., LEONID RADVINSKY, and JOHN DOES 1–10.<br><br>          Defendants. | No. C 22-01101 WHA<br><br>**ORDER RE MOTIONS TO DISMISS** |

## INTRODUCTION

In this diversity and putative class action, plaintiffs claim that defendants remain engaged in unfair competition and tortious interference with contracts and business relationships. Defendants have filed two separate motions to dismiss. For the reasons that follow, the motions are **DENIED**.

## STATEMENT

Plaintiffs Dawn Dangaard, Kelly Gilbert, and Jennifer Allbaugh are adult entertainment performers who use social media to promote themselves. Plaintiffs place (or "post") links on social media to adult entertainment websites. Those websites allow users to watch plaintiffs' content for a price. Plaintiffs split the revenue with the website owners. Of importance here, plaintiffs contract with *competitors* of the adult entertainment website "OnlyFans."

Defendant Meta Platforms, Inc., owns and operates defendants Instagram, LLC, and Facebook, LLC (collectively, "Meta defendants"), who operate Instagram and Facebook. John Does One through Ten were employees of Meta defendants when the claims arose. Defendants Fenix International, Ltd., Fenix Internet, LLC, and Leonid Radvinsky (collectively, "Fenix defendants") are associated with OnlyFans. Defendant Radvinsky owns defendant Fenix International, which operates OnlyFans. Defendant Fenix International owns defendant Fenix Internet — which receives payments from users of OnlyFans and distributes those payments to OnlyFans content creators.

Plaintiffs make the following allegations. Fenix defendants paid Doe defendants to demote or delete plaintiffs' accounts and posts on Instagram and Facebook. That conduct reduced internet traffic to adult entertainment websites with which plaintiffs contract — websites that compete with OnlyFans. Defendants' actions, thereby, reduced plaintiffs' viewership on adult entertainment platforms and plaintiffs' revenue from adult content. Defendants' actions increased internet traffic to OnlyFans and swelled its revenues.

Plaintiffs, moreover, allege that Doe defendants demoted or deleted plaintiffs' accounts and posts in a particular way. They allege Doe defendants caused such demotion or removal by manipulating Facebook and Instagram databases to include plaintiffs in lists of "dangerous individuals or organizations." Such lists identify terrorists, and Facebook and Instagram's algorithms use those lists to demote or remove terrorist content. Plaintiffs refer to this conduct as "blacklisting."

Additionally, plaintiffs allege Meta defendants share their lists of terrorists with other social media platforms via the "Global Internet Forum to Counter Terrorism Shared Hash Database." For that reason, plaintiffs allege their content was also demoted or removed from other social media platforms.

Plaintiffs contend Doe defendants' actions constitute unfair competition and tortious interference with plaintiffs' contracts and business relationships (with competitors of OnlyFans). Plaintiffs seek to hold Meta defendants vicariously liable for the actions of Doe

defendants. And, plaintiffs contend Fenix defendants are liable under a theory of civil conspiracy.

Previously, Meta defendants moved to dismiss all claims under FRCP 12(b)(6) and California's anti-SLAPP statute. Fenix defendants moved to dismiss all claims under FRCP 12(b)(2), FRCP 9(b), and on other grounds. At the hearing on the motions on September 8, 2022, plaintiffs revealed that they had the benefit of information outside the pleadings that may support their claims. For that reason, the district court ordered plaintiffs to file a second amended complaint, pleading as much cure as possible. The district court ordered defendants to re-brief their motions based on the new complaint. Fenix defendants' FRCP 12(b)(2) motion, however, was held in abeyance pending jurisdictional discovery.

Now, all defendants move to dismiss the second amended complaint under FRCP 12(b)(6). Meta defendants again move to strike the claims under California's anti-SLAPP statute. Fenix defendants have not revived their FRCP 9(b) motion. This order follows full briefing and oral argument.

**ANALYSIS**

**1. PLAINTIFFS' CLAIMS ARE PLAUSIBLE.**

To survive a motion to dismiss:

> a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57, 570 (2007)).

Here, plaintiffs' allegations are sufficient to state plausible claims for relief. *First*, plaintiffs provide an email that purports to show several wire transfers from Fenix defendants to Meta defendants (Second Amd. Compl., Exh. D). Specifically, the email lists five bank

3

accounts, account numbers, and physical addresses. It describes a wire transfer from a Fenix International account (in the United Kingdom, where Fenix is headquartered and incorporated) to an intermediary Fenix bank account (in Hong Kong, where Fenix is also incorporated), "Smart Team International." Underneath that information, it lists the names of several adult entertainment websites that compete with OnlyFans. Plaintiffs allege that the list is a "memo" line, indicating the purpose of the wire transfer. Thereafter, the email details several wire transfers from the Smart Team intermediary account to the trust accounts of three employees of Meta defendants (in the Philippines).

Taking the above facts as true, it is reasonable to infer that the money sent from the Fenix International account to the Smart Team intermediary account in October 2018 bore a relationship to the adult entertainment websites listed in the memo line — websites that compete with OnlyFans. Moreover, a wire transfer from the Smart Team intermediary account to one of Meta defendants' employees occurred on the same day as the initial transfer to the intermediary account, so it is reasonable to infer that some of the money related to the adult entertainment websites benefited that employee. This supports plaintiffs' allegation that Meta defendants' employees accepted bribes from Fenix defendants in late 2018 to blacklist competitors of OnlyFans.

*Second*, plaintiffs allege that, starting in late 2018, competitors of OnlyFans experienced significant drops in web traffic while OnlyFans experienced a significant increase in traffic. The complaint contains graphs depicting such changes in traffic for OnlyFans and numerous competitors of OnlyFans (Second Amd. Compl. ¶¶ 94–96 and Exh. B at 31–32). And, a news article incorporated into the complaint states that over 100 Instagram accounts that drove traffic to a competitor of OnlyFans experienced content take downs in late 2018 (*id.*, Exh. A). Coupled with the email above, these facts are strong support for plaintiffs' allegations.

*Third*, plaintiffs' second amended complaint refers to a Facebook whistleblower report that corroborates the claims. Plaintiffs did not append the report to the complaint because they did not receive it until after they opposed defendants' motions. Plaintiffs submitted the report

4

(and a related news article) and filed an administrative motion to supplement the complaint on the due date for defendants' reply briefs.

Nevertheless, this order treats plaintiffs' motion as a motion for leave to amend under FRCP 15(a)(2), which provides that "[t]he [district] court should freely give leave when justice so requires." "District courts generally consider four factors in determining whether to deny a motion to amend: 'bad faith, undue delay, prejudice to the opposing party, and the futility of amendment.'" *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 701 (9th Cir. 2011) (citation omitted).

Here, amendment would not be futile because the whistleblower report supports plaintiffs' claims. Specifically, an anonymous Facebook employee posted the report on a Facebook-owned website (albeit a public website) specifically designated to receive whistleblower reports. The report states that "[c]ertain employees are taking bribes to protect OnlyFans on [Facebook]." "They have taken down every OnlyFans competitor . . . ." "[T]he early stages used the GIFCT database . . . ." The scheme "beg[an] in [the] summer of 2018," and the employee "observed it" in the United Kingdom (Dkt. No. 89, Exh. L).

All of these statements corroborate plaintiffs' allegations. Furthermore, at least Meta defendants have had access to the report since its posting, so it is hard to believe Meta defendants are surprised by the information. Thus, the whistleblower report (and the related news article) shall be added to the complaint.

*Fourth*, plaintiffs have sufficiently pled damages. All of plaintiffs state that they have experienced decreases in revenue since the alleged conduct began. And, one of plaintiffs alleges that her annual revenue decreased by $13,000 from 2020 to 2021.

*Fifth*, plaintiffs have pled actionable harm to competition. Specifically, rather than plead "[i]njury to an individual plaintiff," plaintiffs have pled that defendants' actions have had "'some anticompetitive effect in the larger, interbrand [adult entertainment] market.'" *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 495 (2011) (citation omitted).

*Sixth*, plaintiffs' claims against defendant Radvinsky are plausible. Plaintiffs allege that defendant Radvinsky is the sole owner of Fenix International, Fenix Internet, and OnlyFans.

5

1    Moreover, plaintiffs allege that competitors of OnlyFans experienced significant drops in

2    traffic beginning around the same time that defendant Radvinsky acquired OnlyFans. Taking

3    these facts together with the facts considered above, it is plausible that defendant Radvinsky

4    personally participated in the alleged misconduct.

   Thus, plaintiffs' claims are plausible. To the extent defendants argue that plaintiffs'
factual allegations are unreliable, that will be tested in discovery. On a motion to dismiss, all
well-pled facts are accepted as true.

   **2.   THE COMMUNICATIONS DECENCY ACT DOES NOT BAR PLAINTIFFS' CLAIMS AGAINST META DEFENDANTS.**

   Meta defendants argue Section 230(c)(1) of the Communications Decency Act bars the claims against them. This order disagrees.

   Section 230(c)(1) states: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In other words, "subsection (c)(1) only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). A provider of an interactive computer service cannot meet the third element when it is "also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (quoting 47 U.S.C. § 203(f)(3)).

   **A.   *META DEFENDANTS ARE INFORMATION CONTENT PROVIDERS.***

   Here, Meta defendants certainly provide interactive computer services because they "provide[] or enable[] computer access by multiple users to a computer serv[er]" via the Facebook and Instagram social media platforms. *Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (Judge Lucy Koh) (quoting 47 U.S.C. § 230(f)(2)). And, "the [claims] inherently require[] the court to treat [Meta defendants] as the

6

1  'publisher or speaker' of content provided by another" because "removing content is

2  something publishers do." *Barnes*, 570 F.3d at 1102–03.

3  But Meta defendants are alleged to have done *more* than merely demote or remove

4  information provided by third parties (*i.e.*, plaintiffs' accounts and posts). Meta defendants are

5  information content providers "who [are] 'responsible . . . in part, for the creation or

6  development of' the offending content." Thus, Section 230(c)(1) does not immunize them.

7  *Roommate*, 521 F.3d at 1162 (citation omitted).

8  In *Roommate*, the defendant operated a website designed to match people renting out

9  spare rooms with people looking for places to live. The defendant required subscribers to state

10  their sex, sexual orientation, and number of children in their household before using the

11  website, which is a discriminatory practice prohibited by 42 U.S.C. Section 3604(c). "[The

12  defendant was] not entitled to CDA immunity for the operation of its search system, which

13  filter[ed] listings, or of its email notification system, which direct[ed] emails to subscribers

14  according to discriminatory criteria." Specifically, "[it] designed its system to use allegedly

15  unlawful criteria so as to limit the results of each search, and to force users to participate in its

16  discriminatory process." "By contrast, ordinary [websites] do not use unlawful criteria to limit

17  the scope of searches conducted on them, nor are they designed to achieve illegal ends." In

18  that way, *Roommate* "interpret[ed] the term 'development' as referring not merely to

19  augmenting the content generally, but to materially contributing to its alleged unlawfulness."

20  Because the defendant "help[ed] to develop unlawful content," it was an information content

21  provider "and thus f[ell] within the exception to Section 230." *Id.* at 1164–68.

22  Here, similarly, Meta defendants are not entitled to CDA immunity for operation of their

23  filtering system. Like the defendant in *Roommate*, which was alleged to have purposefully

24  designed its website to filter listings in a discriminatory manner, Meta defendants are alleged

25  to have purposefully designed their platforms to filter posts and accounts in an anticompetitive

26  manner. Although Meta defendants are not alleged to have augmented the posts or accounts

27  themselves, "[their] connection to the [anticompetitive] filtering process is direct and palpable:

28  [They] designed [their] [platforms] to limit the listings available to subscribers based on" ties

7

to competitors of OnlyFans.  While providing "*neutral* tools to carry out what may be unlawful or illicit [conduct] does not amount to 'development,'" Meta defendants are not alleged to have filtered pornographic content in a neutral manner.  Plaintiffs allege that Meta defendants' filtration tools are *designed to facilitate* anticompetitive conduct.  Thus, Section 230(c)(1) is inapplicable here.  *Id.* at 1169 (emphasis in original); *see Barnes*, 570 F.3d at 1101 n. 3.

Furthermore, contrary to Meta defendants' suggestion, allowing plaintiffs to pursue their claims would not open the door to others "to recover for the removal of posts *whenever* automated content-moderation tools [are] used" (Reply Br. 11) (emphasis added).  Rather, this order finds only that, when automated content-moderation tools are allegedly *designed to facilitate* unlawful conduct, the claims survive CDA defenses.

### B.   POLICY WEIGHS AGAINST APPLICATION OF THE CDA.

The policy outlined in the CDA itself weighs heavily against application of the Act here.

*First*, the CDA states that "[i]t is the policy of the United States . . . *to preserve the vibrant and competitive free market that presently exists for the Internet* and other interactive computer services, unfettered by Federal or State regulation."  47 U.S.C. § 230(b)(1) (emphasis added).  Because "[n]othing in [the CDA] shall be construed to prevent any State from enforcing any State law that is consistent with [the CDA]," this order cannot construe the CDA to bar plaintiffs' claims of unfair competition on the Internet.  47 U.S.C. § 230(e)(3).

*Second*, "[t]he [CDA] was not meant to create a lawless no-man's-land on the Internet." "[The Internet's] vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability."  It follows that Meta defendants cannot help OnlyFans violate laws of general applicability and hide behind the CDA to avoid liability itself.  *Roommate*, 521 F.3d at 1164.

True, our court of appeals has affirmed the dismissal of an unfair competition claim on the basis of Section 230(c)(1).  *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1108 (9th Cir. 2007).  But, more recently, in *Zango, Inc. v. Kaspersky Lab, Inc.*, our court of appeals acknowledged the danger that internet service providers may "abuse [their] immunity [under

Section 230(c)(2)] to block content for anticompetitive purposes or merely at [their] malicious whim." *Zango* warned of "a web browser configured by its provider to filter third-party search engine results so they would never yield websites critical of the browser company or favorable to its competitors." That is essentially what Meta defendants are alleged to have done here: configure Facebook and Instagram to filter posts and accounts (and accept bribes from OnlyFans to do so) so that neither platform yields posts favorable to OnlyFans' competitors. 568 F.3d 1169, 1178–79 (9th Cir. 2009) (Fisher, J., concurring).

In *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, our court of appeals took a step further and held Section 230(c)(2) did not immunize the anticompetitive conduct alleged therein. Specifically, *Enigma* considered "whether [Section] 230(c)(2) immunizes blocking and filtering decisions that are driven by anticompetitive animus" when the parties are "direct competitors." The parties in *Enigma* both sold computer security software, and the plaintiff alleged that the defendant had programmed its software to prevent users from downloading the plaintiff's software. The claims for deceptive business practices and tortious interference (with contracts and business relationships) survived the motion to dismiss because "[i]mmunity for filtering practices aimed at suppressing competition, rather than protecting internet users, would lessen user control over what information they receive, contrary to Congress's stated policy." 946 F.3d 1040, 1048–51 (9th Cir. 2019).

While *Zango* and *Enigma* applied only to Section 230(c)(2), and the parties in *Enigma* were direct competitors, the same policy concerns arise here: Meta defendants' "filtering practices [are] aimed at suppressing competition" in the online adult entertainment business. *Id.* at 1051. In fact, Meta defendants could have employed Section 230(c)(2) to attempt to defend themselves ─ they claim to be removing obscene material from their platforms in good faith, which is what Section 230(c)(2) immunizes. But they instead chose Section 230(c)(1) to shield themselves. To approve Meta defendants' CDA defense would make Section 230(c)(1) a backdoor to CDA immunity ─ "contrary to the CDA's history and purpose." *Id.* at 1050. Thus, congressional policy weighs heavily against Meta defendants' CDA defense.

### 3. THE FIRST AMENDMENT DOES NOT BAR PLAINTIFFS' CLAIMS AGAINST META DEFENDANTS.

Meta defendants also argue that the First Amendment protects their decisions to remove plaintiffs' content from their platforms. But the Supreme Court has held that the First Amendment does not immunize anticompetitive conduct:

> The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests. The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity.

*Associated Press v. U.S.*, 326 U.S. 1, 20 (1945).

Here, the First Amendment does not shield Meta defendants from liability for anticompetitive suppression of speech. As discussed above, Meta defendants are allegedly removing posts and accounts linked to *all* adult entertainment websites *except for* OnlyFans. If that is true, then Meta defendants are helping OnlyFans to achieve an unlawful monopoly in the online adult entertainment business.

"It is true that the . . . course of conduct here [was,] as in most instances[,] brought about through speaking or writing." As Meta defendants argue, removal of certain posts and accounts constitutes speech. "But it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Giboney v.*

*Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).  Thus, plaintiffs' claims withstand Meta defendants' First Amendment defense.

### 4. META DEFENDANTS ARE VICARIOUSLY LIABLE FOR THE ACTS OF THEIR EMPLOYEES.

Meta defendants argue they are not liable for the acts of their employees who allegedly participated in the anticompetitive conduct.  This order disagrees.  It is premature to conclude that those accepting bribes were involved in a frolic of their own so as to immunize Meta itself.

*First*, Meta defendants assert that the second amended complaint does not allege the three individuals named therein took any action to blacklist plaintiffs.  But that argument is unavailing.  Plaintiffs allege that two of the individuals are high-ranking officers and one is an employee of Meta defendants.  Plaintiffs also allege that each individual has means to blacklist plaintiffs via the GIFCT database (Second Amd. Compl. ¶¶ 79–83).  Moreover, Exhibit D to the complaint refers to wire transfers that benefited each individual at the expense of OnlyFans' competitors.  And, the whistleblower report states that the bribery "goes all the way to the top" such that "the top executives involved in this [conduct] get a revenue share of [OnlyFans'] growth" (*id.*, Exh. L).  Thus, it is reasonable to infer that the two high-ranking officers and the employee took actions to blacklist plaintiffs.

*Second*, Meta defendants assert that they are not vicariously liable for the acts of the Doe defendants (*i.e.*, Meta defendants' unnamed employees).  But that argument is also unavailing. "[A]n employer is vicariously liable for the torts of its employees committed within the scope of the employment."  "The employment, in other words, must be such as predictably to create the risk [that] employees will commit intentional torts of the type for which liability is sought." "[T]hat [the] tortious act 'was not committed in order to further the interests of the principal' does not preclude vicarious liability."  *M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 296 (1995) (citation omitted).

The employment of individuals within Meta defendants' content-moderation and security teams predictably and plausibly creates the risk that employees will intentionally and tortiously remove certain content from Meta defendants' platforms.  Such employees have a duty to filter

11

content. In the performance of that duty, it is plausibly foreseeable that an employee would abuse his power for his own benefit. *See Khraibut v. Chahal*, No. 15-CV-04463-CRB, 2021 WL 1164940, at *13 (N.D. Cal. Mar. 26, 2021) (Judge Charles Breyer) (citing *Meester v. Davies*, 11 Cal. App. 3d 342, 346 (1970)). And, even if no benefit flows to Meta defendants, that alone would not preclude liability.

*Third*, Meta defendants argue that vicarious liability does not apply to unfair competition claims. But they misstate the law. "[A company] can, of course, be held liable for violations of Section[] 17200 . . . by its employees, [but] [the company owner's] individual liability must be predicated on his personal participation in the unlawful practices." Thus, only individual owners of Meta defendants — not Meta defendants themselves — must have personally participated in the unlawful practices to be held liable. *People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984); *see People v. Regan*, 157 Cal. Rptr. 62, 64 (App. Dep't Super Ct. 1979).

### 5. THE ANTI-SLAPP STATUTE DOES NOT BAR PLAINTIFFS' CLAIMS AGAINST META DEFENDANTS.

Meta defendants move to strike plaintiffs' claims under California's anti-SLAPP statute. To prevail on their anti-SLAPP motion, Meta defendants must make a prima facie showing that the claims arise from an act specified in California Code of Civil Procedure Section 425.16(e). Thereafter, the burden shifts to plaintiffs to establish a reasonable probability of prevailing on the claims to survive dismissal. *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021). "At the second step, if, as here, the 'anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the [FRCP] 12(b)(6) standard and consider whether a claim is properly stated.'" *CoreCivic, Inc. v. Candide Grp., LLC*, No. 20-17285, 2022 WL 3724307, at *3 (9th Cir. Aug. 30, 2022) (citations omitted).

Regardless of whether Meta defendants can show that the claims arise from protected conduct, the anti-SLAPP motion fails. This order has already found plaintiffs' claims plausible, and they withstand our defendants' other defenses. Thus, plaintiffs have established

a reasonable probability of prevailing on their claims, so the claims withstand the anti-SLAPP statute.

### 6. ADMINISTRATIVE MOTIONS TO SEAL.

The parties move to seal and redact certain portions of the second amended complaint and the briefing. "Unless a particular court record is one traditionally kept secret, a strong presumption in favor of access is the starting point. A party seeking to seal a judicial record then bears the burden of overcoming this strong presumption by . . . articulat[ing] compelling reasons supported by specific factual findings[] that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006).

*First*, plaintiffs seek to redact the identities of certain individuals whom they allege handled business of OnlyFans in the Philippines (Second Amd. Compl. ¶¶ 74–75). However, plaintiffs' allegations regarding those individuals derive from public webpages. Thus, redacting the individuals' identities would serve no purpose. Plaintiffs' motion is denied as to paragraphs 74 and 75 of the second amended complaint.

*Second*, plaintiffs request to seal Exhibit D and redact other portions of the complaint. As discussed above, Exhibit D contains bank account information, details of wire transfers from Fenix International to Meta employees, and the names of Meta employees. The remaining paragraphs in the complaint that plaintiffs wish to redact describe the wire transfers and provide background information on the Meta employees referenced in Exhibit D. Plaintiffs also wish to redact the whistleblower report, Exhibit L. Defendants seek to redact similar information in their briefs.

As to Exhibit D, redaction is appropriate. Plaintiffs make only "general claims of [reputational] harm and privacy without any 'particularized showing' that 'specific prejudice or harm will result' with the disclosure of [the] referenced information." District courts have found such claims insufficient to seal bank information and nonparties' identities. *Martin v. Wells Fargo Bank, N.A.*, No. CV 12-06030 SI, 2013 WL 5541973, at *3 (N.D. Cal. Sept. 30, 2013) (Judge Susan Illston); *see Pat. Tech., LLC v. Woodman*, No. 15-CV-00578-DMR,

2015 WL 4537779, at *7 (N.D. Cal. July 27, 2015) (Judge Donna Ryu); *Bunsow De Mory LLP v. N. Forty Consulting LLC*, No. 20-CV-04997-JSC, 2020 WL 7872199, at *2 (N.D. Cal. Sept. 21, 2020) (Judge Jacqueline Corley).

Yet FRCP 5.2(a)(3) and (a)(4) state that, when a filing "contains . . . the name of an individual known to be a minor[] or a financial-account number, a party or nonparty making the filing may include only: . . . (3) the minor's initials; and (4) the last four digits of the financial account-number." Thus, as to Exhibit D, all but the last four digits of each account number shall be redacted, and the name of the minor referenced therein shall be redacted. All other information shall be made available to the public. The same shall apply to (i) the remaining exhibits and paragraphs in the second amended complaint and (ii) the information in defendants' briefs.

## CONCLUSION

For the foregoing reasons, the motions to dismiss and strike are **DENIED**. Plaintiffs' motion for leave to amend the complaint to include the whistleblower report (and the related news article), Exhibits L and M, is **GRANTED**. The parties' motions to seal are **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: November 30, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE