MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
DAVID E. AZAR
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com
*Plaintiffs' Attorney*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

DAWN DANGAARD, a/k/a ALANA EVANS,
KELLY GILBERT, a/k/a KELLY PIERCE,
JENNIFER ALLBAUGH, a/k/a RUBY, and
      on behalf of themselves
      and all others similarly situated,

    *Plaintiffs,*

v.

INSTAGRAM, LLC,
FACEBOOK OPERATIONS, LLC
META PLATFORMS, INC.
FENIX INTERNATIONAL INC.
FENIX INTERNET LLC
LEONID RADVINSKY,
and JOHN DOES 1-10,
    *Defendants.*

Case No. C 22-01101 WHA

SECOND AMENDED CLASS ACTION
COMPLAINT

JURY TRIAL DEMANDED

      Plaintiffs allege upon personal knowledge, or based upon the investigation of counsel, after an inquiry reasonable under the circumstances, and review of information provided anonymously that a reasonably inquiry under the circumstances indicate has indicia of authenticity, that the following factual contentions have evidentiary support, or where stated, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Allegations made on information and belief concern facts that are peculiary within the possession and control of defendant, and for which will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## I.   INTRODUCTION

1.   The Meta Defendants are using their market dominance in social media to aid another company in establishing dominance in the online adult entertainment industry.  There are 2.9 billion Facebook users and 1.4 billion Instagram users, and Meta has the power to help its allies and, in doing so, destroy its allies' competitors.

2.   The following are some of the key additional allegations in this Second Amended Complaint:

    a.   The BBC wrote an article on February 22, 2022, just before this complaint was filed.  That article is attached as Exhibit A.  The article summarizes interviews with two anonymous sources, one from an adult performer and one from a platform that was affected. The article reports that the performers' account was flagged with an internal code that is only available to someone in the Facebook  engineering department. It states: "BBC News has learned that Camila's Instagram account status - *only visible by engineering staff* - was  changed to 'critical'.  This meant it was not promoted as prominently any more, leading to reduced visibility." That quote suggests that the BBC had an inside source that told them that information, because only someone inside Facebook with appropriate access would know of such code and that it was applied to a particular performer's account.  Also, the fact the BBC included those experiences of those two anonymous sources (performer and platform), with a reference to an limited access status code at Facebook that reduces visibility, and all of this information is in the same article that breaks the story of about the allegations in this case (as first substantially alleged in an earlier-filed action

in Florida), suggests that the BBC editors believed they are all connected; otherwise it would fall outside of what, on information and belief, are BBC guidelines, and mislead BBC's readers.  Further, on information and belief, BBC editorial guidelines require more than one source of corroboration for statements made in an article.

b.   In response to the BBC article, Plaintiffs' counsel received anonymous tips, and the ones included in this Second Amended Complaint are those for which counsel conducted a reasonable inquiry under the circumstances, including having the information evaluated by consulting experts and other investigation within their work product privilege.

c.   Counsel received detailed information about some of the alleged wire transfers related to the scheme from accounts affiliated with a Fenix Defendant to three trust accounts in the Philippines, with the name of the three accounts corresponding to the names of two Facebook executives and the name of a third, high-ranking Facebook executive's young son.  That anonymous tip – titled "Follow the money" – is attached as Exhibit D, and is filed under seal.  The memo line in one of the wire transfers lists the names of some of the platforms in Exhibit C that, on information and belief, were wrongfully designated as dangerous organizations as part of this scheme.  Banking experts retained by Plaintiffs' counsel have concluded that the level of detail and format of the information had indicia of reliability sufficient to merit further inquiry.  Further, counsel received a phone call from an attorney who said he reviewed wire transfer records that appear to have included at least some of the same transfers, and they appeared to him

to have sufficient indicia of reliability in that they did not appear to be faked. Plaintiffs conducted a reasonable background inquiry of this attorney and he appears to be very experienced and credible.  Plaintiffs need discovery to ascertain whether someone falsely opened accounts in the names of those Facebook executives or family members, or whether they indeed are associated with those executives; accordingly their names are redacted in the publicly filed Second Amended Complaint, and Exhibit D has been filed under seal.  Plaintiffs are aware of no legitimate reason for payments from bank accounts associated with the Fenix Defendants to those Facebook executives through trust accounts in the Philippines, and such payments would provide circumstantial evidence of the alleged scheme.  The amounts of some of the wire transfers appear consistent with suspicious activity reports and reporting regarding Defendant Radvinsky obtained by Forensic News (see footnote 17, infra); discovery is needed to determine if additional wire transfers or other payments occurred.

d. The same attorney stated that he also reviewed a sample of what appeared to be more than 200 pages of internal Facebook documents concerning an inquiry into possible abuse of the shared hash database of the GIFCT that validated the material allegations of this Second Amended Complaint, and that the  documents appeared to him to have sufficient indicia of reliability in that they appear to have been an internal analysis of the scheme.  In other words, on information and belief, at some point, some people at Facebook determined that the material aspects of this scheme occurred.

e. On information and belief, at some point, there was an attempted coverup of the scheme, after some of the datasets were sufficiently corrupted, in which affected performers and platforms were shifted from a dangerous organization (terrorist) designation to a new sexual solicitation category (used also for trafficking).

f. Plaintiffs also have been informed that at some point, a whistleblower made a report to intergityline.facebook.com that overlaps with some of the allegations alleged herein. Plaintiffs need copies of all internal analyses and writing related to the allegations of this Second Amended Complaint to plead with greater particularity, all of which are in the possession and control of one or more of the Meta defendants.

g. Counsel received a separate listing of more than 21,000 Instagram accounts that was analyzed by expert Jonathan Hochman, who concluded that the list of 21,000 names had sufficient indicia of reliability. That report is attached as Exhibit B.

h. Counsel for Plaintiffs received a list of adult content platforms that allegedly were designated as dangerous organizations, and that list is attached as Exhibit C. The list includes competitor platforms to OnlyFans, but does not include OnlyFans or the Radvinsky affiliated entities, even though they have substantially similar content as the platforms included in the list. For each of those platforms, counsel received a list of Instagram account names that were purportedly associated with that platform, and thus were essentially deemed to be sympathizers of dangerous organizations. There is sufficient overlap of these Instagram account names with those analyzed

in the Hochman report to provide a sufficient indicia of reliability to justify discovery from the Meta Defendants.

3.     The above is a summary of the most important new allegations supporting the existence of the scheme.  The following paragraphs follow the structure of the First Amended Complaint, supplemented by additional factual allegations.

4.     This case is about a corrupt business gaining an enormous advantage over its competitors by wrongfully manipulating behind-the-scenes databases, and in the process, harming thousands of small entrepreneurs who rely on social media to earn a living.

5.     Plaintiffs and Class Members are performers in the online adult entertainment business and anyone else (regardless of the description they use for themselves, such as influencer or artist) who provided content to a competitor of OnlyFans and was harmed by the alleged scheme ("AE Providers" or "AE Performers"). Plaintiffs and Class Members make their performances available to consumers through online adult entertainment platforms ("AE Platforms"). Consumers are charged to access the content on the platform, with the revenue split between the AE Platform and the AE Provider. AE Providers rely on interactions on social media platforms such as Instagram and Twitter to guide customers to their pages on AE Platforms.

6.     Collusion between certain employees or agents of Meta Platforms, Inc. ("Meta") and its subsidiaries (such as Facebook and Instagram), and the OnlyFans adult entertainment business and those affiliated with it, damaged or destroyed the businesses of many competing AE Platforms and with that harmed the livelihoods of Plaintiffs and Class Members featured on those platforms.  Some of those performers and businesses were destroyed.

7.     Until late 2018 or early 2019, the online adult entertainment industry was a vibrant, competitive market. That is when AE Providers that had promoted competitors of OnlyFans suddenly experienced a drop-off in traffic and user engagement on social media platforms. The

1    deletion and hiding of posts, and reduction in social media traffic for certain providers, was so

2    substantial and so dramatic that it could not have been the result of filtering by human reviewers

3    of social media content. The business lifeblood of certain AE Providers and AE Platforms

4    appeared to be blocked so consistently that only automated processes could be responsible. But

5    performers associated exclusively with OnlyFans were not affected in the same way. As a result,

6    OnlyFans began to grow incrementally, and then exponentially – rocketing up the internet traffic

7    rankings – and quickly becoming one of the most dominant players in the adult industry, while

8    most of OnlyFans' competitors stagnated or saw dramatically reduced traffic and revenue.

9        8.    Plaintiffs allege that the following allegations in this paragraph will likely have

10   evidentiary support after a reasonable opportunity for further investigation or discovery: The

11   Defendants in this action orchestrated a scheme through which they caused AE Performers

12   associated with OnlyFans' competitors to be "blacklisted" by certain social media platforms for

13   the purpose of reducing competition with OnlyFans.  "Blacklisting" is a process whereby social

14   media accounts are identified to certain social media platforms in a way to prompt those platforms

15   to suspend or delete those accounts or otherwise reduce their visibility. The blacklisting process

16   was accomplished first internally at Instagram/Facebook by automated classifiers or filters, which

17   were then submitted to a shared industry database of "hashes," or unique digital fingerprints. This

18   database was and is intended to flag and remove content produced by terrorists and related

19   "Dangerous Individuals and Organizations" to curtail the spread of terrorism and violent

20   extremism online. However, the AE Providers blacklisted, and the AE Platforms that were injured

21   by the blacklisting, were not terrorists and had nothing to do with terrorism of any kind. The

22   scheme was intended to destroy the AE Platforms' businesses, and either destroy the AE Providers

23   or force them to work exclusively through OnlyFans.

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint

9.      According to a recent BBC article, Meta claims it was sufficiently concerned about these allegations that it investigated whether the database had been abused.  Meta asserted that it found no evidence the shared hash database had been abused.[1]  Meta did not say the scheme did not happen, just that it found no evidence of it and therefore the claim had no merit.  Meta did not explain what triggered its investigation or how it conducted the investigation. Plaintiffs believe Meta did not investigate thoroughly enough and Plaintiffs encourage Meta to make this information available for independent review.

10.     Critical facts giving rise to a strong inference that the events described occurred include:

(a) A list and a spreadsheet provided to Plaintiffs' Counsel through a tipline demonstrating that over 21,000 Instagram accounts that include but are not exclusively AE Providers, and 95 AE Platforms (but not the platforms associated with the Radvinsky defendants), were targeted by Defendants;

(b) Documentation of wire transfers, also received through the tip line,  of sums of money from entities associated with Fenix and Radvinsky to executives at Meta, at the time the scheme went into effect;

(c) The fact that Meta conducted an internal investigation due to concerns about misuse of the DIO designation by its own employees;

(d) A statement by a Meta representative that some individuals on the "blacklist" that they were not banned because of sexual content, bur rather for "sexual solicitation,"

---

[1] Noel Titheradge, "OnlyFans accused of conspiring to blacklist Rivals," BBC News Feb. 22, 2022. https://www.bbc.com/news/world-60029508 (checked Sept. 24, 2022).  Attached as Exhibit A,

meaning sex trafficking, a newly invented category that was inapplicable to AE providers;

(e) OnlyFans circulated a memo internally stating that OnlyFans and Meta had a special relationship, which provided some protection to its AE Providers' social media posts; and

(f) The absence of any other plausible explanation as to why OnlyFans performers received more favorable treatment from Instagram and other social media platforms than did performers associated with other AE Platforms, despite OnlyFans being the subject of both congressional and media investigations for involvement in exploitation of children.

11.    This lawsuit does not allege wrongdoing by Meta or its subsidiaries as "publishers" of user content under 47 U.S.C. § 230(c)(1). Rather, this lawsuit alleges that Defendants "blacklisted," without justification and in violation of law, Plaintiffs and other Class Members as part of a scheme to reduce and eliminate competition for OnlyFans. The legal duty that is being sued over is the intentional suppression of competition, not editorial choices to allow or remove particular postings by third parties.

12.    Enforcing state and federal laws regulating unfair business practices by interactive computer services is consistent with the purpose of Section 230. To hold otherwise would reward online platforms for anti-competitive and other monopolistic business behavior, and provide no incentive for them to supervise their employees and agents and stop anti-competitive conduct when discovered.

## II. PARTIES

13.    Plaintiff Dawn Dangaard is a professional adult entertainment performer. Her stage name is Alana Evans. In this Complaint, "Alana Evans" refers to Plaintiff Dangaard. She is also

the president of the Adult Performance Artists Guild ("APAG"), a federally recognized labor union whose goals are "to earn employee rights, set performer responsibilities, negotiate fair practices, and help performers provide themselves with a better future." She is a citizen of California.

14.     Plaintiff Kelly Gilbert is a professional adult entertainment performer. Her stage name is Kelly Pierce. In this Complaint, "Kelly Pierce" refers to Plaintiff Kelly Gilbert.  She is Secretary of the APAG.  She is a citizen of Illinois.

15.      Plaintiff Jennifer Allbaugh is a professional adult entertainment performer. Her stage name is Ruby. In this Complaint, "Ruby" refers to Plaintiff Allbaugh. She is Vice President of the APAG. She is a citizen of Ohio.

16.     Defendant Fenix International Limited ("Fenix") is a private, limited company registered under the laws of the United Kingdom and Hong Kong, with its principal place of business at 4th Floor Imperial House, 8 Kean Street, London, WC2B 4AS United Kingdom. Based on public information, Fenix also conducts business or has operations (directly or through subsidiaries or affiliates) in the United States, Manila, Singapore, Tokyo, New Delhi, and Bangkok.  Fenix operates the OnlyFans AE Platform.

17.     Defendant Fenix Internet, LLC ("Fenix Internet") is a Delaware limited liability company that is headquartered in Florida. On information and belief, Fenix Internet, LLC is a wholly owned subsidiary of Fenix. Accordingly, for purposes of diversity jurisdiction, its citizenship is the same as Fenix. Customer charges for the OnlyFans website have appeared as "Fenix Internet LLC" on customer bank statements; accordingly, Fenix Internet LLC receives, and is a conduit for, funds wrongfully obtained and/or proximately connected to the tortious conduct alleged herein.

18.     Leonid Radvinsky ("Radvinsky") is an individual who resides in Palm Beach County, Florida.  He is the owner of the OnlyFans AE Platform, https://onlyfans.com/, through his ownership of Fenix, and he controls Fenix Internet. Radvinsky is also the founder and owner (through a holding company) of the cam site "myfreecams"; Radvinsky also owns or controls "stars.avn.com." Those sites are referred to herein as the Radvinsky-affiliated sites. He is a citizen of Florida.

19.     Defendants Fenix, Fenix Internet, and Radvinsky are collectively referred to as the "Radvinsky Defendants."

20.     The Radvinsky Defendants are subject to the personal jurisdiction of this Court because (i) they operate, conduct, engage in, and carry on business in California and (ii) they caused injury to Plaintiffs and to Class Members in California arising out of activities in California. The Radvinsky Defendants are subject to the personal jurisdiction of this Court because they engaged in substantial and not isolated activity within this district.

21.     Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its headquarters and principal executive offices in this district at 1601 Willow Road, Menlo Park, California 94025. It is a citizen of Delaware and California.  Until its December 1, 2021 renaming, Meta had been known as Facebook, Inc.  It is the owner and operator of, among other things, two large social media platforms, Facebook and Instagram.

22.     Defendant Instagram, LLC is a wholly owned subsidiary of Defendant Meta.  It is the operator of the Instagram social media platform. It is organized under the laws of Delaware. On information and belief, its sole Member is Meta so its citizenship is the same as that of Meta.

23.     Defendant Facebook Operations, LLC is a wholly owned subsidiary of Defendant Meta. It is organized under the laws of Delaware. It is the operator of the Facebook social media

platform. On information and belief, its sole member is Meta so its citizenship is the same as that of Meta.

24.     Meta and its subsidiaries are vicariously liable for the acts of their agents and employees enumerated in this Complaint as the tortious acts of its employees arose out of and are engendered by their employment, are directly liable following the principle of *respondeat superior*.

25.     At all times mentioned herein, each Defendant acted as the actual or ostensible agent, employee, and/or co-conspirator of each other Defendant and, in performing the actions alleged herein, acted within the course and scope of such agency, employment, and/or conspiracy.

26.     Plaintiffs and Class Members allege that they were harmed by each Defendant, or each Defendants' employees, by tortious conduct as alleged herein, and each Defendant is responsible for the harm because and to the extent that each was part of a conspiracy to commit the torts alleged herein.

27.     Plaintiffs allege that the following allegations in this paragraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:  Each Defendant did this by (1) being aware that one or more of the other Defendants planned to do one or more of the wrongful acts alleged herein, and (2) agreed with one or more of the other Defendants and intended that the wrongful act be committed, or (3) was responsible in its capacity as employer of conspirators for the acts in furtherance of the conspiracy taken by such employees in the course of their employment. Plaintiffs allege that each Defendant, or their agents and employees, cooperated, or agreed to cooperate, for one or more of the harms alleged that was committed by one or more of the other Defendants as co-conspirators.

28.     At all times mentioned herein, a unity of interest and ownership existed, and still exists, among the Radvinsky Defendants, such that the separate personalities of the companies and

1  the individuals did not, and do not, exist, and adherence to the fiction of a separate legal existence

2  would promote injustice.

3  ### III.    JURISDICTION AND VENUE

4      29.    This Court has jurisdiction over this action under the Class Action Fairness Act

5  ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the

6  aggregated claims of the individual class members exceed the sum or value of $5,000,000.00

7  exclusive of interest and costs, and some of the members of the proposed class are citizens of states

8  different from each of the Defendants.

9      30.    All Defendants have sufficient minimum contacts with California to be subject to

10 this Court's personal jurisdiction. Defendant Meta and its subsidiaries have their principal place

11 of business in this District. Defendants Fenix, Fenix Internet, and Radvinsky intentionally avail

12 themselves of the markets within California through the promotion, sale, marketing, and

13 distribution of their adult entertainment platforms in this district, which renders this Court's

14 exercise of jurisdiction necessary and proper. In addition, acts in furtherance of the conspiracy

15 occurred in this district at or through (e.g., via technology or systems) the offices of defendant

16 Meta and its subsidiaries.

17     31.    Plaintiffs incorporate by reference the allegations against the Fenix defendants

18 regarding jurisdiction in Exhibit K, especially pages 4-8, which is ECF number 45. Plaintiffs

19 incorporate in an abundance of caution because the court has already set a separate briefing

20 schedule for jurisdictional discovery in the same order in which it requested Plaintiffs filed an

21 amended complaint.

22     32.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants

23 Meta, Instagram, LLC, and Facebook, LLC are based in this District, and a substantial part of the

events giving rise to the claims occurred in this district (e.g., via technology or systems).

1    Alternatively, Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Defendant

2    Meta is subject to this court's personal jurisdiction, and there is no other district where this action

3    could be brought.

## IV.  FACTS

### A.    The Scheme

#### 1.    Background

33.    Plaintiffs allege that Defendants engaged in a scheme to cause performers who worked with competitors of OnlyFans – including Plaintiffs – to be "blacklisted" by mainstream social media platforms, including social media platforms owned and operated by online services other than Meta or its subsidiaries, for the purpose of interfering with those AE Platforms' business and reducing competition with OnlyFans. "Blacklisting" is a process whereby social media platforms suspend or delete particular accounts or otherwise reduce their visibility. Blacklisting is typically accomplished by automated classifiers or filters that keep particular websites or pages from appearing on social media platforms or appearing in the results shown by search engines pursuant to user queries. Plaintiffs are suing Defendants for wrongfully causing their social media content, and that of fellow Class Members, to be identified for blacklisting at multiple social media platforms and included in training data for a "classifier" (a technical term referring to a learning algorithm  that learns a model from training data) or filtering list used by multiple social media platforms and other technology companies. The specification of particular websites or pages for blacklisting is evidence of the scheme and has caused Plaintiffs and Class Members to be damaged.

34.    This Complaint uses the words "classifier" or "classification" in the technical sense as they relate to machine learning. Specifically, as explained in one article: "Classification is the process of predicting the class of given data points. Classes are sometimes called targets/ labels or categories. Classification predictive modeling is the task of approximating a mapping function (f)

from input variables (X) to discrete output variables (y). *For example, spam detection in email service providers can be identified as a classification problem*. This is a binary classification since there are only 2 classes as spam and not spam. A classifier utilizes some *training data* to understand how given input variables relate to the class. In this case, known spam and non-spam emails have to be used as the training data. When the classifier is trained accurately, it can be used to detect an unknown email. Classification belongs to the category of supervised learning where the targets also provided with the input data."[2]

35.   For ease of reference, throughout this Complaint the word "database" is used generically to refer to a collection of data and information and includes the training data used for a classifier; when the context requires, the word database also refers to the database management system and applications associated with them so that the term refers to both the data and the program/application that uses it.

36.   The AE Providers relevant to this lawsuit are adult performers who create content posted on their accounts on AE Platforms. Customers are charged to access the content, with the revenue split between the AE Platform and the AE Provider. The AE Providers attempt to drive traffic to their accounts on the AE Platforms by posting content on mainstream social media services, such as using their personal Instagram accounts. The AE Providers endeavor to comply with the various mainstream social media services' terms of service and other policies, including Facebook's Community Standards and Instagram's Community Guidelines.

37.   AE Providers drive traffic to their accounts on the AE Platforms by posting on their personal mainstream social media accounts, such as their personal accounts on Instagram.  One important mechanism for AE Providers to establish and maintain connections with potential

---

[2] Machine Learning Classifiers, https://towardsdatascience.com/machine-learning-classifiers-a5cc4e1b0623 (emphasis added).

customers over social media is by attracting "followers." Social media users may choose to "follow" any other account (whether or not that followed is promoting commercial services) by pressing the "follow" button, thus affirmatively requesting that they be notified when the followed individual has posted new content. "Followers" of the AE Providers' social media accounts may become paying customers on AE Platforms.

## 2.     The Origin of the Scheme

38.     Up until the fourth quarter of 2018, the online adult entertainment industry was a vibrant, competitive market with many AE Platforms, large and small.

39.     In October 2018, the controlling interest in Fenix changed ownership, with Radvinsky acquiring 100 percent of the company.

40.     Soon after Radvinsky's acquisition of OnlyFans through his purchase of Fenix, AE Providers that had worked with competitors of OnlyFans, including the Plaintiffs in this Action, suddenly began to experience a drop-off in traffic and user engagement on social media platforms (with the effects first appearing for some AE Providers, and then seeming to expand to others over several months, consistent with more AE Providers being targeted). AE Providers that used OnlyFans' competitors as platforms for their adult content experienced having many of their posts on the mainstream social media services – which would normally lead followers on those services to the adult AE Platforms – deleted by the social media services, other posts being "hidden" from users searching for the sites and from users who had chosen to "follow" the site, and the number of click-throughs from those posts that did appear on social media services dropped drastically. This deletion of posts and reduction in traffic was most noticeable on Instagram but also occurred on Twitter, Facebook, Snap, and other mainstream platforms.[3] The combination of deleted and

---

[3] *See* Exhibit A.

hidden posts led to reduced click-throughs and substantially reduced visibility for the AE Providers on social media.

41.     The deletion and hiding of posts, and reduction in social media traffic for certain AE Providers started to occur suddenly and was so substantial and dramatic that it is very unlikely to have been the result of filtering by human reviewers of social media content.[4]   Rather, the takedowns and other adverse actions and reduced traffic suggested that the social media services were using computer algorithms that automatically classify/filter content without human intervention. Put another way, the postings and traffic that were the business lifeblood of certain AE Providers appeared to be blocked so methodically, systematically, and consistently that only automated processes could be responsible.  At this time, Threat Exchange, a data sharing platform created and hosted by Meta[5], and the Global Internet Forum to Combat Terrorism, or GIFCT, were the only data sharing systems in existence that would have been capable of creating this observed effect.

42.     AE Providers who had exclusively promoted OnlyFans on their mainstream social media accounts, or the Radvinsky-affiliated sites, and had never promoted or affiliated online with any of OnlyFans' competitors, appeared to be unaffected by these automated takedowns and reduced traffic. They did not experience the dramatically reduced visibility on social media that was experienced by AE Providers who worked with OnlyFans' competitors.

### 3.     How the Scheme Worked

43.     As explained in the attached expert report, individual and shared classification/filtering databases include, but are not limited to, those which identify and block

---

[4] See Expert Declaration of Jonathan E. Hochman ("Hochman Decl."), attached as Exhibit B, ¶ 19.
[5] Hochman Decl., ¶¶ 42—52.

fake accounts, spam accounts, and terrorist content, such as Facebook's Threat Exchange and the GIFCT Shared Hash Database and URL sharing.

44.    In 2015, Facebook launched Threat Exchange, as "a community and mechanism for sharing threat intelligence among organizations." When Threat Exchange was launched, Facebook worked informally with various companies using the Threat Exchange to collaborate on threat identification on the internet, until ultimately sponsoring the GIFCT, which appears to be a collaboration of entities (who refer to themselves as a "consortium") who created a non-profit, public-facing entity to coordinate the fight against harmful content on the internet, while utilizing Facebook's Threat Exchange platform.

45.    The GIFCT was created in 2016 by Facebook, Microsoft, Twitter, and YouTube (a subsidiary of Google). The GIFCT has a shared industry database of "hashes," or unique digital fingerprints, of violent terrorist content that had been flagged and removed from their services to curtail the spread of terrorism and violent extremism online. The GIFCT also has a program to share URLs, coordinated with an outside vendor.

46.    In addition to the founding member companies, the GIFCT lists thirteen general members: Tumblr, WordPress, Justpaste.it, Airbnb, Mailchimp, Discord, Instagram, WhatsApp, Pinterest, Amazon, Dropbox, Mega, and LinkedIn. In addition to these companies, The GIFCT engages with more than 120 tech companies, including smaller platforms that lack the resources to develop their own classifier/filtering systems.[6]

47.    Publicly available documents (including a recent case study discussed in the accompanying expert report), show that the GIFCT still uses the Facebook Threat Exchange platform, which is still owned, operated, and maintained by Facebook, and for which a substantial

---

[6] https://counterspeech.fb.com/en/initiatives/global-internet-forum-to-counter-terrorism-gifct/ (checked September 15, 2022).

amount of developer documentation describing how to use and access it is publicly available. For example, a publicly available letter from the GIFCT's Executive Director Nick Rasmussen posted to the GIFCT.org website, references recommendations made by partner organization BSR (Business for Social Responsibility) based on assessment of the "actual and potential human rights impacts of GIFCT's work." In his letter, Rasmussen references BSR's recommendations regarding content removal and preservation, with specific reference to the Hash Sharing Database being hosted by Facebook's Threat Exchange:[7]

**Content removal and preservation:**

- Require contributing companies to conduct human review and approval prior to adding hashes to the database
- Investigate how to enable third-party reviews of the hash-sharing database to assess whether hashes are consistent with the GIFCT taxonomy
- Develop a process for enabling researcher access to the hash-sharing database and associated content
- Require companies that contribute to and utilize the hash-sharing database to commit to specific disclosure
- Enable multi-stakeholder governance of the hash-sharing database to the extent possible under the current management model (i.e., hosted by Facebook Threat Exchange) and develop a plan for long-term governance and oversight

48.    In addition, a publication of Tech Against Terrorism and published by CounterExtremism.com, describes the GIFCT Hash Sharing Database as hosted on Facebook's Threat Exchange:

---

[7]Hochman Decl., ¶ 44.
.

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13



The database itself is hosted on Facebook's ThreatExchange platform which was originally developed to allow companies to share hashes of malware with one another. ThreatExchange is secure, flexible, and robust; data shared via the hash-sharing consortium is available only to other members of the consortium, not all users of ThreatExchange. ThreatExchange also has a mature API, and many consortium members choose to integrate with that platform in that way. Others use a graphical interface. The consortium uses multiple hashing techniques to facilitate easy engagement by companies that may have familiarity with one technique over another.

The consortium has developed guidelines for the type of content to be uploaded into the database. When a hash is uploaded it includes metadata that corresponds to the company that uploaded it and a code that corresponds roughly to the type of content reflected in the hash. The hash-sharing consortium does not share personally identifiable information.

**How Do Small Companies Get Involved?**

The first step to joining the hash-sharing consortium is signing an NDA, which facilitates more detailed discussion about ThreatExchange, the coding scheme, and the hashing techniques we use. This also gives existing members of the consortium an opportunity to vet interested companies. Companies then sign an MOU, register for ThreatExchange, and get set up with one or more of the supported hashing techniques. The Facebook team provides support and guidance for all of those technical aspects, and the hash-sharing companies more broadly sometimes collaborate to write and share useful scripts and tools. After that, implementation is a matter of engaging the ThreatExchange API and developing tools and processes for managing matches to hashes that are found on the platform. Many of the GIFCT member companies are happy to provide support and guidance for developing those protocols, but they are ultimately the purview of each platform.

14
15
16
17
18
19
20
21
22
23

49.     One purpose of the GIFCT is to allow members to share hashes (and also URLs) in order to identify and quickly remove potential terrorist content on their respective platforms, sometimes referred to as content originating from "dangerous individuals or organizations," or DIO lists. Each of the GIFCT members uses the shared hash tags (and URLs) in their own way, based on their classification/filtering/machine learning/artificial intelligence system(s).

50.     In order to generate the hashes (and URLs to share), each GIFCT member has its own list (or structured data), sometimes referred to as its dangerous individuals and organizations list, comprised of individuals and organizations (and their associated URLs and other electronic identifying data) that are designated as terrorists, terrorist sympathizers, or otherwise a dangerous organization or individual. Computer algorithms use that data to generate unique hashes of content from organizations and individuals to be classified/filtered due to their supposed connection with

or promotion of (including by linking to, liking, or tagging) those terrorist/dangerous organizations or individuals. The GIFCT members share their dangerous organizations lists (particularly through sharing URLs), and also the shared hash database (of content).

51.     The GIFCT is the public facing organization that provides a framework for social media platforms and other organizations, including Amazon, Microsoft, YouTube, Twitter, Zoom, Airbnb, LinkedIn, Pinterest, Tumblr, WhatsApp, Discord, and Dropbox to collaborate on the Threat Exchange platform owned and maintained by Facebook, in order to submit and exchange various  designations, descriptions, or other information pertaining to various digital content types through its Application Programming Interface ("API"), which has parameters for access, tracking of who submits what, privacy levels for data, etc. It contains information that pertains to how submitted Threat Indicators are designated in various manners, including by categorizing, tagging, and setting privacy levels which determine what other users or members can view the data and information pertaining to it. In addition to the GIFCT, the Threat Exchange itself allows organizations, including small businesses, to apply for membership (via Facebook) to license use of the Threat Exchange and participate in the contribution of designated content to the Threat Exchange, as well as rely on the designations submitted by other members in their policing of their own platforms.

52.     In a recent transparency report, the GIFCT reported over 300,000 unique hashes in its database, consisting of approximately 250,000 distinct images and approximately 50,000 distinct videos.[8]

53.     None of the associated content in the GIFCT shared hash database is presently available for independent review or audit.

---

[8]  GIFCT Transparency Report July 2020,  https://gifct.org/wp-content/uploads/2020/10/GIFCT-Transparency-Report-July-2020-Final.pdf at 3 (checked Sept. 27, 2022).

54.     During the time relevant to the allegations in this Complaint, Instagram drove significant traffic to external adult websites (i.e., the AE Platforms). Instagram has been one of the primary platforms used by content AE Providers to drive traffic to OnlyFans and competitors of OnlyFans.

### 4.   Operation of the Blacklisting Scheme

55.     Just months before Radvinsky acquired OnlyFans, when the OnlyFans website was still owned by the Stokely family, Facebook's own transparency report shows a sudden 500% increase in content removed for terrorist propaganda and a 66% increase in content removals for Adult Nudity and Sexual Activity in Q2 2018, occurring in unison, one or more of the participants in the scheme to wrongfully include AE Providers in the shared filtering database tested the scheme and prepared to implement the scheme in advance of an acquisition. It is unclear whether the dates on the Transparency Report reflect when the content was posted on the platform, rather than the date on which the content was actioned. The scheme appears to have commenced soon after Radvinsky acquired OnlyFans in October 2018. The Stokely family may have provided the link between Radvinsky and at least some of the British Meta employees involved in the scheme.

56.     Due to the misuse of one or more individual and shared databases, social media services removed accounts and hid posts of AE Providers who used AE Platforms competing with OnlyFans and the identifying URLs and other information for those competing AE Platforms. This affected (i) AE Providers who at any point promoted a competitor of OnlyFans and (ii) AE Platforms that compete against OnlyFans. But the removals had a much smaller effect on OnlyFans and the Radvinsky-affiliated sites. While some AE Providers who worked with both OnlyFans and other AE Platforms were deleted or hidden, those who *always, exclusively* linked their postings on mainstream social media services to OnlyFans, or the Radvinsky-affiliated sites, were allowed to remain.

57.   On occasion, takedowns were reversed when AE Providers complained to social media services, and postings and accounts that had been removed were restored. These reversals apparently did not change any training data for a "classifier" or any individual or shared database that identified those AE Providers or their content as terrorists, terrorist sympathizers, or otherwise a dangerous organization or individual. In other words, a takedown might be reversed because a social media service decided that particular content was not, for example, adult content, but it would not change the separate classification of the person, organization or their associated content as (or related to) terrorists, terrorist sympathizers, or otherwise a dangerous organization or individual in the separate lists, training data, and databases for that purpose. However, when reversals happened only at the individual social media company level – e.g., by Instagram and Facebook – it did not change the fact that the training data and individual or shared databases of terrorist or dangerous individuals, organizations, and/or associated content still had the names, IP addresses and URLs of those AE Providers and AE Platforms in those training data or databases (along with their hashed content), and thus those AE Providers and AE Platforms continued to suffer wrongful filtering. This had the effect of further concealing the scheme to AE Providers while also ensuring that the targeted AE Provider would continue to have their content removed or hidden in the future.

58.   There is no statistical or other benign explanation (such as better marketing) for the disproportionate classification/filtering treatment of and effects on both (i) OnlyFans' competitors on social media platforms and (ii) AE Providers who had promoted or affiliated with OnlyFans' competitors, leaving the conclusion that it was caused by a manipulation of one or more of the individual databases (or sets of training data) that was then shared in part or in full among multiple companies for the purpose of harming the competitors of OnlyFans and their AE Providers, and to

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint

1   cause a net benefit to OnlyFans and its AE Providers who never promoted any OnlyFans

2   competitor.[9]

3   59.     Nor is it plausible that OnlyFans AE Providers received protected status from Meta

4   and other platforms because OnlyFans had a good reputation for legal compliance in the world of

5   social media.  OnlyFans has frequently been the target of investigation for facilitating the sexual

6   solicitation of children.[10]  According to Congresswoman Ann Wagner:

> The pandemic has forced our children into isolation, where they are seeking out
> social interaction through the internet. Traffickers know this, and they have ramped
> up their grooming activity online, tricking oftentimes vulnerable children into
> trusting them and sending explicit photos and videos, then using that sensitive
> material to extort the minors into engaging in sexual acts, both online and in person.
>
> Among the worst facilitators of this exploitation is the website OnlyFans.com. In
> just this year alone, OnlyFans has been connected to human trafficking, selling
> child sexual abuse material, kidnapping, sexual battery, sexual servitude, extortion,
> and child rape.

13   Hearing Before the House Judiciary Committee, Oct. 22, 2021[11].

14   60.     The combination of the following six facts -- (i) sudden volume of increased content

15   classification/filtering starting close to October 2018 across multiple online platforms, (ii) massive

16   spike in content classification/filtering activity specifically targeting AE Providers in the adult

17   industry that is inconsistent with human filtering, (iii) disproportionate impact of

18   classification/filtering on AE Platform competitors of OnlyFans, (iv) mysterious immunity of

19   OnlyFans and the Radvinsky-affiliated sites to a similar level of impact from this new heightened

---

[9] Hochman Decl., ¶ 19.

[10] Noel Titheradge and Rianna Croxford, "The children selling explicit videos on OnlyFans,"
published May 27, 202 (checked Sept. 25, 2022), https://www.bbc.com/news/uk-57255983
(checked Sept. 26, 2022).

[11] Hearing before the House Judiciary Committee, Serial No. 117-43, October 22, 2021, at 17.
https://www.congress.gov/117/chrg/CHRG-117hhrg48225/CHRG-117hhrg48225.pdf,   In her
written testimony, Congresswoman Wagner stated, "Homeland Security Investigations Special
Agent Austin Berrier told us he sees up to 50 files of child sexual abuse material per day, Mr.
Chair, that have originated on OnlyFans."  *Id.*  At 23.

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint

classification/filtering activity, (v) subsequent mass migration of AE Providers from competitors of OnlyFans to OnlyFans, to the point that external links to OnlyFans virtually took over the Instagram platform, while AE Providers who promoted competitors to OnlyFans continued to have their posts removed, visibility reduced (as shown by reduced click-throughs from social media postings), user engagement reduced, and pages deleted, and (vi) such a dramatic shift in OnlyFans' adult content market position at the detriment of other competitors -- can only be explained by the manipulation of one or more persons of information in one or more of the individual databases that was later shared in part or in full with other social media companies, including but not limited to manipulation of training data for a "classifier."

61.     One or more DIO lists, combined with the GIFCT Shared Hash Database and URL sharing program, would have served as the ideal training data for a classifier/filtering tool to create this blacklisting effect, particularly in 2018 and 2019.  No other tool then in existence could have produced this effect.

62.     The anti-terrorism and anti-DIO tools at individual social media services, which were shared at least in part with other social media services (including but not limited through Threat Exchange and the GIFCT), were the only ones capable of the broad blacklisting competitors of OnlyFans, and the AE Providers who had ever promoted them, experienced in 2018 and 2019.

63.     Plaintiffs have nothing to do with terrorism, are not terrorist sympathizers, or DIOs. All or virtually all of the other AE Providers and AE Platforms targeted by Defendants also have nothing to do with terrorism, and are not terrorist sympathizers or DIOs.  Plaintiffs and other AE Providers were blacklisted as terrorist organizations or individuals, sympathizers, or otherwise as dangerous organization or individuals, and content associated with them was hashed and shared with the GIFCT, along with certain URL data, with the goal of harming the businesses of AE

Platforms that competed with OnlyFans, in order to improve the market position, revenue, power, and otherwise benefit OnlyFans and its owner, Radvinsky.

64.     Plaintiffs allege that the following allegations in this paragraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery: After the Defendants originally executed the scheme by using individual social media companies' anti-terrorism tools (such as their lists of dangerous individuals and organization, combined with wrongly populating training data and databases, and then sharing hashed content and URLs through the Threat Exchange and GIFCT programs), new shared databases or systems beyond the individual anti-terrorism tools and GIFCT may have also been utilized to negatively impact both (i) AE Providers that promoted any competitor websites to OnlyFans, and (ii) the competitor AE Platforms.

65.     The scheme necessarily required and involved (i) officers, directors, or managing agents of Meta and its subsidiaries with the ability to add and/or manipulate content on one or more individual lists of dangerous organizations and individuals and/or databases (including training data) which were then shared in part or in whole with multiple online service providers, to (ii) direct the company's employees or agents to manipulate the content and/or the use of that/those list(s) of dangerous organizations/individuals or database(s)/training data for the purpose of wrongfully suppressing content posted by users of AE Platforms that compete with OnlyFans, and protect OnlyFans and Radvinsky-affiliated sites from similar content suppression.

66.     Plaintiffs allege that the following allegations in this paragraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery: Further, Radvinsky and one or more other owners, officers, directors, or managing agents of Fenix and/or Fenix Internet provided the information used by agents of Meta and its subsidiaries to add false classifier/filtering information to the individual databases/training data and/or lists of dangerous

organizations and individuals (i.e., falsely identifying an AE Provider or AE Platform, or their associated content, as terrorist related or as a dangerous individual or organization), some or all of which were then included in one or more shared databases or lists, in order to effectuate the scheme, and otherwise provided direction to it, and aided and abetted and/or conspired to pursue the scheme.

B.     **Evidence of the Scheme**

1.     **DIO List and Spreadsheet from Confidential Sources**

67.     In April 2022, Plaintiffs' counsel received through a confidential tip line a lengthy document (the "DIO list"), in the form of an email that provided confirmation of some of the claims in the Amended Complaint. This document began with the heading

> 20k+ ig users that FB labeled 'dangerous individuals' because they
> used sites that competed with onlyfans...most pages either deleted
> or shadow banned.

Following this heading was a list of 21,784 Instagram "handles," (names chosen by Instagram creators, which may include letters, numbers, and symbols, that uniquely identify each content provider). A high percentage of the Instagram handles are associated with AE Providers.  Expert statistical analysis of this list concluded that the list bears hallmarks of authenticity and that it is statistically impossible that the list could be a forgery.[12]  Plaintiffs believe that discovery will demonstrate that this document is an accurate list of names that Meta had labeled as "Dangerous Individuals" and submitted to a shared database at some point in time.

68.     In August 2022, through the same confidential tip line, Plaintiffs' counsel received an Excel spreadsheet  (the "DIO spreadsheet").  The first column of this document was headed "Designation list."  Under that heading was a list of 95 AE Platforms, which appeared to be the platforms targeted by the scheme.   The names of many of the same AE Platforms also appear as

---

[12]Hochman Decl., ¶¶ 20-25.

column headings in the top row of columns B through CO.  Instagram handles appear underneath the headings in Columns B through CO.  listed in several of the columns beneath the AE Platform network heading, The list of AE Platforms is attached to this Complaint as Exhibit C.  Plaintiffs believe that discovery will demonstrate this list to be the AE Platforms that had been targeted by the scheme at some point in time.

69.   Conspicuously absent from the list of AE Platforms are the Radvinsky-connected platforms, onlyfans, myfreecams, and stars.avn.com.

70.   Counsel have determined that 21,684 handles appear on both the DIO list and the DIO spreadsheet, so the two information sources are at least 98% overlapping.

71.   Instagram handles associated with Plaintiffs Evans and Pierce, "alanaevansxxx" and "MrsKellyPierce," appear on the DIO list.  AE Platforms that had contracted with Plaintiffs Evans and Pierce appear on the DIO Spreadsheet, including cams.com, streamate, and chaturbate, appear on the DIO spreadsheet.

### 2.   Payments from Fenix to Accounts Associated with Facebook Executives

72.   The Radvinsky Defendants' economic incentive to engage in this scheme is obvious: it dramatically increased the market share and revenue of OnlyFans, which provided more money to, and increased valuation of, Fenix and Fenix Internet.

73.   Plaintiffs allege that the following allegations in this paragraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:The agents and employees of Meta and its subsidiaries benefited economically in return for their participation in manipulating one or more individual databases and/or lists of dangerous organizations and individuals and for classification/filtering that was later shared in part of in whole with other companies to benefit OnlyFans, and thus Fenix, Fenix Internet, and Radvinsky. The economic

benefits included payments to employees of Meta, which were accomplished in a way to minimize the chance of discovery.

74.     OnlyFans advertises its Hong Kong-based operations through online job postings and listed an individual by the name of RJ Phillips as a member of their Hong Kong-based team. RJ Phillips has been identified as a "former OnlyFans exec" in recent news reports concerning his new business co-venture with former OnlyFans CEO Tim Stokely, a business called Zoop.[13]  The laws of Hong Kong make it very difficult to obtain discovery for a proceeding in a foreign court.

75.     Phillips also has connections in the Philippines through Deanna Visperas Sallao, a citizen and resident of the Philippines who now lists her employment as "Deputy Chief of Staff at Zoop," the company co-founded by Phillips and Tim Stokely[14].   A confidential witness has confirmed that Visperas and Phillips have had a business relationship for many years, and Visperas handled OnlyFans business in the Philippines.

76.     Fenix International Limited Hong Kong, and a different entity that was listed as its Secretary during the key period that the scheme was implemented, Smart Team International Business Limited ("Smart Team"), shared the same physical address in Hong Kong.   Radvinsky used Smart Team International Business Limited Hong Kong to make the scheme-facilitating payments.  In May 2022, shortly after its name appeared in the initial Complaint in this case, Smart Team formally dissolved.

77.      Plaintiffs have received through the confidential tip line a document titled "Follow the Money," containing banking wire transfer information for a group of transactions involving Smart Team.   Each of the transfer records appears to be a copy of a genuine wire transfer; for

---

[13] Anita Ramasmany, "OnlyFans founder makes crypto debut selling influencer trading cards, https://techcrunch.com/2022/05/26/onlyfans-founder-crypto-debut-influencer-trading-cards/ (checked Sept. 24, 2022),
[14] https://www.linkedin.com/in/deannasallao/?originalSubdomain=ph (checked Sept. 24, 2022).

1 example, the ABA Banking numbers match the numbers associated with the three banks involved,

2 and the format is consistent with typical wire transfer records.

3     78.    The transfer information includes one transfer of funds from Fenix International

4 Ltd to Smart Team, The memo line of that transfer states, "LIVEJASMIN CHATURBATE

5 BONGACAMS CLIP4SALE MANYVIDS MODELCENTRO CELEBTV CAMVERSITY

6 CAMSTER CAMDOLLS ALL MINDGEEK VARIANTS ." These are names of AE Platforms

7 listed on the DIO Spreadsheet; *see* Exhibit C. Mindgeek is the parent company of several AE

8 Platforms that compete with OnlyFans. Thus, the memo line apparently indicates that Fenix is

9 paying for services associated with hurting its competitors.

10     79.    The remaining wire transfers are for transfers from a Smart Team account at HSBC,

11 a Hong Kong bank, to three trust accounts at the Philippine Bank of Communication ("PBCOM"),

12 each benefiting individuals with high positions at Meta: Nicholas Clegg; Nicola Mendelsohn; and

13 Cristian Perrella.

14     80.    Nicholas Clegg is now President of Global Affairs for Meta. From October 2018

15 to early 2022, he was the Vice President of Global Affairs and Communication of Meta. From

16 2007 to 2015, he was a Member of Parliament of the United Kingdom, and Leader of the Liberal

17 Democrat Party. He was also Deputy Prime Minister of the United Kingdom from 2010 to 2015.

18     81.    Nicholas Clegg became Vice President of Global Affairs and Communication of

19 Meta in October 2018. News accounts at the time stated that he had been negotiating with Meta

20 for several months before he publicly joined the organization. He is currently President of Global

21 Affairs. By virtue of his position within Meta, he was able to direct that data be entered into the

22 Threat Exchange and/or GIFCT databases. Smart Team made a transfer to a Trust account at

23 PBCOM in the name of Nicholas Clegg's minor child. This transfer occurred on the same date as

the transfer from Fenix International Ltd. to Smart Team described above. Clegg had lived in the

1   United Kingdom for his entire life until he moved to the United States in 2018 —indeed, he served

2   as a Member of Parliament and Deputy Prime Minister— and he has no known familial or other

3   connection to the Philippines.

4        82.    Nicola Mendelsohn was Vice President for Europe, the Middle East, and Africa of

5   Meta. From 2013 to 2021.   She is now the Vice President of the Global Business Group of Meta.

6   She is based in the United Kingdom. She is a citizen of the United Kingdom. By virtue of her

7   position within Meta, she was able to direct that data to be entered into the Threat Exchange and/or

8   GIFCT databases. Smart Team made transfers to "Nicola Mendelsohn Trust" at PBCOM in five

9   transactions between 2017 and 2019. Mendelsohn is a life long resident of the United Kingdom,

10  and has no known familial or other connection to the Philippines.

11       83.    Cristian Perrella has been employed by Meta in the cybersecurity arena from at

12  least 2016.  He was authorized by Meta to speak on its behalf on topics relating to cybersecurity

13  at industry conferences.  For example, he is listed as "Representative of Facebook" on the agenda

14  for a conference on cybersecurity and privacy held in Pristina, Kosovo in January 2016.[15]  He also

15  spoke, as the representative of Facebook, on the topic of Facebook's response to human trafficking

16  at the Fourth Interpol Global Trafficking in Human Beings Conference, held in Lugano,

17  Switzerland in October 2016.[16] Perrella's position of trust within Meta, and his expertise in

18  Facebook's cybersecurity operations and responses to human trafficking, meant that he was well-

19  positioned to illicitly enter data (or direct subordinates to enter data) to the Threat Exchange and

20  GIFCT databases.  Smart Team made several transfers to "Cristian Peralta Trust" at PBCOM in

21  2018.

22

23  [15] https://1st.cybersecurity-privacy.com/ (checked Sept. 24, 2022).
    [16] https://twitter.com/interpol_htce/status/789406135736410112 (checked Sept. 24, 2022);
    https://www.selec.org/4th-interpol-global-trafficking-in-human-beings-conference/. (checked
    Sept. 24, 2022).

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint

84.     Independent from the information that Plaintiffs received from the confidential tip line, the bribe payments are also mentioned in a public news article:

> The allegations largely comport with information that was shared with *Forensic News* in early 2022 by a source familiar with the situation. The source, who asked for anonymity to protect their safety, told *Forensic News* that they have seen bank wires from Fenix International Limited to Smart Team International which then paid offshore trust accounts set up in the Philippines by "*senior Facebook executives.*" *Forensic News* could not independently confirm the allegations, and Meta and OnlyFans have denied any wrongdoing.[17]

85.     Plaintiffs do not know whether other payments were made by Fenix to these individuals, or whether these are the only individuals employed or otherwise affiliated with Meta who received payments originating from Fenix or its agents for the purpose of carrying out the scheme alleged in this Complaint.

86.     Additional evidence corroborates that influencing mid-level Meta employees is a practical means to manipulate Meta's restrictions on visibility.  In a podcast interview in May, 2022, Kity Lixo, an AE Provider, described her successful effort to reinstate her own Instagram account.[18]  She said that she was able to get her Instagram account unbanned on multiple occasions, by offering sex to male Instagram employees in the Los Angeles area.

### 3.     Meta's employees attempt to cover their tracks

87.     According to a Confidential Witness, after the scheme went into effect, OnlyFans circulated a memo internally stating that OnlyFans and Meta had a special relationship, which provided some protection to its AE Providers' social media posts.

---

[17] Scott Stedman, "AdminLeo:  OnlyFans Owner's Dubious Financial History," https://forensicnews.net/adminleo-onlyfans-owners-dubious-financial-history/ (checked Sept. 25, 2022).
[18] Nick Mordowanec, "OnlyFans Star Says She Slept With Meta Employees to Get Instagram Unbanned," https://www.newsweek.com/onlyfans-star-slept-meta-employees-instagram-unbanned-1708744.  The video appears at https://twitter.com/i/status/1527005564802600960 (checked Sept. 25, 2022).

88.     Plaintiffs allege that the following allegations in this paragraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:After the scheme was implemented, Defendants and other participants in the scheme over time attempted to cover their tracks by various means, including but not limited to (i) changing the identifying names on the social media companies' lists of dangerous individuals and organizations and other shared databases or services while leaving intact the URL, IP addresses, and other technical information for the automated computer filtering system to use, and/or (ii) shifting the scheme to a different classifier or content filtering system, and/or (iii) determining that the behind the scenes hashed tag database and effect of the URL sharing contain enough linkage to competitors of OnlyFans (and the AE Providers who promote them) that they no longer need to be listed explicitly on the manually curated list(s) or databases/training data of terrorists and other dangerous organizations and individuals made available to human reviewers.

89.     At a meeting between several members of APAG and Meta representatives, the Meta representative stated that bans had not been for sexual content, but for "sexual solicitation," the category that encompassed sex trafficking.  This made no sense to the AE Providers, who were not involved in "sexual solicitation," but it demonstrates that Meta had recognized that the DIO categorization was so implausible that something else had to be tried.

### C.     The Success of the Scheme

90.     As a result of Defendants' conduct, Plaintiffs and other Class Members were damaged, experiencing stagnating or decreasing social media interactions and declining revenue.

91.     Many of these AE Providers had little to no previous experience being subjected to such classifications/filtering. Effectively overnight, their traffic dropped without any apparent reason. But OnlyFans' traffic did not drop, even though OnlyFans was providing the same type of content as its competitor AE Platforms.

92.     In contrast, as indicated in Similarweb data, OnlyFans started to take off towards the end of 2018 – around the same time that Class members began losing social network referrals – and OnlyFans then continued to build momentum and snowballed into exponential growth. , this growth occurred because (i) content providers who exclusively promoted OnlyFans or the Radvinsky-affiliated sites were not targeted by the individual social media services' classification/filtering systems, or added to a shared database or system used by multiple social media services for classification/filtering, and thus were less likely to be adversely classified/filtered with deletion of posts and reduction in traffic, while (ii) other AE Providers who suffered from deletion of posts and reduction in traffic, switched to OnlyFans.

93.     As a result, links to OnlyFans pages became ubiquitous on Instagram. AE Providers were allowed to freely promote their OnlyFans pages on Instagram, and as long as the AE Providers had only ever promoted OnlyFans on Instagram (or one of Radvinsky's other affiliated sites), they were significantly less likely to be impacted by classifiers/filtering.

94.     OnlyFans began to grow incrementally, and then exponentially – rocketing up the internet traffic rankings – and quickly becoming one of the most dominant players in the adult industry, while most of OnlyFans' competitors stagnated or saw dramatically reduced traffic and revenue. Within a few years, OnlyFans became the 129th largest website in the world, the 86th largest website in the United States, the 8th largest adult website in the world (including all free sites), and the 4th largest adult pay website in the world. The chart below shows the growth of OnlyFans, measured by total web traffic as determined by Similarweb, from June 2019 through June 2021.



95.    Many of the AE Providers that were promoting themselves in 2018 and 2019 on social media have been deleted or had their visibility dramatically reduced on social media services, particularly on Instagram.

96.    For example, third-party traffic data shows that, over a two-year period of 2019-2020, AE Platforms that compete against OnlyFans were losing traffic sourced from social media while only OnlyFans increased traffic sourced from social media. Examples of traffic losses experienced by three competitors of OnlyFans, all of which were named on the DIO spreasssheet, appear below:[19]

---

[19]19 Additional examples appear in Hochman Decl., ¶ 82.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23





97.    The use of a classifier to blacklist AE Providers who had promoted, or affiliated online with, any of OnlyFans' competitors, and thus to suppress traffic to OnlyFans' competitors, was experienced on multiple mainstream social media services, indicating that the social media companies were sharing information about OnlyFans' competitors and AE Providers who promoted or affiliated with them. Social media companies are allowed, under their terms of service, to control content on their services, and they are protected in some circumstances from liability for removing content in good faith. However, the classification/filtering effects experienced by OnlyFans' competitors can be explained only by the social media services' reliance on one or more databases – individual (to that service), and shared (among the services) – that blacklisted AE Providers that had used OnlyFans' competitors, and blacklisted certain AE Platforms that competed with OnlyFans but did not blacklist OnlyFans or the Radvinsky-affiliated sites.

**D. Individual Plaintiffs' Injuries**

1.  Alana Evans

98.    Plaintiff Alana Evans has been a prominent AE Provider long before the events

described in this Complaint. She had used Instagram to promote her Adult Entertainment content on several different AE Platforms, none of which was associated with the Radvinsky Defendants. Her principal platform had been cams.com.  By 2019, Evans had over 100,000 followers on Instagram.  Her Instagram handle was  "AlanaEvansXXX."

99.     Beginning in March 2019, Evans noticed that her followers were receiving many fewer of her posts than they had previously received. She made inquiries on behalf of herself, as well as on behalf of other member of the APAG, but did not receive any clear explanation of why this was happening.

100.     On November 13, 2019, Evans received a notification from Instagram informing her that she was no longer eligible to use Instagram's branded contents tools, with no explanation.

101.     On January 24, 2020, Instagram deleted Evans' account, so that none of the content in her account could be seen, and she could not log in to make new posts. She had received no explanation for why this occurred. Following complaints to Instagram from Evans and from followers, as well as coverage in the adult entertainment trade press, the account was partially reinstated three days later, so that she could see past posts and post new content.  However, the reach of her account was vastly reduced, and has remained vastly reduced o the present.. For example, the publicity from the unexplained deletion of her account resulted in an immediate increase of about 30,000 followers, but those followers disappeared almost immediately afterwards.  Her follower count was at 105,000 in July 2020, 199,000 in April 2021, and 283,000 in October 2021, but her posts were not reaching as many of her followers as had been the case before 2019.

102.     While Evans remained a popular performer, so that increasing numbers of potential customers followed her on Instagram, the content that she produced was not served to most of her followers. Evans now has almost 300,000 followers, but many of her posts are viewed by less than

2,000 users, indicating that the content is not reaching the vast majority of her followers. The loss of social media reach has adversely affected Evans' revenue, which remains lower than it had been in previous years.

103.     The scheme also affected Evans by causing competitors of OnlyFans, with whom she had contractual dealings, to go out of business, thus forcing her to the OnlyFans platform. For example, in February 2020, Evans' AE Platform Provider, https://cams.com, became unable to meet the payment terms of its existing contracts, and to remain in business she had no choice but to move some of her content to OnlyFans.

### 2. Kelly Pierce

104.     Representative Plaintiff Kelly Pierce is an active AE Provider. She has worked with several different platforms over the past decade, including Chaturbate and Streamate, and has also posted content to OnlyFans.  She began promotion on Instagram before that platform was acquired by Facebook, Inc. (now Meta) in 2012. Her Instagram handle is MrsKellyPierce.   She had about 75,000 followers in early 2021.

105.     In about 2019, Pierce began to notice that her posts were reaching fewer followers, leading to fewer click-throughs to her AE Platforms. She received regular complaints from long-time fans that they were unable to find her posts on Instagram and Snap. In March 2021, her Instagram site was deleted in its entirely. Instagram refused to reinstate the existing site, but it permitted her to open a new promotional account after a few months with the help of the APAG Union's lawyer. APAG was meeting with Instagram in that time period, mainly concerning the unfair practices of their site, where celebrities being able to post scantily clad photos, while adult stars in bikinis or tank tops were being deleted for sexual explicit content.  However, the new account they allowed her to open has been met with complaints that it is often not visible to her fans, and she has only 6,000 followers at her new account. In November 2021, her Snap account,

1   which she had built with a fan base of thousands of fans from her performances on the Chaturbate

2   AE Platform, was deleted in its entirety. She relied heavily on snapchat for advertising her white

3   label with streamate and other sites other than OnlyFans.

4       106.   In addition to the account deletion, Pierce has also had numerous individual posts

5   deleted on both Instagram and Snap. In 2022 she had her twitter account deleted,  even though she

6   followed Twitter's guidelines by marking her account "sensitive," and followed all Terms of

7   Service.  Yet they still deleted her account. She believes that posts promoting content at sites other

8   than  OnlyFans  are  especially  likely  to  be  deleted.  Specifically,  promotions  of

9   Kellysdreamhouse.com, her personal label on the AE Platform Streamate, are frequently deleted.

10       107.   As a consequence of reduced visibility on social media, Pierce has experienced

11   decreasing revenue since 2019 from online sales, and fewer visits to her personal sites. Some of

12   her fans even think she has retired due to her being shadow banned or not being easily found. She

13   has also been blocked from promotion and live events, even though her content is legal, and she

14   does no other nefarious activity. She believes placement on a blacklist has been the reason many

15   of her bikini clad photos advertising other sites have been deleted or shadow banned by social

16   media sites that are essential to growing her revenue and brand. Pierce has remained a popular

17   performer, winning accolades for her performances, and she is astounded that this is happening to

18   her.  She looks at her peers in the industry having no issues posting much more scantily clad

19   content, and yet she is the one being reported and banned. This has led her to believe that the acts

20   by Fenix and Meta described in this Complaint ruined her small business and brand, leaving her

21   stressed and depressed. As a trans-woman, she relies heavily on her job to support herself. She

22   thinks social media companies are gaining too much power on data as well as censorship hurting

23   thousands of adult models all over the world every day when they are just trying to survive.

    108.   As a consequence of these actions by Instagram and Snap, Pierce's revenue from

1    kellysdreamhouse.com has been steadily declining, from $74,000 in 2020 to $61,000 in 2021, to

2    only $43,000 in the first eight months of 2022.

3               3.  <u>Ruby</u>

4         109.   Representative Plaintiff Ruby has been an AE Provider for over 30 years. In recent

5    years, her principal platform has been sexpanther.com, and she also uses AE Platforms

6    unfiltered.com and loyalfans.com, as well as OnlyFans and the Radvinsky-affiliated site

7    stars.avn.com. She was never exclusively associated with OnlyFans or the Radvinsky-affiliated

8    sites.

9         110.   Ruby has used social media to promote her own content, including Facebook and

10   Instagram, which she joined in 2014. Her Instagram handles are @therubyverse and

11   @jenniferroubenesallbaugh.   Ruby now has about 2,000 followers on Instagram. However,

12   starting in 2018, she has experienced unexplained deletions of posts on Instagram, and unexplained

13   loss of distribution of her posts to followers, as well as reduced search engine traffic. She has also

14   been blocked from posting on Facebook for 30 day periods because of purported violations of

15   Community Standards that did not occur.  She has experienced a loss of revenue due to the loss of

16   social media visibility.

17          **V.  <u>THIS DISPUTE IS NOT SUBJECT TO ARBITRATION</u>**

18        111.   Plaintiffs, and Class members who have or had accounts at Facebook or Instagram,

19   may arguably be subject to the terms of service of Meta and its subsidiaries, which contain a limited

20   arbitration agreement and class action waiver. Even if provisions are enforceable, which Plaintiffs

21   do not concede, the terms of service make clear that the dispute described in this Complaint is not

22   subject to arbitration. The relevant provisions state:

23            Except as provided below, you and we agree that **any cause of action, legal
             claim or dispute between you and us arising out of or related to these Terms or
             Instagram ("claim(s)") must be resolved by arbitration on an individual basis.**
             Class actions and class arbitrations are not permitted; you and we may bring a claim

only on your own behalf and cannot seek relief that would affect other Instagram users. If there is a final judicial determination that any particular claim (or a request for particular relief) cannot be arbitrated in accordance with this provision's limitations, then only that claim (or only that request for relief) may be brought in court. All other claims (or requests for relief) remain subject to this provision.
. . .

**The following claims don't have to be arbitrated and may be brought in court: disputes related to . . . efforts to interfere with the** Service or engage with the Service in unauthorized ways (for example, automated ways). In addition, issues relating to the scope and enforceability of the arbitration provision are for a court to decide. This arbitration provision is governed by the Federal Arbitration Act.

The claims pleaded in this complaint are "disputes related to . . . efforts to interfere with the Service or engage with the Service in unauthorized ways," and thus do not need to be arbitrated under the terms of service.

112.     Plaintiffs, and many class members, have also entered into business relationships with OnlyFans at one time or another. The forum selection clause in the OnlyFans Terms of Service also clearly does not affect this dispute, as it states only:

If you are a business User, you and we agree that the courts of England and Wales shall have exclusive jurisdiction to resolve **any dispute or claim (including non-contractual disputes or claims) which you have or which we have arising out of or in connection with your agreement with us (including its subject matter or formation) or your use of OnlyFans.**[20]

Unquestionably, this dispute does not arise in connection with any agreements between Class members and OnlyFans, or in connection with Class Members' use of OnlyFans.

## VI.  CLASS ACTION ALLEGATIONS

113.     The Class Plaintiffs bring this action on behalf of themselves and the members of the following class (the "Class"):

All Adult Entertainment Providers, regardless of the label they use, such as performer, influencer or artist, who suffered economic injury because they either (i) used their Instagram or Facebook account to link to, promote, or demonstrate praise, substantive support, or representation of any competitor of OnlyFans at a time when those businesses were falsely designated as a Dangerous Individual or

---

[20] OnlyFans Terms of Service, https://onlyfans.com/terms.html

Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies, or (ii) were themselves falsely designated as a DIO; the class includes anyone who suffered damages from any shift in the scheme beyond the initial DIO tactic, such as suffering continuing effects through other computerized systems. .

Specifically excluded from this definition are Defendants, any entity in which any Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors.

114.    Plaintiffs reserve the right to amend the Class definition as necessary.

115.    As used herein, "Class Members" shall mean and refer to the members of the Class, including Plaintiffs.

116.    <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is believed to be greater than 100 and is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

117.    <u>Typicality</u>: The claims of the representative plaintiffs are typical in that they, like all Class Members, have been damaged by Defendants' misconduct in that, *inter alia*, they experienced loss of business and revenue as a consequence of being blacklisted from social media by Defendants. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of deliberate, and negligent misconduct resulting in injury to all Class Members.

118.    <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any individual questions.  These common legal and factual issues include the following:

a)    Whether Defendants engaged in any scheme, plan, or contrivance to designate any competitor of OnlyFans as a Dangerous Individual or Organization ("DIO") under any past

or present version of Meta's DIO policy, or that of Facebook or Instagram or of their predecessor or subsidiary entities or technologies; or

b) Whether Defendants engaged in any scheme, plan, or contrivance to exclude OnlyFans and/or myfreecams from being designated as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies; or

c) Whether Defendants engaged in any scheme, plan, or contrivance to designate anyone (such as an adult entertainment performer), through the misuse of automated systems and unrelated to the selection, editing or removal of particular user-created content, with a relationship with any competitor of OnlyFans, as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of your or their predecessor or subsidiary entities or technologies; or

d) Whether Defendants engaged in any scheme, plan, or contrivance through the misuse of automated systems, unrelated to the selection, editing or removal of particular user-created content, to remove, filter, moderate, or perform other content actioning on anyone (such as an adult entertainment performer) due to that person's relationship with any competitor of OnlyFans because they were designated as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies; or

e) Whether Defendants engaged in any scheme, plan, or contrivance through the misuse of automated systems, unrelated to the selection, editing or removal of particular user-created content, to cause Facebook, Instagram, or Meta to remove, filter, moderate, or perform other content actioning on anyone (such as an adult entertainment performer) who was not designated as a Dangerous Individual or Organization and did not violate terms of service but

was deemed to be providing Praise, Substantive Support, or Representation (as defined by

Meta's current DIO policy, or alternative concepts in any prior version of said policy) of any

competitors of OnlyFans.

f)      Whether Defendants engaged in any scheme, plan, or contrivance to cause

Facebook, Instagram, or Meta to hash the content that was removed, filtered, moderated, or

actioned as described in subparagraph (d) and/or (e) above and then share that hash data, and/or

any associated labels, classifications, and taxonomies, with the Global Internet Forum to Counter

Terrorism ("GIFCT") Shared Hash Database(s), with companies within the Hash Sharing

Consortium, or with any other internal or external database(s), or collections of information,

including those owned, operated, and maintained by non-Meta owned entities.

g)      Whether Defendants engaged in any scheme, plan, or contrivance, through misuse

of automated systems and unrelated to the selection, editing or removal of particular user-created

content, to cause Facebook, Instagram, or Meta to give preferential treatment or otherwise

benefit OnlyFans over competitors of OnlyFans. "Preferential treatment" includes but is not

limited to the misuse of automated systems to cause individuals (including adult entertainment

performers) who only ever linked to, promoted (including via advertisements), engaged with,

shared, or provided praise, substantive support, or representation of OnlyFans on Instagram

and/or Facebook, and never linked to, promoted (including via advertisements), or provided

praise, substantive support, or representation of any other competitor of OnlyFans on Instagram

and/or Facebook, to:

      a.   Be able to generate a higher level of traffic from Instagram or Facebook to

          OnlyFans;

  b. Be able to generate a higher level of engagement on Instagram or Facebook with OnlyFans accounts and content, including followers, likes, shares, comments and other forms of user engagement;

  c. Experience a lower degree of page deletions, content removals, and other forms of content actioning;

  d. Have higher visibility and discoverability on Instagram and Facebook;

  e. Experience less "shadow banning," less suppression of content in user feeds, and less filtering or other content actioning.

 h) Whether Defendants, through the misuse of automated systems, engaged in any scheme, plan, or contrivance to cause Plaintiffs and other Class Members to experience negative treatment unrelated to the selection, editing or removal of particular content posted by Plaintiffs and other Class Members, including but not limited to any of the following:

  a. Heightened scrutiny by artificial intelligence (including machine learning scoring and algorithmic content actioning) and human content actioning systems on Instagram or Facebook, including but not limited to a higher degree of page deletions and other forms of content actioning;

  b. Less ability to generate engagement within, and traffic from Instagram or Facebook to FanCentro or other competitors of OnlyFans;

  c. Lower visibility and discoverability on Instagram and Facebook;

  d. Fewer followers and less engagement on accounts and content, including followers, likes, shares, comments and other forms of user engagement;

  e. More "shadow banning," more suppression of content in user and/or Subscriber feeds, more filtering and other content actioning.

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint

1      i)      Whether Defendants engaged in any scheme, plan, or contrivance, through the

2   misuse of automated systems and unrelated to the selection, editing or removal of particular

3   content, to give preferential treatment or otherwise benefit businesses owned by, connected to, or

4   affiliated with Leonid Radvinsky (including but limited to OnlyFans) over competitors of

5   OnlyFans.

6      j)      Whether Defendants engaged in any scheme, plan, or contrivance, through the

7   misuse of automated systems and unrelated to the selection, editing or removal of particular

8   content, to cause Facebook, Instagram, or Meta to give preferential treatment or otherwise

9   benefit users and/or subscribers that generate and/or contribute content to the businesses

10  described in subparagraph (i) above over competitors of OnlyFans.

11     k)      Whether there was any direct or indirect payment of money or other consideration

12  to any Facebook, Instagram, or Meta employee by the parent company of OnlyFans (Fenix

13  International Ltd.) or any of its affiliates (including Smart Team International Business Limited

14  Business Ltd), or by any of their executives or owners (including Leonid Radvinsky and anyone

15  with the last name of Stokely), or by any other companies owned by or affiliated with Radvinsky

16  or any member of the Stokely family. An "indirect" payment to an employee is when a payment

17  is made to their family member or any trust in the name of an employee or family members, or to

18  a trust in which any of them are a trustee or beneficiary, or to any other entity controlled by the

19  employee.

20     l)      Whether Defendants Meta, Instagram, and Facebook are legally responsible for

21  the acts of their agents and employees in furtherance of the alleged scheme/conspiracy; and

22     m)      Whether Plaintiffs and other Class Members were injured by these actions;

23     n)      Whether the Radvinsky Defendants were unjustly enriched by the acts described

above; and

o)      Whether Class Members are entitled to damages and/or injunctive relief as a consequence of the Defendants' action.

119.    Pursuant to Fed. R. Civ. Proc. 23(e)(4), Plaintiff seeks certification of a class for purposes of proving liability only.

120.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including class actions and other mass actions, and Plaintiffs intend to prosecute this action vigorously.

121.    <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

122.    Further, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**
**<u>TORTIOUS INTERFERENCE WITH CONTRACT</u>**
**(AGAINST ALL DEFENDANTS)**

123.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

fully set forth herein.

124.    The Radvinsky Defendants and John Does 1-10 knew that Class Members had (and have) contracts with AE Platforms, in which Class Members and the AE Platforms split revenue from customers who paid to view the Class Members' content posted on the AE Platforms.  The Class Members that worked with competitors of OnlyFans, or referred traffic to them from social media services, were known to OnlyFans, and the Does who carried out the scheme, including but not limited to the fact that such data was available in 2018 and 2019 through one or more third party services.

125.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts of tortious interference undertaken by their agents and employees, including Clegg, Mendelsohn, and Perrella, because their participation in the scheme arose from and was engendered by their employment and /or association with these Defendants.  Alternatively, these defendants are directly liable for the acts of their agents and employees by the doctrine of *respondeat superior.*

126.    The Radvinsky Defendants and John Does 1-10 intentionally took actions to interfere with those contracts as alleged herein by, among other acts, causing AE Platforms and the Class Members that promoted them to be blacklisted on individual lists of dangerous organizations and individuals and/or databases of social media services that were also shared in part or in whole with other social media services, including Instagram, among other sites.

127.    There was no legal justification for these Defendants' actions.

128.    The Radvinsky Defendants have profited from their tortious interference with Class Members' contracts with AE Platforms.

129.    As a proximate result of Defendants' tortious interference, Plaintiffs and Class Members have been damaged including lost income.

1

2

## COUNT II
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (AGAINST ALL DEFENDANTS)

3    130.    Plaintiffs incorporate by reference and realleges the preceding allegations as though

4    fully set forth herein.

5    131.    The Radvinsky Defendants and John Does 1-10 intentionally and knowingly

6    interfered with business relationships between Class Members and AE Platforms, and their

7    customers (i.e., people who paid to view the Class Members' content posted on AE Platforms).

8    Additionally, it became known in the industry that the only viable platform for Class Members

9    was OnlyFans and the two other affiliates of Radvinsky (myfreecams and stars.avn.com), and this

10   caused Class Members to avoid entering into business relationships with the AE Platform(s) of

11   their choice; it also caused customers to avoid entering into business relationships with certain AE

12   Platforms and/or to reduce the amount of Class Members' content they paid to view.

13   132.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held

14   liable for, acts of tortious interference undertaken by their agents and employees, including Clegg,

15   Mendelsohn, and Perrella, because their participation in the scheme arose from and was

16   engendered by their employment and/or association with these defendants. Alternatively, these

17   defendants are directly liable for the acts of their agents and employees by the doctrine of

18   *respondeat superior*.

19   133.    The interference was unjustified and not privileged, and done through improper

20   means.

21   134.    As a proximate result of Defendants' intentional interference, Plaintiffs and Class

22   Members have been damaged including lost income.

23

## COUNT III
## <u>VIOLATION OF THE UNFAIR COMPETITION LAW</u>
### (California Business and Professions Code § 17200, et seq.)

135.    Plaintiffs incorporate by reference and realleges the preceding allegations as though fully set forth herein.

136.    The Radvinsky Defendants and John Does 1-10 have engaged and continue to engage in unfair and/or unlawful business practices in California in violation of California's Unfair Competition Law ("UCL"), Business and Professions Code, § 17200 et seq., by: (a) causing the classifying of AE Provider content as originating from terrorists, terrorist sympathizers, or a DIO; and (b) falsely representing AE Provider content as originating from terrorists, terrorist sympathizers, or otherwise a DIO to other social media platforms, including but not limited to GIFCT members.

137.    Defendants Meta, Instagram, and Facebook are responsible for, and may be held liable for, acts, including communications, undertaken by their agents and employees, including Clegg, Mendelsohn, and Perrella, because their participation in the scheme arose from and was engendered by their employment and/or association with these Defendants. Alternatively, these defendants  are directly liable for the acts of their agents and employees by the doctrine of *respondeat superior.*

138.    Defendants' utilization of these unfair practices also injured Plaintiffs and Class Members because in the absence of the scheme they would have been free to continue to promote their content across social media as they had done so in the past.

139.    Because Plaintiffs and Class Members are victims of Defendants' unfair and/or unlawful conduct alleged herein, Plaintiffs seek full restitution of monies, as necessary and according to proof, and restoration of any and all monies withheld, acquired, and/or converted by the Defendants pursuant to Business and Professions Code §§ 17203 and 17208.

140.    The acts complained of herein occurred within the last four years immediately preceding the filing of the Complaint in this action.

141.    Plaintiffs have suffered injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.

142.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business in the state of California.

143.    Because, *inter alia*, injury to Plaintiffs and Class Members is continuing and cannot be redressed absent an injunction, plaintiff lacks an adequate remedy at law.

144.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful and/or deceptive practices, and to restore to Plaintiffs the monies the Defendants owe Plaintiff, including restitution and/or restitutionary disgorgement, unjust enrichment and for such other relief as may be appropriate.

145.    Plaintiffs were compelled to retain the services of counsel to file this action to protect their interests, to obtain restitution, to secure injunctive relief on behalf of OnlyFans Competitors, and to enforce important rights affecting the public interest. Plaintiffs thereby incurred the financial burden of attorneys' fees and costs, which they are entitled to recover under Code of Civil Procedure § 1021.5.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs, individually and on behalf of the Class of all others similarly situated, seek a judgment against Defendants, as follows:

     a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class representatives and Plaintiffs' attorneys as Class Counsel;

     b.    For an order declaring that Defendants' conduct violates the statutes referenced

herein;

c.   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d.   For compensatory, statutory, and punitive damages, as applicable, in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For an injunction against all Defendants to refrain from abuses of shared hashtag databases for anti-competitive purposes;

h.   For such other injunctive relief as pleaded or as the Court may deem proper; and

i.   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, expenses and costs incurred in bringing and prosecuting this lawsuit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: December 13, 2022                                   Respectfully submitted,

                                                          By: */s/* David Azar

                                                          MILBERG COLEMAN BRYSON
                                                          PHILLIPS GROSSMAN PLLC
                                                          DAVID E. AZAR
                                                          280 S. Beverly Drive, Suite PH
                                                          Beverly Hills, California  90212
                                                          Telephone: 1-866-252-0878
                                                          dazar@milberg.com
                                                          *Counsel for Plaintiff*

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on December 13, 2022, the foregoing was electronically filed with the

3

Clerk of the U.S. District Court, Northern District of California, using the CM/ECF system, which will send notification of such filing to all parties.

4

                         /s/ David Azar

                         David Azar

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

*Dangaard v. Instagram, LLC et al.*  Second Amended Class Action Complaint