MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
DAVID E. AZAR
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com

*Plaintiffs' Attorney*

[ADDITIONAL FILING PARTIES
ON SIGNATURE PAGE]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DAWN DANGAARD, *et al.*,

                              Plaintiffs,

        v.

INSTAGRAM, LLC, *et al.*

                              Defendants.

Case No. 3:22-cv-01101-WHA

**CLASS ACTION**

**JOINT CASE MANAGEMENT
STATEMENT**

**Initial Case Management Conference:**
DATE: March 29, 2023
TIME:  8:00 a.m.
HON. WILLIAM H. ALSUP

Operative Complaint filed: Sept. 27,
2022
Trial Date: None set

1.     **JURISDICTION & SERVICE**

        Plaintiffs maintain under 28 U.S.C. § 1332(d)(2)(A) that this Court has subject matter

jurisdiction because the aggregated amount in controversy exceeds $5,000,000 exclusive of interest

and costs, and is a putative class action in which some Plaintiffs are citizens of different states than

Defendants. There are no personal jurisdiction issues regarding Meta Defendants.[1] Venue is proper

---

[1] "Meta Defendants" or "Meta" collectively refers to Defendants Meta Platforms, Inc., Instagram,

under 28 U.S.C. § 1391(b)(2) because Defendants Meta Platforms Inc., Instagram, LLC, and Facebook, LLC are based in this District, and a substantial part of the events giving rise to the claims allegedly occurred in this District.

The Fenix Defendants moved to dismiss the Plaintiffs' pleading for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) (ECF No. 40) ("Motion").  The Fenix Defendants and Plaintiffs have completed jurisdictional discovery and have fully briefed the jurisdictional dispute, with Plaintiffs maintaining that several bases exist for this Court to maintain personal jurisdiction over the Fenix Defendants (including purposeful availment/direction and alter ego). The Fenix Defendants deny each of those arguments for jurisdiction.[2]  The Motion is set for hearing on March 29, 2023 (ECF No. 134.)

Defendants waived service of the summonses pursuant to the terms of a Joint Stipulation (ECF No. 26.)

**2.    STATEMENT OF FACTS**

Plaintiffs' Statement:  Plaintiffs appreciate that the Court is familiar with the facts from its prior orders and related briefing, and therefore provide a high-level summary here.

This is a tortious interference and unfair competition case.  Plaintiffs allege—and Defendants deny—that Defendants engaged in unfair business practices and an anti-competitive scheme by misusing automated systems to benefit OnlyFans and hurt its competitors and the Content Creators[3] affiliated with them, including by driving consumer traffic and Creators to the OnlyFans platform.  Plaintiffs allege that the scheme initially involved so-called blacklisting and whitelisting, and is now also being carried out and/or perpetuated by other automated technical means.  Plaintiffs allege that Defendants caused Content Creators who associated with OnlyFans'

---

LLC, and Facebook Operations, LLC.
[2] "Fenix Defendants" collectively refer to Defendants Fenix Internet LLC, Fenix International Ltd., and Leonid Radvinsky.
[3] "Content Creators" is one of the terms used to describe the people who post content on a platform like OnlyFans.com which often charge for access to the content, and share the revenues with the Content Creators.  "Creators" is the term OnlyFans presently uses, and it is thus synonymous with the term Adult Entertainment Performers ("AE  Performers") in the SAC at ¶ 5.  As alleged in the SAC, social media users who follow or are otherwise connected with the Content Creators on mainstream social media, including Instagram, often visit the adult entertainment sites after seeing the Content Creator postings on mainstream social media..

competitors to be blacklisted by certain social media platforms, including but not limited to those platforms operated by the Meta Defendants. (SAC ¶ 8.) This scheme was initially accomplished by falsely designating the competitors and/or certain Content Creators as "Dangerous Individuals or Organizations" ("DIOs"), which is a content enforcement designation used by Meta to flag and remove content posted on social media by, or in support of, terrorists and violence and/or violent missions.[4] (*Id.*) This caused impacts within Meta (especially Instagram)—such as Content Creators who promoted competitors of OnlyFans being designated as the equivalent of a terrorist sympathizer—and also resulted in content being hashed (creation of a digital fingerprint), with those hashes added to the GIFCT shared hash database of terrorist content. The scheme was designed to harm the business of certain adult performers and entertainment platforms ("AE Platforms") that competed with the OnlyFans website by blacklisting performers that associate with those AE Platforms, thereby compelling those Content Creators to work exclusively through OnlyFans. (*Id.*) Defendants also are alleged to have engaged in a scheme to whitelist (to protect from certain adverse effects) OnlyFans and affiliated sites, and certain of its affiliated performers–even though OnlyFans and its performers posted similar content on Instagram and Facebook promoting themselves and OnlyFans. While OnlyFans flourished, traffic to its competitors from Instagram (in particular) declined. The scheme is alleged to have transitioned from the GIFCT to other technical means, including the Content Moderation Media Matching Service Databanks and including but not limited to wrongfully classifying creators as engaged in sexual solicitation, given that Meta Defendants have continued to classify/moderate OnlyFans differently than competitor websites over the last several years prior to these suits being file (e.g., SAC 2(e), 88).

Plaintiffs bring their claims on behalf of themselves and a putative class of Content Creators who promoted AE Platforms on social media that competed with OnlyFans and suffered economic injury by the original scheme and/or the migration of it, including without limitation those who were falsely designated/classified to advance the scheme (e.g., as DIOs, sexual solicitation, or other adverse designation), either because of their use of a competing platform or because they were

---

[4] https://transparency.fb.com/policies/community-standards/dangerous-individuals-organizations/?from=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards%2Fdangerous_individuals_organizations

personally targeted.  (SAC ¶ 113.)  First, Plaintiffs allege that Defendants tortiously interfered with their contracts with the AE Platforms.  (*See* SAC ¶¶ 123-29.)  Second, Plaintiffs allege that Defendants intentionally interfered with Plaintiffs' business relationships with the AE Platforms.  (*Id*. ¶¶ 130-34.)  Finally, Plaintiffs allege violations of California's Unfair Competition Law ("UCL"). (*Id*. ¶¶ 135-45.)

Meta Defendants' Statement:  Meta denies these allegations and expects to establish through discovery that Plaintiffs' claims are without merit.

Fenix Defendants' Statement:  The Fenix Defendants reject and deny the entirety of the allegations of an illegal "conspiracy" between them and the Meta Defendants.  The Plaintiffs have provided no evidence of improper or illegal conduct as between the Defendant group, and instead rest their case on conspiracy theories, speculation, and innuendo.  The Fenix Defendants engaged in an extensive investigation and found zero evidence that the Fenix Defendants had any knowledge of or involvement in the alleged blacklisting scheme alleged by Plaintiffs.  Simply put, there is no factual or legal basis for the allegations in Plaintiffs' Second Amended Complaint.  Moreover, Plaintiffs wrongfully named Leonid Radvinsky as a party to their conspiracy theory claim despite failing to cite or submit any evidence whatsoever suggesting that Mr. Radvinsky had anything to do with the allegations in the Second Amended Complaint.

For these and other reasons, the Fenix Defendants deny Plaintiffs' allegations, claims, and theories of liability and will oppose certification of any putative class.

**3.    LEGAL ISSUES**

Plaintiffs' Position: The key legal issues in this case are summarized in detail in paragraph 118 of the Second Amended Complaint (ECF No. 74), and include:

a.    Whether Defendants engaged in any scheme, plan, or contrivance to misuse any automated system (initially the DIO designation system) as alleged to help OnlyFans and hurt its competitors and the Content Creators that supported them.

b.    Whether Defendants engaged in any scheme, plan, or contrivance to cause Facebook, Instagram, or Meta to hash the Content Creator content that was removed, filtered, moderated, or actioned as alleged and then shared that hash data, and/or any associated labels,

classifications, and taxonomies, with the GIFCT Shared Hash Database(s), with companies within the Hash Sharing Consortium, or with any other internal or external database(s), or collections of information, including those owned, operated, and maintained by non-Meta owned entities.

c.      Whether Defendants, in engaging in the aforementioned scheme, also used or transitioned their scheme to use other automated systems, classifier, databases, etc. other than the GIFCT Shared Hash Database with the purpose of covering up the anti-competitive conduct.

d.      Whether Defendants engaged in any scheme, plan, or contrivance, through misuse of automated systems and unrelated to the selection, editing or removal of particular user-created content, to cause Facebook, Instagram, or Meta to give preferential treatment or otherwise benefit OnlyFans over competitors of OnlyFans and Content Creators who promoted those competitors.

e.      Whether Defendants Meta, Instagram, and Facebook are legally responsible for the acts of their agents and employees in furtherance of the alleged scheme/conspiracy, including whether any of the Meta Defendants were aware of Plaintiffs' allegations through internal investigations and/or whistleblower reports, and then failed to remedy it and/or covered it up.

f.      Whether Defendants' conduct constitutes unfair and/or unlawful business practices under the UCL.

g.      Whether Defendants were unjustly enriched by the alleged conduct.

h.      Whether Plaintiffs and other Class Members were injured by these actions.

i.      Whether Class Members are entitled to compensatory or punitive damages, restitution and/or injunctive relief as a consequence of the Defendants' actions.

j.      Whether Plaintiffs are entitled to reasonable attorneys' fees and costs.

Meta Defendants' Position:  Subject to and without waiving its positions and arguments, the Meta defendants submit that the disputed points of law in this case include the following:

a.      Whether the alleged actions are protected by Section 230(c)(1) of the Communications Decency Act of 1996, 47 U.S.C. § 230(c)(1).

b.      Whether the alleged actions are protected by the First Amendment of the United States Constitution. U.S. Const., amend. I.

c.      Whether the Meta defendants are liable for any of the alleged claims under principles of agency liability or vicarious liability.

d.      Whether plaintiffs have viable claims under the law of tortious interference with contract, tortious interference with business relationships, and California's Unfair Competition Law (UCL), Business & Professions Code § 17200 et seq.

<u>Fenix Defendants' Position:</u>  Subject to and without waiving its positions and arguments, the Fenix Defendants submit that their anticipated defenses include:

(1)      The Fenix Defendants are not subject to personal jurisdiction in this Court.

(2)      There was no agreement, conspiracy, or scheme among the Fenix Defendants and the Meta Defendants to "blacklist" or "shadow ban" the putative class in this matter.  Plaintiffs' case is based entirely on allegations that are false.

(3)      Mr. Radvinsky is an apex witness who was improperly named as a party despite the absence of any credible allegations tying him to the alleged conspiracy; he should be dismissed with prejudice.

(4)      Plaintiffs did not suffer an actual injury as a required element of their claims, much less an injury caused by any action by the Fenix Defendants.

(5)      A class cannot be certified under Rule 23 because Plaintiffs cannot satisfy the requirements of that Rule.

**4.      MOTIONS (PRIOR, PENDING, AND ANTICIPATED)**

*Prior Motions*: Defendants filed motions to dismiss on June 30, 2022 (ECF No. 40, 41) The Court granted Plaintiffs' request for jurisdictional discovery on September 8, 2022 (ECF No. 65), and declined to rule on Defendants' motions, but ordered Plaintiffs to file an amended complaint (ECF No. 71.)  Plaintiffs filed their amended complaint on September 28, 2022 (ECF No. 74), the Meta Defendants renewed their motion to dismiss on October 11, 2022 (ECF No. 78), and the Fenix Defendants filed their motion to dismiss on October 12, 2022 (ECF No. 79.) The Court denied Defendants' motions to dismiss on November 30, 2022 (ECF No. 101.) On December 13, 2022 (ECF No. 105), Plaintiffs revised redactions of the 2AC consistent with the Court's November 30 Order.

*Pending Motions:* The Fenix Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(2), which on September 8, 2022, was held in abeyance pending Jurisdictional Discovery, which is set for hearing March 29, 2023.

Anticipated Motions:

Plaintiffs' Position:  Plaintiffs anticipate filing the following motions with the Court in order to efficiently prosecute this case, in the absence of a stipulated agreement with the relevant Defendants:

a)      In order to promote investigation into the facts, Plaintiffs seek a mechanism to allow current and former employees, contractors, or agents of Meta or Fenix Defendants to come forward with information without risk of retaliation.  Plaintiffs anticipate a motion that may request (1) the Court to determine that Non-Disclosure Agreements do not prohibit people from speaking about the conduct alleged, and/or (2) that whistleblower protections apply to any current or former Meta or Fenix employee who wishes to speak with Plaintiffs' counsel (or a Court appointed special master) about the allegations in the Complaint.

b)      Plaintiffs anticipate a motion to implement a process for the reverse hash comparison, as proposed by Plaintiffs at a prior hearing.  Specifically, Plaintiffs intend to compile a database of content of putative class members that they wish to have hashed using the same methodology as Meta uses, and then compare it both to (1) hash values that Meta has sent to – or withdrew from – the GIFCT, and also (2) to compare against historical versions/data of the GIFCT Shared Hash Database going back to 2018.  This is a technical endeavor, and it is important to coordinate this from the outset, and it also involves the question of the extent to which Meta's hosting and administration of the GIFCT database puts it within Meta's possession, custody, or control for this process, or if now, how to compel participation by the GIFCT.

c)      Plaintiffs anticipate seeking leave from the Court to propound detailed requests for admissions and interrogatories that are anticipated to exceed the number allowed without leave of court, and absent agreement with Defendants, anticipate filing a motion with the Court with the proposed discovery, which Plaintiffs believe will expedite and focus the resolution of this matter.

In response to Defendants' position about proposing two different fact discovery processes and two different summary judgment procedures, Plaintiffs oppose that as explained in Section 8 below regarding discovery, where Defendants explain their proposal.

Further, the United States Supreme Court has made clear that Rule 56 *requires*, rather than merely permits, discovery "where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986). Judge Kozinski explanation of this bedrock rule in *Makaeff v. Trump University LLC*, 715 F.3d 254 (9th Cir. 2013), remains true today:

> The Federal Rules contemplate that the sufficiency of a plaintiff's case will be tested prior to discovery only for legal sufficiency. *See* Fed.R.Civ.P. 12. *If a plaintiff's case vaults that hurdle, the Federal Rules provide for a period for discovery before defendant can test plaintiff's case for factual sufficiency*. (Citation omitted.) The Federal Rules don't contemplate that a defendant may get a case dismissed for factual insufficiency while concealing evidence that supports plaintiff's case. *See* 10B Charles Alan Wright, Arthur R. Miller et al., *Federal Practice & Procedure §* *2740* (3d ed. 2012); *see also* Fed.R.Civ.P. 56(d). . . . That's why we held in *Metabolife International, Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir.2001), that the "discovery-limiting aspects" of the anti-SLAPP statute don't apply in federal court. *See also* Cal.Civ.Proc.Code § 425.16(f)–(g). *The Federal Rules, after all, reflect a policy of forcing a defendant to disclose adverse facts before he may challenge plaintiff's case for factual sufficiency.* *See* John H. Beisner, *Discovering a Better Way: The Need for Effective Civil Litigation Reform,* 60 Duke L.J. 547, 554–59 (2010).

*Makaeff*, 715 F.3d at 274 (Kozinski, J., concurring) (emphasis added).

Meta Defendants' Position:

Meta anticipates bringing a motion for summary judgment following a brief period of targeted discovery, and a second motion for summary judgment if the first, narrow motion is denied and full fact discovery is ordered. Meta includes below additional details on its proposed case schedule and phasing of discovery.

Meta further states that plaintiffs' anticipated motions are improper, and expressly reserves the right to object to such motions. Without waiving this reservation, while the precise relief sought under plaintiffs' anticipated "whistleblower" motion remains unclear, Meta specifically objects to any relief that would prevent relevant discovery into the basis and reliability of plaintiffs' allegations.

Fenix Defendants' Position:

The Fenix Defendants agree with Meta's position statement above and similarly anticipate bringing a motion for summary judgment following a brief period of targeted discovery in the event this Court were to find that it can properly exercise jurisdiction against some or all of the Fenix Defendants.  This anticipated initial motion for summary judgment would address, among other things, the complete lack of any evidence supporting Plaintiffs' allegations.  The Fenix Defendants also anticipate bringing a second motion for summary judgment if its initial motion is denied and full fact discovery is ordered.[5]

The Fenix Defendants will confer in good faith with Plaintiffs concerning any anticipated motions, but expect to oppose the anticipated motions described by Plaintiffs above and reserve all rights to oppose such motions once they are filed.

5.   **AMENDMENT OF PLEADINGS**

Plaintiffs' Statement:  None anticipated.

Meta Defendants' Statement:  None anticipated.

Fenix Defendants' Statement:  The Court held the Fenix Defendants' 12(b)(2) motion in abeyance pending the completion of jurisdictional discovery, supplemental briefing, and a hearing to be held on March 29, 2023. Given the pendency of its motion, the Fenix Defendants have not yet answered and no merits discovery has occurred.  In the event this Court were to find that it can properly exercise jurisdiction against some or all of the Fenix Defendants, the Fenix Defendants reserve the right to amend their forthcoming pleading at the appropriate time, if necessary.

6.   **ELECTRONIC DISCOVERY**

The Parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI"), and have begun to meet and confer pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action.  The Parties agree that they will continue to meet and confer as to the

---

[5]  The Fenix Defendants note that they have alerted Plaintiffs that their claims are not made in good faith and have requested that the claims be withdrawn.

appropriate and reasonable manner in which e-discovery is to be preserved, collected, and produced.

**7.      INITIAL DISCLOSURES**

The Plaintiffs and Meta Defendants made their Initial Disclosures under FRCP 26(a)(1) on January 23, 2023, the same day as the original Case Management Report was filed.

The Fenix Defendants understand that discovery, except for jurisdictional discovery, is currently limited pending resolution of the Fenix Defendants' 12(b)(2) Motion and therefore proposes that their initial disclosures be due within 10 days of a ruling on the Fenix Defendants' Motion to Dismiss, in the event the Motion is denied.

**8.      DISCOVERY**

Plaintiffs and the Fenix Defendants have completed jurisdictional discovery pursuant to the Order Allowing Jurisdictional Discovery (ECF No. 65).

More generally, the Parties anticipate the scope of discovery will reasonably encompass the claims and defenses asserted by them.

Plaintiffs' Statement:  Discovery should be straightforward and not unduly burdensome so long as the parties cooperate and use updated methods for identifying and producing relevant documents and protocols for reviewing technical and proprietary information.  That said, this case will involve technical and data issues, so it will require some effort by technical experts, and Plaintiffs are eager to put their experts in touch with Meta's experts to begin those discussions.

However, based on Defendants' position below, it appears that Meta is determined to oppose the production of relevant data from their systems.  In light of Defendants' position (below) requesting the Court severely restrict discovery generally and implement a two-phase process (which we address below), Plaintiffs have provided a detailed list of their initial contemplated discovery.  This will allow for a fuller discussion of Plaintiffs' initial discovery objectives if the Court wishes to consider/evaluate some of the details, without prejudice to modifying or adjusting it during the normal course of the case and the meet-and-confer process.

Items (a)-(d) in the list are the original big-picture items discussed in September as items which might provide information for early settlement discussions and potentially obviate the need

for further briefing on the motions to dismiss that were pending at the time. Other discovery topics stem from the Facebook whistleblower report and conducting other analyses and obtaining other information. Some of the items listed below would normally be a discovery request and not included in a 26(f) report, but given Defendants' position, Plaintiffs are providing the Court and parties with additional detail. There may be some overlap in the technical scope of some items due to Plaintiffs' limited visibility into Meta's system, such as references to information about the content enforcement history (e.g. designation, moderation, and other content actioning) or the content moderation media matching databases, which the Parties' respective experts can address. ("Media" includes any piece of digital information (email addresses, phone numbers, etc.), not simply images and videos.)

*Discovery (Bigger Picture)*

a)      Confirm/ascertain if any class members have ever been wrongfully added to the Shared Hash Database from 2018 to the present by creating a court (or special master) supervised process to create a database of Content Creator account information, identifiers, and content, to hash and run against the GIFCT or other content moderation databases used in the anti-competitive scheme, including (1) hash values that Meta has sent to—or withdrew from—the GIFCT, and also (2) to compare against historical versions/data of the GIFCT Shared Hash Database going back to 2018. This process would be informed by the JustPasteIt case study attached to the SAC as Exhibit C to the Hochman Declaration.

b)      A process for the analysis/review of the comprehensive content moderation/classification/designation and enforcement history of the list of the approximately 21,000 Instagram account names Plaintiffs provided to the Meta Defendants and which Plaintiffs' expert, Jonathan Hochman, used for the analysis attached to the Second Amended Complaint. The process would include the information requested by Mr. Hochman, including the detailed traffic data (for statistical analyses) for these accounts, and also to determine whether their content was: (1) ever designated/classified/etc. in a manner or for a purpose as alleged in the complaint (including but not limited to as DIO or sexual solicitation, and/or affiliation with an AE Platform that competes with OnlyFans), and if so, details about how it occurred and how it was changed; (2)

ever hashed and either sent to (or withdrawn from) the GIFCT shared hash or sent/or used in some other way consistent with the allegation of the complaint; or (3) actioned or enforced by other media matching content moderation databases consistent with the allegation of the complaint. (Note, Meta states below that internally the acronym used is "DOI", although Meta's website refers to it as the Dangerous Individuals and Organization policy; it is unclear if that is a change and when it occurred, but this illustrates the importance of including all internal acronyms in a search protocol).

c)     A process for the same review of data related to the competing platforms identified in an attachment to the complaint (the Designation List (ECF No. 105-3)).

d)     Discovery into banking records, wire transfer information and associated metadata.

e)     All internal investigations, documents, and findings that Meta has conducted into the allegations outlined in the complaint, including (i) the whistleblower report cited by the Court in its Order denying the motions to dismiss, and any other investigations into the matters alleged.

f)     Plaintiffs to provide detailed Requests for Admissions and Special Interrogatories and document requests.

g)     A process for Meta to produce data concerning the comprehensive moderation/classification/designation and enforcement history of users who have promoted OnlyFans vs competitor AE ("adult entertainment") Platforms across all Meta platforms (this overlaps in part with item (b), since some users will be the same). This will include a request for access to the media matching content moderation databases other than the GIFCT Shared Hash Database that have been used to affect (e.g. take action against) users who promoted OnlyFans and competing AE Platforms, and the content they created.  This will also be a technical process that combines Plaintiffs identifying users of competitor platforms and obtaining data from Defendants.

h)     Given public information in the Wall Street Journal and other sources that the whitelisting (and inferentially blacklisting) process at Meta allegedly has included manipulating/changing code—presumably by targeting particular Instagram accounts, URLs, or other identifiers—the Parties need a process to review change logs memorializing, recording, or related to the modification of any database, text file, filter, flag, or any other stored data that could have been used in implementing the alleged scheme detailed in Plaintiffs' complaint, including but

not limited to the DIO list and any Git, Subversion, or any other kind of version control repository. There are plenty of protocols and people with experience for how to identify and review such information from the patent, software, and other intellectual property contexts; the details and timing of such a review would be a topic for the parties' respective technical experts to discuss.

*Additional specific discovery topics/requests that Plaintiffs intend to seek from Meta Defendants, in case the Court prefers further insight:*

i)    Content moderation media matching databases, including but not limited to those used to find, monitor, and control postings involving adult sexual exploitation, dangerous individuals and organizations, nudity and pornography/adult nudity and sexual activity, and sexual solicitation.

j)    Comprehensive data on how Content Creators who promoted OnlyFans were treated differently than Content Creators who used AE Platforms that compete with OnlyFans.

k)    An analysis/explanation from Meta about (supported by documents/evidence) of what exactly happened starting in October of 2018 that began the process of large scale deleting, demoting, or any other actioning or enforcement of the content and pages of Meta Defendant platform users (especially Instagram) who promoted AE Platforms that compete with OnlyFans, while OnlyFans continued to grow exponentially and was comparatively unaffected.

l)    An explanation from Meta Defendants on how it is possible that OnlyFans has been and continues to be one of the most linked-to external websites from Meta platforms (especially Instagram) since 2018, despite the fact that OnlyFans hosts, among other content, explicit adult content.

   a.   Relatedly, given that activity, what mechanisms have existed and continue to exist to protect OnlyFans and its affiliated accounts and content at Meta despite the fact that OnlyFans accounts on the Meta Defendant platforms – and the OnlyFans.com website itself – operate in direct contravention to Meta's own Terms of Service?

   b.   How did this preferential treatment come to exist in the first place and how does it continue to exist to this day?

m)     Data to show Meta Defendant platforms' user traffic being directed from Meta Defendant platforms to OnlyFans.com vs traffic to competing AE Platforms from 2018 to the present.

n)     Data to show Meta platforms' user engagement metrics for OnlyFans-affiliated Meta accounts vs. user engagement metrics for competing AE Platforms-affiliated Meta accounts from 2018 to the present.

o)     Why were certain employees in the London office between approximately January and April 2019 asked to sign NDAs and not communicate about certain conduct alleged to have taken place in the office, and inquiry into whether that conduct related to the allegations in Plaintiffs' complaint.

p)     Content moderation, actioning, and/or enforcement history for any Meta Platforms content utilizing links to all competitor site URLs ((*list of all competing AE Platforms plus Onlyfans and MyfreeCams)).

q)     Meta Defendnatss content moderation, actioning, and/or enforcement "Implementation Standards" from 2018 to present.

r)     Content moderation "Known Questions" document from 2018 to the present (including but not limited to all variation of its sections on adult sexual exploitation, dangerous individuals and organizations, nudity & pornography/adult nudity and sexual activity and sexual solicitation).

s)     All internal employee requests (known as "Tasks") involving any of the following terms ((*list of all competitors sites plus Onlyfans and MyfreeCams))

t)     All posts on Facebook Workplace message boards involving any of the following terms ((*list of all competitors sites plus Onlyfans and MyfreeCams))

u)     All Product Policy Forum presentation, slides, notes, etc. involving any of the following terms ((*list of all competitors sites plus Onlyfans and MyfreeCams))

v)     Any transmittal to the GIFCT URL sharing program of the URLS of OnlyFans competitor site URLs plus Onlyfans.com and MyfreeCams.com.

w)      Information about the whitelisting described by publications like the Wall Street Journal and Gizmodo, including ascertaining if any of the Instagram accounts that had been whitelisted were ones consistent with the alleged scheme.

Separately, Plaintiffs intend to send subpoenas to third parties for user and traffic data (e.g., Google Analytics, and similar services) and content actioning/enforcement history (such as other social media platforms who are members of the GIFCT to determine if they obtained hash data for class members from the GIFCT, and then tracing where that hash data came from).  Plaintiffs also contemplate related discovery from the GIFCT.

Plaintiffs do not yet know whether any additional modifications of the discovery rules would be appropriate, but anticipate the possibility of requesting additional depositions depending on the outcome of the above procedure.  Plaintiffs initially anticipated that the information from the first 7 items (a-g) may provide enough information for the parties to discuss potential options for resolution, but given Defendants' position, it is most appropriate to proceed in the normal course on all issues.  A draft protective order regarding confidential information has been circulated, and an interim protective order is in place between Plaintiffs and the Fenix Defendants for purposes of jurisdictional discovery.  This report seems to identify some current discovery disputes about scope, but the parties can also meet and confer with any guidance the Court chooses to offer.

***In response to Defendants' position about phasing fact discovery***: Plaintiffs submit that Defendants' proposal to upend the Federal Rules of Civil Procedure to create two phases of fact discovery, with two summary judgment processes, is unjustified, impractical, and is essentially a blocking mechanism to make discovery of the truth more difficult.  It will just serve to create delay, undue expense, procedural complications, and unnecessary expenditure of Court time. Plaintiffs' complaint survived Defendants' motions to dismiss, and thus Plaintiffs should be permitted to proceed with discovery. The Federal Rules of Civil Procedure provides mechanisms that Defendants can use to challenge the scope or form of any discovery.  And from Defendants' portion of this Joint Report, it seems clear to Plaintiffs that Defendants—particularly the Meta Defendants (who control the key data)—intend to take a very, very narrow view of discovery and essentially ask the Court to trust them in their denials of wrongdoing.  Thus, the best use of time is not what

Defendants suggest, but instead for the parties to confer and work through what they can of the above anticipated discovery topics and motions, and bring any disputes about scope to the Court.

Meta appears to take the lead on this proposal, and bases its position for limited/phased discovery on a discussion at the September 9, 2022 hearing in the related state court JFF class action case (a proposed class action filed by JFF, as the sole named plaintiff, for the competing AE Platforms) about what Plaintiffs' counsel understood was a potential way for early merits discovery to see if settlement was possible. It was presented as a way to potentially avoid further briefing, amendment of pleadings, and anti-SLAPP and jurisdictional discovery in all of the cases if it led to sufficient information to justify early settlement discussions. Meta Defendants rejected Plaintiffs' proposal on November 11, 2022 (email discussed below). It was never intended as concession by Plaintiffs that they were not entitled to full discovery in this or other litigation.

To the extent this Court cares about what was discussed at that September 9, 2022 hearing in deciding how to manage this case, Plaintiffs provide details because they disagree with Defendants' interpretation/characterization of the hearing, which is also different than the position Meta Defendants took on November 11, 2022, when these issues were last discussed.

At the JFF hearing in question, San Mateo Superior Court Judge Foiles first addressed arguments from Meta about the Court's tentative decision to grant limited anti-SLAPP discovery, in which Meta asserted that it was immune from suit for anti-competitive conduct under the Communications Decency Act, and the First Amendment. (*See* discussion starting at 7:22 through 16:14.) Then Meta shifted to proposed merits discovery, and seemed to propose to the Court that instead of the Court allowing JFF to pursue limited anti-SLAPP discovery, it should permit JFF to pursue the HSBC subpoena, with Meta taking the position that all cases would rise or fall on the merits of only the HSBC subpoena (thus confusing the unfair conduct itself, which is the actionable wrong, with proof of the quid pro quo). Plaintiff's counsel welcomed the concept of immediate merits discovery to determine if an early "settle[ment] was possible" (20:18). Plaintiff's counsel said any such process should include the extra steps of evaluating the internal data at Meta for both the 21,000 plus Instagram account names and the approximately 94 competing AE Platforms, and

1    also performing the reverse hash evaluation.  (*E.g.*, Tr. at 18:14-20:18 (referring to the three

2    spreadsheets of data, plus the reverse hash process).)

3            Judge Foiles suggested the parties meet and confer to see if they could come up with a

4    mechanism for the four prongs of early merits discovery. (Tr. at 20:19-24, 21:2-7.) But in

5    meantime, Judge Foiles adopted his tentative decision to permit anti-SLAPP and jurisdictional

6    discovery (Tr. at 20:25-26).  That was the only discovery Judge Foiles ordered at that particular

7    time, prior to a decision on Defendants' anti-SLAPP and jurisdictional motions; there was no

8    discussion of limiting merits discovery in that lawsuit. (Tr. at 21:12-22.)  The only reason limited

9    merits discovery was even discussed at that time in the JFF action was because the filing of an anti-

10   SLAPP motion stays discovery in state court proceedings absent leave of court, and anti-SLAPP

11   discovery is narrower than full merits discovery.

12           Accordingly, Plaintiffs' counsel in that action never agreed to limit their right to merits

13   discovery if the litigation passed muster at the pleadings stage.  Exploring the possibility of

14   obtaining early merits discovery to facilitate possible early settlement discussions was the context

15   for Plaintiffs' participation in the parties' joint stipulation to this Court in September 2022 to

16   postpone the date for Plaintiffs to file their Second Amended Complaint.  Plaintiffs' objective was

17   to see if the parties could obviate the need to file a further amended complaint, which would change

18   the public landscape, by seeing if they could agree on a process for some focused merits discovery

19   to see if information might develop to permit productive discussions about potential resolution.

20   This Court denied the proposed stipulation, leading to the filing of the Second Amended Complaint,

21   and then Meta's eventual explicit rejection of Plaintiffs' proposals in the following subsequent

22   email exchanges.

23           On November 9, 2022, at 12:09 p.m., Plaintiffs' counsel Mr. Azar wrote to Meta's counsel,

24   Devin Anderson, to advise that if this Court, at the November hearing on the motions to dismiss,

25   segued into a broader case management discussion:

26           I would also raise the other 3-4 prongs of what was discussed with the JFF court as

27           an expeditious way to proceeding: analysis of the content actioning

28           history/classifications/etc. of the platforms we identified, the lists of Instagram

names we have, and getting underway a process to compare the hashes of content from class members and platforms to current and prior hash values in the shared hash database (i.e., akin to the JustPasteIt case study) (among perhaps some other things).   Regardless of what happens at the hearing, we can either start those conversations directly or get the process underway before a special master or discovery referee, as discussed with the JFF court.

In response, Mr. Anderson wrote on November 11, 2022, at 11:05 a.m.:

David:

***We don't agree that the categories you list below are appropriate.  I believe those were your suggestions at the JFF hearing, but we never consented to them nor did the court endorse them***.  The place to start with any discovery is the HSBC subpoena.  If that subpoena does not yield any records supporting the wire transfers that you allege have occurred and that are the backbone of the alleged misconduct, then the claims in both cases are without merit and both complaints should be voluntarily dismissed immediately.

Plaintiffs' counsel notes that Meta's position indicates that they are conflating the "wrongdoing"—the manipulation of the automated systems—with the quid pro quo or other consideration for why it happened.   While Plaintiffs recognize that the Facebook internal whistleblower report alleges payoffs, and Plaintiffs have some alleged bank transfer information, those will require third party discovery and potential review into third party transaction ledger data, while evidence of the anticompetitive conduct is within Meta Defendants' control.  ***Plaintiffs' case is about anti-competitive and unfair business conduct by the Meta Defendants***, whose services are used by ***__billions__*** of people around the globe; it does not rest solely on payoffs to particular individuals who work at those companies.

Finally, it is notable that Meta's proposal here is also entirely one-sided and does not reflect the proposal made at the JFF hearing.   Meta's description below of the three extra prongs has little similarity to Plaintiff's proposals at the JFF hearing or the allegations in the complaint (including the shift from the DIO version of the scheme).  In the JFF case, Plaintiff there requested the full

history of all 21,000+ Instagram accounts plus the competing AE Platforms, and also the reverse hash process. Here, Meta offers here just a declaration or verified interrogatory response and a 30(b)(6) deposition on very limited subset of information, with no verification of information, actual discovery or provision of data. However, Meta proposes full discovery for itself, stating that it "requires discovery into the named Plaintiffs' alleged experiences and injuries, and the provenance of the documents that Plaintiffs have relied on in their complaint." This is patently unfair and unreasonable. Meta's proposal also does not come close to providing Plaintiffs' with the discovery to address a motion for summary judgment. And the proposals at the JFF hearing were just for settlement purposes and not for summary judgment: the information that a lawyer might want to have to determine if settlement conversations might be productive is much different than the extent of information that is needed before summary judgment. Under Meta's proposal, rather than proceed with full discovery and addressing particular issues in the normal course, the Court will be required to weigh in on whether Plaintiffs' discovery requests belong in one phase or another. Meta's proposal merely invites more, not fewer, discovery disputes that will unnecessarily expend party and judicial resources.

<u>Meta Defendants' Statement:</u>    Meta agrees with Plaintiffs that discovery should be straightforward and not burdensome.  Plaintiffs' convoluted discovery proposal, however, is neither.  Meta believes that the commands of Rule 1 of the Federal Rules of Civil Procedure are best furthered in this case by a targeted period of fact discovery, followed by an early motion for summary judgment.  The parties would proceed to full merits and class discovery only if that early motion for summary judgment is denied.  Given the nature of the factual assertions in Plaintiffs' complaint, this procedure will quickly and efficiently determine the issues before the parties engage in the extensive and costly discovery that plaintiffs propose.

As the Court is aware, there is a parallel proceeding that involves counsel for plaintiffs in this case, the Meta Defendants, and the Fenix Defendants in the Superior Court of the State of California for San Mateo County's Southern Branch, before Judge Robert Foiles.  *See JFF Publications, LLC v. Facebook Operations, LLC*, Case No: 22-CIV-00782.  The plaintiff in that case is an adult-entertainment platform, not an adult entertainer, but the allegations are materially

the same.  Judge Foiles granted in part the plaintiff's motion for anti-SLAPP discovery.  *See* Meta Ex. 1 (*JFF* Order) at 2–3.  That discovery is to be completed by April 14, 2023.  *Id.* at 3.  The court will then hear a renewed demurrer and motion to strike on April 21, 2023.  *Id.*

During the hearing on the defendants' demurrers and motions to strike, Plaintiffs' counsel proposed three categories of anti-SLAPP discovery that he represented would allow the parties to "cut to the chase" and "figure out this case as alleged and settle and walk away in due course very fast."  Meta Ex. 2, 9/9/22 *JFF* Hr'g Tr. 20:16–18.  Judge Foiles in the San Mateo case noted that he was "inclined to limit discovery of any specific AE Provider or AE Performer to the four named plaintiffs."  Meta Ex. 1 (*JFF* Order) at 3.[6]  With that clarification, Meta agrees with counsel for Plaintiffs that the following categories of discovery would allow the parties to "cut to the chase" and "figure out this case as alleged … very fast."

Meta respectfully submits that the most efficient way to achieve a resolution in this case is to allow the parties to conduct narrow, focused discovery on a few issues that will allow for quick adjudication of the issues in this case.  Especially in light of the already ordered discovery in the *JFF* action, allowing the parties to complete the same discovery in this case on the following issues would, in plaintiffs' counsel's words, "streamline" the litigation, Meta Ex. 2, 9/9/22 *JFF* Hr'g Tr. 20:6.

- **Third-party discovery from HSBC:** According to the allegations of the complaint, the alleged payments from entities associated with OnlyFans to the employees of the Meta defendants occurred through HSBC.  Second Am. Compl. ¶ 79 & Ex. D.  If these transactions actually occurred, HSBC would have records of them.  Plaintiffs' counsel has described the HSBC subpoena as "very important to receive conformation" regarding the alleged payments.  Ex. 2, 9/9/22 *JFF* Hr'g Tr. 18:12–13.

- **Determining whether the named plaintiffs' Instagram accounts are on Meta's Dangerous Individuals and Organizations list:** Plaintiffs' counsel told the *JFF Publications* court that he would like to "figure out if they"—the named plaintiffs in both actions—"were added to the DIO list and if they were essentially viewed as a terrorist sympathizer."  Meta Ex. 2, 9/9/22

---

[6] There are three named plaintiffs in this action and one named plaintiff in the state-court action.

*JFF* Hr'g Tr. 19:10–11.  Consistent with Judge Foiles's order, this discovery would focus on plaintiff JustFor.Fans in the state-court action and plaintiffs Evans, Pierce, and Ruby in this action. Meta will provide a verified interrogatory response or a declaration regarding whether the named plaintiffs' accounts are on such list, which Meta refers to internally not as a "DIO" list, but rather as a "DOI" list.

- **Meta's use of and interaction with the GIFCT's database.**  The final category of information that plaintiffs' counsel told the *JFF* court would "really … bring this whole to a rest" is Meta's use of the GIFCT database.  Meta Ex. 2, 9/9/22 *JFF* Hr'g Tr. 20:26.  Meta would provide a Rule 30(b)(6) deposition concerning its interaction with and use of the GIFCT database.

In addition, Meta requires discovery into the named Plaintiffs' alleged experiences and injuries, and the provenance of the documents that Plaintiffs have relied on in their complaint, including discovery into the unnamed sources who Plaintiffs allege provided them the information (both documentary and oral) that forms the basis of their complaint.  While this Court concluded that these anonymous sources were properly considered at the pleading stage, Plaintiffs may not continue to prosecute this action while shielding the origins of substantially all of the core allegations relating to the alleged "scheme."  In discovery, as a matter of basic due process, Meta is entitled to learn, through depositions and written discovery, the identity of such sources—and the provenance of their purported information and materials—for purposes of probing their motives, biases, and whether they were even in a position to obtain personal knowledge of the allegations.

This targeted discovery will permit the parties to cut to the chase and quickly and efficiently determine whether the claims as alleged have any merit to them.  This discovery can be accomplished quickly and on the same timeline as the state-court action.

Following completion of this discovery, the parties should have an opportunity to file a motion for summary judgment, if they believe discovery warrants summary judgment.  If such a motion is filed, that motion should be briefed, argued, and resolved.  If the motion is denied or no motion is filed, then the parties can move on to full fact and expert discovery.  Meta proposes a schedule that would accomplish this in § 17.

By contrast, plaintiffs' proposal envisions a complex, judicially supervised fishing expedition that sweeps well beyond what is necessary to determine whether the named plaintiffs in this action were affected by any purported bribes or blacklisting. Plaintiffs offer up 23 categories of ill-defined discovery that are disconnected from their core claims. This extensive discovery is not even subject to meaningful time or subject-matter limits and will impose substantial costs and burdens on the parties. By contrast, the Meta Defendants' plan contemplates more-targeted discovery that cuts to the core of plaintiffs' claims that individuals were bribed to put the plaintiffs on purported terrorist lists. The better course is to take the same, targeted discovery in both this action and the *JFF Publications* action and see whether these cases can be brought to a swift resolution via the summary-judgment device.

Fenix Defendants' Statement: The Fenix Defendants do not believe this Statement is the appropriate vehicle for the parties to describe in great detail the discovery they may seek in this action and therefore object to Plaintiffs' extensive discovery discussion set forth above. However, the Fenix Defendants note that, in response to Plaintiffs' far-reaching jurisdictional requests that also covered merits issues in this case, the Fenix Defendants conducted a comprehensive search, collecting ESI from 38 custodians who could have had any involvement in the alleged scheme, applying broad search terms, and employing a date range going back to January 1, 2018. The Fenix Defendants uploaded and searched 564,895 files and engaged a team of lawyers who spent over 1,000 hours processing and reviewing 39,245 documents while also confirming that certain custodians were unaware of any alleged scheme or illicit wire payments and directing those custodians to search additional sources where such evidence could theoretically appear (including personal devices and messaging applications). At the conclusion of this process, the Fenix Defendants found (1) *no evidence* of wire transfers to Meta personnel, (2) *no evidence* of the provision of names for a purported blacklist, (3) *no evidence* of communications about blacklisting or illicit wire payments, and (4) *no evidence* of or reference to any "special relationship" with the Meta Defendants. Any further discovery from the Fenix Defendants must account for the substantial discovery they have already participated in to date.

As for Plaintiffs' prior representations to this Court concerning their discovery needs to

determine whether the alleged "scheme" occurred, the Fenix Defendants submit that the search they have already performed was extensive.  This search, combined with the fact that HSBC does not have any records regarding the alleged wire transfers, destroys any good faith basis for Plaintiffs continuing with this lawsuit.  In any event, Plaintiffs' record statements speak for themselves.  At a hearing before this Court on September 8, 2022, Plaintiffs' counsel represented that there were three particular forms of discovery that would "empirically" determine whether there's any "meat" to the allegations in Plaintiffs' Complaint "without a lot of time and effort."  Fenix Ex. 1, 9/8/22 Hr'g Tr. 31:20-23; 32:24–33:1.  Plaintiffs' counsel repeated the same general discovery needs the next day in the companion case pending in state court in San Mateo County, as detailed by the Meta Defendants above.

Specifically, Plaintiffs' counsel stated that "[w]e have very targeted and focused requests that we could ask – that we could send out next week that will allow [the Court] to quickly figure out if there's meat to this."  *Id.* 31:20–23.  When the Court asked Plaintiffs' counsel what his "best example of something narrow and targeted" would be, *id.* 31:24-25, Plaintiffs' counsel cited three forms of discovery that would resolve the matter:

First, Plaintiffs' counsel claimed to be aware of "transactions that went through HSBC USA … for wire transfers … that went … from Fenix UK to Hong Kong, and then went to … Facebook executives' bank accounts in the Philippines."  *Id.* 32:1-11.  Plaintiffs' counsel stated that a "subpoena has been served on HSBC," but was "paused temporarily because Fenix objected to it," so Plaintiffs' counsel proposed "let[ting] that roll through" and "let[ting] HSBC produce that information.  That's number one."  *Id.* 32:12-16.  To date, this subpoena has revealed nothing; on the contrary, HSBC has stated that it has no records to support the existence of any such wire transfers having ever occurred.  The only reason there is not a conclusive, formal response from HSBC is because Plaintiffs' counsel has still yet to formally serve the subpoena out of the San Mateo proceeding that grants them authority to do so.  This Court admonished Plaintiffs on November 16, 2022, asking "Why didn't you get the subpoena issued, and take it over to this bank and serve it on whoever is there?  ….  You were supposed to get the records, and you didn't.  You could have subpoenaed them ….  You did not serve the subpoena.  You should have served the

subpoena. Put them under legal compulsion." Fenix Ex. 2, 11/16/22 Hr'g Tr. 46:15–49:2. Despite the Court's November admonition, to the Fenix Defendants' knowledge Plaintiffs have done nothing to formally serve the subpoena or otherwise put HSBC under legal compulsion.

Second, beyond the HSBC subpoena, Plaintiffs' counsel explained in September that "[t]he second easy way to verify this would be, if you let me go ahead and submit this list that we received that's very detailed … asking for the content actioning history of these specified people on the spreadsheets." Fenix Ex. 1, 9/8/22 Hr'g Tr. 32:17–20.

Finally, "the third thing—and the third easy way to do it is, let me collect some images from class members, and then let the [GIFCT], which Facebook administers, run it through the database and let's see if they're matches. That would empirically resolve this without a lot of time and effort and it's super simple." *Id.* 32:21-33:1.

The Fenix Defendants therefore adopt Meta's proposed discovery plan and agree that the most efficient way to achieve a resolution in this case is to allow the parties to conduct narrow, focused discovery that will allow for quick adjudication of the issues in this case and that accounts for the discovery conducted to date.

**9.    CLASS ACTIONS**

All attorneys of record for the Parties have reviewed the Procedural Guidance for Class Action Settlements. Counsel of record for the Parties have also reviewed this Court's Notice and Order Re Putative Class Actions And Factors To Be Evaluated For Any Proposed Class Settlement And Protocol For Interviewing Putative Class Members.

Plaintiffs' Statement under Local Rule 16-9(a):

**(1)    Paragraphs of Fed. R. Civ. P. 23 under which the action is maintainable as a class action.** Plaintiffs contend that pursuant to Federal Rule of Civil Procedure 23(a), this action is maintainable as a class action, and satisfies the requirements of numerosity, commonality, typicality, adequacy. Plaintiff believes this action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) requiring a predominance of common questions of law and fact over individual questions and superiority of a class action over other available methods.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(2)** **Description of the Class(es) and Subclasses.** Plaintiffs bring Count I (Tortious Interference with Contract), Count II (Intentional Interference with Business Relationships), and Count III (Violation of the Unfair Competition Law), on behalf of themselves and the following Class:

> All Adult Entertainment Providers, regardless of the label they use, such as performer, influencer or artist, who suffered economic injury because they either (i) used their Instagram or Facebook account to link to, promote, or demonstrate praise, substantive support, or representation of any competitor of OnlyFans at a time when those businesses were falsely designated as a Dangerous Individual or Organization ("DIO") under any past or present version of Meta's DIO policy, or that of Facebook or Instagram or any of their predecessor or subsidiary entities or technologies, or (ii) were themselves falsely designated as a DIO; the class includes anyone who suffered damages from any shift in the scheme beyond the initial DIO tactic, such as suffering continuing effects through other computerized systems. (*See* SAC ¶ 113.)

Plaintiffs reserve the right to amend or modify the Class to include a broader scope, greater specificity, further division, or limitations to particular issues. (*See* SAC ¶ 114.)

**(3)** **Facts showing that the party is entitled to maintain the action under Fed. R. Civ. P. 23(a) and (b).** Plaintiffs contend that all investigation and evidence indicate that numerosity and commonality exists because Defendants engaged in the same anti-competitive conduct affecting Plaintiffs and all class members. Fed. R. Civ. P. 23(a). (SAC ¶¶ 8, 116, 118.) Plaintiffs' claims are typical of the claims of all putative class members because they all suffered similar injuries arising out of Defendants' common course of conduct. (*See* SAC ¶ 117.) Plaintiffs are adequate representatives of the Class, and will fairly protect the interest of the members of the Class. (*See* SAC ¶ 120.) All common elements exist that would permit recovery for all persons who suffered economic damages from being falsely designated a DIO.

Further, questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b). (SAC ¶ 121.)

**Liability Class 23(e)(4)**

Paragraph 119 of the SAC explicitly provides that "Pursuant to Fed. R. Civ. Proc. 23(e)(4), Plaintiff seeks certification of a class for purposes of proving liability only." Here, Plaintiffs' maintain that proof of the misuse of automated systems in the ways alleged would be susceptible

to common proof of liability and permit injunctive relief under the UCL, independent of any other arguments by Defendants against certification.

**(4)    Hearing on Plaintiff's Motion for Class Certification.** Plaintiffs will request that the Court schedule a further case management conference to set a date for the filing of Plaintiff's Motion for Class Certification and set a briefing schedule, after the Court has ruled on Defendants' motion to dismiss for lack of jurisdiction and after the Parties and Court discuss further the potential timing for Plaintiffs' access to data.  Plaintiff requests that a filing date for Plaintiff's class certification motion be set in June 2024, in approximately 18 months, in order for the Parties to complete related discovery.

Meta Defendants' Statement:  As set forth in § 8, Meta respectfully submits that this is an unusual case where targeted merits discovery regarding the named plaintiffs and an early motion for summary judgment—rather than full-fledged discovery that would include class issues—is the best use of the parties' and the Court's resources.  Plaintiffs seem to agree that targeted fact discovery is the most effective way to "cut to the chase" of these claims.  If the Court denies summary judgment, then the parties can proceed with full discovery, including on class-related issues.

In all events, Meta denies that class-action treatment is appropriate in this case and denies that any class can be certified.

Fenix Defendants' Statement:  The Fenix Defendants agree with the Meta Defendants' statement above and note that they do not believe that this action is suitable for class treatment and will oppose Plaintiffs' motion for class certification and/or move to deny class certification. Plaintiffs cannot satisfy the requirements of Rule 23 including commonality, predominance, typicality, adequacy, and superiority.

## 10.    RELATED CASES

There are two pending state court cases relating to the same conduct described herein. *See JFF Publications v. Facebook, et al.*, Case No. 22-CIV-00782 (San Mateo County Superior Court); *Centro Publisher Ltd. v. Fenix Internet LLC et al.*, Case No. CACE-21-021238 (Broward County Florida Circuit Court).  The Meta Defendants and the Fenix Defendants are defendants in the *JFF*

*Publications* action, but are not all in the *Centro Publisher* action, which is against Fenix Internet and Mr. Radvinsky alone.  Plaintiffs in *JFF* and *Centro* are both represented by the law firm who represents Plaintiffs in this case.

**11.    RELIEF SOUGHT**

Plaintiffs' Statement:  Plaintiffs seek available remedies for tortious interference with contract (Count 1), intentional interference with business relationships (Count 2), and California's Unfair Competition Law (Count 3), including restitution, compensatory, statutory, and punitive damages, and claims for injunctive relief as well as other available equitable remedies. Plaintiffs also seek attorneys' fees and costs.

Meta Defendants' Statement: Meta believes that plaintiffs are not entitled to relief from Meta. Meta also disputes that Plaintiffs may establish a class-wide basis for awarding monetary or equitable relief.  At this stage in the litigation, Meta is not in a position to describe the bases on which any alleged damages should be calculated in the event liability were established.

Fenix Defendants' Statement: The Fenix Defendants deny that Plaintiffs will be able to prove Counts 1–3 and deny that Plaintiffs are entitled to any relief.  The Fenix Defendants also seek judgment dismissing the Complaint on the merits, in their entirety and with prejudice, as well as the fees and costs incurred in having to defend against Plaintiffs' baseless class claims.

**12.    SETTLEMENT AND ADR**

Plaintiffs filed their ADR Certification forms with the Court on August 29, 2022. Defendants filed their ADR Certification forms with the Court on August 18 and 25, 2022. The Parties will discuss ADR selection with the Court at the case management conference.

**13.    CONSENT TO MAGISTRATE**

Whether all Parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment:

_____Yes__X__No

**14.    OTHER REFERENCES**

The case is not suitable for reference to binding arbitration, special master, or the Judicial Panel on Multidistrict Litigation.

15.    **NARROWING OF ISSUES**

The Parties have no suggestions to expedite presentation of evidence at trial (e.g., summaries or stipulated facts), or any request to bifurcate issues, claims, or defenses. The Parties intend to discuss potential stipulation to the authenticity and admissibility of certain documents and information produced by the Parties and presumptive business records from third parties.  The parties agree to work together in good faith to identify any issues appropriate for narrowing as the case progresses.

16.    **EXPEDITED TRIAL PROCEDURE**

The matter is not suited for Expedited Trial Procedures of General Order No. 64.

17.    **SCHEDULING**

Plaintiffs' Position:    Plaintiffs scheduling proposal is more standard, with deadlines for milestones, and then the parties are left to pursue discovery and seek relief from the Court as needed.  Plaintiffs disagree with Defendants' scheduling proposal for the reasons expressed above, which is intended to restrict Plaintiffs ability to obtain discovery and will involve more burden on the Court and parties, and essentially will incentivize Defendants to withhold information.  Plaintiffs provide their proposed schedule in a table, and Defendants provide theirs in the text.  Plaintiffs anticipate foreign discovery, and will need names and contact information from Defendants for some witnesses, and thus they want to begin the Hague convention process as soon as possible but that timing can vary, including if challenged.  Plaintiffs' schedule assumes reasonable cooperation by Defendants as to, at minimum, the procedural aspects with foreign discovery and efficiently resolving any disputes.

| Deadline | Plaintiff's Proposal |
|---|---|
| Disclosure of Pl.'s Expert for Class Cert. | September 1, 2024, or sooner if Plaintiffs can promptly obtain data |
| Motion for Class Cert. Due | 14 days later |

| | |
|---|---|
| Opposition Due | 30 days later |
| Reply Due | 14 days later |
| Hearing Date | 14 days later |
| Expert Disclosures | 30 days late after ruling on class certification |
| Expert Disclosures (Rebuttal) | 21 days later |
| Discovery Cut-off | 60 days later |
| L/D to File Discovery Motion | 45 days later |
| L/D for MSC or Mediation | 21 days later |
| L/D Motion Hearing | 21 days later |
| Final Pretrial Conf. | 60 days later |
| Trial Date | 30 days later |

Meta Defendants' Position: For the reasons set forth above, Meta believes that targeted discovery will allow the parties to "cut to the chase" and "figure out this case as alleged … very fast." Meta Ex. 2, 9/9/22 *JFF* Hr'g Tr. 20:16–18. Meta's proposed discovery plan involves two phases: (1) Phase 1: an initial phase of targeted discovery, followed by potential early motions for summary judgment; and then (if necessary) (2) Phase 2: move to full fact and expert discovery, followed by motions for class certification and motions for summary judgment. To that end, Meta proposes the following case schedule

- **July 31, 2023:** Close of limited discovery into topics identified in § 8.

- **August 30, 2023:** Deadline for early motions for summary judgment. If such a motion is filed, then the following schedule will govern:

- **September 29, 2023:** Deadline for oppositions to summary judgment

- **October 14, 2023:** Deadline for replies in support of summary judgment

- **October 26, 2023:** Hearing on motions for summary judgment

If summary judgment is granted, then judgment would be entered and the case terminated.

If no motions for summary judgment are filed, then the case would proceed into full fact and expert discovery on the following schedule:

- **October 31, 2023:** close of full fact discovery

- **December 31, 2023:** close of expert discovery

- **January 31, 2023:** deadline for plaintiffs' motion for class certification

- **March 15, 2024:** deadline for defendants' opposition to class certification and any motions to exclude any of plaintiffs' class-related experts

- **April 15, 2024:** deadline for plaintiffs' reply in support of class certification and any motions to exclude any of defendants' class-related experts and oppositions to defendants' motions re plaintiffs' experts

- **May 6, 2024:** deadline for defendants' replies in support any motions to exclude any of plaintiffs' class-related experts

- **May 27, 2024:** deadline for plaintiffs' replies in support any motions to exclude any of plaintiffs' class-related experts

- **June 13 , 2024:** hearing on class-certification motion and experts

Further schedule for motions for summary judgment and trial, if necessary, to be set following court's ruling on class certification

If motions for summary judgment are filed and denied, a schedule consistent with the schedule above would be entered.

Plaintiffs' proposal—which imposes no deadlines until nearly 18 months from now—does not promote the just, speedy, and inexpensive resolution of this matter. The parties will be better

served by having clear interim deadlines and tight discovery periods that will focus their energies on the issues that are central to the resolution of this case. Meta's proposal creates an opportunity for early resolution on the merits by this summer, while reserving ample time to accomplish the remaining pretrial tasks if necessary.

Fenix Defendants' Position: The Fenix Defendants agree with the Meta Defendants' proposed schedule above.

18.    **TRIAL**

Plaintiffs' Position:  Plaintiff has requested a jury trial and estimates trial of the case, if certified, will last up to 15 days. Plaintiffs estimate approximately 10-15 witnesses will testify at trial. If a Class is not certified, Plaintiff anticipates trial will last approximately 10 days, because the technical and other issues will still need to be addressed, they will call 7-12 witnesses.

Meta Defendants' Position: The Meta Defendants anticipate trial would last 5 days.

Fenix Defendants' Position: The Fenix Defendants believe that any trial estimates are premature at this time given, among other reasons, pending dispositive issues in the case, the sprawling nature of the allegations in the case, and Plaintiffs' reliance on numerous anonymous sources whose identities have not yet been revealed.  The Fenix Defendants believe the case is likely to be dismissed on summary judgment, if not before then.  Nonetheless, the Fenix Defendants anticipate that a trial would last 5 days.

Trial Counsel

Plaintiffs:           David E. Azar, Milberg Coleman Bryson Phillips Grossman PLLC.

Meta Defendants:      Winn Allen, Kirkland & Ellis LLP

Fenix Defendants:     John O'Sullivan and Jason Sternberg, Quinn Emanuel Urquhart & Sullivan, LLP

19.    **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

Other than the named parties, Plaintiffs have no such interest to report. Plaintiffs disclose that the litigation is being funded by Plaintiffs and their counsel.

Defendants filed their Certification of Interested Entities or Persons. (ECF No. 19-21, 61, 62.)

Defendants Meta Platforms, Inc. (f/k/a Facebook, Inc.), Facebook Operations, LLC, and Instagram, LLC, pursuant to Federal Rule of Civil Procedure 7.1, disclose that they are publicly held corporations with no parent corporation and that no publicly held corporation owns 10% or more of their stock. (ECF No. 16-18.)

The Fenix Defendants certify, pursuant to Civ. L. R. 3-15 that, other than the named parties in this action, they know of no persons, associations of persons, firms, partnerships, corporations (including parent corporations) or other entities that (i) have a financial interest in the subject matter in controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be substantially affected by the outcome of this proceeding.  (ECF No. 61, 62.)

20. **PROFESSIONAL CONDUCT**

The Parties have reviewed the Guidelines for Professional Conduct, and will uphold their professional duties to clients, opposing parties and counsel, the court, and the public.

21. **OTHER MATTERS**

A. **Proposal for Interviews with Putative Class Members.** The Parties agree that they will act in accordance with any applicable ethical or procedural rules in speaking with any putative class members about the litigation.  The parties believe that a formal protocol for witness interviews is unnecessary at this time given the absence of any evidence that any counsel has engaged in conduct that would necessitate such a protocol.  The parties agree to continue to confer in good faith about the necessity of such a protocol in the future.

B. **Involvement of Junior Lawyers.**

Plaintiffs' counsel state that attorney Kelsey Davies will work on this case, and will be involved with all aspects of the case. Ms. Davies earned her J.D. in 2021, and is admitted to practice in Tennessee and in the Eastern and Middle Districts of Tennessee. Ms. Davies will argue some discovery motions and motions in limine, take two or more witness depositions, and have the opportunity to examine witnesses at trial under the supervision of senior counsel.

Meta plans to provide opportunities for junior lawyers working on this matter to argue discovery-related motions, to take or defend depositions of witnesses, and to participate actively at

trial.  Specifically, Meta intends to provide such opportunities for associates John Hannon (class of 2018, with less than three years in private practice), Erin Quick (class of 2019), and Morgan Phoenix (class of 2022).

The Fenix Defendants state that attorneys Dan Humphrey (J.D. 2019), Thomas Geeker (J.D. 2020), and Abigail Clark (J.D. 2019) will be participating in various facets of this case, including taking or defending depositions, arguing motions in whole or part, and potentially examining witnesses at trial to the extent the case is not resolved by that point.

DATED:  March 22, 2023                QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP


By /s/ Jason D. Sternberg
    Jason D. Sternberg
    Attorneys for Defendants
    Fenix Internet LLC,
    Fenix International Ltd, and
    Leonid Radvinsky


MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC


By  /s/ David E. Azar
    David E. Azar
    Attorneys for Plaintiffs
    Dawn Dangaard,
    Kelly Gilbert, and
    Jennifer Albaugh

1

KIRKLAND & ELLIS LLP

2

3

By   /s/ Devin S. Anderson

4

Devin S. Anderson

5

Attorney for Defendants
Meta Platforms, Inc.,

6

Instagram, LLC, and
Facebook Operations, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28