1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DAWN DANGAARD, *et al.*, | CASE NO. 3:22-cv-01101-WHA |
| Plaintiffs, | **DECLARATION OF DEVIN S. ANDERSON IN SUPPORT OF META'S STATUS REPORT ABOUT ORDERED DISCOVERY AND REQUEST FOR AN EXPEDITED SUMMARY JUDGMENT BRIEFING SCHEDULE** |
| v. | |
| INSTAGRAM, LLC, *et al.*, | |
| Defendants. | |

I, Devin S. Anderson, declare as follows:

1. I am an attorney at law, a member in good standing of the bars of the District of Columbia and the state of Utah and am duly admitted to practice before this and other courts. I practice with Kirkland & Ellis LLP, and am counsel of record for Defendants Meta Platforms, Inc., Facebook Operations, LLC, and Instagram, LLC (collectively "Meta") in this matter and one of the firm's attorneys chiefly responsible for this representation.

2. I submit this declaration in support of Meta's Status Report About Ordered Discovery and Request For An Expedited Summary Judgment Briefing Schedule.

3. I have personal knowledge of the matters in this declaration, and I am competent to testify to the same.

4. Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the transcript of the June 8, 2023 deposition of Sir Nicholas Clegg, from which certain portions concerning sensitive information have been redacted, including references to a minor. *See* Nov. 30, 2022 Order re Motions to Dismiss (ECF No. 101) § 6 (permitting such redactions).

5. Attached hereto as **Exhibit 2** a true and correct copy of excerpts of the transcript of the May 25, 2023 deposition of Lady Nicola Mendelsohn, from which certain portions concerning sensitive information subject to a pending motion to seal (ECF No. 145) have been redacted.

6. Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the transcript of the May 30, 2023 deposition of Cristian Perrella.

7. Attached hereto as **Exhibit 4** is a true and correct copy of the Objections of Non-Party Media Entity Advance Magazine Publishers Inc. to Plaintiffs' Subpoena to Testify at a Deposition in a Civil Case, dated April 19, 2023.

8. Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the transcript of the May 24, 2023 deposition of Dell Cameron.

9. Attached hereto as **Exhibit 6** is a true and correct copy of excerpts of the transcript of the May 25, 2023 deposition of Andrew Couts.

10. Attached hereto as **Exhibit 7** is a true and correct copy of Non-Party HSBC Bank USA, N.A.'s Objections to Subpoena, dated April 28, 2023.

11.    Attached hereto as **Exhibit 8** is a true and correct copy of Plaintiffs' Objections and Responses to Defendants Instagram, LLC, Facebook Operations, LLC, and Meta Platforms, Inc.'s First Set of Requests for Production of Documents (Issued Pursuant to March 29, 2023 Order), dated May 8, 2023, from which a reference to a minor has been redacted.  *See* Nov. 30, 2022 Order re Motions to Dismiss (ECF No. 101) § 6 (permitting such redactions)

12.    Attached hereto as **Exhibit 9** is a true and correct copy of Plaintiffs' May 23, 2023 production of documents pursuant to Meta's Requests for Production, produced with Bates numbers Dan-Pltf-000001 to Dan-Pltf-000013.

13.    Attached hereto as **Exhibit 10** is a true and correct copy of the March 23, 2023 Declaration of Sir Nicholas Clegg, from which certain portions referencing a minor have been redacted.  *See* Nov. 30, 2022 Order re Motions to Dismiss (ECF No. 101) § 6 (permitting such redactions).

14.    Attached hereto as **Exhibit 11** is a true and correct copy of the March 23, 2023 Declaration of Lady Nicola Mendelsohn.

15.    Attached hereto as **Exhibit 12** is a true and correct copy of the March 23, 2023 Declaration of Cristian Perrella.

16.    Attached hereto as **Exhibit 13** is a true and correct copy of the Declaration of Sabrina Mannai in Support of Meta Defendants' Response to Plaintiffs' Administrative Motion to Consider Whether Certain Materials Should be Sealed (ECF No. 145-1), dated April 4, 2023.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Executed this 6th day of July 2023, in Salt Lake City, Utah.

Devin S. Anderson

3

# EXHIBIT 1

CONFIDENTIAL

Page 1

```
1              UNITED STATED DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2
3              CASE NO. 3:22-CV-01101-WHA
4    DAWN DANGAARD, a/k/a ALANA
     EVANS, ASHLEY NICOLE MILLER,
5    a/k/a NICOLE ANISTON, KELLY
     GILBERT, a/k/a KELLY PIERCE,
6    JENNIFER ALLBAUGH, a/k/a RUBY,
     and LAURA ALLEN, a/k/a AMBER
7    LYNN on behalf of themselves and all
     others similarly situated,
8                    Plaintiffs,
9    V.
10
     FENIX INTERNET LLC, FENIX
11   INTERNATIONAL INC., META
     PLATFORMS, INC., INSTAGRAM,
12   LLC, FACEBOOK OPERATIONS, LLC,
     LEONID RADVINSKY, and JOHN
13   DOES 1-10,
                    Defendants.
14   _____
15
16                        Remote Proceedings
                          June 8, 2023
17                        8:15 a.m. - 11:34 a.m.
18           DEPOSITION OF NICHOLAS CLEGG
19    * * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY * *
20       Taken before SUZANNE VITALE, R.P.R., F.P.R.
21   and Notary Public for the State of Florida at Large,
22   pursuant to Notice of Taking Deposition filed in the
23   above cause.
24
25
```

CONFIDENTIAL

1  or organization on the DIO list?

2      A.  Absolutely not.

3      Q.  Have you ever heard of an allegation that

4  anyone at Facebook took money in order to manipulate

5  the content moderation treatment of an individual or

6  an entity?

7      A.  No, never.

8      Q.  If it had happened, would you have known

9  about it or might that be outside of your remit?

10          MR. ALLEN:  Object to form.

11          MR. STERNBERG:  Object to form.

12          THE WITNESS:  I think the gravity of the

13          allegation would be such that it would

14          definitely be escalated to senior executives

15          such as myself.

16  BY MR. AZAR:

17      Q.  Are you familiar with -- so you've never

18  heard of anyone being terminated for taking some

19  consideration to favor an individual organization in

20  terms of content moderation; is that correct?

21      A.  Correct.  In terms of content moderation,

22  I am unaware of anyone being accused of abusing the

23  system for personal gain.

24      Q.  How about broader than content moderation?

25  Are you aware of anyone at Facebook/Meta taking

1    to GIFCT, okay.

2         You testified generally that you weren't

3    familiar with the granular details about, you know,

4    people who -- how people who affiliate, let's say,

5    with someone from the terrorist list or designated.

6         My question is:  Are you familiar with any

7    documents that provide those granular details,

8    really for any of the systems that you've

9    identified?

10         MR. ALLEN:  Object to form.

11         THE WITNESS:  I know that more detailed

12       guidance must exist, otherwise these systems

13       can't operate.  I, myself, do not -- I, myself,

14       am not familiar with them, don't delve into

15       them.  Don't make it my business to read them.

16    BY MR. AZAR:

17       Q.   Okay.  And in terms of who you would ask

18    to get access to those manuals or detailed

19    documents, would it be the same people you

20    identified earlier in our conversation?

21       A.   Yes, it would be.

22       Q.   Okay.  Have you ever communicated with

23    OnlyFans in any -- for any capacity?

24       A.   No.

25       Q.   Actually, let me -- for any capacity.  For

1    any purpose.
2         Have you ever communicated with OnlyFans
3    for any purpose?
4         A.   No.
5         Q.   Have you ever communicated with
6    Mr. Radvinsky, R-A-D-V-I-N-S-K-Y, for any purpose?
7         A.   No.
8         Q.   Have you ever communicated with anyone by
9    the last name of Stokely for any purpose?
10        A.   No.
11        Q.   Are you aware of anyone else at Meta who
12   communicated with OnlyFans for any purpose?
13        A.   Am I -- sorry, can you ask the question
14   again?
15        Q.   Sure.
16             Are you aware of anyone else at Meta who
17   communicated with OnlyFans for any purpose?
18        A.   Well, we have OnlyFans representation on
19   this call.  So I don't -- do you mean outside this
20   litigation?
21        Q.   I do mean outside this litigation, yes.
22        A.   Oh.  Not to my knowledge.  That doesn't
23   mean there isn't communication.  There's
24   communication between Meta and other entities all
25   the time.  But to my knowledge or at least I have no

CONFIDENTIAL

1    recollection of that ever being brought to my

2    attention.

3        Q.   Okay.  Are you aware of anyone else at

4    Meta, outside of this litigation, who communicated

5    with Mr. Radvinsky for any purpose?

6        A.   Since I haven't the faintest idea who

7    Mr. Radvinsky is, no, I don't.

8        Q.   Okay.  Do you recall ever discussing with

9    anyone at Meta, outside of this litigation, the

10   activity of any adult performer on any of the Meta

11   platforms?

12       A.   No.

13       Q.   Do you recall discussing, outside of this

14   litigation, with anyone at Meta, the activity of any

15   adult platform on any of the Meta platforms?

16       A.   No.

17       Q.   I'm not sure if I repeated "Meta platform"

18   in that question, but I --

19       A.   No.

20       Q.   Do you have any knowledge of the content

21   of any adult platform -- sorry.  Let me start again.

22           Do you have any knowledge of the content

23   of any adult performer being added to the GIFCT

24   database?

25       A.   Absolutely not.

CONFIDENTIAL

1          Do you have any information about the
2    extent to which OnlyFans is linked from Instagram or
3    any of the other social media sites run by Meta?
4          A.    No, I don't have that information.
5          Q.    Okay.  Do you have any information, other
6    than what you have testified to today so far, about
7    any content enforcement against any adult performer?
8          A.    No, I don't have that information, no.  I
9    could -- I could ask to find out that information
10   but I haven't done so ever.  I don't have that
11   information available to me now.
12         Q.    If you wanted to ask someone for that
13   information, would it be the same people you
14   identified earlier?
15         A.    Yes.
16         Q.    Would your answer be the same, instead of
17   asking about adult performers, if I asked about
18   adult platforms, do you have any other information
19   about content enforcement actions or lack of actions
20   against any adult platform?
21         A.    It's not something that's ever really come
22   up in my work.
23         Q.    Okay.  Did you, by any chance, speak with
24   Lady Mendelsohn about her deposition in this case?
25         A.    No, I didn't.

CONFIDENTIAL

1    that there were many -- many content was

2    miscategorized within the database of terrorist

3    content?

4        A.    Yeah, I've never been told that.

5        Q.    Have you -- other than through this case,

6    has anyone ever told you that anyone did an

7    investigation of any kind, an interim investigation

8    that tracks anything covered in this Exhibit 22?

9            MR. STERNBERG:  Object to form.

10           THE WITNESS:  No, it seems from top to

11       bottom to be a wholly fictional artifact.

12   BY MR. AZAR:

19           MR. ALLEN:  Objection.

20           MR. AZAR:  I'm sorry.

21           MR. ALLEN:  Go ahead and finish, David.

22           MR. AZAR:  Sure.

23   BY MR. AZAR:

24       Q.    -- that track or have any overlap with the

25   content of this document?

CONFIDENTIAL

```
 1   BY MR. AZAR:
 2        Q.   I'm not asking you to waive anything.  I'm
 3   asking you as a business executive, whether or not
 4   you would feel comfortable authorizing somebody who
 5   had something to say that corroborated any
 6   information in this report to speak to us without
 7   fear of retaliation or breach of an NDA, without
 8   taking a legal?
 9             MR. STERNBERG:  Object to form.
10             THE WITNESS:  I would speak to my
11        attorneys about that.  And it's exceptionally
12        difficult to provide responses on the basis of
13        entirely, you know, fictitious allegations and
14        entirely fabricated documents.
15   BY MR. AZAR:
16        Q.   Right.  That's not my question.
17             My question is if there was somebody out
18   there who is a current or former employee of Meta
19   who believes that they have testimony that supports
20   any of the allegations against you in this document,
21   from a business perspective, not from a legal one,
22   would you have an objection to them speaking to us
23   without a risk of retaliation or claim of breach of
24   an NDA?
25             MR. STERNBERG:  Object to form.
```

CONFIDENTIAL

1           THE WITNESS:  My answer is the same as

2       before.  This is -- this is an elaborate

3       fictitious account with no grounding in reality

4       whatsoever.  So I'm simply not -- I can't

5       provide answers to wholly hypothetical

6       questions related to something which I know to

7       be wholly false.

8   BY MR. AZAR:

9       Q.   As you were reading this document and

10  looking at the wire transfer records, did any

11  thought occur to you non-privileged about who might

12  have written such a thing or created such documents?

13      A.   No, it's a complete mystery to me,

14  complete mystery to me.

15      Q.   When you read this document that we're

16  looking at, Exhibit 22, do you have an impression in

17  your own mind about whether or not this likely was

18  written by somebody at Meta?

19           MR. ALLEN:  Object to form.

20           MR. STERNBERG:  Object to form.

21           THE WITNESS:  It's clearly someone who's

22      seeking to give the impression that they worked

23      at Meta because this is a fictional transcript.

24      It's not even an original copy of what purports

25      to be an internal document, so they clearly

CONFIDENTIAL

1          I mean, just describing it, I hope

2     underlines how ludicrous this is and how false it

3     is.

4          Q.    Well, listen, I'm not -- I understand that

5     you're -- I understand your testimony for that.

6          But I think for this purpose really what

7     you're saying is you just deny it entirely, it did

8     ████████████████████████████████████████████████████

9     ██████████████████████████████████████

10         All right --

11         A.    I'm very happy to -- but, obviously, as

12    you just suggested, since all of the events here

13    described are false, my responses are consistently

14    going to say that they're false because they are,

15    and I'm very happy to obviously continue to do that,

16    but that is, obviously, one follows from the other.

17         Q.    I understand.

18         And I'm not going to give you any other

19    information about this.  I just want to focus on

20    your own knowledge.

21         A.    Sure, sure.

22    ██████    ██    ██████    ████████████████████████████

23    ██████████████████████████████████████████████████████

24    ██████████████████████

25         Am I correct that your testimony is all of

CONFIDENTIAL

Page 103

1    this is false, there's no truth whatsoever to any of

2    this content?  And I'm referring to basically one,

7            We can do it paragraph by paragraph or if

8    you feel comfortable, you can tell me that there's

9    no truth to any of this.

10           A.    Totally comprehensively false and some of

11    the detail -- alleged false detail alleged here is

12    also insulting.

CONFIDENTIAL

1    London office.  But, no, I wasn't even here so I

2    couldn't have done -- even if this false account was

3    true, I wasn't physically here.

4         Q.   Right, I just was wondering do you recall

5    hearing anything about anything like that, about a

6    bunch of people being asked to sign documents such

7    as NDAs in or around January of 2019?

8         A.   I can't see any reference here to NDAs in

9    that paragraph.  Am I missing something?

10         Q.   No, I'm asking you whether you signed

11   documents.  The NDA stuff comes from someone else's

12   testimony.

13             But as far as the documents go, I was

14   giving you an example when I asked to sign the

15   documents.

16         A.   I literally have no idea what this is

17   about because it's false, so I'm not -- I'm not

18   likely to have known.

19         Q.   Okay.  I think you've already covered the

20   next two paragraphs on other testimony.

21             You also covered the next one.

22             Let me then go down to the paragraph that

23   says, "In addition."

24             You already testified that you have no

25   knowledge of white-listing.  But I want to focus on

CONFIDENTIAL

1    same way I do but basically I left the exhibit tab

2    the same as what we're submitting to a bank.  So I'm

3    showing you a document that says Exhibit 1 on the

4    first page, and the second page is a purported wire

5    transfer from the FedPayments manager with a create

6    time of October 1, 2018, and the --

7         A.   Yes, I got it in front of me.

8         Q.   The information on the bottom says,

9    "October 2018 payment"?

10        A.   Yes.

11        Q.   Mr. Clegg, do you recognize any of the

12   information in here?

13        A.   None whatsoever.

14             And if I can say for the record, the idea

15   that in the midst of all of this extraordinary

16   fabrication, that █████████████████████

17   ██████, would have been listed as the particular head

18   of a trust for a bank account in the Philippines, I

19   mean, it's so preposterous, I don't really know

20   where to start.  And, no, I don't recognize any of

21   this.

22        Q.   Do you or any member of your family have

23   an offshore trust account?

24        A.   No.

25        Q.   Do you or anyone in your family have any

CONFIDENTIAL

```
 1    accounts in the Philippines?
 2         A.   No.
 3         Q.   Exhibit 50 will be the other wire
 4    transfer, Exhibit 8.
 5              (Thereupon, the referred-to document was
 6    marked for Identification as Plaintiff's
 7    Exhibit 50.)
 8    BY MR. AZAR:
 9    BY MR. AZAR:
10         Q.   I'm showing you a two-page document.
11         A.   Can I ask a clarifying question?
12              So the exhibit you showed me earlier would
13    have been -- purports to be for a payment that was
14    made in the, what, four or five working days that I
15    was at Meta, having started I think on the 22nd of
16    October.  I only ask just to reinforce the point
17    that it has to be fictional.  It would be
18    inconceivable I can receive payment ███████
19    ████████████████████ in the Philippines within three
20    or four working days of arriving at Facebook.
21         Q.   I appreciate that clarification or that
22    point of emphasis.
23              You have to understand, in this situation
24    it's for me to ask questions.
25         A.   Yes, yes.
```

CONFIDENTIAL

Page 111

1    Q.   But I understand your point.  Thank you

2  for mentioning that.

3              MR. LIBBARES:  I have a quick question off

4      the record.

5              MR. ALLEN:  Let's take a break.

6              (Short discussion off the record.)

7  BY MR. AZAR:

8    Q.   We're back on the record.

9              Mr. Clegg, anything occur to you that you

10  have to clarify or amplify with your prior testimony

11  or can we go to the next exhibit?

12    A.   We can go to the next exhibit.  Thanks.

13    Q.   Okay, we're Exhibit 50 then, a two-page

14  document.  The first page says, "Exhibit 8."  The

15  second page is a printout of a purported FedPayments

16  Manager Funds wire transfer record dated -- create

17  time of October 1, 2018.  And in the text

18  information, it says, "October 2018 rev final."

19              Do you have that in front of you?

20    A.   Yes, I do now, yes.

21    Q.   Okay.  Do you recognize any of the

22  information in this document?

23    A.   Not a single word or number in this is

24  recognizable to me or conceivable.

25    Q.   Okay.  And did you already say that, to

# EXHIBIT 2

ATTORNEYS EYES ONLY

Page 1

```
 1              UNITED STATED DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
 3              CASE NO. 3:22-CV-01101-WHA
 4   DAWN DANGAARD, a/k/a ALANA
     EVANS, ASHLEY NICOLE MILLER,
 5   a/k/a NICOLE ANISTON, KELLY
     GILBERT, a/k/a KELLY PIERCE,
 6   JENNIFER ALLBAUGH, a/k/a RUBY,
     and LAURA ALLEN, a/k/a AMBER
 7   LYNN on behalf of themselves and all
     others similarly situated,
 8                    Plaintiffs,
 9   V.
10
     FENIX INTERNET LLC, FENIX
11   INTERNATIONAL INC., META
     PLATFORMS, INC., INSTAGRAM,
12   LLC, FACEBOOK OPERATIONS, LLC,
     LEONID RADVINSKY, and JOHN
13   DOES 1-10,
                     Defendants.
14   _____
15
16                    Remote Proceedings
                      May 25, 2023
17                    8:13 a.m. - 12:47 p.m.
18         DEPOSITION OF NICOLA MENDELSOHN
19    *** HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY ***
20      Taken before SUZANNE VITALE, R.P.R., F.P.R.
21    and Notary Public for the State of Florida at
22   Large, pursuant to Notice of Taking Deposition filed
23   in the above cause.
24
25
```

ATTORNEYS EYES ONLY

Page 36

1    Q.   Do you have any information, first or
2    secondhand, about people at Facebook or Meta
3    receiving payments in order to protect people from
4    content actioning?
5    A.   No, Counsel, I'm not aware of that and it
6    would go against the company guidelines and rules.
7    Q.   Are you aware, have you heard that
8    Meta/Facebook has a group dedicated to trying to
9    find people who take money in order to affect
10   content actioning?
11   A.   Counsel, I'm not aware of a specific group
12   as such.  But I would imagine that we do have --
13   well, I know that we have our own internal audit
14   like any large company that would always be on the
15   lookout for anything that was improper or goes
16   against our company rules and guidelines.
17   Q.   Have you heard anything about how -- have
18   you heard anything about any situation in which
19   Meta/Facebook has found people who have accepted
20   money in return for affecting the content actioning?
21   A.   No, Counsel, I'm not aware of any such
22   incidents.
23   Q.   And you're not aware of it firsthand or
24   secondhand in any respect, correct?
25   A.   That is correct, Counsel.

ATTORNEYS EYES ONLY

Page 40

1    when you're ready to answer a question about it.

2         A.   I'm ready, Counsel.

3         Q.   Do you recognize any of the information in

4    this document prior to just looking at it from --

5    any -- let me start that again.

6              Prior to your counsel showing you this, do

7    you recognize any of the information in this

8    document?

9         A.   No, Counsel, I do not.

10        Q.   If you look at the beneficiary name, it

11   says "Nicola Mendelsohn Trust."

12             Do you see that?

13        A.   Yes, Counsel, I do.

14        Q.   Are you familiar with any trust by that

15   name?

16        A.   No, Counsel, I am not.

17        Q.   And when I say this, I mean not just if

18   you direct it but if -- are you familiar with

19   foreign trusts at all, how they work?

20        A.   No, Counsel, I am not.

21        Q.   Do you have any foreign trusts?

22        A.   No, Counsel, I do not.

23        Q.   Do you know if any of your family members

24   have foreign trusts?

25             MR. ANDERSON:  Object to form.

ATTORNEYS EYES ONLY

Page 42

```
 1    than an employment relationship, is that what you're
 2    referring to?
 3              MR. ANDERSON:  Object to form.
 4              THE WITNESS:  Counsel, please share that
 5         again.
 6    BY MR. AZAR:
 7         Q.   Sure.  When you're saying that the 5,000
 8    is ludicrous, that it's not the kind of person you
 9    are, am I correct to infer that you're saying that
10    it would be ludicrous to accept money from someone
11    outside of your employment?  Is that kind of what
12    you were pointing to, or were you referring to the
13    dollar amount or something else?
14         A.   The nature of accepting money as a payment
15    outside work that I do, yes.
16         Q.   Okay.  Great.
17              When you look at this document, if it's
18    not an accurate document, you're saying this is
19    not -- this information is not accurate or at least
20    if it's a Nicola Mendelsohn Trust, you have nothing
21    to do with that trust, correct?
22              MR. ANDERSON:  Object to form.
23              THE WITNESS:  That is correct.
24    BY MR. AZAR:
25         Q.   Do you know of anyone that you can think
```

ATTORNEYS EYES ONLY

Page 50

1    A.   Counsel, I don't want to confuse what I

2  might have seen in -- this week versus what I saw

3  when I wrote this at this time.

4    Q.   Okay.  Have you had any communications

5  whatsoever with anyone affiliated with OnlyFans?

6    A.   No, Counsel, I have not.

7    Q.   And I'm speaking broadly.  I'm speaking,

8  you know, from any time period initially?

9    A.   No, Counsel, to the best of my knowledge,

10  I have not had any communication with anybody from

11  OnlyFans.

12    Q.   Okay.  And I'm going to ask again some

13  specifics.

14        To your knowledge, have you had any

15  communication with anyone from a company called

16  Fenix International?

17    A.   No, Counsel, I have not.

18    Q.   Have you had any communications with

19  anyone from a company called Fenix Internet?

20    A.   No, counsel, I have not.

21    Q.   Have you had any communications with Leo

22  Radvinsky, R-A-D-V-I-N-S-K-Y?

23    A.   No, Counsel, I have not.

24    Q.   Have you had any communications with

25  anyone associated with MyFreeCams.com?

ATTORNEYS EYES ONLY

1    A.   No, Counsel, I am not familiar with any of

2    the details on this document.

3        Q.   And is any of the information on this

4    document, to your knowledge, accurate?

5        A.   No, Counsel, none of the information here

6    is accurate, nor have I ever even been to the

7    Philippines.

8        Q.   Understand.

9            But this doesn't say you were in the

10   Philippines.  This just talks about a bank account

11   or a trust account linked to the Philippines.

12           I see you're referring generally to your

13   same testimony as before is that you're not familiar

14   with anything called a Nicola Mendelsohn Trust.

15   You're not familiar with any bank in the Philippines

16   and had no interaction with them.

17           Is that what you were getting at?

18       A.   Yes, Counsel.

19           MR. AZAR:  Let's, Ryan, go to exhibit

20       number 5 in your file.  This would be Exhibit

21       Number 31 which identifies Exhibit 5 to the

22       subpoena to the Federal Reserve Bank of New

23       York.

24           (Thereupon, the referred-to document was

25   marked for Identification as Exhibit Number 31.)

ATTORNEYS EYES ONLY

Page 83

1      MR. ANDERSON:  Object to form.

2      THE WITNESS:  Counsel, this is too long a

3   document for me to hold all of that in my head,

4   so I couldn't give you an answer at a high

5   level.

6  BY MR. AZAR:

7      Q.   Okay.  That's fine.  So we'll go through

8  this in more detail.

9      So I'd like to go through -- let me ask

10 you this.  Before we go through this, what was your

11 impression, if you recall, after reading this, your

12 personal impression when you read this, how did you

13 react to it?  What did you think about it?

14     A.   Counsel, my personal impression was that

15 the overall take was ludicrous.

16     Q.   And which part of it was ludicrous?  Are

21     A.   Counsel, all of the things

22 that you've just stated I found to be ludicrous.

23     Q.   Ludicrous because it's impossible that it

24 happened or ludicrous for a different reason?

25     A.   Ludicrous because the different

1  allegations that I can recall seem so implausible
2  that -- as I said, the use of my word was I could
3  never have imagined such a thing having taken place.
4       Q.   And which part seems so implausible?
5  Implausible that -- I mean, are you saying that it's
6  completely implausible that someone internally at
7  Facebook or Meta decided to help a company by adding
8  their competitors to the DL list, putting aside who
9  it was, just as a concept goes.  Is that completely
10  implausible in your mind, that someone could
11  accomplish a market shift by finding a way to
12  wrongly include certain organizations on the DL
13  list?
14       MR. ANDERSON:  Object to form.
15       THE WITNESS:  Yes, Counsel, I believe that
16     would be implausible given the amount of checks
17     and balances the company has in place across
18     the board, even though I'm not an expert on how
19     such a list is created in the first place.
20  BY MR. AZAR:
21       Q.   Can you describe the checks and balances
22  that you're referring to that would make it
23  implausible?
24       A.   Counsel, I'm not an expert but the company
25  seeks to have lots of checks and balances across the

1    just want to be precise here.

2            Do you have any knowledge, first or

3    secondhand, of any allegations that there was an

4    abuse of the designation lists on the shared hash

5    database other than from this lawsuit?

6        A.    No, Counsel, I do not.

7        Q.    You have no knowledge and you have not

8    heard of any such allegation or a discussion

9    internally at Meta about it other than through this

10   lawsuit, correct?

11       A.    That is correct, Counsel.

25       A.    No, Counsel, I'm not aware.

ATTORNEYS EYES ONLY

Page 154

1      A.   Counsel, that is correct.  I did work

2   during the period but I didn't travel and I was very

3   rarely in the London office.

4      Q.   Understood.

5           MR. AZAR:  Ryan, go back up to the top, to

6        the first page there.

7   BY MR. AZAR:

[redacted]

17  BY MR. AZAR:

18      Q.   Let me ask you this.  Assume for a moment

19  that Meta became aware of someone who had authority

20  and access to the content action and content

21  moderation work, and was taking money from people to

22  influence content actioning and Meta knew about it,

23  Meta entered into an NDA with this person and the

24  person left the company.

25           So just assume for a minute that this

 1    actually happened, okay, that there's somebody who
 2    had the right access, who took money, Meta found out
 3    about it, had the person sign an NDA, et cetera.
 4           So if you assume that that fact exists,
 5    that there at least is one person, okay, who has
 6    done such a thing who had that kind of access, does
 7    that change any of your testimony about the
 8    plausibility of this -- putting aside of -- putting
 9    aside who was involved with it, but just the
10    plausibility of it.
11           If you assume that that has happened and
12    Meta is aware of it, how does that affect your
13    testimony, if at all?
14           MR. ANDERSON:  Object to form.
15           MR. STERNBERG:  Object to form.
16           THE WITNESS:  Counsel, you're asking me to
17       play hypotheticals with something that I hold
18       so deeply true in terms of how I think the
19       company would behave in an example like this,
20       whereby the person or persons, if it came to
21       the company's attention, would be fired.
22    BY MR. AZAR:
23       Q.   So if it turns out that the person was not
24    fired but instead was given money and signed an NDA,
25    and then went to work for a different social media

ATTORNEYS EYES ONLY

Page 157

1    there.

2            Before I begin, just like last time, Lady

3    Mendelsohn, is there anything else you want to add

4    or clarify from prior testimony?

5        A.    No.

6        Q.    So I think you, essentially, said when

7    answering the question I'm about to ask, but I

8    didn't ask it exactly this way so let me just make

9    sure I have a clear understanding.

10           Do you know whether anyone in the London

11   office or even at Facebook, generally, has ever been

12   fired for accepting a bribe, direct or indirectly,

13   to help a content creator as to their Instagram

14   page?

15           MR. STERNBERG:  Object to form.

16           THE WITNESS:  Counsel, I'm not aware of

17       such a person or event happening.

18   BY MR. AZAR:

19       Q.    When is the first time you learned of the

20   allegations of your involvement in this alleged

21   scheme that's reflected in the whistleblower report

22   we just looked at or the transcript or our case?

23       A.    Counsel, I believe it was around summer

24   '22.

25       Q.    So that's sort of well after we filed our

# EXHIBIT 3

Page 1

```
 1              UNITED STATED DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3                CASE NO. 3:22-CV-01101-WHA
 4    DAWN DANGAARD, a/k/a ALANA
      EVANS, ASHLEY NICOLE MILLER,
 5    a/k/a NICOLE ANISTON, KELLY
      GILBERT, a/k/a KELLY PIERCE,
 6    JENNIFER ALLBAUGH, a/k/a RUBY,
      and LAURA ALLEN, a/k/a AMBER
 7    LYNN on behalf of themselves and all
      others similarly situated,
 8                    Plaintiffs,
 9    V.
10
      FENIX INTERNET LLC, FENIX
11    INTERNATIONAL INC., META
      PLATFORMS, INC., INSTAGRAM,
12    LLC, FACEBOOK OPERATIONS, LLC,
      LEONID RADVINSKY, and JOHN
13    DOES 1-10,
                      Defendants.
14    _____
15
16                    Remote Proceedings
                      May 30, 2023
17                    8:04 a.m. - 9:26 a.m.
18          DEPOSITION OF CRISTIAN PERRELLA
19
20       Taken before SUZANNE VITALE, R.P.R., F.P.R.
21    and Notary Public for the State of Florida at Large,
22    pursuant to Notice of Taking Deposition filed in the
23    above cause.
24
25
```

1        Q.    Understood.

2              Do you know whether or not Lady Mendelsohn

3    was somehow in charge of the London office on a --

4        A.    She was in charge of the London office,

5    yes.  She was in charge of the EMEA sales

6    operations.

7        Q.    Other than being in charge of the EMEA

8    sales operations, was there anyone in the London

9    office who was kind of in charge more generally

10   about all operations in the EMEA in London?

11       A.    No, I don't think so.  I think anyone in

12   charge of ops at the time was based in Dublin for

13   EMEA, but I'm not 100 percent sure about this to be

14   honest.

15       Q.    Can you hear me?  You muted for a moment.

16   I'm not sure if everyone heard the answer.

17       A.    You want me to repeat?

18             MR. ALLEN:  He answered.  I'd rather the

19        court reporter read back the answer, David, if

20        you didn't hear it.

21             MR. AZAR:  That's fine.

22             (Last question and answer read back.)

23   BY MR. AZAR:

24       Q.    Have you ever heard, Cristian, anyone

25   referring to -- anyone taking money to affect

1    someone's content moderation?

2        A.    Never.

3        Q.    Have you ever heard of anyone taking money

4    to affect the moderation of an organization?

5        A.    No, never heard anything like that, sir.

6        Q.    Have you ever heard of anyone taking money

7    to whitelist an organization?

8        A.    Same, never heard of anything like that,

9    sir.

10       Q.    What about whitelisting an individual?

11       A.    Same.  This will be serious violation.

12       Q.    Do you know what whitelisting means?

13       A.    Yes, I do.

14       Q.    What is whitelisting?

15       A.    We actually don't use the term

16    whitelisting.  We use the term "allow listing"

17    because whitelisting has a racial connotation and we

18    decide not to use any terms that might have a racial

19    connotation.

20            And same goes with black listing.  We

21    rather use block listing.

22            So allow list means a list that is

23    designed to bypass a specific rule in general.  So

24    I'm not sure in what context you ask me what

25    whitelist means.  But, generally speaking, allow

1  definitely not in my area of responsibility.

2      Q.   Do you recall ever discussing with anyone

3  at Meta activity of any adult platform on Instagram?

4      A.   Well, adult content is not allowed on

5  Instagram so we hardly discuss things that are not

6  allowed on Instagram.  The answer is no.

7      Q.   Are you aware of whether or not adult

8  performers advertise on Instagram for people to go

9  to their page sites?

10     A.   I am not aware.  If they do so, they must

11  abide to our content policies, otherwise they will

12  be disabled for violating our terms of content.

13     Q.   Are you aware of whether or not adult

14  platforms also have a presence on Instagram as part

15  of their business?

16     A.   I don't know.

17     Q.   And by the way, when I say adult

18  platforms, since you read the complaint, am I

19  correct that you have an understanding of what I'm

20  referring to?

21     A.   It's either Facebook or Instagram.

22     Q.   Well, okay, Facebook or Instagram are the

23  platforms of Meta.  But when I say adult platforms,

24  I'm referring to primarily sites where adult

25  performers can charge customers to view content.

1    A.   No.

2    Q.   Give me a moment.  I'm going to jump past

3  a bunch of questions here.

4        Now, you know that -- have you seen

5  examples of wire transfer records that purport to

6  send money to an account in the Philippines to a

7  Cristian Peralta Trust?

8    A.   Yes, I think I did.

9    Q.   Do you have any foreign trusts?

10   A.   I don't.  Never had.

11   Q.   Do you know if anyone in your family has

12  foreign trusts?

13   A.   No one in my family has any foreign

14  trusts.

15   Q.   Have you ever visited the Philippines Bank

16  of Commerce, PBCOM Bank?

17   A.   I never visited the Philippines bank you

18  mentioned nor have I ever visited the Philippines.

19   Q.   Do you know -- have you ever had any

20  communications whatsoever with that bank in the

21  Philippines or any bank in the Philippines?

22   A.   Never had any communication with any bank

23  in the Philippines in my life.

24   Q.   Have you ever had any communications with

25  any entity in Hong Kong that acts as a facilitator?

```
 1              MR. ACOSTA:  Yes, sir.  38, 39 and 40?

 2              MR. AZAR:  Yes, thank you.

 3              MR. ACOSTA:  Just one moment.

 4          (Thereupon, the referred-to document was

 5      marked for Identification as Exhibit 38.)

 6          (Thereupon, the referred-to document was

 7      marked for Identification as Exhibit 39.)

 8          (Thereupon, the referred-to document was

 9      marked for Identification as Exhibit 40.)

10      BY MR. AZAR:

11          Q.   So I'm showing you a two-page document.

12      The first page says Exhibit 4 because I'm using the

13      same exhibit numbers that were given to some banks,

14      so I'm keeping the cross reference, okay.

15              So the first page says Exhibit 4.  The

16      second page is a printout -- purported from the

17      FedPayments manager.  It has a create time of

18      12/1/2018.

19              Dan, if you scroll down a little bit,

20      you'll see that the beneficiary name is the Cristian

21      Peralta Trust.

22              Cristian, have you seen this document

23      before?

24          A.   I think I saw this document during our

25      prep session.
```

1      Q.    Okay.  Do you recognize any of the

2   information in this document as being accurate?

3      A.    Accurate compared to what, to the document

4   that I've previously seen?

5      Q.    No, I'm sorry.  Like in terms of the truth

6   of it.

7            Is any of the information in here familiar

8   to you?

9      A.    No, that's not even my name on it so I

10   have no idea what this is.

11      Q.    So in terms of the name of the trust,

12   right, your name is Perrella, P-E-R-R-E-L-L-A; is

13   that correct?

14      A.    Yes, that's correct.

15      Q.    And this is Peralta, P-E-R-A-L-T-A,

16   correct?

17      A.    That's what it looks like on this

18   document.

19      Q.    Do you recall anyone at Meta

20   mispronouncing your name and sometimes called you

21   Peralta any chance?

22      A.    My name gets misspelled quite regularly

23   but it's very different misspelling.

24      Q.    I understand.  I'm just wondering, does

25   that resonate with you?  Is there anybody you can

# EXHIBIT 4

**JASSY VICK CAROLAN** LLP
Duffy Carolan, State Bar No. 154988
601 Montgomery Street, Suite 850
San Francisco, CA 94111
Tel: 415-539-3399
Fax: 415-539-3394
Email: dcarolan@jassyvick.com

Meghan Fenzel
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: 310-870-7048
Fax: 310-870-7010

Attorneys for Non-Party Media Entity Advance
Magazine Publishers Inc.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN DANGAARD, *et al.*, | Case No. 3:22-cv-01101-WHA |
| PlaintiffS, | **OBJECTIONS OF NON-PARTY MEDIA ENTITY ADVANCE MAGAZINE PUBLISHERS INC. TO PLAINTIFFS' SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL CASE** |
| vs. | |
| INSTAGRAM, LLC, *et al.*, | |
| Defendant. | |

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

Non-party Advance Magazine Publishers Inc. ("Advance"), improperly served herein as Condé Nast, respectfully submits the following objections and responses to the Subpoena to Testify at a Deposition in a Civil Action (the "Subpoena") served on April 5, 2023, by Plaintiffs Dawn Dangaard, et al. ("Plaintiffs" or "Subpoenaing Party") in civil matter *Dawn Dangaard, et al. v. Instagram, LLC, et al.*, Case No. 3:22-cv-01101-WHA (the "Action"):

**GENERAL OBJECTIONS TO SUBPOENA**

Without waiving any rights to later raise other objections or to bring or oppose any motions or other procedures related to the Subpoena, Advance objects to the Subpoena in its entirety on the following grounds:

1.      Advance objects to the Subpoena, which does not set a deposition location, to the extent it commands a person to attend a deposition, or commands the production of documents or materials, at a place more than 100 miles from where the person resides, is employed, or regularly transacts business in person.  F.R.C.P. 45(c)(1)(A) & (c)(2)(A).

2.      Advance objects to the Subpoena as it names, is directed to and was served on Condé Nast, which is a dba of Advance not a separate organization.  Condé Nast, like WIRED, are brands operating under the corporate umbrella of Advance.  Thus, service on Condé Nast is improper. F.R.C.P. 45 (b)(1).

3.      Advance objects to the Subpoena to the extent it seeks documents and/or testimony that go beyond the scope of the limited jurisdictional discovery authorized by the Court on March 29, 2023.

4.      Advance, a non-party media entity that – through its journalists at Advance's brand WIRED – gathered information for dissemination to the public, objects to the Subpoena as seeking materials and testimony calling for the disclosure of confidential source information and non-confidential, unpublished information protected from compelled disclosure under the First Amendment qualified reporter's privilege and/or the reporter's privilege recognized under the common law pursuant to Federal Rule of Evidence 501.  *See United States v. Burke*, 700 F.2d 70, 76-77 (2d Cir.) *cert. denied*, 464 U.S. 816 (1983) (recognizing qualified privilege for confidential materials); *Gonzales v. National Broadcasting Co.*, 194 F.3d 29 (2d Cir. 1999) (recognizing qualified privilege for non-confidential materials); *Shoen v. Shoen* (*"Shoen I"*), 5 F.3d 1289, 1292-1295 (9th Cir. 1993) (recognizing qualified privilege that applies to confidential and non-confidential information);  *Shoen v. Shoen*, 48 F.3d 412, 418 (9th Cir. 1995) ("*Shoen II*"). (holding that to overcome the journalist's privilege, a party seeking non-confidential discovery must show that the material is "(1) unavailable despite exhaustion of all reasonable alternative sources; (2)

1    noncumulative; and (3) clearly relevant to an important issue in the case."); *Planet AID, Inc., et al.*

2    *v. Reveal, Center for Investigative Reporting*, 2019 WL 935131, *1 (Feb. 26, 2019) (recognizing

3    qualified reporter's privilege for non-confidential materials sought from defendant/journalist and

4    ordering an *in camera* review to determine whether information sought was clearly relevant to an

5    important issue in the case). The protections for journalists' confidential and non-confidential

6    source materials referenced in this paragraph are collectively referred to herein as the "Reporter's

7    Privilege."

8            5.      Advance further objects to the Subpoena as seeking materials and testimony

9    protected from compelled disclosure under state law, including but not limited to Article I, Section

10   8 of the New York Constitution, the New York Civil Rights Law Section 79-h, Article I, Section

11   2(b) of the California Constitution, the California Evidence Code Section 1070, and related case

12   law. *See Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 107 (2d Cir. 2012) ("New York's Shield

13   Law provides journalists an absolute privilege from testifying with regard to news obtained under a

14   promise of confidentiality but only a qualified privilege with regard to news that is both

15   unpublished and not obtained under a promise of confidentiality."); *O'Neill v. Oakgrove Constr.,*

16   *Inc.*, 71 N.Y.2d 521, 523 N.E.2d 277 (1988); *Flynn v. NYP Holdings, Inc.*, 235 A.D.2d 907, 652

17   N.Y.S.2d 833 (3d Dep't 1997); *Los Angeles Memorial Coliseum Comm'n v. National Football*

18   *League*, 89 F.R.D. 489, 492 (C.D. Cal. 1981); *New York Times Co. v. Superior Court*, 51 Cal. 3d

19   453, 456, 461, 462 (1990) (California reporter's shield law provides "on its face an absolute

20   immunity," and a civil litigant has no federal or state constitutional rights which are sufficient to

21   overcome journalists' rights under the shield law even upon a purported "showing of need for

22   unpublished information") (emphasis added; internal quotation marks omitted); *McGarry v. Univ. of*

23   *San Diego*, 154 Cal. App. 4th 97, 119-120 (2007) ("the Shield Law confers an absolute immunity

24   against compelled disclosure of the protected information and, although that immunity must

25   occasionally yield when it threatens to frustrate the competing federal constitutional right of a

26   criminal defendant to a fair trial, there is no analogous competing right of a civil litigant that will

27   suffice to overcome the immunity"). The protections for journalists' confidential and non-

28

confidential source materials referenced in this paragraph are collectively referred to herein as the "State Shield Law."

6.      Advance also objects to the Subpoena to the extent it seeks materials or testimony outside of Advance's possession, custody, or control, or that are not known or reasonably available to it, including but not limited to any information sought, gathered or obtained by any Advance journalist while employed by any other news entity or organization.

7.      Advance further objects to the Subpoena to the extent it purports to impose any duty upon Advance that is inconsistent with, or beyond that required by the Federal Rules of Civil Procedure, any applicable orders or rules of the Court, or other applicable law or rules.

8.      Advance objects to the Subpoena to the extent it requires the disclosure of information or documents, if any, prepared in anticipation of litigation or subject to a claim of privilege or protection, including, without limitation, the attorney-client privilege, the attorney work product doctrine, or recognized privacy, confidentiality, proprietary and/or trade secret interests.

9.      Advance objects to the Subpoena to the extent it requires Advance to disclose information and/or documents that are neither relevant to the claims or defenses of any party nor proportional to the needs of the case.

10.     Advance objects to the Subpoena on the grounds that it imposes unreasonable and undue burdens that outweigh any potential relevance of the information sought.

11.     Advance further objects to the Subpoena to the extent that it seeks material or information that can be obtained through other means of discovery that are more convenient, less burdensome, or less expensive.

12.     Advance further objects to the Subpoena to the extent that it seeks material or information that is publicly available, accessible from parties to the action and/or already in one or more of the parties to the action's possession, custody, or control.

13.     Advance objects to the "Definitions" and "Instructions" attached to the Subpoena as vague, ambiguous, overbroad and unduly burdensome.

14.     Notwithstanding the specificity of Advance Responses set forth below, it expressly incorporates these General Objections by reference as though fully set forth into the Responses.

Thus, if any objection contained above is not restated under the specific Response to an individual Documents Request or Matter on which Examination is Requested, this should not be construed as a waiver of any such objections.

15.    Advance reserves the right to ask the Court to order the Subpoenaing Party to pay all expenses associated with responding to the Subpoena or any portion thereof.  *See* Fed. R. Civ. P. 45(d)(2)(B)(ii).

## RESPONSES TO DOCUMENT REQUESTS

Subject to and without waiving the General Objections to Subpoena set forth above, Advance responds and objects to the individual Document Requests as follows:

## REQUEST FOR PRODUCTION NO. 1:

All documents related to the identities of anybody proving information to Wired about the Case Study, the March 23, 2023 Email, the Whistleblower Report, the Gizmodo Article, or the SAC. Please interpret the term "identities" broadly so that it is not limited to a person's name, but applies more broadly to information about whether/ why they were believed to be credible or providing genuine documents or information, including without limitation whether anyone providing information was in a position to know the information, or have genuine documents, such as being a former employee of Facebook, Instagram, or Meta.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Advance objects to this Request as calling for source material protected from disclosure by the Reporter's Privilege.  Advance objects to this Request as calling for source material protected from disclosure under the State Shield Law. Advance further objects to this Request to the extent that it calls for material protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine. Advance objects to this Request as calling for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade secrets. Advance objects to this Request to the extent it calls for materials comprising Advance's journalistic/expert opinion or information that does not describe specific occurrences in dispute and results from Advance's study that was not requested by a party

1  in violation of F.R.C.P. 45(d)(3)(ii).  Advance objects to this Request as vague, ambiguous,

2  compound, overbroad and unduly burdensome, including but not limited to that part of the request

3  asking Advance to interpret the term "identities" broadly so as to include documents or information

4  as to whether/why it believes information to be credible or genuine, and the general and broad

5  reference to the SAC, which was not attached to the Subpoena and the exhibits to which are not part

6  of any one inclusive docket entry accessible via PACER.  Advance also objects to this Request to

7  the extent that it calls for material that is publicly available and/or equally accessible to the

8  Subpoenaing Party.  Advance objects to this Request to the extent that it calls for material not in

9  Advance's possession, custody or control, including but not limited to any materials or information

10  obtained by Advance journalists while employed by any other news organization or entity.

11  Advance objects to this Request to the extent that it calls for material that is not relevant and/or not

12  reasonably calculated to lead to the discovery of admissible evidence.  Advance objects to this

13  Request on the grounds that the burden associated with searching for and producing potentially

14  responsive materials, if any, is not proportionate to the relevance, if any, of the requested material.

15  **REQUEST FOR PRODUCTION NO. 2:**

16      All documents relating to bribery of any kind (i.e., money or favor or something else of

17  value given or promised in order to influence someone's judgment or conduct) related to the matters

18  referenced in the Case Study, the March 23, 2023 Email, the Whistleblower Report, the Gizmodo

19  Article, or the SAC.

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

21      Advance incorporates by reference, as if fully set forth herein, the General Objections set

22  forth above.  Advance objects to this Request to the extent it calls for source material protected

23  from disclosure by the Reporter's Privilege.  Advance objects to this Request to the extent it calls

24  for source material protected from disclosure under the State Shield Law. Advance further objects

25  to this Request to the extent that it calls for material protected from disclosure by the attorney-client

26  privilege, the attorney work product doctrine, and any other applicable privilege or doctrine.

27  Advance objects to this Request to the extent it calls for the disclosure of confidential, sensitive,

28  proprietary and/or private information and/or trade secrets.  Advance objects to this Request as

vague, ambiguous, compound, overbroad and unduly burdensome, including but not limited to the general and broad reference to the SAC, which was not attached to the Subpoena and the exhibits to which are not part of any one inclusive docket entry accessible via PACER.  Advance also objects to this Request to the extent that it calls for material that is publicly available and/or equally accessible to the Subpoenaing Party.  Advance objects to this Request to the extent that it calls for material not in Advance's possession, custody or control, including but not limited to any materials or information obtained by Advance journalists while employed by any other news organization or entity.  Advance objects to this Request to the extent that it calls for material that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  Advance objects to this Request on the grounds that the burden associated with searching for and producing potentially responsive materials, if any, is not proportionate to the relevance, if any, of the requested material.  Notwithstanding the above objections, and subject to them, Advance has conducted a reasonable search and diligent inquiry for responsive materials within its possession, custody or control and has been unable to locate any responsive documents, nor does it believe any such responsive documents were once in its possession custody or control but have since been lost, discarded or destroyed.  Its search is ongoing and its response hereto is subject to amendment.

**REQUEST FOR PRODUCTION NO. 3:**

All documents relating to the matters described in the Case Study, the March 23, 2023 Email, the Whistleblower Report, the Gizmodo Article, or the SAC, including without limitation any documents that support the verification of any information in lieu of disclosure of the identity of a source, and your communications with any Defendant about it.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Advance objects to this Request as calling for source material protected from disclosure by the Reporter's Privilege.  Advance objects to this Request as calling for source material protected from disclosure under the State Shield Law. Advance further objects to this Request to the extent that it calls for material protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine.

Advance objects to this Request as calling for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade secrets. Advance objects to this Request to the extent it calls for materials comprising Advance's journalistic/expert opinion or information that does not describe specific occurrences in dispute and results from Advance's study that was not requested by a party in violation of F.R.C.P. 45(d)(3)(ii).  Advance objects to this Request as vague, ambiguous, compound, overbroad and unduly burdensome, including but not limited to that part asking for "any document that support the verification of any information in lieu of disclosure of the identity of a source," and the general and broad reference to the SAC, which was not attached to the Subpoena and the exhibits to which are not part of any one inclusive docket entry accessible via PACER. Advance also objects to this Request to the extent that it calls for material that is publicly available and/or equally accessible to the Subpoenaing Party.  Advance objects to this Request to the extent that it calls for material not in Advance's possession, custody or control, including but not limited to any materials or information obtained by Advance journalists while employed by any other news organization or entity.  Advance objects to this Request to the extent that it calls for material that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Advance objects to this Request on the grounds that the burden associated with searching for and producing potentially responsive materials, if any, is not proportionate to the relevance, if any, of the requested material.

## **MATTERS ON WHICH EXAMINATION IS REQUESTED**

Subject to and without waiving the General Objections to Subpoena set forth above, Advance responds and objects to the individual Matters on which Examination is Requested as follows:

## **MATTER NO. 1:**

The identities of anybody providing information to Wired about the Case Study, the March 23, 2023 Email, the Whistleblower Report, the Gizmodo Report, or, to the extent that Wired has such information, the SAC. Please interpret the term "identities" broadly so that it is not limited to a person's name, but applies more broadly to information about whether/ why they were believed to be credible or providing genuine documents or information, including without limitation whether

1  anyone providing information was in a position to know the information, or have genuine

2  documents, such as being a former employee of Facebook, Instagram, or Meta.

3  **RESPONSE TO MATTER NO.1:**

4          Advance incorporates by reference, as if fully set forth herein, the General Objections set

5  forth above.  Advance objects to this Examination Matter as calling for testimony on matters

6  protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter

7  as calling for testimony on matters protected from disclosure under the State Shield Law. Advance

8  further objects to this Examination Matter to the extent that it calls for testimony on matters

9  protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and

10  any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling

11  for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade

12  secrets. Advance objects to this Examination Matter to the extent it calls for testimony on matters

13  comprising Advance's journalistic/expert opinion or information that does not describe specific

14  occurrences in dispute and results from Advance's study that was not requested by a party in

15  violation of F.R.C.P. 45(d)(3)(ii).  Advance objects to this Examination Matter as vague,

16  ambiguous, compound, overbroad and unduly burdensome, including but not limited to that part

17  asking Advance to interpret the term "identities" broadly so as to include information as to

18  whether/why sources were believed to be credible or genuine or were providing genuine documents

19  or information, and the general and broad reference to the SAC, which was not attached to the

20  Subpoena and the exhibits to which are not part of any one inclusive docket entry accessible via

21  PACER.  Advance also objects to this Examination Matter to the extent that it calls for testimony on

22  matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance

23  objects to this Examination Matter to the extent that it calls for testimony about matters not in

24  Advance's possession, custody or control, or known or reasonably available to it, including but not

25  limited to any information or materials obtained by Advance journalists while employed by any

26  other news organization or entity.  Advance objects to this Examination Matter to the extent that it

27  calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery

28  of admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden

1  associated with preparing one or more of its officers, directors, or managing agents, or designated

2  other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of

3  the requested testimony.

4  **MATTER NO. 2:**

5      All information and documents about bribery of any kind (i.e., money or favor or something

6  else of value given or promised in order to influence someone's judgment or conduct) related to the

7  matters referenced in the Case Study, the March 23, 2023 Email, the Whistleblower Report, the

8  Gizmodo Article, or, to the extent that Wired has such information, the SAC.

9  **RESPONSE TO MATTER NO. 2:**

10     Advance incorporates by reference, as if fully set forth herein, the General Objections set

11  forth above.  Advance objects to this Examination Matter to the extent it calls for testimony on

12  matters protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination

13  Matter to the extent it calls for testimony about matters protected from disclosure under the State

14  Shield Law. Advance further objects to this Examination Matter to the extent that it calls for

15  testimony about matters protected from disclosure by the attorney-client privilege, the attorney

16  work product doctrine, and any other applicable privilege or doctrine.  Advance objects to this

17  Examination Matter to the extent it calls for the disclosure of confidential, sensitive, proprietary

18  and/or private information and/or trade secrets.  Advance objects to this Examination Matter as

19  vague, ambiguous, compound, overbroad and unduly burdensome, including but not limited to the

20  general and broad reference to the SAC, which was not attached to the Subpoena and the exhibits to

21  which are not part of any one inclusive docket entry accessible via PACER.  Advance also objects

22  to this Examination Matter to the extent that it calls for testimony on matters publicly available

23  and/or equally accessible to the Subpoenaing Party.  Advance objects to this Examination Matter to

24  the extent that it calls for testimony on matters not in Advance's possession, custody or control, or

25  known to or reasonably available to it, including but not limited to any information obtained by

26  Advance journalists while employed by any other news organization or entity.  Advance objects to

27  this Examination Matter to the extent that it calls for testimony on matters that are not relevant

28  and/or not reasonably calculated to lead to the discovery of admissible evidence.  Advance objects

1    to this Examination Matter on the grounds that the burden associated with preparing one or more of

2    its officers, directors, or managing agents, or designated other persons who consents to testify on its

3    behalf, is not proportionate to the relevance, if any, of the requested testimony.

4    **MATTER NO. 3:**

5         Communications with any person relating [sic] matters included in the March 23, 2023

6    Email.

7    **RESPONSE TO MATTER NO. 3:**

8         Advance incorporates by reference, as if fully set forth herein, the General Objections set

9    forth above.  Advance objects to this Examination Matter as calling for testimony on matters

10   protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter

11   as calling for testimony on matters protected from disclosure under the State Shield Law. Advance

12   further objects to this Examination Matter to the extent that it calls for testimony on matters

13   protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and

14   any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling

15   for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade

16   secrets. Advance also objects to this Examination Matter to the extent that it calls for testimony on

17   matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance

18   objects to this Examination Matter to the extent that it calls for testimony about matters not in

19   Advance's possession, custody or control, or known to or reasonably available to it, including but

20   not limited to any information obtained by Advance journalists while employed by any other news

21   organization or entity.  Advance objects to this Examination Matter to the extent that it calls for

22   testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of

23   admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden

24   associated with preparing one or more of its officers, directors, or managing agents, or designated

25   other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of

26   the requested testimony.

27   **MATTER NO. 4:**

28        Communications with any person relating to the Case Study, including Meta Defendants.

**RESPONSE TO MATTER NO. 5:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Advance objects to this Examination Matter as calling for testimony on matters protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter as calling for testimony on matters protected from disclosure under the State Shield Law. Advance further objects to this Examination Matter to the extent that it calls for testimony on matters protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade secrets. Advance also objects to this Examination Matter to the extent that it calls for testimony on matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance objects to this Examination Matter to the extent that it calls for testimony about matters not in Advance's possession, custody or control, or known to or reasonably available to it, including but not limited to any information obtained by Advance journalists while employed by any other news organization or entity.  Advance objects to this Examination Matter to the extent that it calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden associated with preparing one or more of its officers, directors, or managing agents, or designated other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of the requested testimony.

**MATTER NO. 5:**

The Case Study.

**RESPONSE TO MATTER NO. 5:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Advance objects to this Examination Matter as calling for testimony on matters protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter as calling for testimony on matters protected from disclosure under the State Shield Law. Advance further objects to this Examination Matter to the extent that it calls for testimony on matters

1  protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and

2  any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling

3  for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade

4  secrets. Advance also objects to this Examination Matter to the extent that it calls for testimony on

5  matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance

6  objects to this Examination Matter to the extent that it calls for testimony about matters not in

7  Advance's possession, custody or control, or known to or reasonably available to it, including but

8  not limited to any information obtained by Advance journalists while employed by any other news

9  organization or entity.  Advance objects to this Examination Matter to the extent that it calls for

10 testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of

11 admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden

12 associated with preparing one or more of its officers, directors, or managing agents, or designated

13 other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of

14 the requested testimony.

15 **MATTER NO. 6:**

16     All information you have obtained relating to matters addressed in the Case Study.

17 **RESPONSE TO MATTER NO. 6:**

18     Advance incorporates by reference, as if fully set forth herein, the General Objections set

19 forth above.  Advance objects to this Examination Matter as calling for testimony on matters

20 protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter

21 as calling for testimony on matters protected from disclosure under the State Shield Law. Advance

22 further objects to this Examination Matter to the extent that it calls for testimony on matters

23 protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and

24 any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling

25 for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade

26 secrets. Advance also objects to this Examination Matter to the extent that it calls for testimony on

27 matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance

28 objects to this Examination Matter to the extent that it calls for testimony about matters not in

Advance's possession, custody or control, or known to or reasonably available to it, including but not limited to any information or materials obtained by Advance journalists while employed by any other news organization or entity.  Advance objects to this Examination Matter to the extent that it calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden associated with preparing one or more of its officers, directors, or managing agents, or designated other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of the requested testimony.

**MATTER NO. 7:**

Your access to Case Study or any portion thereof.

**RESPONSE TO MATTER NO. 7:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Advance objects to this Examination Matter as calling for testimony on matters protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter as calling for testimony on matters protected from disclosure under the State Shield Law. Advance further objects to this Examination Matter to the extent that it calls for testimony on matters protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade secrets. Advance also objects to this Examination Matter to the extent that it calls for testimony on matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance objects to this Examination Matter to the extent that it calls for testimony about matters not in Advance's possession, custody or control, or known to or reasonably available to it, including but not limited to any information or materials obtained by Advance journalists while employed by any other news organization or entity.  Advance objects to this Examination Matter to the extent that it calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden associated with preparing one or more of its officers, directors, or managing agents, or designated

1    other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of

2    the requested testimony.

3    **MATTER NO. 8:**

4          The circumstances in which you obtained the Case Study or any portion thereof.

5    **RESPONSE TO MATTER NO. 8:**

6          Advance incorporates by reference, as if fully set forth herein, the General Objections set

7    forth above.  Advance objects to this Examination Matter as calling for testimony on matters

8    protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter

9    as calling for testimony on matters protected from disclosure under the State Shield Law. Advance

10   further objects to this Examination Matter to the extent that it calls for testimony on matters

11   protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and

12   any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling

13   for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade

14   secrets. Advance also objects to this Examination Matter to the extent that it calls for testimony on

15   matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance

16   objects to this Examination Matter to the extent that it calls for testimony about matters not in

17   Advance's possession, custody or control, or known to or reasonably available to it, including but

18   not limited to any information or materials obtained by Advance journalists while employed by any

19   other news organization or entity.  Advance objects to this Examination Matter to the extent that it

20   calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery

21   of admissible evidence.  Advance objects to this Examination Matter on the grounds that the burden

22   associated with preparing one or more of its officers, directors, or managing agents, or designated

23   other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of

24   the requested testimony.

25   **MATTER NO. 9:**

26          The identities of the individuals referred to in the Case Study as "Employee 1," "Employee

27   2," "Employe 3," and "Employee 4."

28

**RESPONSE TO MATTER NO. 9:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Without waiving those objections, and subject to them, the Examination Matter on which Advance is being asked to designate a deponent is not known or reasonably available to Advance, and thus it cannot designate a deponent to testify on its behalf on the matter.

**MATTER NO. 10:**

All information you have obtained about actions by any person employed by Meta Platforms, Inc. or any of its subsidiaries or affiliated entities, that occurred or are occurring in California relating to OnlyFans.com or its owners, employees, agents, contractors, or representatives.

**RESPONSE TO MATTER 10:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above.  Advance objects to this Examination Matter to the extent it calls for testimony on matters protected from disclosure by the Reporter's Privilege.  Advance objects to this Examination Matter to the extent it calls for testimony on matters protected from disclosure under the State Shield Law. Advance further objects to this Examination Matter to the extent that it calls for testimony on matters protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine.  Advance objects to this Examination Matter as calling for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade secrets.  Advance objects to this Examination Matter as vague, ambiguous, overbroad and unduly burdensome. Advance also objects to this Examination Matter to the extent that it calls for testimony on matters that are publicly available and/or equally accessible to the Subpoenaing Party.  Advance objects to this Examination Matter to the extent that it calls for testimony about matters not within Advance's possession, custody or control, or known to or reasonably available to it, including but not limited to any information or materials obtained by Advance journalists while employed by any other news organization or entity.  Advance objects to this Examination Matter to the extent that it calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  Advance objects to this

Examination Matter on the grounds that the burden associated with preparing one or more of its officers, directors, or managing agents, or designated other persons who consents to testify on its behalf, is not proportionate to the relevance, if any, of the requested testimony.

**MATTER NO. 11:**

All information you have obtained about communications among any persons employed by Meta Platforms, Inc. or any of its subsidiaries or affiliated entities, that occurred or are occurring in California relating to OnlyFans.com or its owners, employees, agents, contractors, or representatives.

**RESPONSE TO MATTER NO. 11:**

Advance incorporates by reference, as if fully set forth herein, the General Objections set forth above. Advance objects to this Examination Matter to the extent it calls for testimony on matters protected from disclosure by the Reporter's Privilege. Advance objects to this Examination Matter to the extent it calls for testimony on matters protected from disclosure under the State Shield Law. Advance further objects to this Examination Matter to the extent that it calls for testimony on matters protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine. Advance objects to this Examination Matter as calling for the disclosure of confidential, sensitive, proprietary and/or private information and/or trade secrets. Advance objects to this Examination Matter as vague, ambiguous, overbroad and unduly burdensome. Advance also objects to this Examination Matter to the extent that it calls for testimony on matters that are publicly available and/or equally accessible to the Subpoenaing Party. Advance objects to this Examination Matter to the extent that it calls for testimony about matters not in Advance's possession, custody or control, or known to or reasonably available to it, including but not limited to any information or materials obtained by Advance journalists while employed by any other news organization or entity. Advance objects to this Examination Matter to the extent that it calls for testimony on matters not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Advance objects to this Examination Matter on the grounds that the burden associated with preparing one or more of its

1  officers, directors, or managing agents, or designated other persons who consents to testify on its

2  behalf, is not proportionate to the relevance, if any, of the requested testimony.

3  DATED:          April 19 __, 2023              JASSY VICK CAROLAN LLP

4

5                                                          _____/s/ _Duffy Carolan_____

6                                                          DUFFY CAROLAN
                                                          Counsel for Non-Party Media Entity Advance
7                                                          Magazine, Publishers Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

I am over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is 601 Montgomery Street, Suite 850, San Francisco, California 94111.

On April 19, 2023, I served true copies of the following document(s) described as:

**NON-PARTY MEDIA ENTITY ADVANCE MAGAZINE PUBLISHERS INC.'S OBJECTIONS TO SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION.**

on the interested parties in this action as follows:

David E. Azar
Milberg Coleman Bryson Phillips Grossman PLLC
280 S. Beverly Dr., #PH
Beverley Hills, CA 90212
dazar@milberg.com

Timothy L. Alger
Emerge Law Group, P.C.
100 Spectrum Center Drive, Suite 900
Irvine, CA 92618
tim@emergelawgroup.com

☑     **BY ELECTRONIC MAIL (E-MAIL):**  I caused the said documents to be transmitted by e-mail, by advance agreement for service, to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made

Executed on April 19, 2023, at San Francisco, California.

 /s/ Duffy Carolan
Duffy Carolan

# EXHIBIT 5

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2           CASE NO.:  3:22-CV-01101-WHA

3

       DAWN DANGAARD, a/k/a ALANA
4      EVANS, KELLY GILBERT, a/k/a
       KELLY PIERCE, JENNIFER ALLBAUGH,
5      a/k/a RUBY; and on behalf of
       themselves and all others
6      similarly situated,

7                   Plaintiffs,

8      vs.

9      INSTAGRAM, LLC; FACEBOOK
       OPERATIONS, LLC; FENIX INTERNET
10     LLC; FENIX INTERNATIONAL INC.;
       META PLATFORMS, INC.; LEONID
11     RADVINSKY; and JOHN DOES 1-10,,

12                  Defendants.
       _____/

13

14

15          TRANSCRIPT DEEMED CONFIDENTIAL

16

               REMOTE DEPOSITION OF

17

             CORDELL JAMES CAMERON

18

19

20          Pages 1 through 199

21

             Wednesday, May 24, 2023
22            1:10 p.m. - 7:10 p.m.

23

24        Stenographically Reported By:
25        Denise Sankary, RPR, RMR, CRR

CONFIDENTIAL

Page 127

1          Q.   From whom did you receive the

2     whistleblower report?

3               MS. CAROLAN:   Objection.  Calls for

4          information protected by the reporter's

5          privilege.  Instruct the witness not to answer.

6          A.   I decline to answer that.

7       BY MR. ALLEN:

8          Q.   On what date did you receive the

9     whistleblower report?

10              MS. CAROLAN:   Objection.  Calls for

11         information protected by the reporter's

12         privilege.  Instruct the witness not to answer.

13         A.   I decline to answer that.

14      BY MR. ALLEN:

15         Q.   So just so we're clear, Judge Alsup has

16    issued a standing order governing discovery, and in

17    that standing order he says, and I quote, "When a

18    privilege is claimed, the witness should

19    nevertheless answer questions relevant to the

20    existence, extent or waiver of the privilege such as

21    the date of a communication, who made the statement,

22    to whom and whose presence the statement was made,

23    other persons to whom the contents of the statement

24    have been disclosed, and the general subject matter

25    of the statement."

CONFIDENTIAL

Page 136

1          it's protected under the reporter's privilege,

2          unless the reporter elects to answer.

3          A.   I decline to answer that.

4     BY MR. ALLEN:

5          Q.   When you reviewed the report in January of

6     2023, for how long did you review it?

7               MS. CAROLAN:  Same objection.  Calls for

8          information protected by the reporter's

9          privilege.

10         A.   I reviewed it approximately two hours.

11    BY MR. ALLEN:

12         Q.   Did you take notes while you were

13    reviewing it?

14              MS. CAROLAN:  Objection.  Calls for

15         information protected by the reporter's

16         privilege.

17         A.   I did take notes.

18    BY MR. ALLEN:

19         Q.   Do you have possession of those notes

20    today?

21         A.   I don't.

22         Q.   You do not?

23         A.   I do not.

24         Q.   Do you know where those notes are located

25    today?

CONFIDENTIAL

Page 137

1        A.    They're not located anywhere.

2        Q.    Were they subsequently destroyed?

3        A.    They were.

4        Q.    How did that come to be?

5        A.    They were electronically destroyed in a --

6    based on an automated deletion, a timed deletion.

7        Q.    Did you set the time deletion to occur at

8    a particular point in time?

9        A.    I don't recall.

10        Q.    Is this via some special program that

11    deletes stuff via -- you know, within a certain time

12    period?

13        A.    Yes.

14        Q.    What program?

15        A.    Signal.

16        Q.    Do you recall approximately when the

17    deletion occurred?

18            MS. CAROLAN:  I'm going to object to the

19        extent it calls for information protected by

20        the reporter's privilege.

21        A.    Within a week of taking the notes.

22      BY MR. ALLEN:

23        Q.    In the period where the notes existed

24    between when you took them and when they were

25    destroyed, did you record the contents of those

CONFIDENTIAL

Page 143

1    BY MR. ALLEN:

2        Q.   Has anyone else employed by WIRED seen a

3    physical copy of the report?  And by "the report,"

4    again, I'm not talking about the transcript.  I'm

5    talking about the original report that you reviewed

6    in 2023.

7            So has anyone else employed by WIRED, to

8    your knowledge, seen the original copy of the report

9    that you reviewed in January of 2023?

10           MS. CAROLAN:  I'm just going to object to

11           the extent it calls for information protected

12           by the reporter's privilege.  If it can be

13           answered without implicating those protections.

14       A.   I decline to answer that.

15   BY MR. ALLEN:

16       Q.   Do you know who originally authored the

17   report?

18           MS. CAROLAN:  Same objection.  I instruct

19           the witness not to answer.

20       A.   I decline to answer that.

21   BY MR. ALLEN:

22       Q.   Mr. Cameron, the source that allowed you

23   to come and review a physical copy of this report in

24   January of 2023, do you know -- strike that.

25           What basis do you have for believing that

Page 152

1    produced it?

2        A.    I provided Meta with portions of it and

3    cited it in e-mails, but I did not provide anyone

4    with a full copy of this report.

5        Q.    Okay.  So just so the record is clear, you

6    have a copy of a transcript of the report that

7    includes four sections that you have not provided to

8    any of the parties in this litigation, correct?

9        A.    Minus copy of a transcript.  I don't know

10   what that means.  I have the transcript of the

11   document that contains all four sections of the

12   report in my possession, yes.

13           MS. CAROLAN:  He's asking whether you

14       provided it to any of the parties in the

15       action.

16       A.    Oh, I'm sorry.  No, I did not provide the

17   full transcript to any parties in this case.

18     BY MR. ALLEN:

19       Q.    Thank you.  Appreciate it.

20           Are you willing to provide that full

21   transcript to us either today or shortly after this

22   deposition?

23           MS. CAROLAN:  I just object on the

24       reporter's privilege grounds.

25       A.    Not at this time.

CONFIDENTIAL

Page 153

1       BY MR. ALLEN:
2           Q.   Has anyone else at WIRED seen the version
3       of this transcript that includes all four sections?
4               MS. CAROLAN:  I'm going to object as
5               calling for information protected by the
6               reporter's privilege.  I'm going to instruct
7               the witness not to answer.
8           A.   My editor has seen it.
9       BY MR. ALLEN:
10          Q.   That's Mr. Couts?
11          A.   That's right.
12          Q.   Anyone else?
13              MS. CAROLAN:  I'm going to object to the
14              extent it calls for information protected by
15              the reporter's privilege and/or the
16              attorney-client privilege, and instruct the
17              witness not to answer.
18          A.   I decline to answer.
19      BY MR. ALLEN:
20          Q.   Has anyone at WIRED conveyed to you any
21      concerns they have about the authenticity of the
22      report?
23              MS. CAROLAN:  Objection.  Calls for
24              information protected by the reporter's
25              privilege.  I instruct the witness not to

CONFIDENTIAL

Page 154

```
 1              answer.
 2         A.   I decline to answer that.
 3      BY MR. ALLEN:
 4         Q.   Was the report provided to you by one
 5    source or multiple sources?
 6              MS. CAROLAN:  Objection, asked and
 7              answered, and objection based on the reporter's
 8              privilege.  I think he refused to answer that
 9              already.
10         A.   I decline to answer that.
11      BY MR. ALLEN:
12         Q.   Mr. Cameron, what steps did you take to
13    try to corroborate the information that's contained
14    in Exhibit 22 here?
15              MS. CAROLAN:  I'm going to object to the
16              extent it calls for information protected by
17              the reporter's privilege, and instruct the
18              witness not to answer unless he can do so
19              without implicating the protections by, for
20              example, publishing information in a news
21              article.
22         A.   My steps weren't limited to this.  But
23    among them, reaching out to Meta to inquire and ask
24    them questions about the details in this document,
25    which included a list of 22 questions, plus others.
```

CONFIDENTIAL

1      BY MR. ALLEN:

2          Q.   Did you take any other steps to

3      corroborate the information in Exhibit 22?

4              MS. CAROLAN:   Same objection.

5          A.   Yes.

6      BY MR. ALLEN:

7          Q.   What else did you do?

8          A.   I decline to answer that.

9          Q.   Exhibit 22 mentions a few different Meta

10     employees without naming them.   It mentions Employee

11     1, Employee 2, Employee 3, and Employee 4.

12              Do you recall that?

13         A.   Yes.

14         Q.   Do you know the identity of the individual

15     that's been listed as Employee 1 in Exhibit 22?

16              MS. CAROLAN:   I'm going to object to the

17              extent it calls for information protected by

18              the reporter's privilege.   But if the witness

19              can answer without implicating those

20              protections, he may.

21         A.   I decline to say whether I know the

22     identities of Employees 1 through 3.   Employee 4 is

23     identified by a job title that seems exclusive to a

24     single person, and --

25

CONFIDENTIAL

1      BY MR. ALLEN:

2          Q.   Who -- I'm sorry.  Go ahead.

3          A.   And that is publicly available

4      information.

5          Q.   Since it's publicly available information,

6      can you tell us who your understanding of who

7      Employee 4 is?

8          A.   I don't have that information in front of

9      me.

10         Q.   And you don't recall at the moment?

11         A.   I don't recall the name of the individual.

12     They're an assistant to an executive at Facebook.

13         Q.   One second.

14              Mr. Cameron, you told Mr. Alger you

15     believe Facebook was looking to find employees who

16     had had anything to do with this document and maybe

17     trying to rehire them or place them closer within

18     its legal department in an effort to keep them from

19     communicating about the document.

20              Do you recall that testimony?

21         A.   I'm sorry.  The beginning of your question

22     started how?

23         Q.   I'll repeat it.

24              Mr. Cameron, you told Mr. Alger when he

25     was questioning you the following:  You told him

1  that you believed Facebook was looking to find

2  employees who had had anything to do with this

3  document, the report we've been talking about, and

4  that Facebook may be trying to rehire them or place

5  them closer within its legal department in an effort

6  to keep them from communicating about the document.

7          Do you recall that testimony?

8      A.  I recall the testimony.  If I said I

9  believed that, that was an overstatement, and I

10  would like to correct the record.

11     Q.  Please do correct the record.  Thank you.

12     A.  I had heard that information, but had

13  taken no steps to verify it.

14     Q.  From whom did you hear that information?

15         MS. CAROLAN:  Objection.  Calls for

16         information protected by the reporter's

17         privilege.

18     A.  I decline to answer that.

19   BY MR. ALLEN:

20     Q.  You also testified that you recall telling

21  Mr. Bamberger that you believed Meta had approached

22  the author of the report and asked that individual

23  to sign a sworn statement that it was just a draft

24  and not intended for public release.

25         Do you recall that testimony?

CONFIDENTIAL

1      A.   I recall the testimony.  But if I said at

2  that time, and I don't recall, that I believe that,

3  then I would like to correct the record and state

4  that I heard that information, but had taken no

5  steps to verify it during that conversation with

6  Mr. Bamberger.

7      Q.   Have you taken any steps to verify it

8  since?

9          MS. CAROLAN:  Objection.  Calls for

10      information protected by the reporter's

11      privilege.  Instruct the witness not to answer

12      unless he can do so without implicating those

13      protections.

14      A.   I decline to answer that.

15  BY MR. ALLEN:

16      Q.   From whom had you heard that?

17          MS. CAROLAN:  Same objection.

18      A.   A confidential source.

19  BY MR. ALLEN:

20      Q.   Are you willing to identify that

21  confidential source?

22      A.   I am not.

23      Q.   Mr. Cameron, other than the whistleblower

24  report that we've talked about and the draft of the

25  alleged internal report that you reviewed, do you

1    penultimate sentence on page 7.  It says,

2    "Notwithstanding the above objections, and subject

3    to them, Advance has conducted a reasonable search

4    and diligent inquiry for responsive materials within

5    its possession, custody or control and has been

6    unable to locate any responsive documents, nor does

7    it believe any such responsive documents were once

8    in its possession, custody or control, but have

9    since been lost, discarded or destroyed."

10            Do you see that, Mr. Cameron?

11        A.   I do.

12        Q.   Is that an accurate statement at the time

13    these responses and objections were served?

14            MS. CAROLAN:  I just want to object as

15        vague.  And to clarify, Mr. Cameron is

16        testifying on behalf of Advance pursuant to the

17        designation letter.  That designation is

18        limited to information he obtained in the

19        course of newsgathering while employed by

20        Advance, i.e. not Gizmodo.

21        So the questions as to bribery,

22        information about that while he was employed by

23        Advance is to limitation, the objection and the

24        purpose for which we designated Mr. Cameron.

25            MR. ALLEN:  Okay.  My question still

CONFIDENTIAL

1        stands.

2      BY MR. ALLEN:

3        Q.   Mr. Cameron, is that statement accurate at

4    the time these responses and objections were served?

5        A.   To the best of my knowledge.

6        Q.   And to the best of your knowledge, is it

7    accurate today?

8        A.   Yes.

9                MR. ALLEN:  One second, please.

10               Thank you, Mr. Cameron.  I have no further

11           questions.

12               We will need to hold the deposition open

13           given the number of objections that were made

14           to questions that we asked and that we believe

15           Judge Alsup wanted us to inquire into, so the

16           deposition will have to remain open.

17               I will, before I forget, designate the

18           deposition as confidential under the various

19           applicable protective orders that apply in this

20           case.

21               But I have no further questions for you,

22           but Mr. Sternberg might.

23               MR. STERNBERG:  Yeah, I do have questions.

24               Can we take a five -- actually, let's make

25           it a ten-minute break, and I'll try to organize

# EXHIBIT 6

ATTORNEYS EYES ONLY

Page 1

```
 1              UNITED STATED DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3              CASE NO. 3:22-CV-01101-WHA
 4    DAWN DANGAARD, a/k/a ALANA
      EVANS, ASHLEY NICOLE MILLER,
 5    a/k/a NICOLE ANISTON, KELLY
      GILBERT, a/k/a KELLY PIERCE,
 6    JENNIFER ALLBAUGH, a/k/a RUBY,
      and LAURA ALLEN, a/k/a AMBER
 7    LYNN on behalf of themselves and all
      others similarly situated,
 8                   Plaintiffs,
 9    V.
10
      FENIX INTERNET LLC, FENIX
11    INTERNATIONAL INC., META
      PLATFORMS, INC., INSTAGRAM,
12    LLC, FACEBOOK OPERATIONS, LLC,
      LEONID RADVINSKY, and JOHN
13    DOES 1-10,
                     Defendants.
14    _____
15
16                   Remote Proceedings
                     May 25, 2023
17                   4:02 p.m. - 4:48 p.m.
18          DEPOSITION OF ANDREW COUTS
19    **** HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY****
20       Taken before SUZANNE VITALE, R.P.R., F.P.R.
21    and Notary Public for the State of Florida at Large,
22    pursuant to Notice of Taking Deposition filed in the
23    above cause.
24
25
```

ATTORNEYS EYES ONLY

1      Q.    You can answer the question, please.

2      A.    I believe he is a very talented reporter

3  and writer.

4      Q.    Did you find that his work was high

5  quality?

6      A.    Yes.

7      Q.    And have your opinions of Mr. Cameron's

8  performance changed since he came to work for you at

9  WIRED?

10      A.    No.

11      Q.    Have you discussed with Mr. Cameron his

12  research regarding allegations that OnlyFans has

13  received special treatment on Instagram and

14  Facebook?

15          MS. CAROLAN:   I'm going to interject an

16      objection based on the First Amendment and

17      common law reporter's privilege as well as

18      state shared law protections, including Article

19      1, Section 2(b) of the California Constitution

20      and California Evidence Code, Section 1070 and

21      Article 1, Section 8 of the New York

22      Constitution and the New York Civil Rights Law,

23      Section 779(h).

24          I instruct the witness not to answer

25      unless he can do so without implicating those

ATTORNEYS EYES ONLY

Page 12

1      protections or unless he otherwise elects to

2      answer the question.

3           And just for -- again, like we did

4      yesterday with Mr. Cameron's deposition for

5      brevity, I'll be referring to these

6      journalist's protections collectively as a

7      reporter's privilege and objecting on that

8      basis throughout these proceedings.

9           MR. ALGER:  Thank you.

10   BY MR. ALGER:

11        Q.   Are you prepared to answer that question,

12   Mr. Couts?

13        A.   I decline to answer that question.

14           MR. ALGER:  Okay, I'm going to send to the

15      court reporter and counsel Exhibit 35.

16           MS. CAROLAN:  Mr. Alger, if you can send

17      it to us before you discuss it.

18           MR. ALGER:  I'm going to send it to

19      counsel before I put it on the screen.

20           MS. CAROLAN:  I still don't have it.

21           MR. ALGER:  I'm just going slow.  Sorry.

22           Has everybody gotten it?

23           MS. CAROLAN:  I don't have it yet.

24           MR. STERNBERG:  It came through for me.

25           MR. ALGER:  Ms. Carolan, have you received

ATTORNEYS EYES ONLY

Page 19

1      Q.   Mr. Couts, are you going to follow your
2   counsel's advice?
3      A.   I am.
4      Q.   And you're going to decline to answer?
5      A.   I am.
6      Q.   Did Mr. Cameron provide you with any
7   information regarding his source for Exhibit 22?
8           MS. CAROLAN:  I'm going to object based on
9       the reporter's privilege and instruct the
10      witness not to answer.
11   BY MR. ALGER:
12      Q.   Mr. Couts, are you going to follow your
13   counsel's advice?
14      A.   Yes.
15      Q.   And you're going to decline to answer?
16      A.   Yes.
17      Q.   Mr. Couts, do you know anything about the
18   source of Exhibit 22?
19           MS. CAROLAN:  Same objection, same
20      instruction.
21   BY MR. ALGER:
22      Q.   Mr. Couts, are you going to follow your
23   counsel's advice and decline to answer?
24      A.   I am.
25      Q.   Mr. Couts, did you discuss at any time

ATTORNEYS EYES ONLY

Page 20

```
 1    with Mr. Cameron whether the transcript, Exhibit 22,
 2    was newsworthy?
 3              MS. CAROLAN:  Objection to the extent it
 4         calls for unpublished information, information
 5         protected by the reporter's privilege.  I
 6         instruct the witness not to answer.
 7    BY MR. ALGER:
 8         Q.   Mr. Couts, are you going to follow your
 9    counsel's advice and decline to answer?
10         A.   I am.
11         Q.   Mr. Couts, did you discuss with
12    Mr. Cameron whether to publish an article about
13    Exhibit 22?
14              MS. CAROLAN:  Objection, calls for
15         information protected by the reporter's
16         privilege and instruct the witness not to
17         answer.
18    BY MR. ALGER:
19         Q.   Mr. Couts, are you going to follow your
20    counsel's advice and decline to answer?
21         A.   I am.
22         Q.   Mr. Couts, have you ever had any form of
23    contact with an attorney named David Azar?
24         A.   No.
25         Q.   Mr. Couts, have you ever had any form of
```

ATTORNEYS EYES ONLY

Page 24

1        reporter's privilege and instruct the witness

2        not to answer.

3    BY MR. ALLEN:

4        Q.    Are you going to follow that instruction?

5        A.    Yes.

6        Q.    Who do you believe to be the author of the

7    original report that Mr. Cameron reviewed?

8            MS. CAROLAN:  Same objection, same

9        instruction.

10   BY MR. ALLEN:

11       Q.    Are you going to follow that instruction?

12       A.    Yes.

13       Q.    Other than Mr. Cameron, to your knowledge,

14   has anyone else at WIRED reviewed the original copy

15   of the report?

16           MS. CAROLAN:  Objection, calls for

17       information protected by the reporter's

18       privilege and instruct the witness not to

19       answer.

20   BY MR. ALLEN:

21       Q.    Are you going to follow that instruction?

22       A.    Yes.

23       Q.    To your knowledge, other than the physical

24   copy of the report that Mr. Cameron reviewed, are

25   there any other copies of the report?

1    opposed to one section?

2              MS. CAROLAN:  Object to the extent it

3         calls for information protected by the

4         reporter's privilege and instruct the witness

5         not to answer.

6    BY MR. ALLEN:

7         Q.   Are you going to follow that instruction?

8         A.   Yes.

9         Q.   What steps have you taken to confirm or

10   deny the allegations made in Exhibit 22?

11             MS. CAROLAN:  Objection, it's calling for

12        information protected by the reporter's

13        privilege and I would instruct the witness not

14        to answer.

15   BY MR. ALLEN:

16        Q.   Are you going to follow that instruction?

17        A.   Yes.

18        Q.   Who else at WIRED has seen Exhibit 22?

19             MS. CAROLAN:  Same objection, same

20        instruction.

21   BY MR. ALLEN:

22        Q.   Will you follow that instruction?

23        A.   Yes.

24        Q.   Without telling me the name, or identity

25   of the confidential source that provided either

# EXHIBIT 7

1  GREENBERG TRAURIG, LLP
   Rick L. Shackelford (SBN CA 151262)
2  1840 Century Park East, Suite 1900
   Los Angeles, California 90067-2121
3  Telephone: 310.586.7700
   Facsimile: 310.586.7800
4  shackelfordr@gtlaw.com

5

6  Attorneys for HSBC Bank USA, N.A.

7

8             UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 DAWN DANGAARD, a/k/a ALANA         CASE NO.  3:22-cv-01101-WHA
   EVANS, KELLY GILBERT, a/k/a
12 KELLY PIERCE, JENNIFER             **NON-PARTY HSBC BANK USA,**
   ALLBAUGH, a/k/a Ruby, and on behalf **N.A.'S OBJECTIONS TO SUBPOENA**
13 of themselves and all others similarly
   situated,
14
          Plaintiffs,
15
   v.
16
   INSTAGRAM, LLC, FACEBOOK
17 OPERATIONS, LLC, META
   PLATFORMS, INC., FENIX
18 INTERNATIONAL INC., FENIX
   INTERNET LLC, LEONID
19 RADVINSKY, and JOHN DOES 1-10,

20        Defendants.

21

22

23

24

25

26

27

28

*ACTIVE 686842550v5*

HSBC BANK USA, N.A. ("HSBC"), pursuant to Rule 45 of the Federal Rules of Civil Procedure, hereby provides its Objections to the Subpoena issued to it by Plaintiff DAWN DANGAARD, KELLY GILBERT, and JENNIFER ALLBAUGH, and states:

## I.    <u>GENERAL OBJECTION</u>

1.    HSBC generally objects to the Subpoena and the appearance at deposition because Exhibits 1 through 12 to the Subpoena are not HSBC's documents.  HSBC cannot vouch for them, interpret them, or provide an opinion on them.  The Subpoena calls for HSBC to provide opinion testimony on documents that it did not author.  Prior to providing any testimony or documents, HSBC is accepting the invitation in the Subpoena to meet and confer because the Subpoena would require guesswork on the part of HSBC and is not sufficiently specific in what information it seeks from HSBC to permit a more meaningful response.

## II.    <u>OBJECTIONS TO INSTRUCTIONS</u>

2.    HSBC objects to the Subpoena because it does not allow a reasonable time to comply by assembling the Documents requested and preparing to answer the Topics posed.  *See* Fed. R. Civ. P. 45(d)(3)(A)(i).

3.    HSBC objects to Instruction 7, which requires a statement of documents destroyed, lost, or discarded, to the extent that it exceeds the requirements of the Federal Rules of Civil Procedure.

4.    HSBC objects to the Instruction and "Integrated Document Requests) (Subpoena, p. 7) to combine the Document request and the deposition Topics because it requires HSBC to guess at where the Document request ends and the deposition Topics begin, and do not clearly spell out which Documents are requested for production, as opposed to questions about the documents attached to the Subpoena.

## III.    <u>OBJECTIONS TO GENERAL TOPICS (SUBPOENA, P. 7)</u>

5.    HSBC objects to General Topic 1 and the definition of "genuine" to the extent that it calls for HSBC to speculate about a non-HSBC document that Plaintiffs admit was created on a non-HSBC system, the FedPayments Manager tool, using

"information" drawn from "other databases/systems/etc." As such, the information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive." *See* Fed. R. Civ. P. 26(b)(2)(C)(i).

6.  HSBC objects to General Topic 2 because it calls for the answer to a hypothetical question, *i.e.*, "If someone decided to print the information from the FedPayments Manager tool," and again requires HSBC to speculate about non-HSBC documents that Plaintiffs admit were created on a non-HSBC system, the FedPayments Manager tool, using "information" drawn from "other databases/systems/etc." General Topic 2 is vague and ambiguous insofar as it purports to request "printouts", but is unclear on what, if any, documents are being sought.

7.  HSBC objects to General Topic 3 because it calls for the answer to a question, *i.e.*, "And do you have records of any other transactions from the same originator to the same beneficiary," that is confined not just to wire transfer records, but involves every other possible transaction between the originator and beneficiary. As such, the General Topic is overbroad and oppressive.

8.  HSBC objects to General Topic 4 because the terms "audit logs/ledger/source documents" are vague, ambiguous, and undefined. To the extent that "source documents" refer to every bank statement or item of information pertaining to the account, HSBC objects that General Topic 4 is oppressive and unduly burdensome. To the extent that the word "ledger" refers to every bank account statement, HSBC objects that General Topic 4 is oppressive and unduly burdensome. HSBC objects to General Topic 4 because it requires it to draw a legal conclusion on accusations of alteration and destruction with no basis in fact. HSBC objects to General Topic 4 because it fails to provide any criteria by which HSBC could ascertain and answer the legal conclusion posed. HSBC objects to any requirement to produce a representative to "testify about that investigation" insofar as it invades the attorney-client and work product privileges. *See* Fed. R. Civ. P. 45(d)(3)(iii).

9.  HSBC objects to General Topic 5 because it calls for the answer to a

hypothetical question, *i.e.*, "If any of the wire transfers are not genuine, is any of the information in the Exhibits genuine," insofar as it calls for speculation and again requires HSBC to speculate about non-HSBC documents that Plaintiffs admit were created on a non-HSBC system, the FedPayments Manager tool, using "information" drawn from "other databases/systems/etc." HSBC objects to General Topic 5 because it requires HSBC to guess at whether information listed in a third-party system is genuine.

10.    HSBC objects to General Topic 5(a) as overbroad and oppressive insofar as it requires HSBC to conduct a search of all IMAD or OMAD numbers. HSBC objects to the request for a "component of the IMAD or OMAD number" as vague and undefined. As phrased, it could refer to a single digit of the IMAD or OMAD number. HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC. Thus, the Topic would require HSBC to opine on a third-party system. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive."). To the extent that the requested search results in disclosure of third-party documents, HSBC objects that it invades third-party privacy and confidentiality expectations in the requested documents.

11.    HSBC objects to General Topic 5(b) insofar as it calls for the answer to a hypothetical and speculative accusation as to how IMAD or OMAD numbers in a third-party banking record, *i.e.*, the FedPayments Manager tool, were created. HSBC objects that it lacks personal knowledge as to how the FedPayments Manager tool creates IMAD or OMAD numbers. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

12.    HSBC objects to General Topic 5(c) insofar as it calls for the answer to a hypothetical and speculative accusation as to how Originator or Beneficiary information in a third-party banking record, *i.e.*, the FedPayments Manager tool, were created. HSBC objects to General Topic 5(c) insofar as, if the Originator and Beneficiary information are associated with another customer, it requires HSBC to disclose information about a third-

party bank customer in violation of privacy and banking regulations.

13.    HSBC objects to General Topic 6 because it calls for HSBC to opine as to the contents of a third-party system, *i.e.*, the FedPayments Manager tool, and opine if the information is "genuine" or "false."  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").  HSBC objects to General Topic 6(a)(iii) insofar as it is incomprehensible and contains a sentence fragment:  "what information you lack sufficient information."  HSBC objects to General Topic 6(a)(iii) insofar as it calls for speculation on what HSBC would need to determine if third-party information is "genuine" or "false."

14.    HSBC objects to General Topic 7 because it calls for the answer to a hypothetical question, *i.e.*, "Can you tell anything about the kind of information someone would have had to have in order to create the exhibit."  HSBC objects to General Topic 7 because it calls for speculation on information that would be needed in order to "create the exhibit" where the exhibit is, by Plaintiff's own admission, from a third-party system. HSBC objects to General Topic 7(a) insofar as all of the questions involved call for complete speculation.  HSBC objects to General Topic 7(b) insofar as all of the questions posed call for complete speculation.

15.    HSBC objects to General Topic 8 insofar as it calls for the disclosure of work product and attorney-client privileged information. Virtually every question calls not for a discussion of existing facts, but for application of opinion to facts or speculation on a third-party system.

16.    HSBC objects to General Topic 9 insofar as it calls for testimony on what each of the numbers, codes and textual descriptions on a document generated by a third-party system refer to.  By Plaintiffs' own admission, the system at issue is a Federal Reserve system.

17.    HSBC objects to General Topic 10 insofar as it calls for testimony on what each of the numbers, codes and textual descriptions on a document generated by a third-

party system refer to.  By Plaintiffs' own admission, the system at issue is a Federal Reserve system, and each of the questions involved relate to Federal Reserve policies, not HSBC policies.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").  HSBC objects to General Topic 10 insofar as it requires HSBC to "infer" anything as compared to testifying about existing facts.

18.    HSBC objects to General Topic 11 insofar as it calls for the answer to a hypothetical question, "What access level would be required in FedPayments Manager to input the kind of information in the Exhibits, or to access or print a form like that of the Exhibits…."  The speculative and hypothetical question relates to a third-party system, not owned or originated by HSBC.  HSBC objects to any requirement to identify every single employee of HSBC who might have access to the information in FedPayments Manager.

19.    HSBC objects to General Topic 12 as vague and ambiguous as there is only one wire between Fenix (Exhibit 12) and Smart Team International, and that wire is originated from a Barclay's account, not HSBC.  The question seems to imply that there are more than one, but does not identify which ones.

20.    HSBC objects to General Topic 13 as vague and ambiguous as to whether it is seeking wires between "Fenix" and "Fenix International" or whether "Smart Team International" needs to be a party to the wire.  HSBC objects to General Topic 13 insofar as it is vague as to whether the wire transfer must be wholly in Hong Kong.  HSBC objects to General Topic 13 insofar as it seeks information outside the possession, custody, or control of HSBC.

## IV.    OBJECTIONS TO SUB-TOPICS ON FEDPAYMENTS MANAGER FORMS (SUBPOENA, P. 9)

21.    HSBC objects to Sub-Topic 1 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation about whether those documents are genuine.  By Plaintiffs' own admission, the system at issue is a Federal Reserve system.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from

another source that is "more convenient, less burdensome, [and] less expensive"). HSBC objects to Sub-Topic 1 insofar as it does not define what "appear to be" means and does not define what is a "FedPayments Manager report(s) or form(s)." The Sub-Topic calls for HSBC to make a factual admission on whether a document that is wholly-generated by a third party is, in fact, a "report" or "form."

22. HSBC objects to Sub-Topic 2 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation. By Plaintiffs' own admission, the system at issue is a Federal Reserve system. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

23. HSBC objects to Sub-Topic 3 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation. By Plaintiffs' own admission, the system at issue is a Federal Reserve system. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

24. HSBC objects to Sub-Topic 4 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

25. HSBC objects to Sub-Topic 5 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive"). HSBC objects to Sub-Topic 5 to the extent that it calls for a legal opinion on Fed Reserve requirements.

26. HSBC objects to Sub-Topic 6 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that

HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

27.     HSBC objects to Sub-Topic 7 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive"). HSBC further objects that "this information" is vague as to the subject of the "information."

28.     HSBC objects to Sub-Topic 8 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive"). HSBC further objects that "this information" is vague as to the subject of the "information."

29.     HSBC objects to Sub-Topic 9 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive"). HSBC further objects that "this information" is vague as to the subject of the "information." HSBC objects that Sub-Topic 9 does not define what "justification" is or what "authorization" is, and what format does the "justification" or "authorization" need to take.

30.     HSBC objects to Sub-Topic 10 insofar as it calls for a factual opinion on a third-party document and therefore calls for speculation on a Federal Reserve system that HSBC does not operate. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

## V.    OBJECTIONS TO SUB-TOPICS ON IMAD/OMAD

31.    HSBC objects to Sub-Topic 1 insofar as it calls for speculation about a IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

32.    HSBC objects to Sub-Topic 2 insofar as it calls for speculation about a IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system and whether a IMAD or OMAD number be used for multiple transactions.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

33.    HSBC objects to Sub-Topic 3 insofar as it calls for speculation about a IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system and whether an IMAD or OMAD can contain the exact same sequence.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

34.    HSBC objects to Sub-Topic 4 insofar as it calls for speculation about a IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve and the specific components of an IMAD or OMAD number.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

35.     HSBC objects to Sub-Topic 5 insofar as it calls for speculation about a IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve and the origin of the specific components of an IMAD or OMAD number.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

36.     HSBC objects to Sub-Topic 6 insofar as it calls for speculation about a IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

37.     HSBC objects to Sub-Topic 7 insofar as it does not define what "similar" IMAD or OMAD information is for purposes of conducting the search.  For example, if an IMAD or OMAD number contains a single digit that matches the subject IMAD or OMAD numbers, is that a "similar" IMAD or OMAD numbers?  The Request does not identify what level of similarity, aside from a complete match of IMAD or OMAD numbers, rises to the level of a "similar, identical, or additional transaction[] between these parties, using similar…IMAD/OMAD information."

38.     HSBC objects to Sub-Topic 8 insofar as it calls for speculation about an IMAD or OMAD number, which is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

39.     HSBC objects to Sub-Topic 9 to the extent it seeks responses about the "IMAD/OMAD information," but does not specify what subset of data in the various

exhibits comprises the "IMAD/OMAD information," e.g., a single digit of an IMAD/OMAD number.  HSBC objects to Sub-Topic 9 insofar as it calls for speculation about prior use of an IMAD or OMAD number, which is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve and "IMAD/OMAD information" associated with an IMAD or OMAD number.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

40.    HSBC objects to Sub-Topic 10 insofar as it calls for speculation about "Sender/Receiver" information associated with an IMAD or OMAD number, which is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve and the specific purpose of the IMAD or OMAD number.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").  For example, Sub-Topic 10(a) requires information on who the "sender" is, but requires HSBC to state definitively the parameters of the Federal Reserve system software as it relates to that specific field.

41.    HSBC objects to Sub-Topic 11 insofar as it calls for speculation about access levels /modifications on an IMAD or OMAD number, which is a number generated by the Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").  In addition, Sub-Topic 11 requires HSBC to provide factual information about third parties, namely, "the Fed," "the sender" [which is not necessarily HSBC] or "receiver bank" [which is not necessarily HSBC], as appropriate.

42.    HSBC objects to Sub-Topic 12 insofar as it calls for speculation about access levels /modifications on an IMAD or OMAD number, which is a number generated by the

NON-PARTY HSBC BANK USA, N.A.'S OBJECTIONS TO SUBPOENA

Federal Reserve system, and not HSBC.  Thus, the Sub-Topic would require HSBC to opine on a third-party system operated by the Federal Reserve.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").  In addition, Sub-Topic 12 requires HSBC to provide factual information about third parties, namely, "the Fed," "the sender," or "receiver bank", as appropriate

43.    HSBC objects to Sub-Topic 13 insofar as it does not identify "the system", as to whether it is an HSBC system or a Fed system.  HSBC objects to Sub-Topic 13 insofar as it does not identify or define what is an "audit trail," and which "system" the "audit trail" refers to.  HSBC objects to Sub-Topic 12 insofar as it calls for speculation about "audit trails" on an IMAD or OMAD number.  HSBC objects that the IMAD or OMAD number is a number generated by the Federal Reserve system, and not HSBC.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").

44.    HSBC to Sub-Topic 14 objects insofar as it does not clearly delineate which, if any, "records" need to be checked.  Nor does it define any criteria by which to judge if "records [are] related to the information in the Exhibits."  HSBC objects to Sub-Topic 14 insofar as it calls for HSBC's opinion on a third-party document generated by the Federal Reserve.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (information sought can be obtained from another source that is "more convenient, less burdensome, [and] less expensive").  HSBC objects that the Sub-Topic 14 calls for a legal conclusion on a set of hypothetical accusations of alteration, destruction and deletion.

## VI.    OBJECTIONS TO ADDITIONAL DOCUMENT REQUESTS (SUBPOENA, P. 10).

45.    HSBC objects to the scope of "records" that may be "related" to a wire transfer.  Read literally, it could encompass every document relating to HSBC's wire transfer system.

46.    To the extent that a Court does not sustain these objections, HSBC requests

1  that it be protected from significant expense resulting from compliance.  *See* Fed. R. Civ.

2  P. 45(d)(2)(B).

3

4  DATED:  April 28, 2023                    GREENBERG TRAURIG, LLP

5

6                                            By  /s/ Rick L. Shackelford
                                             Rick L. Shackelford
7                                            Attorneys for HSBC Bank USA, N.A.

8

9  Of Counsel:

10 John L. McManus
   Florida Bar No. 0119423
11 Email: mcmanusj@gtlaw.com
   GREENBERG TRAURIG, P.A.
12 401 East Las Olas Boulevard
   Suite 2000
13 Fort Lauderdale, Florida 33301
   Tel:  (954) 768-8291/Fax:  (954) 765-1477

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NON-PARTY HSBC BANK USA, N.A.'S OBJECTIONS TO SUBPOENA
*ACTIVE 686842550v5*

1

### PROOF OF SERVICE

2 STATE OF CALIFORNIA, COUNTY OF CALIFORNIA:

3       I am employed in the aforesaid county, State of California; I am over the age of 18

4 years and not a party to the within action; my business address is 1840 Century Park East,

5 Suite 1900, Los Angeles, California 90067-2121.

6       On April 28, 2023 I served the **NON-PARTY HSBC BANK USA, N.A.'S**

7 **OBJECTIONS TO SUBPOENA**, on the interested parties, addressed as follows:

8                              **SEE ATTACHED SERVICE LIST**

9 ☐  **(BY MAIL)**

10      ☐  I deposited such envelope in the mail at Los Angeles, California. The envelope
           was mailed with postage thereon fully prepaid.

11      ☐  I am readily familiar with the business practice of my place of employment in
           respect to the collection and processing of correspondence, pleadings and

12         notices for mailing with United States Postal Service. The foregoing sealed
           envelope was placed for collection and mailing this date consistent with the

13         ordinary business practice of my place of employment, so that it will be picked
           up this date with postage thereon fully prepaid at Los Angeles, California, in the

14         ordinary course of such business.

15 ☒  **(BY ELECTRONIC MAIL)**

16      I served the above-mentioned document electronically on the parties listed at the
        email addresses above and, to the best of my knowledge, the transmission was

17      complete and without error in that I did not receive an electronic notification to the
        contrary.

18      I declare under penalty of perjury that the foregoing is true and correct, and that I

19
   am employed at the office of a member of the bar of this Court at whose direction the
20
   service was made.
21

22      Executed on <u>April 28, 2023,</u> at Los Angeles, California.

23

24                                          _____
                                                    Rosa Irajpanah
25

26

27

28

## SERVICE LIST

David Azar, Esq.
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
280 S. Beverly Drive, Suite PH
Beverly Hills, CA 90212
dazar@milberg.com

Shon Morgan, Esq.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
shonmorgan@quinnemanuel.com

Victoria B. Parker, Esq.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street
22nd Floor
San Francisco, CA 94111
vickiparker@quinnemanuel.com

John F. O'Sullivan, Esq.
Jason D. Sternberg, Esq.
Joshua T. Fordin, Esq.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
2601 South Bayshore Drive
15th Floor
Miami, Florida 33133
johnosullivan@quinnemanuel.com
jasonsternberg@quinnemanuel.com
joshuafordin@quinnemanuel.com

K. Winn Allen, P.C., Esq.
Devin S. Anderson, Esq.
KIRKLAND & ELLIS, LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
winn.allen@kirkland.com
devin.anderson@kirkland.com

Michael P. Esser, Esq.
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 9401
Michael.esser@kirkland.com

John P. Hannon, Esq.
KIRKLAND & ELLIS LLP
60 East South Temple
Salt Lake City, UT 84111
John.hannon@kirkland.com

CASE NO.  3:22-cv-01101-WHA
NON-PARTY HSBC BANK USA, N.A.'S OBJECTIONS TO SUBPOENA
*ACTIVE 686842550v5*

# EXHIBIT 8

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
DAVID E. AZAR (SBN 218319)
280 S. Beverly Drive, Suite PH
Beverly Hills, California 90212
Telephone: 1-866-252-0878
dazar@milberg.com

EMERGE LAW GROUP, P.C.
Timothy L. Alger (SBN 160303)
100 Spectrum Center Drive, Suite 900
Irvine, California 92618
Telephone: 949-936-2610
tim@emergelawgroup.com

*Plaintiffs' Attorneys*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN DANGAARD, a/k/a ALANA EVANS, KELLY GILBERT, a/k/a KELLY PIERCE, JENNIFER ALLBAUGH, a/k/a RUBY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FENIX INTERNET LLC, FENIX INTERNATIONAL INC., META PLATFORMS, INC., INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, LEONID RADVINSKY, and JOHN DOES 1-10, <br><br> Defendants. <br> . | CASE NO. 3:22-CV-01101-WHA <br><br> **PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS (ISSUED PURSUANT TO MARCH 29, 2023 ORDER)** |

Pursuant to Federal Rules of Civil Procedure 26 and 34, the applicable Civil Local Rules of the United States District Court for the Northern District of California, and the rules and orders of the Court, Plaintiffs hereby respond and object to Defendants Instagram, LLC, Facebook Operations, LLC, and Meta Platforms, Inc.'s First Set of Requests for Production of Documents to Plaintiffs, dated April 5, 2023, as follows:

## PRELIMINARY STATEMENT

For Defendants' request for documents that are currently within Plaintiffs' possession or control, Plaintiffs make the following Objections and Responses on the basis of information that is presently known and available to Plaintiffs and Plaintiffs' attorneys of record.

## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1:**

All Documents and Communications, including any alleged bank or wire-transfer records, relating to any alleged bribes or payments sent from anybody associated with OnlyFans to Meta or any of Meta's employees, agents, executives, or representatives, including but not limited to Nicholas Clegg, Nicola Mendelsohn, or Cristian Perrella.

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order limiting the scope of discovery, and it is otherwise improper. On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document requests regarding any ***evidence of bribe***." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe -- with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

As to documents "relating to" that evidence, Plaintiffs object that it is overbroad and improper as phrased. Plaintiffs believe a reasonable interpretation of this request is that it pertains

to documents and communications that do ***not*** include communications with opposing counsel in this litigation or documents or communications of what would be subject to attorney client or work product privilege such as between or among Plaintiffs' counsel, their staff, clients, or consulting experts. To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and/or work product doctrine. As phrased, this Request could seek documents and communications that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. Certain of the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts. To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation. Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action. Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs will produce any responsive documents that are within the scope of the Court's Order, are not privileged, and do not constitute attorney work product. To the extent this Request calls for documents protected by attorney work

product, Plaintiffs are willing to meet and confer with Defendants at a mutually agreeable time and place concerning the scope of this Request.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and Communications relating to or supporting (1) Plaintiffs' allegations about the existence of "wire transfers … from a Smart Team account at HSBC, a Hong Kong bank, to three trust accounts at the Philippine Bank of Communications ("PBCOM"), each benefiting individuals with high positions at Meta"; (2) the allegations that "Smart Team made transfers to 'Nicola Mendelsohn Trust' at PBCOM in five transactions between 2017 and 2019," "made several transfers to 'Cristian Peralta Trust' at PBCOM in 2018," and "made a transfer to a Trust account at PBCOM ███████████████████████"; (3) the allegation that the Fenix Defendants "used Smart Team International Business Limited Hong Kong to make the scheme-facilitating payments"; and (4) the allegation that Plaintiffs have "[d]ocumentation of wire transfers, also received through the tip line, of sums of money from entities associated with Fenix and Radvinsky to executives at Meta," as alleged in ¶¶ 2(c), 10(b), 76, 79, and 81–84 of the Complaint.

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order limiting the scope of discovery, and it is otherwise improper.  On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document requests regarding any ***evidence of bribe***." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe, including any evidence of or supporting any of the 4 subparts of this Request -- with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)."  *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

As to documents "relating to" that evidence, Plaintiffs object that it is overbroad and improper as phrased. Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and communications that do ***not*** include communications with opposing counsel in this litigation or documents or communications of what would be subject to attorney client or work product privilege such as between or among Plaintiffs' counsel, their staff, clients, or consulting experts. To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and/or work product doctrine. As phrased, this Request could seek documents and communications that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. Certain of the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts. To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation. Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action. Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs will produce any responsive documents that are within the scope of the Court's Order, are not privileged, and do not constitute

5

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
CASE NO. 3:22-CV-01101-WHA

attorney work product. To the extent this Request calls for documents protected by attorney work product, Plaintiffs are willing to meet and confer with Defendants at a mutually agreeable time and place concerning the scope of this Request.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications related to the Follow the Money Email, including those documents sufficient to identify the individual(s) who provided the Follow the Money Email to You, the provenance of the Follow the Money Email, any investigation or analysis You conducted to identify the sender or to authenticate or verify the information contained therein, and any Communications with the attorney who reviewed the Follow the Money Email in ¶¶ 2(c), (d) of the Complaint.

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order limiting the scope of discovery, it is vague and compound such that it is almost impossible to understand, and it is otherwise improper. On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document requests regarding any ***evidence of bribe***." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe including any of the transactions or information in the Follow the Money email -- with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

As to documents "relating to" the Follow the Money Email, Plaintiffs object that it is overbroad and improper as phrased. Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and communications that do ***not*** include communications with opposing counsel in this litigation or documents or communications of what would be subject to attorney client or work product privileged such as between or among Plaintiffs' counsel, their staff,

6

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
CASE NO. 3:22-CV-01101-WHA

clients, or consulting experts.  To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and/or work product doctrine. As phrased, this Request could seek documents and communications that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts.  Further, Plaintiffs object that the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts.  To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation.  Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action.  Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs respond to this Request as follows:  Plaintiffs have no documents sufficient to identify the individual(s) who provided the Follow the Money Email beyond the email itself and no documents about the provenance of the Follow the Money Email other than the FedPayments Manager records attached to the bank subpoenas and thus already in Meta Defendants' possession.  Plaintiffs have no unprivileged documents of any investigation or analysis Plaintiffs conducted to identify the sender or to

1  authenticate or verify the information contained therein. Finally, as the request for "any

2  Communications with the attorney who reviewed the Follow the Money Email," the complaint did

3  not allege that the attorney reviewed that email, and thus there are no responsive documents.

4  **REQUEST FOR PRODUCTION NO. 4:**

5       All Documents and Communications related to the "FedPayments Manager" document

6  presented in the March 29, 2023 hearing by Plaintiffs' counsel to Judge Alsup in the United States

7  District Court of Northern California, including those documents sufficient to identify the

8  individual(s) who provided the "FedPayments Manager" document to You, the provenance of the

9  "FedPayments Manager" document Email, and any investigation or analysis You conducted to

10 authenticate or verify the information contained therein.

11 **RESPONSE:**

12       Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order

13 limiting the scope of discovery, it is vague and compound such that it is almost impossible to

14 understand, and it is otherwise improper. On March 30, 2023, the Court entered a Minute Order

15 (Doc. 143) stating in part that "Meta may serve a reasonable set of document requests regarding

16 any evidence of bribe." (underline in original; emphasis added).

17       Plaintiffs will produce any "evidence" of a bribe including  -- with evidence meaning

18 "Something (including testimony, documents and tangible objects) that tends to prove or disprove

19 the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United*

20 *States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

21       As to Documents (including those of Communications) "relating to" the Follow the Money

22 Email, Plaintiffs object that it is overbroad and improper as phrased. Plaintiffs believe a reasonable

23 interpretation of this request is that it pertains to documents and communications that do not

24 include communications with opposing counsel in this litigation or documents or communications

25 of what would be subject to attorney client or work product privilege such as between or among

26 Plaintiffs' counsel, their staff, clients, or consulting experts. To the extent that the request intends

8

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK
OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF
DOCUMENTS
CASE NO. 3:22-CV-01101-WHA

to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client communications that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. Certain of the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts. To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation. Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action. Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs respond to this Request as follows: Plaintiffs have no documents identifying the individual(s) who provided the "FedPayments Manager" document beyond the document itself and no documents about the provenance of the "FedPayments Manager" document other than the FedPayments Manager records attached to the bank subpoenas and thus already in Meta Defendants' possession. Plaintiffs have no unprivileged documents of any investigation or analysis Plaintiffs conducted to identify the sender or to authenticate or verify the information contained therein, other than the subpoeans they have served and thus already in Meta Defendants' possession.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents and Communications sufficient to identify the sources who provided You any information concerning alleged bribes or payments sent from anybody associated with OnlyFans to Meta or any of Meta's employees, agents, executives, or representatives, including but not limited to Nicholas Clegg, Nicola Mendelsohn, or Cristian Perrella.

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order limiting the scope of discovery, it duplicates a prior request, it is vague and ambiguous in seeking "all" documents "sufficient to identify," and it is otherwise improper. On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a reasonable set of document requests regarding any evidence of bribe." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe including -- with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and communications that do not include communications with opposing counsel in this litigation or documents or communications of what would be subject to attorney client or work product privilege such as between or among Plaintiffs' counsel, their staff, clients, or consulting experts. To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and the work product doctrine that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. Certain of the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts. To the extent that Defendants are requesting production of

documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation. Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action. Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs will produce any responsive documents that are within the scope of the Court's Order, are not privileged, and do not constitute attorney work product. To the extent this Request calls for documents protected by attorney work product, Plaintiffs are willing to meet and confer with Defendants at a mutually agreeable time and place concerning the scope of this Request.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and Communications relating to any investigation You conducted related to the reliability of the sources that provided You information regarding alleged bribes and/or Your efforts to authenticate or verify any information provided to You containing allegations of alleged bribes or payments sent from anybody associated with Only Fans to anyone associated with Meta.

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order limiting the scope of discovery, it is vague and ambiguous to the point of being nearly impossible to understand, and it is otherwise improper. On March 30, 2023, the Court entered a Minute Order

11

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
Case No. 3:22-cv-01101-WHA

(Doc. 143) stating in part that "Meta may serve a reasonable set of document requests regarding any evidence of bribe." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe including  -- with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and communications that do not include communications with opposing counsel in this litigation or documents or communications of what would be subject to attorney client or work product privilege such as between or among Plaintiffs' counsel, their staff, clients, or consulting experts. To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and the work product doctrine that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. Certain of the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts. To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation. Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action. Plaintiffs interpret the time period

1   as pertaining to the scope of discovery related to the operative complaint; to the extent a different

2   time period is intended, Plaintiffs further object that this request is not limited to a reasonable time

3   period.

4        Subject to and without waiving these objections, Plaintiffs have no unprivileged documents

5   of any investigation or analysis Plaintiffs conducted to identify the sender or to authenticate or

6   verify the information contained therein, other than the subpoeans they have served and thus

7   already in Meta Defendants' possession.

8   **REQUEST FOR PRODUCTION NO. 7:**

9        All Documents and Communications relating to Richard Bamberger, including all

10   Communications between Richard Bamberger and You, and all Communications between Richard

11   Bamberger and any member of the press or media, that concern any alleged bribes or payments

12   sent from anybody associated with OnlyFans to Meta or any of Meta's employees, agents,

13   executives, or representatives, including but not limited to Nicholas Clegg, Nicola Mendelsohn, or

14   Cristian Perrella.

15   **RESPONSE:**

16        Plaintiffs object that the request as phrased is overbroad, disregards the Court's Order

17   limiting the scope of discovery, and otherwise improper.  On March 30, 2023, the Court entered a

18   Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document

19   requests regarding any ***evidence of bribe***." (underline in original; emphasis added). A demand for

20   "[a]ll Documents and Communications relating to Richard Bamberger" is wildly overbroad,

21   burdensome and intrusive, seeks documents that are irrelevant, and is inconsistent with the Court's

22   expressed purpose of discovery at this point in the case.

23        Plaintiffs will produce any "evidence" of a bribe, with evidence meaning "Something

24   (including testimony, documents and tangible objects) that tends to prove or disprove the existence

25   of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)."  *DeGeorge v. United States*

26   *District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

27

13

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK
OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF
DOCUMENTS
CASE NO. 3:22-CV-01101-WHA

Plaintiffs object that all documents and communications between Richard Bamberger and any member of the press or media concerning the alleged bribes is overbroad because it is not limited to "evidence" of a bribe. Further, as to Documents (including those of Communications) "relating to Richard Bamberger, including all Communications between Richard Bamberger and You," Plaintiffs object that it is overbroad and improper as phrased. Richard Bamberger is a consulting expert to Plaintiffs' counsel, and thus the only potentially responsive documents would be of communications between Bamberger and any member of the press or media or other third party regarding evidence of a bribe (such as the email already produced from Wired to Bamberger that attached a partial transcript of an alleged internal Meta document). Accordingly, Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and communications that do ***not*** include communications of what would be subject to work product or attorney client privilege. To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and/or work product doctrine. As phrased, this Request could seek documents and communications that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. Further, Plaintiffs object that the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts. To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation. Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall

agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action.  Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs respond to this Request as follows: Plaintiffs will produce any responsive documents between Richard Bamberger and any member of the press or media regarding any evidence of bribe.

## REQUEST FOR PRODUCTION NO. 8:

All Documents and Communications exchanged between You and any member of the press or media—including but not limited to, Dell Cameron and any reporter associated with WIRED, Gizmodo, Forensic News, or the BBC,—relating to alleged bribes or payments sent from anybody associated with OnlyFans to Meta or any of Meta's employees, agents, executives, or representatives, including but not limited to the source or provenance of the Documents Plaintiffs filed at ECF No. 138.

## RESPONSE:

Plaintiffs object that the request as phrased is overbroad, disregards the Court's Order limiting the scope of discovery, and otherwise improper.  On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a reasonable set of document requests regarding any *evidence of bribe*." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe, with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)."  *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

Plaintiffs object that all documents and communications between Plaintiffs "and any member of the press or media" "relating to alleged bribes or payments" is overbroad because it is

15

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

CASE NO. 3:22-CV-01101-WHA

1   not limited to "evidence" of a bribe.  It would include, for example, forwarding a copy of the

2   complaint or a court filing to a member of the media or a request for comment about the case.

3   Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and

4   communications that do ***not*** include communications of what would be subject to work product or

5   attorney client privilege.  To the extent that the request intends to include such documents,

6   including of such communications, Plaintiffs object to the request as overbroad and improper.  To

7   the extent that Defendants are requesting production of documents (including of communications)

8   related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope

9   contradicts the work product privilege position taken to date by Meta Defendants as to facts and

10  other information obtained from their internal investigation(s), and Plaintiffs therefore assert a

11  reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the

12  Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from

13  its internal investigation.  Plaintiffs expect that if any such documents are produced pursuant to

14  agreement by the Parties, then Defendants shall agree to the same scope of discovery for any

15  documents relating to their own investigation regarding the alleged wrongful conduct alleged in

16  this action.  Plaintiffs interpret the time period as pertaining to the scope of discovery related to

17  the operative complaint; to the extent a different time period is intended, Plaintiffs further object

18  that this request is not limited to a reasonable time period.

19          Subject to and without waiving these objections, Plaintiffs respond to this Request as

20  follows: Plaintiffs will produce any responsive non-privileged documents constituting evidence of

21  a bribe exchanged between them and any member of the press or media.

22  **REQUEST FOR PRODUCTION NO. 9:**

23          All Communications with any bank, including but not limited to HSBC Bank, Barclay's

24  Bank, PBCOM, or any Federal Reserve bank, alleged to been involved in alleged wire transfers of

25  bribes to Meta or any of its employees, agents, executives, or representatives, including but not

26  limited to Nicholas Clegg, Nicola Mendelsohn, or Cristian Perrella.

27

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, disregards the Court's Order limiting the scope of discovery, and otherwise improper.  On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document requests regarding any ***evidence of bribe***." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe, with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)."  *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

A different request already requests any productions from the subpoenas issued to any of the banks identified in the request.  Plaintiffs object that all communications between Plaintiffs "and any bank . . . alleged to been involved in alleged wire transfers of bribes to Meta" is overbroad because it is not limited to "evidence" of a bribe.  It would extend, for example, to a communication asking for confirmation of a location for service of process, or other communications that have no substantive nexus to a bribe.  Plaintiffs believe a reasonable interpretation of this request is that it pertains only to communications about the alleged bribes in this case (as opposed to other communications with those banks on unrelated matters), and that it pertains to documents and communications that do ***not*** include communications of what would be subject to work product or attorney client privilege.  To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and/or work product doctrine. To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants

pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation.  Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action.  Plaintiffs interpret the time period as pertaining to the scope of discovery related to the operative complaint; to the extent a different time period is intended, Plaintiffs further object that this request is not limited to a reasonable time period.

Subject to and without waiving these objections, Plaintiffs respond to this Request as follows: Plaintiffs will produce any responsive non-privileged documents constituting evidence of a bribe in any communication with them and any of the banks referenced in the request; at this time, Plaintiffs have no such responsive documents.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and Communications concerning the alleged intermediary for bribe payments, Smart Team International, including any investigation or analysis You conducted to determine whether Smart Team International is associated with any of the defendants in this matter.

**RESPONSE:**

Plaintiffs object that the request as phrased is overbroad, it disregards the Court's Order limiting the scope of discovery, and it is otherwise improper.  On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a reasonable set of document requests regarding any evidence of bribe." (underline in original; emphasis added).

Plaintiffs will produce any "evidence" of a bribe including -- with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

Plaintiffs object that all documents and communications "concerning the alleged intermediary for bribe payments, Smart Team International, including any investigation or analysis You conducted to determine whether Smart Team International is associated with any of the defendants in this matter" is overbroad because it is not limited to "evidence" of a bribe.  Further, at this time, given Defendants' position that no bribe payment occurred through Smart Team, documents about Smart Team are not yet potentially responsive as evidence of a bribe.  Plaintiffs believe a reasonable interpretation of this request is that it pertains to documents and communications that do not include communications with opposing counsel in this litigation or documents or communications of what would be subject to attorney client or work product privilege such as between or among Plaintiffs' counsel, their staff, clients, or consulting experts.  To the extent that the request intends to include such documents, including of such communications, Plaintiffs object to the request as overbroad and improper, including because it seeks documents protected by attorney-client privilege and the work product doctrine that reflect the legal advice and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts.  Certain of the requested documents are protected under the work product doctrine as they include information from counsel's mental impressions and legal conclusions and consulting experts.  To the extent that Defendants are requesting production of documents (including of communications) related to Plaintiffs' counsel's investigation of the alleged bribes, such an unlimited scope contradicts the work product privilege position taken to date by Meta Defendants as to facts and other information obtained from their internal investigation(s), and Plaintiffs therefore assert a reciprocal objection identical to the scope of that asserted by the Meta Defendants pending the Court's adjudication of the issue of the extent to which Meta Defendants must provide facts from its internal investigation.  Plaintiffs expect that if any such documents are produced pursuant to agreement by the Parties, then Defendants shall agree to the same scope of discovery for any documents relating to their own investigation regarding the alleged wrongful conduct alleged in this action. Plaintiffs interpret the time period

19

1    as pertaining to the scope of discovery related to the operative complaint; to the extent a different

2    time period is intended, Plaintiffs further object that this request is not limited to a reasonable time

3    period.

4         Subject to and without waiving these objections, Plaintiffs will produce any responsive

5    documents that are within the scope of the Court's Order, are not privileged, and do not constitute

6    attorney work product.  To the extent this Request calls for documents protected by attorney work

7    product, Plaintiffs are willing to meet and confer with Defendants at a mutually agreeable time

8    and place concerning the scope of this Request.

9    **REQUEST FOR PRODUCTION NO. 11:**

10        Any other Document or Communication You intend or expect to use in this case, including

11   in any motion or at any hearing, to support Your allegations that bribes or payments sent from

12   anybody associated with OnlyFans to Meta or any of Meta's employees, agents, executives, or

13   representatives, including but not limited to Nicholas Clegg, Nicola Mendelsohn, or Cristian

14   Perrella.

15   **RESPONSE:**

16        Plaintiffs object that the request as phrased is overbroad, disregards the Court's Order

17   limiting the scope of discovery, and otherwise improper.  On March 30, 2023, the Court entered a

18   Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document

19   requests regarding any ***evidence of bribe***." (underline in original; emphasis added). A demand for

20   "[a]ll Documents and Communications relating to Richard Bamberger" is wildly overbroad,

21   burdensome and intrusive, seeks documents that are irrelevant, and is inconsistent with the Court's

22   expressed purpose of discovery at this point in the case.

23        Plaintiffs have already said they will produce any "evidence" of a bribe, with evidence

24   meaning "Something (including testimony, documents and tangible objects) that tends to prove or

25   disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge*

26   *v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th

27

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK
OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF
DOCUMENTS
CASE NO. 3:22-CV-01101-WHA

Cir. 2000). To the extent that this request seeks documents other than "evidence" of bribe, it is improper.

Plaintiffs' also object to the terms "[a]ny other Document or Communication You **intend** or **expect to use** in this case" because it is broad enough to seek documents protected by attorney-client privilege and/or work product doctrine, by asking what a lawyer may "intend" or "expect" to do or use in advance of a hearing, or motion, or in the case generally which seeks documents and communications that reflect the legal advice, mental impressions and legal strategies prepared for anticipated or pending litigation by Plaintiffs' attorneys and consulting experts. What Plaintiffs "intend" or "expect to use" is also vague and ambiguous, rather than focusing on the concrete point to which Plaintiffs already agreed, that they Plaintiff will produce "evidence" of a bribe.

Plaintiffs will comply with their discovery and disclosure obligations under the Federal Rules of Civil Procedure, the local rules, and the orders of the Court, including complying with disclosure requirement of FRCP 26(a) as to document and witnesses on which they will rely.

## REQUEST FOR PRODUCTION NO. 12:

All Documents produced to You pursuant to any subpoena issued in this case, including but not limited to documents produced by WIRED, the Federal Reserve, HSBC, or any other banks in the chain of the alleged bribe and all Communications between you and any subpoena recipient.

## RESPONSE:

Plaintiffs object that the request as phrased is overbroad, disregards the Court's Order limiting the scope of discovery, and otherwise improper. On March 30, 2023, the Court entered a Minute Order (Doc. 143) stating in part that "Meta may serve a <u>reasonable</u> set of document requests regarding any **evidence of bribe**." (underline in original; emphasis added). A demand for "[a]ll Documents and Communications relating to Richard Bamberger" is wildly overbroad, burdensome and intrusive, seeks documents that are irrelevant, and is inconsistent with the Court's expressed purpose of discovery at this point in the case.

PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
CASE NO. 3:22-CV-01101-WHA

Plaintiffs will produce any "evidence" of a bribe, with evidence meaning "Something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary 576 (7th ed. 1999)." *DeGeorge v. United States District Court for the Central District of California*, 219 F.3d 930, 937-38 (9th Cir. 2000).

The requests for "All Documents produced to You pursuant to any subpoena issued in this case" exceeds that limited scope, since it purports to apply generally to any subpoena during the case.

Plaintiffs will comply with their discovery and disclosure obligations under the Federal Rules of Civil Procedure, the local rules, and the orders of the Court.  Plaintiffs will promptly provide copies to Defendants of documents produced by third parties.  Plaintiffs are not aware of legal authority requiring them to provide Defendants with ongoing copies of all communications with subpoena recipients as they occur or to include them in all communications with subpoena recipients, or in all communications with them, and requests any authority of that  position.  A communication about a subpoena (such as to schedule a call) is not "evidence" of a bribe, and this beyond the scope of the Court's March 30, 2023 order.


Dated: May 8, 2023

                                            **MILBERG COLEMAN BRYSON**
                                            **PHILLIPS GROSSMAN, PLLC**

                                            /s/ David E. Azar
                                            David E. Azar, ESQ. (SBN 218319)
                                            280 S. Beverly Drive, Suite PH
                                            Beverly Hills, California 90212
                                            Telephone: 1 -866 -252 -0878
                                            Email: dazar@milberg.com

                                            EMERGE LAW GROUP, P.C.
                                            Timothy L. Alger (SBN 160303)
                                            100 Spectrum Center Drive, Suite 900
                                            Irvine, California 92618
                                            Telephone: 949-936-2610
                                            tim@emergelawgroup.com

1

*Attorney for Plaintiffs*

2

3

## <u>CERTIFICATE OF SERVICE</u>

4    I, David E. Azar, an attorney, hereby certify that on May 8, 2023, I caused a true and correct

5  copy of the PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS

6  INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, AND META PLATFORMS, INC.'S

7  FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS foregoing to be served

8  electronically by e-mail to at least one counsel for each party at an email address also used by the

9  Court's CM/ECF system.

10

11                                         /s/ David E. Azar
                                              David E. Azar
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# EXHIBIT 9

# Bank Wires

| From | STIB-HK3 <STIB-HK3@proton.me> |
|------|-------------------------------|
| To   | Tips-milberg@protonmail.com |
| Date | Tuesday, January 24th, 2023 at 2:52 AM |

**17.52 MB**   12 files attached

| | |
|---|---|
| 9C56CD4F-7338-47D4-BEC4-759EF42C8EF7.png 271.51 KB | 8770F244-AA07-4869-84C3-134724C2CB8C.png 266.87 KB |
| C6B88C7C-52A1-4028-A169-A0F9CDE944FC.png 280.63 KB | |
| C70CCBDC-7AE9-48DD-86CB-DE4796488B60.png 296.18 KB | B7A14E5D-426C-4C57-8BCE-79A581F0E02E.jpeg 1.91 MB |
| 32707A94-7C6C-4396-970D-09F1E7695463.jpeg 2.04 MB | 59184ACA-006A-418A-A13F-A6B3A68BBDA8.jpeg 2.17 MB |
| 888ACAF9-F0B4-4D3F-80D7-D3EC7C9A92DB.jpeg 2.18 MB | 8E607336-C05F-4359-906A-310E458F926E.jpeg 2.03 MB |
| 63FD23B1-11CF-4C35-BC2B-3C77E93B1F11.jpeg 2.01 MB | 696D4357-BC98-45DC-B7D1-7FD162F6138C.jpeg 2.03 MB |
| 873108C6-62F9-4474-8667-88AE198B8FC8.jpeg 2.05 MB | |

Dan-Pltf-000001

### Press inquiry: Dangaard v. Instagram

**Dell Cameron** <dell.cameron@gizmodo.com>
Thu 10/6/2022 4:31 PM
To: David Azar <dazar@milberg.com>;Blake Montgomery <bmontgomery@gizmodo.com>

Mr. Azar,

My name is Dell Cameron. I'm a reporter with Gizmodo. I had written up a story today concerning the new information in the amended complaint you filed in Dangaard; in particular any details I could gather about the wire transfers you submitted under seal.

Although I cite the complaint itself extensively, I wanted to see if you had any comment you'd like to add, since I also reached out to Meta and OnlyFans earlier. (Neither had anything to say.)

I appreciate your time.

--
Dell Cameron (he/him)
Sr. Reporter, Gizmodo
dell@gizmodo.com
Ph. 469-387-1810

Dan-Pltf-000002



Conversation between Me and Scott Stedman - page 1 of 3

—— Thursday, Feb 24, 2022 ——

**Scott Stedman**
hey David, too late for a call? Sorry I've been busy
7:08 PM

**Me**
No worries
7:09 PM

**Me**
When are you talking to the source?  If today then we can chat briefly now or in 3 hours plus.  If not then tomorrow.  I have a possible name of the woman and man.
7:11 PM

**Scott Stedman**
would around 1 work?
7:55 PM

**Me**
Sure
8:30 PM

—— Thursday, Aug 25, 2022 ——

**Scott Stedman**
hi David, any updates on the banking/payoff stuff? I've been unable to confirm much of anything beyond the fact that Smart Team banked at HSBC
12:19 PM

Dan-Pltf-000003

Conversation between Me and Scott Stedman - page 2 of 3

**Me**
Not yet
12:41 PM

--- Thursday, Sep 15, 2022 ---

**S** **Scott Stedman**
is the payment to smart team from fenix the hong kong branch of fenix?
12:14 PM

**S** **Scott Stedman**
or uk?
12:14 PM

**Me**
UK Fenix wire to smart team hong Kong I understand.  It looks like they didn't bother to first send that money to Hong Kong Fenix.
12:16 PM

--- Wednesday, Sep 28, 2022 ---

**S** **Scott Stedman**
I was able to confirm that Smart Team has had a long standing relationship with HSBC
3:04 PM

--- Sunday, Oct 16, 2022 ---

Dan-Pltf-000004

Conversation between Me and Scott Stedman - page 3 of 3

 **Scott Stedman**



hey David, are you able to share this or point me in a direction?

http://63.55.100.87/servlets /mms?message-id= 0811608DDC560000ADC0000201

1:56 PM

 **Scott Stedman**

I know its RJ

1:56 PM

**Me**

yes.  and we got contacted by someone who used to work closely with RJ on OnlyFans, before getting fired, who has some inside information.

1:58 PM

**Me**

We have the name of RJ and someone who assists him, who apparently is based in the Phillipines.

1:58 PM

 **Scott Stedman**

holy shit, just confirmed the Deanna Visperas/OnlyFans connection

2:10 PM

 **Scott Stedman**

independent of RJ

2:11 PM

Dan-Pltf-000005

# MEMORANDUM

| | |
|---|---|
| **TO:** | Lauren Moxley Beatty/Collin Anderson |
| **FROM:** | Richard R. Brown, Esq. |
| **DATE:** | May 19, 2022 |
| **RE:** | Facebook/Instagram Suspect Activity/Terrorist Content List |

Per our telephone discussion of the past week, you requested that I forward to you public information about Facebook (META) and the possibility that certain employees engaged in serious and possible illegal activity and corrupt business practices resulting in providing false and misleading information to shared industry terrorist databases for the purpose of causing competition in a given industry, in this case the Adult Entertainment industry (AE), to be put at a competitive disadvantage with a competitor, in exchange for significant repeated kickbacks to individuals who have been in high executive positions at Facebook.

In order for the scheme to work it is alleged that certain employees or former employees at Facebook would use their positions there to enter into an agreements with a specific adult entertainment business to undermine their AE competition by causing the names of each major competitor in the business to be surreptitiously listed on Facebook's own terrorist databank, which then could also be share with terrorist lists, as the Global Internet Forum to Counter Terrorism, GIFCT. Thus, this false corrupted terrorist list would then be distributed to many other social platforms. The corrupt alleged AE business enjoyed an internet boom while many of their major competitors online listings disappeared because they had falsely been listed as terrorist organizations and were precluded from being listed in the most popular social media websites.

With the manipulation of the terrorist contact list, it had become almost impossible for adult entertainment websites to get their respective products out into the open market. So that you are aware, Facebook is part of The Global Internet Forum to Counter Terrorist (GIFCT https://gifct.org). With the manipulation purportedly by Facebook, it would affect the whole GIFCT algorithm as once content or content producer is flagged as a terrorist group, the AI behind the algorithm thinks that the contact is promoting terrorism. Once content is flagged as terrorist content by one member of the GIFCT it is automatically then flagged across all GIFCT platforms, the result is that competitors advertising is banned unjustly from the social platforms.

This misconduct can easily be applied to other areas of commercial business and competition can be destroyed if this type of misbehavior is allowed to continue.

Given the apparent misuse of these blacklisting databases, there are significant consequences. Competition, in this case, the adult entertainment industry, is materially

Dan-Pltf-000006

negatively interfered with and one competitor is able to get an unfair competi
at the expense of the public; while one may not care too much for the adult ᴜ
business, if it can happen here, and it has, then any other competitive busines⸝
affected by this same type of misconduct.  This is in addition to the misuse of the ᴜ
shard classification/filtering database to block terrorist content (as well as spam accounts ̦
fake accounts) from creeping onto the internet.  The Global Internet Forum to Counter
Terrorism (GIFCT) shared hash database is one of systems, that is injured by misconduct.

This brings us to the purpose of the proposed meeting, which is to share very important
credible evidence not yet available to the public that my client believes would clearly and
overwhelmingly demonstrate significant evidence that certain high-level individuals
associated with Facebook now or in the past misused their platform for economic gain.
Further, my client believes that Facebook was engaged in a coverup of their own internal
investigation by hiding, as opposed to exposing, this misconduct.  While the documents are
not in Connecticut, arrangements can be made to make them immediately available for you
to review and decide for yourself whether there is sufficient evidence to commence an
investigation.

The corruption of lists used by multiple social media companies to "blacklist" organizations
bent on doing harm to the people of the United States, materially affects the ability of non-
governmental, as well as governmental organizations to do their respective jobs to protect the
public.  On February 24, 2022 BBC published an article, attached hereto, where it was
alleged that certain Facebook employees for self-serving reasons, conspired with an adult
business, "Only Fans" to cause other websites to Only Fans to suffer significant competitive
losses.  It is further claimed that social media content of adult performers from rival websites
to Only Fans was placed on a database of terrorist material shared between tech companies
that is run by the Global Internet Forum to Counter Terrorism (GIFCT).  The database used
by Facebook, YouTube and Twitter, for example, flags terror content to other members so
they can moderate similar content on their respective platforms. See attached article.

When false and misleading information of a company is circulated to the various social
media platforms, it causes these platforms, in the interest to the safety of the United States
and its people, to delist or refuse to list these companies that have been falsely accused.
When false and misleading information is intentionally added to a database of being terrorist,
it corrupts the system that evolved over the years to the point that social media groups and
others may hesitate to act upon such terrorist list; all at the expense of our national security.
This should not be tolerated.  Feel free to call me to discuss.  860-522-3343.

Enclosures.

Dan-Pltf-000007





They created this legal fiction and are even taking official stances that OnlyFans isnt a porn site. It's such a joke. I truly think it is putting the entire Company at risk and I really need to speak out so someone gets to the bottom of this. I've heard rumors that the guy behind OnlyFans has tied to russian intelligence and people are truly scared to speak out.

I have heard further rumors that the competitors are catching wind of this and a big lawsuit is coming. We need to limit our exposure right away.

I'm having a friend submit this on an anonymous device on a VPN from a remote location, for my own safety. You will not be able to follow up with me. Please get to the bottom of this. I want my stock options to stay valuable and provide for my children. This could be the straw that broke the camel's back and gets 230 revised or otherwise gets us regulated.

Who's involved in or aware of what happened?
→ EMEA team, Integrity, Machine Learning, pretty much everyone under Mendelsohn. I think she is getting the biggest kickbacks as scary as that is

When did it happen?
→ Beginning in summer of 2018 apparently

How did you become aware?
→ I observed it

How did you become aware?
→ I observed it

In what country did this take place?
→ United Kingdom

Case status
→ New case / Assessment started

# Inbox

Incident number: r4XT3H

Send*

Please enter information...



Dan-Pltf-000010





5/7/23, 3:57 PM                              Sent | d2021case@protonmail.com | Proton Mail

# re [2] follow the money....

| | |
|---|---|
| From | tips-milberg <tips-milberg@protonmail.com> |
| To | STIB-HK<STIB-HK@protonmail.com> |
| Date | Friday, January 20th, 2023 at 11:55 PM |

Hello.  As an update, the Fenix entities are saying that no such account(s) existed for them and that HSBC did not have records of the wire transfers you listed.  Would you please consider sending me actual wire transfer documents you have, so that we can try to figure this out?

Thank you.

Sent with [Proton Mail](Proton Mail) secure email.

Dan-Pltf-000013

# EXHIBIT 10

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

DAWN DANGAARD, *et al.*,

          Plaintiffs,

     v.

INSTAGRAM, LLC, *et al.*,

          Defendants.

CASE NO. 3:22-cv-01101-WHA

**DECLARATION OF SIR NICHOLAS CLEGG**

I, Nicholas Clegg, declare as follows:

1.    I have personal knowledge of the matters in this declaration, and I am competent to testify to the matters set forth below.

2.    From May 5, 2005, to May 3, 2017, I served as a Member of the Parliament of the United Kingdom in the House of Commons.  In addition, from May 11, 2010, to May 8, 2015, I served as the Deputy Prime Minister of the United Kingdom.

3.    On October 22, 2018, I began my employment with Facebook Operations, LLC as Vice-President of Global Affairs and Communications, in which role I oversaw Facebook's communications and content policies.

4.    In February 2022, I was elevated to the position of President, Global Affairs at Meta Platforms, Inc., a role in which I oversee Meta's Global Policy group, among other responsibilities, and in which role I continue to serve today.

5.    I have reviewed the Second Amended Class Action Complaint filed in this matter ("Complaint").  That Complaint alleges, in essence, that I accepted bribes from individuals associated with OnlyFans in exchange for agreeing to "blacklist" adult entertainment providers who had "promoted, or affiliated online with, any of OnlyFans' competitors, and thus to suppress traffic to OnlyFans' competitors." ECF No. 74, ¶ 97.  That allegation is categorically false.  I have never accepted any "bribes" or any monetary payment from *anyone* (including OnlyFans) in exchange for actioning adult entertainment-related content on Meta's platforms.  The claim that I would accept bribes in exchange for taking actions to "blacklist" competitors of OnlyFans is preposterous and false.

6.    I am aware that the plaintiffs in the above-captioned matter allege that an entity named "Smart Team made a transfer to a Trust account at PBCOM [The Philippine Bank of Communications] in the name of ██████████  ██████████.  ECF No. 74, ¶ 81.  I have no knowledge of any such transfer, and I believe this to be a false allegation.  Neither I nor any member of my immediate family—including my ████████  ████████—has ever held a bank account of any kind at The Philippine Bank of Communications or any other Philippine financial institution.  I have never heard of an entity named

Smart Team, and to my knowledge neither I nor any member of my immediate family has ever received a wire transfer from an entity named Smart Team.

7.    I am aware that plaintiffs in the above-captioned matter also allege that the purported payments from Smart Team were in fact payments from Fenix International Ltd.  ECF No. 74, ¶ 78.  I have never received payments from Fenix International Ltd. or to my knowledge any entity that is affiliated with OnlyFans.  To my knowledge, neither has any member of my immediate family, including my ▮▮▮▮▮ received payments of such kind in any form.

8.    I have reviewed Exhibit D to plaintiffs' Second Amended Complaint, ECF No. 75-4, which purports to contain information regarding wire transfers from entities associated with OnlyFans to a trust account at PBCOM in the name of my ▮▮▮▮ ▮▮▮▮▮▮.  I have no knowledge of, awareness of, or familiarity with the alleged wire-transfer transactions referenced in Exhibit D.

9.    I am further aware that plaintiffs in the above-captioned matter allege that I "was able to direct that data be entered into the Threat Exchange and/or GIFCT databases."  ECF No. 75-3, ¶ 81.  I have never directed that data associated with adult-entertainment platforms be entered into the Threat Exchange or the GIFCT database.  Neither have I directed that data associated with adult entertainers be entered into the Threat Exchange or the GIFCT database.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 23rd day of March 2023, in London, United Kingdom.

_____
Sir Nicholas Clegg

# EXHIBIT 11

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DAWN DANGAARD, *et al.*, | CASE NO. 3:22-cv-01101-WHA |
| Plaintiffs, | **DECLARATION OF NICOLA MENDELSOHN** |
| v. | |
| INSTAGRAM, LLC, *et al.*, | |
| Defendants. | |

I, Nicola Mendelsohn, declare as follows:

1.     I have personal knowledge of the matters in this declaration, and I am competent to testify to the matters set forth below.

2.     In June 2013, I began my employment with Facebook as the Vice-President for Europe, and the Middle East and Africa (EMEA), a position I occupied until October 2021.

3.     In October 2021, I was elevated to the position of Vice-President of Meta's Global Business Group, in which role I oversee Meta's global advertising business.  In February 2023, I was elevated to the position of Head of the Global Business Group and Partnerships.

4.     I have reviewed the Second Amended Class Action Complaint filed in this matter ("Complaint").  That Complaint alleges, in essence, that I accepted bribes from individuals associated with OnlyFans in exchange for agreeing to "blacklist" adult entertainment providers who had "promoted, or affiliated online with, any of OnlyFans' competitors, and thus to suppress traffic to OnlyFans' competitors."  ECF No. 74, ¶ 97.  That allegation is categorically false.  I have never accepted any "bribes" or any monetary payment from *anyone* (including OnlyFans) in exchange for actioning adult entertainment-related content on Meta's platforms.  The claim that I would accept bribes in exchange for taking actions to "blacklist" competitors of OnlyFans is preposterous and false.

5.     I am aware that the plaintiffs in the above-captioned matter allege that an entity named "Smart Team made transfers to 'Nicola Mendelsohn Trust' at PBCOM [The Philippine Bank of Communications] in five transactions between 2017 and 2019.  ECF No. 75-3, ¶ 82.  I have no knowledge of any such transfer, and I believe this to be a false allegation.  Neither I nor any member of my immediate family has ever held a bank account of any kind at The Philippine Bank of Communications or any other Philippine financial institution.  I have never heard of an entity named Smart Team, and to my knowledge neither I nor any member of my immediate family has ever received a wire transfer from an entity named Smart Team.

6.     I am aware that plaintiffs in the above-captioned matter also allege that the purported payments from Smart Team were in fact payments from Fenix International Ltd.  ECF No. 74, ¶ 78.  I have never received payments from Fenix International Ltd. or to my knowledge any entity that is

affiliated with OnlyFans.  To my knowledge, neither has any member of my immediate family received payments of such kind in any form.

7.    I have reviewed Exhibit D to plaintiffs' Second Amended Complaint, ECF No. 75-4, which purports to contain information regarding wire transfers from entities associated with OnlyFans to a trust account at PBCOM in my name.  I have no knowledge of, awareness of, or familiarity with the alleged wire-transfer transactions referenced in Exhibit D.

8.    I am further aware that plaintiffs in the above-captioned matter allege that I "was able to direct that data be entered into the Threat Exchange and/or GIFCT databases."  ECF No. 75-3, ¶ 82.  I have never directed that data associated with adult-entertainment platforms be entered into the Threat Exchange or the GIFCT database.  Neither have I directed that data associated with adult entertainers be entered into the Threat Exchange or the GIFCT database.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 23rd day of March 2023, in London, United Kingdom.

_____
Nicola, The Lady Mendelsohn CBE

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DAWN DANGAARD, *et al.*, | CASE NO. 3:22-cv-01101-WHA |
| Plaintiffs, | **DECLARATION OF CRISTIAN PERRELLA** |
| v. | |
| INSTAGRAM, LLC, *et al.*, | |
| Defendants. | |

I, Cristian Perrella, declare as follows:

1.  I have personal knowledge of the matters in this declaration, and I am competent to testify to the matters set forth below.

2.  In September 2010, I began my employment with Facebook as the Head of Law Enforcement Outreach for Europe, and the Middle East and Africa (EMEA), and I am now the Director of Law Enforcement Outreach for EMEA, in which role I interface with law enforcement personnel, and, among other things, coordinate with internal Meta teams focusing on counter-terrorism regarding information I receive from law enforcement.

3.  I have reviewed the Second Amended Class Action Complaint filed in this matter ("Complaint"). That Complaint alleges, in essence, that I accepted bribes from individuals associated with OnlyFans in exchange for agreeing to "blacklist" adult entertainment providers who had "promoted, or affiliated online with, any of OnlyFans' competitors, and thus to suppress traffic to OnlyFans' competitors." ECF No. 74, ¶ 97. That allegation is categorically false. I have never accepted any "bribes" or any monetary payment from *anyone* (including OnlyFans) in exchange for actioning adult entertainment-related content on Meta's platforms. The claim that I would accept bribes in exchange for taking actions to "blacklist" competitors of OnlyFans is preposterous and false.

4.  I am aware that the plaintiffs in the above-captioned matter allege that an entity named "Smart Team made several transfers to 'Cristian Peralta Trust' at PBCOM [The Philippine Bank of Communications] in 2018." ECF No. 75-3, ¶ 83. My name is not now, nor has it ever been "Cristian Peralta," and I have never been known by that name. Additionally, I have no knowledge of any such transfer, and I believe this to be a false allegation. Neither I nor any member of my immediate family has ever held a bank account of any kind at The Philippine Bank of Communications or any other Philippine financial institution. I have never heard of an entity named Smart Team, and to my knowledge neither I nor any member of my immediate family has ever received a wire transfer from an entity named Smart Team.

5.  I am aware that plaintiffs in the above-captioned matter also allege that the purported payments from Smart Team were in fact payments from Fenix International Ltd. ECF No. 74, ¶ 78. I

1   have never heard of or received payments from an entity named Fenix International Ltd. or to my

2   knowledge received payments from any entity that is affiliated with OnlyFans. To my knowledge, neither

3   has any member of my immediate family received payments of such kind in any form.

4        6.    I have reviewed Exhibit D to plaintiffs' Second Amended Complaint, ECF No. 75-4, which

5   purports to contain information regarding wire transfers from entities associated with OnlyFans to a trust

6   account at PBCOM in the name of "Cristian Peralta." I have no knowledge of, awareness of, or familiarity

7   with the alleged wire-transfer transactions referenced in Exhibit D, and my name is not "Cristian Peralta."

8        7.    I am further aware that plaintiffs in the above-captioned matter allege that my "position of

9   trust within Meta, and [my] expertise in Facebook's cybersecurity operations and responses to human

10   trafficking, meant that [I] was well-positioned to illicitly enter data (or direct subordinates to enter data)

11   to the Threat Exchange and GIFCT databases." ECF No. 75-3, ¶ 82. I have never directed that data

12   associated with adult-entertainment platforms be entered into the Threat Exchange or the GIFCT database.

13   Neither have I directed that data associated with adult entertainers be entered into the Threat Exchange or

14   the GIFCT database. I do not even have access to the Threat Exchange or the GIFCT database.

15        I declare under penalty of perjury under the laws of the United States of America that the foregoing

16   is true and correct. Executed on this 23rd day of March 2023, in Milan, Italy.

17

18

19             Cristian Perrella

20

21

22

23

24

25

26

27

28

# EXHIBIT 13

# EXHIBIT 1

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAWN DANGAARD, *et al.*,

 Plaintiffs,

 v.

INSTAGRAM, LLC, *et al.*,

 Defendants.

CASE NO. 3:22-CV-01101-WHA

**DECLARATION OF SABRINA MANNAI IN SUPPORT OF META DEFENDANTS' RESPONSE TO PLAINTIFFS' ADMINISTRATIVE MOTION TO CONSIDER WHETHER CERTAIN MATERIALS SHOULD BE SEALED**

I, Sabrina Mannai, declare as follows:

1. I have personal knowledge of the matters in this declaration, and I am competent to testify to the matters set forth below.

2. A WIRED reporter reached out to Meta in January of 2023 when WIRED was considering publishing an article based on a document that purports to be an alleged "report" of an internal Meta "investigation," dated October 2019.

3. WIRED would not give Meta's representative an actual copy of the alleged "report" but provided its alleged title, the time and place of the alleged wrongdoing, and several excerpts purportedly from the alleged "report." I have reviewed the "transcript of an alleged internal Facebook document" in Exhibit A to Plaintiffs' Application for Leave to File Supplementation of (1) Plaintiffs' Portion of Rule 26(f) Report, and (2) Plaintiffs' Proposed Supplement in Support of Jurisdiction Over Fenix Defendants, with Recently Obtained Transcript of an Alleged Internal Facebook Document About the Alleged Scheme (ECF Nos. 138-2 and 138-3), and the information and language in the alleged "transcript" corresponds with some of the excerpts we received in January 2023 from WIRED.

4. Using sophisticated technical tools and employees specializing in identifying information relevant to litigation, Meta searched multiple relevant documentary sources trying to locate the alleged "report" or anything relating to the allegations made in the alleged "report" by using keyword search terms based on the excerpts provided by WIRED. These search terms would also capture the "document" that is allegedly being transcribed in plaintiffs' Exhibit A, to the extent such a document exists in Meta's files.

5. Meta found no documents relating to the investigation described in the alleged "report," no evidence the alleged "report" itself ever existed, no evidence of the allegations contained in the alleged "report," and no evidence that such an investigation took place.

6. There are other indications that the alleged "report" is a fabrication. First, the alleged "report" uses certain terms to refer to internal Meta that are not used at Meta, which would not be the case if the alleged "report" was accurate. Second, the alleged "report" includes purported descriptions of certain technical systems and processes at Meta that are inaccurate and do not describe how Meta systems

and processes actually function, which is again not something that would occur if the alleged "report" was accurate.

7.     Since WIRED's first communication in relation to the alleged "report," Meta has conducted privileged discussions with more than 30 employees, including individuals who would have been aware of such an investigation if it existed, and has not found a single employee who could recall any of the allegations apparently made in the alleged "report," any investigation into them, or any such allegations against the individuals named in the alleged "report."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 4th day of April 2023, in Washington, D.C.

*Sabrina Mannai*

Sabrina Mannai

Associate General Counsel, Special Investigations, Meta Platforms, Inc.