1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAWN DANGAARD, KELLY GILBERT,
JENNIFER ALLBAUGH, and all other
similarly situated,

             Plaintiffs,

      v.

INSTAGRAM, LLC, FACEBOOK
OPERATIONS, LLC, META
PLATFORMS, INC., and JOHN DOES 1-
10,

             Defendants.

No.  C 22-01101 WHA

**ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
MOTION TO STRIKE**

**INTRODUCTION**

In this putative class action, plaintiffs allege that defendants are engaged in unfair

competition, and intentional interference with contracts and business relationships.  Defendants

have filed a motion for summary judgment and motion to strike expert testimony.  A period of

supplemental discovery and briefings was then permitted (Dkt. No. 273).  Now that the

supplemental filings are complete, the motion for summary judgment is hereby **GRANTED**, and

the motion to strike is **GRANTED IN PART**.

**STATEMENT**

1.     **FACTUAL HISTORY**

Plaintiffs Dawn Dangaard, Kelly Gilbert, and Jennifer Allbaugh are adult entertainment

performers who use social media to disseminate their content and promote themselves.

United States District Court
Northern District of California

1    Plaintiffs post links on social media to adult entertainment websites, which allow users to

2    watch plaintiffs' content for a price.  Currently, one of the most heavily used online platforms

3    for adult entertainment is a website called "OnlyFans."  While some of the plaintiffs may have

4    used this adult entertainment website, plaintiffs have also contracted with competitors of

5    OnlyFans.  Defendant Meta Platforms, Inc., owns and operates defendants Instagram, LLC,

6    and Facebook, LLC (collectively, "Meta defendants").  John Does One through Ten were

7    employees of Meta defendants when the claims arose.  This action included three additional

8    defendants when it was first filed in 2022: Fenix International, Ltd., Fenix Internet, LLC, and

9    Leonid Radvinsky who were associated with OnlyFans.

10       In 2022, the BBC published an interview with an anonymous adult performer and an

11   anonymous adult entertainment platform.  The performer stated that their social media account

12   had been flagged by an employee of a social media platform which led to reduced visibility of

13   the account.  Plaintiffs' counsel subsequently received anonymous tips regarding alleged wire

14   transfers affiliated with the Fenix defendants.  With this whistleblowing article and anonymous

15   tips, plaintiffs filed the instant action in February 2022 with the following allegations: plaintiffs

16   experienced a precipitous drop in web traffic from 2018 to 2019 which could only be attributed

17   to a blacklisting scheme that was directed towards plaintiffs because they were utilizing adult

18   entertainment platforms that compete with OnlyFans.

19       Plaintiffs allege that defendants conspired in an anticompetitive scheme to boost the

20   popularity of OnlyFans to the detriment of plaintiffs through two tactics: bribery and

21   blacklisting (Second Amd. Compl. ¶¶ 63, 84).  Fenix defendants allegedly paid Meta

22   defendants to delete or decrease the visibility of plaintiffs' accounts and posts on Instagram.  In

23   return for accepting bribes from Fenix defendants, Meta defendants allegedly reduced the web

24   traffic of competitors of OnlyFans, in part by suppressing their online visibility.

25       More specifically, plaintiffs allege a blacklisting scheme whereby Meta defendants

26   caused such demotion or removal by manipulating Facebook and Instagram databases to

27   include plaintiffs in lists of dangerous individuals or organizations ("DIO List").  Such lists

28   identify terrorists, and Facebook and Instagram's algorithms use those lists to demote or

remove terrorist content.  Plaintiffs also allege that Meta defendants share their lists of terrorists with other social media platforms via the "Global Internet Forum to Counter Terrorism" ("GIFCT") shared hash database.

Taken together, plaintiffs allege that both tools "would have served as the ideal training data for a classifier/filtering tool to create this blacklisting effect, particularly in 2018 and 2019.  No other tool then in existence could have produced this effect" (Second Amd. Compl. ¶ 61).  Plaintiffs argue that this conduct constitutes unfair competition and tortious interference with plaintiffs' contracts and business relationships (with competitors of OnlyFans).  Plaintiffs seek to hold Meta defendants vicariously liable for the actions of Doe defendants.

The allegations and claims of relief have shifted throughout the course of this action.  This order will therefore briefly review this action's procedural history.

## 2.   PROCEDURAL HISTORY

Plaintiffs filed the original complaint as a putative class action in February 2022 and filed their first amended complaint in September in 2022 (Dkt. No. 4).  Meta defendants moved to dismiss all claims under Rule 12(b)(6) and California's anti-SLAPP statute (Dkt. No. 41).  During the hearing for defendant's motion, plaintiffs informed the Court that they had information outside of the pleadings that may support their claims for bribery and blacklisting.  The Court granted plaintiffs leave to file a second amended complaint and ordered defendants to re-brief their motions based on the new complaint.  Again, all defendants moved to dismiss the second amended complaint under Rule 12(b)(6).

Defendants' motion to dismiss was denied and an order permitted the case to go forward on the grounds that, at that time, plaintiffs had sufficiently alleged that web-traffic had precipitously dropped off during the relevant period and plaintiffs sufficiently alleged claims of bribery and blacklisting (Dkt. No. 101).  Specifically, that order found that the whistleblower article referenced in the second amended complaint supported plaintiffs' claims (*ibid*.).  For this reason, that same order permitted broad discovery for plaintiffs to take discovery and to further investigate the existence of the alleged bribes.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  In March 2023, all parties appeared for a case management conference.  During that
2  hearing, plaintiffs were ordered to serve subpoenas on several banks and third parties in order
3  to prove up their bribe allegations.  Likewise, Meta defendants were permitted to serve
4  plaintiffs with reasonable sets of document requests relating to the bribe allegations.  By July
5  2023, however, plaintiffs withdrew the allegations of bribery because they could "no longer
6  certify that the particular factual contentions . . . will likely have evidentiary support after a
7  reasonable opportunity for further investigation" (Dkt. No. 172).

8  Shortly thereafter, an order dismissed defendants Fenix International Limited, Fenix
9  Internet LLC, and Leonid Radvinsky for lack of specific personal jurisdiction (Dkt. No. 178).
10  In another hearing in August 2023, the undersigned judge, being concerned that plaintiffs'
11  counsel had sweeping allegations but slow to seek proof, urged the parties to invest in this
12  action and again authorized broad discovery into the merits.  And again, in September 2023, an
13  order was issued reiterating that discovery was open (Dkt. No. 193).

14  In March 2024, plaintiffs filed a motion to dismiss their own case for lack of subject-
15  matter jurisdiction.  Mere hours later, Meta defendants filed a motion for summary judgment
16  on all claims.  Meta defendants also filed a motion to exclude and strike plaintiffs' proffered
17  experts who are in fact two of the named plaintiffs: Dawn Dangaard and Kelly Gilbert.  Also of
18  note, plaintiffs never moved for class certification.

19  Counsel fully briefed all three motions.  In preparation for oral argument, the
20  undersigned judge also asked several questions, which will be discussed in due course.  This
21  order will now briefly summarize the main issues and concerns raised during oral argument in
22  May 2024 and the subsequent period of supplemental discovery.

23  ### A.    MAY 2024 HEARING

24  Each side presented their respective dispositive motions during the May 2024 hearing.
25  Again, the central claims in this action involve the alleged misuse of databases for "terrorist
26  content" and "dangerous individuals and organizations" (Br. at 9).  Specifically, plaintiffs have
27  alleged that one or more DOI Lists combined with the GIFCT shared hash database has created

28

4

a blacklisting effect that has impacted adult artists who have promoted or affiliated with OnlyFans' competitors (Second Amd. Compl. ¶ 58).

### (i) Meta's Use of a DOI List

Meta's use and maintenance of their DOI List was a major topic of discussion during the May 2024 hearing. Most importantly, Meta defendants stated in their summary judgment motion that because the DOI List was a "living document," Mr. Patrick James's reviews were "necessarily done as of the dates on which he conducted the searches" (Br. at 10).

In plaintiffs' motion to dismiss for lack of subject-matter jurisdiction, plaintiffs had taken this to mean that "there is no archived version of the DOI list . . . [t]herefore, the only way to search that database is as of a particular date, which provides a contemporaneous snapshot as of that date" (Dkt. No. 236 at 10; Azar Decl. ¶ 18). Additionally, in plaintiffs' opposition to the motion for summary judgment, they acknowledged that defendants "do[] not have the data to know, one way or another, whether or not its terror list . . . was manipulated . . . to benefit the OnlyFans adult entertainment platform" (Reply Br. at 1). This concession revealed a major pitfall in plaintiffs' case: due to the manner in which Meta defendants maintained the DOI List, neither side can confirm or deny whether an individual was on the List during the relevant period between 2018 and 2019.

The undersigned judge expressed both concern towards Meta's recordkeeping practices and a degree of skepticism that neither side was able to ascertain whether any of the plaintiffs appeared on Meta's DOI List during the relevant period. Among other questions, the undersigned judge asked Meta defendants: (1) where in the summary judgment record there is anything under oath explaining that the DOI List is a "living document" and (2) if there was or is now any way to retrieve an archived version of the DOI List. Counsel for Meta defendants repeated that the DOI List is a "living document" but they did not provide a declaration or a sworn statement stating such in the record. Moreover, counsel for Meta defendants confirmed that because they do not have a practice of archiving copies of the DOI List, they are unable to determine who was included in the List during the relevant period. They were, however, able to review versions of the list in August 2022, November 2023, and January 2024 and

confirmed that none of the plaintiffs or their platforms appeared on the List as of those searches.

Likewise, the undersigned judge asked plaintiffs what evidence they have to prove that they experienced a precipitous drop off in web traffic.  Counsel for plaintiffs responded that they could not provide a clear answer because Meta does not keep referral traffic for more than forty days, nor does it retain engagement metrics data for more than ninety days.

On both of these issues—the DOI List and plaintiffs' referral traffic data—plaintiffs' counsel had taken zero depositions.  Characterizing it as a deliberate and strategic decision, plaintiffs' counsel maintained that they did not wish to give Meta defendants an opportunity to change their responses to interrogatories or document requests through depositions.

### (ii)      Order to File Declarations

At the end of the May 2024 hearing, counsel for both sides were required to file a declaration under oath that statements made during oral argument were accurate.  Counsel were also ordered to provide clarifications to any of the undersigned judge's questions if necessary.

Meta defendants provided the following information on the issue of whether there was any blacklisting through the DOI List or the GIFCT shared hash database.  In their declaration, Meta's counsel stated that in 2018 and 2019, designations were approved by a member of what is now called Meta's content policy team.  Since 2019, Mr. James joined Meta as a DOI Policy Manager, and the designation process evolved.

Currently, there is a multistage nomination process to be placed on the DOI List, which is primarily done by a team of experts within Meta who work under Mr. James.  This team then compiles a package of evidence which is reviewed by a cross-functional team at Meta which includes the DOI Policy Team, DOI Process Team, Core Policy Team, Strategic Response Policy, Legal, Communications, and several other departments (Allen Decl. at 3).  The designations are ultimately approved by the DOI director, the strategic response director, and a core policy director.  If the designation decision is not unanimous, it is escalated to a more senior member of content policy leadership, who ultimately makes the final decision (*ibid.*).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    When asked whether it is possible to bypass the nomination process, counsel for defendants

2    stated that while it is theoretically possible, it "also technically difficult" to do so, and that after

3    a reasonable investigation, "Meta found no evidence that such a bypass occurred here" (*id*. at

4    5).

5          Most importantly, however, Meta's counsel revealed a discovery oversight.  Although

6    Meta defendants had previously produced what they considered as constituting records of

7    enforcements of the plaintiffs' accounts, they did not include other records of any of the

8    plaintiffs' posts that "were subject to other actions that were not clearly identified as

9    constituting enforcements" (*ibid*.).  Here, there were three instances in which plaintiff

10   Allbaugh posted images that were similar or possibly similar to content in two counter-

11   terrorism banks.  The images consisted of text against a background.

12         Meta's counsel for defendants clarified that Meta had determined that the images were

13   likely "false positives" and "after reasonable investigation," defendants found "no evidence"

14   that these three images resulted in or were caused by plaintiffs being blacklisted, their names

15   being added to the DOI List, or being hashed into the GIFCT.  Lastly, the declaration offered

16   an additional thirty days of discovery on the issue.

17         Regarding counsel for plaintiffs' declaration, two points are of note.  *First*, plaintiffs'

18   counsel protested against permitting supplemental discovery because they did not wish to give

19   defendants an opportunity to correct their discovery missteps. *Second*, plaintiffs' counsel

20   clarified that referral traffic (as opposed to internet search traffic) was at issue (Azar Decl. at 6-

21   7).

22              **(iii)**      ***Order to Conduct Supplemental Depositions and Briefings***

23         Defendants were ordered to file a supplemental declaration as to why and how the

24   documents were not previously produced.  To that end, plaintiffs were also ordered (Dkt. No.

25   273) to conduct depositions as to why and how Meta's supplemental productions were not

26   previously produced, and the merits issues raised by the documents in Meta's June and July

27   productions.  Further, plaintiffs were permitted to file a supplemental brief to address whether

28   and to what extent their findings impacted their opposition to the motion for summary

judgment.  Meta defendants were then permitted to file an opposition brief.  This order will now provide a brief overview of this supplemental briefing period.

**B.** ***SUPPLEMENTAL DISCOVERY PERIOD FROM JULY 2024 TO SEPTEMBER 2024***

In their supplemental brief, plaintiffs raise three main points.  *First*, plaintiffs allege that even after completing supplemental depositions, Meta does not know the full impact of the "matches" between plaintiff Allbaugh's posts and content in two counter-terrorism banks. Plaintiffs argue that Meta cannot confirm whether or not plaintiff Allbaugh's content was sent to the GIFCT shared hash database or if the "matches" created any negative signals that might connect her to terrorism for moderation purposes.

*Second*, plaintiffs request that the Court instruct a jury, should this proceed to trial, on an adverse inference that the above-mentioned effects are possible.  Alternatively, plaintiffs request that the Court preclude Meta defendants' from denying that those effects are possible. This order finds that a jury instruction permitting an adverse inference is unwarranted. Plaintiffs made a deliberate decision to not take any depositions prior to this Court's order (Dkt. No. 273) and missed out on ample opportunities to develop this record further.  Instead of raising concerns much earlier regarding Meta defendant's compliance with discovery requests and requirements, plaintiffs chose to proceed—in their own words—like "ships passing in the night" (May 29, 2024, Tr. at 37).

*Third*, plaintiffs request that the Court compel Meta defendants to produce additional documents and information (including privileged information) related to an internal investigation completed by Meta defendants in the fall of 2021 and spring of 2022.  Plaintiffs argue that it is "not clear" whether all documents responsive to plaintiffs' previous document requests "were actually produced, or collected but then withheld" (Dkt. No. 301-3 at 31). Plaintiffs concede that some of the documents in this investigation would be protected by attorney work-product.  They attempt to argue, however, that those materials should still be disclosed because the underlying facts are discoverable and they have "substantial need." FRCP 26(b)(3)(A).  According to plaintiffs, they have been "stymied in presenting direct

evidence" of their claims due to Meta's "inability or unwillingness" to provide records (Dkt. No. 301-3 at 29).   This order is not convinced.  Plaintiffs have not raised any discovery disputes prior to the instant motions and therefore have not demonstrated substantial need.

 It is concerning that Meta had overlooked producing records. Nevertheless, as this order will explain in more detail, it does not move the needle; there is insufficient evidence to proceed past summary judgment.

With the benefit of the initial briefing, oral argument, and supplemental briefing, this order now turns to the instant two motions.  This entire case proceeded first**,** on the withdrawn bribe allegations, and thereafter, on a now-failed allegation of blacklisting.  Plaintiffs have developed no proof sufficient to go to a jury on any of these claims.

## ANALYSIS

1.     MOTION FOR SUMMARY JUDGMENT

A.     Legal Standard.

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986).  Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  A dispute is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–249 (1986).  In this analysis, all reasonable inferences must be drawn in the light most favorable to the non-moving party.  *Johnson v. Racnho Santiago Cmty. Coll. Dist.,* 623 F.3d 1011, 1018 (9th Cir.2010).  Unsupported conjecture or conclusory statements, however, cannot defeat summary judgment.  *Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir. 2008).

Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claims, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.

*See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.2000).  If the moving party does not satisfy its initial burden, then the non-moving party has no obligation to produce anything and summary judgment must be denied.  If, however, the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show there exists a genuine issue of material fact.  *Id.* at 1102–1103.

Meta defendants argue that they should be granted summary judgment because: (1) plaintiffs have not shown any factual basis to their allegations showing entitlement to relief, (2) plaintiffs have failed to show that the elements of their causes of action are met, and (3) plaintiffs' claims are barred by Section 230 of the Communications Decency Act and the First Amendment.

This action began with spectacular allegations that OnlyFans had bribed Meta to blacklist adult entertainers who also used other competing sites.  This was, in a way, to "monopolize" the adult entertainment market.  After hearing this allegation at least twice, the Court instructed plaintiffs' counsel to go present proof of such a bribe and to specifically subpoena the banks that were allegedly involved in laundering the bribe.  Plaintiffs' counsel were given the opportunity and eventually reported that they could find no proof of the bribe and withdrew the allegation.  The complaint then shifted to claiming that Meta, for its own reasons, had discriminated against plaintiffs by blacklisting them.  Again, the judge gave ample opportunities to plaintiffs' counsel to prove up this claim.  Again, plaintiffs' counsel failed to find any poof.  This is the basic reason that summary judgment, at long last, must be **GRANTED** to Meta defendants.

### B.    Plaintiffs Have Not Shown Evidence of the Elements of the Claims of Relief

Plaintiffs assert three claims: tort of intentional interference with a contract, intentional interference with business relationships, and unfair competition.  Meta defendants argue that plaintiffs have failed to establish the elements for each of their claims of relief.  As stated above, the crux of plaintiffs' claims for relief depends on identifying who was or was not on Meta's DOI List during the relevant period.  It is disturbing that Meta failed to archive a daily

copy of the DOI List so that in future litigation (or consultations with federal or state law enforcement) it could identify when someone was on the list. It would have been easy to save the list at the end of each day.

Nevertheless, this order has no choice but to grant Meta defendants' motion for summary judgment; it does so in spite of and not because of the questionable recordkeeping. Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to their three claims for relief.

### (i)   Intentional Interference with Contract

The elements for the tort of intentional interference with a contract are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014).

Meta defendants assert that plaintiffs have not produced a valid contract during the relevant time. Although plaintiff Gilbert produced two contracts dating back to 2011-2012, this is prior to the relevant period between 2018 and 2019. Plaintiff Allbaugh produced one contract which was signed in 2020, after the relevant period. Dangaard has produced no contracts at all (Br. at 22). Plaintiffs have not rebutted this point, provided any additional contracts, or cited to any other documents in the record which would purport to serve as a contract during the relevant period.

Moreover, Meta defendants argue that plaintiffs have no evidence as to whether Meta had any knowledge of the contracts. Plaintiff Allbaugh was asked in a deposition whether "Meta ha[d] any way of knowing you had a contract with any of those companies," to which she responded, "I don't think so" (Allbaugh Dep. at 259:20-23). According to defendants, Gilbert and Dangaard have offered no evidence that Meta had any knowledge of these alleged contracts. Nor has plaintiffs stated otherwise in their opposing brief.

As such, this order finds that plaintiffs have not met the elements for their first claim for relief. Therefore, summary judgment is **GRANTED** for plaintiffs' first claim for relief.

### *(ii)* *Intentional Interference with Business Relationships*

The elements of an intentional inference with business relationships claim are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 689 (9th Cir. 1990) (quoting *Youst v. Longo*, 43 Cal. 3d 64, 71 n.6 (1987)).

Defendants argue that this claim fails because plaintiffs have provided no evidence of an economic relationship; plaintiffs have failed to identify a "paying customer who would have continued paying for plaintiffs' services" in the absence of Meta's alleged conduct (Br. at 23). This order agrees. Plaintiffs provide nothing more than speculation in their depositions regarding potential customers they may have gained. Nor have plaintiffs rebutted this point in their opposition brief.

With respect to the second element, defendants assert that plaintiffs have not established that Meta had any knowledge of these alleged business relationships.

Regarding the third element, the 'intentional act' alleged by plaintiffs is the "participation in the scheme" i.e. blacklisting plaintiffs by improperly adding them to Meta's DOI List during the relevant period (Second Amd Compl. 132). As explained above, both sides concede this cannot be determined given the nature of the DOI List.

Regarding the fourth element, defendants argue that plaintiffs would need to establish that Meta engaged in an "independently wrongful act" that caused a disruption in the business relationship. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal.5th 1130, 1139 (2020). Defendants assert that plaintiffs have not identified an independently wrongful act or proved that one occurred at all. Plaintiffs do not rebut or respond to this argument at all in their opposition.

12

United States District Court
Northern District of California

With respect to the last element, defendants maintain that plaintiffs have established no cognizable damages. This order agrees. Although Dangaard vaguely asserts a connection between the alleged actions of Meta and an alleged economic harm, neither she nor have the other plaintiffs provided actual evidence of damages.

Therefore, plaintiffs have not met the elements for this cause of action. As such, summary judgment of the second claim for relief is **GRANTED**.

### (iii) *Unfair Competition*

A claim of unfair competition can be brought under unfair, unlawful, or fraudulent business practices. Cal. Bus. & Prof. Code § 17200. Plaintiffs' complaint does not specify which of type of unfair competition claim they are asserting. Given that plaintiffs refer to defendants' actions as "unfair practices," this order will proceed under the unfair business practice theory.

Plaintiffs assert that defendants have caused the classifying of adult entertainer provider content as "originating from terrorists . . . or a DIO," and "falsely representing [adult entertainer provider content] as originating from terrorists . . . or otherwise DIO to other social media platforms" (Second Amd. Compl. ¶ 136). Plaintiff have presented no admissible proof of this allegation.

As such, defendant's motion for summary judgment for plaintiffs' third claim for relief is **GRANTED**.

Given that this order grants summary judgment as to all three claims for relief, this order need not decide on defendants' additional arguments related to the Communications Decency Act or the First Amendment.

This order will now turn to Meta defendants' motion to strike.

### 2. MOTION TO EXCLUDE PLAINTIFFS' PROFFERED EXPERTS DAWN DANGAARD AND KELLY GILBERT AND STRIKE THEIR EXPERT DECLARATIONS

Plaintiffs have used two of their named plaintiffs, Dawn Dangaard and Kelly Gilbert, as experts in this action. Dangaard and Gilbert have each provided a declaration. Defendants

move to exclude these two named plaintiffs as experts and move to strike their expert testimony.

### A.     Legal Standard

District courts have a "gatekeeping role" to ensure that expert testimony admitted into evidence is both reliable and relevant, and to exclude "junk science." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014).  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; see *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592–94 (1993).

However, an expert is not bound by the *Daubert* factors in cases involving non-scientific testimony.  In that case, "a trial court may consider one or more" of the *Daubert* factors in determining the reliability of nonscientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141.  The proponent of the testimony must establish admissibility by a preponderance of the evidence.  *Bourjaily v. United States,* 483 U.S. 171, 175–176, (1987).

Defendants argue that four areas of Dangaard's and Gilbert's testimony should be stricken.  *First*, defendants seek to strike opinion about disproportionate enforcement between how Instagram moderates content posted by a competitor to OnlyFans as opposed to content relating to OnlyFans.  *Second*, expert opinion which involves interpretating of Meta's terms of service.  *Third*, expert opinion regarding various websites are similar to OnlyFans in that they have a paywall and non-adult content is viewable unless a purchase is made.  *Fourth*, plaintiffs testify as to what percentage of the content on OnlyFans is pornographic.

To support their motion, defendants primarily argue that plaintiffs lack the relevant expertise; although this action involves adult entertainers, "the scheme alleged by plaintiffs is one of . . . misuse of counter-terrorism databases at Meta" (Dkt. No. 238 at 4).  For this reason,

United States District Court
Northern District of California

defendants argue that relevant expertise would include fields such as statistics, data analysis, or web-traffic analysis (*ibid.*).

Plaintiffs Dangaard and Gilbert, argue that their expertise as adult content creators should be held to the admissibility requirements for non-scientific expert testimony based on their personal knowledge (Opp. at 9). Interestingly, however, both plaintiffs concede that "the claims in this case implicate both scientific and non-scientific aspects" (*ibid*.). The following is a brief overview of each declaration.

Gilbert's declaration boils down to three conclusions. *First*, "[b]ased on [her] experience in the industry," content posted to Instagram relating to non-OnlyFans competitor platforms "was more likely to be actioned by Meta whereas content relating to OnlyFans was not actioned in the same way" (Gilbert Decl. ¶ 21). *Second*, that this "preferential treatment" of OnlyFans, "negatively affected the ability of performers on other competing platforms to . . . earn income they would have otherwise been able to earn" (¶ 22). *Third*, that "at least 90% in [Gilbert's] opinion" of OnlyFans is pornographic" (¶ 38).

Likewise, Dangaard's declaration provides four conclusions. The first three conclusions are almost identical to those of Gilbert. *First*, based on Dangaard's "experience in the industry," content posted to Instagram relating to non-OnlyFans competitor platforms "was more likely to be actioned by Meta whereas content relating to OnlyFans was not actioned in the same way" (Dangaard Decl. ¶ 22). *Second*, Dangaard concludes that the supposed "preferential treatment" of OnlyFans, "negatively affected the ability of performers on other competing platforms to . . . earn income they would have otherwise been able to earn" (¶ 23, 35). *Third*, that "at least 90% in [Dangaard's] opinion" of OnlyFans is pornographic" (¶ 34). *Fourth*, Dangaard provided insight surrounding "the economics of the industry" (¶ 44). Here, she explained that subscription-based adult websites "rely entirely on traffic from social media platforms to survive and grow" because social media is free and social media promotions "target" users that are already following a specific performer "and therefore have a higher conversion rate to paying users [versus] buying traffic" (¶¶ 45-47).

This order agrees with plaintiffs that they should not be strictly bound by *Daubert* factors insofar as the fourth conclusion provided by Dangaard is based on personal knowledge as opposed to a scientific methodology.  As noted by defendants, however, the first, second, and third conclusions espoused by both Gilbert and Dangaard are based on some form of data or statistical analysis.  In their respective declarations, neither Gilbert nor Dangaard provide the basis upon which they arrived at the conclusion that Meta was actioning content made by non-OnlyFans adult entertainers more frequently than OnlyFans adult entertainers.  Therefore, the first, second, and third conclusions from both Gilbert's and Dangaard's declarations are **STRICKEN**.

This order finds, however, that the fourth conclusion espoused by Dangaard is based on her specialized knowledge and shall therefore **NOT** be stricken.

## CONCLUSION

Defendant's motion for summary judgment is **GRANTED**.  Defendant's motion to strike is **GRANTED IN PART AND DENIED IN PART**.  There is no claim left to try.  Given that plaintiffs have been unable to produce the predicate data to move past the summary-judgment stage, judgment shall be entered accordingly.  All hearing dates are hereby **VACATED**.

**IT IS SO ORDERED.**

Dated:  September 23, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE